1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5

UNITED STATES OF AMERICA,      )  CR-10-00730 LHK
6                              )
                  PLAINTIFF,    )  SAN JOSE, CALIFORNIA
7                              )
          VS.                  )  FEBRUARY 4, 2014
8                              )
BARBRA ALEXANDER,              )  VOLUME 2
9                              )
                  DEFENDANT.    )  PAGES 208-475
10  _____  )

11                TRANSCRIPT OF PROCEEDINGS
12         BEFORE THE HONORABLE LUCY H. KOH
                UNITED STATES DISTRICT JUDGE
13

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                           BY:  JEFFREY B. SCHENK
16                               DANIEL R. KALEBA
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA  95113

18  FOR THE DEFENDANT:     LAW OFFICES OF PETER A. LEEMING
                           BY:  PETER A. LEEMING
19                         95 SOUTH MARKET STREET, SUITE 300
                           SAN JOSE, CALIFORNIA  95113

20

21

22

23  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

1

2                        INDEX OF PROCEEDINGS

3      OPENING STATEMENT BY MR. KALEBA            P. 216

4      OPENING STATEMENT BY MR. LEEMING           P. 224

5

6                        INDEX OF WITNESSES

7      PLAINTIFF'S

8      **PATTERSON GAUGHF**
              DIRECT EXAM BY MR. SCHENK           P. 230
9             CROSS-EXAM BY MR. LEEMING           P. 283
              REDIRECT EXAM BY MR. SCHENK         P. 347
10

11     **JAMES KASTNER**
              DIRECT EXAM BY MR. KALEBA           P. 351
12            CROSS-EXAM BY MR. LEEMING           P. 384

13     **JOHN SALISBURY**
              DIRECT EXAM BY MR. SCHENK           P. 414
14            CROSS-EXAM BY MR. LEEMING           P. 442

15     **RANDELL OLMSTEAD**
              DIRECT EXAM BY MR. KALEBA           P. 458
16

17

18

19

20

21

22

23

24

25

1

2                          INDEX OF EXHIBITS

3                                       MARKED        ADMITTED

4        PLAINTIFF'S

5        54, PAGES 2 - 7                              250
         82                                           259
6        11                                           264
         12                                           267
7        13                                           269
         38                                           270
8        39                                           360
         81                                           363
9        60                                           418
         37                                           426
10       84A                                          464

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1     SAN JOSE, CALIFORNIA                    FEBRUARY 4, 2014

 2                    P R O C E E D I N G S

 3         (JURY OUT AT 9:04 A.M.)

 4             THE COURT:  GOOD MORNING AND WELCOME.  MR. LOUYEH

 5     WOULD LIKE TO BE EXCUSED FROM THE JURY.  HE SAYS THAT HE WILL

 6     NOT BE PAID BY HIS EMPLOYER.

 7             SO WE CAN BRING HIM OUT AND ASK HIM QUESTIONS, OR IF YOU

 8     ALL WANT TO STIPULATE TO LET HIM GO, WE'LL BE DOWN TO ONE

 9     ALTERNATE IN A FOUR WEEK TRIAL, WHICH IS NOT MY IDEAL

10     SITUATION, BUT HE'S CLEARLY INTENT ON GETTING OFF.

11             MR. KALEBA:  WAS THIS THE GENTLEMAN WHOSE WIFE WAS

12     THE BROKEN ELBOW AND THE PRESCHOOL TEACHER?

13             THE COURT:  SHE'S THE PRESCHOOL TEACHER, THAT'S

14     RIGHT.

15             WHAT WOULD YOU LIKE ME TO DO?  DO YOU WANT ME TO VOIR DIRE

16     HIM TO SEE HOW MUCH OF AN ECONOMIC HARDSHIP IT IS FOR HIM?

17             MR. SCHENK:  WE DON'T OBJECT TO LETTING HIM GO.

18             MR. LEEMING:  I DON'T THINK WE'LL OBJECT, YOUR HONOR.

19     THE LAST THING WE WANT IS SOMEBODY WHO REALLY DOES NOT WANT TO

20     BE ON THE JURY.

21             THE COURT:  TO BE HERE?  I AGREE WITH YOU.

22             ALL RIGHT.  THEN LET'S BRING IN OUR WHOLE JURY.

23             AND WE HAVE REVISED JURY INSTRUCTIONS FOR THEM.

24             THE CLERK:  SO BRING EVERYBODY IN AND THEN YOU'LL --

25             THE COURT:  YEAH.  I MEAN, DID MR. LOUYEH -- MAYBE WE
```

```
1    SHOULD AT LEAST TALK TO HIM.  LET'S HAVE HIM COME IN FOR JUST A

2    MINUTE.

3              THE CLERK:  OKAY.

4          (JUROR LOUYEH PRESENT.)

5              JUROR:  GOOD MORNING.

6              THE COURT:  OKAY.  GOOD MORNING, SIR.

7          SO YOUR EMPLOYER WILL NOT PAY YOU DURING YOUR JURY

8    SERVICE?

9              JUROR:  YES.

10             THE COURT:  OKAY.  DID YOU CALL THEM OVER THE LUNCH

11   HOUR YESTERDAY OR FIND THAT OUT -- PLEASE TAKE A SEAT --

12             JUROR:  ACTUALLY, YESTERDAY AFTER I LEAVE HERE, I

13   WENT BACK TO WORK AND I ASKED THEM, "OKAY, I HAVE TO GO TO JURY

14   DUTY FOR MAYBE, I DON'T KNOW, FOR TWO -- FOR MAYBE, LIKE, TEN

15   DAYS."

16         AND THEY SAID, "WE ARE NOT PAYING YOU AND YOU HAVE TO TALK

17   TO YOUR JUDGE."

18       OKAY.

19             THE COURT:  OKAY.  WOULD IT BE A FINANCIAL HARDSHIP

20   FOR YOU NOT TO GET PAID BY YOUR EMPLOYER?

21             JUROR:  ALL RIGHT.

22             THE COURT:  NO.  WOULD THAT BE A FINANCIAL HARDSHIP

23   FOR YOU?  SO DID YOU WORK LAST NIGHT?

24             JUROR:  LAST NIGHT?

25             THE COURT:  YES.  WHEN YOU SAID YOU WENT BACK TO
```

1    WORK?

2              JUROR:  YES.

3              THE COURT:  OH, YOU WORKED LAST NIGHT?

4              JUROR:  NO, NO.  I HAVE TO GO TO THEM, ASK THEM,

5    OKAY, THEY ARE PAYING TO ME OR NO?  THAT'S WHAT I HAVE TO ASK

6    THEM.

7              THE COURT:  I SEE.  OKAY.  WOULD IT BE A FINANCIAL

8    HARDSHIP FOR YOU NOT TO GET PAID DURING THE DAYS OF THIS TRIAL?

9    YOU WOULD ONLY GET THE, IS IT $44, $45 OF THE --

10             JUROR:  I KNOW.  BUT I'M JUST WORKING WITH

11   COMMISSION.  IF I CANNOT SELL ANY CAR, I CANNOT GET ANY MONEY.

12   THAT'S THE DEBATE.

13             THE COURT:  WOULD THAT BE A FINANCIAL HARDSHIP FOR

14   YOU?  FOR YOU AND YOUR FAMILY, WOULD IT BE A FINANCIAL HARDSHIP

15   FOR YOU NOT TO BE ABLE TO GET ANY COMMISSIONS DURING --

16             JUROR:  SO CAN --

17             THE COURT:  -- THESE NINE DAYS?

18             JUROR:  EXPLAIN TO ME.  I CANNOT UNDERSTAND WHAT

19   YOU'RE SAYING.

20             THE COURT:  OKAY.  WHAT ARE YOUR NORMAL WORKING

21   HOURS?

22             JUROR:  FIVE DAYS ON THE WEEK.

23             THE COURT:  UM-HUM.

24             JUROR:  SOME DAY I'M WORKING 9:00 TO 6:00, SOME DAY

25   WORKING FROM 12:00 TO 9:00.

```
1              THE COURT:  I SEE.

2              JUROR:  YES.

3              THE COURT:  OKAY.  ALL RIGHT.  SO IF YOU DID NOT SELL

4     CARS FOR NINE DAYS, MAYBE TEN DAYS, WOULD THAT BE FINANCIALLY

5     DIFFICULT FOR YOU AND YOUR FAMILY?

6              JUROR:  I DON'T UNDERSTAND.  SO I HAVE TO WORK -- I

7     HAVE TO SELL THE CAR AND I CAN GET A COMMISSION, LIKE THAT.

8     AND IF I CANNOT SELL IT -- BUT USUALLY FOR THE ONE MONTH, I'M

9     SELLING, LIKE, MAYBE 10, 12.  AND THE COMMISSION FOR THE CAR

10    DEPEND IS, LIKE, MAYBE 200, 150, 300, DEPEND.  I CANNOT FIND

11    OUT, FOR EXAMPLE, THIS CAR HOW MUCH, THAT CAR HOW MUCH.

12         SO THEY PAY TO ME AND ALL MY PAYCHECK IS, LIKE, MAYBE

13    SOMETIMES IT'S 3,000, 2,000, 2,500, SOMETIMES LIKE THAT.

14             THE COURT:  OKAY.  BUT IT WOULD BE DIFFICULT FOR YOU

15    NOT TO BE ABLE TO SELL CARS FOR NINE DAYS, TEN DAYS?

16             JUROR:  PROBABLY I'M WORKING FOR THIS DEALER ALMOST

17    TWO YEARS, ACTUALLY EXACTLY TWO YEARS.  SO EVERY MONTH I'M

18    SELLING, LIKE, MAYBE 10 TO 15, LIKE THAT.

19             THE COURT:  UM-HUM.

20             JUROR:  SO IF I CANNOT SELL THAT MUCH, PROBABLY JUST

21    CLEAR OUT.

22             THE COURT:  YOU MIGHT GET LAID OFF?

23             JUROR:  YES.

24             THE COURT:  ALL RIGHT.  THEN I'M GOING TO EXCUSE YOU.

25             JUROR:  THIS HAPPENED TO ANOTHER PERSON.  THEY CANNOT
```

1    SELL IT, ONE MONTH, TWO MONTHS, THEY GIVE TO YOU THE PERSON

2    LIKE THAT, AND THEN GONE.

3              THE COURT:  ALL RIGHT.  I'M GOING TO EXCUSE YOU FROM

4    THE JURY.  THANK YOU FOR SERVING AS OUR JUROR.

5              JUROR:  THANK YOU SO MUCH.

6              THE COURT:  SO CAN YOU GO AHEAD --

7         CAN YOU LET HIM DO THE PAPERWORK HERE OR GO DOWNSTAIRS?

8         OKAY.  GO TO THE SECOND FLOOR AND TURN IN YOUR JUROR BADGE

9    AND THE INSTRUCTIONS.

10             THE CLERK:  I'LL TAKE THE BADGE.

11             JUROR:  OKAY.  SORRY FOR THAT.  THANK YOU.

12             THE COURT:  ALL RIGHT.  THANK YOU.

13        CAN YOU BRING IN THE REST OF OUR JURORS?

14             THE CLERK:  YES.

15        (JURY IN AT 9:09 A.M.)

16             THE COURT:  WELCOME BACK.  GOOD MORNING.

17        WE HAVE LOST MR. LOUYEH.  HE HAD A HARDSHIP DEVELOP.

18        SO MR. MAO IS NOW A JUROR AND NOT AN ALTERNATE.

19        SO EVERYONE ON THE SECOND ROW, MS. MCBRIDE, YOU CAN ALL

20   SLIDE DOWN ONE NOW.  MR. LEE, YOU CAN TAKE SEAT NUMBER 9.

21   MS. NGUYEN, SEAT NUMBER 10.

22        SO MR. MAO, YOU NOW WILL BE DELIBERATING.  YOU ARE NO

23   LONGER AN ALTERNATE.  YOU ARE NOW ONE OF THE 12.

24             JUROR:  OKAY.

25             THE COURT:  OKAY?  ALL RIGHT.  THANK YOU.

```
 1          SO YOU CAN ALL JUST SLIDE DOWN ONE SEAT ON THE SECOND ROW

 2     SINCE WE'VE LOST MR. LOUYEH.

 3          SO YOU'VE RECEIVED A REVISED COPY OF THE PRELIMINARY JURY

 4     INSTRUCTIONS AND I MADE THE CORRECTIONS TO INSTRUCTION NUMBER

 5     1.2.

 6          OKAY.  NOW, WE ARE GOING TO BEGIN THIS MORNING -- PLEASE

 7     TAKE A SEAT.  WELCOME TO EVERYONE.

 8          EACH SIDE MAY MAKE AN OPENING STATEMENT, BUT IS NOT

 9     REQUIRED TO DO SO.  I REMIND YOU THAT AN OPENING STATEMENT IS

10     NOT EVIDENCE.

11          ALL RIGHT.  GO AHEAD, PLEASE.

12          MR. KALEBA:  THANK YOU.

13          (MR. KALEBA GAVE HIS OPENING STATEMENT ON BEHALF OF THE

14     GOVERNMENT.)

15          MR. KALEBA:  GOOD MORNING.  I'M DANIEL KALEBA.  I

16     REPRESENT THE UNITED STATES.  YOU MET MY COLLEAGUE, MR. SCHENK,

17     YESTERDAY.

18          THIS CASE IS ABOUT PROMISES.  YESTERDAY THE JUDGE

19     DESCRIBED WHAT THE CRIMINAL CHARGES ARE THAT ARE INVOLVED.  YOU

20     HEARD BANK FRAUD, WIRE FRAUD, MONEY LAUNDERING.

21          BUT WHAT THIS CASE REALLY IS ABOUT IS PROMISES AND HOW

22     THOSE PROMISES WERE BROKEN.

23          MS. ALEXANDER, THE DEFENDANT, MADE PROMISES TO PEOPLE

24     ABOUT HOW SHE WAS GOING TO INVEST THEIR MONEY.  PEOPLE RELIED

25     ON THOSE PROMISES AND THEN SHE BROKE THOSE PROMISES.  THAT'S
```

1       WHAT THIS CASE IS ABOUT.

2           LET ME DESCRIBE AN OUTLINE ABOUT WHAT THE CASE IS GOING TO

3       BE THROUGH THE EVIDENCE.

4           THE EVIDENCE WILL SHOW MS. ALEXANDER WAS LIVING IN

5       MONTEREY, CALIFORNIA.  SHE WAS INVOLVED IN THE BUSINESS OF REAL

6       ESTATE.  AND SHE AND A PARTNER, A WOMAN BY THE NAME OF

7       BETH PINA, WHO WILL TESTIFY IN THIS TRIAL, FORMED A BUSINESS

8       CALLED A&P PROPERTIES, AND THE BUSINESS WAS TO MAKE REAL ESTATE

9       LOANS.

10          THEY WEREN'T A BANK, LIKE A TRADITIONAL BANK WHO MADE

11      LOANS FOR SOMEONE BUYING A HOUSE.  INSTEAD, THEY WOULD GIVE

12      LOANS TO CONTRACTORS, PAINTERS, LANDSCAPERS, OTHER PEOPLE WHO

13      WANTED TO FIX UP A HOUSE AND SELL IT.  SO THESE WOULD BE

14      SHORT-TERM LOANS, HIGH INTEREST RATE, THAT WOULD BE INVOLVED IN

15      REAL ESTATE.  THOSE WERE THE BORROWERS SHE WAS GOING TO LEND

16      MONEY TO.

17          SHE POOLED MONEY TOGETHER FROM OTHER PEOPLE, THESE WERE

18      THE INVESTORS, TO FUND THESE LOANS.

19          WHY WOULD SOMEONE WANT TO DO THIS?  WHAT'S THE APPEAL IF

20      YOU'RE AN INVESTOR?

21          WELL, THE EVIDENCE WILL SHOW THAT MS. ALEXANDER AND HER

22      PARTNERS PROMISED, FIRST, THAT THESE LOANS WERE GOING TO BE

23      INVESTED IN REAL ESTATE, AND THE EVIDENCE WILL SHOW, FROM THE

24      INVESTORS' SIDE, THAT SOUNDED LIKE A PRETTY SAFE INVESTMENT.

25      IT'S SOMETHING THAT'S TANGIBLE.  IT'S REAL.  IT'S NOT -- IT HAS

1    SOME VALUE TO IT.  AND THEY WANTED TO BE INVOLVED IN REAL

2    ESTATE.

3            FURTHERMORE, SHE SAID THESE INVESTMENTS WOULD BE SECURED

4    BY A DEED OF TRUST.  AND IF ANYONE'S EVER BORROWED A LOAN

5    BEFORE, OR TAKEN OUT A MORTGAGE, YOU KNOW THAT THE BANK, WHEN

6    IT LENDS THE MONEY, WILL SAY, "WELL, YOU KNOW, JUST IN CASE

7    THIS LOAN GOES BAD, THERE'S A DEED OF TRUST.  THE BANK IS

8    PROTECTED.  WE CAN GO AND FORECLOSE ON THE HOUSE."

9            YOU MAY HAVE HEARD THAT TERM, "FORECLOSURE."

10           SO SHE PROMISED THE INVESTORS THAT THESE INVESTMENTS WOULD

11   BE SECURED.

12           SHE ALSO PROMISED A REALLY HIGH RATE OF RETURN, 12

13   PERCENT.

14           SHE ALSO PROMISED THE INVESTORS THAT THE INVESTORS WOULD

15   GET PAID BEFORE SHE AND HER PARTNERS WOULD GET PAID, SO THEY

16   WOULD GET SOMETHING CALLED PRIORITY.

17           THE EVIDENCE WILL ALSO SHOW THAT SHE PROMISED THE

18   INVESTORS THAT THE EXPENSES WOULD BE KEPT LOW, AND IN THE

19   INVESTMENT DOCUMENTS THAT WE'LL GO THROUGH, SHE PROMISED

20   INVESTORS THAT THE COMPANY EXPENSES WOULD BE ABOUT $15,000, AND

21   THAT THAT $15,000 TO RUN THIS BUSINESS WOULD BE PAID FOR BY THE

22   PARTNERS.

23           AND THEN SHE PROMISED THAT ANY MONEY THAT SHE AND HER

24   PARTNERS TOOK WOULD BE COMING FROM THE BORROWERS, THAT SHE

25   WOULDN'T TAKE MONEY FROM THE INVESTORS.

1          THE EVIDENCE WILL SHOW THAT MS. ALEXANDER BROKE ALL OF

2     THOSE PROMISES, AND THAT'S WHY WE'RE IN FEDERAL COURT TODAY,

3     BECAUSE IT'S A CRIME TO MAKE PROMISES TO PEOPLE, TO GET THEIR

4     MONEY, AND THEN TO DO SOMETHING DIFFERENT WITH THAT MONEY.

5          SO LET ME TURN TO THE BROKEN PROMISES.

6          SO THE BIG ONE, BROKEN PROMISE NUMBER 1:  THE EVIDENCE

7     WILL SHOW THAT MS. ALEXANDER DID NOT INVEST THE MONEY IN REAL

8     ESTATE.  SOME OF IT DID, BUT MUCH OF IT DID NOT.

9          SO WHERE DID THE MONEY GO?

10         THE EVIDENCE WILL SHOW, AND WE'LL DO THIS THROUGH BANK

11    RECORDS, WE'LL DO IT THROUGH FORMER EMPLOYEES -- ALTHOUGH THEY

12    WERE CALLED VENDORS, NOT EMPLOYEES AT THE TIME -- THE MONEY

13    WENT TO MS. ALEXANDER.  IT WENT TO HER PARTNER, MS. PINA.

14    THERE WAS ALSO A THIRD PARTNER, A MAN BY THE NAME OF

15    MICHAEL SWANSON.  THE THREE OF THEM RAN THEIR BUSINESS AND THEY

16    STARTED TAKING MONEY THEMSELVES.

17         AND REMEMBER WHEN I SAID THEY PROMISED THE INVESTORS THAT

18    THE EXPENSES WOULD ONLY BE $15,000?  THE EVIDENCE WILL SHOW

19    THAT THEY WERE TAKING OUT $30,000 A MONTH JUST FOR THE THREE OF

20    THEM PAYING THEMSELVES.

21         BROKEN PROMISE NUMBER 2:  SHE PROMISED THAT THESE LOANS

22    WOULD BE SECURED, RIGHT, BY REAL ESTATE, AND THEY WOULD TAKE

23    OUT DEEDS OF TRUST.

24         WELL, THAT JUST DIDN'T HAPPEN.  THESE INVESTMENTS WEREN'T

25    SECURED.  A LOT OF LOANS THAT WERE MADE BY THE COMPANY -- AND I

```
1    USE THAT TERM REALLY LOOSELY -- WEREN'T SECURED AT ALL, AND

2    THEY CERTAINLY WEREN'T SECURED BY REAL ESTATE.

3         SHE TOOK -- SHE MADE LOANS TO, AMONG OTHER THINGS, HER

4    RADIO SHOW CALLED MONEY DOTS, AND THIS WAS A PERSONAL PET

5    PROJECT THAT SHE HAD.  IT HAD ABSOLUTELY NOTHING TO DO WITH

6    REAL ESTATE.  AND THE EVIDENCE WILL SHOW THAT SHE NEVER TOLD

7    THE INVESTORS THAT SHE WAS GOING TO GIVE THEIR MONEY TO

8    MONEY DOTS, HER RADIO PROGRAM.

9         AND THE EVIDENCE WILL SHOW THAT IF THE INVESTORS HAD KNOWN

10   ABOUT THAT, THEY NEVER WOULD HAVE GIVEN HER MONEY TO BEGIN

11   WITH.  THEY THOUGHT, FROM THE INVESTOR PERSPECTIVE, THAT THEY

12   WERE INVESTING IN REAL ESTATE.

13        BROKEN PROMISE NUMBER 3:  COMPENSATION.  LIKE I SAID, SHE

14   PROMISED TO KEEP EXPENSES LOW AND IT WAS MUCH, MUCH HIGHER.

15        FURTHERMORE, SHE PROMISED THAT THE INVESTORS WOULD GET

16   PAID FIRST AND THAT THE PARTNERS, THE PEOPLE RUNNING THIS

17   BUSINESS, WOULD GET PAID FROM WHATEVER MONEY THEY MADE ON THE

18   LOANS.

19        SO THINK OF IT THIS WAY:  A FARMER SAYS, "LET ME -- YOU

20   KNOW, GIVE ME YOUR SEEDS.  LET ME RUN THIS BUSINESS FOR YOU.

21   LET ME PLANT YOUR CROPS."  HE'S TELLING A BUNCH OF OTHER

22   FARMERS, "LET ME RUN THIS BUSINESS FOR YOU AND I'LL PLANT YOUR

23   CROPS.  I HOPE TO HAVE A GOOD YEAR AND, AT THE END OF THE YEAR,

24   I'LL PROMISE YOU A CERTAIN RATE OF RETURN.  I'LL SAY 12

25   PERCENT.  BUT WHATEVER I CAN MAKE ABOVE THAT 12 PERCENT I GET
```

1    TO KEEP BECAUSE I'M THE ONE WHO'S GOING TO BE DOING ALL THE

2    WORK RUNNING THIS FARM."

3         AND SO HE TAKES SEEDS AND HE USES LAND FROM OTHER PEOPLE

4    TO RUN THE OPERATION.

5         WELL, WHAT HAPPENED HERE?  ALEXANDER DIDN'T PLANT ALL THE

6    SEEDS.  SHE DIDN'T USE ALL THE CROPS.  INSTEAD, SHE TOOK SEEDS

7    THAT CAME IN, NEVER PLANTED THEM, SPENT THE MONEY HERSELF, GAVE

8    SEEDS AWAY, DIDN'T MAKE ANY MONEY.

9         SO THEN AT THE END OF THE HARVEST WHEN IT'S TIME TO

10   COLLECT THE CROPS, TO SEE WHAT HAS GROWN, THERE JUST WASN'T

11   ENOUGH THERE.  THERE WASN'T ENOUGH MONEY TO GIVE THE INVESTORS

12   THEIR 12 PERCENT BECAUSE SHE DIDN'T USE ALL THE SEEDS, SHE

13   DIDN'T USE ALL THE LAND.  INSTEAD, SHE USED IT FOR HERSELF,

14   MUCH OF IT.

15        AND FURTHERMORE, SHE WAS PAYING HERSELF DURING THE CROP

16   SEASON.  WHEN THESE CROPS WERE SUPPOSED TO BE IN THE GROUND --

17   SHE WAS THE ONE, YOU KNOW, MAKING MONEY FOR EVERYBODY -- SHE

18   WAS TAKING MONEY DURING THAT PERIOD OF TIME RATHER THAN AT THE

19   END.

20        SO LET ME DESCRIBE AN OUTLINE OF THE WITNESSES AND HOW

21   WE'RE GOING TO PROVE MS. ALEXANDER'S GUILT BEYOND A REASONABLE

22   DOUBT.

23        THE FIRST IS YOU'RE GOING TO HEAR FROM INVESTORS.  WE'RE

24   GOING TO CALL A NUMBER OF INVESTORS WHO PARTICIPATED IN THIS

25   INVESTMENT.  THEY'LL TELL YOU THE REASONS WHY THEY THOUGHT THIS

1    WAS A GOOD INVESTMENT AND WHY THEY WANTED TO WORK WITH

2    MS. ALEXANDER IN PARTICULAR, AND THEY'LL TELL YOU HOW MUCH

3    MONEY THEY MADE AND WHY THEY DID IT.

4         THEY'LL ALSO DESCRIBE WHAT HAPPENED WHEN THINGS WENT BAD,

5    BECAUSE IT DID GO BAD.  THE EVIDENCE WILL SHOW THAT THE MONEY

6    WAS GONE.  IT DISAPPEARED.  THEY DIDN'T GET THEIR MONEY BACK.

7         WE'LL ALSO PRESENT EVIDENCE FROM EMPLOYEES.  YOU'LL HEAR

8    FROM THE PARTNERS.

9         I MENTIONED EARLIER MS. PINA, ONE OF HER FORMER PARTNERS.

10   SHE'LL TESTIFY.  SHE PLED GUILTY TO COMMITTING A FELONY.  SHE'S

11   GOING TO DESCRIBE WHAT SHE DID AND HER ROLE IN THIS CONSPIRACY.

12        YOU'LL ALSO HEAR FROM OTHER EMPLOYEES OF THE COMPANY,

13   BOOKKEEPERS, A PERSON WHO WAS BROUGHT IN TO HELP MANAGE THESE

14   LOANS.  THEY'LL DESCRIBE WHAT THEY DID FOR MS. ALEXANDER.

15        YOU'LL GET A CHANCE TO LOOK AT THE COMPANY'S BUSINESS

16   RECORDS, THE BANK RECORDS WHICH WILL SHOW CHECKS BEING WRITTEN

17   FROM THE COMPANY TO THE PARTNERS DURING THE CONSPIRACY PERIOD

18   OF TIME WHEN THAT MONEY WAS SUPPOSED TO HAVE BEEN INVESTING IN

19   REAL ESTATE LOANS.

20        AND YOU'LL BE ABLE TO SEE FOR YOURSELF -- FURTHERMORE,

21   YOU'LL BE ABLE TO FOLLOW THE EVIDENCE YOURSELF, FOLLOW THE

22   MONEY.  THERE'S A SAYING THAT OFTEN TIMES YOU'LL HEAR IN

23   CRIMINAL MONEY CASES, WHAT HAPPENED TO THE MONEY?  HOW DO YOU

24   KNOW THE PERSON'S GUILTY?  WELL, FOLLOW THE MONEY.  WHAT

25   HAPPENED TO IT?

1        AND WHAT SHE DID WITH THE MONEY, IS THAT WHAT SHE PROMISED

2    PEOPLE?  THE ANSWER IS NO.  SHE BROKE THOSE PROMISES.

3        I SAID AT THE BEGINNING, THE CHARGES IN THIS CASE ARE

4    CONSPIRACY.  THERE'S MAIL FRAUD.  THERE'S WIRE FRAUD.  THERE'S

5    SECURITIES FRAUD.  THERE'S MONEY LAUNDERING.

6        AT THE END OF THE CASE, THE JUDGE WILL GIVE YOU

7    INSTRUCTIONS ON WHAT THOSE CHARGES ARE.  SHE'LL TELL YOU WHAT

8    THE LAW IS.

9        YOU'LL THEN HAVE AN OPPORTUNITY TO CONSIDER THE EVIDENCE,

10   THE FACTS THAT HAVE BEEN PRESENTED, AND DETERMINE FOR YOURSELF

11   WHETHER OR NOT THE GOVERNMENT HAS PROVEN ITS CASE BEYOND A

12   REASONABLE DOUBT.

13       BUT REMEMBER, AS YOU'RE HEARING THE TESTIMONY, THINK ABOUT

14   IT.  THIS IS A CASE THAT IS ABOUT PROMISES.  WERE THE INVESTORS

15   PROMISED ONE THING AND DID MS. ALEXANDER AND HER PARTNERS DO

16   SOMETHING DIFFERENT THAN THOSE PROMISES?  DID THEY BREAK THOSE

17   PROMISES?

18       AND AT THE CONCLUSION OF THIS CASE, AFTER YOU'VE HEARD ALL

19   THE EVIDENCE, WE'RE GOING TO ASK YOU TO RETURN A VERDICT OF

20   GUILTY ON ALL COUNTS FOR THOSE BROKEN PROMISES.

21       THANK YOU.

22            THE COURT:  ALL RIGHT.  MR. LEEMING.

23            MR. LEEMING:  THANK YOU.

24            JUROR:  EXCUSE ME.  CAN I BORROW A PEN?

25            THE COURT:  YES, A PEN.

```
 1              THE CLERK:  ANYBODY ELSE NEED ONE?

 2              THE COURT:  ANYONE ELSE NEED A PEN?

 3              JUROR:  THANK YOU.

 4          (MR. LEEMING GAVE HIS OPENING STATEMENT ON BEHALF OF THE

 5      DEFENDANT.)

 6              MR. LEEMING:  GOOD MORNING EVERYBODY.  I WANT TO

 7      THANK YOU ALL FOR BEING HERE.  I KNOW PEOPLE HAVE BUSY LIVES

 8      AND IT'S A LOT TO TAKE A COUPLE WEEKS OR THREE WEEKS OUT OF

 9      YOUR LIVES, BUT WHAT YOU DO IS REALLY IMPORTANT HERE.

10              THE GOVERNMENT HAS TOLD YOU, THE JUDGE HAS TOLD YOU, AND

11      I'M GOING TO TELL YOU, WHAT I SAY RIGHT NOW IS NOT EVIDENCE.

12      WHAT YOU JUST HEARD IS NOT EVIDENCE.

13              WHAT YOU DECIDE THIS CASE ON COMES FROM RIGHT HERE, THE

14      WITNESSES.  AND YOU DECIDE WHAT HAPPENED.  WE DON'T.

15              WHAT YOU JUST HEARD FROM THE GOVERNMENT IS A VERY

16      SIMPLIFIED DESCRIPTION OF SOME VERY COMPLEX EVENTS.  IT'S ABOUT

17      PROMISES, YOU'VE BEEN TOLD.

18              WELL, THERE WERE WRITTEN AGREEMENTS THAT PEOPLE SIGNED.

19      LOOK AT THOSE WRITTEN AGREEMENTS, I'M GOING TO ASK YOU.

20              YOU'RE GOING TO HEAR A LOT ABOUT MS. ALEXANDER IN THE

21      COMING DAYS, BUT I WANT TO TALK BASICALLY ABOUT HER BUSINESSES.

22              SHE WAS A MORTGAGE BROKER AND IN REAL ESTATE IN THE

23      MONTEREY AREA FOR MORE THAN 20 YEARS.  IT WAS HER COMPANY.  IT

24      WAS CALLED GCF.  SHE HAD POSITIVE RELATIONSHIPS, SUCCESSFUL

25      RELATIONSHIPS WITH MANY PEOPLE.  SHE HAD REPEAT CUSTOMERS.
```

1    PEOPLE WERE HAPPY.  SHE HAD POSITIVE, CONSTRUCTIVE

2    RELATIONSHIPS WITH PEOPLE IN THE LENDING INDUSTRY.  THEY WOULD

3    COME BACK.

4         THE FIRST WITNESS YOU'RE GOING TO HEAR FROM, MR. GAUGHF,

5    WAS A REGULAR LENDER.  HE WAS A -- HE WAS THE INTERFACE BETWEEN

6    THE BANKS AND MS. ALEXANDER'S CUSTOMERS.

7         SHE PUT PEOPLE IN HOUSES.  IT WAS A GOOD MODEL FOR HER AND

8    IT WORKED.

9         SHE ALSO HAD A SEPARATE BUSINESS CALLED MONEY DOTS, WHICH

10   WAS A RADIO SHOW, AND IT BEGAN IN A SMALL RADIO STATION IN

11   SANTA CRUZ ON SATURDAY MORNINGS, BUT IT BEGAN TO GET EXPANDED

12   AND EVENTUALLY IT WAS PICKED UP BY CLEAR CHANNEL RADIO AND WAS

13   SYNDICATED TO OVER 200 RADIOS ALL OVER THE COUNTRY, RADIO

14   STATIONS.

15        THAT WAS HER PASSION.  YOU'RE GOING TO HEAR ABOUT THAT.

16   SHE WAS INTO IT.

17        SO WHAT HAPPENED?

18        WELL, THE STORY KIND OF BEGINS WHEN MS. ALEXANDER MEETS A

19   PERSON NAMED BETH PINA, WHO WAS A BOOKKEEPER, IN ABOUT 2001.

20   MS. PINA WAS WORKING FOR A GENTLEMAN CALLED DUSTIN COOK, AND

21   DUSTIN COOK HAD A CONSTRUCTION BUSINESS, AND THROUGH THAT

22   PERSON SHE MET BARBARA AND EVENTUALLY STARTED DOING BOOKS FOR

23   BARBRA ALEXANDER.

24        NOW, BARBARA ENCOURAGED BETH TO GET A REAL ESTATE LICENSE.

25   AND THEY GOT ALONG.  THEY WERE FRIENDS.  AND EVENTUALLY IN

 1      ABOUT 2004, 2005, MS. PINA GOT HER REAL ESTATE LICENSE AND

 2      BEGAN WORKING IN BARBARA'S LOAN BUSINESS.

 3          AND ABOUT THAT TIME THEY STARTED DOING WHAT ARE CALLED

 4      PRIVATE MONEY LOANS, OR HARD MONEY LOANS.  AND A HARD MONEY

 5      LOAN IS A DIFFERENT -- IT'S NOT WHAT YOU GET FROM A BANK.  YOU

 6      HAVE A PERSON WHO HAS SOME MONEY, AND THE WAY THE BUSINESS

 7      OPERATED THEN WAS THAT THE INDIVIDUAL WOULD COME AND INVEST

 8      SOME MONEY.  THAT INDIVIDUAL'S MONEY WOULD BE PUT ON A DEED OF

 9      TRUST, SECURED AGAINST PROPERTY, WITH THE INDIVIDUAL'S NAME ON

10      IT.  IT WORKED.

11          SO, AGAIN, WHAT HAPPENED?

12          WELL, THERE'S A PERSON NAMED MIKE SWANSON, AND

13      MIKE SWANSON KNEW BARBARA FROM WAY BACK.  SHE LOST TOUCH WITH

14      HIM IN THE EARLY 2000S, BUT THE END OF 2005, MR. SWANSON COMES

15      BACK.

16          AND MR. SWANSON HAS A SERIOUS FINANCIAL BACKGROUND.

17      MR. SWANSON HAS A DEGREE FROM BERKELEY.  MR. SWANSON HAS AN

18      M.B.A.  MR. SWANSON HAS A BIG FINANCIAL IDEA, AND HE COMES IN

19      AND TELLS BARBARA AND BETH, "WE'RE GOING TO MAKE THIS BUSINESS

20      GROW.  I HAVE BIG IDEAS AND I HAVE NEW STRUCTURE FOR YOUR

21      COMPANY."

22          SO MIKE HELPED FORM A NEW COMPANY, AND THE NEW COMPANY WAS

23      CALLED GCF LIMITED, AND IT WAS A POOLED INVESTMENT FUND.

24          AND I SAY "HELPED."  HE WAS ACTUALLY INSTRUMENTAL IN

25      FORMING THIS COMPANY.  HE MET WITH A LAWYER NAMED NEIL TICKER

```
 1        IN MONTEREY, WHO DID A LOT OF CORPORATE STUFF, AND MIKE AND

 2     MR. TICKER GOT TOGETHER AND THEY DEVELOPED A SERIES OF

 3     DOCUMENTS.

 4        ONE WAS AN INVESTOR SUITABILITY SURVEY, WHICH YOU'RE GOING

 5     TO HEAR ABOUT, THAT PEOPLE SIGNED THAT SAID "I'M A QUALIFIED

 6     INVESTOR.  I CAN AFFORD TO LOSE THIS MONEY."

 7        THERE'S A PRIVATE PLACEMENT MEMORANDUM, WHICH TALKS ABOUT

 8     SOME OF THE USES OF THE MONEY, AND IT'S NOT AS SIMPLE AS WHAT

 9     YOU JUST HEARD.

10        THERE'S AN OPERATING AGREEMENT, AND THAT OPERATING

11     AGREEMENT, AMONG OTHER THINGS, PERMITS THE PARTNERS, IN

12     WRITING, TO BORROW MONEY FROM THE FUND.

13        NOW, IN ORDER TO UNDERSTAND MR. SWANSON'S ENTHUSIASM FOR

14     THIS NEW BUSINESS MODEL, YOU HAVE TO GO BACK TO 2006, WHICH WAS

15     A TIME THAT WAS PASSED, BUT IT'S A CRAZY TIME IN BUSINESS

16     FINANCE.  BANKS WERE LENDING FREELY.  PEOPLE WERE INVESTING IN

17     ALL KINDS OF THINGS, AND PARTICULARLY SECURITIES.  THE HOME

18     LOANS WERE BEING SLICED UP AND RESOLD AND PACKAGED AND ALL

19     KINDS OF STUFF WAS HAPPENING IN THE FINANCIAL WORLD.

20        AND HOW EXCITED WAS MICHAEL SWANSON ABOUT THIS?  I'M GOING

21     TO READ YOU A PORTION OF AN E-MAIL THAT I THINK IS GOING TO

22     COME INTO EVIDENCE -- THAT I KNOW IS GOING TO COME INTO

23     EVIDENCE -- AND THIS IS AN E-MAIL FROM MR. SWANSON TO MS. PINA.

24        AND MS. PINA MAY DENY IT TODAY, BUT IN EARLIER TESTIMONY,

25     YOU WILL HEAR THAT MS. PINA REALLY WANTED MIKE IN THIS
```

```
 1    BUSINESS.  SHE PUSHED FOR IT.  SHE KEPT ASKING BARBARA TO BRING

 2    MIKE IN.

 3         SO WHAT HE'S TALKING ABOUT IS EXPANDING THE BUSINESS BY

 4    USING WHAT'S CALLED A WAREHOUSE LINE OF CREDIT.

 5         SEE, BARBARA HAS A SMALL OPERATION AND, AS I SAID BEFORE,

 6    IT WAS WORKING FOR HER.

 7         BUT MIKE THINKS, "WELL, WAIT A MINUTE.  IF WE CAN GET A

 8    LARGE BANK TO GIVE US A BUNCH OF MONEY AND WE CAN INVEST THAT

 9    AND KEEP IT GOING, IT'S GOING TO GET HUGE."

10         AND THIS IS WHAT HE SAYS ABOUT THAT.  THIS IS AN E-MAIL

11    FROM 2006, AS I SAID, TO BETH PINA.

12         I JUST HAVE TO FIND MY SPOT.

13         SO, AGAIN, I JUST MENTIONED, HE'S LOOKING FOR A WAREHOUSE

14    LINE OF CREDIT.  QUOTE, "ONCE WE HAVE THE LINE SET UP, PAYING

15    ONLY SMALL INTEREST FEES, THEN A&P WILL MAKE MEGA BUCKS AND

16    THEN WE'LL BE ABLE TO PAY FINDER'S FEE AND COMMISSIONS.  I.E.,

17    INVESTORS WIN, REFERRAL SOURCES WIN, GCF WINS, A&P WINS.  THEN

18    BARBARA MAKES MUCHO MONEY.  BETH MAKES MUCHO MONEY.  AND THEN

19    EVEN ME.  I WOULD LIKE TO MAKE MUCHO MONEY, TOO.  IT'S FUN."

20         AND THEN HE DID SOME CALCULATIONS.  ONE MILLION INVESTOR

21    MONEY, FOUR MILLION WAREHOUSE LINE PAYING 8 PERCENT A YEAR,

22    WE'D MAKE 440,000 A YEAR.

23         ONE MILLION INVESTOR MONEY, FOUR MILLION WAREHOUSE LINE,

24    FIVE MILLION IN LOANS TO GCF, WE MAKE 800,000 A YEAR.

25         BUT IF WE HAVE 3 MILLION IN INVESTOR MONEY, THEN IT'S
```

1          TIMES 60, THAT'S $1,180,000 A YEAR PROFIT FOR A&P.

2              BUT I'M GOING FOR FIVE MORE, HE SAYS, FIVE MILLION, MY

3      IMMEDIATE GOAL FOR GCF INVESTOR FUNDS GETS GCF 20 MILLION FROM

4      THE WAREHOUSE LINE.  THAT'S $1,800,000 A YEAR PROFIT FOR A&P.

5              SEE HOW FUN IT WILL BE ONCE THE LINE IS SET UP?

6              AND AGAIN, "THE LINE" IS THE LINE OF CREDIT.

7              "DO YOU LIKE MONEY?  I LIKE MONEY."

8              THAT'S HIS WORDS, MIKE'S.  SO MIKE'S A VERY ENTHUSIASTIC

9      PERSON, AS YOU CAN TELL FROM THESE THINGS, AND HE'S GOT BIG

10     IDEAS AND HE'S THINKING BIG.

11             THE TROUBLE IS THAT WAREHOUSE LINE NEVER MATERIALIZES.

12             THAT DOESN'T STOP MIKE.  THEY COME UP WITH SOME NEW IDEAS.

13     THEY COME UP WITH A COMPANY CALLED GOLDEN EGG RESOURCES.  THIS

14     COMPANY IS GOING TO SELL IDEAS ON HOW TO MAKE MONEY FROM GIVING

15     SEMINARS.  THAT COMPANY DIDN'T GET OFF THE GROUND.

16             NOW, THE OTHER THING THAT HAPPENS IN THIS TIME PERIOD IS

17     THERE'S A CHANGE IN THE FINANCIAL MARKET.  AND AGAIN, YOU'RE

18     GOING TO HEAR FROM MR. GAUGHF, WHO IS A VERY EXPERIENCED

19     GENTLEMAN IN THE INVESTMENT WORLD.

20             BUT IN 2007, THERE WERE SOME RUMBLINGS.

21             IN 2008, A LOT OF DEFAULTED LOANS.  PEOPLE WEREN'T MAKING

22     PAYMENTS.

23             AND AT THE END OF 2009, THIS WHOLE THING HAD COLLAPSED.

24             SO THE QUESTION FOR YOU, AND THE ULTIMATE QUESTION IN THIS

25     CASE, IS DID BARBRA ALEXANDER INTEND TO DEFRAUD PEOPLE?  WAS

 1    THAT IN HER MIND?  WAS THAT WHAT SHE SET OUT TO DO?

 2         AND AT THE END, I THINK YOU'RE GOING TO FIND THAT SHE DID

 3    NOT AND YOU'RE GOING TO FIND HER NOT GUILTY.

 4         THANK YOU.

 5              THE COURT:  ALL RIGHT.  PLEASE CALL YOUR FIRST

 6    WITNESS.

 7              MR. SCHENK:  THANK YOU, YOUR HONOR.

 8         THE UNITED STATES CALLS PATTERSON GAUGHF.

 9              MR. LEEMING:  AND YOUR HONOR, I'M NOT SURE IF WE DID

10    THIS BEFORE, BUT THERE WOULD BE A MOTION TO EXCLUDE WITNESSES

11    FROM THE TRIAL.

12              THE COURT:  THAT IS GRANTED.  THERE SHOULD BE NO

13    TESTIFYING WITNESSES IN THE COURTROOM.

14              THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

15         (PATTERSON GAUGHF, PLAINTIFF'S WITNESS, WAS SWORN.)

16              THE WITNESS:  I DO.

17              THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

18         AND WOULD YOU STATE YOUR NAME, PLEASE, AND SPELL IT?

19              THE WITNESS:  MY NAME IS CHARLES PATTERSON GAUGHF,

20    LAST NAME IS SPELLED G-A-U-G-H-F.

21              THE COURT:  GO AHEAD, PLEASE.

22              MR. SCHENK:  THANK YOU, YOUR HONOR.

23                          **DIRECT EXAMINATION**

24    BY MR. SCHENK:

25    Q.   MR. GAUGHF, BEFORE WE GET STARTED, DO YOU SEE THREE

1    BINDERS AT YOUR FEET, I THINK TO THE LEFT?

2    A.   YES.

3    Q.   WOULD YOU MIND GRABBING THE LARGEST OF THEM, IT'S LABELED

4    BINDER 1 OF 2, AND JUST PLACE THAT ON THE TABLE IN FRONT OF

5    YOU.  I'LL BE ASKING YOU SOME QUESTIONS ABOUT DOCUMENTS IN THAT

6    BINDER IN A FEW MINUTES.

7    A.   YES.

8    Q.   BEFORE WE GET INTO THE DOCUMENTS, ARE YOU CURRENTLY

9    EMPLOYED?

10   A.   YES.

11   Q.   HOW ARE YOU EMPLOYED?

12   A.   I CURRENTLY AM EMPLOYED BY PLAZA HOME MORTGAGE AS A

13   WHOLESALE ACCOUNT EXECUTIVE.  I'VE BEEN EMPLOYED WITH PLAZA

14   SINCE MAY OF 2012.

15   Q.   AND WHAT ARE YOUR RESPONSIBILITIES WITH PLAZA?

16   A.   WE SOLICIT RETAIL ORIGINATORS.  THEY COULD BE MORTGAGE

17   BROKERS, CREDIT UNIONS, OR OTHER MORTGAGE BANKS THAT PROVIDE

18   RETAIL FINANCING TO CONSUMERS.  WE REVIEW THE LOANS, WE FUND

19   THE LOANS, AND THEN WE CAN EITHER KEEP THE LOAN, SELL THE LOAN

20   TO FANNIE MAE, FREDDIE MAC, OR ANOTHER INVESTOR, OR KEEP THE

21   SERVICING OURSELVES, SERVICING THEM.

22        BUT BASICALLY I REVIEW LOANS FROM A RETAIL ORIGINATOR FOR

23   PURPOSES OF QUALIFYING FOR AN INVESTOR.

24   Q.   HOW LONG HAVE YOU WORKED IN THE REAL ESTATE INDUSTRY?

25   A.   ON THE LENDING SIDE, SINCE 1991.

```
 1            PRIOR TO THAT, I WAS A BUILDER, SO I DEVELOPED PROPERTIES,

 2    SMALL TIME.  SO TO SOME DEGREE, I WAS IN THE BUSINESS PRIOR TO

 3    THAT, BUT I ENTERED THE REAL ESTATE FINANCE BUSINESS IN 1991.

 4    Q.   WOULD YOU JUST BRIEFLY DESCRIBE FOR THE JURY YOUR

 5    EXPERIENCES BETWEEN 1991 AND PLAZA; THAT IS, WHAT TYPE OF WORK

 6    DID YOU DO IN THOSE INTERVENING YEARS AND FOR WHOM?

 7    A.   YES.  IN 1991 I JOINED A COMPANY CALLED MONUMENT MORTGAGE.

 8    THIS IS A WHOLESALE MORTGAGE ORIGINATOR.  WE DON'T DEAL WITH

 9    THE PUBLIC.  WE'RE SIMPLY INVOLVED IN THE BACK END WITH REVIEW

10    OF A LOAN FILE TO DETERMINE IF IT'S ELIGIBLE FOR SALE TO, AT

11    THE TIME, FREDDIE MAC, AND THEN LATER FANNIE MAE.

12            I WORKED WITH MONUMENT MORTGAGE FROM 1991 UNTIL THE END OF

13    2000, DECEMBER 30TH, 2000.

14            THE BEGINNING OF 2001, I WORKED FOR A YEAR WITH ANOTHER

15    SIMILAR MORTGAGE BANK CALLED CMG MORTGAGE DOING THE SAME THING

16    FOR THEM FOR THE SAME -- IN THE SAME TERRITORY.  AGAIN,

17    ORIGINATING LOANS ON A WHOLESALE LEVEL, WORKING WITH BROKERS,

18    CREDIT UNIONS, AND OTHER LENDERS.

19            CMG WAS NOT ABLE TO KEEP UP WITH MY FUNDING ABILITY, SO I

20    JOINED ANOTHER COMPANY CALLED SCME MORTGAGE BANKERS.  I BELIEVE

21    IT STOOD FOR SOUTHERN CALIFORNIA MORTGAGE EXCHANGE, ALTHOUGH WE

22    NEVER USED THAT TERM, SCME MORTGAGE BANKERS.

23            AGAIN, IT WAS ANOTHER WHOLESALE ORIGINATOR DOING -- WITH

24    THE SAME DUTIES, ORIGINATING THE LOANS FROM BROKERS, CREDIT

25    UNIONS, AND OTHER SMALL RETAIL BANKS.  I WORKED THERE FROM 2002
```

1      UNTIL 2007.

2             SCME MORTGAGE BANKERS FOLDED AT THE END OF THE MORTGAGE

3      CRISIS, SO I JOINED ANOTHER COMPANY THAT IS STILL IN BUSINESS

4      CALLED STEARNS LENDING.  STEARNS COULDN'T SUPPLY THE TYPE OF

5      SERVICE THAT I REQUIRED FOR MY CLIENTS, SO I WAS ONLY THERE FOR

6      LESS THAN A YEAR, ABOUT TEN MONTHS.

7             THIS WAS DURING TRANSITION OF THE MELTDOWN WHERE MORTGAGE

8      BROKERS WERE UNDER STRESS AND I SAW THAT MY CLIENTELE WAS

9      BEGINNING TO EXIT THE BUSINESS.

10            IN 2009, I JOINED A RETAIL MORTGAGE BANKING COMPANY WHERE

11     I WAS PROVIDING LOANS TO THE PUBLIC.  I WAS DIRECTOR OF SALES

12     AND OPERATIONS.  THIS WAS DURING THE TIME WHEN LICENSING WAS

13     BEING REQUIRED FOR ALL LOAN ORIGINATORS, SOMETHING THAT I, BY

14     THE WAY, ENDORSE.

15            AS A MEMBER OF THAT MORTGAGE BANK, TREEHOUSE MORTGAGE

16     GROUP WAS A SUBSIDIARY OF AMERICAN PACIFIC MORTGAGE

17     CORPORATION.  WE WERE A RETAIL DIRECT LENDER, A RETAIL BANK.  I

18     ACTUALLY TOOK APPLICATIONS FROM CLIENTS FOR PURPOSES OF FUNDING

19     RETAIL LOANS, REAL ESTATE LOANS.

20            FOR THAT I WAS LICENSED UNDER DRE.  I WAS A SALES PERSON.

21     I WAS ALSO LICENSED UNDER NMLS, NATIONAL MORTGAGE LICENSING

22     SYSTEM, WHICH WAS REQUIRED TO, AT THE TIME, ORIGINATE LOANS ON

23     A RETAIL BASIS.

24            BECAUSE OF THE STRESS IN THE INDUSTRY, I LOOKED FOR A

25     DIFFERENT AVENUE.  IN 2010, I OBTAINED MY SECURITIES LICENSE,

1    SO I'M A LICENSED SECURITY ADVISOR.  I WENT TO WORK FOR AN

2    INVESTMENT REPRESENTATIVE OUT OF SAN DIEGO CALLED

3    MADISON AVENUE SECURITIES.  I HOLD A SERIES 7 AND A SERIES 66

4    SECURITIES LICENSE.

5         I PROVIDED FINANCIAL GUIDANCE TO RETIREES, AND IN DOING

6    SO, I FELT IT WAS NECESSARY TO ALSO HAVE MY INSURANCE LICENSE,

7    SO I CARRY A LIFE INSURANCE LICENSE IN THE STATE OF CALIFORNIA,

8    HEALTH, DISABILITY, WHICH ALSO HAS AN ENDORSEMENT FOR

9    ANNUITIES.

10        I GOT IN THE GAME A LITTLE BIT LATE.  TRYING TO GET ASSETS

11   UNDER MANAGEMENT WAS A BIT OF A DIFFICULT TASK.

12        I HAD AN OPPORTUNITY TO RE-ENTER THE MORTGAGE BUSINESS IN

13   2012 AFTER IT HAD CLEANED UP ITS ACT, SO TO SPEAK, SO IT'S A

14   VERY SOLID INDUSTRY AT THIS POINT, AND I ACCEPTED AN OFFER WITH

15   PLAZA HOME MORTGAGE, RETURNING TO MY ROOTS AS A WHOLESALE

16   ORIGINATOR, WHICH I'M CURRENTLY DOING.

17   Q.   THANK YOU.

18        YOU USED ONE TERM JUST A MOMENT AGO AND I WONDER IF YOU'D

19   EXPLAIN IT, DRE.  WHAT IS THAT?

20   A.   I'M SORRY.  THAT'S THE DEPARTMENT OF REAL ESTATE.  MANY

21   BROKERS OPERATE UNDER THE AUSPICES OF THE DEPARTMENT OF REAL

22   ESTATE, WHICH IS NOW THE BUREAU OF REAL ESTATE.  THEY'VE

23   CHANGED THEIR NAME SO THEY CALL THEMSELVES A BUREAU AS OPPOSED

24   TO A DEPARTMENT.

25        BUT IT -- THE LICENSING AT THE TIME WAS DEPARTMENT OF REAL

1    ESTATE.

2    Q.    THANK YOU.

3           THROUGH WORK, DID YOU HAVE THE OPPORTUNITY TO MEET A WOMAN

4    NAMED BARBRA ALEXANDER?

5    A.    YES, I DID.

6    Q.    AND DO YOU SEE HER IN THE COURTROOM TODAY?

7    A.    YES, I DO.

8    Q.    WOULD YOU IDENTIFY HER BY AN ITEM OF CLOTHING, PLEASE?

9    A.    THE GRAPHIC PRINT, BLACK ON THE BACK, SITTING AT THE

10   DEFENSE TABLE.  I --

11   Q.    THANK YOU.

12   A.    BLOND HAIR.

13          MR. SCHENK:  IF THE RECORD MAY REFLECT THE WITNESS

14   IDENTIFIED THE DEFENDANT?

15          THE COURT:  SO REFLECTED.

16       GO AHEAD, PLEASE.

17          MR. SCHENK:  THANK YOU.

18   Q.    WHEN DID YOU MEET HER?

19   A.    AS I RECALL, IT WAS 1992, 1993, EARLY IN MY CAREER.

20   Q.    AND WHAT WERE THE CIRCUMSTANCES UNDER WHICH YOU MET HER?

21   WHERE?

22   A.    AT THE TIME BARBRA WAS A LOAN ORIGINATOR LICENSED UNDER

23   THE DEPARTMENT OF REAL ESTATE ORIGINATING UNDER THE SPONSORSHIP

24   OF A MORTGAGE BROKER.

25          SOMEONE HOLDING A DRE, DEPARTMENT OF REAL ESTATE, SALES

```
 1    LICENSE HAS TO BE SPONSORED BY A MORTGAGE BROKER.  AT THE TIME

 2    SHE WAS.  I DON'T RECALL THE NAME OF THE COMPANY OR THE BROKER.

 3         HOWEVER, SHORTLY AFTER THAT, SHE BECAME THE BROKER OF

 4    RECORD HERSELF.  SO SHE OBTAINED HER BROKER LICENSE.

 5         SHE WAS A CLIENT, A GOOD CLIENT.  I ORIGINATED LOANS FROM

 6    HER.  SHE DEALT WITH THE PUBLIC.  I WAS THE BACK END.  I

 7    REVIEWED THE FILES, SUBMITTED THEM TO OUR UNDERWRITING

 8    DEPARTMENT FOR REPRESENTATIONS AND WARRANTS, WHICH MEANS THAT

 9    EVERYTHING IN THE FILE IS AS REPRESENTED, AND WE WOULD FUND THE

10    LOANS AND SERVICE THE LOANS OR SELL THE LOANS AND THEN I WOULD

11    GO DO MORE.

12         BUT SHE WAS A RETAIL CLIENT OF MINE.

13    Q.   AND WHEN WAS THAT?  COULD YOU PUT YEARS ON THAT?  YOU'VE

14    DESCRIBED A PERIOD OF TIME WHEN YOU DID BUSINESS WITH HER.

15    WHEN WAS THAT?

16    A.   WELL, IT WAS -- I ENTERED THE BUSINESS IN 1991.  IT WAS

17    SHORTLY AFTER THAT THAT I HAD MET ALL OF MY CLIENTS, SO LET'S

18    SAY '92 OR '93 ALL THE WAY UP UNTIL 2009 SHE WAS A CLIENT.

19    Q.   OKAY.  DID YOU EVER TALK TO HER ABOUT A BUSINESS NAMED

20    APS FUNDING?

21    A.   LET'S SEE.  HOW CAN I PUT THIS?  I'M AWARE OF APS FUNDING.

22    MY DISCUSSIONS --

23              MR. LEEMING:  OBJECTION.  NONRESPONSIVE.

24              THE WITNESS:  YES.

25              THE COURT:  OVERRULED.
```

```
 1              GO AHEAD, PLEASE.

 2                  THE WITNESS:  I BECAME AWARE OF APS FUNDING AFTER MY

 3      INTRODUCTION TO BARBRA'S OTHER BUSINESSES, WHICH WERE -- HER

 4      BROKER BUSINESS WAS GOLD COAST FINANCIAL.  THAT WAS MY CLIENT

 5      RELATIONSHIP.

 6              THERE WAS ANOTHER BUSINESS CALLED GOLD COAST INVESTMENT.

 7      BY MR. SCHENK:

 8      Q.   OKAY.  DID MS. ALEXANDER TALK TO YOU ABOUT GOLD COAST

 9      FINANCIAL INVESTMENTS?

10      A.   GOLD COAST FINANCIAL WAS THE BROKERAGE.

11      Q.   OKAY.

12      A.   THAT WAS PURE MORTGAGE BROKERING.  SHE WAS MY CLIENT.

13              GOLD COAST INVESTMENT WAS, FOR LACK OF A BETTER TERM, A

14      REAL ESTATE INVESTMENT PORTFOLIO.

15      Q.   OKAY.  THEN FOR EASE AND FOR CLARIFICATION, LET'S JUST

16      CALL IT INVESTMENTS FOR NOW IF THAT'S OKAY.

17      A.   ALL RIGHT.

18      Q.   WHAT DID MS. ALEXANDER TELL YOU ABOUT INVESTMENTS?

19      A.   WELL, THIS WAS A TYPICAL PRIVATE --

20                  MR. LEEMING:  OBJECTION.  VAGUE AS TO TIME.

21                  THE WITNESS:  I'M SORRY?

22                  THE COURT:  SUSTAINED.  VAGUE AS TO TIME.

23      BY MR. SCHENK:

24      Q.   DID YOU HAVE A CONVERSATION WITH MS. ALEXANDER ABOUT

25      INVESTMENTS?
```

1    A.   YES.

2    Q.   WHEN WAS THAT?

3    A.   BEGINNING OF 2007 OR 2008 WHEN I BECAME AWARE THAT SHE HAD

4    A COMPANY THAT INVESTED IN FIRST AND SECOND TRUST DEEDS IN THE

5    PRIVATE MARKET.

6    Q.   HOW DID YOU BECOME AWARE OF THAT?

7    A.   SHE WOULD SHARE WITH ME HER SUCCESSES AND THAT SHE HAD A

8    BUSINESS, AND BECAUSE OF MY PRETTY CLOSE RELATIONSHIP WITH HER

9    AS A CLIENT, WE WOULD HAVE DISCUSSIONS NOT ONLY ABOUT THE

10   LOANS, BUT ABOUT THE BUSINESS ITSELF, AND I BECAME AWARE THAT

11   SHE WAS DEVELOPING A COMPANY FOR PURPOSES OF INVESTMENT IN THE

12   REAL ESTATE MARKET.

13   Q.   DID MS. ALEXANDER DESCRIBE THIS BUSINESS, THAT IS,

14   INVESTMENTS, TO YOU?

15   A.   YES.

16   Q.   AND HOW DID SHE DESCRIBE IT?  WHAT DID SHE SAY?

17   A.   PRIVATE MONEY LENDING -- LET'S SEE.  I DON'T WANT TO JUMP

18   IN THE MIDDLE OF A CONVERSATION, BUT I KNOW WHAT PRIVATE MONEY

19   LENDING IS, SO WE DIDN'T HAVE TO HAVE A DISCUSSION NECESSARILY

20   ABOUT HER EXACT BUSINESS MODEL.

21        BUT IT WAS --

22             MR. LEEMING:  OBJECTION.  NONRESPONSIVE.

23             THE WITNESS:  I'M SORRY.

24             THE COURT:  OVERRULED.

25        GO AHEAD.  YOU MAY CONTINUE ANSWERING THE QUESTION.

```
 1      BY MR. SCHENK:

 2      Q.   WOULD YOU LIKE ME TO REASK THE QUESTION?

 3      A.   YEAH, LET'S RESET THAT, PLEASE.

 4      Q.   YOU SAID THAT YOU KNEW WHAT PRIVATE MONEY LENDING WAS.

 5      A.   YES.

 6      Q.   WHAT IS PRIVATE MONEY LENDING?

 7      A.   TO EXPLAIN PRIVATE MONEY LENDING, WE SHOULD GO THROUGH THE

 8      LEVELS OF LENDING AS IT'S GENERALLY KNOWN IN THE BUSINESS.

 9           WE HAVE PRIME LENDING, A LENDING.  THIS IS THE FANNIE MAE,

10      FREDDIE MAC TYPE OF LOAN.  VERY FEW DEFAULTS.  HIGH

11      QUALIFICATIONS.

12           THEN YOU'LL HAVE AN ALTERNATIVE A, WHICH NO LONGER EXISTS

13      BUT WAS VERY POPULAR IN THE MID-2000S AND CAUSED A LOT OF OUR

14      PROBLEMS.

15           NEXT WOULD BE SUBPRIME, WHICH HAS A LOWER BAR FOR ENTRY,

16      BUT TYPICALLY PROVIDED BY AN INSTITUTIONAL LENDER.

17           AND THEN YOU HAVE PRIVATE MONEY.  PRIVATE MONEY HAS

18      DIFFERENT CHARACTERISTICS.  HIGHER ON THE RISK SCALE, HIGHER ON

19      THE REWARD SCALE.  BUT IT'S MADE FROM AN INDIVIDUAL SMALL

20      COMPANY TO ANOTHER INDIVIDUAL WITH INTERACTION BETWEEN THE

21      PARTNERS, BETWEEN THE PRINCIPALS, THE LENDER AND THE BORROWER.

22           THERE IS A LOWER BAR OF QUALIFICATIONS, BUT IT'S STILL A

23      VERY VIABLE SOURCE OF LENDING BECAUSE IT'S FAST, IT'S

24      ONE-ON-ONE, AND IT PROVIDES A SERVICE THAT YOU CANNOT GET FROM

25      AN INSTITUTIONAL LENDER.
```

1          THIS IS MADE TO SOMEONE WHO MIGHT NOT HAVE THE

2    CHARACTERISTICS, THE CREDIT PROFILE THAT'S REQUIRED OF AN

3    INSTITUTIONAL LENDER, BUT HAS CHARACTERISTICS THAT GUARANTEE

4    SOME DEGREE OF SECURITY BECAUSE THE BORROWER IS REVIEWED FOR

5    CREDITWORTHINESS, THE COLLATERAL IS REVIEWED FOR ACCEPTABILITY.

6    Q.   IS PRIVATE MONEY LENDING ALSO KNOWN AS HARD MONEY LENDING?

7    A.   HARD MONEY LENDING IS ANOTHER TERM.

8    Q.   MEANING THE SAME THING?

9    A.   YES.   THESE ARE NOT, YOU KNOW, TERMS THAT CAN BE DEFINED.

10   IT'S JUST LOOSE TERMS THAT WE USE IN THE BUSINESS.

11   Q.   OKAY.

12   A.   PRIVATE MONEY AS OPPOSED TO INSTITUTIONAL LENDING.

13   Q.   DID MS. ALEXANDER DESCRIBE TO YOU HER INVESTMENT BUSINESS

14   AS PRIVATE MONEY LENDING OR HARD MONEY LENDING?

15   A.   YES.

16   Q.   WHAT ELSE DID SHE SAY TO YOU ABOUT THIS INVESTMENT

17   OPPORTUNITY?

18   A.   WELL, OVER THE YEARS, MUCH WAS SAID ABOUT IT.

19   Q.   I'M STILL JUST REFERRING TO THE INITIAL CONVERSATION THAT

20   YOU HAD WITH HER ABOUT IT.

21   A.   WELL, THAT SHE WAS DOING IT, THAT IT WAS SUCCESSFUL, THAT

22   IT WAS PROFITABLE, AND, YOU KNOW -- I CAN'T SAY THE FIRST TIME

23   I WAS ASKED IF I WANTED TO PARTICIPATE IN IT, BUT AT SOME POINT

24   I WAS ASKED, "DO YOU WANT TO PARTICIPATE IN THIS?   PERHAPS YOU

25   SHOULD GET IN.   IT'S WORKING WELL."

1          AND I DECLINED IT AT FIRST AND ACCEPTED IT LATER.

2     Q.   OKAY.  WE'LL GET TO THAT IN A MOMENT.

3          DID MS. ALEXANDER TELL YOU WHETHER SHE WAS WORKING WITH

4     ANYONE ELSE IN THIS INVESTMENT OPPORTUNITY OR WAS SHE DOING IT

5     BY HERSELF?

6     A.   INITIALLY I ONLY KNEW OF HER.

7     Q.   OKAY.  AT SOME POINT LATER DID SHE TELL YOU THAT SHE WAS

8     WORKING WITH OTHER INDIVIDUALS?

9     A.   LATER THERE WAS A -- LATER SHE WAS JOINED BY A

10    MR. MICHAEL SWANSON.

11    Q.   OKAY.  ANYBODY ELSE?

12    A.   NOT IN TERMS OF THE LENDING SIDE.  SHE DID HAVE A

13    BOOKKEEPER, BETH PINA, THAT WAS ULTIMATELY A PARTNER.  BUT IN

14    MY OPINION -- AND I KNEW BETH -- SHE WAS ANCILLARY.  SHE WAS

15    REALLY A BOOKKEEPER.

16          MR. LEEMING:  OBJECTION.  IMPROPER OPINION.  NO

17    FOUNDATION.

18          THE COURT:  SUSTAINED.

19        LAY A FOUNDATION, PLEASE.

20          MR. SCHENK:  I'LL MOVE ON.

21    Q.   MR. GAUGHF, DID MR. -- DID MS. ALEXANDER DESCRIBE TO YOU

22    MR. SWANSON'S ROLE IN THE COMPANY?

23    A.   IT WAS VERY VAGUE.  I -- I THINK I ACTUALLY ASKED A

24    QUESTION ONE TIME AND DIDN'T GET A CLEAR ANSWER.

25          BUT I DO BELIEVE THAT HE -- HIS RESPONSIBILITY WAS

```
 1     CREATING ASSETS, TRYING TO SOLICIT CAPITAL TO RUN THE BUSINESS,

 2     THE INVESTORS.

 3     Q.   OKAY.

 4          MR. LEEMING:  OBJECTION.  MOVE TO STRIKE.

 5     SPECULATION, NO FOUNDATION.

 6          THE COURT:  OVERRULED.

 7          GO AHEAD, PLEASE.

 8     BY MR. SCHENK:

 9     Q.   DID MS. ALEXANDER TALK TO YOU ABOUT A RADIO SHOW CALLED

10     MONEY DOTS AT SOME POINT?

11     A.   YES.

12     Q.   WHEN WAS THAT?  DO YOU RECALL?

13     A.   THAT WAS EARLY -- ACTUALLY, THAT WAS WHEN WE STILL HAD THE

14     EXPLICIT BROKER/WHOLESALE/RETAIL ORIGINATOR RELATIONSHIP.

15          SHE HAD A LOCAL RADIO SHOW THAT WAS ULTIMATELY SYNDICATED,

16     AND I WAS A FREQUENT GUEST ON HER SHOW.

17     Q.   HOW OFTEN?

18     A.   WELL, LET'S SAY OVER THE YEARS, MAYBE A DOZEN TIMES.

19     Q.   DID YOU PAY HER OR DID SHE PAY YOU TO BE A GUEST ON THE

20     SHOW?

21     A.   NO.

22     Q.   WAS THERE ANY FINANCIAL ARRANGEMENT TO ENTITLE YOU TO BE

23     ON THE SHOW?

24     A.   NOTHING FORMAL, ALTHOUGH IT'S BEEN DISCUSSED THAT I DID

25     CARRY HER PHONE -- I CARRIED CERTAIN PHONE LINES THAT MIGHT BE
```

 1    CONSTRUED AS AN INCENTIVE.

 2         BUT THIS WAS SOMETHING I DID ON MY OWN.  IF YOU'D LIKE FOR

 3    ME TO, I CAN ELABORATE.

 4    Q.   YEAH.  I'M NOT SURE WHAT YOU MEAN WHEN YOU SAY YOU CARRIED

 5    SOME OF HER LINES.

 6    A.   OKAY.  WELL, THE -- I'M A WHOLESALE ORIGINATOR.  THIS IS

 7    BASICALLY SALES, A PRODUCTION PERSON.  WE LIKE TO GET OUR NAME

 8    OUT AS FREQUENTLY AND OFTEN TO THE LARGEST MARKET THAT WE CAN.

 9         WHENEVER I WOULD BE ON THE SHOW, I WOULD GET CALLS SAYING,

10    "I HEARD YOU ON THE MONEY DOTS SHOW."  SO I THOUGHT THIS WAS A

11    PRETTY GOOD AVENUE FOR ME TO REACH OUT TO CLIENTS THAT MIGHT

12    NOT KNOW ME.

13         SO I'D GET NAME RECOGNITION.  WHEN YOUR NAME IS MENTIONED

14    ON THE AIR, WHETHER LOCAL OR SYNDICATED, IT CREATES SOMETHING

15    OF A FAMILIARITY.

16         IT WAS INITIALLY A CALL-IN SHOW, AND I THOUGHT IT WOULD BE

17    PRETTY CLEVER TO HAVE AN 800 CALL-IN NUMBER AND A LOCAL NUMBER

18    THAT RELATED TO THE SHOW ITSELF.  I ACQUIRED THE NUMBER

19    1-800-4BARBRA AND THE LOCAL NUMBER 373-T-A-L-K.

20         I OPENED THE ACCOUNTS.  I PAID FOR THE ACCOUNTS.  THEY RAN

21    THROUGH MY OFFICE.  MY OFFICE WAS IN MONTEREY, AND I HAD A

22    PHONE SYSTEM, JUST A VERY BASIC AT&T, SBC, WHATEVER IT WAS AT

23    THE TIME.  AND TWO OF MY BACK LINES WERE DEDICATED TO T-A-L-K

24    AND 4BARBRA THAT TRANSFERRED DIRECTLY THROUGH MY PHONES TO HER.

25         SO TO THE EXTENT THAT I PAID THE 30, $40 A MONTH FOR THESE

1    TWO LINES TO TRANSFER THROUGH, YOU MIGHT -- YOU COULD CONSTRUE

2    THAT AS BEING I DID PAY SOMETHING FOR IT, ALTHOUGH IT WAS NOT

3    INTENTIONAL TO BUY MYSELF TIME ON THE AIR.

4        I THOUGHT IT WAS PRETTY CLEVER THAT, BECAUSE I CONTROLLED

5    THESE PHONE NUMBERS, THAT IF I SAID, "BARBRA, WE NEED TO TALK

6    ABOUT A CERTAIN ISSUE IN THE MORTGAGE INDUSTRY, WHETHER IT'S

7    THE MELTDOWN OR THE APPRAISAL CHANGES, CAN YOU SLOT ME IN?"

8        SO I HAD A SYMBIOTIC RELATIONSHIP WITH BARBRA FOR THE

9    RADIO SHOW FOR THE PURPOSES OF DISCUSSING THE MORTGAGE BUSINESS

10   AS IT WAS MELTING DOWN, AND ALSO SHE WOULD BENEFIT FROM MY

11   HAVING THE PHONE NUMBERS THAT PEOPLE COULD USE TO CONTACT HER.

12       AND AS AN EXTENSION OF THAT, I NEVER ANSWERED THE PHONE.

13   IT NEVER RANG IN MY OFFICE.  I COULD USE THE PHONE LINES TO

14   CALL OUT, SO THEY WERE A BENEFIT TO ME.  IF I WANTED TO KEEP MY

15   FRONT LINES OPEN, I COULD USE THE BACK LINES TO CALL OUT SO MY

16   FRONT LINES WOULDN'T RING BUSY.

17       IT WAS A VERY SIMPLE RELATIONSHIP, NOTHING FANCY.  YOU CAN

18   DO CALL FORWARDING FROM VIRTUALLY ANY PHONE, AND THAT'S ALL I

19   DID.  SO THEY WOULD CONNECT TO HER PHONES.

20   Q.   DID MS. ALEXANDER EVER TELL YOU WHETHER MONEY DOTS WAS

21    PROFITABLE FOR HER?

22   A.   NOT INSOMUCH AS TO SAY "I MAKE THIS AMOUNT, IT'S

23    PROFITABLE."

24       BUT THE FACT THAT IT WENT FOR SO LONG, ONE DOESN'T

25   TYPICALLY ENDEAVOR IN A LOSING PROPOSITION OVER MANY YEARS, AND

1    I'M SAYING SIX, SEVEN, EIGHT YEARS, IF YOU'RE LOSING MONEY ON

2    IT.

3         SO I PRESUME IT WAS SOME BENEFIT, WHETHER IT WAS A BENEFIT

4    FOR HER MORTGAGE BUSINESS WHERE SHE COULD SOLICIT, YOU KNOW,

5    BORROWERS.  HER REACHING OUT TO HER AUDIENCE ALSO BROUGHT HER

6    BUSINESS, SO THERE WAS A BENEFIT THERE.

7         BUT WHETHER IT MADE MONEY AS A STANDALONE, I HAVE NO IDEA.

8    Q.   OKAY.  AT SOME POINT, I THINK YOU SAID THIS EARLIER, YOU

9    DECLINED TO BE AN INVESTOR AND THEN LATER DECIDED TO INVEST.

10   A.   CORRECT.

11   Q.   DO I HAVE THAT RIGHT?

12   A.   YES.

13   Q.   DO YOU REMEMBER WHEN THAT WAS THAT YOU INITIALLY DECLINED

14   TO BE AN INVESTOR?

15   A.   IT WAS EARLY.  AND I APOLOGIZE.  THE YEARS KIND OF RUN

16   TOGETHER BACK THERE.  PROBABLY 2007, 2008.

17   Q.   OKAY.  DESCRIBE TO ME WHAT MS. ALEXANDER SAID TO YOU ABOUT

18   THE INVESTMENT THAT LED YOU TO DECLINE TO BE AN INVESTOR.

19   A.   WELL, THEY'RE RISKY.  THIS IS A RISKY INVESTMENT TO BEGIN

20   WITH, AND I HAD NO NEED TO ENGAGE IN A RISKY INVESTMENT.  MY --

21   AT THE TIME MY PORTFOLIO HADN'T SHRUNK AS IT ULTIMATELY DID.

22        AND I DIDN'T WANT -- I DIDN'T NECESSARILY WANT THE

23   RELATIONSHIP TO GO BEYOND THE PROFESSIONAL

24   RETAIL/WHOLESALE/ORIGINATOR RELATIONSHIP THAT I WAS COMFORTABLE

25   WITH.

GAUGHF DIRECT

```
1         I -- IT'S NOT THAT I THOUGHT IT WAS GOOD OR BAD.  IT WAS

2    JUST NOT SOMETHING THAT I WAS INTERESTED IN.

3    Q.   HOW DID MS. ALEXANDER DESCRIBE THE INVESTMENT TO YOU?

4    A.   WELL, THE WAY THE INVESTMENT WORKED, MY UNDERSTANDING, AND

5    SUBSEQUENTLY CONFIRMED, WE WERE ENTERING A MARKET WHERE

6    FORECLOSURES WERE BECOMING MORE FREQUENTLY -- MORE FREQUENT,

7    UNFORTUNATELY, WITH THE MORTGAGE MELTDOWN.

8         THERE WERE MANY HOMES AVAILABLE ON THE MARKET, BUT THEY

9    WERE DISTRESSED.  THE PERSON ON -- WHOSE HOME WAS FORECLOSED

10   WAS REASONABLY UPSET WITH THE LENDER AND SOMETIMES THEY DAMAGED

11   THE PROPERTY.

12        IF A HOME SAT FOR TOO LONG UNOCCUPIED, VANDALS WOULD COME

13   IN AND LITERALLY TAKE APPLIANCES AND DESTROY THE WALLS.

14        SO THE HOMES THEMSELVES, THE BONES, THE FOUNDATIONS WERE

15   GOOD.  BUT THEY WERE UNLENDABLE.  THEY WERE NOT APPROVED TYPE

16   LOANS THAT WE COULD SELL INTO THE OPEN MARKET.

17        SO THERE WAS A VERY SMALL MARKET OF BORROWERS WHO WOULD

18   QUALIFY FOR THIS TYPE OF LOAN, BECAUSE WE QUALIFIED BOTH THE

19   BORROWER AND THE PROPERTY.

20        THERE WAS A -- MOST HOMES SOLD IN THAT CONDITION WERE SOLD

21   FOR CASH, AND I WOULD SAY 30 TO 40 PERCENT OF THE HOMES,

22   DISTRESSED HOMES WERE SOLD TO AN INVESTOR THAT HAD THE

23   WHEREWITHAL TO WRITE A CHECK AND OWN THE HOME THEMSELVES AND

24   THEN DO WHAT THEY WOULD WITH IT.

25        THERE WAS A MARKET THERE FOR THOSE WHO HAD MORE OF AN
```

GAUGHF DIRECT

```
 1    ENTREPRENEURIAL SPIRIT TO PURCHASE THESE HOMES THEMSELVES, FIX
 2    THEM UP -- I THINK THE TERM THAT WAS USED WAS CALLED "BUFF AND
 3    FLUFF," IT WAS APPROPRIATE -- AND FOR A RELATIVELY SMALL AMOUNT
 4    OF MONEY, THESE COULD NOW BECOME HOMES THAT WERE ACCEPTABLE FOR
 5    SALE ONTO THE OPEN MARKET, TO AN INVESTOR MARKET, THAT MORE
 6    BORROWERS COULD QUALIFY FOR.
 7         SO THEY WOULD QUALIFY FROM A CREDIT STANDPOINT, BUT THEY
 8    COULD ALSO BUY ONE OF THE ENTRY LEVEL HOMES THAT WAS NOW
 9    ACCEPTABLE TO, LIKE, MY COMPANY.
10    Q.   OKAY.  AND IS THIS THE WAY THAT MS. ALEXANDER DESCRIBED
11    THE INVESTMENT OPPORTUNITY TO YOU?
12    A.   YES.
13    Q.   DID SHE TELL YOU THAT THIS IS HOW, IF YOU INVESTED, YOUR
14    MONEY WOULD BE SPENT?
15    A.   YES.
16    Q.   AND IS THE PRACTICE THAT YOU'VE JUST DESCRIBED, IS IT ALSO
17    KNOWN AS FLIPPING?
18    A.   WELL, THIS -- YEAH.  A TRUE FLIP, YOU BUY THE HOME BELOW
19    VALUE AND YOU TURN IT OVER FOR A HIGHER VALUE WITH VERY LITTLE
20    WORK DONE.
21         SO THESE WOULD, IN A WAY, BE CALLED A FLIP.  BUT IT WAS
22    MORE AN ACQUISITION AND DEVELOPMENT AND THEN RESOLD ON THE
23    MARKET.  SO YOU ACQUIRED THE PROPERTY AT CERTAINLY BELOW
24    MARKET, PROVIDE SOME CONSTRUCTION TO IT -- AND WE'RE TALKING
25    ROOFING, PAINTING, MAYBE NEW ELECTRICAL, LIGHT FIXTURES,
```

1    LANDSCAPING -- TO MAKE IT PRESENTABLE AND THEN IT'S RESOLD AT A

2    CONSIDERABLY HIGHER VALUE.  YOU RECOUP YOUR PURCHASE MONEY, AS

3    WELL AS THE CONSTRUCTION MONEY, AND THEORETICALLY ARE ABLE TO

4    SELL IT AT A PROFIT.

5    Q.   NOW, THIS FIRST PITCH SESSION, IF YOU WILL, THIS INSTANCE

6    WHEN MS. ALEXANDER PITCHES THE INVESTMENT TO YOU, DID YOU SAY

7    THAT WAS IN 2007?

8    A.   IF I RECALL, IT WAS AROUND 2007.

9    Q.   OKAY.  AND DID YOU MAKE AN INVESTMENT THEN?

10   A.   NO.

11   Q.   DID MR. SWANSON PITCH THE INVESTMENT TO YOU?

12   A.   NO.

13   Q.   DID MS. PINA PITCH THE INVESTMENT TO YOU?

14   A.   NO.

15   Q.   DID YOU EVER TALK TO MS. ALEXANDER ABOUT WHAT ARE KNOWN AS

16   UNDERWRITING GUIDELINES?

17   A.   YES.

18   Q.   WHEN WAS THAT?

19   A.   2008-ISH.

20   Q.   OKAY.  SO AFTER THIS FIRST FAILED PITCH, IF YOU WILL?

21   A.   RIGHT.  AS THE MARKET WAS MELTING DOWN, MY INVESTMENTS

22   WERE NOT -- YOU KNOW, MY MUTUAL FUNDS, FOR LACK OF A BETTER

23   TERM, WERE NOT PERFORMING VERY WELL AND IT WAS A GOOD

24   OPPORTUNITY TO REINVEST MY MONEY IN A MORE LUCRATIVE FASHION.

25   Q.   OKAY.

GAUGHF DIRECT

1    A.   SO I DID ASK -- I DID SOME VETTING, WHAT ARE YOUR

2    UNDERWRITING GUIDELINES?

3    Q.   AND I KNOW THIS WAS A WHILE AGO, BUT ROUGHLY A YEAR

4    LATER -- YOU SAID YOU MAY HAVE DECLINED THE INVESTMENT IN 2007.

5    IN 2008 IS WHEN YOU MADE YOUR INVESTMENT?

6    A.   YES.

7    Q.   THE UNDERWRITING GUIDELINE DISCUSSION THAT YOU JUST

8    RELAYED, WAS THAT IN ADVANCE OF WHEN YOU ACTUALLY MADE THE

9    INVESTMENT, SO IT WOULD HAVE BEEN IN 2008?

10   A.   YES.

11   Q.   OKAY.  I'M GOING TO ASK YOU NOW, IF YOU WOULD, IN THE

12   BINDER TO TURN TO EXHIBIT 54, AND IT'S A MULTIPLE PAGE

13   DOCUMENT.  I'M GOING TO ASK YOU TO SKIP THE FIRST PAGE AND JUST

14   FOCUS ON THE PRECEDING SIX PAGES -- SORRY -- THE FOLLOWING SIX

15   PAGES.

16   A.   THE FOLLOWING PAGES.  I HAVE IT.

17   Q.   DO YOU RECOGNIZE WHAT ARE PAGES 2 THROUGH 7 OF EXHIBIT 54?

18   A.   YES.

19   Q.   WHAT ARE THEY?

20   A.   THESE ARE THE UNDERWRITING GUIDELINES FOR GCF INVESTMENT,

21   THAT WOULD BE GOLD COAST FINANCIAL INVESTMENT, THE UNDERWRITING

22   GUIDELINES.

23        AND IT -- IT'S THE VERY BASIC GUIDELINES THAT WE LOOK AT

24   TO DETERMINE --

25   Q.   WELL, BEFORE WE GET INTO THE BODY OF IT, YOUR HONOR, ONE

```
1       MORE FOLLOW-UP.

2            DID MS. ALEXANDER GIVE YOU THESE UNDERWRITING GUIDELINES?

3       A.   YES.

4            MR. SCHENK:  THE GOVERNMENT OFFERS PAGES 2 THROUGH 7

5       OF EXHIBIT 54 INTO EVIDENCE.

6            THE COURT:  ANY OBJECTION?

7            MR. LEEMING:  NO OBJECTION.

8            THE COURT:  IT'S ADMITTED.

9            (PLAINTIFF'S EXHIBIT 54, PAGES 2 - 7, WAS ADMITTED IN

10      EVIDENCE.)

11           THE COURT:  GO AHEAD, PLEASE.

12           MR. SCHENK:  THANK YOU.  MAY WE PUBLISH?

13           THE COURT:  GO AHEAD, PLEASE.

14           MR. SCHENK:  LET'S START WITH PAGE 2, PLEASE, AND IF

15      WE CAN ZOOM IN JUST ON THE TOP HALF OF THE DOCUMENT.

16      Q.   NOW, YOU WERE JUST ABOUT TO SAY, WHAT ARE THESE?

17      A.   I'M SORRY?

18      Q.   WHAT ARE THESE?  I THINK I CUT YOU OFF WHEN YOU WERE

19      DESCRIBING WHAT THEY WERE.

20      A.   THESE ARE VERY BASIC WHAT WE CALL UNDERWRITING GUIDELINES.

21      THESE WILL DETERMINE UNDER WHAT CIRCUMSTANCES ONE WOULD MAKE A

22      LOAN, WHAT INVESTMENT IS REQUIRED BY THE BORROWER, CREDIT

23      PROFILE, THE VALUE OF THE PROPERTY BEING LOANED ON, ASSETS, AND

24      OF COURSE INCOME.

25      Q.   OKAY.  THERE'S A TERM THAT'S HIGHLIGHTED NOW FOR THE JURY,
```

GAUGHF DIRECT

```
1      AND IF YOU LOOK AT THE -- THERE'S A MONITOR, I THINK, TO YOUR

2      LEFT THAT'S NOT WORKING.

3           CAN YOU SEE THE SCREEN -- OR I CAN JUST TELL YOU.  THE

4      TERM IS LTV.

5      A.   LTV IS LOAN TO VALUE, THE DOLLAR AMOUNT OF A LOAN RELATIVE

6      TO THE VALUE OF THE PROPERTY.

7           THAT'S OKAY.  I CAN USE THIS.

8           THE CLERK:  OKAY.  I'LL CHECK IT OUT LATER.  IT MAY

9      NOT BE PLUGGED IN.

10     BY MR. SCHENK:

11     Q.   WHAT DOES --

12     A.   DO YOU WANT ME TO REPEAT THAT?

13     Q.   YES.  PLEASE TELL US AGAIN WHAT THAT IS.

14     A.   LOAN TO VALUE IS THE LOAN AMOUNT RELATIVE TO THE VALUE OF

15     THE PROPERTY.  SO A 75 PERCENT LOAN TO VALUE ON A $100,000

16     VALUED PROPERTY WOULD BE $75,000.

17     Q.   OKAY.  AND WHY IS THAT RELEVANT FOR THIS INVESTMENT?

18     A.   ALL LENDING IS MADE WITH THE UNDERSTANDING THAT YOU'RE

19     GOING TO BE REPAID AT SOME TIME BASED ON THE TERMS OF THE LOAN.

20          IF ONE IS UNABLE TO MAKE THE PAYMENTS FOR SOME REASON,

21     THERE'S ALWAYS AN UNDERLYING ASSET, AND WE HAVE THE BORROWER

22     PROVIDE SOME OF THEIR OWN EQUITY IN THE PROPERTY -- SKIN IN THE

23     GAME, SO TO SPEAK.  A DOWN PAYMENT IS ANOTHER TERM THAT WE USE

24     FOR IT -- TO BE SURE THAT IN THE EVENT THAT THEY'RE UNABLE TO

25     MAKE PAYMENTS, THE ASSET CAN THEN BE LIQUIDATED, WHETHER IT'S
```

GAUGHF DIRECT

1    SOLD OR FORECLOSED UPON, AND THERE WOULD STILL BE A VALUE

2    REMAINING TO SETTLE THE DEBT.

3         SO WE LOOKED AT THE BORROWER, WHAT SKIN IN THE GAME THEY

4    HAD, NUMBER ONE, SO THEIR INCENTIVE TO MAKE THE PAYMENTS; AND

5    NUMBER TWO, THAT THERE IS AN ASSET THAT SUPPORTS THE LOAN.

6    Q.   OKAY.  DID MS. ALEXANDER TELL YOU THAT HER INVESTMENT

7    COMPANY WAS FOLLOWING THESE GUIDELINES?

8    A.   NOT VERBATIM.  I ASKED FOR THE GUIDELINES OF WHAT HER

9    COMPANY WAS OFFERING AND THIS IS WHAT I WAS PROVIDED.

10   Q.   OKAY.  WERE YOU SATISFIED WITH THESE OR WERE YOU TROUBLED

11   BY THEM?

12   A.   NO, I WASN'T TROUBLED AT ALL.  THIS IS VERY STANDARD.

13   Q.   OKAY.  AND WHY DO YOU SAY THAT?

14   A.   WHY DO I SAY THAT THESE ARE VERY STANDARD?

15   Q.   YES.

16   A.   WELL, THE LTV IS LOWER THAN WHAT WE WERE OFFERING IN THE

17   PRIME WORLD.  IN THE PRIME WORLD, WE HAVE A HIGHER STANDARD.

18        SO IN THIS CASE YOU'RE GOING TO HAVE A, A LOWER LTV, MORE

19   INVESTMENT BY THE CLIENT OR BY THE BORROWER THEMSELVES.

20        NOW, THE IDEA BEHIND THIS INVESTMENT FIRM WAS THAT A

21   PROPERTY COULD BE PURCHASED WITH A 25 PERCENT INVESTMENT BY THE

22   BORROWER.  MONIES WOULD THEN BE LOANED TO IMPROVE THE PROPERTY,

23   AND THEN THERE WOULD BE A SECOND VALUE UPON IMPROVEMENT

24   BECAUSE, REMEMBER, THE PURCHASE PRICE IS BASED ON A DISTRESSED

25   PROPERTY, ONE THAT CAN'T BE SOLD OR CAN'T BE FINANCED IN AN

1    OPEN MARKET, AND IT'S MORE TO, TO LIQUIDATE THE PROPERTY FROM

2    THE INVESTMENT.  SO THESE ARE DISTRESSED PRICES.

3         HOWEVER, ONCE THEY ARE IMPROVED, PAINTED, LANDSCAPED,

4    ROOFED, ET CETERA, THE VALUE IS CONSIDERABLY HIGHER THAN THE

5    TOTAL OF THE FIRST LOAN AND THE MONIES THAT WERE OFFERED TO

6    IMPROVE THE PROPERTY.

7         SO UPON IMPROVEMENT, THE LTV ACTUALLY GOES DOWN BASED ON

8    THE IMPROVEMENT PRICE, OR THE IMPROVED PRICE.  SO THESE WERE

9    VERY SAFE.

10        AND THE CREDIT HISTORY, YOU SEE MINIMUM 580 CREDIT SCORE.

11   WELL, THAT'S THE LOWEST SCORE AVAILABLE TODAY IN FHA LENDING.

12   IT WASN'T NECESSARILY THE LOWEST SCORE THERE, BUT UNDERSTAND,

13   THESE WERE BORROWERS THAT COULD NOT GO TO A FINANCIAL

14   INSTITUTION, WELLS FARGO, FANNIE MAE, FREDDIE MAC, ET CETERA,

15   AND BORROW MONEY.

16        BUT BECAUSE THEY HAD INVESTMENT IN THE PROPERTY, YOU DID

17   HAVE AN UNDERLYING ASSET TO COVER YOUR LOAN.

18   Q.   IN 2008, DID YOU DECIDE TO INVEST MONEY WITH

19   MS. ALEXANDER?

20   A.   YES.

21   Q.   WHY?

22   A.   SEVERAL REASONS.  I HAD A RELATIONSHIP WITH BARBRA GOING

23   BACK TO 1992 OR '93; I HAD NEVER EXPERIENCED ANYTHING UNTOWARD

24   IN ANY OF HER FILES; THEY WERE DELIVERED TO ME IN A MORTGAGE

25   BROKER/MORTGAGE BANKING RELATIONSHIP.

GAUGHF DIRECT

```
 1        SO OVER 15, 17 YEARS, YOU HAVE SOME UNDERSTANDING OF
 2   SOMEONE'S ABILITY TO PROVIDE FINANCING.  YOU ASSUME THAT THEY
 3   UNDERSTAND WHAT FINANCING IS.
 4        SO LOANING MONEY LIKE THIS WAS NOT A BIG CONCERN, NUMBER
 5   ONE.
 6        NUMBER TWO, IT DID HAVE A NICE -- A REASONABLE RATE OF
 7   RETURN THAT EXCEEDED ANYTHING THAT ONE COULD GET ON THE MARKET.
 8        RISKY?  ABSOLUTELY.
 9        THIRD, I'M A BUILDER.  PRIOR TO 1991, I WAS A GENERAL
10   CONTRACTOR.  NOT ONLY DID I BORROW MONEY FOR -- FROM -- IN
11   SIMILAR TERMS FOR MY INVESTMENTS OR FOR MY DEVELOPMENT, I BUILT
12   HOMES FROM SCRATCH STARTING IN THE LATE '70S.
13        SO I THOUGHT THAT, BASED ON MY BACKGROUND OF CREDIT RISK
14   UNDERWRITING, CONSISTENT WITH THE GUIDELINES, KNOWING THE
15   PRINCIPAL OF THE COMPANY THAT I'M INVESTING WITH, AND IN THE
16   EVENT THAT EVERYTHING ELSE BLOWS UP -- AND THIS WAS
17   DISCUSSED -- I COULD LITERALLY WALK IN WITH MY CREW, MY TOOLS,
18   REBUILD THE HOUSE, PUT IT BACK ON THE MARKET, AND GET MY MONEY
19   BACK.
20        WORST CASE IS I CAN'T DO ANY OF THAT.  THERE IS ALWAYS AN
21   UNDERLYING ASSET.  REAL ESTATE IS DIFFERENT FROM ANY OTHER
22   INVESTMENT BECAUSE DIRT DOESN'T GO AWAY.  DIRT ALWAYS HAS A
23   VALUE.  WHETHER IT HAS A $100,000 VALUE ON A $200,000
24   INVESTMENT, THERE'S A VALUE THERE AS LONG AS YOU HAVE A LIEN
25   AGAINST THAT PROPERTY, A DEED OF TRUST.
```

GAUGHF DIRECT

```
 1              THE LOAN IS SECURED BY, YOU KNOW, I'M SORRY, DIRT.  REAL,
 2       REAL ESTATE.
 3       Q.   YOU SAID A COUPLE OF THINGS IN THERE THAT I'D LIKE TO
 4       UNPACK.
 5              THE FIRST WAS A HIGH RATE OF RETURN.
 6       A.   YES.
 7       Q.   DID MS. ALEXANDER TELL YOU THAT YOU WOULD GET A CERTAIN
 8       RATE OF RETURN ON YOUR INVESTMENT?
 9       A.   YES.
10       Q.   WHAT WAS THAT?
11       A.   TWELVE PERCENT.
12       Q.   AND YOU ALSO SAID THAT THE INTRINSIC VALUE OF DIRT, OF THE
13       PROPERTY, RELIES ON A LIEN.
14       A.   CORRECT.
15       Q.   WHAT DO YOU MEAN BY THAT?
16       A.   WHEN YOU -- A LOAN IS SECURED BY A DEED OF TRUST FILED
17       AGAINST A PROPERTY.  IF YOU WANT TO PURCHASE A HOME, THE HOME
18       VALUE WILL BE, LET'S SAY, 300,000, IF YOU PUT A 10 PERCENT DOWN
19       PAYMENT, YOU'RE GOING TO BORROW 280,000.
20              THE LENDER HAS A LIEN AGAINST YOUR PROPERTY FOR THAT
21       $280,000, AND THAT'S INCENTIVE FOR YOU TO PAY BACK.  THEY HAVE
22       THE FIRST RIGHT OF POSITION.
23              IF YOU SELL THE PROPERTY, IF YOU REFINANCE THE PROPERTY,
24       THE ORIGINAL LENDER HAS THEIR MONEY RETURNED FIRST.  THEY'RE IN
25       FIRST POSITION.
```

GAUGHF DIRECT

```
 1            AND THEN ANY EQUITY THAT IS LEFT GOES TO THE OWNER OF THE
 2    PROPERTY, OR THE SELLER OF THE PROPERTY.  SO IT'S CALLED A LIEN
 3    AGAINST THE PROPERTY.
 4    Q.   OKAY.  SO DO I HAVE THIS RIGHT?  IF YOU GIVE MS. ALEXANDER
 5    MONEY AS AN INVESTMENT AND THEN SHE INVESTS YOUR MONEY IN
 6    PROPERTY --
 7    A.   CORRECT.
 8    Q.   -- YOU'RE SAYING IF SHE TAKES A LOAN -- I'M SORRY -- IF
 9    SHE TAKES A LIEN AGAINST THAT PROPERTY, WORST CASE SCENARIO,
10    YOU COULD GO FIX UP THAT HOME AFTER FORECLOSURE AND SELL IT?
11    A.   CORRECT.  WELL, THE COMPANY CAN.
12    Q.   RIGHT.  AND WHY IS THAT -- WHY DID THAT MAKE YOU MORE
13    COMFORTABLE IN THE INVESTMENT?  WHY DOES THAT --
14    A.   WELL, IF -- IF THE BORROWER, THE ENTREPRENEUR BORROWER
15    DECIDES NOT TO MAKE THE PAYMENTS, IS NOT CAPABLE OF MAKING THE
16    PAYMENTS, THE LENDER CAN FORECLOSE ON THE PROPERTY AND THEN
17    LIQUIDATE THAT PROPERTY FOR THEIR OWN BENEFIT, GET THEIR MONEY
18    BACK.
19            SO I'M NOT SAYING THE PROPERTY IS ALWAYS GOING TO BE WORTH
20    THAT, BUT THE PROPERTY WILL ALWAYS BE WORTH SOMETHING, AND
21    SINCE YOU OWN THE LIEN, YOU CAN EXCUSE YOUR OWN LIEN TO THE
22    EXTENT THAT YOU CANNOT RECOUP IT IN THE SALE OF THAT PROPERTY.
23            THIS IS VERY STANDARD LENDING PRACTICES, BY THE WAY.  IT'S
24    NOTHING UNUSUAL.
25    Q.   DID MS. ALEXANDER TELL YOU THAT SHE WOULD BE TAKING LIENS
```

1    AGAINST THE PROPERTIES?

2    A.   YES.

3    Q.   AND DID THESE FACTS THAT YOU'VE DESCRIBED, THE 12 PERCENT

4    RETURN, THE LIENS ON PROPERTY, DID THEY CAUSE YOU TO INVEST?

5    A.   YES.

6    Q.   WHY DO YOU SAY THAT?

7    A.   TWELVE PERCENT RETURN, THAT'S NUMBER ONE.

8        NUMBER TWO, IT'S SECURED LENDING.  IT'S NOT -- YOU'RE NOT

9    INVESTING IN THE COMPANY THAT SELLS WIDGETS THAT YOU HAVE NO

10   CONTROL OVER.  YOU'RE INVESTING IN, ESSENTIALLY, A LOCAL

11   MARKET, IN A LOCAL COMPANY WITH AN UNDERLYING ASSET TO SECURE

12   YOUR LOAN.

13   Q.   OKAY.

14   A.   AND, AGAIN, I CAN REBUILD THE PROPERTY AND PUT THE VALUE

15   BACK IN THERE MYSELF IF IT COMES TO THAT.

16       THIS IS SMALL TIME LENDING, BY THE WAY.

17   Q.   AT THE TIME OF YOUR INVESTMENT, DID YOU GO OVER SOME

18   DOCUMENTS WITH MS. ALEXANDER, OR DID SHE GIVE YOU DOCUMENTS TO

19   SIGN?

20   A.   YES.

21   Q.   THERE'S ANOTHER BINDER I'D LIKE YOU TO LOOK TO NOW, IT'S

22   ON THE FLOOR TO YOUR LEFT, AND IT'S LABELED 2 OF 2.  IF YOU

23   WOULDN'T MIND TURNING TO EXHIBIT 82 IN THAT BINDER.

24       AND IF YOU WOULDN'T TAKE -- IF YOU WOULDN'T MIND, TAKE A

25   MOMENT AND LOOK THROUGH THE DOCUMENTS THAT ARE AT TAB 82.

```
 1      A.   I'M FAMILIAR WITH THESE, WITHOUT GOING THROUGH PAGE BY

 2      PAGE.  I'M LOOKING AT THE SIGNATURE PAGES.  THOSE ARE MY

 3      SIGNATURES.

 4      Q.   AND HAVE YOU SEEN THESE DOCUMENTS BEFORE?

 5      A.   YES, I HAVE.

 6      Q.   WHAT ARE THEY?

 7      A.   IT'S A SUBSCRIPTION AGREEMENT.  IT SAYS, "MY INVESTMENT.

 8      I WILL INVEST IN THIS COMPANY THAT" -- IT --

 9      Q.   I'M SORRY.  LET ME ASK YOU -- INTERRUPT YOU.  LET ME ASK

10      YOU A DIFFERENT QUESTION.  DID MS. ALEXANDER GIVE YOU THESE

11      DOCUMENTS AT THE TIME OF YOUR INVESTMENT?

12      A.   YOU KNOW, I CAN'T RECALL IF SHE ACTUALLY HANDED THEM TO ME

13      OR THEY WERE MAILED TO ME OR WHETHER BETH PINA FAXED THEM TO

14      ME.  I HONESTLY CAN'T TELL YOU HOW I GOT THE FIRST, YOU KNOW,

15      THE FIRST SUBSCRIPTION.  I DON'T RECALL.

16      Q.   YOU GOT THEM AT THE TIME OF YOUR INVESTMENT; IS THAT

17      RIGHT?

18      A.   YES.  PRIOR TO.  PRIOR TO.

19      Q.   PRIOR TO YOUR INVESTMENT?

20      A.   CORRECT.

21           MR. SCHENK:  THE GOVERNMENT OFFERS EXHIBIT 82 IN

22      EVIDENCE.

23           THE COURT:  ANY OBJECTION?

24           MR. LEEMING:  NO OBJECTION.

25           THE COURT:  IT'S ADMITTED.
```

```
 1              (PLAINTIFF'S EXHIBIT 82 WAS ADMITTED IN EVIDENCE.)

 2              THE COURT:  GO AHEAD, PLEASE.

 3              MR. SCHENK:  IF WE COULD PUBLISH THE VERY FIRST PAGE

 4    OF EXHIBIT 82 TO THE JURY?

 5              THE COURT:  THAT'S FINE.

 6              MR. SCHENK:  THANK YOU.

 7         AND JUST ZOOM IN ON THE TOP FOUR OR FIVE LINES.

 8    Q.   IS THIS THE SUBSCRIPTION AGREEMENT THAT YOU'VE BEEN

 9    REFERRING TO?

10    A.   YES.

11    Q.   OKAY.  COULD WE TURN TO THE THIRD PAGE OF THIS DOCUMENT?

12    IS THAT YOUR HANDWRITING ON THE DOCUMENT?

13    A.   YES, IT IS.

14    Q.   AND THE -- NOW WHAT'S ZOOMED IN FOR THE JURY, THE BOTTOM

15    LINE OF THIS DOCUMENT, BUT FOR YOU, WHEN YOUR MONITOR DOESN'T

16    WORK, 6G.

17         DO YOU SEE THAT?

18    A.   YES.

19    Q.   WHAT IS THAT?  IS THAT THE AMOUNT OF YOUR INVESTMENT?

20    A.   THAT'S MY INITIAL INVESTMENT.

21         HOWEVER, I INVESTED FROM MY RETIREMENT ACCOUNT, MY IRA, SO

22    I INVESTED THROUGH A SERVICE CALLED IRA SERVICES OUT OF

23    SAN JOSE, WHICH FOR THE, YOU KNOW, PURPOSES OF MAINTAINING MY

24    QUALIFIED ACCOUNT TOOK A FEE, AND THEN SENT A CHECK FOR THE

25    REMAINDER TO GOLD COAST FINANCIAL.
```

```
1              SO MY INVESTMENT IN THE COMPANY WAS NOT EXACTLY $100,000.

2        IT WAS 100,000 LESS THE FEE THAT WAS CHARGED BY IRA SERVICES.

3        Q.   OKAY.  THANK YOU.

4              WOULD YOU TURN NOW TO PAGE 23 OF EXHIBIT 82.

5              AND, AGAIN, IF WE COULD ZOOM IN ON THE TOP.

6              IS THIS THE OPERATING AGREEMENT THAT YOU RECEIVED?

7        A.   YES, IT IS.

8        Q.   I WONDER IF YOU WOULDN'T MIND READING ONE OF THE

9        PARAGRAPHS TO THE JURY.

10             1.4, IF WE COULD ZOOM IN ON THAT PARAGRAPH.

11       A.   DO YOU WANT ME TO READ IT NOW?

12       Q.   YES, PLEASE.

13       A.   OKAY.  THANK YOU.  "COMPANY BUSINESS.  THE COMPANY'S

14       BUSINESS IS THE UNDERWRITING AND ISSUING OF SHORT-TERM, FIXED

15       INTEREST RATE LOANS SECURED BY REAL ESTATE, AND TO DO ALL OTHER

16       ACTS NECESSARY OR BENEFICIAL TO THE ACHIEVEMENT OF THE

17       COMPANY'S BUSINESS.  THE COMPANY HAS THE NECESSARY POWER TO DO

18       ALL THINGS REASONABLY INCIDENTAL TO OR IN FURTHERANCE OF THE

19       COMPANY'S BUSINESS."

20       Q.   OKAY.  AND THE PHRASE THAT YOU JUST READ, "UNDERWRITING

21       AND ISSUING OF SHORT-TERM, FIXED INTEREST RATE LOANS SECURED BY

22       REAL ESTATE," IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF HOW

23       YOUR MONEY WOULD BE USED?

24       A.   YES.

25       Q.   IS THAT HOW MS. ALEXANDER DESCRIBED TO YOU THAT YOUR
```

```
 1    INVESTMENT MONEY WOULD BE USED?

 2    A.   YES.

 3    Q.   WOULD YOU PLEASE TURN NOW TO PAGE 30?  IT'S JUST A COUPLE

 4    OF PAGES AFTER THE ONE WE WERE ON.

 5         AND IN SECTION 5.2, I'M GOING TO ASK YOU TO READ JUST A

 6    COUPLE OF SECTIONS IN THERE.  LET'S START WITH THE VERY TOP

 7    WHERE IT SAYS "AUTHORITY."

 8         DO YOU SEE THAT?

 9    A.   YES, I DO.

10    Q.   WOULD YOU READ "AUTHORITY," PLEASE.

11    A.   "AUTHORITY.  THE MANAGING MEMBER SHALL HAVE ALL NECESSARY

12    AUTHORITY, CONSISTENT WITH THIS AGREEMENT, TO ACT ON THE

13    COMPANY'S BEHALF IN ALL MATTERS CONCERNING THE COMPANY BUSINESS

14    AND PROPERTY, INCLUDING, WITHOUT LIMITATION, THE AUTHORITY TO

15    DO THE FOLLOWING."

16    Q.   OKAY.  AND IN HERE, IN THE MIDDLE OF THE THREE LINES, DO

17    YOU AGAIN SEE THAT PHRASE "COMPANY BUSINESS"?

18    A.   YES.

19    Q.   AND JUST A MOMENT AGO, DID YOU READ TO US WHAT COMPANY

20    BUSINESS MEANT?

21    A.   YES.

22    Q.   IF WE COULD ZOOM OUT NOW AND LET'S LOOK AT A FIRST.

23         WOULD YOU PLEASE READ A TO THE JURY?

24    A.   "A.  INVEST AND EXPEND THE COMPANY FUNDS, INCLUDING,

25    WITHOUT LIMITATION, FOR COMPANY FORMATION AND STRUCTURE,
```

1    MANAGEMENT, AND OPERATIONS, CURRENT OR CAPITAL EXPENDITURES,

2    AND IN SHORT-TERM AND LONG-TERM INVESTMENTS OF ALL TYPES

3    (INCLUDING, WITHOUT LIMITATION, MONEY MARKET ACCOUNTS,

4    SECURITIES, COMMODITIES, OPTIONS, AND HEDGING TRANSACTIONS,

5    EITHER FULLY-PAID OR ON MARGIN)."

6    Q.   OKAY.  AND IF WE COULD NOW FOCUS ON F AND G.  WOULD YOU

7    READ THOSE TWO FOR THE JURY?

8    A.   "F.  BORROW MONEY.

9         "G.  LOAN MONEY, INCLUDING, WITHOUT LIMITATION, TO ANY

10   MEMBER FOR COMPANY PURPOSES, WITH OR WITHOUT SECURITY."

11   Q.   WOULD YOU TURN TO PAGE 45, STILL OF EXHIBIT 82.  DO YOU

12   RECOGNIZE THIS DOCUMENT?  IT MAKES UP THE LAST SEVERAL PAGES OF

13   EXHIBIT 82.

14   A.   YES.

15   Q.   AND WHAT IS THIS?

16   A.   CONFIDENTIAL INVESTOR SUITABILITY STATEMENT.

17   Q.   OKAY.  AND THERE'S HANDWRITING THROUGHOUT THIS DOCUMENT.

18   IT LOOKS TO BE ABOUT SIX OR SEVEN PAGES LONG.

19        DO YOU RECOGNIZE THAT HANDWRITING?

20   A.   YES.  THAT'S MINE.

21   Q.   IT'S YOUR HANDWRITING?

22   A.   YES.

23   Q.   WERE YOU ASKED TO FILL OUT THIS DOCUMENT?

24   A.   YES.

25   Q.   AND DOES IT DESCRIBE YOUR FINANCIAL NET WORTH AND OTHER

```
 1        INFORMATION ABOUT YOUR ASSETS?

 2   A.   YES.  SECTION 14, IT HAS BRACKETS.

 3   Q.   OKAY.

 4        ONE MOMENT, YOUR HONOR.

 5        WHEN YOU DECIDED TO INVEST, DID YOU ASK MS. ALEXANDER

 6   ABOUT THE PROCESS TO WITHDRAW YOUR INVESTMENT?

 7   A.   NOT SPECIFICALLY.

 8   Q.   OKAY.  DID YOU EVER HAVE CONVERSATIONS WITH HER ABOUT HOW

 9   TO GET YOUR MONEY BACK?

10   A.   LATER WHEN I REQUESTED MY MONEY BACK, YES.

11   Q.   OKAY.  WE'LL GET TO THAT IN A MOMENT.

12        HOW MUCH DID YOU INVEST?

13   A.   WELL, LIKE I SAID, MY INITIAL -- MY INITIAL CHECK WAS

14   100,000 TO IRA INVESTMENT.  OF THAT, 99,500 SOMETHING, $99,591

15   WAS INVESTED IN THE FUND.

16   Q.   OKAY.  LET'S NOW TURN -- THIS IS BACK IN THE FIRST

17   BINDER -- TO EXHIBIT 11.

18   A.   OKAY.

19   Q.   DO YOU RECOGNIZE -- IT'S A TWO-PAGE DOCUMENT.  IF YOU

20   WOULDN'T MIND TAKING A LOOK AT PAGES 1 AND 2.

21        DO YOU RECOGNIZE THOSE PAGES?

22   A.   YES, I DO.

23   Q.   WHAT ARE THEY?

24   A.   THESE WERE PROVIDED TO ME AFTER MY INITIAL INVESTMENT, A

25   WELCOME LETTER, HELLO LETTER, WELCOME-TO-THE-FUND TYPE LETTER.
```

GAUGHF - DIRECT

```
1              ON PAGE 2, IT STATES THE DOLLAR AMOUNT THAT THEY RECEIVED

2       FROM IRA INVESTMENT, $99,951.75.

3       Q.    OKAY.  AND DID GCF INVESTMENT MAIL THESE DOCUMENTS TO YOU?

4       A.    YES.

5              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

6       EXHIBIT 11 INTO EVIDENCE.

7              THE COURT:  ANY OBJECTION?

8              MR. LEEMING:  NO OBJECTION.

9              THE COURT:  IT'S ADMITTED.

10             (PLAINTIFF'S EXHIBIT 11 WAS ADMITTED IN EVIDENCE.)

11             MR. SCHENK:  AND IF WE COULD PUBLISH THE FIRST PAGE

12      OF EXHIBIT 11 TO THE JURY.

13             THE COURT:  GO AHEAD, PLEASE.

14             MR. SCHENK:  THANK YOU.

15             LET'S ZOOM IN AT THE VERY TOP.

16      Q.    WHAT'S THE DATE ON HERE?

17      A.    APRIL 1ST, 2008.

18      Q.    OKAY.  AND IS THAT YOUR NAME AND ADDRESS ON THE DOCUMENT?

19      A.    YES, IT IS.

20      Q.    WOULD YOU READ THE FIRST TWO PARAGRAPHS?  I'M SORRY.  THE

21      FIRST THREE PARAGRAPHS?

22      A.    "WELCOME TO THE GCF INVESTMENT, LLC FAMILY OF INVESTORS.

23             "ENCLOSED PLEASE FIND YOUR STATEMENT OF YOUR IRA FUNDS,

24      WHICH ARRIVED ON MARCH 24TH, 2008.

25             "YOU WILL RECEIVE THESE STATEMENTS EACH MONTH ON OR AROUND
```

1    THE 1ST OF THE MONTH.  WE APPRECIATE YOUR OPPORTUNITY."

2    Q.   AND DID YOU RECEIVE MONEY EVERY MONTH AFTER YOU RECEIVED

3    THIS LETTER?

4    A.   NO.  BECAUSE IT WAS AN IRA ACCOUNT, I DID NOT WITHDRAW

5    FUNDS.  I WASN'T OLD ENOUGH.

6    Q.   OKAY.  AND WHAT WAS THE OTHER OPTION?  IF YOU DIDN'T

7    WITHDRAW FUNDS, THEN WHAT HAPPENED?

8    A.   CALL IT ROLLING OVER.  IT WAS REINVESTED IN THE FUNDS.  SO

9    ANY -- ANY INTEREST DUE WAS THEN REINVESTED.

10   Q.   OKAY.  IF WE COULD TURN TO THE SECOND PAGE OF THIS

11   DOCUMENT, IN THE UPPER RIGHT-HAND CORNER, DO YOU SEE THE DATE?

12   A.   YES.  APRIL 2008.

13   Q.   OKAY.  AND THE FIRST LINE -- AGAIN, THAT'S YOUR NAME AND

14   ADDRESS; IS THAT RIGHT?

15   A.   YES.

16   Q.   NOW, THE FIRST LINE UNDER THE DATE COLUMN, WHAT IS THAT?

17   WHAT DATE IS ON THE DOCUMENT?

18   A.   MARCH 24TH, 2008.  THAT REFLECTS MY INITIAL INVESTMENT AS

19   RECEIVED FROM IRA SERVICES.

20   Q.   OKAY.  YOU WERE DESCRIBING TO US A MOMENT AGO, I THINK,

21   THE DIFFERENCE BETWEEN YOUR $100,000 INVESTMENT AND THE AMOUNT

22   THAT ACTUALLY HIT GCF INVESTMENT.

23   A.   CORRECT.

24   Q.   AND WHAT'S THE DIFFERENCE THERE?  I DON'T MEAN THE MATH,

25   BUT WHY IS THERE A DIFFERENCE BETWEEN THE TWO?

GAUGHF DIRECT

```
 1      A.   JUST TECHNICAL SERVICES.  SO THEY COULD -- AN IRA ACCOUNT

 2      IS A TAX TREATMENT OF INVESTMENTS, SO THEY -- BECAUSE I

 3      INVESTED NOT DIRECTLY, BECAUSE I INVESTED THROUGH AN IRA

 4      SERVICES COMPANY, I WAS ABLE TO MAINTAIN MY QUALIFIED STATUS OF

 5      MY IRA WITHOUT WITHDRAWING THE FUNDS AND INVESTING DIRECTLY.

 6      THAT WOULD HAVE BEEN A TAXABLE PENALTY EVENT.

 7           BUT BY INVESTING THROUGH A SERVICES COMPANY, IT PROTECTED

 8      MY TAX STATUS AND THEY CHARGE A FEE FOR THE SERVICE.

 9      Q.   THANK YOU.

10           THE SECOND LINE, THAT IS, APRIL 1ST, 2008, WHAT'S

11      REFLECTED ON THAT LINE?

12      A.   WELL, THE INCOME, THE IMPUTED INTEREST THAT WOULD HAVE

13      BEEN RECEIVED THAT WAS THEN REINVESTED, SO MY BALANCE INCREASED

14      FROM THE INITIAL INVESTMENT TO REFLECT THE INTEREST THAT WAS

15      DUE.

16      Q.   YOUR BALANCE IS GROWING?

17      A.   YEAH, MY BALANCE GREW.

18      Q.   AND WAS THAT IMPORTANT TO YOU TO SEE ON A STATEMENT THAT

19      YOUR BALANCE WAS GROWING?

20      A.   SURE.

21      Q.   WHY?  I KNOW IT'S MAYBE OBVIOUS, BUT WHY?

22      A.   WELL, THAT REFLECTS THE, THE MONIES THAT I'M DUE.  THAT'S

23      MY BALANCE.  SO MY MONEY IS NOW WORKING IN THE MARKET, AND

24      PRESUMABLY WORKING WELL BASED ON THE STATEMENT.  -

25      Q.   OKAY.
```

GAUGHF DIRECT

1    A.   THERE'S NO LOSS.  THERE'S A GAIN ACCORDING TO MY

2    AGREEMENT.

3    Q.   OKAY.  AND, AGAIN, THIS IS ON PAPER.  YOU DIDN'T GET THE

4    $199.90?

5    A.   DIDN'T GET IT.  DIDN'T REQUEST IT.

6    Q.   OKAY.  WOULD YOU TURN TO THE NEXT EXHIBIT?  IT'S

7    EXHIBIT 12, PLEASE, AND IT'S JUST ONE PAGE.

8         DO YOU RECOGNIZE THAT DOCUMENT?

9    A.   YES.

10   Q.   WHAT IS THAT?

11   A.   THIS IS A SUBSEQUENT STATEMENT.  THIS IS THE MAY 2008

12   STATEMENT REFLECTING MY INITIAL INVESTMENT, THE FIRST MONTH'S

13   INTEREST ROLLED OVER, AND THEN THE SECOND MONTH'S INTEREST WITH

14   THE BALANCES.

15   Q.   DID YOU RECEIVE THIS STATEMENT BY MAIL?

16   A.   YES.

17        MR. SCHENK:  THE GOVERNMENT OFFERS 12 IN EVIDENCE,

18   YOUR HONOR.

19        THE COURT:  ANY OBJECTION?

20        MR. LEEMING:  NONE, YOUR HONOR.  THANK YOU.

21        THE COURT:  IT'S ADMITTED.

22   (PLAINTIFF'S EXHIBIT 12 WAS ADMITTED IN EVIDENCE.)

23        MR. SCHENK:  AND MAY WE PUBLISH?

24        THE COURT:  GO AHEAD, PLEASE.

25        MR. SCHENK:  THANK YOU.

1    Q.   AGAIN, YOU SAID THE DATE.  IS THAT IN THE UPPER RIGHT-HAND

2    CORNER?

3    A.   YES.

4    Q.   AND WHAT'S THE DATE?

5    A.   MAY 2008.

6    Q.   LET'S LOOK AT WHAT LOOKS TO BE THE ONE NEW ENTRY THAT'S

7    ADDED TO THIS, THAT IS, THE DIFFERENCE BETWEEN EXHIBIT 12 AND

8    EXHIBIT 11, THE LAST LINE --

9    A.   CORRECT.

10   Q.   -- ON THIS DOCUMENT.

11        COULD YOU TELL THE JURY WHAT IS REFLECTED THERE?

12   A.   AS YOUR BALANCE INCREASES, THE INTEREST DUE IS BASED ON

13   THE INCREASED BALANCE.  THIS IS THE MAGIC OF COMPOUNDED

14   INTEREST.

15        SO THAT WOULD REFLECT THE, THE RETURN ON MY MONEY FOR THE

16   SUBSEQUENT MONTH.

17   Q.   AND ON MAY 1ST, 2008, YOU RECEIVED AN ADDITIONAL

18   $1,001.52?

19   A.   CORRECT.

20   Q.   BUT YOU DIDN'T GET THAT MONEY IN YOUR BANK ACCOUNT OR YOUR

21   HANDS?  IT'S JUST ON PAPER?

22   A.   CORRECT.

23   Q.   WOULD YOU TURN TO THE NEXT DOCUMENT?  IT'S EXHIBIT 13,

24   ALSO A ONE-PAGE DOCUMENT.

25        DO YOU RECOGNIZE THIS DOCUMENT?

GAUGHF  DIRECT

1    A.    YES.

2    Q.    WHAT IS IT?

3    A.    THIS IS THE JUNE 2008 STATEMENT THAT REFLECTS A SUBSEQUENT

4    MONTH'S REINVESTMENT OF THE INTEREST THAT WAS DUE, OR EARNED.

5    Q.    DID YOU RECEIVE THIS DOCUMENT BY MAIL?

6    A.    YES, I DID.

7           MR. SCHENK:  THE GOVERNMENT OFFERS EXHIBIT 13 IN

8    EVIDENCE.

9           MR. LEEMING:  NO OBJECTION.

10          THE COURT:  IT'S ADMITTED.

11    (PLAINTIFF'S EXHIBIT 13 WAS ADMITTED IN EVIDENCE.)

12          MR. SCHENK:  AND IF WE CAN PUBLISH THIS DOCUMENT TO

13    THE JURY?

14          THE COURT:  GO AHEAD, PLEASE.

15          MR. SCHENK:  THANK YOU.

16    Q.    AND LET'S DO THE SAME THING.  WOULD YOU EXPLAIN TO THE

17    JURY THE ONE NEW ENTRY.  IT LOOKS LIKE THIS JUNE STATEMENT IS

18    IDENTICAL TO THE MAY STATEMENT, SAVE FOR ONE LINE.

19    A.    CORRECT.

20    Q.    WHAT LINE IS THAT?

21    A.    THE INTEREST EARNED, ONCE AGAIN, WAS BASED ON THE PREVIOUS

22    MONTH'S BALANCE, WHICH REFLECTED THE PREVIOUS MONTH'S

23    INVESTMENT, OR RETURN ON THE DOLLAR.

24          SO ONCE AGAIN, THE INTEREST IS COMPOUNDING AS YOU'RE

25    GAINING INTEREST ON HIGHER AMOUNTS.

1      Q.   SO, AGAIN, IN JUNE YOU RECEIVED BY MAIL FROM GCF

2      INVESTMENT THIS PIECE OF PAPER SAYING YOUR BALANCE IS GROWING,

3      YOU HAVE MORE MONEY WITH US?

4      A.   CORRECT.

5      Q.   COULD YOU TURN NOW TO EXHIBIT 38?

6      A.   THIRTY --

7      Q.   -- EIGHT.  AND IN PARTICULAR, THE BOTTOM LEFT.  THERE'S A

8      LIST OF CHECKS ON THIS PAGE, BUT THE BOTTOM LEFT ONE IS WHERE

9      I'D LIKE TO FOCUS YOUR ATTENTION.

10     A.   I SEE IT.

11     Q.   DO YOU SEE THE AMOUNT ON THAT DOCUMENT?

12     A.   YES.

13     Q.   WHAT IS THE AMOUNT?

14     A.   IT IS THE $99,951.75 THAT WAS INVESTED VIA IRA SERVICES.

15     Q.   OKAY.  AND DO YOU ALSO SEE YOUR NAME?  I KNOW THE WRITING

16     IS SMALL, BUT DO YOU SEE YOUR NAME ON THE DOCUMENT?

17     A.   YES.  FOR THE BENEFIT OF GCF INVESTMENTS, LLC, FOR THE

18     BENEFIT OF GAUGHF, CHARLES PATTERSON.

19              MR. SCHENK:  THE GOVERNMENT OFFERS 38 IN EVIDENCE.

20              MR. LEEMING:  NO OBJECTION.

21              THE COURT:  IT'S ADMITTED.

22         (PLAINTIFF'S EXHIBIT 38 WAS ADMITTED IN EVIDENCE.)

23              MR. SCHENK:  AND IF WE COULD JUST QUICKLY BRING THAT

24     UP AND SHOW IT TO THE JURY.  IT'S, AGAIN, THE BOTTOM LEFT

25     CHECK.  IT'S DIFFICULT TO READ.

1    Q.   AND ARE YOU SAYING THAT -- I DON'T KNOW IF YOU CAN SEE THE

2    SCREEN, THE SECOND LINE --

3    A.   YES.   THE SECOND LINE SAYS FBO GAUGHF, CHARLES PATTERSON.

4    FBO IS FOR THE BENEFIT OF.   YOU'LL NOTICE IF YOU HAVE AN IRA

5    STATEMENT, IT'S ALWAYS LISTED AS FOR THE BENEFIT OF.

6    Q.   OKAY.   AND BELOW THE CHECK THERE'S A DATE.   IS THAT DATE

7    CONSISTENT WITH WHEN YOU MADE YOUR FIRST INVESTMENT?   DO YOU

8    SEE THAT?

9    A.   YES.

10   Q.   AND IS IT CONSISTENT WITH WHEN YOU MADE YOUR FIRST

11   INVESTMENT?

12   A.   YES.

13   Q.   AT ANY POINT DID -- WELL, LET ME ASK ONE LAST QUESTION

14   ABOUT THIS DOCUMENT.

15        AT THE VERY TOP THERE'S A BUSINESS NAME AND A P.O. BOX.

16   DO YOU SEE THAT AT THE TOP OF THE CHECK?

17   A.   AT THE TOP OF THE CHECK?

18   Q.   YEAH.

19   A.   YES.

20   Q.   AND WHAT IS THE BUSINESS NAME?

21   A.   IRA SERVICES.

22   Q.   IS THAT THE BUSINESS THAT YOU SAID YOU WIRED YOUR MONEY

23   THROUGH, YOU USED THEM TO SEND YOUR MONEY TO MS. ALEXANDER'S

24   BUSINESS, GCF INVESTMENTS?

25   A.   YES.

1    Q.   AT ANY POINT DID MS. ALEXANDER ASK YOU FOR PERMISSION TO

2    CHANGE THE WAY THAT APS OR GCF INVESTMENTS DID THEIR

3    ACCOUNTING?

4    A.   NO.

5    Q.   DID MR. SWANSON ASK YOU FOR PERMISSION FOR APS TO CHANGE

6    THE WAY THAT THEY DID THEIR ACCOUNTING?

7    A.   NO.

8    Q.   DID MS. PINA ASK YOU THAT SAME QUESTION, PERMISSION TO

9    CHANGE?

10   A.   NO.

11   Q.   SO IS IT FAIR TO SAY NOBODY FROM THE BUSINESS EVER ASKED

12   YOU?

13   A.   CORRECT.

14   Q.   DID YOU GET YOUR MONEY BACK?  WE'VE SEEN SOME STATEMENTS

15   WHERE YOUR BALANCE IS GROWING.  DID YOU EVER GET YOUR INITIAL

16   INVESTMENT OR THE INTEREST THAT'S NOW PROMISED TO YOU BACK?

17   A.   NO, I DIDN'T.

18   Q.   DID A TIME COME WHEN YOU BECAME WORRIED OR CONCERNED THAT

19   YOU MIGHT NOT GET YOUR MONEY BACK?

20   A.   YEAH.  I FIRST BECAME CONCERNED IN MAY 2009.

21   Q.   OKAY.  AND WHY?

22   A.   WELL, FIRST, IT'S -- IT'S A SMALL TOWN.  PEOPLE TALK.

23          MR. LEEMING:  OBJECTION.  HEARSAY.

24          MR. SCHENK:  IT'S -- YOUR HONOR, HE'S NOT OFFERING

25   ANY OUT OF COURT STATEMENT.  IT'S WHAT CAUSED HIM TO BE

GAUGHF DIRECT

1     CONCERNED.

2            THE COURT:  OVERRULED.

3        GO AHEAD, PLEASE.

4            THE WITNESS:  I DON'T WANT TO CALL IT RELATIONSHIPS

5     OR ASSOCIATES, BUT THERE WERE TWO -- SCRATCH THAT.

6         THERE WAS ONE INDIVIDUAL THAT WAS IN CONTACT WITH ME THAT

7     HAD EXPRESSED SOME CONCERN ABOUT THE, THE INVESTMENT ITSELF,

8     JOANNA WUEFLING.

9            MR. LEEMING:  SAME OBJECTION, YOUR HONOR.

10           MR. SCHENK:  YOUR HONOR, IT'S NOT OFFERED FOR THE

11    TRUTH.  IT'S WHAT CAUSED HIM TO BE CONCERNED.

12           THE WITNESS:  THIS IS WHAT CAUSED ME TO BE CONCERNED.

13           THE COURT:  ALL RIGHT.  GO AHEAD, PLEASE.

14           THE WITNESS:  AND SHE SAID, "PAT, DO YOU KNOW WHAT'S

15    HAPPENING OVER THERE?"  OR SOMETHING TO THAT EFFECT.

16      I SAID NO.  BUT THERE WAS ENOUGH CONCERN BY THAT -- AND I

17    HAD -- NOW THE MARKET WAS BEGINNING TO STRENGTHEN UP AND I

18    THOUGHT IT WAS A GOOD TIME TO REINVEST INTO THE STOCK MARKET OR

19    MY STANDARD INVESTMENTS, SO I THOUGHT IT WAS A GOOD TIME TO

20    PULL OUT.  IT HAD DONE WHAT IT SAID IT WAS GOING TO DO WITH THE

21    INCREASE, YOU KNOW, THE INTEREST THAT I WAS GETTING ON IT.

22      AND I REQUESTED MY MONEY IN, I THINK, JUNE OF 2009,

23    SOMEWHERE AROUND THERE.  I REQUESTED IT.  FIRST I APPROACHED

24    BARBRA AND SAID, "I THINK IT'S TIME FOR ME TO CASH OUT.  THANK

25    YOU.  IT'S BEEN A GOOD RUN.  CAN I CASH OUT?"

GAUGHF DIRECT

```
1              AND SHE SAID, "SURE, JUST FILL OUT A WITHDRAWAL FORM."

2              I BELIEVE MS. PINA PROVIDED THE FORM THAT I COMPLETED

3      ASKING FOR ALL OF THE MONEY THAT WAS REFLECTED ON MY MOST

4      RECENT STATEMENT, AND I FAXED IT IN, AND NOTHING HAPPENED.

5      BY MR. SCHENK:

6      Q.   OKAY.  DID YOU MAKE A SECOND REQUEST TO HAVE YOUR MONEY

7      WITHDRAWN?

8      A.   YES.  ABOUT A 30 DAY PERIOD WENT BY WITH NO ACTION, SO I

9      REQUESTED A SECOND TIME FOR MY MONEY TO BE WITHDRAWN.

10     Q.   THE SAME WAY?  DID YOU FILL OUT ONE OF THESE FORMS?

11     A.   YES.  I PROBABLY REFAXED THE SAME FORM.

12     Q.   OKAY.  AND DID YOU RECEIVE A RESPONSE TO THE SECOND

13     REQUEST?

14     A.   NO RESPONSE.

15     Q.   OKAY.  DID YOU EVER HAVE A CONVERSATION -- AGAIN, WE'RE IN

16     ABOUT JULY 2009 -- WITH MS. ALEXANDER ABOUT WHY YOU WEREN'T

17     GETTING YOUR MONEY BACK?

18     A.   YES, WE HAD SEVERAL CONVERSATIONS REGARDING THAT.

19     Q.   WHAT DID SHE TELL YOU?

20     A.   I KNEW THAT WE HAD A DISTRESSED MARKET, THAT THESE HOMES

21     WERE NOT TURNING AS FAST AS ONE WOULD LIKE FOR THEM TO.  SO THE

22     FIRST RESPONSE WAS -- YOU KNOW, EITHER THE FIRST RESPONSE WAS

23     "I NEED -- I'M WAITING FOR NEW CAPITAL TO COME IN, I'VE GOT

24     SOME NEW INVESTORS," OR "I'M WAITING FOR A PROPERTY TO BE

25     SOLD."
```

1          EITHER ONE WOULD HAVE RETURNED SOME FUNDS, SOME FUNDS, AND

2    I WAS GOING TO BE ABLE TO TAKE MY FUNDS OUT ONCE ONE OF THOSE

3    TWO THINGS OCCURRED, EITHER THEY HAD A NEW INVESTOR OR ONE OF

4    THE PROPERTIES SETTLED AND SHE WAS ABLE TO RECOUP ONE OF THE

5    LOANS AND THEN REPAY ME.

6    Q.   OKAY.  DID THAT HAPPEN?

7    A.   NO.

8    Q.   AND DID YOU CONTINUE TO HAVE CONTACT WITH MS. ALEXANDER

9    REGARDING THE STATUS OF THE RETURN OF YOUR INVESTMENT?

10   A.   YES.

11   Q.   AND HOW LONG DID THIS CONTACT CONTINUE, THIS DANCE?

12   A.   ABOUT FOUR MONTHS.

13   Q.   OKAY.  AND HOW OFTEN WOULD YOU HAVE CONTACT WITH

14   MS. ALEXANDER ABOUT THE STATUS OF YOUR MONEY?

15   A.   WITHOUT -- I CAN'T REMEMBER SPECIFICALLY, BUT ONCE A MONTH

16   WOULD HAVE BEEN REASONABLE.

17   Q.   UNDER WHAT CIRCUMSTANCES?  DID YOU GO TO HER HOUSE?  DID

18   SHE COME TO YOURS?  WHERE WERE THESE?

19   A.   WE WOULD FREQUENTLY HAVE LUNCH TOGETHER IN DOWNTOWN

20   MONTEREY AS A CLIENT, AS A FRIEND, AS AN INVESTOR.  BUT NOT

21   MY -- SHE WAS A CLIENT.  SO WE HAD MULTIPLE RELATIONSHIPS

22   THERE.

23        WE WOULD HAVE LUNCH.  WE WOULD TALK.  HOW ARE YOUR

24   INVESTMENTS DOING?

25        I WAS ASSURED THAT EVERYTHING WAS WHOLE, IT WAS JUST

GAUGHF DIRECT

```
 1      TAKING MUCH LONGER THAN WE COULD HAVE ANTICIPATED FOR THE

 2      PROPERTIES TO BE SOLD, TO BE LIQUIDATED, FOR THE FUNDING TO BE

 3      REPLENISHED SO I COULD WITHDRAW MINE.

 4      Q.   OKAY.  DID MS. ALEXANDER EVER TELL YOU THAT HER BUSINESS

 5      WAS IN FINANCIAL TROUBLE?

 6      A.   NEVER.

 7      Q.   DID MS. ALEXANDER EVER TELL YOU THAT YOU WOULDN'T BE

 8      GETTING YOUR MONEY BACK?

 9      A.   NO.

10      Q.   DID MS. ALEXANDER EVER TELL YOU THAT THERE WOULD BE MORE

11      DELAYS BEFORE YOU GOT YOUR MONEY BACK, BUT EVENTUALLY YOU'LL

12      GET IT?

13      A.   YES.

14      Q.   DID YOU EVER GET YOUR MONEY BACK?

15      A.   NO.

16      Q.   DID YOU CONTINUE THESE LUNCHES WITH MS. ALEXANDER?

17      A.   UNTIL NOVEMBER.

18      Q.   OF WHAT YEAR?

19      A.   2009.

20      Q.   OKAY.  WHAT HAPPENED THEN?

21      A.   THE INDICTMENT WAS PUBLISHED IN THE PAPER AND THE MONTEREY

22      PENINSULA HERALD PUBLISHED AN ARTICLE ON THE INDICTMENT.  THAT

23      WAS MY FIRST CLUE THAT THERE WAS SOMETHING UNTOWARD.

24           AND I IMMEDIATELY CALLED BARBRA AND SAID, "LET'S GO TO

25      LUNCH.  LET'S FIND OUT WHAT'S GOING ON."  I WAS GIVING HER THE
```

```
1        BENEFIT OF THE DOUBT.

2               AND WE DID HAVE LUNCH THE DAY, I BELIEVE THE DAY AFTER,

3        MAYBE THE DAY OF THE INDICTMENT BEING PUBLISHED IN THE PAPER.

4               AND I SAID, "WHAT'S GOING ON?"  I THINK THAT WAS MY TERM,

5        "WHAT'S GOING ON?"

6               AND SHE COULD PROVIDE NOTHING THAT WAS OUT OF THE

7        ORDINARY.  THE ANSWER WAS "I DON'T KNOW."

8               "SO THERE'S NO PROBLEM WITH YOUR INVESTMENTS?"

9               "NO."

10              "WHY WOULD THE FBI RAID YOUR HOME AND TAKE YOUR FILES,

11       TAKE YOUR COMPUTERS IF NOTHING IS UNTOWARD?  ARE THEY GOING TO

12       FIND ANYTHING?"

13              "NO, NOTHING."

14              IT WAS BLAMED ON A DISGRUNTLED EMPLOYEE.

15       Q.   WHEN YOU SAY "IT WAS BLAMED," WHAT DO YOU MEAN?

16       A.   THE RAID, THE FBI CONFISCATING THE FILES AND THE COMPUTERS

17       WAS BLAMED ON A DISGRUNTLED EMPLOYEE.

18       Q.   WHO BLAMED IT ON A DISGRUNTLED EMPLOYEE?

19       A.   BARBRA.

20       Q.   SO YOU HAD READ OR HEARD THAT THE FBI EXECUTED SEARCH

21       WARRANTS?

22       A.   CORRECT.

23       Q.   AND DID YOU ASK MS. ALEXANDER WHY THE FBI WOULD EXECUTE

24       SEARCH WARRANTS?

25       A.   YES.
```

GAUGHF DIRECT

```
1    Q.   AND WHAT WAS HER ANSWER?

2    A.   NO IDEA.

3    Q.   OKAY.  WHEN DID THE BLAME START?

4    A.   AT THE SAME TIME.  SHE SAID IT WAS PROBABLY FROM A

5    DISGRUNTLED EMPLOYEE THAT HAS CONTACTED THE FBI AND SAID TO GO

6    RAID THE THING.

7         I MADE A COMMENT AT THE TIME THAT --

8    Q.   WHAT DID YOU SAY?

9    A.   I SAID, "A DISGRUNTLED EMPLOYEE CANNOT COMPEL THE FBI TO

10   RAID YOUR COMPANY AND TAKE YOUR FILES AND YOUR COMPUTERS UNLESS

11   THERE'S SOMETHING BEYOND WHAT YOU'RE TELLING ME."

12   Q.   AND WHAT DID MS. ALEXANDER SAY?

13   A.   "THERE'S NOTHING -- THERE'S NOTHING GOING ON.  I DON'T

14   KNOW WHAT THEY'RE LOOKING FOR."

15   Q.   DID YOU HAVE ANY DISCUSSIONS OF A JOB OFFER AT THIS LUNCH

16   WITH MS. ALEXANDER?

17   A.   WELL, IT WAS ACTUALLY RESCINDING THE JOB OFFER.

18        AS THE MARKET WAS PROGRESSING, AS I SAID EARLIER, I MOVED

19   INTO RETAIL MORTGAGE BANKING AT A LOCAL COMPANY.  BROKERS WERE

20   UNDER A LOT OF STRESS TO MAINTAIN THEIR POSITIONS IN THE MARKET

21   AS THE CFPB, THE CONSUMER FINANCE PROTECTION BUREAU, WAS MAKING

22   A LOT OF CHANGES TO PROTECT THE CONSUMER, SOME VALUABLE, SOME

23   NOT NECESSARILY SO.

24        BUT BROKERS WERE FEELING THE STRESS OF THE NEW MARKET

25   COMPLIANCE ISSUES.
```

```
1              I OFFERED BARBRA A POSITION WITH MY COMPANY -- AGAIN, I

2       HAD -- THERE WAS NO ANIMOSITY.  THERE WAS NOTHING UNUSUAL ABOUT

3       OUR RELATIONSHIP.

4              BUT I KNEW THAT MAINTAINING HER BROKERAGE COMPANY WAS

5       GOING TO BE DIFFICULT, BUT SHE WAS STILL LICENSED AS A MORTGAGE

6       BROKER, WHICH GAVE HER THE ABILITY TO ORIGINATE LOANS UNDER

7       ANOTHER COMPANY.

8              MY COMPANY AT THE TIME, TREEHOUSE -- NOT MY COMPANY, THE

9       COMPANY I WORKED FOR -- TREEHOUSE MORTGAGE GROUP, A SUBSIDIARY

10      OF AMERICAN PACIFIC MORTGAGE CORPORATION, I SAID, "WHY DON'T

11      YOU JUST COME ORIGINATE LOANS FOR ME?  YOU'LL STILL BE ABLE TO

12      ACCESS YOUR MARKETPLACE, YOUR DATABASE, BUT YOU'RE OPERATING

13      UNDER MY AUSPICES, NOT YOUR OWN."

14             I TOOK THE APPLICATION, WE DID OUR DUE DILIGENCE LIKE ANY

15      TIME THAT WE HIRE SOMEONE IN THE MORTGAGE BANKING INDUSTRY, AND

16      AN OFFER WAS MADE.

17      Q.   WHEN WAS THAT?  DO YOU REMEMBER?  IF YOU WERE AT THIS --

18      A.   I'M THINKING, LIKE, OCTOBER-ISH.

19      Q.   SO A FEW MONTHS BEFORE THE LUNCH?

20      A.   NOT A FEW MONTHS BEFORE, BUT A MONTH OR SO BEFORE.  IT

21      TAKES US A COUPLE OF WEEKS TO DO A BACKGROUND CHECK ON ANY

22      INDIVIDUAL THAT WE'RE GOING TO ALLOW IN OUR COMPANY TO

23      ORIGINATE LOANS.

24      Q.   OKAY.

25      A.   AND THIS IS AN FBI BACKGROUND CHECK.
```

1          BEFORE -- BEFORE BARBRA BEGAN OPERATING UNDER TREEHOUSE

2     MORTGAGE GROUP, AMERICA PACIFIC MORTGAGE CORPORATION, THE

3     INDICTMENT WAS PUBLISHED.

4     Q.   OKAY.

5     A.   I HAD THE LUNCH AND AT THAT TIME I DID RESCIND THE OFFER.

6     I SAID, "YOU DO UNDERSTAND THAT AS LONG AS YOU'RE OPERATING

7     UNDER THIS CLOUD, YOU WILL NOT BE ABLE TO ORIGINATE LOANS IN MY

8     COMPANY?"

9     Q.   AND WHAT WAS HER RESPONSE TO YOU RESCINDING?

10    A.   SHE WASN'T EXACTLY THRILLED WITH THE WHOLE IDEA.  I THINK

11    SHE UNDERSTOOD INTUITIVELY WHY IT WOULD HAPPEN, BUT IT WASN'T

12    WELL RECEIVED I DON'T BELIEVE.

13    Q.   OKAY.  JUST A MOMENT.

14          THE COURT:  IT'S 10:40.  WHY DON'T WE GO AHEAD AND

15    TAKE OUR BREAK NOW?  WE'RE GOING TO TAKE A 15 MINUTE BREAK.

16          ALL RIGHT.  SAME ADMONITION.  PLEASE DON'T INVESTIGATE OR

17    DISCUSS THE CASE.  THANK YOU.

18          YOU CAN LEAVE YOUR NOTEBOOKS AND YOUR JURY INSTRUCTIONS ON

19    YOUR CHAIR.  WE'LL GET EVERYONE BACK AT 10:55.  THANK YOU.

20          (JURY OUT AT 10:41 A.M.)

21          THE COURT:  YOU MAY STEP DOWN.

22          (RECESS FROM 10:41 A.M. UNTIL 10:57 A.M.)

23          (JURY IN AT 10:57 A.M.)

24          THE COURT:  ALL RIGHT.  WELCOME BACK.  THE TIME IS

25    NOW 10:58.

GAUGHF DIRECT

```
1              PLEASE TAKE A SEAT.

2              GO AHEAD, PLEASE.

3                   MR. SCHENK:  THANK YOU.

4    Q.   BEFORE THE BREAK, YOU WERE DESCRIBING TO US THIS

5    CONVERSATION YOU HAD WITH MS. ALEXANDER WHERE YOU RESCINDED A

6    JOB OFFER.

7              DO YOU RECALL THAT?

8    A.   YES.

9    Q.   AFTER THAT -- THIS WAS OVER LUNCH?

10   A.   YES.

11   Q.   AFTER THAT LUNCH, HAVE YOU HAD ANY CONTACT WITH

12   MS. ALEXANDER SINCE THEN?

13   A.   NONE.

14   Q.   HOW MANY YEARS HAVE PASSED, ROUGHLY?

15   A.   A LITTLE OVER FOUR YEARS.

16   Q.   DID YOU EVER GET YOUR MONEY BACK?

17   A.   NO.

18   Q.   AT THE VERY END, SO ABOUT FOUR YEARS AGO, THE VERY END OF

19   YOUR CONVERSATION WITH MS. ALEXANDER, DID YOU STILL THINK THAT

20   YOUR MONEY WAS INVESTED IN REAL ESTATE?

21   A.   I'M SORRY.  SAY THAT AGAIN, PLEASE.

22   Q.   YES.  THIS LUNCH CONVERSATION THAT YOU HAD WITH

23   MS. ALEXANDER, THAT WAS THE VERY LAST CONVERSATION YOU HAD WITH

24   HER ABOUT YOUR INVESTMENT?

25   A.   YES.
```

1   Q.   EVEN AT THAT TIME, DID YOU STILL THINK THAT YOUR

2   INVESTMENT MONEY HAD BEEN INVESTED IN REAL ESTATE?

3   A.   YES.

4   Q.   AND DID MS. ALEXANDER CONTINUE TO TELL YOU THAT?

5   A.   WELL, SINCE I HAD NO CONVERSATION AFTER THAT DATE, NO.

6   Q.   I'M SORRY.  I MEANT IN THE DAYS AND WEEKS LEADING UP TO

7   THIS --

8   A.   YES.

9   Q.   -- LUNCH.

10   THANK YOU.

11   YOU SAID SOMETHING EARLIER IN YOUR TESTIMONY THAT I JUST

12   WANTED TO CLARIFY, AND THAT WAS YOU SAID EVEN IN A BAD -- I

13   THINK -- EVEN IN A BAD ECONOMY, THE ECONOMY WE WERE IN, YOU SAW

14   THIS AS A GOOD INVESTMENT OPPORTUNITY.

15   A.   YES.

16   Q.   WHY IS THAT?

17   A.   WELL, THE REASONS I STATED.  FIRST, I DO UNDERSTAND

18   LENDING, AND IF THESE GUIDELINES ARE FOLLOWED, THERE IS A

19   DEGREE OF SAFETY THAT'S APPLIED TO IT.

20   YOU KNOW, SHORT OF THE CREDIT, YOU KNOW, THE CREDIT SCORE,

21   WHICH COULD IMPLY SOME DIFFICULTY MAKING PAYMENTS TO CREDITORS

22   EARLIER, THE LOAN TO VALUE, THE WAY THAT A BORROWER IS

23   QUALIFIED IS CONSISTENT WITH UNDERWRITING GUIDELINES THAT I'VE

24   USED THROUGHOUT MY CAREER.

25   SECOND, IT'S SECURED LOANS.  THEY'RE SECURED BY A PROPERTY

```
 1    THAT HAS A VALUE.  IT MIGHT BE A DECREASED VALUE, BUT A VALUE.

 2         AND MY RELATIONSHIP WITH BARBRA.  IT TAKES ME A WHILE TO

 3    TRUST SOMEONE, BUT I FELT THAT AFTER 17 YEARS, I'D DEVELOPED

 4    SOME DEGREE OF RELATIONSHIP THAT I COULD RELY ON.  I HAD NEVER

 5    BEEN DECEIVED, THAT I KNEW OF, YOU KNOW, BEFORE.

 6         SO THE RELATIONSHIP, UNDERSTANDING THE MARKET, AN

 7    UNDERLYING ASSET TO PROTECT SOME OF YOUR INVESTMENT.

 8         I'M NOT SAYING EVERYONE CAN EXPECT TO BE MADE WHOLE IN A

 9    RISKY INVESTMENT, BUT LOSING 100 PERCENT OF YOUR MONEY VERSUS

10    50 PERCENT OF YOUR MONEY IS A BIG DIFFERENCE.

11         AND THEN MY ABILITY TO REPAIR THE UNDERLYING ASSET, TO

12    MAKE IT MARKETABLE.

13         I REALLY THOUGHT THAT I HAD THIS PRETTY WELL COVERED.

14         MR. SCHENK:  OKAY.

15    NO FURTHER QUESTIONS.  THANK YOU.

16         THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

17         MR. LEEMING:  YES.  THANK YOU, YOUR HONOR.  IF I

18    COULD HAVE JUST A MOMENT?

19         THE COURT:  OH, OF COURSE.  GO AHEAD.  IT'S 11:01.

20    (PAUSE IN PROCEEDINGS.)

21                         CROSS-EXAMINATION

22    BY MR. LEEMING:

23    Q.   GOOD MORNING, MR. GAUGHF.

24    A.   GOOD MORNING.

25    Q.   MY NAME IS PETER LEEMING.  I REPRESENT BARBRA.
```

GAUGHF CROSS

```
1    A.   I'M SORRY.  THE LAST NAME?

2    Q.   MY NAME IS PETER LEEMING, L-E-E-M-I-N-G.

3    A.   THANK YOU.

4    Q.   SO, SIR, I WANT TO BACK UP A LITTLE BIT AND TALK ABOUT

5    SOME OF YOUR WORK HISTORY IN FINANCE.

6         BEFORE THAT, YOU WERE A CONTRACTOR; CORRECT?

7    A.   I WAS A LICENSED CONTRACTOR IN THE '80S.  PRIOR TO THAT, I

8    WAS A BUILDER, CARPENTER.  SO, YOU KNOW, STARTING IN THE '70S I

9    ENTERED THE TRADES, LEARNED THE TRADES.

10   Q.   CAME UP THROUGH THE TRADES?

11   A.   CAME UP THROUGH THE TRADES.

12   Q.   GOT YOUR CONTRACTOR'S LICENSE?  I'M SORRY.

13   A.   AT 40 YEARS OLD, I FELT THAT I HAD ENOUGH OF THAT AND HAD

14   AN OPPORTUNITY TO GET INTO SOMETHING A LITTLE MORE CEREBRAL.

15        I APOLOGIZE.  I SHOULDN'T SAY THAT.

16        IT'S A VERY DIFFICULT INDUSTRY TO BE IN, BUT I WANTED

17   SOMETHING THAT DIDN'T RELY ON MY BODY.  HOW ABOUT THAT?

18   Q.   SO IN 1991, YOU BEGAN TO WORK FOR MONUMENT MORTGAGE;

19   CORRECT?

20   A.   YES, SIR.  YES, SIR.

21   Q.   AND I THINK YOU DESCRIBED THAT AS A WHOLESALE MORTGAGE

22   COMPANY.

23   A.   A WHOLESALE -- LOOSELY TERMED A WHOLESALE MORTGAGE BANKING

24   COMPANY.  WE WERE TECHNICALLY KNOWN AS SELLER SERVICERS.  WE

25   WOULD GATHER LOANS FOR UNDERWRITING, PROVIDE REPRESENTATIONS
```

```
 1    AND WARRANTS TO AN INVESTOR, FUND THE LOAN OUT OF OUR OWN

 2    MEANS, A WAREHOUSE LINE OF CREDIT, AND THEN SELL THE LOAN TO AN

 3    AGENCY, AT THE TIME IT WAS FREDDIE MAC, AND WE COULD SELL THE

 4    SERVICING OR KEEP THE SERVICING.  SO WE WERE TECHNICALLY KNOWN

 5    AS A SELLER/SERVICER.

 6    Q.   A SELLER/SERVICER?

 7    A.   YES.

 8    Q.   SO WAS THAT BASICALLY THE SAME WHEN YOU -- THE SAME JOB

 9    DESCRIPTION THAT YOU HAD AT SCME?

10    A.   YES.

11    Q.   ALL RIGHT.  SO I'D LIKE TO UNPACK THAT JUST A LITTLE BIT

12    IF I COULD.

13    A.   UM-HUM.

14    Q.   YOU REVIEW LOANS; CORRECT?

15    A.   YES.

16    Q.   YOU'RE ACTUALLY LOOKING AT INDIVIDUAL LOANS THAT HAVE BEEN

17    FINANCED THROUGH, SAY, A BROKER TO AN INDIVIDUAL?  IS THAT THE

18    SORT OF DOCUMENTS YOU WERE LOOKING AT?

19    A.   WELL, MY JOB WAS, WAS TO REVIEW PACKAGES, IF I WAS ASKED

20    TO, TO DETERMINE IF IT MET OUR GUIDELINES.

21    Q.   OKAY.

22    A.   AND OUR GUIDELINES MIGHT BE A LITTLE DIFFERENT THAN

23    SOMEONE ELSE'S.  BUT, YES, SIR, I WOULD REVIEW THE FILE IF

24    REQUESTED.

25         IT WASN'T A REQUIREMENT THAT I REVIEW EVERY LOAN
```

1    SUBMITTED.  SOME OF THEM JUST MET THE GUIDELINES BECAUSE MY

2    CLIENTS UNDERSTOOD WHAT WAS REQUIRED.

3         THERE MIGHT BE A QUESTION ON A PARTICULAR ISSUE INSIDE THE

4    FILE WHERE I WOULD BE ASKED TO REVIEW INCOME, ASSET, APPRAISAL,

5    CREDIT REPORT.

6    Q.   OKAY.  SO LET'S -- AGAIN, FOCUSSING ON THE PACKET THAT YOU

7    JUST DESCRIBED, WHAT'S A PACKET?

8    A.   WELL, A PACKET IS THE SET OF LOAN DOCUMENTS THAT

9    REPRESENTS THE CREDIT WORTHINESS OF A BORROWER, AND ALSO THE

10   ACCEPTABILITY OF A PROPERTY.

11   Q.   SO --

12   A.   IF YOU WOULD LIKE FOR ME TO BREAK IT DOWN, I COULD, SIR.

13   Q.   I WOULD LIKE TO YOU DO THAT, SIR, BUT IF WE COULD DO IT A

14   LITTLE BIT SLOWER?  AGAIN, I'M ONLY GOING TO GO THROUGH THIS

15   ONCE.

16   A.   OKAY.

17   Q.   WE NEED TO KNOW WHAT'S IN A LOAN PACKET.  WOULD THERE BE

18   AN INITIAL APPLICATION FOR A LOAN?

19   A.   YES, SIR.  THERE ARE INITIAL APPLICATIONS, IT'S A FORM

20   1003, FANNIE MAE FORM 1003.  AT THE TIME I BELIEVE IT WAS A

21   THREE-PAGE DOCUMENT -- TODAY IT'S A FOUR-PAGE DOCUMENT -- THAT

22   LISTS PERTINENT INFORMATION ABOUT THE BORROWER AND THE REQUEST

23   THAT THE BORROWER IS MAKING.

24        NAME, OBVIOUSLY; ADDRESS OF THE PROPERTY; WHETHER IT'S A

25   REFINANCE OR A PURCHASE; THE BORROWER'S WORK HISTORY, WE'LL GO

GAUGHF CROSS

1    BACK AT LEAST TWO YEARS; THE ASSETS; WHERE THE ASSETS ARE

2    DEPOSITED; THE AMOUNT OF THE ASSET.

3    Q.   OKAY.  IF I COULD INTERRUPT YOU BRIEFLY.  BY "ASSET," YOU

4    MEAN THE PROPERTY IN QUESTION OR DO YOU MEAN THEIR PERSONAL

5    ASSETS TO PURCHASE THE PROPERTY?

6    A.   I'M SORRY.  THE LIQUID ASSETS, THE BANK ACCOUNT, THE

7    CHECKING ACCOUNT, THE SAVING ACCOUNT, INVESTMENT ACCOUNTS, ANY

8    LIQUID ASSET.

9    Q.   AND THERE WOULD BE SOME SPECIFIC REQUIREMENTS ABOUT THOSE

10   ASSETS THAT THE PROSPECTIVE PURCHASER OR BORROWER WOULD BE

11   REQUIRED TO VERIFY; CORRECT?

12   A.   YES, SIR.

13   Q.   AND THOSE WOULD BE THINGS LIKE I REALLY HAVE THIS MONEY,

14   FOR EXAMPLE?

15   A.   I REALLY HAVE THIS MONEY.  THAT'S ONE WAY TO LOOK AT IT.

16   THERE ARE VARIOUS WAYS TO DETERMINE THAT SOMEONE OWNS THAT

17   ASSET.

18   Q.   OKAY.  AND IN ADDITION TO THE INITIAL APPLICATION, WHAT

19   ELSE IS IN THAT PACKET?

20   A.   DISCLOSURES.  YOU HAVE TO MAKE INITIAL DISCLOSURES TO A

21   BORROWER ON THE TERMS OF THE REQUEST THAT THEY'RE MAKING,

22   GIVING THEM ALL OF THEIR RIGHTS TO -- WELL, TODAY IT'S

23   COUNSELLING, BUT NON-DISCRIMINATION; THE TERMS OF THE LOAN, WE

24   CALL IT A TRUTH IN LENDING STATEMENT THAT SAYS YOU'RE BORROWING

25   THIS, THE CREDIT -- THE INTEREST RATE THAT WE'RE OFFERING IS

1      THIS, YOUR PAYMENTS WILL BE SO AND SO, AND IT WILL LAST FOR A

2      PERIOD OF 30 YEARS, SO THE DETAILS OF THE REQUEST.

3          YOU'RE NOT HELD TO IT LATER BECAUSE THIS IS THE INITIAL

4      ESTIMATE OF WHAT YOU THINK IT'S GOING TO BE.

5          THERE IS A DOCUMENT CALLED A GOOD FAITH ESTIMATE, WHICH IS

6      WHAT IT IS BECAUSE IT'S BASED ON THE TERMS PRIOR TO REVIEW OF

7      THE LOAN ITSELF.

8          SO THERE ARE DISCLOSURES, QUITE A FEW DISCLOSURES.

9          THERE WILL BE A CREDIT REPORT.  THE CREDIT REPORT TELLS US

10     ABOUT THE BORROWER'S ABILITY AND WILLINGNESS TO REPAY DEBT THAT

11     THEY'VE INCURRED.  IT WILL REFLECT PRETTY MUCH EVERYTHING THAT

12     YOU'VE DONE IN THE CREDIT WORLD, STUDENT LOANS, CREDIT CARDS,

13     ANY MORTGAGES, ANY LATES, IT'LL TELL US HOW MANY DAYS YOU'VE

14     BEEN LATE, HOW MANY TIMES YOU'VE BEEN LATE, ON WHAT MORTGAGES

15     YOU'VE BEEN LATE.

16         AND THIS IS CREATED BY THE THREE REPOSITORIES.

17     TRANSUNION, EQUIFAX, AND EXPERIAN ALL DEVELOPED THEIR OWN

18     CREDIT PROFILE.

19         AND IN 1994, WE STARTED USING WHAT WAS CALLED FICO SCORES,

20     FAIR ISAAC COMPANY.  TODAY THEY'RE JUST REFERRED TO AS CREDIT

21     SCORES GENERICALLY AND CREDIT SCORES ARE DEVELOPED BY THE

22     AGENCIES, SO THESE ARE THE THINGS THAT WE RELY ON TO DETERMINE

23     A BORROWER'S ABILITY AND CHARACTER AND WILLINGNESS, BECAUSE WE

24     HAVE BORROWERS THAT WERE CAPABLE OF MAKING PAYMENTS THAT DIDN'T

25     NECESSARILY FEEL LIKE THEY WANTED TO MAKE IT THAT MONTH.  SO

1    THAT WAS THE CHARACTER.

2         THEN YOU HAVE --

3    Q.   IF I COULD INTERRUPT YOU VERY BRIEFLY, BECAUSE YOU

4    MENTIONED THE CREDIT SCORE.

5    A.   THE CREDIT.

6    Q.   YOU REFERENCED A DOCUMENT EARLY IN YOUR TESTIMONY, I

7    BELIEVE IT WAS EXHIBIT 54 IF I'M NOT MISTAKEN.

8    A.   YOU'RE REFERRING TO THE UNDERWRITING GUIDELINES?

9    Q.   UNDERWRITING GUIDELINES, YEAH.  THERE'S A CREDIT SCORE

10   REFERENCED IN THAT?

11   A.   THE 580 CREDIT SCORE.

12   Q.   OKAY.  MINIMUM 580?

13   A.   MINIMUM 580.

14   Q.   AND YOU MENTIONED THAT WAS A PRETTY LOW SCORE BY TODAY'S

15   STANDARDS.  COULD YOU EXPLAIN THAT FOR US, PLEASE?

16   A.   YEAH.  SCORES CAN RANGE FROM A LOW OF 300 TO A HIGH OF

17   AROUND 925.  I HAVE REVIEWED ROUGHLY 25,000 LOANS.  I'VE NEVER

18   SEEN A CREDIT SCORE ABOVE 825 AND I'VE NEVER SEEN A CREDIT

19   SCORE BELOW 500.  SO THOSE ARE EXTREME CIRCUMSTANCES THAT YOU

20   CAN GET OUTSIDE OF THOSE RANGES.

21        A GOOD CREDIT SCORE TODAY, IN TODAY'S WORLD, IS ROUGHLY

22   720.  IF YOU GET BELOW 720, IT DOESN'T MEAN THAT YOU HAVE BAD

23   CREDIT, YOU JUST MIGHT HAVE TOO MUCH CREDIT.

24        SO A CREDIT SCORE IS DERIVED FROM THE NUMBERS OF LINES

25   THAT YOU HAVE, THE USE OF THOSE LINES, THE REPAYMENT OF THOSE

1      LINES OVER A PERIOD OF TIME.

2          IF YOU HAVE LIMITED CREDIT, PERFECT PAYMENT HISTORY, YOU

3      CAN HAVE A LOW CREDIT SCORE BECAUSE YOU HAVEN'T DEVELOPED A

4      HISTORY OF MAKING REPAYMENTS.

5          YOU CAN HAVE PERFECT CREDIT WITH MANY LINES AND HAVE A LOW

6      CREDIT SCORE EVEN THOUGH YOU'VE NEVER MISSED A PAYMENT BECAUSE

7      YOU HAVE ACCESSED TOO MUCH.

8          SO THERE ARE RANGES.  WE HAVE TO DEVELOP A CREDIT SCORE

9      BASED ON YOUR HISTORY OF USE, THE AMOUNT OF USE, AND YOUR

10     WILLINGNESS OR ABILITY TO REPAY YOUR CREDITORS ON TIME.

11         A 580 CREDIT SCORE TODAY IS THE LOWEST SCORE AVAILABLE,

12     AND THAT'S ONLY THROUGH -- AND INSTITUTIONAL LENDING I'M

13     TALKING ABOUT TODAY THAT I HAVE ACCESS TO -- AND THAT'S ONLY

14     THROUGH A HUD GUARANTEE, FHA GOVERNMENT BACKED INSURANCE.

15         IN THE CONVENTIONAL WORLD, WHICH WE REFER TO AS FANNIE MAE

16     AND FREDDIE MAC, THE LOWEST SCORE THAT WE HAVE AVAILABLE IS

17     620.  AND FOR A SCORE TO BE THAT LOW, YOU HAVE TO HAVE WHAT WE

18     REFER TO AS COMPENSATING FACTORS, A PARTICULAR LOW DEBT TO

19     INCOME RATIO, WHICH MEANS YOUR INCOME IS SUFFICIENT TO MAKE THE

20     PAYMENTS, MORE EQUITY IN THE PROPERTY, OR WHAT WE CALL A LOWER

21     LTV, A LOWER LOAN TO VALUE WHICH GIVES YOU INCENTIVE TO REPAY,

22     OR PERHAPS SUBSTANTIAL ASSETS THAT SAY IN THE EVENT THAT YOUR

23     JOB DOES NOT SUPPORT YOUR ABILITY TO MAKE A REPAYMENT, YOU CAN

24     USE YOUR SAVINGS OR YOUR ASSETS TO PAY BACK THE COMPANY.

25     Q.   OKAY.  SO --

```
 1    A.   DO YOU WANT ME TO GO ON ABOUT WHAT ELSE IS IN THE PACKAGE?

 2    BECAUSE WE WERE TALKING ABOUT --

 3    Q.   CAN WE DO IT BRIEFLY?  MAYBE A LITTLE LESS DETAIL, PLEASE.

 4    BUT I WOULD LIKE TO KNOW WHAT'S IN THE PACKAGE.

 5    A.   I'M SORRY.  THIS IS ALL I KNOW.

 6         AND THEN THE APPRAISAL, OF COURSE, IS GOING TO TELL US THE

 7    CONDITION, THE VALUE OF THE PROPERTY.  AND AN APPRAISAL IS AN

 8    OPINION OF VALUE.  IT IS NOT A SCIENTIFIC -- IT'S MORE OF A,

 9    YOU KNOW, AN OPINION PROVIDED BY AN INDIVIDUAL BASED ON OTHER

10    COMPARABLE SALES IN THE NEIGHBORHOOD.  IT'S RARE THAT YOU EVER

11    HAVE A SALE THAT IS IDENTICAL TO YOUR HOME PROPERTY.  SO YOU

12    DEVELOP AN OPINION.

13    Q.   SO I'D LIKE TO TALK A LITTLE BIT ABOUT VALUE --

14    A.   VALUE?

15    Q.   -- IN REAL ESTATE.

16    A.   YES, SIR.

17    Q.   IS IT FAIR TO SAY THAT VALUE OF REAL ESTATE CAN BE

18    SOMETHING OF A MOVING TARGET?

19    A.   I'M SORRY?

20    Q.   IS IT FAIR TO SAY THAT THE VALUE OF A PIECE OF REAL ESTATE

21    CAN BE SOMETHING OF A MOVING TARGET?

22    A.   YES.

23    Q.   WHAT FACTORS AFFECT THAT?

24    A.   THE AVAILABILITY OF FINANCING IS THE PREDOMINANT FACTOR,

25    IN MY OPINION, OF THE VALUE OF REAL ESTATE.
```

1         THE VALUE OF REAL ESTATE, OR ANY VALUE, IS DERIVED BY A

2    SELLER SELLING TO A WILLING PURCHASER WITHOUT COERCION.

3         SO IF A REALTOR OFFERS A PROPERTY FOR SALE AT 300,000 AND

4    THERE ARE NO -- AND THE GENERAL MARKET IN THAT AREA CANNOT

5    AFFORD THAT $300,000 BECAUSE FINANCING IS NOT AVAILABLE ON

6    ATTRACTIVE TERMS, THERE WILL BE A LOWER MARKET -- LET'S SEE.

7    HOW CAN I SAY THIS?  THERE WILL BE FEWER PEOPLE IN THE MARKET

8    THAT CAN AFFORD THAT HOUSE SO THE PRICE WILL COME DOWN.

9         IF MORE PEOPLE CAN AFFORD THAT HOME, YOU HAVE A SELLER'S

10   MARKET, MORE PEOPLE TRYING TO BUY THE ASSET, SO THE VALUE WILL

11   INCREASE.

12        THIS IS WHAT WE EXPERIENCED FROM 2002 TO 2007.  MONEY WAS

13   READILY AVAILABLE, AND THE MORE MONEY AVAILABLE AT EASIER

14   TERMS, THE MORE BORROWERS/BUYERS LOOKING FOR A SINGLE PROPERTY

15   WOULD RAISE THE VALUE.  SO WE OVERVALUATE THE PROPERTIES

16   THEMSELVES.

17   Q.   AND THAT'S WHAT WAS SOMETIMES CALLED THE HOUSING BUBBLE?

18   IS THAT FAIR TO SAY?

19   A.   YEAH, THE HOUSING BUBBLE, AND IT WAS CAUSED BY LENDERS

20   OFFERING MONEY ON VERY ATTRACTIVE TERMS WITHOUT VERIFICATION.

21   Q.   YOU MENTIONED -- I'M GOING TO JUMP AROUND HERE A LITTLE

22   BIT, BUT YOU MENTIONED DIFFERENT KINDS OF LOAN PRODUCTS.

23   A.   YES, SIR.

24   Q.   RIGHT?  AND YOU MENTIONED THE PRIME LOAN AND THEN THE

25   PRIME -- WAS IT A PRIME A?

```
 1        A.   ALTERNATIVE A.

 2        Q.   ALTERNATIVE A.

 3        A.   RIGHT.

 4        Q.   CAN YOU TALK A LITTLE BIT ABOUT THAT, PLEASE?

 5        A.   YES.  A PRIME LOAN IS ELIGIBLE FOR --

 6             MR. SCHENK:  OBJECTION.  FORM OF THE QUESTION.

 7             MR. LEEMING:  I'M SORRY.

 8        Q.   I WAS REFERRING SPECIFICALLY TO THE ALTERNATIVE A MARKET.

 9        A.   TO GET TO THE ALTERNATIVE A, YOU HAVE TO BRACKET IT

10   WITH --

11             THE COURT:  OVERRULED.

12        GO AHEAD, PLEASE.  YOU MAY ANSWER.

13             THE WITNESS:  I'M SORRY?

14   BY MR. LEEMING:

15        Q.   YOU CAN ANSWER THE QUESTION.

16             THE COURT:  OVERRULED.  YOU MAY ANSWER.

17             THE WITNESS:  OKAY.

18             THE COURT:  BUT WHY DON'T YOU WAIT UNTIL I'VE RULED

19   BEFORE YOU TESTIFY?  OKAY?

20             THE WITNESS:  I'M SORRY.

21             THE COURT:  THANKS.  NOT A PROBLEM.

22             THE WITNESS:  YOU HAVE TO BRACKET IT WITH SOME

23   REFERENCE.  SO YOU HAVE A PRIME LOAN THAT HAS A VIRTUAL ZERO

24   DEFAULT.  THESE ARE FULLY DOCUMENTED FILES SOLD TO THE AGENCIES

25   PREDOMINANTLY AS THEY REPRESENT 85 TO 90 PERCENT OF THE MARKET
```

1    AND YOU HAVE A DEFAULT RATE, DELINQUENCY RATE AT A FRACTION OF

2    A PERCENTAGE.

3         THE NEXT LEVEL DOWN IS ALTERNATIVE A.  ALTERNATIVE A WAS

4    OFFERED BY SHADOW BANKS, INVESTMENT BANKS.

5    BY MR. LEEMING:

6    Q.  I'M SORRY.  DID YOU SAY SHADOW BANKS?

7    A.   IT WAS REFERRED TO AS SHADOW BANKS, INVESTMENT BANKS,

8    GOLDMAN SACHS, MERRILL LYNCH, LEHMAN BROTHERS, YOU MIGHT RECALL

9    THEM, THAT OFFERED A PRODUCT THAT WAS NOT ELIGIBLE FOR SALE TO

10   FANNIE MAE OR FREDDIE MAC, BUT THEY STILL REQUIRE A DEGREE OF

11   PROVEN ABILITY TO REPAY.  TYPICALLY YOU'RE LOOKING AT A BETTER

12   CREDIT, A BETTER CREDIT SCORE.

13        THE DOCUMENTATION CAN BE REDUCED BASED ON THE GUIDELINES

14   OF THE INDIVIDUAL INVESTOR.

15        LEHMAN BROTHERS MIGHT HAVE A MORE AGGRESSIVE, MIGHT HAVE A

16   MORE AGGRESSIVE APPROACH TO UNDERWRITING.

17   Q.  WHEN YOU SAY AN "AGGRESSIVE APPROACH TO UNDERWRITING,"

18   WHAT DO YOU MEAN, SIR?

19   A.  LOWER UNDERWRITING STANDARDS.

20   Q.  OKAY.

21   A.  LOWER UNDERWRITING STANDARDS IN THE SENSE OF DOCUMENTING

22   THE VERACITY OF THE DATA ON THE 1003.

23   Q.  AND THE 1003, AGAIN, IS --

24   A.  I'M SORRY.

25   Q.  -- THE APPLICATION --

GAUGHF CROSS

```
1    A.   THAT'S THE APPLICATION --

2    Q.   -- FOR THE FINANCING THAT IS SUBMITTED BY THE PROSPECTIVE

3    BORROWER, AND THERE ARE CERTAIN REQUIREMENTS THAT THOSE

4    STATEMENTS BE TRUE AND ACCURATE; RIGHT?

5    A.   CORRECT, YES.  BECAUSE A 1003, IN A PERFECT WORLD, HAS ALL

6    THE INFORMATION ONE NEEDS TO MAKE A LOAN.  EVERYTHING ELSE IS

7    VERIFYING THE VERACITY OF THE DATA.

8    Q.   OKAY.  YOU MENTIONED A MOMENT AGO, WHEN I WAS ASKING YOU

9    ABOUT YOUR BACKGROUND, THAT YOU HAD A WAREHOUSE LINE OF CREDIT.

10        CAN YOU EXPLAIN WHAT A WAREHOUSE LINE OF CREDIT IS?

11   A.   YEAH.  THE COMPANIES WOULD HAVE A WAREHOUSE LINE OF

12   CREDIT, AND IN SIMPLE TERMS, IT WAS A VERY LARGE CREDIT CARD.

13   Q.   OKAY.

14   A.   WE COULD BORROW MONEY FROM A LINE OF CREDIT TO FUND THE

15   LOAN.  THE COMPANY THAT OWNED THAT LOAN, THEY COULD KEEP IT,

16   THEY COULD SERVICE IT, OR MORE LIKELY WE'RE GOING TO SELL THE

17   LOAN TO AN INVESTOR WHO WOULD THEN REPLENISH OUR CREDIT CARD,

18   OR OUR LINE OF CREDIT, SO WE COULD DO IT AGAIN, EACH TIME

19   TAKING A SERVICE FEE.

20   Q.   VERY GOOD.

21        NOW, FINALLY, I THINK YOU MENTIONED THAT IN 2009, YOU

22   BEGAN DOING LOANS TO THE PUBLIC DIRECTLY YOURSELF THROUGH

23   TREEHOUSE MORTGAGE.

24   A.   YES.

25   Q.   AND SO DID THAT MEAN THAT YOU MET PERSONALLY WITH THE
```

GAUGHF CROSS

```
1      INDIVIDUAL BORROWERS?

2      A.   YES.   INITIALLY I DIDN'T BECAUSE I WAS THE DIRECTOR OF

3      SALES AND MANAGEMENT POSITION AND I DIDN'T FEEL LIKE I WANTED

4      TO COMPETE WITH MY LOAN AGENTS.

5           THE SECOND PART OF MY TENURE WITH TREEHOUSE MORTGAGE

6      GROUP, I WAS A DIRECT ORIGINATOR THAT HAD MY OWN CLIENT BASE

7      THAT I COULD PROVIDE FUNDS, TAKE THE APPLICATION, ET CETERA.

8      Q.   SO YOU'VE LOOKED AT LOANS FROM SORT OF THE UPPER LEVEL,

9      RIGHT, WHERE YOU'RE LOOKING AT PACKAGES THAT ARE GOING TO BE

10     RESOLD TO INSTITUTIONAL INVESTORS?   IS THAT FAIR TO SAY?

11     A.   THAT'S FAIR TO SAY.

12     Q.   AND YOU'VE ALSO HAD EXPERIENCE DEALING DIRECTLY WITH

13     RETAIL, FOR LACK OF A BETTER WORD, CONSUMERS WHO WERE LOOKING

14     TO GET A LOAN TO FINANCE THEIR HOUSE; RIGHT?

15     A.   YES.

16     Q.   AND YOU'VE DONE THOUSANDS OF THOSE; RIGHT?

17     A.   NOT THOUSANDS OF RETAIL.   VERY LIMITED ON RETAIL.

18     Q.   OKAY.   SO LET ME -- SORRY.

19     A.   GO AHEAD.

20     Q.   SO I THINK YOU MENTIONED YOU'D LOOKED AT LITERALLY

21     THOUSANDS OF LOANS IN SORT OF THE REVIEW PROCESS?

22     A.   YES.

23     Q.   AND YOU ALSO HAVE DONE RETAIL LOANS YOURSELF; CORRECT?

24     A.   YES.

25     Q.   FAIR TO SAY YOU'RE VERY FAMILIAR WITH THE PROCESS OF
```

```
 1          LENDING OUT LOANS ON MORTGAGES?

 2          A.   I THINK THAT'S FAIR TO SAY.

 3          Q.   YOU -- WHEN YOU GO THROUGH A LOAN WITH A PROSPECTIVE

 4          RETAIL BORROWER, DO YOU TELL THEM IT'S IMPORTANT TO READ WHAT

 5          THEY SIGN?

 6          A.   WE OFFER THEM DOCUMENTS.  WE EXPLAIN THE DOCUMENTS TO THE

 7          EXTENT THAT WE FEEL IT'S PERTINENT TO THEIR TRANSACTION.

 8               IT IS IMPORTANT TO READ A DOCUMENT THAT YOU SIGN.

 9          Q.   IT'S --

10          A.   AND WE PROVIDE DOCUMENTS TO OUR BORROWERS TO SIGN.

11          Q.   AND YOU OFFER THEM -- SORRY.

12          A.   AND THESE ARE TYPICALLY SIGNED IN TITLE.

13               IF YOU'VE EVER SIGNED LOAN DOCUMENTS FOR A HOUSE, YOU READ

14          THE FIRST COUPLE, BUT THERE IS AN OVERWHELMING NUMBER OF

15          DOCUMENTS THAT ARE WELL BEYOND A BORROWER'S ABILITY TO

16          UNDERSTAND, THE TYPICAL BORROWER.  I WOULD LIKE TO SAY IN A

17          PERFECT WORLD THEY KNEW EXACTLY WHAT THEY WERE SIGNING, BUT I'M

18          SORRY, IN MY EXPERIENCE, VERY FEW BORROWERS READ THE FINE PRINT

19          ON EVERY DOCUMENT.

20          Q.   AND A LOT OF BORROWERS THEN DON'T NECESSARILY UNDERSTAND

21          THE LOAN THEY'RE GETTING INTO; IS THAT RIGHT?

22          A.   UNFORTUNATELY, THAT IS TRUE.  THEY RELY VERY MUCH ON THE

23          ASSERTIONS OF THE INDIVIDUAL THAT HAS OFFERED THEM THE LOAN OR

24          HELPED THEM SECURE FINANCING.

25          Q.   IN -- YOU MENTIONED A COUPLE OF TIMES IN YOUR DIRECT
```

GAUGHF CROSS

```
 1      TESTIMONY THAT THINGS WERE CHANGING IN 2008 AND 2009, 2010, AND

 2      THE PHRASE YOU USED WAS "BECAUSE OF THE STRESS IN THE

 3      INDUSTRY."

 4      A.   YES.

 5      Q.   WHAT GENERALLY DID YOU MEAN BY "THE STRESS"?

 6      A.   THE BUBBLE, THE HOUSING BUBBLE.

 7      Q.   THE HOUSING BUBBLE COLLAPSING?

 8      A.   YES.

 9      Q.   AND THE LACK OF CREDIT BEING AVAILABLE?

10      A.   YES, SIR.

11      Q.   THE DEPRECIATION IN PROPERTY VALUES?

12      A.   THE PROPERTIES HAD APPRECIATED UNREASONABLY UNTIL A POINT

13      THAT THEY COULD NO LONGER APPRECIATE.

14          I CAN EXPLAIN THE SITUATION, BUT IT MIGHT BE A LITTLE BIT

15      TOO DEEP IN THE WEEDS FOR TODAY'S PURPOSES.

16      Q.   BUT THE BASIC -- THE BASIC RESULT OF THAT WAS THAT SOME

17      AREAS, INCLUDING MONTEREY, EXPERIENCED RAPID DECLINES IN

18      PROPERTY VALUES?

19      A.   YES, SIR.

20      Q.   EVEN SOME VERY NICE AREAS; RIGHT?

21      A.   YES, SIR.

22      Q.   YOU MET BARBRA ALEXANDER IN 1992; IS THAT CORRECT?

23      A.   IF I RECALL.

24      Q.   OKAY.  OR ABOUT 1992?

25      A.   ABOUT THERE, YES, SIR.
```

1    Q.   AND HOW DID YOU GET TO MEET HER?  DO YOU REMEMBER?

2    A.   I SOLICITED HER.

3    Q.   YOU SOLICITED HER?  WHAT DOES THAT MEAN?

4    A.   THAT MEANS THAT I IDENTIFIED HER AS A RETAIL LOAN

5    ORIGINATOR DULY LICENSED TO ORIGINATE LOANS ON A RETAIL LEVEL

6    THAT I PURSUED AS A CLIENT.

7    Q.   AND WHEN YOU SAY "PURSUED AS A CLIENT," WHAT DOES THAT

8    MEAN?

9    A.   THAT MEANS I MET WITH HER; I DETERMINED HER ABILITY, HER

10   UNDERSTANDING OF THE MARKETPLACE; THAT SHE WAS LICENSED TO

11   ORIGINATE; SHE HAD A BOOK OF BUSINESS; AND MY JOB TO REPRESENT

12   MY COMPANY WAS TO OFFER OUR PRODUCTS, OUR PRICING, OUR

13   UNDERWRITING PROCEDURES THAT SHE COULD USE TO PROVIDE FINANCING

14   FOR HER CLIENTS.

15   Q.   ALL RIGHT.  SO YOUR -- WHAT EXACTLY ARE YOU PROVIDING

16   MS. ALEXANDER AT THAT POINT IN TIME THAT SHE CAN PROVIDE TO HER

17   CLIENTS?

18   A.   WE FUNDED THE LOAN.  A MORTGAGE BROKER DOES NOT HAVE THE

19   WHEREWITHAL TO FUND LOANS AS A TRUE BROKER.  THEY ARE BROKERING

20   LOANS.

21        ANYONE WHO FUNDS A LOAN IS REFERRED TO AS A LENDER.  WE

22   WERE REFERRED TO AS A LENDER.

23        SO A BROKER WAS PROVIDING SERVICES TO THE PUBLIC TO

24   ACQUIRE FUNDS FOR THEIR PURPOSES, BUT NOT TO PROVIDE THE FUNDS

25   FOR THEIR PURPOSES.

1          SO A MORTGAGE BROKER WOULD CREATE WHAT YOU REFERRED TO

2     EARLIER AS THE LOAN PACKAGE, PROVIDING THE APPLICATION, THE

3     DISCLOSURE, THE CREDIT, THE ASSETS, THE INCOME, THE APPRAISAL,

4     PACKAGED IN A WAY THAT REQUIRED, WE CALLED IT A STACKING ORDER,

5     THAT WOULD THEN BE SUBMITTED TO MY COMPANY, AMONG A THOUSAND

6     OTHER COMPANIES.

7          WE WOULD REVIEW THE PACKAGE FOR COMPLIANCE WITH THE

8     VARIOUS INVESTORS, WHETHER IT WAS FANNIE MAE, FREDDIE MAC, OR A

9     JUMBO INVESTOR, TO DETERMINE IF IT MET THEIR GUIDELINES.

10          AS A LENDER, WE WOULD FUND THE LOAN AFTER EVERYTHING WAS

11     SATISFIED.  WE WOULD SEND OUT THE LOAN DOCUMENTS THAT THE

12     BORROWER WOULD SIGN WITH ALL OF THE DISCLOSURES.  IT WOULD BE

13     RETURNED TO OUR OFFICE, WE WOULD REVIEW IT TO MAKE SURE THAT

14     ALL OF THE SIGNATURES WERE ACCURATE AND WE HAD ALL THE CORRECT

15     DOCUMENTS FROM TITLE, AND THEN WE WOULD WIRE FUNDS TO TITLE FOR

16     DISBURSEMENTS TO EITHER THE SELLER OR TO THE MORTGAGE BROKER,

17     TO THE BORROWER IF THEY'RE TAKING CASH OUT, BUT DISTRIBUTE IT

18     THROUGH ESCROW TO THE VARIOUS PARTIES.  THAT'S WHAT WE DID.

19          THE BROKER COMPILED THE REQUEST.  THEY DIDN'T FUND.

20     Q.   AND YOU DISTRIBUTED THE FUNDS?

21     A.   AND WE DISTRIBUTED THE FUNDS.

22          AND AT THAT POINT, WE OWNED THE LOAN.  WE WERE DUE THE

23     MONIES THAT WERE, THAT WERE PROMISED IN THE NOTE, AND THEN WE

24     WOULD TRANSFER THAT NOTE OR SELL THAT NOTE TO AN INVESTOR.

25     Q.   SO WHEN YOU MET -- YOU SAID YOU SOUGHT OUT MS. ALEXANDER

1       AS A PROSPECTIVE CLIENT.

2       A.   YES, SIR.

3       Q.   DID SHE HAVE HER BROKER'S LICENSE AT THAT POINT?

4       A.   AT THAT TIME SHE WAS LICENSED UNDER THE DEPARTMENT OF REAL

5       ESTATE AS A SALES PERSON OR A LOAN AGENT.   SHORTLY AFTER THAT,

6       SHE BECAME A BROKER.

7            A BROKER IS A LEVEL ABOVE A SALES PERSON.   A SALES

8       PERSON'S LICENSE REQUIRES MINIMUM EDUCATION, AND A BROKER'S

9       LICENSE REQUIRES A MINIMUM OF TWO YEARS EXPERIENCE AS A LOAN

10      AGENT, OR A LOAN -- OR A REAL ESTATE SALES PERSON.

11           THEY CAN THEN, WITH TAKING A DIFFERENT, A DIFFERENT LEVEL

12      OF TEST, ACQUIRE THEIR BROKER'S LICENSE.

13      Q.   OKAY.   SO MY QUESTION WAS, AT THE TIME YOU SOLICITED HER,

14      DID SHE HAVE HER BROKER'S LICENSE AT THAT POINT?

15      A.   I DON'T BELIEVE SO, BECAUSE SHE WAS WORKING UNDER ANOTHER

16      BROKER, SPONSORED BY ANOTHER BROKER.

17      Q.   DID YOU SOLICIT THAT PERSON?

18      A.   I DID.   I NEVER GOT ANY BUSINESS FROM THAT PERSON.   WE

19      TALKED ABOUT OTHER STUFF, BUT I NEVER GOT A LOAN FROM HIM.   IF

20      I RECALL, THE ONLY PERSON IN THE OFFICE THAT I RECEIVED A LOAN

21      FROM WAS BARBRA.

22      Q.   SO YOU SAW HER AS A SUCCESSFUL REALTOR AT THAT STAGE, AND

23      LATER A SUCCESSFUL BROKER?

24      A.   I SAW HER AS A SUCCESSFUL LOAN ORIGINATOR THAT PROVIDED A

25      SERVICE TO HER COMMUNITY.

1    Q.   AND YOU DID QUITE A NUMBER OF LOANS WITH MS. ALEXANDER

2    DURING THAT PERIOD OF TIME; CORRECT?

3    A.   YES, I DID.

4    Q.   AND THOSE WERE CONVENTIONAL MORTGAGES?

5    A.   YES, SIR.

6    Q.   AND I THINK YOU TESTIFIED BEFORE THE GRAND JURY THAT THOSE

7    WERE ALL GOOD LOANS.  CORRECT?

8    A.   YES.

9    Q.   WHAT DOES THAT MEAN?

10   A.   A GOOD LOAN IS ONE THAT PERFORMS BASED ON THE EXPECTATION

11   OF THE CREDIT RISK.  IT IS SOLD, IT STAYS SOLD, THE BORROWER

12   PAYS BACK ON TIME, ACCORDING TO THE AGREEMENT, THE NOTE, THE

13   CONTRACT.

14   Q.   OKAY.  DID YOU -- AT THAT PERIOD OF TIME, WERE YOU SEEING

15   LOANS THAT WEREN'T SO GOOD FROM OTHER PEOPLE, OR --

16   A.   NO.  I WAS ONLY INVOLVED IN THE PRIME MARKET AT THE TIME.

17   I ONLY REVIEWED THE HIGHEST LEVEL OF LOANS.

18   Q.   AND THAT -- AND BARBRA ALEXANDER AT THAT TIME WAS ALSO

19   ONLY INVOLVED IN THE PRIME MARKET; CORRECT?

20   A.   MY RELATIONSHIP WITH BARBRA ONLY REVOLVED AROUND PRIME

21   LOANS.  IF SHE OFFERED OTHER TYPES OF LOANS TO OTHER BORROWERS,

22   THAT WAS NOT MY PURVIEW.  I HAD NO REASON TO REVIEW ANYTHING

23   OTHER THAN THE LOANS THAT I WOULD ACCEPT.

24   Q.   OKAY.

25   A.   BUT A LOAN ORIGINATOR -- A BROKER CAN HAVE RELATIONSHIPS

1    WITH OTHER INVESTORS, OTHER LENDERS.  THEY'RE LICENSED TO DO

2    THAT.

3    Q.   AND YOU DON'T HAVE PERSONAL KNOWLEDGE OF THAT, DO YOU?

4    A.   NOT AT THE TIME, NO, SIR.

5    Q.   WHEN DID YOU BECOME AWARE THAT BARBRA ALEXANDER HAD A

6    RADIO SHOW?

7    A.   IF I CAN GUESS, SOMEWHERE IN THE EARLY 2000S.

8    Q.   WE DON'T WANT YOU TO GUESS.  YOUR BEST ESTIMATE IS

9    SOMEWHERE --

10   A.   YEAH, BEST ESTIMATE IS EARLY 2000S.  THAT'S -- I KNOW SHE

11   HAD A SUCCESSFUL RADIO SHOW FOR A PERIOD OF TIME.

12   Q.   IN -- AND DESCRIBE THE RADIO SHOW FOR US.

13   A.   IT WAS A TALK SHOW, A ONE HOUR TALK SHOW THAT DISCUSSED

14   ITEMS RELATED TO WHAT I WAS INTERESTED IN, ITEMS RELATED TO

15   MORTGAGES, YOU KNOW, WHAT WAS GOING ON IN THE MARKET.

16        LATER IT BECAME A DIFFERENT TYPE OF SHOW.

17        BUT INITIALLY IT WAS TALKING ABOUT LENDING, TALKING ABOUT

18   THE ISSUES IN THE INDUSTRY, TALKING ABOUT BORROWERS' NEEDS.

19        I'VE BEEN ON THE SHOW WHERE CALLERS WOULD CALL IN AND ASK

20   SPECIFIC QUESTIONS ABOUT THEIR CIRCUMSTANCE AND TOGETHER WE

21   WOULD PROVIDE ANSWERS TO THE BEST OF OUR ABILITY AND OUR

22   KNOWLEDGE.

23   Q.   WERE YOU AWARE OF OTHER PEOPLE THAT SPOKE ON HER SHOW

24   BESIDES YOURSELF?

25   A.   WELL, SHE HAD GUESTS EVERY WEEK.

```
 1        Q.   DO YOU KNOW WHO?

 2                  MR. SCHENK:  OBJECTION.  RELEVANCE.

 3                  THE WITNESS:  I --

 4                  THE COURT:  OVERRULED.

 5             YOU MAY ANSWER.

 6                  THE WITNESS:  I CAN'T NAME ONE OTHER PERSON.

 7        BY MR. LEEMING:

 8        Q.   WOULD IT BE OTHER PEOPLE SPEAKING ABOUT FINANCE AND MONEY

 9        MATTERS?

10        A.   CERTAINLY THAT.

11        Q.   NOW, I WANT TO GO THROUGH THE ARRANGEMENT WITH THE

12        TELEPHONE LINES THAT YOU TALKED --

13        A.   SURE, I KNOW.

14        Q.   -- ABOUT A LITTLE BIT.  YOU SAID "I KNOW."  YOU'RE

15        SMILING.

16        A.   IT'S SUCH A SIMPLE THING.

17        Q.   OKAY.  WELL, LET'S TALK ABOUT IT A LITTLE BIT.

18        A.   OKAY.

19        Q.   SO YOU LIKED BEING ON THE RADIO SHOW; RIGHT?

20        A.   ABSOLUTELY.

21        Q.   YOU SAW IT AS A BUSINESS OPPORTUNITY?

22        A.   YES, I DID.

23        Q.   YOU SAW IT AS AN OPPORTUNITY TO GROW YOUR LENDING

24        BUSINESS; CORRECT?

25        A.   YES, I DID.
```

```
1     Q.   AND, IN FACT, IT SEEMED TO HAVE WORKED THAT WAY?  PEOPLE

2     WOULD COME UP AND SPEAK TO YOU ABOUT THAT AND SAY, "HEY, I

3     HEARD YOU ON THE RADIO"?

4     A.   IT ALL HELPS.

5     Q.   IT ALL HELPS?

6     A.   YES, SIR.

7     Q.   SO YOU PROPOSED TO BARBRA THAT YOU SET UP A COUPLE OF

8     TOLL-FREE LINES SO PEOPLE COULD CONTINUE TO CALL IN; RIGHT?

9     A.   RIGHT.

10    Q.   AND THOSE LINES RAN THROUGH YOUR OFFICE?

11    A.   THEY RAN THROUGH MY OFFICE.

12    Q.   YOU HAD FOUR LINES AT YOUR OFFICE AT THE TIME?

13    A.   YES.

14    Q.   AND TWO OF THEM WERE FOR BARBRA'S RADIO SHOW?

15    A.   YES.

16    Q.   AND YOU DIDN'T ANSWER THEM, THEY WERE FORWARDED TO -- DO

17    YOU KNOW WHERE?

18    A.   YES.  THEY WERE FORWARDED TO HER OFFICE NUMBER.

19    Q.   OKAY.  AND IS IT FAIR TO SAY YOU THINK OF YOURSELF AS A

20    MARKETING PERSON?

21    A.   THERE ARE THREE THINGS I DO:  I MARKET; I SELL; AND I

22    SERVICE.  SO, YES, MARKETING IS PART OF WHAT I DO.

23    Q.   AND IS IT FAIR TO SAY THAT THE MORE YOU CAN GET YOUR NAME

24    INTO A LARGER TERRITORY, THE MORE SUCCESSFUL YOU'RE GOING TO

25    BE?
```

GAUGHF  CROSS

```
 1        A.   THAT'S THE IDEA, YES, SIR.

 2        Q.   AND THAT'S THE IDEA YOU HAD BY BEING ON THE RADIO SHOW;

 3   CORRECT?

 4        A.   THAT, AND ALSO TO PROVIDE KNOWLEDGE.  I MEAN, IT WASN'T

 5   ALL ABOUT ME AND MY EGO.  IT -- I WOULD LIKE TO THINK THAT I

 6   GAVE SOME GOOD ADVICE.

 7        Q.   OF COURSE.  AND YOU SAW IT AS A BUSINESS OPPORTUNITY FOR

 8   YOU; CORRECT?

 9        A.   FOR ME AND FOR MY CLIENTS.  YOU KNOW, I'M SUPPORTING MY

10   CLIENT.  THE MORE INTEREST THAT BARBRA CAN CREATE ON HER SHOW,

11   THE MORE BUSINESS SHE GETS.  THE MORE BUSINESS SHE GETS, IF I

12   SUPPORT THAT BUSINESS, THE MORE BUSINESS I GET.

13        Q.   SO YOU WOULD GET --

14        A.   FOLLOW ME?

15        Q.   OH, ABSOLUTELY.  YOU SAW THAT IT WAS A BENEFIT TO BOTH OF

16   YOU THROUGH THE RADIO SHOW; CORRECT?

17        A.   YES, SIR.

18        Q.   AND YOU FELT LIKE ANY TIME YOU WANTED TO, YOU COULD PICK

19   UP THE PHONE, BECAUSE OF THE TELEPHONE ARRANGEMENT THAT YOU

20   HAD, AND YOU COULD SAY, "BARBRA, I WANT TO BE ON YOUR RADIO

21   SHOW," AND SHE'D HAVE TO MOVE SOMEBODY AND PUT YOU ON THE AIR;

22   RIGHT?

23        A.   THAT WAS WHAT I FELT.  THERE WAS NO OVERT DISCUSSION ABOUT

24   THAT, BUT I WAS NEVER REFUSED AN OPPORTUNITY TO COME ON THE

25   SHOW.  IT MIGHT NOT HAVE BEEN THAT WEEK.
```

```
 1            BUT ISSUES WERE ARISING IN THE INDUSTRY THAT I THOUGHT

 2      NEEDED TO BE DISCUSSED.

 3      Q.   AND LET'S FOCUS ON THE TIME PERIOD AND THEN FOCUS ON WHAT

 4      THE ISSUES WERE THAT YOU FELT NEEDED TO BE DISCUSSED.

 5      A.   OKAY.

 6      Q.   YOU SAID ISSUES WERE ARISING.  WHEN WAS THIS?

 7      A.   WELL, LET'S TALK ABOUT THE, WHAT WE CALL HVCC, HOME

 8      VALUATION CODE OF CONDUCT.  THE ATTORNEY GENERAL OF NEW YORK,

 9      CUOMO, SUED FANNIE MAE -- LET ME SEE IF I GET THIS RIGHT --

10      BECAUSE APPRAISALS WERE OVERVALUATING PROPERTIES.  THIS WAS

11      THROUGH A COMPANY CALLED MERIQUEST, I BELIEVE.

12            BUT THEY WERE -- THEY WERE COERCING APPRAISERS TO EVALUATE

13      A PROPERTY FOR THEIR NEEDS UNDER THREAT OF NONPAYMENT.  "IF YOU

14      DON'T BRING THIS PROPERTY IN AT X VALUE, WE'RE NOT GOING TO USE

15      YOU ANYMORE."  SO THERE WAS DURESS.

16            FANNIE MAE WAS SUED AND, TO SETTLE IT, THEY CAME OUT -- OR

17      THEY CREATED A HOME VALUATION CODE OF CONDUCT, WHICH MEANT AN

18      ORIGINATOR --

19      Q.   IF I COULD STOP YOU VERY BRIEFLY.  WHEN WAS THIS?

20      A.   2008, I BELIEVE.

21      Q.   OKAY.

22      A.   AROUND 2008.

23            THE -- WHICH CREATED A FIRE WALL BETWEEN A LOAN ORIGINATOR

24      THAT HAD A VESTED INTEREST IN A VALUE AND THE APPRAISER.

25            SO THE LOAN AGENT, THE LOAN ORIGINATOR COULD NO LONGER
```

1    CONTACT DIRECTLY AN APPRAISER.  THEY HAD TO CONTACT AN

2    APPRAISAL MANAGEMENT COMPANY THAT THEN, IN TURN, CONTACTED AN

3    APPRAISER TO PROVIDE THAT SERVICE.

4         SO THE LOAN ORIGINATOR AT THAT TIME WAS NO LONGER ABLE TO

5    IDENTIFY THEIR FRIEND AND THEN THREATEN NONPAYMENT IF SOMETHING

6    WASN'T BROUGHT IN ON VALUE.

7         THAT WAS JUST ONE OF THE ISSUES THAT WAS ARISING AND I

8    THOUGHT IT MIGHT BE VALUABLE.

9    Q.   AND WHY WAS THAT VALUABLE?

10   A.   WELL, IT WAS -- IT ADDRESSED THE ISSUE OF OVERVALUATION OF

11   PROPERTIES THAT WOULD PUT PEOPLE UNDER WATER IF THEY WERE

12   SPENDING MORE ON A PROPERTY THAN A PROPERTY WAS WORTH BASED ON

13   AN APPRAISAL, PARTICULARLY WHEN YOU'RE ACCESSING EQUITY IN A

14   PROPERTY THROUGH WHAT WE REFER TO AS THE CASH OUT REFINANCE.

15        IF A BROKER CAN BE PAID, CAN GET MORE MONEY ON A

16   TRANSACTION BY INCREASING THE VALUE OF THE PROPERTY BY PUTTING

17   PRESSURE ON AN INDIVIDUAL CONTRACTOR APPRAISER, EVERYBODY MAKES

18   MORE MONEY.

19        BUT THAT'S TO THE DISSERVICE OF THE BORROWER THEMSELVES,

20   AND EVERYTHING WE DO HAS TO BENEFIT THE CONSUMER, NOT US.

21        SO THAT WAS JUST ONE OF THE ISSUES THAT WAS COMING UP THAT

22   WAS GOING TO FUNDAMENTALLY TRANSFORM THE INDUSTRY.

23   Q.   AND JUST TO UNPACK IT A LITTLE BIT, PRESSURE ON THE

24   APPRAISERS TO OVERVALUE PROPERTIES?

25   A.   CORRECT.

1    Q.   THERE WAS SOME ATTEMPT AT THAT POINT TO REIGN IN THAT

2    PRACTICE?

3    A.   YES, SIR.

4    Q.   THE OVERVALUED PROPERTIES WERE GETTING TOO MUCH MONEY LENT

5    ON THEM; RIGHT?

6    A.   YES, SIR.

7    Q.   AND THAT WAS DETRIMENTAL TO THE BORROWER BECAUSE IT PUT

8    THEM AT RISK BECAUSE THEY COULDN'T PAY IT?  MAYBE?

9    A.   WELL, IT WAS AN UNFAIR TRANSACTION.  IT WAS SEPARATE FROM

10   A BORROWER'S ABILITY TO PAY.

11       BUT THE COLLATERAL THAT THEY WERE PURCHASING, THE HOME

12   THAT THEY WERE PURCHASING WAS BEING OVERVALUED, OR THE EQUITY

13   THAT THEY WERE TAKING OUT WAS MORE THAN WHAT WAS AVAILABLE IF

14   THE APPRAISAL OR THE VALUE WAS INFLATED.

15       SO IT WAS A DISSERVICE TO THE CONSUMER TO THE BENEFIT OF

16   THE LENDER AND THE BROKER.

17   Q.   AND ULTIMATELY TO A -- A DISSERVICE TO THE BANKS IF THERE

18   WAS SOME DECLINE IN THE VALUE OF THAT PROPERTY?

19   A.   THAT'S CORRECT.

20   Q.   I UNDERSTAND THAT YOU APPEARED ON BARBRA'S RADIO SHOW A

21   DOZEN TIMES OR SO.

22   A.   THAT'S A GUESSTIMATE, YES.

23   Q.   SURE.  OVER ABOUT HOW LONG?

24   A.   SEVERAL YEARS.

25   Q.   COULD IT BE SIX OR SEVEN?

1    A.   OVER SIX OR SEVEN YEARS?

2    Q.   YES.

3    A.   I DON'T BELIEVE IT WAS THAT LONG OF A PERIOD.  THAT WOULD

4    HAVE BEEN THE OUTSIDE PERIOD.  I'M THINKING MORE LIKE THREE

5    YEARS.

6    Q.   DO YOU REMEMBER TESTIFYING BEFORE THE GRAND JURY ON

7    MARCH 10TH OF 2010?

8    A.   YES, SIR.

9    Q.   DO YOU REMEMBER TESTIFYING AT THAT GRAND JURY HEARING THAT

10   YOU WERE ON THE RADIO SHOW FOR A DOZEN TIMES OVER SIX OR SEVEN

11   YEARS?  DOES THAT SOUND RIGHT?

12   A.   THAT COULD BE.  LIKE I SAID, I'M NOT REALLY CLEAR ON WHEN

13   I STARTED OR WHEN I FINISHED.  THAT WOULD HAVE BEEN THE

14   OUTSIDE.

15   Q.   DO YOU REMEMBER WHEN THE LAST APPEARANCE ON HER SHOW WAS?

16   A.   2008 POSSIBLY.  I MIGHT HAVE IN 2009 BECAUSE AT THE TIME

17   WE WERE BROADCASTING FROM A STUDIO IN BARBRA'S HOUSE, SO THAT

18   WAS LATER.

19        WHEN I FIRST STARTED ON THE RADIO, WE WERE OPERATING OUT

20   OF A STATION IN SANTA CRUZ, KSCO, WHICH MOVED TO SALINAS, I

21   THINK BROADCASTING WITH CLEAR CHANNEL, AND THEN ULTIMATELY TO

22   HER HOME.

23        SO THE LAST TIME I WAS THERE WAS AT HER HOME IN HER HOME

24   STUDIO.

25   Q.   YOU MENTIONED THAT IT BEGAN AT KZSO --

1       A.   KSCO, SANTA CRUZ --

2       Q.   SANTA CRUZ.  I SHOULD KNOW THAT.  BUT THAT WAS A

3   RELATIVELY SMALL RADIO STATION; CORRECT?

4       A.   YES, SIR.

5       Q.   YOU GO IN, THERE'S A MICROPHONE.

6            AND THERE'S A LAKE THERE; RIGHT?

7       A.   WELL, I THINK IT'S THE OCEAN.  PRETTY BIG LAKE.

8       Q.   BUT THEN YOU SAID YOU WENT TO SALINAS WITH CLEAR CHANNEL?

9       A.   YES.  SHE MOVED HER BROADCAST OVER TO CLEAR CHANNEL.  IT

10  WAS A SIMILAR SET UP OF STUDIOS.

11      Q.   AT THAT POINT HAD THE RADIO SHOW BECOME SYNDICATED?

12      A.   I DON'T RECALL WHEN IT WAS SYNDICATED.

13      Q.   DO YOU RECALL THAT IT WAS SYNDICATED?

14      A.   AT SOME POINT IT BECAME SYNDICATED, YES.

15      Q.   AND WHAT DID THAT MEAN?

16      A.   I'M NOT A RADIO GUY, BUT APPARENTLY YOU COULD BEAM THIS UP

17  TO A SATELLITE AND OTHER STATIONS THAT HAD ACCESS TO THAT

18  SATELLITE THEN BROADCAST THAT SHOW FOR CONTENT.

19           YOU COULD -- I DON'T KNOW HOW SYNDICATION -- OR HOW A

20  RADIO WAS SYNDICATED, BUT THAT RADIO SHOW THAT IS GENERATED

21  EITHER IN SANTA CRUZ OR SALINAS OR IN MONTEREY IS THEN

22  BROADCAST ON OTHER SHOWS, MAYBE LIVE, MAYBE TAPED, BUT OTHER

23  SHOWS HAVE ACCESS TO THAT FOR THEIR CONTENT.

24      Q.   AND DID YOU HAVE ANY UNDERSTANDING OF HOW MANY OTHER SHOWS

25  THIS SHOW WAS REBROADCAST ON?

1    A.   NOT FIRST-HAND KNOWLEDGE.  BUT IF YOU LOOKED AT THE

2    WEBSITE, I BELIEVE IT WAS OFFERED TO ROUGHLY 200.

3    Q.   AND THOSE WERE ALL OVER THE COUNTRY; RIGHT?

4    A.   ALL OVER AT LEAST THE COUNTRY.

5    Q.   AND FOR YOU, BEING A PERSON WHO WANTED TO GET YOUR PRODUCT

6    OUT THERE, THAT WAS A PRETTY BIG DEAL; RIGHT?

7    A.   YEAH.  ALTHOUGH WHEN WE TALK ABOUT THE COUNTRY, IT REALLY

8    DIDN'T MAKE A LOT OF DIFFERENCE BECAUSE MY TERRITORY WAS ONLY

9    THE WESTERN STATES, SO --

10   Q.   THAT'S A PRETTY BIG PART OF THE COUNTRY, ISN'T IT?

11   A.   THAT'S STILL A PRETTY BIG PART OF THE COUNTRY, YEAH.

12        LET'S DON'T KID OURSELVES.  THERE WEREN'T THAT MANY PEOPLE

13   LISTENING.

14   Q.   NOW, AT ONE POINT IN TIME MS. ALEXANDER OFFERED YOU A

15   POSITION WITH HER COMPANY; RIGHT?

16   A.   YES, SIR.

17   Q.   DO YOU REMEMBER WHEN THAT WAS?

18   A.   I DON'T REMEMBER THE EXACT DATE.  IT WAS PRIOR TO MY

19   INVESTING, SO SOMEWHERE IN 2007 PERHAPS.

20   Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHAT MS. ALEXANDER

21   WANTED YOU TO COME AND BE A PART OF WITH HER?  WHAT DID SHE

22   WANT YOU TO DO?

23   A.   ESSENTIALLY MANAGE THE COMPANY, AND ALSO CREATE MORE

24   ASSETS FOR THE COMPANY, MORE CAPITAL, SOLICIT INVESTORS TO

25   INVEST IN THE COMPANY, AND THEN PROVIDE SOME MANAGEMENT

1    CAPABILITY.

2    Q.   ISN'T IT TRUE, SIR, THAT SHE SPECIFICALLY WANTED YOU TO

3    COME IN AND MANAGE THE HARD MONEY LENDING ASPECTS OF THE

4    BUSINESS?

5    A.   YES.

6    Q.   AND WHAT DID SHE EXPLAIN THAT TO YOU AS BEING?

7    A.   I'M SORRY?

8    Q.   WHAT DID SHE -- HOW DID SHE EXPLAIN THAT TO YOU?

9         THAT WAS A TERRIBLE QUESTION.

10   A.   IT WAS A VERY LOOSE QUESTION.  WE'D LIKE TO OFFER YOU A

11   POSITION, BASICALLY, TO MANAGE THE OPERATION.

12   Q.   AND THIS WAS A CONVERSATION THAT TOOK PLACE OVER A PERIOD

13   OF TIME; CORRECT?

14   A.   IT TOOK PLACE OVER THE PERIOD OF ONE LUNCH.

15   Q.   OVER JUST ONE LUNCH?

16   A.   YES.

17   Q.   AND DO YOU REMEMBER TESTIFYING THAT THIS WAS AN ONGOING

18   DIALOGUE THAT TOOK PLACE OVER THE YEAR OF 2007?

19   A.   NO.  WE HAD ONGOING DIALOGUES ABOUT INVESTMENT, BUT NOT

20   ABOUT MY JOINING THE FIRM.

21        I WAS IN MY OFFICE AND I'D RECEIVED A CALL THAT SAID "CAN

22   WE HAVE LUNCH?"  IT HAD A TWINGE OF URGENCY TO IT.  WE HAD

23   CASUAL LUNCHES.  THIS IS NOT UNUSUAL, YOU KNOW, TO HAVE LUNCH

24   WITH YOUR CLIENT.

25        BUT THIS ONE HAD A LITTLE TWINGE OF URGENCY TO IT, SO I

1    MET WITH HER AND IT WAS OFFERED TO BECOME, I DON'T KNOW IF IT

2    WAS A PARTNER, BUT A POSITION TO MANAGE THE INVESTMENT FIRM.

3    Q.   I'D LIKE TO SHOW YOU -- THIS IS FROM THE GRAND JURY -- A

4    PORTION OF YOUR TESTIMONY BEFORE THE GRAND JURY IN MARCH OF

5    2010, AND I'D LIKE YOU TO READ FROM, OH, ABOUT THE TOP THIRD OF

6    PAGE 28 TO ABOUT HALFWAY THROUGH 29, SIR (HANDING).

7         AND JUST LET ME KNOW WHEN YOU'RE DONE, SIR.

8    A.   "MS. ALEXANDER TALKED TO YOU ABOUT BECOMING" --

9    Q.   NO, NO, NO.  JUST READ IT TO YOURSELF, SIR.  I'M SORRY.

10   A.   OH, SORRY.

11        (PAUSE IN PROCEEDINGS.)

12            THE WITNESS:  OKAY.

13   BY MR. LEEMING:

14   Q.   HAVE YOU DONE SO?

15   A.   YES, SIR.

16   Q.   THANK YOU.

17   A.   (HANDING.)

18   Q.   DOES READING THAT TRANSCRIPT REFRESH YOUR RECOLLECTION

19   ABOUT YOUR TESTIMONY BEFORE THE GRAND JURY BACK IN 2010?

20   A.   IF I TESTIFIED -- IF I SAID THAT, I SAID THAT.

21   Q.   WELL, YOU WERE UNDER OATH, WEREN'T YOU?

22   A.   YES, SIR, I WAS.

23   Q.   AND YOU SAID THAT YOU BEGAN SPEAKING TO BARBRA ABOUT HER

24   COMING TO WORK FOR YOU IN ABOUT 2007 AND IT CONTINUED OVER A

25   PERIOD OF TIME?

1    A.    NO, SIR.  I DIDN'T MAKE AN OFFER TO HER TO COME AND WORK

2    FOR ME.

3    Q.    NO, I'M SORRY.  THAT'S -- IT'S BEEN A LONG DAY ALREADY.

4    A.    IT HAS.

5    Q.    SHE MADE AN OFFER TO YOU TO COME AND WORK FOR HER IN 2007,

6    AND DISCUSSIONS CONTINUED ABOUT THAT OVER A PERIOD OF TIME IS

7    WHAT YOU TESTIFIED TO AT THE GRAND JURY; CORRECT?

8    A.    YES, SIR.

9    Q.    UNDER OATH?

10   A.    UNDER OATH.

11   Q.    BACK IN -- FOUR YEARS AGO?

12   A.    FOUR YEARS AGO.

13   Q.    OKAY.  FAIR TO SAY YOUR MEMORY OF THESE EVENTS WAS A

14   LITTLE CLEARER FOUR YEARS AGO?

15   A.    YES, SIR.

16   Q.    DO YOU KNOW WHY SHE WANTED YOU TO COME AND WORK FOR HER?

17   A.    NOT SPECIFICALLY.  IF -- IF SHE FELT LIKE HER BUSINESS WAS

18   EXPANDING, MAYBE SHE NEEDED A MANAGER.  I REALLY DON'T KNOW.

19   Q.    OKAY.

20   A.    I -- ALTHOUGH I SUSPECTED AT THE TIME IT WAS --

21          MR. SCHENK:  OBJECTION.  MOVE TO STRIKE AS

22   SPECULATION.

23          THE WITNESS:  OKAY.

24          THE COURT:  SUSTAINED.

25

BY MR. LEEMING:

Q.   YOU HAD SPECIFIC EXPERTISE THAT BARBRA KNEW ABOUT AT THAT

TIME; CORRECT?

A.   MY KNOWLEDGE OF THE MORTGAGE BUSINESS, YES, SIR.

Q.   AND MS. ALEXANDER WAS ALSO LOOKING FOR A LINE OF CREDIT AS

YOU UNDERSTOOD IT; CORRECT?

A.   THAT'S CORRECT.

Q.   A WAREHOUSE LINE OF CREDIT?

A.   YES, SIR.

Q.   AND THEN THAT'S BASICALLY A VERY LARGE CREDIT CARD THAT

WOULD BE MANAGED THROUGH A COMPANY SUCH AS YOURS; CORRECT?

A.   YES, A SIMILAR LINE OF CREDIT THAT COULD BE LOANED ON

CERTAIN TERMS.

Q.   AND, AGAIN, YOU WERE BEING OFFERED A POSITION AT GOLD

COAST INVESTMENTS, WHICH WAS THE PRIVATE MONEY BUSINESS SHE WAS

SETTING UP; CORRECT?

A.   YES, SIR.

Q.   AND IT'S AT THAT POINT THAT YOU ASKED FOR SPECIFICS ON THE

GUIDELINES FOR THE LENDING; ISN'T THAT CORRECT?

A.   I DID ASK FOR SPECIFICS.  I DON'T KNOW IF IT WAS IN

CONJUNCTION WITH THAT OFFER OR PRIOR TO MY INVESTING, BECAUSE I

WANTED TO KNOW, YOU KNOW, UNDER WHAT TERMS MONEY WOULD BE

LOANED.  THAT WAS PARAMOUNT TO MY INTEREST.

Q.   RIGHT.  SO YOU WANTED TO KNOW WHAT THE LOAN TO VALUE WAS;

CORRECT?

GAUGHF CROSS

1    A.    AMONG OTHER THINGS, YES, SIR.

2    Q.    YOU WANTED -- WHAT'S A CLTV?

3    A.    WHEN YOU HAVE A MORTGAGE IN A FIRST POSITION, YOUR PRIMARY

4    MORTGAGE, THAT'S CALLED THE LTV, LOAN TO VALUE.

5          IF YOU ALSO HAVE A SECOND MORTGAGE, A SECOND TRUST DEED

6    ASSOCIATED WITH THAT, THE COMBINED OF THE TWO, THE TERM IS YOUR

7    CLTV, YOUR COMBINED LOAN TO VALUE.

8    Q.    OKAY.  AND SO YOU ASKED BARBRA, OVER THE COURSE OF THESE

9    DISCUSSIONS, WHAT GUIDELINES SHE WAS GOING TO USE FOR THIS HARD

10   MONEY LENDING BUSINESS; CORRECT?

11   A.    CORRECT.

12   Q.    AND THAT IS WHEN YOU WERE PROVIDED THE DOCUMENT THAT YOU

13   WERE FIRST SHOWN THIS MORNING; CORRECT?

14   A.    YES.

15   Q.    AND IT WAS IN THE CONTEXT OF YOU BEING OFFERED A JOB AT

16   BARBRA'S BUSINESS TO MANAGE THE HARD MONEY BUSINESS; CORRECT?

17   A.    I -- MY RECOLLECTION IS THAT I ASKED FOR IT PRIOR TO

18   INVESTING.

19   Q.    SO YOU DON'T REMEMBER TESTIFYING BEFORE THE GRAND JURY

20   THAT IT WAS IN THE CONTEXT OF YOU BEING OFFERED THIS MANAGEMENT

21   POSITION?

22   A.    NO, BECAUSE THE, THE OFFERING OF THE MANAGEMENT POSITION

23   WAS A SHORT CONVERSATION THAT I HAD NO INTEREST IN.

24         LATER WHEN I DID HAVE AN INTEREST IN INVESTING, I WANTED

25   TO KNOW UNDER WHAT TERMS THE MONEY WAS BEING INVESTED.

1          THAT'S MY RECOLLECTION.  AND I APOLOGIZE, IT HAS BEEN A

2     WHILE.

3     Q.   IT HAS BEEN A WHILE.

4          COULD I APPROACH, YOUR HONOR?

5               THE COURT:  PLEASE, GO AHEAD.

6     BY MR. LEEMING:

7     Q.   I'D LIKE YOU TO JUST LOOK THROUGH PAGE 31 AND 32 OF YOUR

8     TESTIMONY BEFORE THE GRAND JURY, SIR.  AND AGAIN, DON'T READ IT

9     ALOUD.  JUST LET US KNOW WHEN YOU'VE BEEN ABLE TO GO THROUGH

10    THAT (HANDING).

11    A.   SURE.

12         (PAUSE IN PROCEEDINGS.)

13              THE WITNESS:  OKAY.

14    BY MR. LEEMING:

15    Q.   HAVE YOU HAD A CHANCE TO LOOK AT THAT?

16    A.   YES, SIR.

17    Q.   THANK YOU.

18    A.   (HANDING.)

19    Q.   SO YOU TESTIFIED BEFORE THE GRAND JURY THAT YOU WERE BEING

20    OFFERED A JOB AT GOLD COAST INVESTMENTS; RIGHT?

21    A.   YES, SIR.

22    Q.   AND YOU DISCUSSED THAT WITH HER AND YOU ASKED ABOUT THEIR

23    BUSINESS MODEL; CORRECT?

24    A.   YES.

25    Q.   AND YOU TALKED ABOUT, BEFORE THE GRAND JURY, ABOUT THE

1      VARIOUS BUSINESS MODELS; CORRECT?

2      A.   YES.

3      Q.   AND YOU ASKED MS. ALEXANDER, IN THE CONTEXT OF THE

4      BUSINESS MODEL AND THE JOB SHE WAS OFFERING YOU, WHAT THE LOAN

5      TO VALUE RATIOS WERE; CORRECT?

6      A.   YES.

7      Q.   AND YOU TESTIFIED BEFORE THE GRAND JURY THAT IT WAS KIND

8      OF GENERAL, BUT YOU WANTED SPECIFICS; RIGHT?

9      A.   YES.

10     Q.   AND SHE PROVIDED YOU AT THAT POINT WITH THE GUIDELINES

11     THAT YOU LOOKED AT THIS MORNING; CORRECT?

12     A.   NOT AT THAT POINT.

13     Q.   BUT SHE DID PROVIDE YOU THOSE GUIDELINES AND IT WAS IN

14     CONNECTION WITH YOU BEING OFFERED A JOB AT HER COMPANY?

15     A.   IT WAS AT A LUNCH LATER.

16     Q.   AND IT WAS IN CONNECTION WITH YOU BEING OFFERED A JOB AT

17     HER COMPANY; CORRECT?  YOU TESTIFIED TO THAT HERE, DIDN'T YOU?

18     A.   OKAY, YEAH.

19          I'M JUST TRYING TO THINK, IS THAT THE WAY IT WENT?

20          BUT, OKAY, IF I TESTIFIED TO THAT.  LIKE I SAID, MY MEMORY

21     FOUR YEARS AGO IS A LITTLE --

22     Q.   RIGHT.  SO IT WAS NOT WHEN YOU WERE BEING OFFERED YOUR

23     INVESTMENT WITH HER COMPANY LATER?

24     A.   WELL, IT WAS ALL AT THE SAME TIME, SO MAYBE IN MY MIND IT

25     WAS INFORMATION GATHERING, VETTING THE COMPANY.

1    Q.   WELL, THIS WAS 2007; CORRECT?

2    A.   THAT'S CORRECT.

3    Q.   YOU INVESTED IN 2008?

4    A.   THAT'S CORRECT, FEBRUARY OF 2008.

5    Q.   DO YOU REMEMBER MEETING MR. MICHAEL SWANSON?

6    A.   YES, SIR.

7    Q.   YOU MET HIM AT A LUNCH WITH BARBRA ALEXANDER AND A PERSON

8    WHO WAS AN ATTORNEY; CORRECT?

9    A.   THE FIRST MEETING I DON'T RECALL AN ATTORNEY BEING THERE.

10   HE MAY HAVE.

11        AT A SUBSEQUENT MEETING, YES, WE DID MEET WITH MIKE AND AN

12   ATTORNEY.

13   Q.   DO YOU KNOW WHO THE ATTORNEY WAS?

14   A.   IT -- SHE HAD TWO ATTORNEYS AT THE TIME, A MR. TICKER AND

15   A MR. GERSTL, AND I DON'T RECALL WHICH ONE WAS AT LUNCH.

16   Q.   DO YOU REMEMBER WHICH ONE WAS MORE CLOSELY ASSOCIATED WITH

17   MR. SWANSON?

18   A.   NO, SIR.

19   Q.   AND YOU DON'T REMEMBER WHICH ONE WAS AT THE LUNCH?

20   A.   NOT REALLY.

21   Q.   NOT REALLY?  IS THAT --

22   A.   YEAH.  NO, I DON'T REMEMBER WHICH ONE IT WAS.

23   Q.   OKAY.  AND AT THAT LUNCH MEETING, WHOEVER WAS THERE, THERE

24   WAS A DISCUSSED AGAIN ABOUT YOU COMING ON BOARD TO MANAGE THE

25   BUSINESS; RIGHT?

GAUGHF CROSS                                                    321

1    A.   I DON'T RECALL THAT.

2    Q.   DO YOU RECALL TESTIFYING TO THAT?

3    A.   NO.  BUT IF YOU HAVE THE TESTIMONY, OBVIOUSLY I DID.

4    Q.   WOULD IT REFRESH YOUR RECOLLECTION TO TAKE A LOOK AT IT?

5    A.   I'LL TAKE A LOOK AT IT.

6    Q.   I MAY HAVE THE WRONG PAGE.  EXCUSE ME JUST A MOMENT.

7    A.   TAKE YOUR TIME.

8         (PAUSE IN PROCEEDINGS.)

9    BY MR. LEEMING:

10   Q.   IF I CAN SHOW YOU PAGES 36 AND 37 OF YOUR TESTIMONY BEFORE

11   THE GRAND JURY, SIR (HANDING).

12        (PAUSE IN PROCEEDINGS.)

13   BY MR. LEEMING:

14   Q.   HAVE YOU HAD A CHANCE TO LOOK AT THAT?

15   A.   YES (HANDING).

16   Q.   THANK YOU.

17        AND SO YOU DID TESTIFY TO THE GRAND JURY THAT THIS, THIS

18   LUNCH WITH MR. SWANSON AND MS. ALEXANDER, AGAIN, WAS IN THE

19   CONTEXT OF YOU COMING ON BOARD AS A PRINCIPAL IN THE COMPANY?

20   A.   APPARENTLY SO.  THE WAY I RECALL IT, IT WAS IN CONJUNCTION

21   ALSO WITH INVESTING.

22   Q.   OKAY.  AND THEY WERE TALKING ABOUT THEIR COMPANY; RIGHT?

23   A.   TALKING ABOUT THE COMPANY, YES.

24   Q.   INVESTMENTS?

25   A.   UM-HUM.

1      Q.   YOU'RE A STRAIGHT SHOOTER, AREN'T YOU?

2      A.   THAT'S A LOADED QUESTION.  YES, SIR, I AM.

3      Q.   YOU ARE?

4      A.   YES.

5      Q.   I MEAN, YOU'VE BEEN IN THE BUSINESS A LONG TIME; RIGHT?

6      A.   IF YOU'D LIKE TO KNOW A LITTLE ABOUT MY BACKGROUND, I

7      COULD PROVIDE THAT.

8      Q.   I UNDERSTAND.  YOU WOULD NOT HAVE CONSIDERED OR SPOKEN OF

9      COMING ON TO AN ENTERPRISE THAT YOU BELIEVED TO BE FRAUDULENT

10     UNDER ANY CIRCUMSTANCES; RIGHT?

11     A.   ABSOLUTELY NOT.

12     Q.   DO YOU REMEMBER A DISCUSSION ABOUT VALUE DURING THIS

13     LUNCH, PRESUMED VALUE?  DO YOU REMEMBER THAT, SIR?

14     A.   YES, I DO.

15     Q.   SO THERE WAS A DISCUSSION ABOUT HOW -- AGAIN, WE JUST

16     TALKED ABOUT SOME OF THE BIG NATIONAL PICTURE ABOUT HOUSES

17     BEING OVERVALUED.

18          BUT AT THAT LUNCH AND IN THE SPECIFIC CONTEXT OF THIS

19     BUSINESS, THERE WAS A DISCUSSION ABOUT PRESUMED VALUE, FUTURE

20     VALUE OF THE PROPERTIES THAT WERE BEING INVESTED IN.

21          TELL US ABOUT THAT, IF YOU COULD.

22     A.   WHEN YOU'RE INVESTING IN A PROJECT SUCH AS THIS, THERE ARE

23     TWO VALUES YOU'RE LOOKING AT.  ONE IS THE PURCHASE PRICE, THE

24     VALUE AT THE CLOSE OF THE PURCHASE; AND THEN THE SECOND VALUE

25     IS WHAT THE PROPERTY WILL HYPOTHETICALLY BE VALUED AT ONCE IT'S

1    COMPLETED, PUT BACK INTO SHAPE.  SO THOSE ARE TWO SEPARATE

2    VALUES THAT YOU'RE LOOKING AT.

3         AND I THINK WHAT YOU'RE TALKING ABOUT IS WHAT LTV --

4    Q.   TO USE.

5    A.   -- TO USE TO LOAN THE MONEY.

6         AND I ASKED BARBRA, I SAID, KIND OF INNOCENTLY, "WELL,

7    WHAT VALUE ARE YOU USING?"

8         AND THE RESPONSE WAS, I BELIEVE, THAT "WE'RE USING THE

9    PURCHASE PRICE AS THE" -- NO, "THE TAKE OUT MONEY, THE FUTURE

10   VALUE FOR THE LOAN TO VALUE."

11        AND I IN TURN STATED, "NO, YOU HAVE TO USE THE PURCHASE

12   PRICE FOR THE LOAN TO VALUE FOR YOUR LOANS BECAUSE THAT

13   PROVIDES SKIN IN THE GAME."

14        THE BORROWER MUST THEN PROVIDE SOME OF THEIR OWN FUNDS,

15   PUT UP SOME OF THEIR OWN FUNDS.  IN A HYPOTHETICAL 25 PERCENT

16   OF A $100,000 LOAN, THEY'RE PUTTING UP $25,000, AND THEN YOU

17   PROVIDE, OR THE COMPANY WOULD PROVIDE THE OTHER 75 PERCENT, OR

18   75,000.

19        AND THEN CONSTRUCTION MONEY WOULD BE OFFERED TO IMPROVE

20   THE PROPERTY, AT THE COMPLETION OF WHICH THE VALUE WOULD BE

21   SUBSTANTIALLY MORE THAN THE INITIAL PURCHASE PRICE, PLUS THE

22   COST OF CONSTRUCTION.

23        SO LET'S TAKE A $100,000 PURCHASE.  THE BORROWER HAS

24   $25,000 OF THEIR OWN FUNDS INVESTED IN IT.  THE OTHER 75,000 IS

25   PROVIDED BY THE COMPANY TO PURCHASE THE PROPERTY FROM THE

1    SELLER.  NOW YOU'RE IN AT $100,000.

2         LET'S PRESUME A $50,000 CONSTRUCTION ADVANCE TO IMPROVE

3    THE PROPERTY, AND AT THE END OF WHICH THE PROPERTY WOULD BE

4    VALUED AT, LET'S SAY, 200,000.

5         SO FOR A SHORT PERIOD OF TIME, YOU'RE ABLE TO PURCHASE A

6    PROPERTY, IMPROVE THE PROPERTY, AND THEN SELL IT, PAY BACK ALL

7    THE INVESTORS, THE LENDER, AND HAVE A TIDY PROFIT OF YOUR OWN.

8    Q.   AND THE VALUE THAT BROUGHT YOU CONCERN AT THAT MEETING, IF

9    I'M USING THE WORD PROPERLY IN THIS CONTEXT, WAS THAT THEY WERE

10   ESTIMATING WHAT THEY HOPED TO MAKE; RIGHT?  THEY WERE USING IT

11   AT THE END OF THE SALE?

12   A.   WELL, IF -- IF YOU'RE MAKING YOUR LOAN TO VALUE BASED ON

13   THE FUTURE VALUE -- LET'S TAKE THIS SAME HYPOTHETICAL, $100,000

14   PURCHASE, $50,000 IMPROVEMENT, IT HAS A $200,000 ULTIMATE

15   VALUE.

16        IF YOU MAKE 75 PERCENT OF THAT, YOU'RE ACTUALLY LOANING

17   $150,000 WHEN THE PROPERTY WAS ONLY WORTH 100,000 AT THE TIME

18   THAT YOU MADE YOUR LOAN.

19        SO YOU HAVE TO BASE YOUR LOAN TO VALUE ON THE INITIAL

20   PURCHASE PRICE AND THEN ADVANCE FUNDS TO, FOR THE CONSTRUCTION

21   OR THE IMPROVEMENT, AND THEN YOU HAVE A TAKE OUT NUMBER.

22   Q.   OKAY.  NOW, THIS WAS IN 2007, THIS CONVERSATION THAT YOU

23   RECALL?

24   A.   AS I RECALL IT, YES.

25   Q.   IN 2007, WERE PROPERTIES STILL APPRECIATING?

1    A.   THEY WERE BEGINNING TO DECLINE.

2    Q.   THEY WERE BEGINNING TO DECLINE?

3    A.   YES, SIR.

4    Q.   AND SO WAS THAT THE FACTOR THAT WAS GIVING YOU SOME

5    CONCERN ABOUT POSSIBLE FUTURE VALUE BEING USED?

6    A.   NO, THAT WASN'T THE FACTOR THAT I WAS CONCERNED ABOUT.

7         I JUST WANTED TO KNOW WHAT LOAN TO VALUE, WHAT LTV, WHAT

8    WERE YOUR UNDERWRITING GUIDELINES?  WHAT VALUE ARE YOU USING?

9         THESE WERE THE THINGS I WAS CONCERNED WITH AS A LENDER.

10   HOW WERE YOU PROVIDING YOUR CREDIT RISK, OR HOW WERE YOU

11   EVALUATING YOUR CREDIT RISK?

12   Q.   AND THE WAY YOU PERCEIVED THIS WAS POTENTIALLY MORE RISKY?

13   A.   ABSOLUTELY.  POTENTIALLY MORE LUCRATIVE.  RISK/REWARD.

14   Q.   AND YOU'VE USED THAT TERM A COUPLE OF TIMES.  YOU

15   MENTIONED SPECIFICALLY WHEN YOU WERE CONSIDERING -- FIRST OF

16   ALL, SECOND DEEDS OF TRUST BY PRIVATE MONEY IS A RISKY

17   INVESTMENT; RIGHT?

18   A.   NOT NECESSARILY.

19   Q.   WELL, DO YOU REMEMBER TESTIFYING THAT IT'S RISKY AT ANY

20   TIME, BUT THE RETURN SORT OF MAKES UP FOR THAT?

21   A.   LOANING MONEY IN THIS ENVIRONMENT WITH THESE UNDERWRITING

22   GUIDELINES IS A RISK BECAUSE YOU'RE REDUCING THE, THE

23   EVALUATION OF THE BORROWER.

24        BECAUSE THE RISK IS HIGHER, YOU EXPECT A HIGHER RETURN ON

25   YOUR DOLLAR.  YOU MIGHT WIN.  YOU MIGHT LOSE.

```
 1          THE REASON I WAS CONCERNED ABOUT THE LTV IS WHAT IS THE

 2   INCENTIVE OF THE BORROWER TO IMPROVE THE PROPERTY AND MAKE THE

 3   PAYMENTS WHILE THEY HAVE, IN THIS CASE, A $25,000 INVESTMENT OF

 4   THEIR OWN THAT THEY WILL LOSE IF THEY DON'T IMPROVE THE

 5   PROPERTY OR LIQUIDATE IT TO PAY THE LENDER BACK.

 6          AND, SECOND, WHILE YOU MAY LOSE, IT'S VERY RARE THAT REAL

 7   ESTATE GOES TO ZERO.

 8   Q.   I UNDERSTAND, AND YOU TESTIFIED TO THAT IN YOUR DIRECT

 9   EXAMINATION.

10          BUT AS AN INVESTMENT VEHICLE, IS IT FAIR TO SAY THAT HARD

11   MONEY LENDING IS RISKIER?

12   A.   YES.

13   Q.   MUCH MORE RISKY THAN WHAT YOU PREFERRED TO DO, WHICH WAS

14   FIRST A QUALITY PAPER LOANS TO QUALIFIED INVESTORS?

15   A.   YES.

16   Q.   OR BORROWERS, I'M SORRY.

17   A.   WHAT WAS THAT LAST?

18   Q.   QUALIFIED BORROWERS.  I SAID INVESTORS FIRST.

19   A.   YEAH, A MORE QUALIFIED BORROWER.

20          MR. LEEMING:  YOUR HONOR, I HAVE QUITE A BIT MORE.

21   SHOULD WE STOP FOR LUNCH OR --

22          THE COURT:  IT'S 11:59.  YOU'VE GOT ONE MORE MINUTE.

23          MR. LEEMING:  ONE MORE MINUTE.  I'LL TAKE IT.

24          THE COURT:  OKAY.  IT'S ACTUALLY NOON NOW.

25          MR. LEEMING:  THERE'S NO NEED TO --
```

GAUGHF CROSS

```
1              THE COURT:  SORRY.
2              MR. LEEMING:  -- FOR ME TO GO TO A NEW SECTION.
3              THE COURT:  SORRY.  LET'S TAKE OUR BREAK NOW.  SORRY
4      ABOUT THAT.
5          OKAY.  WE'LL TAKE A ONE HOUR LUNCH BREAK.  I'LL SEE
6      EVERYONE BACK AT 1:00 O'CLOCK.  THANK YOU.
7          PLEASE DON'T RESEARCH OR DISCUSS THE CASE.
8          YOU MAY STEP DOWN.
9              THE WITNESS:  THANK YOU.
10         (JURY OUT AT 12:00 P.M.)
11             THE COURT:  THE RECORD SHOULD REFLECT THE JURORS HAVE
12     LEFT THE COURTROOM.
13         I JUST WANT TO REMIND THE PARTIES, TOMORROW PLEASE FILE
14     YOUR STIPULATION REGARDING RENUMBERING THE MONEY LAUNDERING
15     COUNTS THAT REMAIN IN THE CASE.
16         ALSO, IF YOU WOULD PLEASE FILE AND E-MAIL A REVISED
17     VERDICT FORM WITH THE RENUMBERING OF THE MONEY LAUNDERING
18     COUNTS.
19             MR. SCHENK:  YES, YOUR HONOR.
20             MR. LEEMING:  YOUR HONOR, THERE'S ONE ISSUE.
21         I'VE BEEN ADVISED THAT LINDA CAGLE'S HUSBAND, MR. CAGLE,
22     HAS BEEN IN THE COURTROOM.  HE IS NOT, I BELIEVE, ANTICIPATED
23     TO BE A WITNESS, BUT I'M ALWAYS CONCERNED THAT A SPOUSE OF A
24     WITNESS WILL REPORT BACK TO THEM AND AFFECT THEIR TESTIMONY.
25             THE COURT:  HE'S ACTUALLY ON THE WITNESS LIST.
```

1          MR. SCHENK:  HE IS ON THE WITNESS LIST, BUT WE'VE

2     TOLD HIM THAT WE DON'T INTEND TO CALL HIM.

3          IT SEEMS TO ME THAT'S FAIR CROSS.  IF -- YOU KNOW, IF

4     MR. LEEMING WANTS TO ASK MS. CAGLE ON THE STAND, "DID YOUR

5     HUSBAND -- I SAW HIM IN THE COURTROOM.  DID HE TALK TO YOU?"

6     THAT'S THE WAY TO SOLVE IT.

7          YOU CAN'T KEEP -- IT'S A PUBLIC COURTROOM.  THE HUSBAND

8     WHO'S NOT GOING TO BE CALLED IS, YOU KNOW, AN INTERESTED PARTY

9     AND, FRANKLY, DOESN'T EVEN NEED TO BE HERE AND WANTS TO WATCH

10    THE TRIAL.  I DON'T THINK WE CAN EXCLUDE PEOPLE WHO ARE NOT

11    WITNESSES FROM THE COURTROOM.

12          THE COURT:  HE'S AN INVESTOR?

13          MR. SCHENK:  YES.

14          THE COURT:  OKAY.

15          MR. LEEMING:  WELL, I DIDN'T ACTUALLY TRY TO EXCLUDE

16    HIM.  I'M JUST CONCERNED ABOUT THE POTENTIAL FOR THE

17    COMMUNICATION OF INFORMATION.

18          THE COURT:  ALL RIGHT.  WELL, I WOULD AGREE WITH

19    MR. SCHENK THAT THAT WOULD BE TERRITORY FOR CROSS-EXAMINATION.

20          MR. LEEMING:  VERY GOOD.

21          THE COURT:  ALL RIGHT.  THANK YOU ALL.  WE'LL SEE YOU

22    AFTER LUNCH.

23          MR. LEEMING:  THANK YOU.

24          MR. KALEBA:  THANK YOU, YOUR HONOR.

25          (THE LUNCH RECESS WAS TAKEN FROM 12:02 P.M. TO 1:02 P.M.)

1              **AFTERNOON SESSION**

2          (JURY IN AT 1:02 P.M.)

3              THE COURT:  WELCOME BACK.  PLEASE TAKE A SEAT.

4          MR. LEEMING, PLEASE GO AHEAD.

5              MR. LEEMING:  THANK YOU.

6     Q.   AND GOOD AFTERNOON NOW, MR. GAUGHF.

7     A.   GOOD AFTERNOON.

8     Q.   MR. GAUGHF, DID YOU MAKE AN INVESTMENT THROUGH -- FOR A

9     PERSON NAMED JAN BLOOM IN 2008 THROUGH MS. ALEXANDER?

10    A.   YES.

11    Q.   AND THAT WAS FOR A $60,000 LOAN?

12    A.   YES.

13    Q.   WAS THAT SECURED BY A DEED OF TRUST TO YOUR KNOWLEDGE?

14    A.   YES.  TO MY KNOWLEDGE, YES.

15    Q.   AND HOW DID THAT WORK?

16    A.    IN THIS CASE, IF I REMEMBER, BARBRA ALEXANDER WAS THE

17    RETAIL ORIGINATOR.  I HAD A BORROWER WHO DIDN'T QUALIFY FOR

18    PRIME LENDING.  THE LOAN TO VALUE -- THE DTI, DEBT TO INCOME,

19    RATIOS EXCEEDED WHAT WE WOULD ALLOW BECAUSE OF CONSUMER DEBT.

20         WE HAVE TWO DTI'S WE LOOK AT.  ONE IS THE HOUSING DEBT AND

21    ONE IS THE COMBINED CONSUMER DEBT.

22         THIS BORROWER, MS. BLOOM, COULD BENEFIT FROM A LOWER

23    INTEREST RATE, WHICH WOULD IMPROVE HER ABILITY TO MAKE PAYMENTS

24    ON HER OBLIGATIONS.

25         I HAD AN OPPORTUNITY TO LOAN 60,000 OF MY OWN FUNDS, MY

```
1    OWN PERSONAL FUNDS, DIRECTLY TO MS. BLOOM -- BLOOMBERG? --

2    MS. BLOOM TO CONSOLIDATE HER CONSUMER DEBT.

3         AND BY CONSOLIDATING THE CONSUMER DEBT INTO A SINGLE LOAN,

4    SHE WOULD THEN QUALIFY FOR A PRIME LOAN, TAKING OUT BOTH HER

5    FIRST OR EXISTING MORTGAGE, PLUS PAYING OFF, IN THIS CASE, THE

6    SECOND MORTGAGE, IMPROVING HER ABILITY TO MAKE PAYMENTS,

7    LOWERING HER OVERALL PAYMENTS.

8         SO I MADE A DIRECT LOAN ON THE PROPERTY, AND BECAUSE

9    BARBRA WAS A BROKER, SHE WAS QUALIFIED THROUGH THE DEPARTMENT

10   OF REAL ESTATE TO PROVIDE THE SERVICING ON THAT LOAN.

11   SERVICING IS COLLECTING THE PAYMENTS ON THE LOAN.

12   Q.   AND WAS THAT LOAN THROUGH GOLD COAST FINANCIAL?

13   A.   YES.

14   Q.   AND HOW DID THAT WORK OUT?

15   A.   IT WORKED OUT WELL.

16   Q.   SO YOU GOT YOUR MONEY BACK?

17   A.   YES.

18   Q.   YOU GOT YOUR INTEREST?

19   A.   YES, SIR.  I UNDERWROTE THE FILE.  I UNDERWROTE THE

20   INDIVIDUAL.  I DETERMINED THAT SHE WOULD BENEFIT FROM AN

21   IMPROVED FINANCIAL POSITION, AND BECAUSE SHE HAD DEMONSTRATED

22   THE ABILITY TO MAKE HIGHER PAYMENTS, I WAS COMFORTABLE

23   PROVIDING FINANCING THAT WOULD ALLOW HER TO MAKE LOWER PAYMENTS

24   ON THE SAME OBLIGATION.

25   Q.   SO IN OTHER WORDS, THAT WORKED OUT JUST FINE?
```

1    A.    THAT WORKED OUT WELL.

2    Q.    NOW, ON DIRECT EXAMINATION YOU TESTIFIED THAT THERE WAS A

3    POINT IN TIME WHERE YOU ASKED FOR THE RETURN OF YOUR FUNDS.

4    CORRECT?

5    A.    YES.

6    Q.    AND I THINK YOU TESTIFIED THAT MS. ALEXANDER NEVER SAID

7    THAT HER BUSINESS WAS IN TROUBLE.  I THINK THOSE WERE YOUR

8    WORDS.

9          DO YOU RECALL THAT?

10   A.    YES, SIR.

11   Q.    SHE DID EXPLAIN TO YOU THAT IT WAS VERY DIFFICULT TO GET

12   LOANS FROM BANKS AT THAT PERIOD OF TIME; CORRECT?

13   A.    CORRECT.

14   Q.    AND SHE TOLD YOU THESE LENDERS SURE ARE SLOW; RIGHT?

15   A.    YES.

16   Q.    AND IS THAT CONSISTENT WITH YOUR KNOWLEDGE, OR YOUR

17   UNDERSTANDING OF THE LENDING MARKET AT THAT TIME?

18   A.    THINGS HAD CERTAINLY TIGHTENED UP AND YOU DID HAVE TO HAVE

19   A QUALIFIED BORROWER UNDER TRADITIONAL TERMS.

20   Q.    AND THAT WAS 2009; CORRECT?

21   A.    YES, SIR.

22   Q.    FAIR TO SAY IT WAS VERY DIFFICULT FOR MOST PEOPLE TO GET

23   LOANS IN 2009?

24   A.    MORE DIFFICULT THAN IT HAD BEEN.  CERTAINLY NOT

25   IMPOSSIBLE.

1    Q.   OKAY.  A LOT OF THE PEOPLE -- WELL, STRIKE THAT.

2         IN -- AT SOME POINT YOU OFFERED -- NOW IT'S THE OTHER WAY

3    AROUND.  AT SOME POINT YOU OFFERED MS. ALEXANDER A JOB WITH

4    TREEHOUSE MORTGAGE; IS THAT CORRECT?

5    A.   THAT'S CORRECT.

6    Q.   AND, AGAIN, WHEN WAS THAT?

7    A.   THAT WAS IN 2009.  WITHOUT RECALLING THE EXACT DATE, IT

8    WAS FALL OF 2009.  IT WAS IMMEDIATELY PRIOR TO THE INDICTMENT

9    IN NOVEMBER 2009.

10   Q.   SO YOU MENTIONED THAT THERE WERE CERTAIN REQUIREMENTS FOR

11   HER TO BE ABLE TO WORK AT YOUR COMPANY; RIGHT?

12   A.   THAT'S CORRECT.

13   Q.   AND YOU SAID YOU DID YOUR DUE DILIGENCE ON HER.

14   A.   THAT --

15   Q.   WHAT DOES THAT MEAN?

16   A.   THIS IS A MORTGAGE BANKING FIRM, AND WHEN WE HIRE A LOAN

17   ORIGINATOR, IT'S AS AN EMPLOYEE, AND WE DO BACKGROUND CHECKS ON

18   EMPLOYEES, YOU KNOW, INITIALLY FOR LICENSING TO BE SURE THAT

19   YOU'RE DULY LICENSED TO PROVIDE THE SERVICE; AND SECOND, IF

20   THERE ARE ANY ISSUES IN YOUR BACKGROUND THAT MIGHT CAUSE

21   CONCERNS, BECAUSE WE ARE A BANKER, AND CERTAINLY WE WANT TO

22   HAVE SOMEONE OFFERING LOANS ON OUR BEHALF THAT DOESN'T HAVE A

23   HISTORY OF CHALLENGES.

24   Q.   OKAY.

25   A.   THAT'S WHAT THE DUE DILIGENCE IS.

1    Q.    OKAY.   AND YOU FOUND NO HISTORY OF THOSE, QUOTE,

2    CHALLENGES; CORRECT?

3    A.    NO, SIR.   NONE WERE PROVIDED TO ME.   THIS IS DONE AT THE

4    CORPORATE LEVEL OUTSIDE OF MY PURVIEW.   I RECOMMEND SOMEONE,

5    THEN THE BACKGROUND CHECK IS DONE BY HUMAN RESOURCES AND GIVEN

6    A GO AHEAD.

7    Q.    AND THEN ABOUT A WEEK LATER YOU LEARNED OF THE FBI RAID ON

8    HER HOME; CORRECT?

9    A.    YES, SIR.

10   Q.    AND YOU WITHDREW YOUR OFFER?

11   A.    YES, SIR.

12   Q.    AND THAT WAS IN THE NEWSPAPER; CORRECT?

13   A.    THE INDICTMENT WAS IN THE NEWSPAPER.   NOT MY WITHDRAWAL.

14   Q.    NO, NO, NO.   I APOLOGIZE.

15         THERE WAS NEWS OF THE SEARCH OF HER HOME; CORRECT?

16   A.    YES, SIR.

17   Q.    AND VARIOUS OTHER PLACES?

18   A.    WELL, THE HOME WAS THE ONE I RECALLED.

19   Q.    THAT STUCK OUT IN YOUR MIND; RIGHT?

20   A.    WELL, IT'S THE ONLY ONE THAT I READ.   THERE MAY HAVE BEEN

21   OTHER PLACES.

22   Q.    OKAY.

23   A.    BUT THAT'S THE ONE THAT I RECALL.

24   Q.    IS IT FAIR TO SAY THAT THAT NEWS WAS PRETTY WIDELY

25   CIRCULATED IN THE FINANCIAL INDUSTRY IN THE MONTEREY AREA?

GAUGHF - CROSS

1    A.   IN THE MONTEREY AREA.  NOT SPECIFICALLY THE FINANCIAL

2    INDUSTRY.  THIS IS THE LOCAL NEWSPAPER READ BY, YOU KNOW, HOW

3    MANY LOCAL PEOPLE.

4    Q.   SO EVERYBODY WHO READS THE PAPER?

5    A.   IT'S A SMALL COMMUNITY.

6    Q.   I'D LIKE TO SHIFT GEARS A LITTLE BIT.

7         AND COULD WE CALL UP GOVERNMENT'S EXHIBIT 82?  I THINK

8    IT'S IN BINDER 2.  IT'S RIGHT AT THE BEGINNING.

9         DO YOU HAVE THAT, SIR?

10   A.   YES.  82?  YES.

11   Q.   SO IF WE COULD PULL UP, ON THE SCREEN, I WANT TO PULL UP

12   PAGE 1.  THIS IS ACTUALLY EASIER TO READ.

13        IS YOUR SCREEN WORKING YET, SIR?

14   A.   YES.  I HAVE TO ENLARGE IT, BUT I CAN TELL THAT'S THE SAME

15   THING.

16   Q.   I'M JUST MAKING SURE IT'S WORKING AT THIS POINT.

17   A.   YES, SIR.

18   Q.   WE CAN ENLARGE IT IF WE NEED TO.

19        THE FIRST DOCUMENT IN THE GOVERNMENT'S -- FIRST OF ALL,

20   GOVERNMENT'S 82 IS A PACKAGE OF DOCUMENTS; CORRECT?

21   A.   YES, SIR.

22   Q.   IT'S ABOUT 50 PAGES?

23   A.   YES, SIR, INCLUDING THE SUBSCRIPTION AND OPERATING

24   AGREEMENT.

25   Q.   OKAY.  AND THE SUBSCRIPTION AGREEMENT -- WELL, FIRST OF

1      ALL, WHAT IS YOUR UNDERSTANDING OF THE SUBSCRIPTION AGREEMENT?

2      A.   WELL, IT DETAILS THE -- IN HERE ARE THE REPRESENTATIONS

3      AND WARRANTIES OF THE INVESTMENT I'M INVESTING IN, THE COMPANY

4      AND THE TERMS UNDER WHICH I WOULD BE INVESTING.

5      Q.   AND IT MAKES CERTAIN REPRESENTATIONS BY YOU; CORRECT?  IT

6      CONTAINS CERTAIN REPRESENTATIONS BY YOU?

7      A.   TO THE EXTENT OF MY NET WORTH AND WHAT I'M INVESTING IN,

8      YES, SIR.

9      Q.   WELL, LET'S ZOOM UP -- CAN WE ENLARGE SUB -- 1,

10     SUBPARAGRAPH A AT THE TOP OF EXHIBIT 82, PLEASE.

11          SO YOU SEE THAT, SUBPARAGRAPH A, "I HAVE READ" -- "I HAVE

12     RECEIVED, READ, AND FULLY UNDERSTAND THE PRIVATE PLACEMENT

13     MEMORANDUM, INCLUDING THE 'RISK FACTORS' SECTION, AND I AM

14     PREPARED TO ACCEPT THOSE RISKS."

15     A.   YES, SIR.

16     Q.   YOU RECALL THAT; CORRECT?

17     A.   YES, SIR.

18     Q.   AND JUST TO BE CLEAR, YOU SIGNED THIS -- I DON'T SEE A

19     DATE ON IT.  DO YOU REMEMBER WHEN YOU SIGNED THIS?

20     A.   NO.  IT WOULD HAVE BEEN IMMEDIATELY PRIOR TO -- WELL,

21     THERE'S A DATE ON THE SIGNATURE PAGE ON PAGE 4.

22     Q.   AH.  FEBRUARY 19TH OF 2008.

23     A.   YES.

24     Q.   VERY GOOD.  SO THAT'S WHEN YOU SIGNED THIS?

25     A.   YES, SIR.

1    Q.   AND ALSO, YOU ALSO AGREE THAT YOU RECEIVED, READ, AND

2    FULLY UNDERSTAND THE OPERATING AGREEMENT FOR GCF INVESTMENT,

3    LLC; CORRECT?

4    A.   YES, SIR.

5    Q.   AND THEN SUBSECTION C, "I HAVE COMPLETED, DULY" -- THAT'S

6    OKAY.  WE CAN LEAVE IT RIGHT THERE, THANK YOU.  -- "COMPLETED,

7    DULY EXECUTED AND DELIVERED TO THE COMPANY A CONFIDENTIAL

8    INVESTOR SUITABILITY STATEMENT."

9    A.   THAT'S CORRECT.

10   Q.   OKAY.  AND THAT'S WHAT YOU WERE TALKING ABOUT EARLIER,

11   WHICH IS THE DETAIL OF YOUR FINANCES AND YOUR ABILITY TO

12   QUALIFY AS AN INVESTOR IN THIS; CORRECT?

13   A.   THAT'S THE CORRECT TERM, A QUALIFIED INVESTOR.

14   Q.   A QUALIFIED INVESTOR.  AND THAT HAS A SPECIFIC MEANING

15   WHEN ONE IS INVESTING IN THIS KIND OF AN INVESTMENT; RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   AND IT'S DIFFERENT THAN WHEN YOU'RE INVESTING IN A PIECE

18   OF REAL PROPERTY OR -- EXCUSE ME -- WHEN YOU'RE TRYING TO BUY A

19   HOUSE; RIGHT?

20   A.   AS FAR AS SUITABILITY, YES, THERE'S A DIFFERENT STANDARD.

21   Q.   AND THE SUITABILITY STANDARD IS THAT YOU NEED TO HAVE A

22   MILLION DOLLARS OF NET WORTH IN EXCESS OF YOUR PERSONAL HOME

23   AND YOUR CAR; CORRECT?

24   A.   THAT IS CORRECT.

25   Q.   SO THAT'S -- WHEN THE SUBSCRIPTION AGREEMENT HERE IS

1    REFERRING TO THE SUITABILITY STATEMENT, THAT'S WHAT IS BEING

2    DISCUSSED?

3    A.   THAT'S CORRECT.

4    Q.   ALL RIGHT.  AND THEN UNDER D -- CAN WE ENLARGE D, PLEASE?

5    THANK YOU.

6        SUBSECTION D SAYS, "I UNDERSTAND THAT THE" ACTS "ARE BEING

7    OFFERED AND SOLD WITHOUT REGISTRATION UNDER THE SECURITIES

8    ACT."

9    A.   IT SAYS "I UNDERSTAND THAT THE UNITS ARE BEING OFFERED AND

10   SOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT."

11   Q.   YES.  MY OWN TYPING.  THAT'S NOTORIOUSLY BAD.

12       LET'S TALK ABOUT THAT.  YOU HAVE SOME SECURITIES

13   EXPERIENCE NOW.

14   A.   I DO NOW.

15   Q.   YOU DO NOW?

16   A.   SUBSEQUENT TO THIS TRANSACTION.

17   Q.   SUBSEQUENT TO THIS TRANSACTION.

18       SO WHAT DOES "REGISTRATION UNDER THE SECURITIES ACT" MEAN?

19   A.   OH, YOU'RE REGISTRATING -- I'M SORRY -- YOU'RE REGISTERING

20   YOUR OFFERING ON THE SECURITIES AND EXCHANGE.

21   Q.   AND THAT MEANS THEY GET A CHANCE TO LOOK AT IT AND

22   EVALUATE IT; CORRECT?

23   A.   THEY DON'T EVALUATE IT.  THAT'S NOT SOMETHING THAT THEY'RE

24   GOING TO DO.  THEY DON'T EVALUATE IT FOR SUITABILITY.  THEY

25   EVALUATE IT TO SEE IF IT MEETS OTHER CRITERIA, BUT NOT FOR

```
1       SUITABILITY.

2              IN OTHER WORDS, THEY WOULD NOT TAKE THIS AND SAY "THAT'S A

3       GOOD INVESTMENT, A BAD INVESTMENT.  YOU CAN OFFER IT AT THIS

4       COST."

5              IT'S TO HAVE IT REGISTERED TO SEE THAT SECURITIES THAT ARE

6       OFFERED ARE CONSISTENT WITH THE SUBSCRIPTION AGREEMENT, ET

7       CETERA.

8       Q.    OKAY.  AND ACTUALLY THAT'S WHAT I MEANT, BUT THANK YOU.

9       A.    OKAY.

10      Q.    THANK YOU.  WE DON'T NEED TO ZOOM IN ON THAT ANYMORE.

11             WHAT DOES "BEING SOLD WITHOUT REGISTRATION UNDER THE

12      SECURITIES ACT" MEAN TO YOU?

13      A.    WELL, IT MEANS IT'S MORE OF A PRIVATE PLACEMENT AND I'M

14      INVESTING WHAT -- WHAT I BELIEVED I WAS INVESTING IN WAS A POOL

15      FROM WHICH LOANS WOULD BE MADE, SECURED BY REAL PROPERTY UNDER

16      THE TERMS DISCLOSED IN THE UNDERWRITING AGREEMENT.

17      Q.    OKAY.  BUT THAT'S A DIFFERENT UNDERSTANDING THAN WHAT THIS

18      SAYS.  "WITHOUT REGISTRATION UNDER THE SECURITIES ACT" MEANS

19      WHAT, SIR?

20      A.    IT MEANS THAT IT'S NOT REGISTERED WITH SECURITIES.

21      Q.    OKAY.

22      A.    FUNCTIONALLY IT MEANS NOTHING TO ME IF I'M RELYING ON

23      SOMEONE'S ASSERTION OF WHAT I'M INVESTING IN WITH THE

24      RELATIONSHIP THAT I HAVE, WITH THE UNDERSTANDING, WITH THE

25      VETTING.
```

```
1            THE FACT THAT IT'S REGISTERED WITH THE S.E.C. OR NOT IS

2     NOT RELEVANT IN MY MIND.

3     Q.   OKAY.  HAD YOU INVESTED IN THESE KINDS OF FUNDS BEFORE?

4     A.   NO, SIR.

5     Q.   NOT AT THIS TIME?

6     A.   OTHER THAN THE ONE LOAN THAT I MADE DIRECTLY TO A

7     BORROWER --

8     Q.   YES.

9     A.   -- I'VE NEVER INVESTED IN A PRIVATE PLACEMENT OR ANYTHING

10    THAT REQUIRED A QUALIFIED INVESTOR.

11    Q.   OKAY.  CAN WE GO TO PAGE 9 OF EXHIBIT 82, PLEASE, AND THE

12    FIRST PARAGRAPH OF PARAGRAPH -- THE FIRST PARAGRAPH OF THE

13    PRIVATE -- WELL, FIRST OF ALL, THIS IS THE PRIVATE PLACEMENT

14    MEMORANDUM; CORRECT?

15    A.   YES.

16    Q.   AND THE FIRST PARAGRAPH ENCOURAGED YOU TO READ THE ENTIRE

17    MEMORANDUM; RIGHT?

18    A.    IT CERTAINLY SUGGESTS THAT YOU DO THAT, YES.

19    Q.   AND IT'S SAYING -- ARE YOU FAMILIAR WITH REGULATION D?  DO

20    YOU KNOW WHAT THAT IS?

21    A.   NO, SIR.

22    Q.   OKAY.  DID YOU EVER LOOK INTO IT?

23    A.   EXPLAIN WHAT IT IS AND I'LL TELL YOU IF I THOUGHT ABOUT

24    IT.

25    Q.   I'M ASKING YOU IF --
```

```
 1     A.   I DON'T KNOW WHAT REGULATION D IS.

 2     Q.   THE SECOND PARAGRAPH OF THE PRIVATE PLACEMENT MEMORANDUM,

 3     FULL PARAGRAPH, AGAIN WARNS YOU THAT "THESE SECURITIES HAVE NOT

 4     BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OF

 5     THE SECURITIES ACT OF 1933.  THIS OFFERING IS BEING MADE

 6     PURSUANT TO AN EXEMPTION FROM SUCH REGISTRATION UNDER

 7     REGULATION D, SECTION 46 OF THE ACT."

 8     A.   OKAY.  I SEE THAT.

 9     Q.   DID YOU EVER MAKE ANY INQUIRIES AS TO WHAT REGISTRATION

10     UNDER SECTION 4 -- SORRY -- REGULATION D MEANT?

11     A.   NO, SIR.

12     Q.   ALL RIGHT.  NOW, YOU'VE HAD A LOT OF INVESTMENT EXPERIENCE

13     IN YOUR LIFE, SIR.  BUT THIS IS THE -- NO, I'M SORRY.  YOU'VE

14     HAD A LOT OF BANKING EXPERIENCE; CORRECT?

15     A.   YES.

16     Q.   AND YOU'VE HAD A LOT OF -- YOU'VE REVIEWED THOUSANDS OF

17     LOAN FILES, AS YOU SAID EARLIER, AND YOU'RE FAMILIAR WITH WHAT

18     GOES INTO THOSE FILES; CORRECT?

19     A.   THAT'S CORRECT.

20     Q.   BUT YOU'VE NEVER INVESTED IN AN INVESTMENT LIKE THIS

21     BEFORE?

22     A.   NO, SIR.

23     Q.   BUT YOU DIDN'T BOTHER TO FIND OUT WHAT THESE REGULATIONS

24     THAT WERE BEING REFERENCED HERE WERE, DID YOU?

25     A.   NO, SIR.  IT WASN'T RELEVANT IN MY DECISION WHETHER IT WAS
```

1    REGISTERED OR NOT REGISTERED.

2    Q.   OKAY.

3    A.   I WAS RELYING ON MY RELATIONSHIP.

4    Q.   DID YOU REVIEW THE RISK FACTORS THAT ARE SPELLED OUT AT

5    PAGES 11 AND 12?

6    A.   I DIDN'T READ IT.

7    Q.   YOU DIDN'T READ IT?

8    A.   NO.

9    Q.   DID YOU LOOK AT THE DESCRIPTION OF WHO MAY INVEST THAT

10   BEGINS AT THE BOTTOM OF PAGE 14?

11   A.   NO.  ONCE IT GOT TO THIS POINT, I PRESUMED THIS WAS

12   BOILERPLATE LANGUAGE.  I WAS NOT RELYING ON THIS.

13        I WAS RELYING MORE ON AN ASSERTION, OR A REPRESENTATION, A

14   VERBAL REPRESENTATION OF WHAT THIS IS BASED ON 17 YEARS

15   RELATIONSHIP WITH BARBRA.

16   Q.   DO YOU KNOW WHO WROTE THIS DOCUMENT?

17   A.   I HAVE NO IDEA.  LIKE I SAID, THIS -- THIS COULD VERY WELL

18   BE A BOILERPLATE THAT ONE COULD USE FOR THESE TYPES OF

19   TRANSACTIONS.

20   Q.   BUT YOU DON'T KNOW THAT?

21   A.   I DON'T KNOW THAT.

22   Q.   BECAUSE YOU DIDN'T READ IT AND YOU DIDN'T LOOK INTO IT?

23   A.   THAT'S CORRECT.

24   Q.   DO YOU RECALL READING OR BEING INFORMED THAT THE PROPOSED

25   INVESTMENT INVOLVED A SUBSTANTIAL DEGREE OF RISK AND IS

1    SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS?

2    A.   I WOULDN'T HAVE TO READ THIS TO KNOW THAT.  THAT'S

3    INHERENT IN MY UNDERSTANDING OF THE MORTGAGE INDUSTRY, THAT

4    THIS WOULD BE A RISKY INVESTMENT.

5    Q.   OKAY.

6    A.   BUT ALSO WOULD HAVE SOME SECURITIES.

7    Q.   AND WOULD YOU AGREE THAT THIS KIND OF INVESTMENT IS ONLY

8    SUITABLE FOR SOMEONE WHO HAS NO NEED FOR LIQUIDITY IN THEIR

9    INVESTMENT AND CAN AFFORD THE RISK OF LOSS OF THEIR ENTIRE

10   INVESTMENT?

11   A.   THAT'S TRUE.

12   Q.   YOU AGREE WITH THAT?

13   A.   YES, SIR.

14   Q.   AND I THINK YOU SAID THAT YOU REALLY DIDN'T READ THIS.  IT

15   SOUNDS LIKE NOT AT ALL.  IS THAT RIGHT?

16   A.   I READ THE PART WHERE I HAD TO SIGN AND PUT IN HOW MUCH I

17   WAS WORTH, ET CETERA.

18        BUT, AGAIN, IT'S SOMEWHAT -- MY UNDERSTANDING OF THE

19   MORTGAGE BUSINESS EXCEEDS THOSE OF OTHER INVESTORS.  WHEN WE

20   HAVE TALKED ABOUT THE WAY THE COMPANY IS PERFORMING, UNDER WHAT

21   CIRCUMSTANCES MONEY WOULD BE LOANED, BASED ON A RELATIONSHIP

22   THAT I'VE HAD FOR MANY YEARS WITH NO INCIDENTS OF ANYTHING

23   OUTSIDE OF ACCEPTED PRACTICES ON A REAL ESTATE INVESTMENT TRUST

24   THAT HAD AN UNDERLYING ASSET OF REAL ESTATE THAT NEVER WENT TO

25   ZERO -- I KNEW I COULD LOSE MONEY, BUT I NEVER ANTICIPATED

```
 1        GOING TO ZERO.  BUT I WAS AWARE THAT, YOU KNOW, A QUALIFIED

 2        INVESTOR MUST BE AWARE OF THOSE TERMS.

 3             SO I DIDN'T READ THE BOILERPLATE.  IT DRIVES ME CRAZY.

 4        Q.   SO LET'S JUST UNPACK THAT A LITTLE BIT.

 5        A.   OKAY.

 6        Q.   YOUR 17 YEARS OF EXPERIENCE WITH BARBRA WAS IN HER

 7        ORIGINAL COMPANY; CORRECT?

 8        A.   THE 17 YEARS EXPERIENCE WAS HER ORIGINATING LOANS AS A

 9        MORTGAGE BROKER AND MY PERFORMING AS A LENDER, A WHOLESALE

10        MORTGAGE BANKER.  THAT WAS THE PROFESSIONAL RELATIONSHIP THAT

11        I -- THAT I INITIATED.

12        Q.   CORRECT.  AND THAT RELATIONSHIP DID NOT INVOLVE THIS KIND

13        OF INVESTMENT; CORRECT?

14        A.   THAT RELATIONSHIP DID NOT INVOLVE THIS RELATIONSHIP, I

15        MEAN THIS INVESTMENT.

16        Q.   AND THIS WAS A PART OF A&P PROPERTIES AS YOU UNDERSTOOD

17        IT; CORRECT?  GCF, LLC?

18        A.   I -- WELL, GOLD COAST FINANCIAL INVESTMENT VERSUS GOLD

19        COAST FINANCIAL -- I THOUGHT IT WAS GOLD COAST INVESTMENTS.

20             BUT DISTINGUISHED FROM GOLD COAST FINANCIAL, FINANCIAL WAS

21        THE BROKERAGE OPERATING UNDER THE DEPARTMENT OF REAL ESTATE FOR

22        PURPOSES OF ORIGINATING RETAIL LOANS TO SUBMIT TO MY COMPANIES

23        FOR FUNDING.

24             GOLD COAST INVESTMENTS WAS AN ENTIRE SEPARATE ENTITY.

25        Q.   OKAY.  THIS LLC WAS AN ENTIRELY NEW BUSINESS, OR
```

1    RELATIVELY NEW; CORRECT?

2    A.   YES, SIR.

3    Q.   AND IT WORKED DIFFERENTLY; RIGHT?

4    A.   I'M SORRY?

5    Q.   IT WORKED DIFFERENTLY BY SECURITIZATION OR POOLING THE

6    INVESTMENT FUNDS?

7    A.   YES.

8    Q.   NOW, DID YOU UNDERSTAND THAT MR. SWANSON HAD ANY ROLE IN

9    THE FORMATION OF THIS COMPANY, MIKE SWANSON?

10    A.   DID I UNDERSTAND?

11    Q.   THAT MIKE SWANSON HAD ANY ROLE IN THE FORMATION OF THIS

12    NEW COMPANY?

13    A.   I THOUGHT THAT HE CAME ON AFTER THE FORMATION OF THE

14    COMPANY.  I CAN REMEMBER WHERE I WAS WHEN I WAS INTRODUCED TO

15    MR. SWANSON.

16        I THINK AFTER THE FACT, I SAID, WHAT DOES MIKE DO?  I'M

17    NOT SURE I EVER GOT A CLEAR ANSWER BEYOND HE'LL HELP US RAISE

18    CAPITAL.

19        HE DOES HAVE A BANKING BACKGROUND, SO CERTAINLY SOMEONE IN

20    HIS POSITION WOULD BE BENEFICIAL TO THE COMPANY.  BUT I NEVER

21    KNEW EXACTLY WHAT HIS SPECIFIC DUTIES WERE RELATIVE TO THE

22    MANAGEMENT OF THE COMPANY.

23    Q.   DID YOU KNOW HIM TO HAVE AN M.B.A.?

24    A.   NO, SIR.  I KNEW NOTHING ABOUT HIS BACKGROUND.

25    Q.   YOU DIDN'T KNOW ABOUT HIS EDUCATIONAL BACKGROUND?

1    A.    NO, SIR.

2    Q.    AND JUST TO BE CLEAR, ON PAGE 17 OF THIS DOCUMENT, WE'RE

3    TALKING ABOUT AN ENTITY CALLED A&P PROPERTIES?

4         SORRY.  I'LL LET YOU GET THERE.

5    A.    PAGE 17, YES, SIR.

6    Q.    YEAH.  FORMED ON NOVEMBER 1ST, 2006?

7    A.    OKAY.

8    Q.    AND I KNOW YOU DIDN'T READ THIS, BUT IS THAT CONSISTENT

9    WITH YOUR UNDERSTANDING OF THE COMPANY THAT WAS BEING PUT

10   TOGETHER?

11   A.    THAT WOULD HAVE BEEN ALEXANDER AND PINA.  A&P PROPERTIES

12   THEN MORPHED INTO, I SUPPOSE, ALEXANDER, PINA, AND SWANSON AT

13   ONE POINT.  I DON'T KNOW.

14        BUT I KNEW IT AS GOLD COAST INVESTMENT, NOT AS A&P

15   PROPERTIES, ALTHOUGH THAT -- GOLD COAST INVESTMENT COULD HAVE

16   BEEN A SUBSIDIARY.  THESE RELATIONSHIPS BECOME SOMEWHAT

17   INCESTUOUS AS YOU SPIN OFF OTHER OFFERINGS.

18   Q.    ALL RIGHT.  SO LET'S JUST SUMMARIZE A LITTLE BIT.

19        YOU RELIED ON YOUR RELATIONSHIP WITH MS. ALEXANDER WHEN

20   YOU DECIDED TO INVEST; RIGHT?

21   A.    STRONGLY.

22   Q.    AND THAT WAS PRIMARILY FROM YOUR DEALINGS WITH HER BEFORE

23   THE FORMATION OF A&P PROPERTIES; CORRECT?

24   A.    MY PREVIOUS RELATIONSHIP, YES.

25   Q.    AND YOU DON'T UNDERSTAND WHAT ROLE MIKE SWANSON MAY HAVE

```
1    HAD IN THE FORMATION OF THAT COMPANY, IF ANY?

2    A.   NO, SIR.

3    Q.   AND YOU KNEW BETH PINA; CORRECT?

4    A.   I DID KNOW BETH PINA.

5    Q.   AND YOU KNEW HER FROM DEALING WITH MS. ALEXANDER?

6    A.   PRIOR TO, YES, SIR.

7    Q.   OKAY.  BUT BEYOND THAT, YOU CAN'T TELL US TODAY WHAT

8    MR. SWANSON OR MS. PINA INTENDED OR WANTED TO HAVE HAPPEN WITH

9    THIS COMPANY OR WERE PLANNING TO DO WITH IT; RIGHT?

10   A.   THAT'S CORRECT.  MS. PINA I DON'T THINK HAD THE BACKGROUND

11   TO MAKE ANY MANAGEMENT DECISIONS.  I BELIEVE, IN MY OPINION,

12   THAT SHE WAS MORE OF A BOOKKEEPER.

13   Q.   YOU DON'T THINK SHE WAS QUALIFIED?

14   A.   NOT NECESSARILY.  SHE DIDN'T STRIKE ME AS SOMEONE -- WELL,

15   SHE NEVER ORIGINATED LOANS.  SHE WAS NEVER LICENSED TO DO

16   BUSINESS ORIGINATING LOANS, SO I NEVER HAD A BANKING

17   RELATIONSHIP WITH HER.

18        SHE WAS MORE ON THE ACCOUNTING SIDE --

19   Q.   OKAY.

20   A.   -- WITH FIGURES.

21        MIKE SWANSON DID COME THERE FROM A BANKING, A BANKING

22   POSITION FOR A REGIONAL BANK, AND THAT WAS THE EXTENT THAT I

23   UNDERSTOOD OF HIS BANKING -- OF HIS BACKGROUND IN BANKING.

24   Q.   BUT YOU DIDN'T REALLY KNOW MORE THAN THAT?

25   A.   NO, SIR.  I NEVER RELIED ON ANYONE OUTSIDE OF BARBRA FOR
```

```
 1        THE TERMS OF THE INVESTMENT.

 2              MR. LEEMING:  OKAY.  THANK YOU.

 3           THAT'S ALL I HAVE.

 4              THE COURT:  ALL RIGHT.  WILL THERE BE ANY REDIRECT?

 5              MR. SCHENK:  YES, YOUR HONOR, BRIEFLY.

 6              THE COURT:  OKAY.  GO AHEAD, PLEASE.  THE TIME IS NOW

 7        1:28.

 8                        REDIRECT EXAMINATION

 9        BY MR. SCHENK:

10        Q.   MR. GAUGHF, I'D LIKE TO COVER JUST A COUPLE OF THE AREAS

11        THAT MR. LEEMING TALKED TO YOU ABOUT, AND THE FIRST ONE IS

12        WHERE YOU FINISHED WITH MR. LEEMING, AND THAT IS THAT YOU

13        RELIED ON MS. ALEXANDER WHEN YOU INVESTED.

14           DO YOU REMEMBER SAYING THAT?

15        A.   YES, SIR.

16        Q.   DID YOU RELY -- AND I THINK YOU MAY HAVE DESCRIBED YOUR

17        RELIANCE IN TWO WAYS, THE RELATIONSHIP WITH MS. ALEXANDER, THE

18        HISTORY, BUT ALSO WORDS SHE SAID TO YOU.

19           IS THAT RIGHT?

20        A.   THE HISTORY, THE WORDS SHE SAID, AND THE UNDERWRITING

21        GUIDELINES, YOU KNOW, WHAT ARE YOU LOANING.  THAT'S WHERE MY

22        EXPERTISE IS.

23           I'M NOT VERY GOOD AT RELATIONSHIPS, BUT I AM GOOD AT

24        GUIDELINES.

25        Q.   AND WHEN YOU SAID THAT YOU RELIED ON MS. ALEXANDER TO
```

1       INVEST, YOU KNOW, MR. LEEMING SHOWED YOU STACKS OF DOCUMENTS

2       AND ASKED YOU IF YOU READ PARAGRAPHS IN THE DOCUMENTS.

3           MY RECOLLECTION IS YOU SAID YOU DIDN'T REALLY PAY

4       ATTENTION TO THE BOILERPLATE.

5           IS THAT RIGHT?

6       A.   YES, SIR.

7       Q.   BUT YOU RELIED ON STATEMENTS MS. ALEXANDER MADE TO YOU

8       ABOUT THE INVESTMENT?

9       A.   YES, SIR.

10      Q.   WHY?

11      A.   IT COULD BE MY BACKGROUND.  I STILL COME FROM AN ERA WHERE

12      ONE TRUSTS SOMEONE'S WORD AFTER IT'S BEEN ESTABLISHED OVER A

13      PERIOD OF TIME.

14      Q.   OKAY.

15      A.   IF YOU'RE MY FRIEND AND YOU SAY SOMETHING, I'M GOING TO

16      GIVE YOU THE BENEFIT OF THE DOUBT.

17      Q.   MR. LEEMING COVERED WITH YOU THE PERIOD OF TIME WHEN YOU

18      WERE APPROACHED TO BECOME A PARTNER, OR AN ASSOCIATE OF

19      MS. ALEXANDER'S, TO JOIN HER COMPANY, HER INVESTMENT COMPANY.

20          IS THAT RIGHT?

21      A.   YES, SIR.

22      Q.   AND I THINK WHAT MR. LEEMING SAID TO YOU WAS YOU'RE A

23      STRAIGHT SHOOTER.  YOU WOULDN'T JOIN A COMPANY THAT YOU KNEW

24      WAS RIPE WITH FRAUD.

25          DO YOU REMEMBER THAT?

```
 1     A.   YES, SIR.

 2     Q.   DID YOU JOIN THE COMPANY?

 3     A.   NO, SIR.

 4     Q.   WHY?

 5     A.   WELL, THE MOST OBVIOUS REASON IS THAT THERE WAS NOT ENOUGH

 6     FUNDS IN THE FUND TO PAY ME.

 7     Q.   AND HOW DID YOU UNDERSTAND THAT YOU WOULD BE PAID?

 8     A.   THESE OPERATE ON HAIRCUTS, OR MARGINS.  THE INITIAL

 9     OFFERING WAS $4 MILLION.  THAT 4 MILLION CAN BE LOANED OUT AND,

10     AT THE INCEPTION OF THE LOAN, THEY'LL CHARGE POINTS, UP TO 4

11     POINTS IN THIS CASE, SO ON A $100,000 LOAN, THAT'S $4,000.

12          ADDITIONALLY, THERE'S A DIFFERENCE BETWEEN THE PAYOUT AND

13     THE INTEREST RATE CHARGED THE BORROWER, CALLED A HAIRCUT.

14          THOSE ARE REVENUES THAT BELONG TO THE COMPANY, AND FROM

15     THAT THE OVERHEAD IS PAID, AND THE OFFICERS ARE THEN PAID FROM

16     THE REMAINING REVENUE AFTER EXPENSES, OFFICE SUPPLIES, ET

17     CETERA.

18          IT'S JUST SIMPLE MATH OF HOW MANY TIMES CAN ONE LOAN

19     $4 MILLION IN A GIVEN YEAR UNDER THOSE TERMS, WHAT IS THE

20     ACTUAL REVENUE THAT'S PRODUCED, AND HOW IS IT GOING TO PAY ME

21     IN ADDITION TO BARBRA, MICHAEL, AND BETH PINA?  AND IT WOULD

22     HAVE BEEN CONSIDERABLY LESS THAN WHAT I WAS MAKING AT THE TIME.

23          I DID -- BECAUSE I HAD NO REASON TO BELIEVE THAT IT WASN'T

24     A VIABLE COMPANY, I SAID, "IF YOU GET A LINE OF CREDIT AND NOW

25     YOU HAVE ACCESS TO $20 MILLION AS OPPOSED TO 4 MILLION, NOW THE
```

```
1    NUMBERS WORK, BECAUSE IF I CAN TURN 20 MILLION TWICE A YEAR, DO
2    THE MATH AND THERE'S ENOUGH THERE FOR ME."
3         SO INITIALLY IT WAS THERE'S JUST NOT ENOUGH MONEY HERE.  I
4    DIDN'T HAVE ANY REASON TO BELIEVE THAT THERE WAS ANYTHING GOING
5    ON UNTOWARD IN THE FUND ITSELF.
6    Q.   IN FACT, LATER YOU BECAME AN INVESTOR?
7    A.   LATER I BECAME AN INVESTOR, YEAH.
8    Q.   THE WAY THAT YOU'VE DESCRIBED THE REVENUE STREAM, THAT IS,
9    HOW THE PARTNERS WERE TO BE PAID, SOUNDS LIKE IT'S ON THE BACK
10   END; THAT IS, IF YOU IMAGINE THE COMPANY IN THE MIDDLE, THEY'RE
11   GETTING MONEY FROM INVESTORS THAT COMES INTO APS AND THEN MONEY
12   FROM APS GOING OUT TO BORROWERS.
13        WHERE IN THIS EQUATION DOES THE REVENUE TO THE COMPANY
14   COME FROM?  IS IT FROM THE INVESTORS OR IS IT FROM THE
15   BORROWERS?
16   A.   IT'S NOT FROM THE INVESTORS.  THE INVESTMENT MONEY GOES
17   INTO THE FUND.  IT'S THE PROFIT THAT THEY'RE GOING TO MAKE ON
18   THE INVESTMENT THAT BELONGS TO THE COMPANY ITSELF.  THE
19   INVESTORS' FUNDS DO NOT BELONG TO THE COMPANY.
20   Q.   AS YOU UNDERSTOOD YOUR EARNING POTENTIAL WITH APS, IT WAS
21   A FACTOR OF HOW MUCH THEY LOANED TO BORROWERS, NOT HOW MUCH
22   MONEY THEY GOT FROM INVESTORS?
23   A.   THAT'S CORRECT.
24        MR. SCHENK:  NO FURTHER QUESTIONS.
25        THE COURT:  ALL RIGHT.  IT 1:33.
```

1    IS THERE ANY RECROSS?

2         MR. LEEMING:  NO, YOUR HONOR.

3         THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

4    AND IS IT SUBJECT TO RECALL OR NOT?

5         MR. SCHENK:  HE MAY BE EXCUSED, NOT SUBJECT TO

6    RECALL.

7         THE COURT:  DO YOU AGREE WITH THAT, MR. LEEMING?

8         MR. LEEMING:  I AGREE.

9         THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED.  YOU

10   MAY STEP DOWN.  YOU MAY LEAVE.

11        MR. KALEBA:  THE UNITED STATES CALLS JAMES KASTNER.

12        (PAUSE IN PROCEEDINGS.)

13        THE WITNESS:  GOOD AFTERNOON, YOUR HONOR.

14        THE COURT:  GOOD MORNING.  GOOD AFTERNOON.

15        THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

16        (JAMES KASTNER, PLAINTIFF'S WITNESS, WAS SWORN.)

17        THE WITNESS:  YES.

18        THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

19   AND WOULD YOU STATE YOUR NAME, PLEASE, AND SPELL IT?

20        THE WITNESS:  JAMES A. KASTNER, K-A-S-T-N-E-R.

21        THE CLERK:  THANK YOU.

22                    **DIRECT EXAMINATION**

23   BY MR. KALEBA:

24   Q.   WHERE DO YOU LIVE, SIR?

25   A.   REDMOND, WASHINGTON.

1    Q.   ARE YOU CURRENTLY EMPLOYED?

2    A.   YES, I AM.

3    Q.   WHAT IS YOUR OCCUPATION?

4    A.   I'M A SCHOOL BUS DRIVER FOR THE LAKE WASHINGTON SCHOOL

5    DISTRICT.

6    Q.   HOW LONG HAVE YOU BEEN SO EMPLOYED?

7    A.   FOUR YEARS IN JANUARY.

8    Q.   AND WHY DID YOU -- HAVE YOU ALWAYS BEEN -- HAD THIS

9    CAREER?

10   A.   EXCUSE ME?

11   Q.   DID YOU HAVE ANY OTHER CAREERS?

12   A.   YES.  BEFORE THAT I WAS A COMMERCIAL AIRLINE PILOT FOR 20

13   YEARS.

14   Q.   WHY THE CAREER CHANGE?

15   A.   ONE OF THE -- WELL, THE MAIN REASON WAS MY FATHER HAD

16   PASSED AWAY AND MY MOTHER WAS IN NORTH DAKOTA AND I HAD TO HELP

17   HER MOVE OUT TO WASHINGTON.

18   Q.   ARE YOU FAMILIAR WITH A FIRM OF APS FUNDING?

19   A.   YES.

20   Q.   WHAT IS IT?

21   A.   IT WAS A COMPANY THAT WAS A HARD -- WHAT I LEARNED FROM MY

22   SISTER, THAT IT WAS A HARD MONEY LENDER THAT INVESTED IN

23   COMMERCIAL, RESIDENTIAL, AND VACANT LAND REAL ESTATE BY GIVING

24   HARD MONEY LOANS.

25   Q.   OKAY.  HOW DID YOUR SISTER KNOW ABOUT THIS INVESTMENT?

```
1     A.   MY SISTER WAS A VERY GOOD FRIEND OF BARBRA ALEXANDER'S

2     DOWN IN CALIFORNIA.  MY SISTER LIVED IN PACIFIC GROVE,

3     CALIFORNIA, AND SHE WAS A REAL ESTATE BROKER.  THEY HAD DONE

4     BUSINESS TOGETHER FOR QUITE A FEW YEARS.

5     Q.   WHAT TIME WAS THIS?

6     A.   WELL, IT WAS PROBABLY 15 YEARS, 15 TO 20 YEARS PREVIOUS

7     FROM WHEN I INVESTED IN APS.

8     Q.   WHEN DID YOU FIRST LEARN ABOUT IT?

9     A.   I LEARNED ABOUT IT IN 2008.

10    Q.   DID YOUR SISTER INVEST WITH APS FUNDING?

11    A.   YES, SHE DID.

12    Q.   AND WERE YOU LOOKING TO MAKE AN INVESTMENT AT THIS TIME?

13    A.   YES, I WAS.  SINCE I -- WHEN I -- WHEN I RETIRED FROM

14    FLYING, I HAD A 401(K) AND I HAD PULLED THE 401 -- ACTUALLY, I

15    WANTED TO ROLL THE 401(K) INTO A SELF-DIRECTED IRA.

16    Q.   HOW MUCH MONEY WERE YOU LOOKING TO INVEST?

17    A.   AT THAT TIME ABOUT $30,000.

18    Q.   AND DID YOU TAKE ANY STEPS TO INVEST THAT MONEY WITH APS?

19    A.   YES, I DID.  I TALKED TO MY SISTER ABOUT IT.  SHE HAD BEEN

20    INVESTED WITH APS FOR QUITE A FEW YEARS AND HAD MAINTAINED A

21    GOOD RETURN AND, KNOWING BARBRA, I FELT CONFIDENT THAT IT WAS A

22    GOOD COMPANY TO INVEST IN.

23    Q.   DID YOU EVER SPEAK WITH MS. ALEXANDER ABOUT YOUR

24    INVESTMENT?

25    A.   I DID WHEN I, WHEN I FINALLY DECIDED THAT I WANTED TO
```

1    INVEST.

2    Q.   OKAY.  WHAT DID YOU DISCUSS WITH HER?

3    A.   I JUST ASKED HER ABOUT THE PROSPECTUS AND I'D LIKE TO READ

4    OVER SOMETHING ABOUT INVESTING.

5         AND SHE SAID THAT SHE WOULD SEND ME SOME PAPERWORK AND

6    HAVE SOMEBODY CONTACT ME.

7    Q.   DID YOU EVER MEET WITH HER IN PERSON?

8    A.   NOT ABOUT THE INVESTMENT.  I HAD MET HER YEARS EARLIER

9    DOWN IN -- WHEN I HAD GONE DOWN TO PACIFIC GROVE TO SEE MY

10   SISTER.  WE WERE INVITED OVER TO HER PLACE FOR SUPPER ONE

11   NIGHT.

12   Q.   DID YOU SPEAK WITH ANYONE ELSE AT THE COMPANY PRIOR TO

13   INVESTING?

14   A.   NO.

15   Q.   DO YOU KNOW OF A PERSON NAMED BETH PINA?

16   A.   I DO.

17   Q.   OKAY.  WHO IS MS. PINA?

18   A.   MS. PINA IS THE PERSON THAT CONTACTED ME AFTER I HAD

19   CONTACTED BARBRA ABOUT INVESTING IN APS.

20   Q.   DID YOU DISCUSS THE INVESTMENT POTENTIAL, OR

21   POSSIBILITIES?

22   A.   YES, I DID, AND SHE SAID SHE WOULD SEND ME SOME PAPERWORK

23   AND TO LOOK OVER IT AND IF I WAS INTERESTED, GIVE HER A CALL

24   BACK.

25   Q.   DID SHE OR MS. ALEXANDER EVER DESCRIBE TO YOU THE RATE OF

```
1    RETURN YOU COULD EXPECT?

2    A.   YES.  SHE TOLD ME THAT I COULD EXPECT A 12 PERCENT --

3              MR. LEEMING:  OBJECTION.

4              THE WITNESS:  -- A 12 PERCENT RATE OF RETURN ON MY

5    MONEY.

6              THE COURT:  WHAT'S THE OBJECTION?

7              MR. LEEMING:  VAGUE.  SHE OR MS. PINA.

8              THE COURT:  I'LL SUSTAIN THAT ONE.

9         CLEAR THAT UP, PLEASE.

10             MR. KALEBA:  OKAY.

11   Q.   COULD YOU -- WHO TOLD YOU ABOUT THE RATE OF RETURN?

12   A.   BETH PINA.

13   Q.   OKAY.  AND WHAT DID SHE SAY?

14   A.   SHE TOLD ME THERE WOULD BE A 12 PERCENT RATE OF RETURN ON

15   MY INVESTMENT.

16   Q.   OKAY.  DID MS. PINA OR MS. ALEXANDER DESCRIBE HOW THE

17   INVESTOR FUNDS WOULD BE INVESTED?

18             MR. LEEMING:  OBJECTION.  VAGUE.

19             THE COURT:  SUSTAINED.

20   BY MR. KALEBA:

21   Q.   PRIOR TO INVESTING, DID MS. PINA OR MS. ALEXANDER DESCRIBE

22   HOW THE INVESTOR FUNDS WOULD BE INVESTED?

23             MR. LEEMING:  SAME OBJECTION, YOUR HONOR.

24             THE COURT:  SUSTAINED.

25   BY MR. KALEBA:
```

1    Q.   AT ANY TIME, DID ANYBODY EVER DESCRIBE TO YOU HOW THE

2    INVESTOR FUNDS WOULD BE INVESTED?

3    A.   YES.

4    Q.   WHEN WAS THAT?

5    A.   THAT WAS IN PROBABLY MARCH OF -- MARCH OR APRIL OF 2008.

6    Q.   WAS THIS BEFORE YOUR INVESTMENT?

7    A.   YES.

8    Q.   OKAY.  WHAT WERE YOU TOLD?

9    A.   I WAS TOLD THAT THE MONEY THAT, THAT WAS BEING INVESTED IN

10   COMMERCIAL, RESIDENTIAL, AND RAW LAND LOANS, THE MONEY THAT WE

11   INVESTED WOULD THEN BE LOANED OUT TO BORROWERS.

12   Q.   WERE YOU TOLD ANYTHING ABOUT THE REAL ESTATE INVESTMENTS

13   BEING SECURED BY ANYTHING?

14   A.   YES.  THEY'RE TO BE SECURED BY FIRST AND SECOND DEEDS OF

15   TRUST.

16   Q.   OKAY.  AND WHO MADE THESE REPRESENTATIONS TO YOU?

17   A.   BETH PINA.

18   Q.   DID YOU BECOME INTERESTED IN INVESTING WITH APS?

19   A.   YES.

20   Q.   WHAT WAS ATTRACTIVE TO YOU ABOUT IT?

21   A.   WELL, I HAD INVESTED IN REAL ESTATE SINCE I WAS ABOUT 19

22   AND IT SEEMED LIKE A SAFE INVESTMENT BECAUSE YOU HAD REAL

23   PROPERTY AND IT WAS SECURED BY DEEDS OF TRUST.

24   Q.   DID YOU EVER ASK ABOUT GETTING A RETURN ON YOUR

25   INVESTMENT, GETTING YOUR MONEY OUT OF THE INVESTMENT?

```
1    A.   I DID BEFORE I MADE MY, BEFORE I MADE MY SECOND

2    INVESTMENT.

3    Q.   OKAY.  AND WHO DID YOU DISCUSS THAT WITH?

4    A.   BARBRA ALEXANDER.

5    Q.   WHAT DID YOU DISCUSS?

6    A.   WELL, I MADE A SECOND INVESTMENT OF 100 -- I WAS GOING TO

7    MAKE A SECOND INVESTMENT OF 100,000 AND I ASKED HER -- I TOLD

8    HER THAT I WOULD PROBABLY VERY LIKELY NEED MY MONEY BACK WITHIN

9    TWO YEARS, THE PRINCIPAL, BECAUSE I HAD A BALLOON PAYMENT DUE

10   ON A PIECE OF PROPERTY.

11        SHE AT THAT TIME TOLD ME IT WOULD TAKE PROBABLY UP TO SIX

12   MONTHS, THAT EITHER ONE OF THE BORROWERS WOULD HAVE TO PAY OFF

13   THEIR LOAN, OR ANOTHER INVESTOR WOULD HAVE TO BRING MORE MONEY

14   INTO APS.

15   Q.   OKAY.  DID YOU -- LET'S TALK ABOUT YOUR FIRST INVESTMENT

16   WITH APS THEN.  WHEN WAS THAT?

17   A.   THAT WAS IN MAY OF 2008.

18   Q.   DO YOU RECALL THE AMOUNT?

19   A.   YES.  ORIGINALLY WHEN I TALKED TO BETH PINA, SHE SAID TO

20   GET THE CLASS A SHARES, WHICH WERE $10,000 PER SHARE, THEY

21   NEEDED A MINIMUM OF 40,000, OR YOU HAD TO BUY FOUR SHARES.

22        AT THAT TIME I ONLY HAD $30,000.

23        SHE TOLD ME SHE WOULD GET BACK TO ME, WHICH SHE DID, AND

24   BARBRA INDICATED, SINCE SHE WAS SUCH A GOOD FRIEND OF MY

25   SISTER, SHE WOULD ALLOW ME TO INVEST IN THREE UNITS, THREE
```

```
 1      SHARES, IF I INVESTED THE ADDITIONAL 10,000 WITHIN THE NEXT

 2      YEAR.

 3      Q.   AND WERE YOU -- DID YOU DO THAT?

 4      A.   YES, I INVESTED THE NEXT 10,000.  IT WAS IN FEBRUARY OF

 5      2009.

 6      Q.   DID YOU RECEIVE ANY DOCUMENTS BEFORE YOU MADE YOUR

 7      INVESTMENT?

 8      A.   YES, I DID.

 9      Q.   HOW WERE THOSE DOCUMENTS SENT TO YOU?

10      A.   BY THE -- THROUGH THE MAIL.

11      Q.   OKAY.  DID YOU REVIEW THOSE DOCUMENTS BEFORE INVESTING?

12      A.   YES, I DID.

13      Q.   AND DURING THE COURSE OF YOUR INVESTMENT, DID YOU EVER

14      RECEIVE ANY DOCUMENTS FROM APS?

15      A.   YES, I DID.  THE 40,000, IT WAS A ROLLOVER INTO A

16      SELF-DIRECTED IRA, SO I DID NOT ASK FOR ANY PAYMENTS MONTHLY.

17      IT WAS JUST TO CONTINUE -- THE PROFITS WERE ROLLED BACK INTO

18      THE IRA, SO EVERY MONTH I GOT A STATEMENT FROM THEM SHOWING HOW

19      MY INVESTMENT WAS GROWING.

20      Q.   OKAY.  DID YOU EVER RECEIVE ANY INTEREST PAYMENTS ON YOUR

21      INVESTMENT?

22      A.   THE INTEREST PAYMENTS WERE GOING INTO THE IRA, ROLLING

23      BACK OVER INTO THE IRA, YES.

24      Q.   OKAY.  LET'S TURN TO THE SECOND INVESTMENT THAT YOU

25      REFERRED TO.
```

1          WHY DID YOU DECIDE TO MAKE A SECOND INVESTMENT?

2     A.   MY SISTER AND I OWNED A COMMERCIAL WAREHOUSE IN REDMOND,

3     WASHINGTON THAT WAS BEING TAKEN OVER BY THE CITY OF REDMOND BY

4     EMINENT DOMAIN FOR A ROAD.

5     Q.   AND WHY DID YOU DECIDE TO INVEST WITH APS?

6     A.   THE TRACK RECORD WITH BARBRA WITH MY SISTER OVER THE YEARS

7     THAT SHE HAD INVESTED HAD BEEN VERY GOOD, AND I HAD BEEN

8     GETTING MONTHLY STATEMENTS THAT SHOWED THAT I WAS GETTING MY

9     1 PERCENT PER MONTH INTEREST ROLLED BACK INTO MY IRA.

10          IT SEEMED LIKE A SAFE INVESTMENT.  I'VE ALWAYS -- ONE OF

11    MY MAIN INVESTMENTS THROUGHOUT MY LIFE HAS ALWAYS BEEN REAL

12    ESTATE.

13    Q.   OKAY.  AND BEFORE MAKING THIS SECOND INVESTMENT, YOU SAID

14    YOU HAD A CONVERSATION WITH MS. ALEXANDER.

15    A.   YES.  THAT'S WHEN I ASKED HER ABOUT GETTING THE PRINCIPAL

16    BACK WITHIN TWO YEARS.

17    Q.   AND DURING THAT CONVERSATION, DID YOU DISCUSS HOW THE

18    FUNDS WOULD BE INVESTED?

19    A.   I DID NOT DISCUSS WITH HER AT THAT TIME BECAUSE I KNEW HOW

20    THE FUNDS WERE BEING INVESTED.  THAT'S WHY I INVESTED THE FIRST

21    TIME.

22    Q.   WAS IT IMPORTANT TO YOU AT THAT TIME THAT YOUR FUNDS WERE

23    BEING INVESTED IN REAL ESTATE?

24    A.   ABSOLUTELY.

25    Q.   AND WAS IT IMPORTANT TO YOU AT THE TIME THAT THE REAL

1    ESTATE INVESTMENTS WERE TO BE SECURED BY DEEDS OF TRUST?

2    A.   ABSOLUTELY.

3    Q.   WHY IS THAT IMPORTANT?

4    A.   IT'S IMPORTANT TO ME BECAUSE IF THE BORROWER DEFAULTS, YOU

5    TAKE THE PROPERTY BACK AND YOU HAVE SOMETHING REAL, A REAL

6    INVESTMENT INSTEAD OF JUST PAPER.

7    Q.   OKAY.  I'D LIKE TO SHOW YOU A DOCUMENT NOW -- AND THERE'S

8    BINDERS ON THE TABLE THERE -- IT WOULD BE EXHIBIT NUMBER 39,

9    WHICH IS A COPY OF A CHECK FROM A BANK RECORD.

10         AND I WOULD MOVE TO ADMIT IT AT THIS TIME PURSUANT TO OUR

11    STIPULATION.

12              MR. LEEMING:  SO STIPULATED.

13              THE COURT:  ALL RIGHT.  IT'S ADMITTED.

14    (PLAINTIFF'S EXHIBIT 39 WAS ADMITTED IN EVIDENCE.)

15              THE COURT:  GO AHEAD, PLEASE.

16              MR. KALEBA:  IF YOU WOULD PLEASE PUBLISH IT.

17    Q.   IS THIS A COPY OF A CHECK FOR YOUR $100,000 INVESTMENT

18    WITH APS?

19    A.   YES, IT IS.  YES, IT IS.

20    Q.   AND THIS IS THE FIRST OR THE SECOND PART OF YOUR TWO

21    INVESTMENTS?

22    A.   THE SECOND PART.

23    Q.   IS THAT YOUR SIGNATURE AT THE BOTTOM?

24    A.   YES, IT IS.

25    Q.   OKAY.  AT THE TOP THERE'S A -- THERE ARE WORDS THAT SAY

1    "SOURCE FUNDING, LLC"?

2    A.   YES.

3    Q.   OKAY.  WHAT IS THAT?

4    A.   THAT WAS MY LIMITED LIABILITY CORPORATION THAT I USED TO

5    INVEST IN REAL ESTATE INVESTMENTS.

6    Q.   OKAY.

7    A.   IT WAS A SINGLE MEMBER, WHICH IS MYSELF.

8    Q.   AND AT THE BOTTOM, IT'S A LITTLE DIFFICULT TO READ, BUT

9    DOES IT SAY SOMETHING ABOUT UNITS OF CLASS A?

10   A.   YES, 10 UNITS OF CLASS A.  THEY WERE $10,000 A UNIT.

11   Q.   OKAY.  WHAT WAS YOUR UNDERSTANDING OF WHAT THAT MEANT?

12   WHAT DOES THAT MEAN?

13   A.   WELL, EACH UNIT WAS A SHARE, SO ONE SHARE WAS $10,000.

14   Q.   WHAT WAS THE RATE OF RETURN THAT YOU WERE PROMISED FOR

15   THIS INVESTMENT?

16   A.   TWELVE PERCENT PER YEAR.

17   Q.   HOW DID YOU ELECT TO RECEIVE YOUR RETURN?  WAS IT MONTHLY

18   OR WAS IT ROLLED OVER?

19   A.   NO, MONTHLY.  I ELECTED TO GET A CHECK MONTHLY.

20   Q.   OKAY.  DID YOU RECEIVE MONTHLY CHECKS FOR THIS $100,000?

21   A.   I DID.

22   Q.   OKAY.  SO WHAT WAS THE MONTHLY AMOUNT THAT YOU RECEIVED?

23   A.   $1,000.

24   Q.   AND WAS THIS INTEREST OR WAS THIS A RETURN OF YOUR

25   INVESTMENT CAPITAL?

1      A.   THIS IS A RETURN ON MY INVESTMENT CAPITAL.

2      Q.   OKAY.  AT THIS TIME, WERE YOU -- DID YOU BELIEVE THAT YOUR

3      MONEY WAS BEING INVESTED IN REAL ESTATE LOANS?

4      A.   YES, SECURED BY REAL ESTATE, FIRST AND SECOND DEEDS OF

5      TRUST.

6      Q.   I WANT TO TURN NOW TO EXHIBIT NUMBER 81.  IF YOU COULD

7      PULL THAT UP IN YOUR BINDER FIRST, SIR.

8      A.   I DON'T HAVE A BINDER HERE.

9      Q.   IS IT --

10     A.   OH, MAYBE THEY'RE ON THE FLOOR.

11     Q.   YES.

12     A.   OKAY.  OKAY.  WHAT -- WHAT -- WHERE WAS IT?

13     Q.   81.

14     A.   81.  OKAY.

15     Q.   HAVE YOU SEEN THESE DOCUMENTS BEFORE?

16     A.   YES, I HAVE.

17     Q.   THEY'RE A PACKAGE OF MATERIALS.  IF YOU COULD JUST TAKE A

18     MOMENT TO LOOK THROUGH THE DOCUMENTS THAT ARE WITHIN 81.

19     A.   I NEED TO GET MY GLASSES ON HERE.

20          (PAUSE IN PROCEEDINGS.)

21              THE WITNESS:  OKAY.

22     BY MR. KALEBA:

23     Q.   DO THESE DOCUMENTS RELATE TO YOUR INVESTMENT WITH

24     MS. ALEXANDER?

25     A.   YES, THEY DO.

1          MR. KALEBA:  OKAY.  WE'D MOVE TO ADMIT EXHIBIT

2    NUMBER 81.

3          THE COURT:  ANY OBJECTION?

4          MR. LEEMING:  NO, YOUR HONOR.

5          THE COURT:  IT'S ADMITTED.

6    (PLAINTIFF'S EXHIBIT 81 WAS ADMITTED IN EVIDENCE.)

7          THE COURT:  GO AHEAD, PLEASE.

8          MR. KALEBA:  THANK YOU, YOUR HONOR.

9       COULD YOU PUBLISH, PLEASE, PAGE 1?

10   Q.   AND AT THE TOP, THIS SAYS IT'S A CONFIDENTIAL INVESTOR

11   SUITABILITY STATEMENT.

12   A.   YES.

13   Q.   ARE YOU FAMILIAR WITH THIS?

14   A.   YES.

15   Q.   DID YOU READ THIS BEFORE FILLING OUT THIS INFORMATION?

16   A.   I DID.

17   Q.   OKAY.  CAN YOU TURN TO PAGE 4 OF THIS RECORD?  AND WE'LL

18   PULL IT UP ON THE SCREEN, TOO, IF THAT'S EASIER FOR YOU.

19       THERE'S A DESCRIPTION OF YOUR NET WORTH AT THE TOP.

20       DO YOU SEE THAT?

21   A.   YES.

22   Q.   AT THE TIME DID YOU HAVE A NET WORTH, YOU AND YOUR SPOUSE,

23   OF GREATER THAN A MILLION DOLLARS?

24   A.   YES.

25   Q.   AND THERE'S FURTHER QUESTIONS THAT ASK ABOUT ASSETS THAT

KASTNER DIRECT

```
 1      YOU HAD AT THE TIME?

 2      A.   UM-HUM.

 3      Q.   TURN TO PAGE 6, PLEASE.  AT THE BOTTOM THERE'S A DATE AND

 4      A SIGNATURE.

 5      A.   YES.

 6      Q.   IS THAT YOUR SIGNATURE?

 7      A.   IT IS.

 8      Q.   AND WHAT'S THE DATE OF THE EXECUTION?

 9      A.   APRIL 8TH, 2008.

10      Q.   AND YOU SIGNED THIS IN REDMOND, WASHINGTON?

11      A.   YES.

12      Q.   HOW DID YOU -- DID YOU SEND THIS, THEN, TO APS?

13      A.   I DID.

14      Q.   DO YOU RECALL HOW?

15      A.   BY MAIL.

16      Q.   OKAY.  TURN TO THE NEXT PAGE, PLEASE, PAGE 7.  AND THIS IS

17      A DOCUMENT CALLED A PRIVATE PLACEMENT MEMORANDUM.

18      A.   YES.

19      Q.   COULD YOU ENLARGE THE TOP PART OF THIS?

20           DID YOU RECEIVE THIS DOCUMENT BEFORE MAKING YOUR

21      INVESTMENT?

22      A.   I DID.

23      Q.   AND DID YOU READ IT?

24      A.   YES.

25      Q.   OKAY.  AT THE TOP THERE'S A 4X UNITS AT $10,000 EACH.
```

1    A.   YES.

2    Q.   WHAT DOES THIS REFER TO?

3    A.   THIS REFERS TO THE 10 -- WELL, THEY REQUIRED A MINIMUM

4    PURCHASE IN CLASS A, CLASS A INVESTMENT OF FOUR UNITS, SO EACH

5    UNIT IS WORTH -- IS $10,000.

6    Q.   OKAY.  AND THIS WAS YOUR $40,000 INVESTMENT, YOUR FIRST

7    40,000?

8    A.   CORRECT.

9    Q.   OKAY.  THAT YOU DID IN TWO STAGES?

10   A.   TWO STAGES.

11   Q.   TURN TO PAGE 9, PLEASE, AND THE PARAGRAPH THAT SAYS

12   MANAGING MEMBER.

13   A.   YES.

14   Q.   COULD YOU READ THAT, PLEASE?

15   A.   "THE MANAGING MEMBER IS A&P PROPERTIES, INCORPORATED, A

16   CALIFORNIA CORPORATION.  THE PRINCIPALS OF A&P PROPERTIES,

17   INCORPORATED ARE BARBRA ALEXANDER AND BETH PINA.  SEE

18   MANAGEMENT."

19   Q.   DID YOU HAVE DISCUSSIONS WITH ANYBODY ELSE BESIDES

20   BARBRA ALEXANDER OR BETH PINA AT THE TIME OF YOUR INITIAL

21   INVESTMENT?

22   A.   NO.

23   Q.   OKAY.  IF YOU COULD GO TO THE BOTTOM OF PAGE 9 NOW FOR THE

24   DISTRIBUTIONS, AND THERE'S A STATEMENT THERE ABOUT THE

25   PREFERRED RATE OF RETURN.

```
 1            DO YOU SEE THAT?  IT'S UP ON YOUR SCREEN, TOO, SIR.

 2      A.   OKAY.  DID YOU WANT ME TO READ THAT?

 3      Q.   WOULD YOU PLEASE READ THE FIRST SENTENCE?

 4      A.   "THE HOLDER OF EACH CLASS A UNIT WILL BE ENTITLED TO A

 5      'PREFERRED RETURN' EQUAL TO 12 PERCENT ON AN ANNUAL BASIS OF

 6      THE INITIAL CAPITAL CONTRIBUTION OF $10,000 PER UNIT."

 7      Q.   WAS THIS STATEMENT CONSISTENT WITH YOUR UNDERSTANDING THAT

 8      YOU WOULD GET A 12 PERCENT RETURN?

 9      A.   YES.

10      Q.   COULD YOU READ THE NEXT SENTENCE, PLEASE?

11      A.   "ANY MONIES OVER AND ABOVE THE PREFERRED RETURN SHALL BE

12      PAID TO THE MANAGING MEMBER."

13      Q.   WHAT WAS YOUR UNDERSTANDING OF HOW THE PARTNERS WOULD BE

14      COMPENSATED?

15      A.   I WAS TOLD THAT THEY WERE CHARGING A MINIMUM OF 14 PERCENT

16      ON THE, THE LOANS, THE MONEY THAT WAS BORROWED FROM THEM ON

17      LOANS, AND THE 2 PERCENT IS WHAT THEY WOULD BE PAID, WHERE THEY

18      WOULD MAKE THEIR INCOME.

19      Q.   OKAY.  AND IS THIS STATEMENT IN THE PLACEMENT MEMORANDUM

20      CONSISTENT WITH THE REPRESENTATIONS THAT WERE MADE TO YOU?

21      A.   YES.

22      Q.   OKAY.  PAGE 9, AGAIN, THE USE OF PROCEEDS.

23      A.   OKAY.

24      Q.   DO YOU SEE THAT SECTION?  COULD YOU READ IT?

25      A.   "ALL THE OFFERING PROCEEDS WILL BE POOLED AND USED TO FUND
```

1    LOANS THAT THE COMPANY OFFERS TO ITS CLIENTS AND CUSTOMERS.

2    SEE 'THE COMPANY.'"

3    Q.   BEFORE WE SEE THE COMPANY, WHICH IS REFERRED TO LATER IN

4    THE DOCUMENT, WHAT WERE YOU TOLD THE COMPANY WAS GOING TO DO?

5    HOW WERE THEY GOING TO USE THE PROCEEDS?

6    A.   THEY WERE GOING TO MAKE LOANS THAT WERE INVESTED IN FIRST

7    AND SECOND DEEDS OF TRUST ON COMMERCIAL, RESIDENTIAL, AND RAW

8    LAND.

9    Q.   OKAY.  AND IF WE COULD TURN TO PAGE 14, PLEASE, TO THE

10   SECTION THAT'S TITLED "THE COMPANY."

11        COULD YOU READ THE PARAGRAPH THAT STARTS "GCF INVESTMENT,

12   LLC WAS FORMED TO FILL A NEED"?

13   A.   "GCF INVESTMENT, LLC WAS FORMED TO FILL A NEED IN THE LOAN

14   INDUSTRY.  BARBRA ALEXANDER AND BETH PINA, THE PRINCIPALS OF

15   THE MANAGING MEMBER OF THE COMPANY, FOUND THAT CONVENTIONAL

16   LENDERS WERE NOT PROVIDING FLEXIBLE, SHORT-TERM REAL ESTATE

17   LOANS WITH A HIGH LEVEL OF SERVICE FOR HOME OWNERS, CONTRACTORS

18   AND BUSINESSES."

19   Q.   AND IF YOU COULD READ THE NEXT SENTENCE, PLEASE?

20   A.   SURE.  "THEREFORE, THE COMPANY SPECIALIZES IN MAKING

21   SHORT-TERM, FIXED RATE LOANS TYPICALLY USED FOR PROPERTY

22   ENHANCEMENTS, IMPROVEMENTS, BRIDGE LOANS, TRADITIONAL SECOND

23   TRUST DEED, PURCHASES, CREDIT REPAIR, CONSTRUCTION, AND LAND

24   AND COMMERCIAL PURCHASES."

25   Q.   IS THIS STATEMENT OF THE COMPANY CONSISTENT WITH THE

1    STATEMENTS THAT YOU RECEIVED FROM MS. PINA OR MS. ALEXANDER?

2    A.    YES.

3    Q.    IF YOU COULD READ THE NEXT SENTENCE, THE NEXT PARAGRAPH?

4    A.    "THE COMPANY OFFERS SHORT-TERM (6 TO 12 MONTHS) FIXED RATE

5    (13 PERCENT TO 15 PERCENT) MORTGAGE FINANCING.  IT CHARGES UP

6    FRONT POINTS FROM 1 PERCENT TO 10 PERCENT DEPENDING ON THE

7    PROJECT, SECURITY AND BORROWER.  THE LOANS ARE OFTEN REPAID BY

8    MEANS OF REFINANCING WITH MORE CONVENTIONAL LOANS OR UPON SALE

9    OF THE UNDERLYING PROPERTY.  THE COMPANY'S BORROWERS ARE HOME

10   OWNERS, CONTRACTORS, BUSINESS OWNERS, AND LAND OR COMMERCIAL

11   PROPERTY OWNERS.  THE COMPANY WILL MAKE LOANS SECURED BY

12   RESIDENTIAL, COMMERCIAL PROPERTY AND VACANT LAND LOCATED

13   THROUGHOUT CALIFORNIA, MONTANA, IDAHO, OREGON AND WASHINGTON.

14   THE MANAGING MEMBER WILL CONSIDER OTHER LOCATIONS AT ITS OWN

15   DISCRETION AND BUSINESS JUDGMENT BASED UPON PROPER INSPECTION

16   OF THE PROPERTY LOAN TO VALUE RATIOS AND STRENGTH OF THE

17   BORROWER."

18   Q.    ARE THESE STATEMENTS CONSISTENT WITH THE STATEMENTS MADE

19   TO YOU BY ALEXANDER AND PINA AT THIS POINT?

20   A.    YES.

21   Q.    OKAY.  THERE'S A STATEMENT IN THE MIDDLE THAT SAYS "THE

22   COMPANY WILL MAKE LOANS SECURED BY RESIDENTIAL, COMMERCIAL

23   PROPERTY AND VACANT LAND."

24        WAS THE PROMISE THAT THE LOANS WOULD BE SECURED BY

25   PROPERTY IMPORTANT TO YOU?

1    A.    ABSOLUTELY.

2    Q.    WOULD YOU HAVE INVESTED OTHERWISE?

3    A.    PROBABLY NOT.

4    Q.    TURN BACK TO PAGE 10 OF THIS DOCUMENT, AND PARAGRAPH

5    NUMBER 4, THE "MANAGEMENT AND CONTROL OF COMPANY AFFAIRS."

6    A.    YES.

7    Q.    COULD YOU READ THE FIRST SENTENCE?

8    A.    "ALL OF THE COMPANY'S MANAGEMENT DECISIONS WILL BE MADE BY

9    THE MANAGING MEMBER."

10   Q.    OKAY.  AND WHO WAS YOUR UNDERSTANDING OF THE MANAGING

11   MEMBER?

12   A.    BARBRA ALEXANDER.

13   Q.    OKAY.  WAS THAT IMPORTANT TO YOU THAT SHE WAS THE MANAGING

14   MEMBER?

15   A.    YES, IT WAS, BECAUSE I HAD A LOT OF TRUST IN HER BECAUSE

16   MY SISTER PUT A LOT OF TRUST IN HER OVER THE 10, 15 YEARS THAT

17   THEY'D KNOWN EACH OTHER.

18   Q.    OKAY.  LET'S TURN TO PARAGRAPH 6, PLEASE.

19   A.    OKAY.

20   Q.    THE RISKS STATEMENT.

21   A.    YES.

22   Q.    "RISK OF REAL ESTATE INVESTMENT," COULD YOU READ THE FIRST

23   SENTENCE?

24   A.    "THE COMPANY WILL BE SUBJECT TO THE RISKS INHERENT IN THE

25   MAKING OF LOANS SECURED BY REAL PROPERTY, INCLUDING CHANGES IN

```
 1      NATIONAL AND LOCAL ECONOMIC CONDITIONS ADVERSELY AFFECTING REAL

 2      ESTATE VALUES, DECLINE IN DEMAND FOR RESIDENTIAL AND COMMERCIAL

 3      REAL ESTATE, FLUCTUATING COST, INTEREST RATES, AND AVAILABILITY

 4      OF REAL ESTATE FINANCING" AND IM -- THIS IS -- IS THAT

 5      IMPOSTURE?  I CAN'T -- IT'S NOT TOTALLY PRINTED, "THE

 6      REGULATORY RESTRICTIONS WHICH MAY AFFECT VALUES, AMONG OTHER

 7      FACTORS."

 8      Q.   OKAY.  AND THE NEXT PARAGRAPH IS AN IDENTIFICATION THAT

 9      STARTS WITH JUNIOR LIEN HOLDER?

10      A.   YES.

11      Q.   COULD YOU READ THE FIRST SENTENCE?

12      A.   "MANY OF THE LOANS TO BE MADE BY THE COMPANY WILL NOT BE

13      SECURED BY A FIRST DEED OF TRUST.  MOST WILL BE SECONDS, BUT

14      SOME MAY EVEN BE IN THIRD POSITION.  ALL THE LOANS WILL BE

15      REQUIRED TO MEET THE COMPANY'S UNDERWRITING CRITERIA."

16      Q.   IS THIS STATEMENT CONSISTENT WITH YOUR UNDERSTANDING THAT

17      THE LOANS THAT WERE TO BE MADE BY APS WOULD BE SECURED BY A

18      DEED OF TRUST?

19      A.   YES.

20      Q.   IT MAY BE FIRST, IT MAY BE SECOND, IT MAY BE THIRD, BUT

21      IT'S STILL SECURED?

22      A.   CORRECT.

23      Q.   OKAY.  TURN TO PAGE 12, PLEASE.

24      A.   OKAY.

25      Q.   THERE'S A DESCRIPTION OF THE USE OF PROCEEDS.  DO YOU SEE
```

1    THAT PARAGRAPH AND THE WORDS BELOW, IF YOU DON'T MIND.

2    A.   I'M MISSING IT HERE.

3    Q.   IF YOU LOOK AT THE SCREEN, THAT'LL GIVE YOU A HINT.

4    A.   OKAY.  OH, OKAY.  GOT IT.

5    Q.   DO YOU SEE THE STATEMENT THAT SAYS "ORGANIZATION FEES AND

6    EXPENSES"?

7    A.   YES.

8    Q.   COULD YOU READ THAT SENTENCE?

9    A.   "ORGANIZATION FEES AND EXPENSES ARE ESTIMATED TO BE

10   APPROXIMATELY 15,000, WHICH ARE EXPENSES WHICH WILL BE INCURRED

11   BY THE MANAGING MEMBER IN FORMING THE COMPANY AND SETTING UP

12   THE COMPANY'S BUSINESS AND ADMINISTRATION, INCLUDING LEGAL,

13   ACCOUNTING AND PRINTING COSTS INCURRED IN PREPARING THIS

14   MEMORANDUM."

15   Q.   DID YOU DISCUSS WITH MS. ALEXANDER OR MS. PINA, BEFORE

16   INVESTING, WHAT THE COMPANY EXPENSES WERE GOING TO BE?

17   A.   I DID NOT.

18   Q.   OKAY.  IF WE MAY TURN TO THE NEXT PAGE, AND THE PARAGRAPH

19   THAT SAYS "PROPOSED INVESTMENT INVOLVES A SUBSTANTIAL DEGREE OF

20   RISK."

21   A.   YES.

22   Q.   THIS IS ABOUT WHO MAY INVEST, WHO'S A QUALIFIED INVESTOR,

23   AND IT DESCRIBES A NUMBER OF WAYS IN WHICH SOMEONE COULD BE

24   QUALIFIED.

25        DO YOU SEE THAT?

KASTNER DIRECT

1     A.   YES.

2     Q.   YOU COULD HAVE A NET WORTH, INCLUDING SPOUSE, OF AT LEAST

3     A MILLION DOLLARS, WHICH IS PARAGRAPH 1; HAVE GROSS INCOME IN

4     EXCESS OF $100,000 FOR THE TWO MOST RECENT TAX YEARS; OR IF THE

5     INVESTMENT DID NOT EXCEED 10 PERCENT OF THE NET WORTH OF THE

6     JOINT -- OR JOINT NET WORTH OF THE INVESTOR AND THE INVESTOR

7     SPOUSE.

8          DO YOU SEE THAT?

9     A.   YES.

10    Q.   DID YOU MEET ANY OF THESE CRITERIA?

11    A.   I DID.

12    Q.   OKAY.  WHICH CRITERIA DID YOU MEET?

13    A.   IF -- IF -- IF THE UNITS ARE TO BE HELD AS COMMUNITY

14    PROPERTY, THE INCOME IS A NET WORTH OF HUSBAND AND WIFE MAY BE

15    AGGREGATED TOGETHER IN THE INVESTMENT, INCLUDING ALL MANDATORY

16    INVESTMENTS, DOES NOT EXCEED 10 PERCENT OF THE INVESTOR'S NET

17    WORTH OR JOINT NET WORTH OF THE INVESTOR AND THE INVESTOR'S

18    SPOUSE.

19    Q.   OKAY.  CAN WE TURN TO PAGE 15, PLEASE, AND THE PARAGRAPH

20    OF COMPENSATION OF THE MANAGING MEMBER AND ITS AFFILIATES.

21    A.   YES.

22    Q.   COULD YOU READ THIS PARAGRAPH?

23    A.   "THE MANAGING MEMBER WILL NOT BE PAID OR RECEIVE ANY FEES

24    OR OTHER COMPENSATION REGARDING THE LOANS MADE BY THE COMPANY

25    OTHER THAN THE DISTRIBUTIONS AND INCOME IT RECEIVES AS HOLDERS

1    OF CLASS A AND CLASS B UNITS OF THE COMPANY.  THE MANAGING

2    MEMBER WILL PURCHASE AT LEAST 3 CLASS A UNITS AND AS A MEMBER

3    IT WILL SHARE IN THE INCOME, LOSSES, IF ANY, AND DISTRIBUTIONS

4    ALONG WITH THE OTHER INVESTORS.

5        "IN ADDITION, AS HOLDERS OF CLASS B MANAGING MEMBER UNITS,

6    THE MANAGING MEMBER WILL BE ENTITLED TO THE BALANCE OF ALL

7    DISTRIBUTIONS AND INCOME, OVER AND ABOVE THE PREFERRED RETURN

8    OF 12 PERCENT.  SEE DISTRIBUTIONS AND ALLOCATIONS BELOW."

9    Q.   OKAY.  THE STATEMENT THAT SAYS -- THAT "THE MANAGING

10   MEMBER WILL BE ENTITLED TO THE BALANCE OF ALL DISTRIBUTIONS AND

11   INCOME OVER AND ABOVE THE PREFERRED RATE OF RETURN," WHAT WAS

12   YOUR UNDERSTANDING AT THE TIME OF THAT?

13   A.   THEY WOULD PAY ME AS AN INVESTOR 12 PERCENT.  ANYTHING

14   ABOVE THAT THEY WOULD RECEIVE.

15   Q.   OKAY.  AND HOW -- DID THAT MEAN YOU HAD PRIORITY FIRST IN

16   PAYMENT?

17   A.   YES.

18   Q.   WAS THAT IMPORTANT TO YOU?

19   A.   YES, IT WAS.

20   Q.   WHY?

21   A.   IT -- IT MADE MY INVESTMENT SAFER, THAT I WOULD BE PAID

22   FIRST BEFORE THE MANAGING MEMBERS.

23   Q.   OKAY.  TURN THE PAGE, PLEASE, TO PAGE 16.  AT THE TOP

24   THERE ARE THREE SUBPARAGRAPHS, AND THERE'S A -- DO YOU SEE THE

25   DESCRIPTION "CLASS A MEMBERS WILL RECEIVE A RETURN EQUAL TO 12

1    PERCENT"?

2    A.   YES.

3    Q.   IS THAT CONSISTENT WITH WHAT YOU WERE PROMISED?

4    A.   YES.

5    Q.   AND THEN THERE'S A SECOND PARAGRAPH -- COULD YOU READ THE

6    NEXT TWO PARAGRAPHS?

7    A.   "SECOND TO THE CLASS A MEMBERS IN AN AMOUNT EQUAL TO ANY

8    UNPAID PREFERRED RETURN FROM PREVIOUS MONTHS UNTIL IT HAS BEEN

9    PAID IN FULL.

10       "AND THE BALANCE TO THE CLASS B MEMBERS, MANAGING MEMBER."

11   Q.   IS THIS IS A SCHEDULE, THEN, OF THE PRIORITY?

12   A.   PRIORITY OF PAYMENT, YES.

13   Q.   AND THAT MATTERED TO YOU?

14   A.   YES.

15   Q.   WAS IT YOUR UNDERSTANDING THAT THE MANAGING MEMBER WOULD

16   TAKE COMPENSATION FROM THE INVESTORS OR FROM THE BORROWERS?

17   A.   THEY WOULD TAKE COMPENSATION FROM THE MONIES THEY MADE OFF

18   THE BORROWERS, NOT FROM THE INVESTORS.

19   Q.   IF THE MANAGING MEMBERS WERE TO TAKE MONEY FROM THE

20   INVESTORS FIRST, BEFORE MONIES WERE LOANED, WOULD THAT HAVE

21   MATTERED TO YOU?

22   A.   I WOULD NOT HAVE INVESTED.

23   Q.   WHY NOT?

24   A.   BECAUSE THERE'S NO SECURITY THERE.  IT'S NOT SECURED BY

25   ANYTHING IF THEY'RE JUST TAKING MONEY FROM THE INVESTORS.  THAT

1    MONEY FROM THE INVESTORS NEEDS TO BE INVESTED IN SOMETHING

2    THAT'S REAL, REAL ESTATE.

3    Q.   LET'S TURN TO PAGE 23, PLEASE, SUBPARAGRAPH 1.4, "COMPANY

4    BUSINESS."

5    A.   YES.

6    Q.   DO YOU RECALL REVIEWING THIS DOCUMENT --

7    A.   YES.

8    Q.   -- BEFORE INVESTING?  COULD YOU READ PARAGRAPH 1.4?

9    A.   "THE COMPANY'S BUSINESS IS THE UNDERWRITING AND ISSUING OF

10   SHORT-TERM, FIXED INTEREST RATE LOANS SECURED BY REAL ESTATE,

11   AND TO DO ALL OTHER ACTS NECESSARY OR BENEFICIAL TO THE

12   ACHIEVEMENT OF THE COMPANY'S BUSINESS.  THE COMPANY HAS THE

13   NECESSARY POWER TO DO ALL THINGS REASONABLY INCIDENTAL OR IN

14   FURTHERANCE OF THE COMPANY'S BUSINESS."

15   Q.   IS THIS STATEMENT CONSISTENT TO YOU, OR WITH WHAT YOU WERE

16   PROMISED ABOUT THE COMPANY'S BUSINESS?

17   A.   YES.

18   Q.   AND WAS THIS STATEMENT IMPORTANT TO YOUR DECISION TO

19   INVEST WITH MS. ALEXANDER?

20   A.   YES.

21   Q.   IF THE COMPANY BUSINESS WERE TO MAKE LOANS THAT WERE NOT

22   SECURED IN REAL ESTATE, WOULD YOU HAVE INVESTED WITH

23   MS. ALEXANDER?

24   A.   NO.

25   Q.   TURN TO PAGE 26, PLEASE.  AT THE BOTTOM THERE'S A

1     STATEMENT OF CASH FLOW FROM OPERATIONS.

2     A.   YES.

3     Q.   IF YOU COULD DO A, AND THE ONE BELOW IT AS WELL.  OKAY.

4          YOU'VE SEEN LANGUAGE SIMILAR TO THIS BEFORE; CORRECT?

5     A.   YES.

6     Q.   THE RATE OF RETURN IS?

7     A.   TWELVE PERCENT.

8     Q.   OKAY.  AND AS FAR AS PRIORITY GOES, WHO GETS PAID FIRST?

9     A.   CLASS A MEMBERS.

10    Q.   AND THEN THE MONEY THE CLASS B MEMBERS -- THE MANAGING

11    PARTNERS GET PAID LAST; RIGHT?

12    A.   CORRECT.

13    Q.   THAT WAS YOUR UNDERSTANDING?

14         AND YOUR UNDERSTANDING OF THE SOURCE OF THE MANAGING

15    MEMBERS' COMPENSATION WAS WHAT?  BORROWERS OR --

16    A.   BORROWERS.

17    Q.   AND JUST BORROWERS?

18    A.   JUST BORROWERS.

19    Q.   TURN TO PAGE 29, SECTION 4.2.

20    A.   YES.

21    Q.   THIS IS A STATEMENT ABOUT THE ACCOUNTING METHOD TO BE

22    USED.  IT SAYS "THE COMPANY WILL USE THE CASH BASIS METHOD OF

23    ACCOUNTING."

24    A.   YES.

25    Q.   DID YOU EVER DISCUSS THE ACCOUNTING METHOD WITH THE

1     COMPANY?

2     A.   I DID NOT.

3     Q.   DID ANYBODY EVER TALK TO YOU ABOUT CHANGING THE ACCOUNTING

4     METHOD?

5     A.   NO.

6     Q.   IF YOU COULD TURN TO PAGE 58.  AND THIS IS THE OPERATING

7     AGREEMENT --

8     A.   OKAY.

9     Q.   -- TO THE GREENLIGHT FUND.  AND THERE'S A DATE AT THE TOP.

10    COULD YOU --

11    A.   THE 25TH OF MARCH, 2009.

12    Q.   OKAY.  SO WHICH INVESTMENT DOES THIS REFER TO?

13    A.   THIS REFERS TO THE $100,000 INVESTMENT I MADE.

14    Q.   SO YOUR SECOND INVESTMENT?

15    A.   CORRECT.

16    Q.   OKAY.  IF YOU GO DOWN TO NUMBER 1.4, "COMPANY BUSINESS."

17    A.   YES.

18    Q.   IS THAT THE SAME STATEMENT AS THE -- FROM YOUR PRIOR?

19    A.   YES.

20    Q.   SHORT-TERM, FIXED INTEREST RATE LOANS SECURED BY REAL

21    ESTATE.  OKAY.

22         AND IT MATTERED FOR YOUR FIRST INVESTMENT.  DID THIS

23    MATTER FOR YOUR SECOND INVESTMENT AS WELL?

24    A.   YES.

25    Q.   WOULD YOU TURN TO PAGE 61, PLEASE.  WITH THE -- AT THE

 1     BOTTOM OF 3.2.1A1, THERE IS A STATEMENT OF THE PREFERRED RATE

 2     OF RETURN?

 3     A.   TWELVE PERCENT.

 4     Q.   DID YOU EXPECT 12 PERCENT FROM YOUR SECOND INVESTMENT?

 5     A.   YES.

 6     Q.   AND IF YOU COULD TURN THE PAGE, TOP OF PAGE 62, THERE'S A

 7     SCHEDULE OF PRIORITY OF PRIORITY OF WHO GETS PAID.

 8     A.   YES.

 9     Q.   WAS THE UNDERSTANDING YOU HAD FROM THE FIRST INVESTMENT

10     THE SAME AS THE SECOND?

11     A.   IDENTICAL.

12     Q.   AS FAR AS PRIORITY --

13     A.   PRIORITIES, FIRST, SECOND -- FIRST CLASS A, CLASS B, AND

14     MANAGING MEMBERS.

15     Q.   INVESTORS FIRST?

16     A.   CLASS -- YES, CLASS B, AND THEN MANAGING MEMBERS.

17     Q.   LAST?

18     A.   LAST.

19     Q.   OKAY.  AND THE SOURCE OF MONEY TO THE MANAGING MEMBERS WAS

20     WHAT?  WHAT WERE THEY ENTITLED TO KEEP?

21     A.   THEY WERE ENTITLED TO KEEP ANYTHING THAT THEY RECEIVED

22     OVER, OVER 12 PERCENT, PLUS THEIR UNITS, THE THREE UNITS THEY

23     WERE REQUIRED TO INVEST IN, CLASS A UNITS.

24     Q.   OKAY.  TURN TO PAGE 77, PLEASE.

25              MR. LEEMING:  EXCUSE ME, COUNSEL?  WHAT PAGE WAS

1    THAT?

2              MR. KALEBA:  77.

3              THE WITNESS:  OKAY.

4    BY MR. KALEBA:

5    Q.   HAVE YOU SEEN THIS DOCUMENT BEFORE?

6    A.   I HAVE.

7    Q.   IS THIS THE PRIVATE PLACEMENT MEMORANDUM FOR YOUR SECOND

8    INVESTMENT?

9    A.   YES, IT IS.

10   Q.   OKAY.  IT SAYS GREENLIGHT FUND AT THE TOP?

11   A.   CORRECT.

12   Q.   DID YOU NOTICE A DIFFERENCE BETWEEN THE GREENLIGHT FUND

13   AND GCF?

14   A.   I -- YEAH, I ACTUALLY SHOULD HAVE QUESTIONED IT BECAUSE AS

15   I UNDERSTOOD, IT WAS GOLD COAST FINANCIAL AND APS FUNDING, AND

16   THEN WHEN I INVESTED THE SECOND 100,000, IT CAME BACK AS

17   GREENLIGHT FUND.

18   Q.   OKAY.  IF YOU COULD TURN TO PAGE 80, 8-0, THERE'S A

19   DESCRIPTION OF THE MANAGING MEMBER.

20   A.   YES.

21   Q.   OKAY.  WHO ARE IDENTIFIED AS THE MANAGING MEMBERS?

22   A.   APS FUNDING.

23   Q.   OKAY.  AND WHO ARE THE PRINCIPALS OF APS FUNDING?

24   A.   BARBRA ALEXANDER, MICHAEL SWANSON, AND BETH PINA.

25   Q.   DID YOU KNOW WHO MR. SWANSON WAS?

KASTNER DIRECT

1     A.   I DIDN'T.

2     Q.   DID YOU EVER HAVE ANY DEALINGS WITH HIM?

3     A.   NO, I DIDN'T.

4     Q.   WAS IT IMPORTANT TO YOU THAT MS. ALEXANDER WAS STILL A

5     PRINCIPAL?

6     A.   YES, ABSOLUTELY.

7     Q.   PAGE 82, PLEASE, THE STATEMENT OF RISKS, PARAGRAPH 6.

8     A.   YES.

9     Q.   IS THIS LANGUAGE CONSISTENT WITH THE RISKS THAT WERE

10    IDENTIFIED FROM YOUR FIRST INVESTMENT?

11    A.   YES, IT IS.

12    Q.   AND THE RISKS ARE FOCUSSED ON REAL ESTATE INVESTMENT;

13    CORRECT?

14    A.   CORRECT.

15    Q.   WERE YOU EVER ADVISED OF RISKS FOR OTHER INVESTMENTS THAT

16    WERE NOT REAL ESTATE?

17    A.   NO.

18    Q.   AND WOULD YOU HAVE WANTED TO HAVE KNOWN THAT IF THERE WERE

19    GOING TO BE INVESTMENTS MADE IN SOMETHING OTHER THAN REAL

20    ESTATE?

21    A.   ABSOLUTELY.

22    Q.   IF YOU COULD TURN TO THE JUNIOR LIEN HOLDER PARAGRAPH, THE

23    ONE BELOW.

24    A.   OKAY.

25    Q.   THIS IS A STATEMENT THAT'S CONSISTENT WITH THE MEMO FROM

1    THE FIRST INVESTMENT; CORRECT?

2    A.   YES, IT IS.

3    Q.   AND IT'S A STATEMENT THAT LOANS MAY NOT BE FIRST, SOME MAY

4    BE SECOND, AND SOME MAY BE THIRD?

5    A.   CORRECT.

6    Q.   OKAY.  BUT THEY'RE GOING TO BE SECURED?

7    A.   SECURED BY REAL ESTATE.

8    Q.   AND THAT MATTERED TO YOU FOR THIS INVESTMENT?

9    A.   YES.

10   Q.   AND THERE'S A STATEMENT THAT ALL LOANS WILL STILL MEET THE

11   COMPANY'S UNDERWRITING CRITERIA.

12   A.   YES.

13   Q.   DID YOU EVER HAVE ANY CONVERSATIONS WITH ANYONE AT THE

14   COMPANY ABOUT THE UNDERWRITING CRITERIA?

15   A.   I DIDN'T.  MY SISTER WAS A REAL ESTATE BROKER, SO -- AND

16   SHE WAS A GOOD FRIEND OF BARBRA'S, SO WHENEVER I HAD QUESTIONS

17   ABOUT IT, SHE WAS IN CONTACT WITH BARBRA QUITE OFTEN, THEY WERE

18   SUPPOSEDLY VERY GOOD FRIENDS, SO I JUST TALKED TO MY SISTER

19   ABOUT IT.

20   Q.   OKAY.  WOULD YOU TURN TO PAGE 87, PLEASE.  THERE'S A

21   DESCRIPTION OF THE COMPANY.

22   A.   YES.

23   Q.   SIMILAR TO WHAT WAS BEFORE; IS THAT CORRECT?

24   A.   PRETTY MUCH WORD FOR WORD.

25   Q.   BUT THERE'S AN ADDITION OF A NEW PERSON; RIGHT?

1    MR. MICHAEL SWANSON?  DO YOU SEE THAT?

2    A.   CORRECT, YES.

3    Q.   AND IF YOU COULD TURN TO THE NEXT PARAGRAPH, THE COMPANY

4    OFFERS SHORT-TERM --

5    A.   YES.

6    Q.   IS THIS CONSISTENT WITH YOUR UNDERSTANDING OF WHAT THE

7    COMPANY BUSINESS WAS AT THIS TIME?

8    A.   YES, IT IS.

9    Q.   I WANT TO ASK YOU NOW ABOUT ANY INTEREST PAYMENTS YOU

10   MIGHT HAVE RECEIVED, SO YOU CAN PUT THE BINDER DOWN.

11   A.   OKAY.

12   Q.   DID YOU RECEIVE ANY INTEREST PAYMENTS ON YOUR INVESTMENT?

13   A.   YES, I -- YES, I DID.  I RECEIVED ACTUALLY NINE, NINE

14   PAYMENTS ON THE 100,000; AND IT WASN'T QUITE $9,000 BECAUSE

15   THERE WASN'T ONE FULL MONTH IN THERE.  I THINK IT WAS AROUND

16   $8600 IN PAYMENTS THAT I RECEIVED.

17   Q.   OKAY.  AND WHAT WAS THE TIME PERIOD?

18   A.   IT WAS ABOUT NINE MONTHS.

19   Q.   WHEN DID -- DID THE PAYMENTS END AT SOME POINT?

20   A.   YES, THEY DID.  THEY ENDED -- THE LAST PAYMENT I GOT WAS A

21   CHECK FOR -- IT WAS FOR THE DECEMBER 2009 PAYMENT.

22   Q.   OKAY.  AND WHAT HAPPENED WITH THAT CHECK?

23   A.   I WAS CALLED BY BARBRA ALEXANDER IN DECEMBER OF 2009 THAT

24   THE COMPANY WAS BEING INVESTIGATED BY THE S.E.C. AND THE FBI,

25   AND THE RECORD -- THEIR RECORDS HAD BEEN SEIZED AND THAT I

1      WOULD -- THE CHECK HAD ALREADY BEEN SENT TO ME, BUT IT WOULD

2      VERY POSSIBLY BOUNCE BECAUSE OF INSUFFICIENT FUNDS.

3           IT DID NOT.  IT CLEARED.  BUT I NEVER GOT ANYTHING AFTER

4      THAT.

5           I CONTINUED GETTING MONTHLY STATEMENTS ON MY ROLLOVER IRA

6      THAT INDICATED THAT I WAS STILL GETTING INTEREST PAYMENTS OF

7      APPROXIMATELY $400 A MONTH, BUT IN REALITY, THERE WAS ACTUALLY

8      NO MONEY THERE AT ALL.  IT SAID THAT I HAD $49,000, BUT THERE

9      WAS NOTHING THERE.

10     Q.   YOU SAID ON PAPER YOU GOT THIS.

11     A.   RIGHT.

12     Q.   BUT WAS THERE MONEY IN AN ACCOUNT AS FAR AS YOU KNEW?

13     A.   NO.

14     Q.   DID YOU ASK FOR THE RETURN OF YOUR MONEY AT SOME POINT?

15     A.   AT THAT POINT THE INVESTORS GOT TOGETHER AND GOT A NEW

16     MANAGER, DAVID SCHRINER, WHO WAS AN ATTORNEY VERSED IN THIS

17     STUFF, AND HE DELVED INTO THE PAPERWORK TO FIND OUT IF THERE

18     WAS ANY MONEY LEFT OR ANY INVESTMENTS, AND COME TO FIND OUT

19     OVER THE --

20          MR. LEEMING:  OBJECTION.  HEARSAY.

21     BY MR. KALEBA:

22     Q.   DID YOU GET ANY --

23          THE COURT:  SUSTAINED.

24     BY MR. KALEBA:

25     Q.   DID YOU RECEIVE ANY MONEY THROUGH MR. SCHRINER'S EFFORTS?

1     A.   NO.

2     Q.   OKAY.  WHAT WAS THE EFFECT OF LOSING THIS INVESTMENT ON

3     YOU?

4     A.   UM --

5               MR. LEEMING:  OBJECTION.  RELEVANCE.

6               THE COURT:  OVERRULED.

7          GO AHEAD.

8               THE WITNESS:  THE BALLOON PAYMENT THAT I OWED, I HAD

9     TO TAKE OUT A -- I HAD TO BORROW AGAINST MY HOUSE, SO I'VE HAD

10    TO MAKE THOUSANDS OF DOLLARS OF INTEREST PAYMENTS OVER THE

11    YEARS.

12         AND OF COURSE I'LL PROBABLY END UP WORKING AN EXTRA FIVE,

13    FIVE YEARS.

14              MR. KALEBA:  OKAY.  THANK YOU.  NO FURTHER QUESTIONS.

15              THE COURT:  LET'S GO TO 2:20, OKAY, AND THEN WE'LL

16    TAKE OUR TEN MINUTE BREAK.  JUST A FEW MINUTES AND THEN WE'LL

17    TAKE OUR TEN MINUTE BREAK.

18              MR. LEEMING:  VERY GOOD, YOUR HONOR.

19              THE COURT:  OKAY.  GO AHEAD, PLEASE.

20                         **CROSS-EXAMINATION**

21    BY MR. LEEMING:

22    Q.   GOOD AFTERNOON, MR. KASTNER.

23    A.   GOOD AFTERNOON.

24    Q.   MY NAME IS PETER LEEMING.  I REPRESENT BARBRA ALEXANDER.

25         YOU ACTUALLY READ THESE PAPERS?

```
1     A.   I WOULDN'T SAY COVER TO COVER, NO.

2     Q.   BUT IT SOUNDS LIKE YOU READ THEM PRETTY CAREFULLY?

3     A.   WELL, I'VE BEEN INVESTING IN REAL ESTATE SINCE I WAS 19.

4     Q.   AND SO YOU FELT LIKE IT WAS IMPORTANT TO REVIEW THESE

5     DOCUMENTS AND BE UNDERSTANDING WHAT YOU WERE GETTING INTO?

6     A.   CORRECT.

7     Q.   SO I THINK YOU SAID THAT YOU, YOU TESTIFIED THAT YOU MET

8     MS. -- OR YOU START -- YOU FIRST -- WELL, LET ME GET THIS

9     CLEAR.

10         DID YOU MEET BARBRA INDEPENDENT OF ANY FINANCIAL DEALINGS

11    WITH YOUR SISTER?

12    A.   YES.

13    Q.   BEFORE YOU KNEW ABOUT THIS?

14    A.   OH, YES.

15    Q.   YES.  AND HOW DID YOU -- HOW DID YOU MEET HER?

16    A.   I HAD GONE DOWN TO CALIFORNIA TO VISIT WITH MY SISTER AND

17    BARBRA INVITED US UP TO HER HOME, WITH MY PARENTS WHO WERE ALSO

18    VISITING, FOR SUPPER.

19    Q.   AND WAS THERE ANY DISCUSSION OF INVESTMENT OPPORTUNITIES

20    AT THAT MOMENT?

21    A.   NO.

22    Q.   NOTHING AT ALL ABOUT THAT?

23    A.   NOTHING.

24    Q.   SHE DIDN'T TRY TO SAY, "HEY, I'VE GOT THIS GREAT FUND, YOU

25    CAN MAKE MONEY"?
```

1    A.   NO.

2    Q.   OKAY.  AND DID YOU MEET HER AGAIN SOCIALLY IN SOME OTHER

3    CONTEXT?

4    A.   I -- YOU KNOW, I CAN'T REMEMBER EXACTLY.  I WENT DOWN TO

5    VISIT MY SISTER QUITE OFTEN, SO WE MAY HAVE RUN INTO EACH

6    OTHER.  SHE WAS MAYBE WITH MY SISTER OVER AT HER HOUSE.

7         I DID SEE HER AGAIN.  SHE DID COME UP TO WASHINGTON TO

8    VISIT MY SISTER IN THE SUMMER OF 2009.  WE HAD SUPPER AT MY

9    SISTER'S HOUSE.

10   Q.   AND, AGAIN, NO DISCUSSION OF THE INVESTMENT?

11   A.   NO.

12   Q.   THOSE WERE SOCIAL OCCASIONS?

13   A.   SOCIAL, UM-HUM.

14   Q.   WERE THOSE THE ONLY TWO TIMES THAT YOU ACTUALLY MET HER?

15   A.   THE ONLY TWO TIMES THAT I DIRECTLY REMEMBER MEETING HER.

16   LIKE I SAID, I MAY HAVE RUN INTO HER WHEN I WAS DOWN VISITING

17   MY SISTER.

18        I DID ACTUALLY -- I WAS DOWN VISITING MY SISTER, AND WHEN

19   BARBRA HAD HER RADIO SHOW, I CALLED IN AND ASKED HER A

20   QUESTION, BECAUSE IF YOU CALLED IN, SHE SENT YOU AN INVESTMENT

21   BOOK ON REAL ESTATE.

22   Q.   DO YOU REMEMBER THE QUESTION YOU ASKED?

23   A.   NO, I CAN'T.

24   Q.   ALL RIGHT.

25   A.   I CAN'T REMEMBER.

1    Q.    AND SO YOU LEARNED OF THIS POTENTIAL INVESTMENT THROUGH

2    YOUR SISTER; CORRECT?

3    A.    CORRECT.

4    Q.    WHAT DID SHE TELL YOU?

5    A.    SHE TOLD ME THAT BARBRA WAS, WAS A HARD MONEY LENDER,

6    WHICH I WAS FAMILIAR WITH.  A LOT OF THE INVESTMENTS I MADE

7    WERE FOR RAW LAND AND BANKS GENERALLY DON'T LOANS ON RAW LAND.

8         EXCUSE ME.

9         SO THEY'RE OWNER HELD CONTRACTS.  SO I BOUGHT QUITE A BIT

10   OF LAND ON AN OWNER HELD CONTRACT, AND I ALSO HELD SOME

11   CONTRACTS, PEOPLE BUYING PROPERTY FROM ME.

12        AND I REALIZED THE HARD MONEY MARKET WAS OUT THERE BECAUSE

13   OF THE PARAMETERS THE BANKS HAD TO OPERATE UNDER.

14   Q.    OKAY.  NOW, AT SOME POINT AFTER SPEAKING AND DISCUSSING

15   THIS WITH YOUR SISTER, YOU DECIDED THAT YOU WANTED TO INVEST IN

16   WHATEVER WAS GOING ON WITH BARBRA'S COMPANY AND WHAT YOUR

17   SISTER HAD INVESTED IN; CORRECT?

18   A.    CORRECT.

19   Q.    WHEN WAS THAT?

20   A.    I DECIDED IN PROBABLY MARCH OR APRIL OF 2008.

21   Q.    AND I THINK YOU TESTIFIED THAT YOU MADE A PHONE CALL TO

22   THE OFFICE ABOUT THAT.  IS THAT CORRECT?

23   A.    THAT'S CORRECT.

24   Q.    AND YOU SPOKE TO BETH PINA?

25   A.    I ORIGINALLY CALLED BARBRA AND SHE SAID THAT BETH WOULD,

```
 1    WOULD BE GETTING IN TOUCH WITH ME.  SO BARBRA AND I REALLY
 2    DIDN'T DISCUSS THE FINANCIAL ASPECTS.  SHE SAID "BETH WILL CALL
 3    YOU AND FILL YOU IN ON THE INVESTMENT."
 4    Q.   SO IN THAT INITIAL CONVERSATION, BARBRA DID NOT REPRESENT
 5    TO YOU ANY SPECIFIC INTEREST RATES, ANYTHING LIKE THAT;
 6    CORRECT?
 7    A.   NO.
 8    Q.   AND THEN YOU GOT A PHONE CALL FROM BETH PINA, OR DID YOU
 9    CALL HER?
10    A.   I GOT A CALL FROM BETH PINA.
11    Q.   AND BETH DESCRIBED THE 12 PERCENT AND THE GENERAL
12    OPERATION OF THE COMPANY TO YOU; CORRECT?
13    A.   CORRECT.
14    Q.   OKAY.  NOT BARBRA?
15    A.   NOT BARBRA.
16    Q.   WAS THAT ONLY ONE TELEPHONE CALL THAT YOU HAD WITH
17    MS. PINA AT THAT POINT?
18    A.   NO.  I HAD -- WHEN I INVESTED THE SECOND TIME, I ALSO
19    TALKED WITH BETH.
20    Q.   OKAY.
21    A.   I DEALT PRETTY MUCH DIRECTLY WITH BETH ON THE INVESTMENT.
22    Q.   OKAY.  AND SO BETH SENT YOU THE PAPERWORK ON BOTH
23    OCCASIONS; RIGHT?
24    A.   CORRECT.
25    Q.   AND TOLD YOU TO INVEST IF YOU WERE INTERESTED?
```

```
 1      A.   YES.

 2      Q.   AND, AGAIN, THIS WAS ONLY A PHONE CONVERSATION; RIGHT?

 3   THIS WAS NOT IN PERSON?

 4      A.   PHONE CONVERSATION, CORRECT.

 5      Q.   DID YOU ACTUALLY MEET BETH AT SOME POINT?

 6      A.   I NEVER HAVE, NO.

 7      Q.   JUST SPOKEN TO HER OVER THE PHONE?

 8      A.   CORRECT.

 9      Q.   HOW MANY TIMES DO YOU THINK?

10      A.   THREE.

11      Q.   SO --

12      A.   POSSIBLY FOUR.

13      Q.   AND EACH TIME WAS ABOUT THE INVESTMENT AND THE TERMS?

14      A.   CORRECT.

15      Q.   AND THE AMOUNT OF MONEY AND THAT SORT OF THING?

16      A.   CORRECT.

17           THE COURT:  IT'S 2:22.  SHALL BE GO AHEAD AND TAKE

18   OUR BREAK NOW?  HOW MUCH MORE DO YOU HAVE WITH MR. KASTNER?

19           MR. LEEMING:  I HAVE QUITE A BIT.

20           THE COURT:  OKAY.  THEN LET'S GO AHEAD AND TAKE OUR

21   BREAK NOW IF THAT'S OKAY.

22        ALL RIGHT.  WE'LL TAKE A BREAK UNTIL 2:35.  THANK YOU.

23        PLEASE DON'T INVESTIGATE OR DISCUSS THE CASE.  THANK YOU.

24        AND YOU MAY STEP DOWN.

25        (JURY OUT AT 2:23 P.M.)
```

```
1              (RECESS FROM 2:23 P.M. UNTIL 2:36 P.M.)

2              (JURY IN AT 2:36 P.M.)

3                   THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

4       SEAT.

5              THE TIME IS 2:36.

6              GO AHEAD, PLEASE.

7                   MR. LEEMING:  THANK YOU, YOUR HONOR.

8       Q.   I THINK -- GOOD AFTERNOON AGAIN.

9       A.   GOOD AFTERNOON.

10      Q.   I THINK WE ALREADY COVERED THIS.  YOU -- YOU HAD A

11      SELF-DIRECTED IRA WHICH WAS THE VEHICLE TO DO YOUR INITIAL

12      INVESTMENT; IS THAT CORRECT?

13      A.   THAT'S CORRECT.

14      Q.   AND HOW DID THAT WORK?  DID YOU HAVE AN EXISTING IRA THAT

15      YOU THEN PUT INTO A CORPORATION OR THROUGH AN IRA SERVICES

16      TYPE --

17      A.   I HAD A -- I HAD MY 401(K) FROM WORK, AND ALSO AN IRA THAT

18      I HAD, AND I CONTACTED ENTRUST NORTHWEST AND TOOK THAT MONEY

19      WHEN I QUIT THE COMPANY I WAS WORKING FOR AND ROLLED IT INTO

20      ENTRUST NORTHWEST INTO A SELF-DIRECTED IRA, AND THEN I DIRECTED

21      THEM TO INVEST IN GCF.

22      Q.   I SEE.  SO THE INITIAL -- LET ME FIND THIS IN MY COMPUTER.

23             SO YOU'VE REVIEWED SOME DOCUMENTS TODAY, REALLY TWO SETS

24      OF DOCUMENTS THAT ARE QUITE SIMILAR; RIGHT?

25      A.   CORRECT.
```

1    Q.   AND THE FIRST IS THE SELF-DIRECTED IRA INVESTMENT; RIGHT?

2    A.   CORRECT.

3    Q.   AND THE SECOND WAS THE $100,000 THAT ENDED UP BEING WITH A

4    FUND CALLED THE GREENLIGHT FUND; RIGHT?

5    A.   CORRECT.

6    Q.   OKAY.  AND THOSE ARE VERY SIMILAR DOCUMENTS AS FAR AS YOUR

7    REVIEW INDICATES; CORRECT?

8    A.   CORRECT.

9    Q.   THE MAIN DIFFERENCE IS THAT THERE IS A NEW NAME ADDED TO

10   THE SECOND SET OF DOCUMENTS FOR THE GREENLIGHT FUND, AND THAT'S

11   MICHAEL SWANSON; CORRECT?

12   A.   THAT'S CORRECT.

13   Q.   ALL RIGHT.  SO IS IT FAIR TO SAY YOU GOT THESE IN TWO

14   BATCHES?

15   A.   YES.

16   Q.   EACH TIME YOU WERE CONSIDERING INVESTING?

17   A.   YES.

18   Q.   ALL RIGHT.  AND BOTH TIMES THEY WERE MAILED TO YOUR HOME?

19   A.   CORRECT.

20   Q.   AND YOU HAD TIME TO REVIEW THEM AND GO OVER THEM; RIGHT?

21   A.   YES, I DID.

22   Q.   AND NOBODY WAS PRESSURING YOU, CALLING YOU UP, HIGH

23   PRESSURE SALES TACTICS, YOU'VE GOT TO DO THIS, YOU'RE GOING TO

24   MISS YOUR CHANCE.  NOTHING LIKE THAT; RIGHT?

25   A.   NOT AT ALL, BECAUSE I KNEW -- I'D KNOWN BARBRA THROUGH MY

```
1    SISTER, SO --

2    Q.   OKAY.  SO NOBODY FORCED YOU TO DO ANY INVESTMENT IN THIS;

3    RIGHT?

4    A.   NO.

5    Q.   AND YOU KNEW YOU WERE INVESTING IN SECURITIES; RIGHT?

6    A.   YES, THAT WERE SECURED BY REAL ESTATE.

7    Q.   BUT STILL, NONETHELESS, SECURITIES?

8    A.   CORRECT.

9    Q.   YOU WEREN'T INVESTING IN A SPECIFIC PIECE OF PROPERTY THAT

10   YOU COULD POINT TO?

11   A.   NO.

12   Q.   RIGHT?

13   A.   NO.

14   Q.   IN FACT, YOU WERE BUYING UNITS; RIGHT?

15   A.   THAT'S CORRECT.

16   Q.   AND THOSE WERE ESSENTIALLY SHARES IN THIS COMPANY?

17   A.   CORRECT.

18   Q.   SO LET'S GO TO EXHIBIT 81, IF WE COULD, AND I'VE GOT MINE

19   HERE, BUT COULD WE BRING THAT UP, PLEASE?

20        MS. BURNEY:  WHAT PAGE?

21        MR. LEEMING:  OH, JUST PAGE 1, EXHIBIT 81.

22   Q.   SO -- AND WHAT WE'RE LOOKING AT HERE AT PAGE 1 IS THE

23   INVESTOR SUITABILITY STATEMENT; IS THAT RIGHT?

24   A.   CORRECT.

25   Q.   AND THAT INSTRUCTS YOU TO SIGN IT AND RETURN IT WITH THE
```

1     COUPLE OF OTHER DOCUMENTS THAT ACCOMPANIED IT, AND THOSE ARE

2     THE SUBSCRIPTION AGREEMENT, MEMBER SIGNATURE PAGE, AND A CHECK.

3     RIGHT?

4     A.   CORRECT.

5     Q.   AND THEN THE FIRST PARAGRAPH, RIGHT UNDER 2, MANAGING

6     MEMBER, YOU'RE MAKING CERTAIN ACKNOWLEDGMENTS; RIGHT?

7     A.   YES.

8     Q.   AND ONE OF THEM IS ABOUT REGULATION D OF THE S.E.C., IT'S

9     NOT A REGULATORY -- REGISTERED SECURITY; RIGHT?

10    A.   YEAH.  I DON'T -- I DON'T KNOW REGULATION D.

11    Q.   RIGHT.  YOU DIDN'T LOOK INTO THAT?

12    A.   NO, I DIDN'T.

13    Q.   BUT IT GOES ON TO EXPLAIN THAT YOU -- IT REQUIRES YOU TO

14    HAVE CERTAIN FINANCIAL MEANS IN ORDER TO QUALIFY TO INVEST IN

15    THIS PARTICULAR KIND OF INVESTMENT; RIGHT?

16    A.   CORRECT, YES.

17    Q.   YOU HAD TO BE A QUALIFIED INVESTOR?

18    A.   CORRECT.

19    Q.   WHICH YOU WERE AT THAT TIME; RIGHT?

20    A.   YES.

21    Q.   SO YOU -- IT GIVES YOUR NAME AND WHERE YOU LIVE AND YOUR

22    EDUCATIONAL BACKGROUND; RIGHT?

23    A.   YES.

24    Q.   ALL THAT SORT OF STUFF.

25         AND IT INDICATES THAT YOU WERE AN AIRLINE PILOT FOR A

1    NUMBER OF YEARS.

2    A.    CORRECT.

3    Q.    FOR 13 YEARS; RIGHT?

4    A.    CORRECT, FOR THAT COMPANY.

5    Q.    FOR THAT COMPANY.

6    A.    YES.

7    Q.    AND YOU ALSO WERE AN AIRLINE PILOT FOR A DIFFERENT

8    COMPANY; CORRECT?

9    A.    CORRECT.

10   Q.    AND WHAT COMPANY WAS THE SECOND ONE?

11   A.    PARADISE ISLAND AIR IN THE CARIBBEAN.

12   Q.    WHAT DID YOU FLY?

13   A.    OTTERS.

14   Q.    ON TO THE ISLAND?

15   A.    YES, OUT OF NASSAU.

16         AND THEN IN PROMAC AIR, IN THE YES BAY LODGE, AND OUT OF

17   KETCHIKAN, ALASKA.

18   Q.    AH.  SO YOU HAVE FLOWN IN SOME PRETTY INTERESTING FLYING

19   CONDITIONS?

20   A.    YES, SIR.

21   Q.    IN ANY EVENT, LET'S GO BACK TO THIS DOCUMENT BECAUSE

22   THAT'S WHY WE'RE HERE.

23         PAGE 3, LINE 11 ASKS YOU TO DESCRIBE ANY SUBSTANTIAL

24   EXPERIENCE YOU'VE HAD WITH ACCOUNTING OR FINANCIAL MATTERS;

25   RIGHT?

1     A.    YES.

2     Q.    AND YOU WROTE "OWNER HELD R.E. CONTRACTS, NOTE BROKER."

3     A.    YES.

4     Q.    OKAY.  IS THAT WHAT YOU WERE EXPLAINING EARLIER, THAT YOU

5     HAD REAL ESTATE CONTRACTS?

6     A.    CORRECT.

7     Q.    OKAY.  AND A NOTE BROKER IS WHAT?

8     A.    WELL, I WAS -- THERE WAS -- THERE WAS, OF COURSE,

9     COMPANIES OR PEOPLE THAT WOULD BUY REAL ESTATE NOTES, AND IF I

10    BROUGHT THEM PEOPLE THAT WANTED TO SELL THEIR NOTES, THEY WOULD

11    GIVE ME A COMMISSION.

12    Q.    I SEE.

13    A.    YES.

14    Q.    AND HOW MANY TIMES DID YOU DO THAT?

15    A.    MAYBE ONCE OR TWICE.

16    Q.    I SEE.  AND YOU INDICATE YOUR EMPLOYER, IF I'M CORRECT

17    HERE, I MIGHT HAVE TO ZOOM BACK UP -- I'M NOT FINDING IT.

18          YES.  I'M SORRY.

19          ON PAGE 2, THE PAGE BEFORE THIS, NUMBER 4 IS CURRENT

20    EMPLOYER, BUSINESS AND POSITION HELD, AND YOU SAID SOURCE

21    FUNDING, LLC.

22    A.    CORRECT.

23    Q.    AND WHAT DID SOURCE FUNDING DO?

24    A.    SOURCE FUNDING, LLC, IS WHAT I USE TO INVEST IN REAL

25    ESTATE.

1      Q.    OKAY.

2      A.    SINGLE MEMBER.

3      Q.    OKAY.  THAT'S RIGHT.

4      A.    UM-HUM.

5      Q.    AND THEN -- I'M SORRY TO JUMP AROUND LIKE THIS.  IT'S MY

6      NOTE TAKING.  FORGIVE ME.  SOMETIMES IT'S HARD TO FIND THE

7      SPECIFIC POINT IN THESE PAGES.

8            I'M GOING TO COME BACK TO THAT QUESTION SO I CAN LOOK FOR

9      IT LATER.

10     A.    OKAY.

11     Q.    OKAY.  SO A COUPLE QUESTIONS ABOUT YOUR INCOME.

12           YOU INDICATE ON PAGE 4 YOU HAD -- THE APPROXIMATE

13     PERCENTAGE OF YOUR LAST YEAR'S GROSS INCOME WAS -- I'M SORRY.

14     I'LL LET YOU GET THERE -- WAS 30 PERCENT FROM SALARY AND ABOUT

15     70 PERCENT FROM INVESTMENTS.

16     A.    CORRECT.

17     Q.    AND THEN YOU INDICATE YOU HAD A PREEXISTING RELATIONSHIP

18     WITH BARBRA ALEXANDER.

19     A.    CORRECT.

20     Q.    AND THAT'S BECAUSE YOU KNEW HER THROUGH YOUR SISTER?

21     A.    UM-HUM.

22     Q.    AND THEN YOU GIVE A REPRESENTATIVE INVESTMENT IN LIMITED

23     PARTNERSHIP INTERESTS, AND YOU INDICATE TAX EXEMPT BONDS.

24           DO YOU SEE THAT AT LINE 21, BOTTOM OF PAGE 4?

25     A.    YES.

1    Q.   ARE THOSE DOUBLE TAX EXEMPT BONDS, LIKE BOTH STATE AND

2    FEDERAL TAX EXEMPT?

3    A.   I BELIEVE THEY WERE FEDERAL.  I CAN'T REMEMBER AT THIS

4    MOMENT WHAT THEY WERE.

5    Q.   MUNICIPAL BONDS?

6    A.   YES, MUNICIPAL BONDS, YES.

7    Q.   AND THEN IN LINE ITEM 22, YOU'RE ASKED ABOUT THE FREQUENCY

8    OF INVESTMENT IN MARKET SECURITIES.

9         DO YOU SEE THAT ON THE TOP OF PAGE 5?

10   A.   YES.

11   Q.   AND YOU INDICATE OFTEN THROUGH MY BROKER AT UBS.

12   A.   OCCASIONALLY, YES.

13   Q.   OH, OCCASIONALLY?

14   A.   UM-HUM.

15   Q.   SO I SEE THREE BOXES HERE.  MAYBE I'M MISREADING IT.

16   MAYBE WE CAN ZOOM IN ON LINE ITEM 22 AT THE TOP.

17        YES, THANK YOU.

18   A.   YES.

19   Q.   THERE'S --

20   A.   OH, OKAY.  I SEE THAT.  I'M LOOKING AT OCCASIONALLY.  I

21   SEE -- YEAH, I'VE GOT IT MARKED OFTEN.

22   Q.   YEAH.  WHICH IS THE MOST ACCURATE, OCCASIONALLY OR --

23   A.   PROBABLY OCCASIONALLY.

24   Q.   OKAY.  SO THAT WAS A MISTAKE ON THIS, IF THAT'S WHAT IT

25   SAID, AND IT LOOKS LIKE IT WAS CHECKED?

```
 1              BUT YOU'D HAD A BROKER, UBS?

 2      A.   YES.

 3      Q.   AND UBS IS WHERE?

 4      A.   BISMARK, NORTH DAKOTA.

 5      Q.   OKAY.  AND THAT WAS YOUR INVESTMENT BROKER FOR STOCKS?

 6      A.   YES.  STILL IS.

 7      Q.   THOSE SORTS OF THINGS?

 8      A.   YES, UM-HUM.

 9      Q.   AND I THINK YOU MENTIONED THIS ALREADY, BUT LINE ITEM 23,

10      YOU INDICATED YOU'D BEEN BUYING AND SELLING REAL ESTATE WITH

11      OWNER FINANCED NOTES SINCE YOU WERE 19.

12      A.   THAT'S CORRECT.

13      Q.   SO YOU'D HAD A SIGNIFICANT AMOUNT OF EXPERIENCE INVESTING

14      IN REAL ESTATE AT THE TIME YOU MADE THIS INVESTMENT; RIGHT?

15      A.   YES.

16      Q.   HAD YOU EVER INVESTED IN AN INVESTMENT THAT WAS FORMED

17      LIKE THIS?

18      A.   NO, I HADN'T.

19      Q.   UNITS THAT WERE SECURITIZED?

20      A.   I HAD NOT.

21      Q.   OKAY.  IS THAT PART OF THE REASON YOU WENT THROUGH THIS A

22      LITTLE MORE CAREFULLY THAN YOU MIGHT OTHERWISE HAVE DONE?

23      A.   YES.

24      Q.   YOU WANTED TO KNOW WHAT YOU WERE GETTING INTO?

25      A.   CORRECT.
```

1    Q.   AND THEN THERE'S VARIOUS WARNINGS IN HERE, RIGHT, LIKE

2    LINE 24.  ARE YOU THERE?

3    A.   YES, I AM.

4    Q.   "I AM WILLING AND ABLE TO BEAR THE ECONOMIC RISK OF AN

5    INVESTMENT IN THE UNITS."

6    A.   YES.

7    Q.   AND "IN MAKING THIS STATEMENT, CONSIDERATION HAS BEEN

8    GIVEN TO WHETHER I COULD AFFORD TO HOLD THE UNITS FOR AN

9    INDEFINITE PERIOD."

10   A.   UM-HUM.

11   Q.   DO YOU SEE THAT LANGUAGE?

12   A.   YES.

13   Q.   AND THAT SAME LANGUAGE OCCURS IN BOTH OF THE INVESTMENTS

14   YOU MADE; CORRECT?

15   A.   CORRECT.

16   Q.   AND THEN IT ALSO INDICATES THAT "CONSIDERATION HAS BEEN

17   GIVEN TO WHETHER I COULD AFFORD TO HOLD THE UNITS FOR AN

18   INDEFINITE PERIOD" -- I'M SORRY -- AND "AT THIS TIME I CAN

19   AFFORD A COMPLETE LOSS."

20   A.   YES.

21   Q.   AND THAT WAS TRUE AT THAT TIME?

22   A.   CORRECT, UM-HUM.

23   Q.   LET'S GO DOWN TO PAGE 6, AND THERE'S A SIGNATURE LINE

24   THERE.  BUT THERE'S -- YOU INITIAL A NUMBER OF CONDITIONS, A

25   THROUGH C, ABOUT YOUR INVESTMENT IN THE COMPANY; RIGHT?

```
1      A.   YES.

2      Q.   AND YOU'RE WARNED THAT THIS INVESTMENT WILL INVOLVE

3      SECURITIES FOR WHICH NO MARKET EXISTS OR IS ANTICIPATED TO

4      EXIST.

5      A.   YES.

6      Q.   DO YOU SEE THAT?

7      A.   UM-HUM.

8      Q.   YOU INITIALLED THAT; RIGHT?

9      A.   RIGHT.

10     Q.   AND, AGAIN, AN INDICATION THAT YOU'RE ABLE TO BEAR THE

11     ECONOMIC RISK OF THE INVESTMENT; RIGHT?

12     A.   RIGHT.

13     Q.   AND THEN NUMBER C, IT'S SOLELY FOR INVESTMENT PURPOSES;

14     RIGHT?

15     A.   CORRECT.

16     Q.   AND THEN THERE'S A SECTION BELOW THAT'S ASKING FOR

17     EXCEPTIONS.

18          DO YOU SEE THAT?

19     A.   YES.

20     Q.   AND YOU DON'T WRITE ANYTHING THERE; CORRECT?

21     A.   NO, I DID NOT.

22     Q.   AND YOU DIDN'T WRITE ANYTHING IN THE SECOND INVESTMENT YOU

23     MADE, EVEN THOUGH YOU WERE GOING TO NEED, YOU TESTIFIED, YOUR

24     PRINCIPAL BACK WITHIN A COUPLE OF YEARS; CORRECT?

25     A.   RIGHT.  THAT'S WHY I QUESTIONED BARBRA ABOUT GETTING THE
```

```
1     RETURN ON THE PRINCIPAL.

2     Q.   RIGHT.  BUT THIS, THIS FORM THAT WE'RE LOOKING AT HAS A

3     SPECIFIC PLACE FOR YOU TO --

4     A.   CORRECT.

5     Q.   -- PUT THAT IN IF THAT WAS --

6     A.   I UNDERSTAND.

7     Q.   -- SIGNIFICANT, AND YOU DID NOT; RIGHT?

8     A.   I DID NOT.

9     Q.   THERE'S ALSO AN INDICATION AND A QUESTION WHETHER OR NOT

10    YOU INTEND TO RELY ON THE ADVICE OF AN ATTORNEY OR OTHER

11    ADVISOR; RIGHT?  DO YOU REMEMBER THAT?

12    A.   YES.

13    Q.   AND DID YOU REVIEW THESE DOCUMENTS WITH A LAWYER?

14    A.   I DID NOT.

15    Q.   WITH AN ACCOUNTANT?

16    A.   I DIDN'T.

17    Q.   DID YOU REVIEW THESE DOCUMENTS WITH ANY OTHER PERSON?

18    A.   YEAH.  I REVIEWED THEM WITH MY SISTER.

19    Q.   WITH YOUR SISTER?

20    A.   YES.

21    Q.   OKAY.  SO LET'S GO DOWN TO THE NEXT DOCUMENT, WHICH IS THE

22    PRIVATE PLACEMENT MEMORANDUM, WHICH IS PAGE 7.  AND, AGAIN,

23    THIS HAS A LOT OF SIMILAR WARNINGS.  IT TELLS YOU THAT IT'S

24    ONLY BEING OFFERED TO A LIMITED NUMBER OF SPECIFIED,

25    SOPHISTICATED INVESTORS, ET CETERA.
```

1        YOU RECALL THAT AND YOU READ THAT?

2   A.   YES.

3   Q.   AND, AGAIN, THAT YOU'RE INFORMED YOU MUST CONTINUE TO BEAR

4   THE RISK OF ECONOMIC LOSS FOR AN INDEFINITE PERIOD?

5   A.   CORRECT.

6   Q.   NOT TWO YEARS OR SIX MONTHS; RIGHT?

7   A.   RIGHT.

8   Q.   THAT'S NOT WHAT IT SAYS?

9   A.   RIGHT.

10  Q.   AND, AGAIN, THERE'S A DESCRIPTION OF THE COMPANY, WHICH IS

11  IT'S FORMED ON NOVEMBER 1ST -- LET ME GO DOWN TO THAT --

12  WHOOPS.

13       ALL RIGHT.  THAT IS THE TOP OF PAGE 9, SUMMARY OF THE

14  OFFERING, DESCRIPTION OF THE COMPANY.

15       DO YOU SEE THAT?

16  A.   YES, I DO.

17  Q.   OKAY.  AND I THINK YOU WENT THROUGH THIS ON DIRECT, FORMED

18  ON NOVEMBER 1ST TO RAISE A POOL OF CAPITAL TO BE USED FOR

19  SHORT-TERM, FIXED RATE MORTGAGE FINANCING.

20  A.   CORRECT.

21  Q.   AND THAT WAS WHAT ENCOURAGED YOU TO INVEST IN THIS FUND;

22  CORRECT?

23  A.   YES.

24  Q.   I THINK YOU COVERED SOME OF THIS BRIEFLY ON DIRECT, BUT

25  THERE'S RISK FACTORS THAT ARE INDICATED AT THE BOTTOM OF PAGE 9

1      AND GO ON THROUGH PAGE 10.

2      A.   YES.

3      Q.   DO YOU SEE THOSE?

4      A.   I DO.

5      Q.   ONE OF THEM IS CONFLICTS OF INTEREST.  DO YOU SEE THAT?

6      A.   YES.

7      Q.   AND THERE'S A REFERENCE TO A WAREHOUSE LINE OF CREDIT FOR

8      A MAJOR INSTITUTIONAL LENDER.  DO YOU SEE THAT ABOUT THE THIRD

9      LINE DOWN?

10     A.   RIGHT, LINE OF CREDIT.

11     Q.   DID YOU ASK YOUR SISTER ABOUT WHAT THAT MIGHT HAVE MEANT?

12     A.   I DID NOT.

13     Q.   OKAY.  DO YOU KNOW WHAT IT MEANS?

14     A.   I DON'T -- I HAVE NOT READ IT IN YEARS.

15     Q.   IT'S BEEN A LONG TIME?

16     A.   IT'S BEEN A LONG TIME, YES.

17     Q.   AS YOU SIT HERE NOW, DO YOU HAVE ANY RECOLLECTION OF

18     READING THIS PARTICULAR CONFLICT OF INTEREST WARNING?

19     A.   I DON'T.

20     Q.   NOTHING ABOUT A WAREHOUSE LINE OF CREDIT?

21     A.   NO.

22     Q.   LET'S GO TO THE TOP OF PAGE 10.  NON-LIQUIDITY AND

23     NON-TRANSFERABILITY OF UNITS.

24     A.   CORRECT.

25     Q.   AND YOU UNDERSTOOD THAT THAT SUPPLEMENT MEANS YOU MIGHT BE

1    STUCK WITH THIS FOR QUITE A WHILE; RIGHT?

2    A.   YES.

3    Q.   LACK OF REGISTRATION, THAT'S NUMBER 3 UNDER STATE AND

4    FEDERAL STATE SECURITIES LAWS -- FEDERAL AND STATE SECURITIES

5    LAWS.

6         DO YOU HAVE EXPERIENCE WITH WHAT REGISTRATION, IF ANY,

7    MIGHT BE REQUIRED FOR DIFFERENT INVESTMENT VEHICLES?

8    A.   NO, I DON'T.

9    Q.   AND YOU DIDN'T ASK ABOUT THIS?

10   A.   NO, I DIDN'T.

11   Q.   NUMBER 4 SAYS THAT ALL THE COMPANY'S MANAGEMENT DECISIONS

12   WILL BE MADE BY THE MANAGING MEMBER; CORRECT?

13   A.   CORRECT.

14   Q.   NOW, YOU TESTIFIED ON DIRECT THAT YOU UNDERSTOOD

15   BARBRA ALEXANDER TO BE THE MANAGING MEMBER; RIGHT?

16   A.   THAT'S CORRECT.

17   Q.   BUT, IN FACT, ISN'T IT THE COMPANY THAT SHE WAS A PART OF

18   THAT WAS THE MANAGING MEMBER?

19   A.   I WOULDN'T KNOW FOR SURE, NO.

20   Q.   IS IT DEFINED IN HERE?  DO YOU RECALL?

21   A.   I DO NOT REMEMBER.

22   Q.   OKAY.  I'LL -- I THINK WE'RE GOING TO COME TO IT IN A BIT.

23        LET'S GO DOWN TO NUMBER 5, DEPENDENCE ON MANAGING MEMBER.

24   "THE MANAGING MEMBER AND ITS PRINCIPALS, BARBRA ALEXANDER AND

25   BETH PINA, WILL BE" CHARGED -- WILL BE CHARGE, AND IT LOOKS

```
 1        LIKE THERE'S A TYPO THERE -- "WILL BE CHARGE OF THE MANAGEMENT
 2        OF THE COMPANY AND ITS DAY-TO-DAY OPERATIONS."
 3             RIGHT?
 4        A.   YES.
 5        Q.   SO BARBRA AND BETH ARE THE PRINCIPALS OF THE MANAGING
 6        MEMBER.  BARBRA IS NOT THE MANAGING MEMBER OF THE COMPANY.
 7        DOESN'T THAT MAKE THAT CLEAR?
 8        A.   YES, IT DOES.
 9        Q.   OKAY.  AND AGAIN, THERE'S ANOTHER WARNING ABOUT RISK OF
10        REAL ESTATE INVESTMENT?
11        A.   CORRECT.
12        Q.   INCLUDING NATIONAL AND LOCAL ECONOMIC CONDITIONS?
13        A.   CORRECT.
14        Q.   AND YOU'RE AWARE THAT THERE WERE SOME PRETTY SUBSTANTIAL
15        LOCAL AND NATIONAL ECONOMIC CONDITIONS THAT OCCURRED IN 2008
16        AND 2009?
17        A.   ABSOLUTELY, YEAH.  I DON'T BLAME BARBRA OR ANYBODY FOR
18        WHAT HAPPENED TO THE REAL ESTATE MARKET.  RIGHT.
19        Q.   LET'S GO TO PAGE 12.  NUMBER 8 HAS A REFERENCE TO
20        LIABILITY TO PREFERRED -- TO RETURN DISTRIBUTIONS.
21             DO YOU SEE THAT?
22        A.   YES.
23        Q.   AND IT TALKS ABOUT HOW EVEN IF YOU GET A DISTRIBUTION, YOU
24        MIGHT HAVE TO GIVE IT BACK IF SOMETHING GOES WRONG?
25        A.   CORRECT.
```

1    Q.   WAS THAT YOUR UNDERSTANDING?

2    A.   YES.

3    Q.   OKAY.  AND THEN NUMBER 9 SAYS THERE'S NO ASSURANCE OF

4    RETURN ON INVESTMENT.

5    A.   CORRECT.

6    Q.   SO THERE WAS DISCUSSION OF THIS 12 PERCENT?

7    A.   UM-HUM.

8    Q.   CORRECT?

9    A.   CORRECT.

10   Q.   BUT IN THIS DOCUMENT, AT PARAGRAPH 9, WHICH YOU SIGNED,

11   YOU'RE TOLD THAT THAT'S NOT A GUARANTEE.

12   A.   CORRECT.

13   Q.   OKAY.  LET'S GO TO INVESTOR SUITABILITY REQUIREMENTS AT

14   THE TOP OF PAGE 13.  AND WE'VE TALKED ABOUT THIS ALREADY AND

15   THERE'S A SEPARATE FORM THAT TALKS ABOUT THIS.

16        BUT, AGAIN, YOU'RE BEING TOLD THAT YOU HAVE TO HAVE

17   SUFFICIENT EXPERIENCE, THERE'S A SUBSTANTIAL DEGREE OF RISK IN

18   THIS INVESTMENT, SUITABLE ONLY FOR PEOPLE WHO COULD AFFORD TO

19   LOSE THEIR MONEY; RIGHT?

20   A.   RIGHT.

21   Q.   AND THAT'S HOW YOU UNDERSTOOD IT?

22   A.   CORRECT.

23   Q.   OKAY.  LET'S GO TO PAGE 21.  ARE YOU THERE?  GCF --

24   A.   YES, I AM.

25   Q.   AND IT'S ENTITLED "AMENDMENT TO PRIVATE PLACEMENT

```
1    MEMORANDUM."

2         DO YOU SEE THAT?

3    A.   UM --

4    Q.   I THINK IT'S PAGE -- LET'S SEE.

5    A.   OH, RIGHT.  I'VE GOT IT.

6    Q.   OKAY, GREAT.  THERE'S A NUMBER OF DIFFERENT PAGE NUMBERS

7    ON ALL OF THESE PAGES; RIGHT?

8    A.   RIGHT.

9    Q.   AND I'M TALKING ABOUT THE ONE ON THE BOTTOM IN THE MIDDLE,

10   JUST FOR EASE OF REFERENCE.

11   A.   OKAY.

12   Q.   THIS IS AN AMENDMENT TO THE PRIVATE PLACEMENT MEMORANDUM;

13   RIGHT?

14   A.   YES, IT IS.

15   Q.   OKAY.  AND IT DOES A COUPLE OF THINGS.  ONE IS IT

16   INCREASES THE MAXIMUM OFFERING TO 500 UNITS FOR $5 MILLION;

17   RIGHT?

18   A.   CORRECT.

19   Q.   NOW, DO YOU KNOW IF THAT'S SOME SORT OF A LEGAL LIMIT

20   THAT'S IMPOSED IN THIS KIND OF INVESTMENT?

21   A.   I DO NOT KNOW.

22   Q.   AND THEN IT TALKS ABOUT MICHAEL SWANSON IS NOW A PRINCIPAL

23   OF THE COMPANY; CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   DID YOU GET THIS DOCUMENT?
```

1    A.   YES, I DID.

2    Q.   OKAY.  AND IT DESCRIBES WHO MICHAEL SWANSON IS; CORRECT?

3    A.   CORRECT.

4    Q.   AND HE IS DESCRIBED AS A GRADUATE OF U.C. BERKELEY AND

5    EARNED HIS M.B.A. FROM MONTEREY INSTITUTE OF INTERNATIONAL

6    STUDIES.

7    A.   YES.

8    Q.   NOW, YOU DIDN'T SPEAK TO MICHAEL?

9    A.   I NEVER DID, NO.

10   Q.   AND YOU KNEW BARBRA; RIGHT?

11   A.   BARBRA'S THE ONLY ONE PERSONALLY THAT I EVER MET.

12   Q.   AND WHAT DID YOU KNOW ABOUT MICHAEL SWANSON?  ANYTHING

13   BEYOND THIS PARAGRAPH?

14   A.   I DIDN'T KNOW ANYTHING BEYOND THE PARAGRAPH, NO.

15   Q.   OKAY.  IT TALKS ABOUT HIM BEING THE DIRECTOR OF FINANCE

16   AND CORPORATE AFFAIRS FOR GRANGE FINANCIAL GROUP.  DO YOU SEE

17   THAT IN THE MIDDLE OF THE PARAGRAPH?

18   A.   YES, I DO, UM-HUM.

19   Q.   CORPORATE COMPLIANCE OFFICER FOR MATTERS RELATING TO THE

20   S.E.C. AND THE IRS.  DO YOU SEE THAT IN THE NEXT SENTENCE?

21   A.   YES, I DO.

22   Q.   CALIFORNIA DEPARTMENT OF CORPORATIONS; RIGHT?

23   A.   RIGHT, YES.

24   Q.   SO AT LEAST FROM THIS, HE SEEMS LIKE A FAIRLY

25   SOPHISTICATED, EXPERIENCED FINANCIAL GUY; RIGHT?

1          MR. KALEBA:  OBJECTION, YOUR HONOR.  CALLS FOR

2    SPECULATION ABOUT HIS QUALIFICATIONS.

3          THE COURT:  OVERRULED.

4        GO AHEAD.  YOU MAY ANSWER.

5          THE WITNESS:  I'M SORRY.  COULD YOU --

6    BY MR. LEEMING:

7    Q.   AT LEAST FROM THIS, HE SEEMS LIKE A FAIRLY SOPHISTICATED

8    AND KNOWLEDGEABLE FINANCIAL GUY?

9    A.   YES.

10   Q.   BUT YOU HAD NO FIRST-HAND KNOWLEDGE OF ANY OF THESE

11   QUALIFICATIONS, OR EVEN IF IT'S TRUE; RIGHT?

12   A.   NO, I DID NOT.

13   Q.   I GOT CONFUSED, TOO, ON VARIOUS PAGE NUMBERS, SO FORGIVE

14   ME.  I'LL GET THE RIGHT SPOT.

15        LET'S GO TO THE TOP OF PAGE 23, WHICH IS A GCF, LLC

16   OPERATING AGREEMENT.

17   A.   OKAY.

18   Q.   AND AGAIN, IT'S DATED NOVEMBER -- 1ST NOVEMBER 2006?

19   A.   CORRECT.

20   Q.   NOW, YOU'VE TALKED ABOUT A NUMBER OF THE THINGS IN HERE,

21   AND I'M NOT GOING TO GO OVER THOSE AGAIN, BUT WHAT I WANT TO DO

22   IS TO GO TO ARTICLE 5, AND THAT'S PAGE 29 AND 30 OF THE -- AND

23   THOSE ARE THE MIDDLE BOTTOM NUMBERS AGAIN.

24   A.   PAGE 29 AND --

25   Q.   PAGE 29 THROUGH 30.

1      A.    OKAY.

2      Q.    AND START ON PAGE 29 WHERE IT SAYS, "ARTICLE 5,

3      MANAGEMENT, AUTHORITY."

4      A.    YES.

5      Q.    OKAY.  I'M GETTING THERE NOW.  RIGHT.

6            SO 5.1.1, VERY BOTTOM OF THE PAGE, "THE COMPANY SHALL BE

7      MANAGED BY A MANAGING MEMBER, WHO MAY OR MAY NOT BE A MEMBER.

8      APS PROPERTIES, INCORPORATED, SHALL BE THE INITIAL MANAGING

9      MEMBER."

10     A.    CORRECT.

11     Q.    OKAY.  SO THAT'S NOT BARBRA ALEXANDER PERSONALLY; CORRECT?

12     A.    NO.  IT'S A&P PROPERTIES.

13     Q.    SO LET'S GO DOWN TO PAGE 5.2, "AUTHORITY."  I MEAN PAGE --

14     SECTION 5.2, "AUTHORITY."  SORRY.

15           IT SAYS, "THE MANAGING MEMBER SHALL HAVE ALL NECESSARY

16     AUTHORITY, CONSISTENT WITH THIS AGREEMENT, TO ACT ON THE

17     COMPANY'S BEHALF IN ALL MATTERS RELATING, CONCERNING THE

18     COMPANY BUSINESS AND PROPERTY, INCLUDING, WITHOUT LIMITATION,

19     THE AUTHORITY TO DO THE FOLLOWING."

20           AND THERE'S A CERTAIN SET -- THERE'S A SET OF, OF

21     PERMISSIONS THAT ARE GIVEN THE MANAGING MEMBER; RIGHT?

22     A.    CORRECT.

23     Q.    FOR LACK OF A BETTER WORD?

24     A.    UM-HUM.

25     Q.    "INVEST AND SPEND THE COMPANY FUNDS, INCLUDING, WITHOUT

```
 1     LIMITATION, FOR COMPANY FORMATION AND STRUCTURE."  RIGHT?

 2     A.   CORRECT.

 3     Q.   SO THAT SEEMS TO SUGGEST THAT THAT CAN EXCEED THE $15,000

 4     THAT'S DESCRIBED EARLIER, DOESN'T IT?

 5     A.   YES.

 6     Q.   INCLUDING MANAGEMENT AND OPERATIONS; RIGHT?

 7     A.   YES.

 8     Q.   CURRENT OR CAPITAL EXPENDITURES; RIGHT?

 9     A.   THAT'S WHAT IT SAYS HERE.

10     Q.   OKAY.  ARE YOU HAVING A HARD TIME READING IT?

11     A.   OH, I'M JUST TRYING TO FOLLOW YOU.

12     Q.   YES.  IT'S IN SECTION A.

13     A.   YEAH, I'VE GOT IT, UM-HUM.

14     Q.   IT GOES ON TO TALK ABOUT OTHER KINDS OF TRANSACTIONS,

15     COMMODITIES, OPTIONS, HEDGING TRANSACTIONS, EITHER FULLY PAID

16     OR ON MARGIN; RIGHT?

17     A.   YES, YES, IT DOES.

18     Q.   DO YOU KNOW WHAT "ON MARGIN" IS?

19     A.   NO, I DON'T.

20     Q.   OKAY.  AND THEN IT TALKS ABOUT THE AUTHORITY TO HIRE AND

21     FIRE PEOPLE; RIGHT?

22     A.   YES.

23     Q.   ENTER INTO NECESSARY AGREEMENTS; CORRECT?

24     A.   CORRECT.

25     Q.   SEE SECTION C, TO PROMOTE, DEVELOP, AND CONDUCT THE
```

1    COMPANY BUSINESS AND OTHERWISE CARRY OUT THE INTENT AND PURPOSE

2    OF THIS AGREEMENT.  RIGHT?

3    A.   CORRECT.

4    Q.   OKAY.  GET INSURANCE, THAT'S D, LITIGATE AND PAY AND HIRE

5    LAWYERS, THAT SORT OF THING; F, BORROW MONEY.

6    A.   UM-HUM.

7    Q.   G, LOAN MONEY, INCLUDING, WITHOUT LIMITATION, TO ANY

8    MEMBER FOR COMPANY PURPOSES, WITH OR WITHOUT SECURITY; RIGHT?

9    A.   YES, IT DOES SAY THAT.

10   Q.   IT DOES SAY THAT?

11   A.   UM-HUM.

12   Q.   AGAIN, YOU DON'T KNOW WHO WROTE THIS AGREEMENT?

13   A.   I DON'T.

14   Q.   IS THERE ANYTHING IN ANY OF THESE AGREEMENTS THAT REQUIRES

15   A&P TO INVEST YOUR FUNDS IN ANY PARTICULAR PIECE OF REAL

16   ESTATE?

17   A.   NO.

18   Q.   IS THERE ANYTHING IN THESE DOCUMENTS THAT REQUIRES A&P TO

19   INVEST YOUR FUNDS IN A SECURED DEED OF TRUST ON ANY PARTICULAR

20   DAY?

21   A.   NO, IT DOESN'T.

22   Q.   I'M GOING TO GO DOWN TO PAGE 42, WHICH IS THE SUBSCRIPTION

23   AGREEMENT.  ARE YOU THERE?

24   A.   I'M THERE.

25   Q.   OKAY.  AND THERE'S A NOTATION OF "FULLY EXECUTED" UP IN

1    THE UPPER RIGHT?

2    A.   YES.

3    Q.   DO YOU KNOW WHOSE HANDWRITING THAT IS?

4    A.   NO, I DON'T.

5    Q.   AND, AGAIN, THERE'S A -- THERE'S SOME REPRESENTATIONS BY

6    YOU WHICH YOU'VE READ THE DOCUMENTS.  I'M NOT GOING TO GO

7    THROUGH ALL OF THEM AND READ THEM AGAIN HERE, BUT THIS IS AT

8    PAGE 42, NUMBER 1, REPRESENTATIONS AND WARRANTIES.

9        DO YOU SEE THAT?

10   A.   YES.

11   Q.   AND WITHOUT GOING THROUGH THEM AGAIN IN DETAIL, IT

12   DESCRIBES A NUMBER OF DOCUMENTS AND YOU REPRESENT THAT YOU HAVE

13   DELIVERED THE CONFIDENTIAL INVESTOR SUITABILITY STATEMENT,

14   YOU'VE READ AND UNDERSTOOD THE OPERATING AGREEMENT, AND YOU'VE

15   READ AND UNDERSTOOD THE PRIVATE PLACEMENT MEMORANDUM WHICH

16   WE'VE BEEN REVIEWING.  CORRECT?

17   A.   CORRECT.

18   Q.   ALL RIGHT.  NOW, I'M NOT GOING TO GO THROUGH THE

19   GREENLIGHT FUND DOCUMENTS IN ANY DETAIL LIKE WE JUST DID, BUT

20   AS WE MENTIONED WHEN WE BEGAN, THEY'RE ESSENTIALLY THE SAME

21   THING WITH THE ADDITION OF THE MANAGING MEMBER MICHAEL SWANSON,

22   CORRECT?

23   A.   SWANSON, CORRECT.

24   Q.   ALL RIGHT.  AND I THINK -- DID YOU EVER HAVE CONTACT OR

25   CONVERSATION WITH MR. SWANSON?

SALISBURY DIRECT

1     A.   I DID NOT.

2          MR. LEEMING:  ALL RIGHT.  THANK YOU.  THAT'S ALL I

3     HAVE.

4          THE COURT:  ALL RIGHT.  THE TIME IS NOW 3:06.  IS

5     THERE ANY REDIRECT?

6          MR. KALEBA:  NO, YOUR HONOR.

7          THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

8     AND IS IT SUBJECT TO RECALL OR NOT?

9          MR. KALEBA:  YES, HE MAY BE EXCUSED, AND NO.

10         MR. LEEMING:  AGREED.

11         THE COURT:  OKAY.  NO RECALL.

12      ALL RIGHT.  YOU'RE EXCUSED.

13         THE WITNESS:  THANK YOU, YOUR HONOR.

14         THE COURT:  YOU MAY STEP DOWN AND LEAVE, SIR.

15      ALL RIGHT.  PLEASE CALL YOUR NEXT WITNESS.

16         MR. SCHENK:  THE UNITED STATES CALLS JOHN SALISBURY.

17      (JOHN SALISBURY, PLAINTIFF'S WITNESS, WAS SWORN.)

18         THE WITNESS:  I DO.

19         THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

20      AND WOULD YOU STATE YOUR NAME, PLEASE, AND SPELL IT?

21         THE WITNESS:  JOHN SALISBURY, S-A-L-I-S-B-U-R-Y.

22         THE CLERK:  THANK YOU.

23                    **DIRECT EXAMINATION**

24    BY MR. SCHENK:

25    Q.   GOOD AFTERNOON, SIR.  HOW ARE YOU?

```
 1      A.    THANK YOU.  I'M WELL.

 2      Q.    HOW ARE YOU EMPLOYED?

 3      A.    I WORK FOR THE VETERAN'S ADMINISTRATION HOSPITAL AS AN

 4      OPHTHALMOLOGIST.

 5      Q.    HOW LONG HAVE YOU WORKED FOR THE V.A. AS AN

 6      OPHTHALMOLOGIST?

 7      A.    FIVE YEARS.

 8      Q.    WHAT DID YOU DO BEFORE THAT?

 9      A.    I WAS AN OPHTHALMOLOGIST IN PRIOR PRACTICE IN MONTANA.

10      Q.    IS MONTANA YOUR CURRENT STATE OF RESIDENCE?

11      A.    YES.

12      Q.    HOW LONG HAVE YOU LIVED IN MONTANA?

13      A.    FOR 32 YEARS.

14      Q.    HAVE YOU HEARD OF AN INVESTMENT FIRM CALLED APS FUNDING?

15      A.    YES.

16      Q.    WHEN DID YOU FIRST HEAR ABOUT THEM?

17      A.    PROBABLY 2006, 2007.

18      Q.    OKAY.  WHO TOLD YOU ABOUT THEM?

19      A.    A FRIEND OF MINE.

20      Q.    AND WHO IS THAT INDIVIDUAL?

21      A.    WALT TAYLOR.

22      Q.    WHAT DID MR. TAYLOR TELL YOU ABOUT APS FUNDING?

23      A.    NOT A LOT.  HE JUST TOLD ME THAT IT WAS AN INVESTMENT

24      OPPORTUNITY THAT HE WAS LOOKING AT AND HAD PROBABLY DECIDED TO

25      INVEST IN.
```

1    Q.    OKAY.  DID HE SUGGEST TO YOU THAT YOU INVEST?

2    A.    NOT REALLY.

3    Q.    OKAY.  DID YOU AT SOME POINT MAKE A DECISION TO LOOK

4    FURTHER AT THIS INVESTMENT, TO PURSUE THIS INVESTMENT AT ALL?

5    A.    I DID.

6    Q.    AND WHEN WAS THAT?

7    A.    2006, 2007.

8    Q.    WAS IT FOLLOWING THE CONVERSATION WITH MR. TAYLOR?

9    A.    YES.

10   Q.    AND HOW DID YOU GO ABOUT PURSUING THE INVESTMENT?

11   A.    WELL, I DIDN'T EXACTLY PURSUE IT.  I WENT WITH MR. TAYLOR

12   TO MONTEREY FOR A CONFERENCE, AND DURING THAT TIME WE MET WITH

13   BARBRA ALEXANDER AND DISCUSSED WHAT THE OPPORTUNITIES AND THE

14   CONCEPTS WERE.

15   Q.    OKAY.  DID MR. TAYLOR AND MS. ALEXANDER HAVE A PREEXISTING

16   RELATIONSHIP?

17   A.    I BELIEVE, YES.

18   Q.    DO YOU KNOW THE EXTENT OR ANYTHING ABOUT THEIR

19   RELATIONSHIP?

20   A.    I KNOW THEY WERE -- I -- NO, I DON'T, OTHER THAN THE FACT

21   THAT THEY WERE FRIENDS, AND I THINK THEY MET ON AN ON-LINE

22   DATING SERVICE.

23   Q.    AND WHAT WAS THE REASON THAT BROUGHT YOU OUT TO MONTEREY

24   WITH MR. TAYLOR?

25   A.    A CONFERENCE ABOUT ADOBE SOFTWARE AND THE PRODUCTS THEY --

1   THEY WERE ACTUALLY PUTTING ON A CONVENTION THERE.

2   Q.   OKAY.  DO YOU HAVE AN INTEREST IN ADOBE?  WHY WOULD YOU

3   COME AND ATTEND SUCH A CONFERENCE?

4   A.   BECAUSE I USE THEIR SOFTWARE.

5   Q.   OKAY.  HOW DO YOU USE THEIR SOFTWARE?  WHAT DO YOU DO WITH

6   IT?

7   A.   PHOTOGRAPHY.

8   Q.   DO YOU HAVE A SIDE BUSINESS IN PHOTOGRAPHY, OR JUST AN

9   INTEREST IN IT?

10   A.   BOTH.

11   Q.   OKAY.  WHEN YOU WERE IN MONTEREY, DO YOU REMEMBER WHEN

12   THAT WAS, THE MONTH AND THE YEAR?

13   A.   I THINK IT WAS THE LATE WINTER, EARLY SPRING OF 2007.

14   Q.   OKAY.  DID MR. TAYLOR ARRANGE THE MEETING WITH

15   MS. ALEXANDER?

16   A.   WELL, WE ACTUALLY STAYED AT HER HOUSE, SO, YES, HE

17   PROBABLY DID.

18   Q.   AND HOW LONG WERE YOU THERE?  HOW MANY DAYS AND NIGHTS?

19   A.   THREE OR FOUR DAYS.  THREE NIGHTS AND FOUR DAYS PROBABLY.

20   Q.   DURING YOUR STAY AT MS. ALEXANDER'S HOUSE, DID SHE DISCUSS

21   WITH YOU AN INVESTMENT OPPORTUNITY?

22   A.   YES.

23   Q.   WHAT DID SHE SAY?

24   A.   SHE DESCRIBED A BUSINESS THAT SHE WAS DOING THAT INVESTED

25   IN REAL ESTATE AND PAID INTEREST AND BASICALLY HAD A REALLY

```
 1        HIGH RATE OF RETURN AND HAD A -- IT WAS DISTRESSED PROPERTIES

 2        OR PEOPLE THAT HAD BAD CREDIT, SO IT WAS A HIGHER RATE OF

 3        INTEREST.

 4        Q.   DID SHE GIVE YOU ANYTHING, ANY DOCUMENTS ABOUT THE

 5        INVESTMENT OPPORTUNITY WHEN YOU WERE AT HER HOUSE?

 6        A.   I HAD A BROCHURE.

 7             MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

 8             THE COURT:  YES.

 9        BY MR. SCHENK:

10        Q.   I'M GOING TO SHOW YOU WHAT'S BEEN MARKED FOR

11        IDENTIFICATION AS GOVERNMENT'S EXHIBIT 60.  IT'S ALSO IN THE

12        BINDER.

13             DO YOU RECOGNIZE THIS DOCUMENT (HANDING)?

14        A.   YES.

15        Q.   WHAT IS THAT?

16        A.   IT'S THE BROCHURE I HAVE AT HOME.

17             MR. SCHENK:  THE GOVERNMENT OFFERS EXHIBIT 60 IN

18        EVIDENCE.

19             MR. LEEMING:  NO OBJECTION.

20             THE COURT:  IT'S ADMITTED.

21        (PLAINTIFF'S EXHIBIT 60 WAS ADMITTED IN EVIDENCE.)

22             THE COURT:  GO AHEAD, PLEASE.

23             MR. SCHENK:  COULD WE PUBLISH EXHIBIT 60 TO THE JURY?

24        Q.   IS THE INFORMATION, AND I'LL BE MORE SPECIFIC THAN THAT --

25        LET'S FOCUS ON WHAT'S UNDER THE "WHAT DO WE OFFER" SECTION.
```

1          DO YOU SEE THAT ON THE SCREEN?

2     A.   YES.

3     Q.   COULD YOU READ 1 THROUGH 3 FOR THE JURY?

4     A.   "PLACE YOUR FUNDS WITH GCF INVESTMENT.

5          "WE USE YOUR FUNDS TO CLOSE LOANS FOR BORROWERS.

6          "THEN WE SERVICE THAT LOAN FOR YOU.  THAT MEANS WE COLLECT

7     THE PAYMENT FROM THE BORROWER AND SEND YOU A CHECK MONTHLY."

8     Q.   OKAY.  AND IS THAT CONSISTENT WITH THE WAY THAT

9     MS. ALEXANDER DESCRIBED THE INVESTMENT TO YOU?

10    A.   ROUGHLY, YES.

11    Q.   AND IF WE COULD TURN TO THE NEXT PAGE OF THIS EXHIBIT,

12    UNDER THE "WHAT IS MY MONEY DOING" SECTION, WOULD YOU READ THAT

13    SECTION TO THE JURY, PLEASE?

14    A.   "YOUR MONEY IS PLACED IN SHORT-TERM, RECORDED DEEDS OF

15    TRUST ON REAL PROPERTY.

16         "THE PURPOSE OF THESE LOANS CAN BE FOR NEW CONSTRUCTION; A

17    PORTION OF THE ORIGINAL PURCHASE PRICE; A 2ND DEED OF TRUST FOR

18    THE BORROWER TO IMPROVE OR REMODEL THE PROPERTY; OR FOR ANY

19    OTHER PURPOSE DESIRED BY THE BORROWER.

20         "SHORT-TERM LOANS ARE ADVANTAGEOUS TO YOU BECAUSE THEY

21    EARN INTEREST AT A RATE THAT IS SLIGHTLY HIGHER THAN

22    CONVENTIONAL MORTGAGE LOANS AND CAN MAKE YOU MORE MONEY THAN A

23    SAVINGS ACCOUNT WITHOUT THE UPS AND DOWNS OF THE STOCK MARKET.

24    THESE LOANS PAY AN AVERAGE RETURN OF 10-PLUS PERCENT TO OUR

25    INVESTORS."

SALISBURY DIRECT

```
1    Q.   OKAY.  IS THAT CONSISTENT WITH THE WAY THAT MS. ALEXANDER

2    DESCRIBED THE INVESTMENT TO YOU?

3    A.   YES.

4    Q.   DID SHE AT SOME POINT TELL YOU THAT THE LOAN -- I'M

5    SORRY -- THAT YOUR MONEY WOULD BE USED TO INVEST IN PROPERTY,

6    IN REAL PROPERTY?

7    A.   YES.

8    Q.   DID SHE TELL YOU WHETHER THE LOANS THAT SHE MADE WOULD BE

9    SECURED?

10   A.   WELL, MY UNDERSTANDING WAS THAT IT WAS ON SECOND DEEDS.

11   Q.   OKAY.  SO A SECURED SECOND DEED OF TRUST?

12   A.   THAT WAS MY UNDERSTANDING.

13   Q.   AND WAS THE FACT THAT IT WAS A SECURED INVESTMENT

14   IMPORTANT TO YOU?

15   A.   IT WAS.

16   Q.   OKAY.  WHY DO YOU SAY THAT?

17   A.   WELL, BECAUSE YOU KIND OF WANT SOME BACKUP, A SECURITY FOR

18   THE MONEY YOU PLACE THERE.

19   Q.   SURE.

20   A.   IT'S SORT OF STANDARD LOANS AND REPAYMENT.

21   Q.   WAS THE CONVERSATION THAT YOU HAD WITH MS. ALEXANDER ABOUT

22   THE INVESTMENT ALL OVER THE COURSE OF ONE DAY WHEN YOU WERE OUT

23   THERE, OR THE SEVERAL DAYS?  YOU SAID THAT YOU WERE OUT THERE

24   FOR MORE THAN ONE DAY?  DID IT HAPPEN, LIKE, EVOLVING OVER THE

25   TIME THAT YOU WERE THERE, OR OVER ONE AFTERNOON?
```

1    A.   OH, I'M SURE -- I DON'T REMEMBER SPECIFICALLY, BUT

2    GENERALLY HOW THINGS WENT, BUSINESS AND PLEASURE WERE SORT OF

3    ALWAYS, ALWAYS THERE.  SO IT'S HARD, IN MY MIND, TO SEPARATE

4    IT.

5    Q.   WHAT DO YOU MEAN BY THAT?

6    A.   BUT IT WASN'T AN HOUR CONVERSATION.  IT WASN'T THE INTENSE

7    SIT DOWN.

8    Q.   OKAY.  YOU SAID THAT BUSINESS AND PLEASURE WERE ALWAYS

9    MIXED TOGETHER.  WHAT DO YOU MEAN BY THAT?

10   A.   WELL, I WAS OUT THERE ON A RELATIVELY PLEASURE TYPE

11   ALLOCATION, AND IT WAS ALWAYS A TOPIC OF CONVERSATION.  IT WAS

12   ALWAYS SORT OF INTERTWINED.

13   Q.   WHAT'S THE "IT" IN WHAT YOU JUST SAID?

14   A.   THE DISCUSSION OF THE PROPERTIES, HOW THE INVESTMENTS ARE

15   GOING, WHAT THE FUTURE MIGHT BE, WHAT OTHER THINGS WERE GOING

16   ON, THINGS LIKE THAT.

17   Q.   WHAT DID MS. ALEXANDER SAY TO YOU ABOUT HOW THE

18   INVESTMENTS WERE GOING?

19   A.   I NEVER HAD A -- I NEVER HAD A NEGATIVE.

20   Q.   WHAT DO YOU MEAN?

21   A.   THINGS WERE PERFORMING WELL.

22   Q.   OKAY.  DID YOU EVENTUALLY MAKE A DECISION TO INVEST?

23   A.   EVENTUALLY I DID.

24   Q.   DID YOU INVEST ALL AT ONCE OR OVER SEVERAL PERIODS OF

25   TIME?

1    A.    SEVERAL PERIODS OF TIME.

2    Q.    OKAY.  DO YOU RECALL WHEN YOU MADE YOUR FIRST INVESTMENT?

3    A.    I THINK IT WAS IN 2007.  I DON'T REMEMBER THE MONTH.

4    Q.    OKAY.  HOW MUCH DID YOU INVEST THAT FIRST TIME?

5    A.    I HAD TWO $50,000 PLACEMENTS, AND THEN IN 2009, $100,000.

6    Q.    OKAY.  SO 200,000 ALL TOGETHER?

7    A.    CORRECT.

8    Q.    DID MS. ALEXANDER EVER GIVE YOU DOCUMENTS TO REVIEW OR

9    SIGN BEFORE YOU MADE THIS INVESTMENT?

10   A.    NOT THAT I'M AWARE OF.

11   Q.    OKAY.  NO DOCUMENT CALLED A PRIVATE PLACEMENT MEMORANDUM?

12   A.    NO.

13   Q.    NO OPERATING AGREEMENT?

14   A.    NOT THAT I'M AWARE OF.

15   Q.    NO SUBSCRIPTION AGREEMENT?

16   A.    NOT THAT I'M AWARE OF.

17   Q.    DID SHE EVER ASK YOU WHAT YOUR NET WORTH WAS?

18   A.    NO.

19   Q.    DID SHE EVER ASK YOU ABOUT YOUR HISTORY OF INVESTING, THE

20   TYPES OF INVESTMENTS YOU'D DONE IN THE PAST?

21   A.    NOT SPECIFICALLY.  IT COULD HAVE COME OUT IN CONVERSATION.

22   Q.    OKAY.  YOU SAID TO US EARLIER THAT YOU HAD COME OUT WITH

23   MR. TAYLOR AND STAYED AT HER HOME, AND I THINK YOU SAID THAT

24   YOU THOUGHT THAT WAS ABOUT IN 2007.  IS THAT RIGHT?

25   A.    I THINK SO, YES.

1    Q.   AND THE FIRST $100,000 INVESTMENT THAT YOU MADE THAT WAS

2    SPLIT IN TWO $50,000 CHECKS, THAT WAS ALSO IN 2007?

3    A.   I BELIEVE THAT'S CORRECT.

4    Q.   DO YOU KNOW ABOUT HOW FAR APART THE TWO WERE, THAT IS,

5    FROM THE TIME YOU SPENT OUT AT HER HOME IN MONTEREY TO WHEN YOU

6    MADE THIS $100,000 INVESTMENT?

7    A.   I THINK IT MAY HAVE BEEN SIX -- FOUR TO SIX WEEKS.

8    Q.   OKAY.  DID YOU HAVE CONVERSATIONS WITH MS. ALEXANDER IN

9    THOSE INTERVENING WEEKS?  AFTER YOU WENT BACK HOME TO MONTANA

10   FROM MONTEREY, DID YOU CONTINUE TO TALK TO HER ABOUT THE

11   INVESTMENT?

12   A.   I MIGHT HAVE, BUT I DON'T RECOLLECT SPECIFIC

13   CONVERSATIONS.

14   Q.   IT WAS A WHILE AGO?

15   A.   YES.

16   Q.   DID SHE GIVE YOU AN OPPORTUNITY TO GET -- YOU'VE TALKED

17   ABOUT THE MONTHLY RETURN THAT WAS PROMISED -- TO GET THAT PAID

18   TO YOU BY CHECK EVERY MONTH OR TO ROLL IT OVER?

19   A.   AT FIRST I TOOK IT AS CHECKS, MONTHLY CHECKS.

20   Q.   OKAY.  AND YOU SAY "AT FIRST."  WHAT DO YOU MEAN?

21   A.   WELL, UNTIL I MADE THE SECOND 100,000 INVESTMENT.

22   Q.   OKAY.  IN 2007, YOU INVESTED 100,000 AND YOU BEGAN TO

23   RECEIVE MONTHLY CHECKS?

24   A.   CORRECT.

25   Q.   WAS THERE ANY PROBLEM WITH THE CHECKS?  DID YOU GET THEM

1      ON TIME?

2      A.   YES.

3      Q.   UNTIL WHEN?

4      A.   UNTIL PROBABLY WHEN I MET WITH MR. TAYLOR AND

5      MS. ALEXANDER IN LAS VEGAS AND WE TALKED ABOUT A SECOND

6      INVESTMENT AND IT WAS SUGGESTED THAT, YOU KNOW, THE MONEY WOULD

7      GROW FASTER AT COMPOUND INTEREST IF WE LET IT SORT OF RIDE.

8      Q.   OKAY.

9      A.   AND THAT WAS 2009.

10     Q.   YOU SAID "IT WAS SUGGESTED."  WHO SUGGESTED THAT THE MONEY

11     WOULD GROW FASTER IF YOU LEFT YOUR MONEY IN AS OPPOSED TO

12     RECEIVING MONTHLY CHECKS?

13     A.   MS. ALEXANDER.

14     Q.   WHEN WAS THIS, IF YOU RECALL, MEETING IN LAS VEGAS?

15     A.   AGAIN, I THINK THAT PROBABLY WAS EARLY FALL, MAYBE

16     SEPTEMBER, OCTOBER.

17     Q.   OF?

18     A.   2009.

19     Q.   WHAT WERE THE CIRCUMSTANCES OF THIS MEETING?  WHAT BROUGHT

20     THE THREE OF YOU TO LAS VEGAS?

21     A.   WELL, I WENT THERE TO MEET PART OF MY FAMILY, MR. TAYLOR

22     WAS THERE AT A CONVENTION, AND I DON'T KNOW WHY

23     BARBRA ALEXANDER WAS THERE.

24     Q.   OKAY.  DID YOU GUYS HAVE DINNER TOGETHER?  HOW DID YOU END

25     UP MEETING IN VEGAS?

1     A.    WE SPENT AN AFTERNOON AND EVENING AT DINNER, YES.

2     Q.    DID YOU ASK MS. ALEXANDER ABOUT THE HEALTH OF THE COMPANY

3     BEFORE YOU MADE THIS SECOND INVESTMENT?

4     A.    DEFINITELY.

5     Q.    WHAT -- IF YOU CAN REMEMBER, WHAT DID YOU ASK?

6     A.    I DO REMEMBER, BECAUSE IT WAS A PHONE CALL AND IT WAS IN

7     2009 AND THE REAL ESTATE MARKET WASN'T DOING WELL.  SO I WAS

8     JUST ASKING, YOU KNOW, "HAVE YOU HAD LOANS NON-PERFORMING?

9     HAVE YOU HAD ANY PROPERTIES REPOSSESSED, PEOPLE WALKING AWAY

10    FROM LOANS?  HOW'S THE HEALTH AND EVERYTHING?"

11          BECAUSE AT THAT TIME I WAS CONSIDERING MAKING ANOTHER

12    INVESTMENT.

13          AND THE ANSWER WAS ABSOLUTELY NOT, EVERYTHING IS FINE.

14    Q.    OKAY.  AND DID YOU DECIDE TO MAKE A SECOND INVESTMENT AT

15    THIS POINT?

16    A.    I DID.

17    Q.    HOW MUCH?

18    A.    100,000.

19    Q.    WOULD YOU TURN TO, IT'S IN THE BINDER THAT'S IN FRONT OF

20    YOU, EXHIBIT 37.

21          DO YOU RECOGNIZE THAT DOCUMENT?  AND LET ME BE A LITTLE

22    BIT MORE SPECIFIC.

23    A.    I DO RECOGNIZE THE TRANSACTION.

24          MR. SCHENK:  YOUR HONOR, I THINK WE SHOULD JUST MOVE

25    THIS DOCUMENT IN PURSUANT TO THE STIPULATION AT THIS POINT AND

```
 1      THEN I'LL ASK QUESTIONS WHEN IT'S ON THE SCREEN.

 2               THE COURT:  ALL RIGHT.  ANY OBJECTION?

 3               MR. LEEMING:  THERE'S NO OBJECTION.

 4               THE COURT:  ALL RIGHT.  IT'S ADMITTED.

 5          (PLAINTIFF'S EXHIBIT 37 WAS ADMITTED IN EVIDENCE.)

 6               THE COURT:  GO AHEAD, PLEASE.

 7               MR. SCHENK:  THANK YOU.  CAN WE PUBLISH EXHIBIT 37 TO

 8      THE JURY?

 9               THE COURT:  GO AHEAD, PLEASE.

10      BY MR. SCHENK:

11      Q.   I'M GOING TO ASK YOU A COUPLE OF QUESTIONS, BUT LET'S ZOOM

12      IN.  IT MIGHT ACTUALLY BE EASIER FOR YOU IF YOU LOOK AT THE

13      PAPER COPY.  WE'LL SEE WHEN WE ZOOM IN.

14          ABOUT FIVE OR SIX LINES DOWN FROM THE TOP, THERE'S A

15      SECTION THAT'S TITLED "DATE RECEIVED."

16          DO YOU SEE THAT?

17      A.   YES, I DO.

18      Q.   WHAT'S THE DATE?

19      A.   OCTOBER 20TH, 2009.

20      Q.   OKAY.  AND IS THAT DATE SIGNIFICANT TO YOU WITH REGARD TO

21      YOUR INVESTMENT?

22      A.   WELL, THAT WAS -- I DON'T KNOW WHAT YOU MEAN BY

23      "SIGNIFICANT."

24      Q.   IS THAT WHEN YOU MADE YOUR INVESTMENT?

25      A.   YES.
```

1    Q.   IF WE COULD NOW GO A FEW LINES BELOW THAT, THERE'S AN

2    "AMOUNT" SECTION.

3         DO YOU SEE THAT?

4    A.   I DO.

5    Q.   WHAT'S THE AMOUNT?

6    A.   $100,000.

7    Q.   IS THAT THE AMOUNT OF YOUR INVESTMENT?

8    A.   CORRECT.

9    Q.   THERE'S A BANK LISTED ON THIS, THE SCREEN THAT'S BLOWN UP

10   JUST BELOW THAT.  WHICH BANK IS THAT?

11   A.   BANK OF AMERICA.

12   Q.   AND IS THAT YOUR BANK?

13   A.   YES.

14   Q.   OKAY.  IF WE COULD GO NOW DOWN TO THE SECTION THAT'S

15   TITLED "CREDIT INFO," AND THERE'S A NAME AND ADDRESS.

16        WHAT'S THAT?

17   A.   APS FUNDING INCORPORATED, 484B WASHINGTON STREET,

18   NUMBER 350, MONTEREY, CALIFORNIA.

19   Q.   IS THAT -- I'M SORRY.  IS THAT WHERE YOU SENT YOUR MONEY?

20   A.   YES.

21   Q.   NOW, IF WE COULD GO DOWN TOWARDS THE BOTTOM OF THE

22   DOCUMENT, THERE'S A SECTION THAT IS TITLED "ORG."

23        DO YOU SEE THAT SECTION?

24   A.   YES.

25   Q.   IT LISTS SOME NAMES AND AN ADDRESS.  COULD YOU TELL THE

1    JURY WHOSE NAMES THOSE ARE AND WHOSE ADDRESS THAT IS?

2    A.   GAYLE SALISBURY, JOHN SALISBURY, AND THAT IS OUR ADDRESS.

3    DO YOU WANT ME TO READ IT?

4    Q.   NO, NO.  BUT IS GAYLE YOUR WIFE?

5    A.   CORRECT.

6    Q.   AND BELOW THAT IS MERRILL LYNCH?

7    A.   CORRECT.

8    Q.   WAS MERRILL LYNCH INVOLVED IN THE TRANSACTION ALSO?

9    A.   THEY WERE PART OF BANK OF AMERICA.

10   Q.   OKAY.  IS THIS THEN THE DOCUMENT THAT SUPPORTS THE WIRE?

11        I SHOULD SAY, HOW DID YOU SEND YOUR MONEY TO APS?

12   A.   WIRED IT.

13   Q.   OKAY.  AND WHEN YOU WERE DECIDING TO MAKE THIS INVESTMENT,

14   YOU TOLD US A MOMENT AGO THAT MS. ALEXANDER HAD DESCRIBED TO

15   YOU THAT HER COMPANY WAS HEALTHY, THAT THINGS WERE GOING WELL

16   EVEN IN 2009.

17        DO YOU RECALL THAT?

18   A.   YES.

19   Q.   DID THAT MATTER TO YOU WHEN YOU DECIDED TO MAKE THIS

20   INVESTMENT?

21   A.   YES.

22   Q.   WHY?

23   A.   WELL, IF THEY WERE HAVING -- IF APS WAS HAVING THE SAME

24   PROBLEM AS THE REAL ESTATE MARKET GENERALLY, IT WOULD HAVE

25   DEFINITELY ENTERED INTO MY DECISION WHETHER I WAS GOING TO PUT

1      MORE MONEY IN.

2      Q.   AND AT THE SAME TIME, YOU CHANGED YOUR MIND ABOUT

3      RECEIVING MONTHLY CHECKS.  IS THAT RIGHT?

4      A.   YES.

5      Q.   SO DID YOU CEASE RECEIVING MONTHLY CHECKS AT THAT POINT?

6      A.   YES.

7      Q.   FOR THIS INVESTMENT AND YOUR FIRST 100,000?

8      A.   YES.

9      Q.   AFTER THIS INVESTMENT IN OCTOBER OF 2009, DID THERE COME A

10     POINT WHEN YOU WERE -- WHEN YOU BECAME CONCERNED ABOUT THE

11     HEALTH OF YOUR INVESTMENT?

12     A.   YES.

13     Q.   AND WHEN WAS THAT?

14     A.   IT WAS PROBABLY, YOU KNOW, I -- IT MAY HAVE BEEN

15     JANUARY 2010.

16     Q.   OKAY.  WHAT CAUSED THE CONCERN?

17     A.   I HAVE -- I RECEIVED AN E-MAIL FROM SOME PEOPLE WE DIDN'T

18     KNOW, BUT IT SOUNDED LIKE THEY WERE CONCERNED ABOUT THE OVERALL

19     INVESTMENT.  WE DIDN'T KNOW WHO THEY WERE, BUT THEY WERE

20     TALKING ABOUT GOLD COAST, APS PROBLEMS.

21     Q.   OKAY.  AND WHAT DID THE E-MAIL SAY?

22     A.   WELL, IT WAS PRETTY ALARMING.  THE PERSON HAD SAID THAT

23     THE --

24              MR. LEEMING:  OBJECTION.  HEARSAY.

25              MR. SCHENK:  YOUR HONOR --

```
 1                    THE COURT:  SUSTAINED.

 2                    MR. SCHENK:  IT'S THE SAME.  IT'S NOT OFFERED FOR THE

 3      TRUTH.  IT'S THE EFFECT ON WHAT HE DID IN RESPONSE TO RECEIVING

 4      IT.

 5                    THE COURT:  I THINK YOU CAN DO IT IN A WAY THAT

 6      DOESN'T ELICIT HEARSAY STATEMENTS.

 7                    MR. SCHENK:  OKAY.

 8      Q.   DID THE CONTENT OF THE E-MAIL CAUSE YOU TO DO SOMETHING?

 9      A.   YES.

10      Q.   WHAT DID YOU DO IN RESPONSE TO RECEIVING THE E-MAIL?

11      A.   WELL, I GOOGLED TO SEE IF THE STATEMENTS IN THE E-MAIL

12      COULD BE SUBSTANTIATED AND FOUND THAT IN THE LOCAL PAPER --

13                    MR. LEEMING:  OBJECTION.  HEARSAY.

14                    MR. SCHENK:  YOUR HONOR, SAME RESPONSE.  THIS

15      CERTAINLY ISN'T --

16                    THE COURT:  ALL RIGHT.  OVERRULED.

17          GO AHEAD.  YOU MAY ANSWER.

18                    THE WITNESS:  I GOOGLED THIS AND FOUND THAT THERE WAS

19      A LOCAL NEWSPAPER REPORT ABOUT AN FBI RAID ON MS. ALEXANDER'S

20      HOUSE WHERE THEY HAD TAKEN COMPUTERS AND DOCUMENTS, AND THAT

21      CAUSED CONCERN.

22      BY MR. SCHENK:

23      Q.   WHAT DID YOU DO WHEN YOU SAW THIS ARTICLE?

24      A.   I TALKED TO MR. TAYLOR, WHO WAS STILL, I FELT, IN A BETTER

25      POSITION TO TALK TO MS. ALEXANDER TO TRY TO FIND THE TRUTH.
```

1    Q.   OKAY.  AND WHAT DID HE SAY?

2              MR. LEEMING:  OBJECTION.  HEARSAY.

3              THE COURT:  SUSTAINED.

4              MR. SCHENK:  IT'S THE SAME RESPONSE.  IT'S NOT

5    OFFERED FOR THE TRUTH.

6              THE COURT:  SUSTAINED.

7    BY MR. SCHENK:

8    Q.   DID YOU EVER CONTACT MS. ALEXANDER?

9    A.   NO, NOT AT THAT POINT.

10   Q.   AT ANY POINT AFTER YOU SAW THIS NEWSPAPER ARTICLE IN ABOUT

11   JANUARY 2010, DID YOU REACH OUT TO APS FUNDING?

12   A.   WE WERE -- NO.

13   Q.   OKAY.  DID YOU HAVE AN OPPORTUNITY AT SOME POINT IN 2010

14   TO SPEAK WITH MS. ALEXANDER?

15   A.   I DID.

16   Q.   AND WHEN WAS THAT?

17   A.   FEBRUARY, MARCH.

18   Q.   OKAY.  WHAT CAUSED THAT COMMUNICATION?

19   A.   THAT ACTUALLY PROBABLY WAS PRECIPITATED BY A CALL FROM

20   MS. ALEXANDER.

21   Q.   SHE CALLED YOU?

22   A.   I -- YES.

23   Q.   AND WHAT DID SHE ASK?

24   A.   PARDON?

25   Q.   WHAT DID SHE ASK?

1    A.   WELL --

2    Q.   WHAT WAS THE -- WHAT DID YOU TALK ABOUT ON THAT CALL?

3    A.   WELL, SHE INDICATED THAT THERE WAS A PROBLEM AND THAT

4    THERE WERE PEOPLE THAT WERE TRYING TO TAKE CONTROL OF THE

5    COMPANY AND THAT SHE WASN'T SURE HOW THE INVESTMENTS WERE GOING

6    TO GO, AND THAT MAYBE OUR BEST SITUATION WOULD BE TO TRANSFER

7    THE ASSETS FROM APS/GOLD COAST TO ANOTHER BUSINESS THAT SHE HAD

8    AND SHE FELT THAT THERE WAS MORE EQUALITY AND MAYBE BETTER

9    PROTECTION.

10   Q.   WHAT BUSINESS WAS THAT?

11   A.   MONEY DOTS RADIO SYNDICATE.

12   Q.   AND WHAT DID SHE OFFER YOU?  WHAT DID SHE SUGGEST?

13   A.   WELL, SHE OFFERED TO BASICALLY SWITCH ASSETS FROM APS TO

14   MONEY DOTS.

15   Q.   AND WHAT WAS HER EXPLANATION FOR THE REASON YOU SHOULD DO

16   THAT?

17   A.   AT SOME POINT WE GOT THE IDEA THAT MAYBE THE ASSETS WERE

18   GOING TO BE SEIZED.

19   Q.   OKAY.  DID SHE TELL YOU THAT?

20   A.   I BELIEVE SO.  I -- IN SOME WAY I GOT THAT IDEA, SO IT

21   PROBABLY CAME FROM THAT.

22              MR. LEEMING:  OBJECTION.  MOVE TO STRIKE.

23              THE COURT:  OVERRULED.

24   BY MR. SCHENK:

25   Q.   DID YOU, AT SOME POINT, AGREE TO SWITCH YOUR ASSETS TO

1        MONEY DOTS?

2        A.   YES.

3        Q.   WHAT'S INVOLVED IN SWITCHING YOUR ASSETS TO MONEY DOTS?

4        WHAT DOES THAT MEAN?

5        A.   I'M NOT REALLY SURE.  WE TRIED TO FIND A LAWYER TO CONTACT

6        AND I GOT A LAWYER IN MONTANA AND WE WROTE LETTERS TO SAY THAT

7        WAS OUR INTENT.  SO I'M NOT QUITE SURE THAT IT EVER GOT DONE.

8        I NEVER GOT ANYTHING BACK.

9        Q.   AND WHEN YOU SAY YOUR ASSETS, DO YOU MEAN THE 200,000 THAT

10       WAS, YOU THOUGHT, WITH APS?

11       A.   CORRECT.

12       Q.   DID MS. ALEXANDER SEND YOU ANYTHING SUBSTANTIATING YOUR

13       INVESTMENT IN MONEY DOTS?

14       A.   WE GOT WHAT I THINK WAS AN OPERATING AGREEMENT, ENOUGH TO

15       GIVE ME AN IDEA OF SORT OF HOW MONEY DOTS MIGHT WORK.

16       Q.   OKAY.  DID YOU RECEIVE ANY OF YOUR MONEY BACK AFTER YOU

17       SWITCHED YOUR ASSETS TO MONEY DOTS?

18       A.   NO.

19       Q.   AFTER THIS PHONE CALL THAT YOU SAID BARBRA MADE TO YOU,

20       DID YOU HAVE THE OPPORTUNITY TO SPEAK WITH HER AGAIN?

21       A.   YES.

22       Q.   AND WHAT WAS -- WHEN WAS THAT?

23       A.   IT WAS PROBABLY AN ONGOING PROCESS, A WEEK OR A COUPLE OF

24       WEEKS IN BETWEEN.  BUT IT WAS MOSTLY ABOUT NOW THAT WE WERE

25       INVESTORS IN MONEY DOTS, THERE WAS A CERTAIN AMOUNT OF OVERHEAD

1    THAT NEEDED TO BE KEPT GOING, AND SO WE DISCUSSED THE

2    POSSIBILITY OF FUNDING THIS RADIO PROGRAM AND THE IDEAS AND WHO

3    WAS COMING AND HOW IT GOES AND STUFF LIKE THAT.

4    Q.   DID MS. ALEXANDER ASK YOU FOR MORE MONEY?

5    A.   SHE DID.

6    Q.   HOW MUCH DID SHE ASK FOR?

7    A.   MY REMEMBRANCE IS 24,000 A MONTH.

8    Q.   OKAY.  AND DID YOU AGREE TO GIVE HER $24,000 A MONTH?

9    A.   I AGREED TO GIVE SOME MONEY.

10   Q.   WHY?

11   A.   WELL, AT THIS POINT NOBODY WAS TALKING TO US.  MY FRIEND

12   WAS PRETTY DEVASTATED BECAUSE HE WAS -- HE ACUTELY FELT THE

13   LOSS AND WAS -- AND I THOUGHT MAYBE IT WOULD BUY US SOME TIME.

14            MR. LEEMING:  YOUR HONOR, THIS IS IRRELEVANT AND

15   HEARSAY.

16            THE COURT:  OVERRULED.

17   BY MR. SCHENK:

18   Q.   MR. TAYLOR'S LOSS LED YOU TO GIVE MS. ALEXANDER SOME

19   ADDITIONAL MONEY?

20   A.   WELL, I FIGURED IF WE -- IF I GAVE HER THE MONEY AND WE

21   KEPT TALKING, WE MIGHT FIND OUT WHAT WAS ACTUALLY HAPPENING.

22   Q.   YOU THOUGHT THE MONEY WOULD OPEN LINES OF COMMUNICATION?

23   A.   KEEP THEM OPEN.

24   Q.   HOW MUCH DID YOU GIVE?

25   A.   12,000 -- NO.  8,000 THE FIRST TIME.

1    Q.   THE FIRST TIME.  WAS THERE A SECOND TIME?

2    A.   YES.  WELL, THIS WAS SUPPOSEDLY AN ONGOING $24,000 A

3    MONTH.

4    Q.   SO THE FIRST MONTH YOU SAID YOU GAVE 8,000?

5    A.   CORRECT.

6    Q.   DID YOU HAVE MORE CONVERSATIONS WITH HER THE FOLLOWING

7    MONTH?

8    A.   YES.

9    Q.   HOW MUCH DID SHE ASK FOR THEN?

10   A.   24,000.

11   Q.   AND HOW MUCH DID YOU GIVE?

12   A.   FOUR.

13   Q.   DID YOU AT SOME POINT DEMAND SOME COLLATERAL, SOME

14   SECURITY FOR THESE NEW CHECKS YOU WERE WRITING TO HER?

15   A.   I DID.

16   Q.   WHAT DID YOU ASK FOR?

17   A.   I SAID, "WELL, YOU KNOW, YOU'RE GETTING MONEY.  WHAT CAN

18   YOU GIVE ME AS COLLATERAL?"

19   Q.   WHAT DID SHE SAY?

20   A.   PARDON?

21   Q.   I'M SORRY.  WHAT DID SHE SAY?

22   A.   NOTHING.

23        MR. LEEMING:  YOUR HONOR, OBJECTION.  CAN WE

24   APPROACH?

25        THE COURT:  IT'S OVERRULED.  THESE ARE THE

1        DEFENDANT'S OWN ADMISSIONS.

2                MR. LEEMING:  THIS IS 404(B) EVIDENCE, YOUR HONOR,

3        UNNOTICED.

4                THE COURT:  ALL RIGHT.  WHY DON'T YOU APPROACH?

5                (PAUSE IN PROCEEDINGS.)

6                THE COURT:  WE CAN MEMORIALIZE THIS AFTERWARDS IF

7        THAT'S NOT WORKING.

8                WHY DON'T WE GO AHEAD AND TAKE A TEN MINUTE BREAK NOW

9        UNTIL 3:40?

10               ALL RIGHT.  PLEASE DON'T DISCUSS OR RESEARCH THE CASE.

11       LET'S SAY 3:45.  THANK YOU.

12               AND YOU MAY STEP DOWN.

13               PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

14               (JURY OUT AT 3:32 P.M.)

15               THE COURT:  OKAY.  WHAT IS THE 404(B)?

16               MR. LEEMING:  YOUR HONOR, I BELIEVE -- ACTUALLY, I

17       WAS SURPRISED TO BE HEARING THIS LINE OF QUESTIONING.

18               THE -- I THINK THE WITNESS IS GOING TO BE ASKED ABOUT

19       ASKING FOR SOME COLLATERAL AND RECEIVING SOME JEWELRY THAT WAS

20       REPRESENTED TO HAVE A CERTAIN VALUE THAT HE TOOK TO A JEWELER

21       AND THE JEWELER DID NOT DO AN APPRAISAL, BUT OPINED THAT THE

22       VALUE OF THE JEWELRY WAS LESS THAN WHAT HAD BEEN REPRESENTED TO

23       HIM, WHICH RAISES A NUMBER OF HEARSAY 404(B).  IT'S ANOTHER BAD

24       ACT, IT'S IMPLICATION OF FRAUD THAT IS UNFOUNDED, AND I THINK

25       IT'S IRRELEVANT.

```
 1                 THE COURT:  THIS CAME UP IN MR. SWANSON'S TRIAL, I

 2       VAGUELY RECALL, SO IT'S NOT REALLY NEW.  YOU HAVE THE TRIAL

 3       TRANSCRIPT.

 4                 MR. SCHENK:  THERE'S --

 5                 THE COURT:  I RECALL THIS COMING UP IN THE LAST

 6       TRIAL.

 7                 MR. SCHENK:  AND IT'S IN 302'S WITH MR. -- FROM

 8       DR. SALISBURY THAT HAVE BEEN TURNED OVER.

 9            BUT MORE TO THE POINT, IT'S ABSOLUTELY NOT 404(B)

10       EVIDENCE.  IT'S NOT EVIDENCE OF HER, OF SOMEONE'S BAD CHARACTER

11       THAT WE'RE TRYING TO ESTABLISH A PARTICULAR FACT.

12            IT'S 401.  IT'S RELEVANT EVIDENCE.  IT SHOWS THAT SHE IS

13       DOING WHATEVER SHE CAN TO PREVENT DR. SALISBURY FROM GOING TO

14       THE COPS, FROM KNOWING THAT THE JIG IS UP, BUT RATHER, TO

15       STRING HIM ALONG AND GET HIM TO KEEP PROVIDING HER MONEY.

16            I MEAN, ONCE COMMUNICATION ENDS FROM MS. ALEXANDER'S

17       PERSPECTIVE, ONCE THE VICTIMS FEEL LIKE THEY'RE NOT GETTING

18       THEIR MONEY BACK AND THERE MIGHT HAVE BEEN FRAUD HERE, THEY GO

19       TO THE COPS.

20            SO ANYTHING SHE CAN DO TO LULL THEM, TO PREVENT THAT FROM

21       HAPPENING, TO KEEP THE RELATIONSHIP GOING, ASKING FOR MORE

22       MONEY, SENDING THINGS TO HIM TO TRY TO SECURE HIM AS A SOURCE

23       OF FUNDS IS 401.  THAT'S WHAT WE'RE HERE FOR AND WHAT THE JURY

24       IS HERE TO DECIDE.

25                 IT'S NOT 404(B) AT ALL.
```

1              MR. LEEMING:  I SEE IT AS A SEPARATE AND DISTINCT BAD

2    ACT WHICH RAISES A NUMBER OF ISSUES WHICH I'VE ALREADY OUTLINED

3    TO THE COURT AND I JUST DON'T THINK IT HAS A PLACE.

4         THERE'S PLENTY OF EVIDENCE OF FINANCIAL TRANSACTIONS.

5         TO ARGUE THAT THIS IS SOMETHING THAT MS. ALEXANDER DOES

6    WITH ALL THE INVESTORS IS FLATLY WRONG.  THIS IS THE ONLY

7    PERSON WHO HAD THIS KIND OF EXCHANGE AFTER THE FACT, AND THIS

8    JEWELRY THING AND THE APPRAISAL I THINK IS FAR FROM WHAT WE'RE

9    HERE FOR, TO HEAR ABOUT.

10             THE COURT:  WELL, IT SEEMS LIKE IT UNDERSCORES THAT

11   THERE WERE NO SECURED DEEDS OF TRUST TO SHOW WHAT WAS DONE WITH

12   THE INVESTOR'S MONEY, WHAT THEY WERE --

13             MR. LEEMING:  BUT THIS IS A SEPARATE, A TOTALLY

14   SEPARATE TRANSACTION THAN ANYTHING RELATING TO APS.

15             THE COURT:  RIGHT.  BUT IF THE MONEY HAD BEEN

16   SPENT -- AS THE GOVERNMENT'S ALLEGED, IF IT WAS REPRESENTED

17   THAT THE INVESTOR MONEY WOULD BE USED FOR SECURED DEEDS OF

18   TRUST, THEN THE DEFENDANT WOULD NOT NEED TO RELY ON JEWELRY FOR

19   COLLATERAL FOR ANY ADDITIONAL FUNDS.  THERE WOULD BE SOME

20   ASSETS THERE THAT COULD SECURE ANY ADDITIONAL MONIES THAT WERE

21   GOTTEN.

22             MR. LEEMING:  BUT I THINK THE REPRESENTATION AT THIS

23   POINT IN TIME WAS THAT THE INVESTIGATION HAD STARTED, THE

24   S.E.C. WAS INVESTIGATING, THE FBI HAD SEIZED THE RECORDS.  THIS

25   ALL HAPPENS AFTER THAT.

```
 1              THE COURT:  YEAH.

 2              MR. LEEMING:  AND SO EFFECTIVELY APS IS OVER.

 3              MR. SCHENK:  YOUR HONOR, TO SAY THAT THE GOVERNMENT'S

 4    NOT ALLOWED TO OFFER EVIDENCE AFTER -- I THINK THE SEARCH

 5    WARRANT WAS IN MID-DECEMBER 2009 -- IT JUST NOT, IT'S NOT

 6    ACCURATE.  RELEVANT EVIDENCE EXISTS AFTER 2009 TO SHOW

 7    SOMEONE'S MOTIVE, THEIR OPPORTUNITY.

 8          THERE'S ALL KINDS OF BASES WHY, FOR INSTANCE, THE E-MAILS

 9    FROM MR. SWANSON IN 2010 SHOWING AN ATTEMPT TO COVER UP, THAT'S

10    WHAT THE GOVERNMENT ARGUED THAT THOSE E-MAILS WERE.

11          THIS CONDUCT AFTER THE SEARCH WARRANT IN THIS CASE IS

12    RELEVANT BECAUSE IT SHOWS WHETHER THE DEFENDANT, IN THIS

13    INSTANCE, IS DOING THINGS THAT SOMEONE WHO'S GUILTY WOULD DO OR

14    DOING THINGS THAT SOMEONE WHO'S INNOCENT WOULD DO, AND THAT'S

15    WHY THE JURY SHOULD BE ALLOWED TO HEAR THIS KIND OF EVIDENCE,

16    BECAUSE WHAT YOU DO AFTER THE CRIME IS CERTAINLY RELEVANT TO

17    SUGGEST -- IT PROVIDES SOME PROPENSITY FOR THE TRUTH OF WHETHER

18    YOU COMMITTED THE CRIME OR NOT IS AN ACCURATE STATEMENT.

19              THE COURT:  WELL, IF IT'S PROPENSITY, THEN IT IS 404.

20              MR. LEEMING:  404.

21              MR. KALEBA:  WELL, IT -- SORRY.  I WOULD LIKE TO ADD

22    AN ADDITIONAL BASIS FOR WHY I THINK IT'S 401.

23          I MEAN, THE THREAD GOES BACK TO THE INITIAL $200,000

24    INVESTMENT INTO GCF, AND THE TESTIMONY FROM THE WITNESS WAS

25    THAT "GCF'S ABOUT TO GO DOWN, THE INVESTORS ARE GOING TO TAKE
```

1    OVER THE COMPANY, I'M GOING TO PROTECT YOU BY PUTTING YOUR

2    MONEY INTO A TOTALLY SEPARATE ENTITY, MONEY DOTS."

3         AND HE SAYS, "FINE, OKAY."

4         AND SO NOW -- I MEAN, THE THREAD OF THE CONDUCT THAT'S

5    GOING ON, IT'S STILL ABOUT HIS INITIAL $200,000.

6         MOREOVER, IT'S HIGHLY RELEVANT TO THE CLAIMS THAT WE THINK

7    WE'RE GOING TO HEAR, THAT ARE GOING TO TRY TO BE ESTABLISHED

8    FROM THE DEFENSE IS MONEY DOTS WAS USED TO TRY TO PROMOTE THE

9    COMPANY, OR MONEY DOTS WAS BENEFICIAL TO EVERYBODY BECAUSE IT

10   WAS A MARKETING TOOL.

11        AND HERE YOU HAVE A WITNESS SAYING -- AND THIS IS 401

12   OFFERED -- IT'S SEPARATE, THIS HAS NOTHING TO DO WITH IT, THEY

13   CAN'T GO AFTER IT, SO THAT'S WHY IT'S PROTECTED.

14        I THINK THAT MAKES THIS CLEARLY 401.

15        I AGREE WITH THE COURT ABOUT THE ANALYSIS OF THE ISSUE OF

16   IT BEING SECURED.  IT'S ALSO A FALSE PROMISE OF "I'LL SECURE

17   YOUR ASSET WITH JEWELRY" AND THE JEWELRY IS -- YOU KNOW, WAS

18   NOT SUFFICIENT.

19        SO I THINK WE DON'T GET TO 404(B), YOUR HONOR, FOR THOSE

20   REASONS.

21             THE COURT:  ALL RIGHT.  WELL, I DO THINK IT IS

22   RELEVANT TO WHETHER MONEY DOTS WAS A -- FITS IN WITH THE

23   COMPANY BUSINESS AND WHETHER IT WAS NECESSARY TO PROMOTE THE

24   COMPANY BUSINESS, AND I THINK IT'S RELEVANT FOR THE PURPOSES

25   THAT MR. KALEBA STATED, SO I'M GOING TO ADMIT IT.

1        OKAY.

2              MR. KALEBA:  THANK YOU, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  THANK YOU.

4         (RECESS FROM 3:39 P.M. UNTIL 3:48 P.M.)

5         (JURY IN AT 3:48 P.M.)

6              THE COURT:  ALL RIGHT.  LET'S GO AHEAD, PLEASE.

7    BY MR. SCHENK:

8    Q.   DR. SALISBURY, BEFORE THE BREAK, YOU TOLD US THAT YOU

9    MAILED MS. ALEXANDER, YOU SENT HER SOME ADDITIONAL MONEY IN

10   2010 TO HELP WITH MONEY DOTS RADIO SHOW EXPENSES.

11        DO YOU RECALL THAT TESTIMONY?

12   A.   YES.

13   Q.   HOW MUCH MONEY DID YOU SEND HER IN TOTAL?

14   A.   $12,000.

15   Q.   DID YOU ASK FOR SOMETHING IN RETURN FOR THIS $12,000?

16   A.   EVENTUALLY I SAID, YOU KNOW, "I NEED SOME KIND OF

17   COLLATERAL.  LET'S -- WHAT CAN YOU DO?"

18   Q.   AND WHAT DID MS. ALEXANDER DO?

19   A.   SHE SENT ME SOME JEWELRY.

20   Q.   OKAY.  AND WHAT DID YOU DO WITH THIS JEWELRY?  WAS -- WERE

21   YOU ABLE TO SELL IT AND GET YOUR $12,000 BACK?  OR DID SHE GIVE

22   YOU YOUR $12,000 BACK AND YOU GIVE HER THE JEWELRY BACK?  WHAT

23   HAPPENED?

24   A.   I STILL HAVE THE JEWELRY.  I HAVE NO $12,000.

25   Q.   I'M SORRY?

SALISBURY CROSS

```
 1    A.   I HAVE THE JEWELRY.  I HAVE NO $12,000.

 2    Q.   OKAY.  AND HOW ABOUT THE $200,000 THAT YOU HAD INVESTED

 3    ORIGINALLY?  DID YOU EVER GET THAT BACK?

 4    A.   NO, SIR.

 5    Q.   AT ANY POINT DURING THE TIME THAT YOU WERE AN INVESTOR,

 6    DID YOU TALK TO MICHAEL SWANSON ABOUT YOUR INVESTMENT?

 7    A.   NO.

 8    Q.   HAVE YOU EVER TALKED TO HIM?

 9    A.   NO.

10    Q.   AT ANY POINT DURING YOUR INVESTMENT, DID YOU TALK TO

11    BETH PINA ABOUT YOUR INVESTMENT?

12    A.   NO.

13    Q.   HAVE YOU EVER TALKED TO BETH PINA?

14    A.   NOT THAT I'M AWARE OF.

15    Q.   WHILE YOU WERE AN INVESTOR, DID SOMEONE FROM APS ASK YOU

16    FOR PERMISSION FOR THEM TO CHANGE THEIR ACCOUNTING METHOD, THAT

17    IS, FROM THE CASH METHOD OF ACCOUNTING TO THE ACCRUAL METHOD OF

18    ACCOUNTING?

19    A.   NO, SIR.

20              MR. SCHENK:  THANK YOU.  NO FURTHER QUESTIONS.

21              THE COURT:  ALL RIGHT.  CROSS-EXAMINATION, PLEASE.

22              MR. LEEMING:  THANK YOU.

23                        CROSS-EXAMINATION

24    BY MR. LEEMING:

25    Q.   GOOD AFTERNOON, DR. SALISBURY.
```

```
 1      A.   GOOD AFTERNOON, SIR.

 2      Q.   SO IF I UNDERSTAND, DOCTOR, YOU LEARNED ABOUT APS THROUGH

 3      A GENTLEMAN NAMED WALT TAYLOR.  RIGHT?

 4      A.   CORRECT.

 5      Q.   AND HE'S YOUR FRIEND?

 6      A.   YES.

 7      Q.   AND THIS WAS OUT IN MONTANA; IS THAT RIGHT?

 8      A.   CORRECT.

 9      Q.   AND THAT'S WHERE YOU LIVE?

10      A.   YES.

11      Q.   NOW, HOW DO YOU KNOW WALT?

12      A.   OH, MANY YEARS.

13      Q.   MANY YEARS?

14      A.   (NODS HEAD UP AND DOWN.)

15      Q.   AND SOMEHOW YOU THINK, THROUGH SOME KIND OF AN INTERNET

16      SITE, HE MET MS. ALEXANDER?

17      A.   THAT'S WHAT HE LED ME TO BELIEVE.

18      Q.   AND DID HE ACTUALLY SAY THAT, OR --

19      A.   YES.

20      Q.   OKAY.  AND WERE THEY A COUPLE DURING THIS TIME?

21      A.   YOU'D HAVE TO ASK HIM.

22      Q.   ALL RIGHT.  BUT THEY -- YOU STAYED AT HIS -- YOU STAYED AT

23      HER HOUSE; CORRECT?

24      A.   YES.

25      Q.   HE WAS THERE?
```

1    A.    YES.

2    Q.    AND YOU WERE IN LAS VEGAS; CORRECT?

3    A.    SHE COUGHED.  I DIDN'T HEAR THAT.

4    Q.    I'M SORRY.  IN LAS VEGAS, YOU -- YOU WERE IN LAS VEGAS TO

5    MEET SOME FAMILY; RIGHT?

6    A.    CORRECT.

7    Q.    AND MR. TAYLOR WAS THERE FOR A CONVENTION?

8    A.    INDEPENDENT OF MY VISIT.

9    Q.    INDEPENDENT OF YOUR VISIT, OF COURSE.

10         AND MS. ALEXANDER WAS WITH MR. TAYLOR ON THAT OCCASION?

11   A.    THEY TRAVELLED SEPARATELY.  I DON'T KNOW THE CIRCUMSTANCES

12   OF PEOPLE CONVERGING.

13   Q.    OKAY.  AND IN ANY EVENT, HE DIDN'T REALLY ENCOURAGE YOU TO

14   DO THIS OR NOT DO THIS?  IT'S JUST SOMETHING THAT YOU EXPLORED

15   FURTHER WHEN YOU WERE IN MONTEREY?  IS THAT FAIR TO SAY?

16   A.    THAT IS FAIR.

17   Q.    AND WHEN WAS THE CONVENTION, THE ADOBE CONVENTION THAT YOU

18   ATTENDED IN -- WAS IT IN THE MONTEREY CONFERENCE CENTER?

19   A.    YOU KNOW, I DON'T KNOW.  PROBABLY.  IT WAS IN A BIG

20   CONVENTION.  I COULD DESCRIBE IT.  I HAVE PHOTOS OF IT.

21   Q.    OKAY.  YOU DON'T -- YOU'RE NOT REALLY FAMILIAR WITH

22   DOWNTOWN MONTEREY; RIGHT?

23   A.    NO.

24   Q.    OKAY.  WAS IT IN THE DOWNTOWN AREA, THOUGH?  RIGHT?

25   A.    YES.

```
 1      Q.   OKAY.  CLOSE TO THE HARBOR AND --

 2      A.   YOU KNOW, IT HAD A LOT OF GRILL WORK IN THE LOBBY.  IT HAD

 3      A LARGE CONVENTION HALL.  I HONESTLY DON'T KNOW IF IT'S A HOTEL

 4      OR CONVENTION CENTER.

 5      Q.   FINE.

 6           AND DO YOU REMEMBER WHEN THAT CONVENTION WAS?

 7      A.   I THINK IT WAS LATE WINTER, EARLY SPRING 2007.

 8      Q.   NOW, YOU ACTUALLY STAYED AT MS. ALEXANDER'S HOUSE?

 9      A.   CORRECT.

10      Q.   AND HOW DID THAT COME ABOUT?

11      A.   MR. TAYLOR ARRANGED IT.

12      Q.   OKAY.  SO HE -- DID HE CALL YOU?  DID HE SAY, IF -- DID HE

13      KNOW YOU WERE COMING OUT TO MONTEREY IN ADVANCE, FOR EXAMPLE?

14      A.   NO.  ACTUALLY WHAT HAPPENED WAS HE SAID, DID YOU KNOW

15      ABOUT THE CONFERENCE?

16      Q.   I SEE.

17      A.   NO, WHAT CONFERENCE?  THEN THINGS LED TO, WELL, YOU KNOW,

18      WE COULD PROBABLY WORK SOMETHING OUT.  IT'S GREAT.  IT'S A GOOD

19      OPPORTUNITY FOR THE SOFTWARE.

20      Q.   AND SO YOU DECIDED TO ATTEND?

21      A.   CORRECT.

22      Q.   DID YOU ACTUALLY ATTEND THAT CONFERENCE?

23      A.   MOST CERTAINLY.

24      Q.   SORRY.  WHAT DID MR. TAYLOR TELL YOU ABOUT THE INVESTMENT

25      THAT HE WAS INVOLVED IN WITH MS. ALEXANDER?
```

```
 1    A.   NOT A LOT.  IT WAS A REAL ESTATE INVESTMENT AND PROBABLY

 2    HE TOLD ME THAT HE'D INVESTED.

 3    Q.   OKAY.  DID HE TELL YOU THAT IT WAS A FUND AND THAT THEY

 4    LENT MONEY OUT TO PEOPLE WHO HAD POOR CREDIT RISKS?

 5    A.   YOU KNOW, I DON'T KNOW IF HE TOLD ME OR MS. ALEXANDER TOLD

 6    ME.

 7    Q.   OKAY.  BUT IN ANY EVENT, THAT WAS YOUR UNDERSTANDING OF

 8    HOW THIS FUND OPERATED; RIGHT?

 9    A.   WOULD YOU REPEAT THAT?

10    Q.   THAT WAS YOUR UNDERSTANDING --

11    A.   WHAT WAS MY UNDERSTANDING?

12    Q.   OH, I'M SORRY.  DID YOU UNDERSTAND THAT THE FUND LENT

13    MONEY OUT TO PEOPLE THAT HAD POOR CREDIT HISTORIES?

14    A.   YES.

15    Q.   AND DID YOU UNDERSTAND THAT THIS FUND WAS A HIGH RISK

16    FUND?

17    A.   YES.

18    Q.   SO YOU KNEW BEFORE YOU INVESTED THAT THE FUND DEALT WITH

19    PEOPLE WITH POOR CREDIT HISTORIES AND HAD A LOT OF RISK?

20    A.   THE DEGREES WITH WHICH YOU SAY IT -- I GUESS THE "LOT"

21    BOTHERS ME.  IT WAS HIGHER RISK.

22    Q.   WELL, YOU TESTIFIED IN ANOTHER PROCEEDING IN THIS MATTER;

23    CORRECT?

24    A.   YES.

25    Q.   AND DO YOU REMEMBER BEING ASKED ABOUT THAT AND GIVING THE
```

1      ANSWER THAT THE PEOPLE WHO WERE BEING LENT MONEY HAD POOR

2      CREDIT RISKS -- POOR CREDIT HISTORIES AND WERE HIGH RISK?

3      A.   CONSISTENT WITH WHAT I COULD HAVE SAID, YES.

4      Q.   OKAY.  THAT SOUNDS ABOUT RIGHT?

5      A.   SURE.

6      Q.   AND YOU RECEIVED -- YOU DESCRIBED EXHIBIT 60, WHICH IS THE

7      BOOKLET, THE INVESTMENT BOOKLET; RIGHT?

8      A.   DO YOU WANT ME TO TURN TO PAGE 60?

9      Q.   ONLY IF YOU NEED TO REMEMBER SOMETHING FROM IT.

10     A.   OKAY.

11     Q.   YOU REMEMBER GETTING A LITTLE BOOKLET, RIGHT, THAT WE SAW

12     ON THE SCREEN A MOMENT AGO?  YOU'RE HOLDING IT UP RIGHT NOW?

13     A.   YES (INDICATING).

14     Q.   THAT'S IT; RIGHT?

15     A.   YES.

16     Q.   DID YOU GET ANY OTHER DOCUMENTS AT ALL ABOUT THIS

17     INVESTMENT?

18     A.   I DON'T THINK SO.

19     Q.   YOU DIDN'T GET ANYTHING CALLED A PRIVATE PLACEMENT

20     MEMORANDUM?

21     A.   NO.

22     Q.   YOU DIDN'T GET A DOCUMENT CALLED AN INVESTOR SUITABILITY

23     SURVEY?

24     A.   NO.

25     Q.   DID YOU ASK FOR ANY DOCUMENTS DESCRIBING THIS IN MORE

```
 1      DETAIL BEYOND THE PAMPHLET THAT IS IN FRONT OF YOU?

 2      A.   I DIDN'T ASK FOR PAPER.  I TALKED TO MS. ALEXANDER.

 3      Q.   OKAY.  AND DID SHE SHOW YOU ANYTHING IN WRITING EXPLAINING

 4      HOW YOUR MONEY WOULD BE INVESTED?

 5      A.   NOT THAT I'M AWARE OF.

 6      Q.   DID YOU AT SOME POINT DECIDE TO INVEST?

 7      A.   YES.

 8      Q.   WAS IT AT THE END OF YOUR STAY AT MS. ALEXANDER'S HOUSE?

 9      A.   NO.

10      Q.   OR WAS IT SOMETIME THEREAFTER?

11      A.   IT WAS AFTER.

12      Q.   BETWEEN THE TIME YOU LEFT MS. ALEXANDER'S HOUSE AND THE

13      TIME YOU MADE THE DECISION TO INVEST, DID YOU ASK FOR ANYTHING

14      IN WRITING AT ALL PERTAINING TO THIS PROPOSED INVESTMENT?

15      A.   NO, NOT THAT I'M AWARE OF.

16      Q.   ABOUT HOW MUCH LATER DID YOU DECIDE TO INVEST YOUR FIRST

17      $100,000, SIR?

18      A.   I THINK IT WAS FOUR TO SIX WEEKS.

19      Q.   WERE THERE OTHER CONVERSATIONS THAT TOOK PLACE IN BETWEEN

20      THE TIME YOU LEFT MS. ALEXANDER'S HOUSE AND THE TIME YOU

21      DECIDED TO INVEST?

22      A.   COULD HAVE BEEN.  I DON'T REMEMBER THE SPECIFICS.

23      Q.   OKAY.  SITTING HERE NOW, YOU DON'T REMEMBER ANY SPECIFIC

24      CONVERSATION?

25      A.   CORRECT.
```

```
1    Q.   DO YOU REMEMBER DESCRIBING THE INVESTMENT AS A BLACK BOX?

2    A.   YES.

3    Q.   AND YOU GAVE MONEY, STUFF CAME OUT, AND THAT'S ABOUT HOW

4    IT WORKED; RIGHT?

5    A.   THAT WAS MY -- THAT'S MY DEFINITION OF A BLACK BOX.

6    Q.   OKAY.  I THINK YOU TESTIFIED THAT THIS LAS VEGAS MEETING

7    WAS IN 2009.  IS THAT CORRECT?

8    A.   I BELIEVE SO.

9    Q.   OKAY.  AND IS THAT WHERE YOU WERE ASKING MS. ALEXANDER

10   ABOUT THE HEALTH OF HER COMPANY?

11   A.   NO, SIR.

12   Q.   OKAY.  WHEN -- WHEN DID YOU ASK MS. ALEXANDER ABOUT THE

13   HEALTH OF HER COMPANY?

14   A.   PROBABLY END OF SEPTEMBER, FIRST OF OCTOBER, 2009.

15   Q.   OKAY.  SO SEPTEMBER OR OCTOBER OF 2009?

16   A.   YES.

17   Q.   AND YOU SAID YOU HAD -- YOU'D BEEN HEARING VARIOUS THINGS

18   ABOUT THE REAL ESTATE MARKET AT THAT TIME; RIGHT?

19   A.   CORRECT.

20   Q.   AND THINGS WEREN'T DOING TOO WELL IN THE REAL ESTATE

21   MARKET IN THE UNITED STATES GENERALLY; RIGHT?

22   A.   CORRECT.

23   Q.   AND IS THAT WHY YOU ENTERED INTO A CONVERSATION WITH HER

24   ABOUT WHAT'S GOING ON WITH YOUR COMPANY?

25   A.   YES.
```

1     Q.   AND WAS THIS IN PERSON OR WAS THIS OVER THE PHONE?

2     A.   OVER THE PHONE.

3     Q.   THE SECOND INVESTMENT IN 2009, WERE THERE ANY

4     DOCUMENTATION -- ANY DOCUMENTS ASSOCIATED WITH THAT LOAN?

5     A.   NO, SIR, NOT THAT I'M AWARE OF.

6     Q.   NOTHING IN WRITING AT ALL?

7     A.   NOT THAT I'M AWARE OF.

8     Q.   AND AGAIN, I KNOW I'M BEING REPETITIVE, BUT YOU NEVER SAW

9     A THING CALLED THE PRIVATE PLACEMENT MEMORANDUM?

10    A.   NOT THAT I'M AWARE OF.

11    Q.   AN OPERATING AGREEMENT?

12    A.   NO, SIR.

13    Q.   OR AN INVESTOR SUITABILITY SURVEY?

14    A.   AN INVESTOR WHAT?

15    Q.   SUITABILITY SURVEY.

16    A.   NO.

17    Q.   SO YOU, AT SOME POINT, LEARNED THAT THERE WERE SOME

18    PROBLEMS WITH APS; CORRECT?  AND THAT WAS WHEN MS. ALEXANDER

19    CALLED YOU PERSONALLY AND TOLD YOU THAT?

20    A.   NO, SIR.

21    Q.   OKAY.  WHAT -- WHAT -- WHEN DID YOU LEARN THERE WERE SOME

22    PROBLEMS, POTENTIAL PROBLEMS AT APS?

23    A.   I THINK IT WAS PROBABLY JANUARY 2010.

24    Q.   OKAY.  AND WAS THAT FROM MR. TAYLOR?

25    A.   NO, SIR.  WE -- BOTH OF US, MYSELF AND MR. TAYLOR,

SALISBURY CROSS

1   RECEIVED AN E-MAIL FROM SOMEBODY WHO SAID THEY WERE AN INVESTOR

2   AND THAT THERE WAS PROBLEMS AND THAT THEY WERE TRYING TO KEEP

3   THE GROUP TOGETHER SO THAT, I THINK, IT DIDN'T GO INTO

4   RECEIVERSHIP OR SOMETHING.

5        AND THAT WAS THE FIRST WE HEARD THAT THERE WAS A PROBLEM.

6   Q.   OKAY.  AND DID YOU CONTACT THOSE PEOPLE?

7   A.   I DIDN'T HAVE A CLUE HOW TO DO THAT.

8   Q.   ALL RIGHT.  SO YOU DIDN'T RETURN THE E-MAIL OR HOWEVER IT

9   GOT TO YOU?

10  A.   NO.

11  Q.   OKAY.  DID -- WHAT DID YOU DO THEN?  DID YOU CALL

12  MS. ALEXANDER?

13  A.   NO.  I TRIED TO FIND OUT IF THERE WAS ANY SUPPORT TO THIS.

14  Q.   AND THAT'S WHEN YOU SAW THE ARTICLE IN THE PAPER?

15  A.   THAT'S WHEN I GOOGLED IT, YES.

16  Q.   OKAY.  AND THEN DID YOU CALL MS. ALEXANDER?

17  A.   I FELT MR. TAYLOR -- NO, I DIDN'T CALL MS. ALEXANDER.

18  Q.   YOU DID NOT.  OKAY.

19       AT SOME POINT YOU SPOKE TO MS. ALEXANDER ABOUT MOVING THIS

20  INVESTMENT INTO MONEY DOTS; RIGHT?

21  A.   I WAS CONTACTED ABOUT THAT, YES.

22  Q.   OKAY.  LET'S TALK ABOUT HOW THAT CONTACT TOOK PLACE.

23       WERE YOU THE INITIATING PARTY IN THAT CONVERSATION?

24  A.   NO, SIR.

25  Q.   SHE CALLED YOU?

1    A.   I DO BELIEVE THAT'S CORRECT.

2    Q.   AND ABOUT HOW LONG HAD IT BEEN SINCE SHE HAD -- SINCE SHE

3    HAD SPOKEN TO YOU BEFORE THAT CALL?

4    A.   OCTOBER OF 2009, SO FIVE MONTHS.

5    Q.   FIVE MONTHS.  THERE HAD BEEN NO CONTACT, INTERVENING

6    CONTACT?

7    A.   NOT THAT I'M AWARE OF.

8    Q.   YOU HADN'T CALLED HER AND ASKED, "WHAT'S GOING ON WITH MY

9    FUNDS?"

10   A.   NO.

11   Q.   AND IN THAT CONVERSATION, SHE ASKED YOU IF YOU WOULD BE

12   WILLING TO MOVE YOUR INVESTMENT INTO HER RADIO SHOW; CORRECT?

13   A.   CORRECT.

14   Q.   DID YOU KNOW ANYTHING ABOUT HER RADIO SHOW?

15   A.   YES.

16   Q.   HAD YOU HEARD IT?

17   A.   I HAD BEEN ON IT.

18   Q.   YOU HAD BEEN ON IT.  WHAT -- DO YOU REMEMBER WHAT YOU

19   SPOKE ABOUT ON IT?

20   A.   PROBABLY.

21   Q.   WHAT WOULD THAT HAVE BEEN?

22   A.   ABOUT OPHTHALMOLOGY.

23   Q.   OKAY.  SO YOU SPOKE ABOUT OPHTHALMOLOGY.  WERE YOU ONLY ON

24   IT ONCE?

25   A.   CORRECT.

```
 1    Q.   AND DO YOU REMEMBER WHEN THAT WAS?

 2    A.   NO, I DON'T.

 3    Q.   DO YOU REMEMBER WHERE IT WAS?

 4    A.   WELL, I WAS ON THE PHONE IN MONTANA.

 5    Q.   OH.  SO YOU DID IT THROUGH MONTANA?

 6    A.   CORRECT.

 7    Q.   NOW, WAS THIS SYNDICATED -- WAS THIS SHOW SYNDICATED OUT

 8    TO MONTANA?  DID YOU EVER HEAR IT OUT THERE?

 9    A.   NO.  I TRIED TO FIND IT, BUT WE DIDN'T HAVE A RADIO

10    STATION THAT WAS CARRYING IT.

11    Q.   OKAY.  IT WAS YOUR UNDERSTANDING THAT IT WAS A RADIO SHOW

12    THAT WAS DISTRIBUTED WIDELY; CORRECT?

13    A.   ACCORDING TO WHAT I COULD FIND ABOUT IT, YES.

14    Q.   OKAY.  AND THEN YOU GOT A CALL FROM MS. ALEXANDER ASKING

15    YOU TO MOVE YOUR INVESTMENT IN GCF INTO MONEY DOTS, AND DID

16    YOU -- AND YOU TESTIFIED ON DIRECT THAT YOU WEREN'T REALLY SURE

17    IF THAT HAPPENED OR NOT.

18         DO YOU RECALL THAT?

19    A.   YES.

20    Q.   NOW, YOU HAD AN ATTORNEY WHO WAS WORKING TO TRY TO MAKE

21    THIS HAPPEN; IS THAT RIGHT?

22    A.   WE HAD AN ATTORNEY BECAUSE WE WERE CONCERNED, THROUGH THE

23    BIDDING, ABOUT WHAT WAS HAPPENING OVERALL.  AND THEN WHEN THIS

24    PROPOSAL CAME THROUGH, WE RAN IT THROUGH HIM, TOO.

25    Q.   OKAY.  AND DID YOU EVER SPEAK WITH AN ATTORNEY IN MONTEREY
```

```
1      CALLED NEIL TICKER?

2      A.   I DON'T THINK WE EVER SPOKE TO HIM.  I THINK MY LAWYER

3      DID.

4      Q.   OKAY.  AND DO YOU RECALL -- FIRST OF ALL, LET'S BACK UP A

5      LITTLE BIT.

6           DID -- YOU'RE NOT SURE IF THIS TRANSFER OF EQUITY EVER

7      TOOK PLACE?

8      A.   CORRECT.

9      Q.   DID YOU EVER GET ANY DOCUMENTS ABOUT THE TRANSFER OF FUNDS

10     FROM APS TO MONEY DOTS?

11     A.   NOT THAT I'M AWARE OF.

12     Q.   DID YOU ASK FOR THOSE?

13     A.   YES.

14     Q.   AND DID YOU ASK FOR THOSE DOCUMENTS BEFORE OR AFTER YOU

15     WERE DISCUSSING THE TRANSFER OF THE EQUITY TO MONEY DOTS?

16     A.   I'M NOT SURE WHAT YOU'RE ASKING.  DID I ASK FOR THE

17     DOCUMENTS OF TRANSFER BEFORE I TRANSFERRED IT?

18     Q.   SORRY.  THAT WAS A TERRIBLE QUESTION.  IT'S BEEN A LONG

19     DAY.  LET ME START AGAIN.

20          THERE WAS A SERIES OF DISCUSSIONS ABOUT MOVING YOUR

21     INVESTMENT IN APS INTO MONEY DOTS; RIGHT?

22     A.   CORRECT.

23     Q.   OKAY.  AND I'M ASKING IF -- AT WHAT POINT YOU ASKED FOR

24     SOME DOCUMENTS RELATING TO MONEY DOTS, IF EVER.

25     A.   I DID --
```

1    Q.   OKAY.

2    A.   -- ASK.

3    Q.   AND DO YOU REMEMBER WHEN IN THAT PROCESS YOU DID THAT?

4    A.   I THINK -- I THINK WHAT HAPPENED -- THERE WAS A SENSE OF

5    URGENCY IN THE PHONE CALL I RECEIVED FROM MS. ALEXANDER, AND IT

6    WAS TO THE EFFECT THAT THINGS NEEDED TO HAPPEN PRETTY QUICKLY.

7         SO IN THAT CONTEXT, ASKING FOR DOCUMENTS PROBABLY HAPPENED

8    AFTER WE WERE ASKED TO TRANSFER.

9    Q.   OKAY.  AND BASICALLY THE CONVERSATION WITH MS. ALEXANDER

10   WAS -- DID YOU SPEAK ABOUT AN FBI INVESTIGATION?

11   A.   MR. TAYLOR DID.

12   Q.   OKAY.  DID MS. ALEXANDER SPEAK ABOUT AN S.E.C.

13   INVESTIGATION?

14   A.   YES.

15   Q.   OKAY.  AND THERE WAS SOME CONCERN THAT THE OPERATIONS OF

16   THE COMPANY WOULD BE SHUT DOWN?

17   A.   WHICH COMPANY?

18   Q.   APS.

19   A.   YES.

20   Q.   OKAY.  AND SO I'M STILL NOT CLEAR ON WHETHER YOU AGREED TO

21   MOVE YOUR INVESTMENT INTO MONEY DOTS OR WHETHER AT SOME POINT

22   YOU CHANGED YOUR MIND OR WHETHER IT WAS A DECISION PROCESS THAT

23   WAS NEVER COMPLETED.

24   A.   VERY INTERESTING PROCESS.  THE SENSE OF URGENCY -- WE

25   WROTE A LETTER ASKING MR. TICKER TO TRANSFER THE MONEY.

1       WHEN WE GOT THE DOCUMENTS ABOUT THE CORPORATION AND THE

2   STOCK THAT WAS INVOLVED, I REALIZED THAT WE WERE GETTING

3   SOMEWHERE, YOU KNOW, 5 TO 15 CENTS ON A DOLLAR LESS -- IT WAS

4   ACTUALLY PENNIES -- BECAUSE THERE WAS A POSSIBILITY OF 10

5   MILLION SHARES OF MONEY DOTS THAT COULD BE ISSUED.

6       AND THEN MR. TICKER SORT OF BACKED OFF, BUT OUR LAWYER

7   STARTED TALKING AND SAYS, "I REALLY DON'T HAVE ANYTHING TO DO

8   WITH THIS.  DON'T DO ANYTHING.  I'M NOT REPRESENTING ANYTHING.

9   I DON'T KNOW WHAT'S GOING ON."  AND HE SORT OF WENT DARK.

10       SO WE WROTE ANOTHER LETTER AND SAID, YOU KNOW, "MAYBE THIS

11   ISN'T A GOOD IDEA.  WITHDRAW THIS.  I DON'T KNOW WHO WE'RE

12   SUPPOSED TO SEND IT TO.  WOULD YOU LET US KNOW?"

13       AND WE NEVER HEARD ANYTHING ELSE.

14   Q.   OKAY.  SO YOUR LAST RECOLLECTION THEN IS YOU SENDING IN A

15   LETTER TO SAY "WITHDRAW THIS, WE'RE NOT GOING THROUGH WITH IT"?

16   A.   EVENTUALLY, YES.

17   Q.   OKAY.  SO WAS THAT -- THAT WAS BEFORE YOU RECEIVED A

18   SECOND -- A TELEPHONE CALL ASKING FOR MONEY TO BE SUPPORTING

19   THE MONEY DOTS RADIO SHOW; RIGHT?

20   A.   WELL, THIS WAS ALL ONGOING.  IT'S, YOU KNOW, "IF YOU'RE

21   GOING TO BE AN INVESTOR IN MONEY DOTS, THEN I NEED SOME

22   SUPPORT."

23   Q.   OKAY.  AND AT THAT POINT YOU WERE OR WERE NOT AN INVESTOR

24   IN MONEY DOTS?

25   A.   I HAVE NO IDEA.

SALISBURY CROSS

1   Q.   OKAY.  AND YOU DON'T KNOW WHETHER IT WAS BEFORE OR AFTER

2   YOU SENT THE LETTER OR HAD THE ATTORNEY SEND THE LETTER SAYING,

3   "WE'RE NOT GOING THROUGH WITH THIS"?

4   A.   NO.  IT WAS AFTER WE SENT THE LETTER TO GO THROUGH WITH

5   IT, BUT BEFORE WE SENT THE LETTER, "DON'T GO THROUGH WITH IT."

6   Q.   OKAY.  DO YOU KNOW HOW MUCH TIME LAPSED DURING THAT

7   PERIOD?

8   A.   PROBABLY ABOUT A MONTH.

9   Q.   ABOUT A MONTH.  OKAY.

10      SO YOU SENT MS. ALEXANDER $8,000.

11  A.   THE FIRST TIME.

12  Q.   THE FIRST TIME.  YOU SENT HER ANOTHER $4,000; RIGHT?

13  A.   CORRECT.

14  Q.   AND THIS WAS TO SUPPORT THE OPERATION OF THE RADIO SHOW?

15  A.   AS I UNDERSTOOD IT.

16  Q.   AND AT SOME POINT YOU ASKED FOR SOME COLLATERAL?

17  A.   CORRECT.

18  Q.   AND SOME JEWELRY WAS MAILED TO YOU?

19  A.   CORRECT.

20  Q.   AND YOU STILL HAVE THAT?

21  A.   YES.

22          MR. LEEMING:  OKAY.  THAT'S ALL I HAVE, YOUR HONOR.

23          THE COURT:  ALL RIGHT.  IS THERE ANY REDIRECT?

24          MR. SCHENK:  NO, YOUR HONOR.

25          THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

```
1        AND IS IT SUBJECT TO RECALL OR NOT?

2                  MR. LEEMING:  NO RECALL.

3                  THE COURT:  ALL RIGHT.  NO RECALL FOR THE GOVERNMENT?

4                  MR. SCHENK:  NO, YOUR HONOR.

5                  THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED.  YOU

6        MAY STEP DOWN AND LEAVE.

7                  THE WITNESS:  THANK YOU.

8                  THE COURT:  PLEASE CALL YOUR NEXT WITNESS.

9                  MR. KALEBA:  THANK YOU, YOUR HONOR.

10            THE UNITED STATES CALLS RANDELL OLMSTEAD.

11                 THE CLERK:  WOULD YOU RAISE YOUR RIGHT HAND, PLEASE.

12            (RANDELL OLMSTEAD, PLAINTIFF'S WITNESS, WAS SWORN.)

13                 THE WITNESS:  I DO.

14                 THE CLERK:  THANK YOU.

15            WOULD YOU STATE YOUR NAME, PLEASE, AND SPELL IT?

16                 THE WITNESS:  IT'S RANDELL OLMSTEAD, R-A-N-D-E-L-L,

17        O-L-M-S-T-E-A-D.

18                 THE CLERK:  THANK YOU.

19                            **DIRECT EXAMINATION**

20        BY MR. KALEBA:

21        Q.   GOOD AFTERNOON, SIR.

22        A.   GOOD AFTERNOON.

23        Q.   WHERE DO YOU LIVE?

24        A.   ENCINITAS, CALIFORNIA.

25        Q.   ARE YOU CURRENTLY EMPLOYED?
```

1    A.   YES.  I'M SELF-EMPLOYED.

2    Q.   WHAT DO YOU DO?

3    A.   I'M A TECHNOLOGY CONSULTANT.

4    Q.   DID YOU HAVE ANOTHER CAREER AT SOME POINT?

5    A.   NO.

6    Q.   SORRY?

7    A.   NO.  THAT'S MY MAIN CAREER.

8    Q.   WHAT TYPE OF CONSULTING DO YOU DO?

9    A.   I DO BUSINESS AND TECHNOLOGY CONSULTING FOR VARIOUS

10   COMPANIES IN THE SAN DIEGO AREA.

11   Q.   HAVE YOU EVER BEEN INVOLVED IN REAL ESTATE INVESTING?

12   A.   A LITTLE BIT, YES.

13   Q.   OKAY.  WHAT TYPE?

14   A.   MOSTLY RESIDENTIAL, A LITTLE COMMERCIAL.

15   Q.   AND WHAT TYPE OF INVESTING DO YOU DO?

16   A.   I HAVEN'T DONE ANY RECENTLY, BUT I'VE PURCHASED RESIDENCES

17   AND BEEN A PART OF T.I.C.'S COMMERCIAL PROPERTY.

18   Q.   IS THAT A TENANT IN COMMON, T.I.C.?

19   A.   YES, TENANT IN COMMON.

20   Q.   DO YOU HOLD THOSE PROPERTIES FOR A SHORT TIME OR IS IT

21   SOMETHING YOU WOULD TURN AROUND?

22   A.   I'VE DONE BOTH, YES.

23   Q.   ARE YOU FAMILIAR WITH THE FIRM APS FUNDING?

24   A.   YES.

25   Q.   WHAT IS IT?

1    A.   IT'S A COMPANY THAT I INVESTED WITH, AND IT'S A COMPANY

2    THAT WAS MANAGED BY BARBRA ALEXANDER.

3    Q.   OKAY.  HOW DID YOU FIRST LEARN ABOUT APS?

4    A.   I WAS REFERRED TO THEM AT A REAL ESTATE SEMINAR THAT I WAS

5    TAKING IN LAS VEGAS IN THE SUMMER OF 2008.

6    Q.   DO YOU RECALL BY WHOM?

7    A.   THE GENTLEMAN'S LAST NAME WAS KASTNER.

8    Q.   WAS HE ALSO -- KASTNER?

9    A.   YES.

10   Q.   WAS HE ALSO AN INVESTOR, OR HOW DID HE KNOW ABOUT APS?

11   A.   YES, HE WAS AN INVESTOR AT APS, AND HIM AND I WERE SHARING

12   INVESTMENTS THAT I WAS CURRENTLY IN AND I HAD AN INVESTMENT

13   THAT I WAS RECEIVING A 10 PERCENT RETURN, AND HE WAS MENTIONING

14   THAT THIS RETURN THROUGH THAT GROUP WAS GETTING A 12 PERCENT

15   RETURN.

16   Q.   DID YOU EVER REACH OUT TO ANYONE AT APS?

17   A.   YES, I DID.

18   Q.   HOW DID YOU DO THAT?

19   A.   I CONTACTED BARBRA VIA PHONE AND E-MAIL TO LEARN MORE

20   ABOUT THE FUND.

21   Q.   OKAY.  AND DO YOU RECALL WHEN THIS WAS?

22   A.   IT WOULD HAVE BEEN IN -- I BELIEVE THAT WAS JULY OR AUGUST

23   OF 2008.

24   Q.   AND DID YOU EVER MEET MS. ALEXANDER IN PERSON?

25   A.   NO, NEVER MET HER IN PERSON.

1    Q.   WHAT DO YOU RECALL YOU WERE TOLD ABOUT THE INVESTMENT AT

2    THAT TIME?

3    A.   I WAS TOLD THAT, THAT THEY HAD TWO FUNDS.  ONE FUND WAS

4    FULL.  THE OTHER FUND WAS THE GREENLIGHT FUND AND THAT FUND WAS

5    AVAILABLE FOR INVESTING.  IF I WAS INTERESTED, I COULD INVEST

6    IN THAT, AND IT WAS A 12 PERCENT RETURN AND THEY -- AND THE

7    FUND WAS INVESTING IN TRUST DEED SECURED MORTGAGES.

8    Q.   WHAT DID YOU UNDERSTAND THAT TO MEAN, TO BE TRUST DEED

9    SECURED MORTGAGES?  WAS IT REAL ESTATE INVESTING?

10   A.   YEAH, IT WAS REAL ESTATE WHERE THEY WERE PUTTING --

11   LENDING MORTGAGES.  THEY WERE BASICALLY LENDING MONEY TO

12   BORROWERS TO -- FOR SINGLE FAMILY RESIDENCE, COMMERCIAL

13   PROPERTIES.

14   Q.   OKAY.  AND YOU SAID THINGS -- YOU MENTIONED SECURED OR A

15   DEED OF TRUST.  WHAT DOES THAT MEAN?

16   A.   THAT THE -- THAT THE LOAN IS SECURED BY -- THAT THEY'RE

17   LENDING THAT'S SECURED BY THE PROPERTY THAT'S BEING --

18   Q.   AND DID SHE RAISE WITH YOU THE EXPECTED RATE OF RETURN FOR

19   THE INVESTORS?

20   A.   YES.  SHE SAID IT WAS 12 PERCENT.

21   Q.   OKAY.  AFTER THIS INITIAL CONVERSATION, DID YOU DO

22   ANYTHING ELSE BEFORE INVESTING, LIKE ANY DUE DILIGENCE OR

23   RESEARCH?

24   A.   YES.  MYSELF AND MY ASSISTANT BOTH WENT AND DID RESEARCH

25   ON THE INTERNET.  WE LOOKED AT -- SHE HAD A RADIO SHOW CALLED

1    MONEY DOTS, AS WELL AS WE CONTACTED THE BETTER BUSINESS BUREAU

2    AND VETTED OUT ANYTHING WE COULD FIND.  WE COULD FIND NO BAD

3    INFORMATION THERE.

4        I ALSO PREPARED A LIST OF DUE DILIGENCE QUESTIONS WHICH I

5    E-MAILED TO BARBRA AND HER ASSISTANT, JACKIE LAMBERT.

6    Q.   OKAY.  HOW DID YOU -- WHO IS JACKIE LAMBERT?

7    A.   I BELIEVE JACKIE LAMBERT IS -- WAS BARBRA ALEXANDER'S

8    ASSISTANT.

9    Q.   AND HOW DID YOU COME TO KNOW MS. ALEXANDER -- I MEAN

10   MS. LAMBERT?  WERE YOU REFERRED TO HER BY SOMEBODY?

11   A.   NO.  I WAS -- I -- IT WAS THROUGH WORKING WITH BARBRA THAT

12   I WAS COORDINATING WITH JACKIE.

13   Q.   AND DID YOU WRITE, THROUGH E-MAIL, TO MS. ALEXANDER OR

14   MS. LAMBERT?

15   A.   BOTH OF THEM, YES.

16   Q.   AND WAS THE PURPOSE OF THOSE E-MAILS TO OBTAIN INFORMATION

17   ABOUT THE INVESTMENT?

18   A.   YES, IT WAS.

19   Q.   WOULD YOU TURN TO, IN THE BINDER ON YOUR TABLE, TO

20   EXHIBIT 84A, AND PLEASE TAKE A MOMENT TO READ THROUGH THAT.

21   IT'S FOUR PAGES.

22       (PAUSE IN PROCEEDINGS.)

23          MR. LEEMING:  I'M SORRY, COUNSEL.  WHAT WAS THAT

24   NUMBER AGAIN?

25          MR. KALEBA:  84A.

```
1              THE WITNESS:  IS IT IN A DIFFERENT BOOK?

2       BY MR. KALEBA:

3       Q.   DO YOU HAVE AN 84?

4       A.   NO, I'M NOT FINDING AN 84.  THE LAST ONE IS AN 81A.

5       Q.   IS THERE ANOTHER BINDER ON THE FLOOR?

6       A.   LET ME CHECK.  HERE WE GO.

7            YES, 84A.

8       Q.   TAKE A MOMENT TO REVIEW THESE.

9            (PAUSE IN PROCEEDINGS.)

10             THE WITNESS:  YES, THESE ARE E-MAILS BETWEEN MYSELF

11      AND BARBRA AND JACKIE LAMBERT.

12      BY MR. KALEBA:

13      Q.   OKAY.  WERE YOU PROVIDED, AT SOME POINT, THE E-MAILS OF

14      MS. LAMBERT AND MS. ALEXANDER TO BE ABLE TO CORRESPOND WITH

15      THEM?

16      A.   IT --

17      Q.   HOW?

18      A.   OH, HOW?  I'M NOT SURE I UNDERSTAND THE QUESTION.

19      Q.   AT SOME POINT DID YOU RECEIVE THE E-MAIL ADDRESSES FOR

20      MS. LAMBERT OR MS. ALEXANDER?

21      A.   YES.

22      Q.   HOW DID YOU DO THAT?

23      A.   I'M SURE IT WAS VIA PHONE CALL THAT I GOT THEIR E-MAIL

24      ADDRESSES.

25      Q.   BUT TODAY YOU'RE JUST NOT SURE WHAT THE E-MAIL -- HOW YOU
```

```
1      GOT THE E-MAIL?

2      A.   I'M PRETTY SURE -- IT WOULD HAVE HAD TO HAVE BEEN FROM

3      CALLING THEM, YES.

4      Q.   OKAY.  WAS THE PURPOSE OF THESE E-MAILS DONE FOR

5      COMMUNICATING WITH THEM ABOUT YOUR INVESTMENT?

6      A.   YES.  I WAS INTERESTED IN INVESTING WITH THEM AND IT

7      WAS -- YOU KNOW, FIRST TO ASK THEM DUE DILIGENCE QUESTIONS

8      ABOUT THE INVESTMENT AND -- YES.

9      Q.   WITH RESPECT TO THE CORRESPONDENCE WITH MS. LAMBERT, DID

10     YOU UNDERSTAND THAT SHE WAS SOMEONE WHO WAS AUTHORIZED BY

11     MS. ALEXANDER TO CORRESPOND ON BEHALF OF THE BUSINESS?

12     A.   ABSOLUTELY, YES.

13     Q.   AND THE COPIES THAT WE SEE HERE, AND THE DATES AND TIMES

14     OF THESE E-MAILS, ARE THEY CONSISTENT WITH WHEN THE E-MAILS

15     WERE SENT AND RECEIVED BY YOU?

16     A.   YES.

17     Q.   TO THE BEST OF YOUR MEMORY?

18     A.   YES.

19          MR. KALEBA:  YOUR HONOR, THE UNITED STATES MOVES 84A

20     INTO EVIDENCE.

21          THE COURT:  ANY OBJECTION?

22          MR. LEEMING:  NO OBJECTION.

23          THE COURT:  THEY'RE ADMITTED.

24     (PLAINTIFF'S EXHIBIT 84A WAS ADMITTED IN EVIDENCE.)

25          MR. KALEBA:  OKAY.  MAY IT BE PUBLISHED TO THE JURY?
```

1         THE COURT:  PLEASE, GO AHEAD.

2    BY MR. KALEBA:

3    Q.   AND THESE ARE DONE IN REVERSE CHRONOLOGICAL ORDER, SO

4    COULD YOU TURN TO THE LAST PAGE OF 84A?

5    A.   OKAY.

6    Q.   AND CAN YOU MAGNIFY IT, PLEASE?

7         SO COULD YOU DESCRIBE WHAT THIS E-MAIL IS?

8    A.   THIS E-MAIL IS A LIST OF DUE DILIGENCE QUESTIONS THAT I

9    ASKED REGARDING HOW THE FUND WORKED AND WHAT SORT OF INVESTING

10   THEY DID.

11   Q.   WAS THERE AN E-MAIL BEFORE THIS WITH YOUR QUESTIONS?

12   A.   MUST HAVE BEEN, YES, BECAUSE THIS IS THE ACTUAL ANSWERS.

13   Q.   OKAY.  COULD YOU EXPLAIN TO THE JURY WHAT YOUR QUESTIONS

14   ARE AND WHAT THE RESPONSES ARE THAT YOU RECEIVED?

15   A.   DO YOU WANT ME TO GO THROUGH EACH ONE SEPARATELY OR JUST

16   IN GENERAL?

17   Q.   IN GENERAL.  FOR EXAMPLE, THERE'S STUFF IN BOLD AND

18   THERE'S THINGS THAT ARE BELOW THAT.

19   A.   RIGHT.  SO THE QUESTIONS IN BOLD, THOSE ARE MY QUESTIONS;

20   AND THE ONES WITH THE LITTLE BULLET POINT ARROWS NEXT TO THEM

21   ARE THE ANSWERS FROM JACKIE.

22   Q.   OKAY.  AND I WANT TO TURN TO THE THIRD QUESTION THAT YOU

23   RAISE.

24        IF YOU COULD PULL THAT UP, PLEASE.

25        OKAY.  COULD YOU READ YOUR QUESTION?

1    A.   SURE.   "WHAT ARE THE PARAMETERS FOR INCREASING AND

2    WITHDRAWING THE INVESTOR'S CAPITAL ACCOUNT?"

3    Q.   OKAY.   WHAT WAS THE REASON YOU ASKED THIS QUESTION?

4    A.   WELL, BECAUSE IN CASE I NEEDED TO WITHDRAW FUNDS FROM

5    THE -- I WANTED TO KNOW HOW LONG IT WOULD TAKE TO GET MY FUNDS

6    BACK.   SO BASICALLY I'M DOING DUE DILIGENCE ON THE LIQUIDITY OF

7    THIS INVESTMENT.

8    Q.   AND WHAT WAS THE RESPONSE YOU RECEIVED?

9    A.   "YOU MAY MAKE DEPOSITS INTO YOUR CAPITAL ACCOUNT AT ANY

10   TIME.   IN ORDER TO WITHDRAW FUNDS, THE INVESTOR MUST COMPLETE A

11   WITHDRAWAL FORM.   FUNDS WILL BE FORWARDED WITHIN 30 DAYS FROM

12   RECEIPT OF COMPLETED FORM."

13   Q.   IF YOU COULD TURN TO THE NEXT TWO QUESTIONS.

14        AND WAIT AND WE'LL PULL THOSE UP ON THE SCREEN.   SORRY.

15   NO.   IT'S THE QUESTION, "ARE YOUR INVESTMENTS SECURED BY REAL

16   ESTATE?"

17        OKAY.   IS THIS -- COULD YOU READ THIS QUESTION, PLEASE?

18   A.   SURE.   "ARE YOUR INVESTMENTS SECURED BY REAL ESTATE OR

19   OTHER INVESTMENTS?"

20   Q.   AND WHY WAS THIS IMPORTANT TO YOU?

21   A.   WELL, A -- A SECURED INVESTMENT BY REAL ESTATE IS MUCH

22   LESS RISKY BECAUSE IF SOMETHING WAS TO HAPPEN, THEN THERE'S

23   STILL THE PROPERTY THERE TO BE ABLE TO GET YOUR INVESTMENT

24   BACK.

25   Q.   OKAY.   AND WHAT WAS THE RESPONSE YOU RECEIVED?

1    A.   THE RESPONSE WAS, "INVESTMENTS ARE SECURED BY REAL

2    PROPERTY THROUGH A DEED OF TRUST OR MORTGAGE."

3    Q.   OKAY.  NEXT QUESTION, PLEASE.

4    A.   "ARE THESE RECOURSE OR NON-RECOURSE LOANS THAT YOU PROVIDE

5    TO BORROWERS?"

6    Q.   AND WHY DID YOU ASK THIS QUESTION?

7    A.   BECAUSE IF, IN FACT, A BORROWER WAS TO FORECLOSE AND --

8    NOT ONLY WOULD YOU GET THE PROPERTY BACK, BUT A RECOURSE LOAN

9    ALLOWS YOU TO BE ABLE TO GO AND GO TO THE BORROWER FOR ANY

10   OTHER ASSETS THEY MIGHT HAVE TO COLLECT ANY OF YOUR INVESTMENT.

11   Q.   SO THE FIRST QUESTION ABOVE IT, WHICH IS WHETHER THE

12   INVESTMENT IS SECURED, WHAT'S THE DIFFERENCE THEN BETWEEN THAT

13   QUESTION AND THEN THE ISSUE OF RECOURSE VERSUS NON-RECOURSE?

14   A.   SO SECURED MEANS THAT THERE'S A PIECE OF PROPERTY THERE TO

15   BE ABLE TO GO AND GET THE -- YOU'LL HAVE THE VALUE OF THAT

16   PROPERTY.

17       AND A RECOURSE LOAN MEANS THAT YOU'LL ALSO BE ABLE TO GO

18   AFTER THE BORROWER FOR ANY ASSETS THAT THEY MIGHT HAVE BEYOND

19   THAT PROPERTY TO GET YOUR MONEY BACK.

20   Q.   OKAY.  AND WHAT WERE YOU TOLD BY MS. LAMBERT?

21   A.   "ALL LOANS ARE MADE WITH FULL RECOURSE."

22   Q.   OKAY.  COULD YOU TURN TO THE NEXT QUESTION, PLEASE?  COULD

23   YOU READ YOUR QUESTION?

24   A.   "WHAT DUE DILIGENCE DO YOU PERFORM ON YOUR BORROWERS?"

25   Q.   AND WHY DID YOU ASK THIS QUESTION?

1    A.   WELL, I WANTED TO MAKE SURE THAT THE BORROWERS WERE

2    SUITABLE FOR LENDING MONEY TO THEM.

3    Q.   AND WHAT WAS THE RESPONSE YOU RECEIVED?

4    A.   "WE DO A COMPLETE LOAN APPLICATION, WE HAVE AN APPRAISAL

5    DONE AND CHECK THE BORROWER'S CREDIT.  WE ALSO CONTACT

6    REFERENCES WHERE APPROPRIATE.  MOST BORROWERS ARE REFERRED TO

7    US BY ONE OF OUR INVESTORS OR OTHER BORROWERS."

8    Q.   OKAY.  LET'S TURN TO THE NEXT TWO QUESTIONS, IF YOU DON'T

9    MIND.

10        WHAT WAS YOUR QUESTION?

11   A.   "DO YOU CHECK CREDIT AND/OR ASSETS OR ARE THESE STATED

12   LOANS?"

13        "WE CHECK CREDIT AND WE DO NOT PROVIDE STATED LOANS."

14   Q.   WHY DID YOU ASK THIS QUESTION ABOUT CREDIT CHECKS AS WELL

15   AS STATED LOANS?

16   A.   AGAIN, IT LENDS TO HOW RISKY THESE LOANS ARE.  IF YOU'RE

17   CHECKING SOMEONE'S CREDIT PRIOR TO LENDING THEM MONEY, YOU KNOW

18   THAT YOU'RE DEALING WITH A RESPONSIBLE PERSON THAT'S HAD A

19   HISTORY OF PAYING THEIR CREDIT.

20        STATED LOANS BASICALLY DON'T REQUIRE THAT.

21   Q.   OKAY.  AND THE NEXT QUESTION?

22   A.   "IF A BORROWER DEFAULTS, WHAT RECOURSE DO YOU HAVE TO

23   RECOUP?"

24   Q.   WHY DID YOU ASK THIS QUESTION?

25   A.   SO IF WE DID GET INTO A SITUATION WHERE ONE OF THE

1    BORROWERS DID DEFAULT ON THEIR LOAN, WHAT WERE OUR CHOICES?

2    Q.   AND THE NEXT QUESTION?

3    A.   "IF YOU NEED TO FORECLOSE ON A BORROWER, DO YOU HANDLE

4    THAT OR DO THE INVESTORS NEED TO BECOME INVOLVED?"

5    Q.   AND WHY WAS THIS IMPORTANT TO YOU?

6    A.   WELL, CERTAINLY IT -- AS AN INVESTOR, IT'S EASIER FOR

7    SOMEONE ELSE TO GO DO THAT, THEM HANDLING THE ASPECTS OF THE

8    FORECLOSURE RATHER THAN MYSELF HAVING TO DO IT.

9    Q.   OKAY.  AND THE NEXT QUESTION YOU ASKED?

10   A.   "CAN YOU PROVIDE FINANCIAL INFORMATION AND TRACK RECORD OF

11   APS FUNDING, INC.?"

12   Q.   AND WHAT WAS THE RESPONSE YOU RECEIVED?

13   A.   "CUSTOMARILY, WE DO NOT PROVIDE COMPANY FINANCIAL

14   STATEMENTS TO INVESTORS.  WHAT SPECIFICALLY WOULD YOU LIKE TO

15   SEE?"

16   Q.   OKAY.  AND YOUR NEXT QUESTION?

17   A.   "CAN FORWARD ME A SUBSCRIPTION AGREEMENT AND CONFIDENTIAL

18   SUITABILITY STATEMENT?"

19   Q.   AND THE RESPONSE?

20   A.   "THESE DOCUMENTS ARE ATTACHED TO THIS E-MAIL."

21   Q.   WERE THE REPRESENTATIONS THAT ARE MADE IN THIS E-MAIL

22   ABOUT THE ABILITY TO WITHDRAW YOUR CAPITAL IMPORTANT TO YOU AT

23   THAT TIME?

24   A.   VERY IMPORTANT.

25   Q.   WAS THE REPRESENTATION THAT THE INVESTMENT WAS SECURED BY

1    REAL ESTATE OR OTHER INVESTMENTS IMPORTANT TO YOU?

2    A.   YES.

3    Q.   AND WAS THE REPRESENTATION ABOUT THE CREDITWORTHINESS OF

4    THE BORROWERS IMPORTANT TO YOU?

5    A.   YES.

6    Q.   AS WELL AS THE DUE DILIGENCE THAT THEY PURPORTED TO DO,

7    WAS THAT IMPORTANT TO YOU?

8    A.   YES.

9    Q.   YOU ASKED FOR A REVIEW OF THE SUBSCRIPTION AGREEMENT AND

10   CONFIDENTIALITY -- OR CONFIDENTIAL SUITABILITY STATEMENT.  DID

11   YOU WANT TO -- WHY DID YOU DO THAT?

12   A.   WELL, I CERTAINLY WANTED TO SEE THE DETAILS OF THE

13   CONTRACTS ASSOCIATED WITH INVESTING IN THIS, IN THIS

14   INVESTMENT.

15   Q.   AND DID YOU RECEIVE THOSE DOCUMENTS?

16   A.   I DID.

17   Q.   WERE THEY E-MAILED TO YOU OR MAILED TO YOU?  HOW DID YOU

18   GET THEM?

19   A.   THEY WERE E-MAILED TO ME.

20   Q.   OKAY.  LET'S TURN TO THE PRIOR PAGE.  ON THE BOTTOM IT'S

21   NUMBERED 1610.

22   A.   UM-HUM.

23   Q.   CAN YOU DESCRIBE WHAT'S GOING ON IN THIS E-MAIL CHAIN

24   STARTING AT THE BOTTOM?

25   A.   YES.  HERE IS WHERE I ASKED ADDITIONAL QUESTIONS ABOUT

```
1     TOTALS OF THEIR REVENUE AND EXPENSES AND ASSETS AND

2     LIABILITIES.  I'M TRYING TO GET MORE INFORMATION ABOUT THEIR

3     INCOME STATEMENT AND BALANCE SHEETS.

4     Q.   OKAY.  AND THERE'S A QUESTION IN HERE ABOUT HOW MANY YEARS

5     IN BUSINESS.

6          DO YOU SEE THAT?

7     A.   YES.

8     Q.   WAS THAT IMPORTANT TO YOU?

9     A.   YES.

10    Q.   AND WHY IS THAT?

11    A.   WELL, IT LENDS TO THE LONGER SOMEONE HAS BEEN IN BUSINESS,

12    THE MORE LIKELY THEY, THEY'VE DONE GOOD BUSINESS.

13    Q.   AT THE TOP OF THE E-MAIL THERE'S A HEADER, "FROM," "SENT,"

14    "TO," AND WHO'S COPIED ON IT.

15         AND WHO IS COPIED ON THE E-MAIL?

16    A.   YES.  I CC'D BARBRA ON THIS PARTICULAR E-MAIL.

17    Q.   OKAY.  GETTING BACK DOWN TO THE FORECLOSURES, DO YOU SEE

18    THAT, THE TRACK RECORD FOR PERCENTAGE OF FORECLOSURES?

19    A.   YES.

20    Q.   WHY DID YOU ASK THAT QUESTION?

21    A.   AGAIN, I WANTED TO FIND OUT IF THE COMPANY HAD HAD ANY

22    HISTORY OF LOSSES FOR INVESTORS.

23    Q.   OKAY.  AND THEN THERE'S A STATEMENT BELOW.  IT SAYS, "IN

24    THE MEANTIME, I WILL REVIEW THE AGREEMENT DOCUMENTS."

25         IS THAT YOUR WRITING?
```

1      A.   YES, IT IS.

2      Q.   AND IS THE RESPONSE "THANK YOU" FROM MS. LAMBERT?

3      A.   YES.

4      Q.   OKAY.  DID YOU -- DO YOU RECALL RECEIVING THOSE DOCUMENTS?

5      A.   I DO.

6      Q.   AND DO YOU REMEMBER REVIEWING THOSE DOCUMENTS?

7      A.   IN DETAIL, YES.

8      Q.   OKAY.  WE'LL TURN TO THAT IN A MINUTE.

9           IF WE CAN GO TO THE PRIOR PAGE, 1609.  AT THE BOTTOM

10     THERE'S AN E-MAIL FROM MS. LAMBERT TO YOU.

11     A.   YES.

12     Q.   DO YOU RECALL RECEIVING THAT E-MAIL?

13     A.   YES.

14     Q.   OKAY.  SHE MENTIONED THAT YOU PASSWORD PROTECTED YOUR

15     DOCUMENTS.  DID YOU DO THAT?

16     A.   YES.

17     Q.   AND WHY DID YOU DO THAT?

18     A.   IT'S JUST A WAY OF PROTECTING.  NOWADAYS WITH IDENTITY

19     THEFT AND CREDIT THEFT, IT WAS A WAY TO PROTECT MY CONFIDENTIAL

20     INFORMATION.

21     Q.   OKAY.  WERE THE COPIES THAT YOU SENT E-MAILED TO HER?

22     A.   YES.

23     Q.   ABOVE IT IS YOUR RESPONSE.

24          IF WE CAN SEE THAT?

25     A.   YES, REGARDING THAT I WOULD SEND A CHECK.

1    Q.   OKAY.  AND YOU COPIED MS. ALEXANDER, IS THAT CORRECT, ON

2    THIS?

3    A.   CORRECT.

4    Q.   AND IF YOU CAN GO TO THE E-MAIL ABOVE THIS?

5    A.   YES.  THIS WAS DIRECTLY FROM BARBRA WELCOMING ME TO HER

6    FAMILY OF INVESTORS, AND SHE STATES HERE THAT JACQUELINE HAS

7    BEEN KEEPING HER INFORMED ON OUR COMMUNICATIONS AND THAT SHE'S

8    DELIGHTED THAT I'M GOING TO BE WITH THEM.

9         AND IN ANSWER TO THE LAST QUESTION, SHE TOLD ME WHERE TO

10   SEND A CHECK TO.

11   Q.   OKAY.  WERE YOU REASSURED BY MS. ALEXANDER'S STATEMENTS

12   THAT SHE'D BEEN KEPT INFORMED OF YOUR COMMUNICATIONS?

13   A.   YES.  AS THE PRESIDENCY OF A MANAGING MEMBER, IT WAS

14   IMPORTANT TO ME THAT SHE WAS ACKNOWLEDGING THAT I WAS GOING TO

15   INVEST IN HER COMPANY.

16   Q.   AND DID IT MATTER TO YOU THAT THE MANAGING MEMBER OR THE

17   CEO OR THE PRESIDENT WAS -- HAD PERSONAL ATTENTION ON YOU?

18   A.   YES, THAT WAS -- THAT WAS IMPORTANT, YES.

19        MR. KALEBA:  OKAY.  IF WE COULD, JUST THE LAST E-MAIL

20   AND THEN I THINK WE CAN BREAK, YOUR HONOR, IF THAT WOULD BE

21   OKAY?

22        THE COURT:  THAT'S FINE.

23   BY MR. KALEBA:

24   Q.   PAGE 1607.

25   A.   UM-HUM.

1    Q.   CAN YOU DESCRIBE THESE TWO E-MAILS?

2    A.   YES.  I'LL START AT THE BOTTOM AGAIN.

3         THEY'RE MENTIONING HERE THAT THEY RECEIVED MY CHECK.

4    Q.   OKAY.  AND THE E-MAIL ABOVE THAT ONE IF YOU WOULD?

5    A.   YES.  THEY'RE -- I'M ASKING THEM TO, TO SEND ME OR SCAN,

6    SCAN AND E-MAIL THE PAGE OF THE AGREEMENT WITH BARBRA'S

7    SIGNATURE ON THEM SO THAT I WOULD HAVE AN EXECUTED CONTRACT

8    VERSION.

9    Q.   AND WHY DID YOU WANT A COPY WITH BARBRA'S SIGNATURE ON IT?

10   A.   IT'S ALWAYS IMPORTANT, WHEN YOU SIGN A CONTRACT, THAT YOU

11   HAVE A COPY WITH BOTH PARTIES' SIGNATURE ON IT.

12        MR. KALEBA:  OKAY.  THANK YOU.

13        THE WITNESS:  UM-HUM.

14        THE COURT:  ALL RIGHT.  THE TIME IS NOW 4:30.

15        PLEASE KEEP AN OPEN MIND.  PLEASE DON'T DISCUSS OR

16   RESEARCH THE CASE.

17        SO WE HAVE NO TRIAL TOMORROW OR THURSDAY.  WE'LL SEE YOU

18   BACK ON FRIDAY AT 9:00 A.M.

19        I WILL HAVE OTHER CRIMINAL AND CIVIL CASES HERE TOMORROW

20   AND THURSDAY, SO I RECOMMEND THAT YOU DON'T LEAVE ANYTHING IN

21   THE COURTROOM BECAUSE THERE WILL JUST BE A LOT OF PEOPLE GOING

22   IN AND OUT.

23        AND PLEASE LEAVE YOUR NOTEBOOKS AND THE PRELIMINARY JURY

24   INSTRUCTIONS IN THE JURY ROOM.

25        OKAY.  THANK YOU FOR YOUR PATIENCE AND YOUR SERVICE.

1    WE'LL SEE YOU ON FRIDAY MORNING AT 9:00.

2         AND MR. OLMSTEAD, YOU MAY STEP DOWN.  YOU'RE FREE TO

3    LEAVE.  BUT YOU'LL BE BACK ON MONDAY AT 9:00 O'CLOCK, SIR.

4         THE WITNESS:  FRIDAY OR MONDAY?

5         THE COURT:  FRIDAY, RIGHT.  FRIDAY AT 9:00.

6    DID I TELL YOU ALL TO COME BACK MONDAY?  COME BACK FRIDAY.

7    SORRY.  FRIDAY AT 9:00 A.M.  SORRY.  MY MISTAKE.  I'LL SEE

8    EVERYBODY ON FEBRUARY 7TH AT 9:00 O'CLOCK, FRIDAY.

9         (JURY OUT AT 4:31 P.M.)

10        THE COURT:  ALL RIGHT.  ANYTHING ELSE FOR TODAY?

11        MR. SCHENK:  NO, YOUR HONOR.

12        THE COURT:  NO?  OKAY.  SO PLEASE JUST FILE YOUR

13   STIPULATION ON RENUMBERING THE MONEY LAUNDERING COUNTS, AS WELL

14   AS A REVISED VERDICT FORM.

15        THANK YOU.

16        MR. KALEBA:  AND JUST ONE LAST THING.  YOUR HONOR

17   ASKED FOR UPDATES ON ANTICIPATED WITNESSES FOR FRIDAY.  WE

18   SHOULD BE ABLE TO DO THAT TOMORROW FOR THE COURT AND DEFENSE

19   COUNSEL.

20        THE COURT:  THAT'S FINE.

21        MR. LEEMING:  THANK YOU.

22        THE COURT:  THAT'S FINE.  THANK YOU.

23        MR. KALEBA:  THANK YOU, YOUR HONOR.

24        (THE EVENING RECESS WAS TAKEN AT 4:32 P.M.)

25

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:   SEPTEMBER 28, 2014

19

20

21

22

23

24

25