```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4


 5
     UNITED STATES OF AMERICA,        )  CR-10-00730 LHK
 6                                     )
                     PLAINTIFF,        )  SAN JOSE, CALIFORNIA
 7                                     )
              VS.                      )  FEBRUARY 7, 2014
 8                                     )
     BARBRA ALEXANDER,                 )  VOLUME 3
 9                                     )
                     DEFENDANT.        )  PAGES 476-709
10   _____  )

11
                   TRANSCRIPT OF PROCEEDINGS
12           BEFORE THE HONORABLE LUCY H. KOH
                UNITED STATES DISTRICT JUDGE
13

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JEFFREY B. SCHENK
16                              DANIEL R. KALEBA
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA  95113

18   FOR THE DEFENDANT:    LAW OFFICES OF PETER A. LEEMING
                           BY:  PETER A. LEEMING
19                         95 SOUTH MARKET STREET, SUITE 300
                           SAN JOSE, CALIFORNIA  95113
20

21

22


23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER
```

1

2                           INDEX OF WITNESSES

3       PLAINTIFF'S

4       RANDALL OLMSTEAD
              DIRECT EXAM BY MR. KALEBA (RES.)        P. 485
5             CROSS-EXAM BY MR. LEEMING               P. 511

6       BARBARA WORKMAN
              DIRECT EXAM BY MR. KALEBA               P. 543
7             CROSS-EXAM BY MR. LEEMING               P. 572

8       LINDA CAGLE
              DIRECT EXAM BY MR. KALEBA               P. 596
9             CROSS-EXAM BY MR. LEEMING               P. 689

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              INDEX OF EXHIBITS

3                                      MARKED        ADMITTED

4        PLAINTIFF'S

5        84B                                         487
         84C                                         488
6        79                                          490
         84D                                         503
7        33                                          505
         17                                          507
8        23                                          510
         70                                          555
9        24                                          562
         200, 203, 205, 206, 207                     604
10             208, 214
         204                                         618
11       210                                         640
         211                                         641
12       53A - 53K                                   653
         26                                          673
13       27                                          674
         71                                          677
14       63, PAGES 10 AND 11                         685
         63, BATES PAGES 696, 697, 699               687
15

16

17

18

19

20

21

22

23

24

25

```
1     SAN JOSE, CALIFORNIA                    FEBRUARY 7, 2014

2                        P R O C E E D I N G S

3         (JURY OUT AT 9:04 A.M.)

4              THE COURT:  OKAY.  THERE'S ONE ISSUE I WOULD LIKE TO

5     RAISE.  GOOD MORNING.

6              MR. LEEMING:  GOOD MORNING.

7              THE CLERK:  THEY'RE ALL HERE.

8              THE COURT:  OH, THEY'RE ALL HERE.

9         OKAY.  I UNDERSTOOD YOU HAD AN ISSUE.

10             MR. SCHENK:  YES.  DOES THE COURT WANT TO TAKE THAT

11    UP NOW?

12             THE COURT:  I WOULD RATHER NOT.  CAN THIS WAIT OR

13    DOES IT HAVE TO BE DONE RIGHT NOW?

14             MR. SCHENK:  WHY DON'T WE TELL YOU WHAT THE ISSUES

15    ARE AND YOU CAN TELL US?  THEY BOTH ARE LIKELY TO COME UP IN

16    CROSS-EXAMINATIONS, BUT NOT WITH MR. OLMSTEAD.  SO IF WE'RE

17    GOING TO TAKE A BREAK AT SOME POINT LATER, WE DON'T NEED TO

18    KNOW THE ANSWERS FROM THE COURT.

19             THE COURT:  WHO ARE THEY GOING TO COME UP WITH?

20             MR. SCHENK:  CAGLE AND WORKMAN.

21             MR. LEEMING:  YES.

22             THE COURT:  OKAY.  AND WORKMAN IS NEXT, IS THAT

23    RIGHT?

24             MR. SCHENK:  YES.

25             MR. LEEMING:  YES.
```

```
 1              THE COURT:  WHAT'S THE ISSUE?

 2              MR. LEEMING:  YOUR HONOR, THE ISSUE IS THAT

 3      MS. WORKMAN -- FIRST OF ALL, I BELIEVE SHE'S GOING TO TESTIFY

 4      AND COME ACROSS AS AN ELDERLY PERSON WHO'S NOT VERY

 5      SOPHISTICATED FINANCIALLY, AND SO I HAVE OBTAINED, AS OF LAST

 6      NIGHT, A COPY OF A DIVORCE FILE THAT MAY IMPEACH HER ON SOME OF

 7      THOSE ISSUES.

 8              SPECIFICALLY, THERE'S A COUPLE OF THINGS.  ONE IS SHE MADE

 9      A CLAIM THAT SHE WAS A VICTIM OF A $10 MILLION JEWELRY THEFT.

10      I DON'T KNOW IF SHE TESTIFIED TO THAT AT THE LAST TRIAL.

11              THE COURT:  NO.

12              MR. LEEMING:  BUT SHE DID MAKE A REPORT ABOUT THAT TO

13      THE MONTEREY POLICE DEPARTMENT, AND THERE WAS SOME INTIMATION

14      THAT MS. ALEXANDER OR SOMEONE WHO WORKED FOR HER DID THAT.  SHE

15      SAID THAT THAT JEWELRY WAS NOT INSURED AND IT WAS TAKEN FROM

16      HER HOME VAULT.

17              ACCORDING TO THE FINANCIAL STATEMENTS FILED DURING THE

18      DIVORCE, WHICH WAS HEAVILY LITIGATED, IT WENT ALL THE WAY UP TO

19      THE SUPREME COURT OF THE STATE THAT SHE LIVED IN, HER HUSBAND

20      WAS PAYING FOR INSURANCE ON HER JEWELRY, WHICH AT THAT POINT,

21      INCLUDING THE FURS, WAS VALUED AT $1.5 MILLION.

22              SO HER CREDIBILITY IS AT STAKE ON THE QUESTION OF THIS

23      CLAIM TO THE POLICE DEPARTMENT THAT SOMEONE HAD STOLEN $10

24      MILLION.  IT'S ACTUALLY A CRIME TO MAKE A FALSE STATEMENT TO

25      A --
```

```
 1                 THE COURT:  SO DO YOU WANT TO RAISE THIS IF SHE
 2     DOESN'T RAISE IT?
 3                 MR. LEEMING:  YES.  I WANT TO ASK HER ABOUT.
 4                 MR. KALEBA:  WE HAVEN'T SEEN THE FILE YET.  I GUESS
 5     WE JUST GOT IT THIS MORNING FROM MR. LEEMING.
 6                 MR. LEEMING:  I HAD IT SCANNED YESTERDAY AND I'VE
 7     GIVEN THE PROSECUTION AN ELECTRONIC COPY.
 8                 MR. KALEBA:  I WAS TOLD LAST NIGHT ABOUT IT.  I THINK
 9     A COUPLE ISSUES --
10                 THE COURT:  SO WHEN DID YOU PROVIDE IT?
11                 MR. LEEMING:  THIS MORNING.  AS SOON AS I GOT IT LAST
12     NIGHT, I STARTED READING IT, AND I THOUGHT, WOW, THIS IS
13     INTERESTING.
14                 MR. KALEBA:  SO I THINK THIS IS 608(B) IMPEACHMENT OF
15     WHAT HE'S CLAIMING TO BE EITHER A PRIOR BAD ACT, AND I THINK
16     WHAT HE'S TRYING TO ALLEGE IS SHE LIED IN THE DIVORCE
17     PROCEEDINGS ABOUT THE VALUE OF THE JEWELRY, OR SHE INFLATED THE
18     VALUE OF THE JEWELRY WHEN SHE MADE A POLICE REPORT AFTER THE
19     FACT.
20                 THE COURT:  UM-HUM.
21                 MR. KALEBA:  I THINK, YOU KNOW, IT'S TOTALLY
22     COLLATERAL.  I THINK HE'S OFFERING IT FOR A COUPLE REASONS, NOT
23     JUST THAT SHE MAY HAVE BEEN UNTRUTHFUL, BUT I THINK HE'S TRYING
24     TO SOMEHOW SUGGEST SHE WAS VERY WEALTHY AND NOT VERY --
25     THEREFORE, SHE COULD AFFORD TO LOSE THE MONEY, WHICH IS
```

1        SEPARATE FROM WHETHER SHE DESERVED TO LOSE THE MONEY.

2               THE COURT:  UM-HUM.

3               MR. KALEBA:  I THINK ON THIS ISSUE, WE'D LIKE TO AT

4        LEAST GET A CHANCE TO LOOK AT THE DIVORCE PAPERWORK, BECAUSE ON

5        THE POINT OF DID SHE LIE IN THE DIVORCE PROCEEDINGS, IF HE'S

6        ONLY RELYING ON THE INSURANCE POLICY THAT WAS TAKEN OUT, THAT

7        ONLY SHOWS THAT THE INSURANCE POLICY WAS TAKEN OUT FOR 1.5

8        MILLION, BUT THAT DOESN'T MEAN THEY DIDN'T HAVE A POLICY THAT

9        COVERED ALL THE JEWELRY.

10              THE COURT:  WELL, IT SOUNDS LIKE THIS IS NOT QUITE

11       RIPE, BECAUSE YOU WANT SOME TIME.  IF YOU JUST GOT IT THIS

12       MORNING, IT'S --

13              MR. LEEMING:  AND I JUST GOT IT LAST NIGHT.

14              THE COURT:  IT'S 9:08 A.M.  YOU MAY WANT TO TALK

15       ABOUT IT.  IS THERE ANY WAY THAT SHE DOES NOT HAVE TO GO NEXT

16       AFTER MR. OLMSTEAD?

17              MR. KALEBA:  CERTAINLY WE COULD --

18              THE COURT:  HOW MUCH TIME DO YOU NEED TO TAKE A LOOK

19       AT IT?

20              MR. KALEBA:  I THINK IF WE LOOKED AT IT OVER LUNCH,

21       WE WOULD BE PREPARED FOR IT --

22              THE COURT:  BUT THEN YOU'D HAVE TO HAVE ANOTHER

23       WITNESS.

24              MR. KALEBA:  AND I CAN START WITH MS. CAGLE RIGHT

25       AFTER THIS.

```
 1                THE COURT:  ALL RIGHT.  THAT'S FINE.  CAN WE DEAL
 2      WITH IT AT LUNCH?
 3                MR. LEEMING:  THAT'S FINE.  THERE'S JUST SOME LITTLE
 4      SLICES -- THERE ARE SOME FINANCIAL STATEMENTS THAT ARE
 5      SUBMITTED BY HER --
 6                THE COURT:  THERE'S QUITE A BIT OF INFORMATION THAT
 7      YOU'D LIKE TO DO?
 8                MR. LEEMING:  YES.
 9                THE COURT:  OKAY.  WELL, I'D LIKE TO GIVE THE
10      GOVERNMENT SOME TIME TO LOOK IT OVER, THINK ABOUT IT, AND MAYBE
11      WE CAN DEAL WITH IT OVER THE LUNCH BREAK.
12           NOW, THE ONE QUICK ISSUE I HAD IS I WANT YOU TO RESUBMIT
13      YOUR JOINT STIPULATION TO RENUMBER CERTAIN MONEY LAUNDERING
14      COUNTS TO MAKE IT CLEAR WE ARE NOT RENUMBERING THE COUNTS
15      FOREVER IN THE WHOLE CASE.  WE'RE JUST RENUMBERING THEM FOR THE
16      PURPOSES OF THE JURY INSTRUCTIONS AND THE VERDICT FORM TO
17      PREVENT THE JURY FROM SPECULATING ABOUT THE MISSING COUNTS.
18           BUT FOR ANY JUDGMENT IN THIS CASE, WHETHER IT'S AN
19      ACQUITTAL OR A CONVICTION, WE WILL USE THE ORIGINAL GRAND JURY
20      INDICTMENT COUNTS.  DOES THAT MAKE SENSE?
21                MR. LEEMING:  THAT MAKES PERFECT SENSE, YOUR HONOR.
22                THE COURT:  I JUST WANT US TO BE ABLE TO TRANSLATE IT
23      BACK AND FORTH.  THE STIPULATION CAUSED OUR CLERK'S OFFICE A
24      BIG CONCERN, AND SO I RELAYED TO THEM THAT THIS IS STRICTLY
25      JUST KIND OF COSMETIC FOR THE JURY AND THAT FOR ALL OTHER
```

```
 1        PURPOSES IN THE CASE, THE PARTIES AND THE COURT WILL ALWAYS
 2        TREAT THIS AS THE GRAND JURY COUNTS, AND WE'LL DO THAT
 3        TRANSLATION SO IT'S CLEAR FOR THEM.  OKAY?
 4             MR. LEEMING:  AND WOULD YOUR HONOR PREFER THE
 5        STIPULATION TO BE WORDED IN JUST THAT WAY?
 6             THE COURT:  YES, BECAUSE THIS -- THIS SAYS THAT THE
 7        COUNTS WILL BE RENUMBERED AS FOLLOWS, WHICH MAKES IT SEEM AS IF
 8        WE'RE JUST COMPLETELY DOING THAT FOR THE WHOLE CASE, AND THAT'S
 9        GOING TO CAUSE OUR CLERK'S OFFICE A HUGE AMOUNT OF PROBLEMS.
10          SO I'D LIKE IT TO BE CLARIFIED THAT THIS IS SOLELY FOR THE
11        JURY INSTRUCTIONS AND THE VERDICT FORM TO PREVENT JURY
12        SPECULATION ABOUT MISSING COUNTS.
13          BUT REGARDLESS OF WHETHER THERE'S AN ACQUITTAL OR A
14        CONVICTION OR WHATEVER, THE ULTIMATE JUDGMENT WILL USE THE
15        ORIGINAL NUMBERING OF THE COUNTS IN THE INDICTMENT, YOU KNOW,
16        AND ULTIMATELY IF THERE IS ANY SENTENCING, IT WILL ALSO BE
17        ACCORDING TO THOSE ORIGINAL INDICTMENT COUNT NUMBERS, AND THAT
18        THIS IS JUST COSMETIC FOR THE JURY.  IT'S NOT UNDERLYING OR
19        CHANGING ANYTHING THE GRAND JURY DID.
20          SO IF YOU COULD RESUBMIT THAT?  THERE'S NO HURRY ON IT.  I
21        THINK WE'RE ALL -- YOU KNOW, YOU ALL HAVE STIPULATED AND I
22        UNDERSTAND WHAT YOU WANT TO DO.
23          BUT IF YOU COULD SUBMIT THAT, I DON'T KNOW, NEXT WEEK?
24        WHENEVER YOU HAVE TIME.
25             MR. SCHENK:  YES, YOUR HONOR.
```

```
 1                  THE COURT:  THAT WOULD HELP FOR OUR CLERK'S OFFICE AS

 2      WELL.

 3                  MR. LEEMING:  THANK YOU, YOUR HONOR.

 4                  THE COURT:  OKAY.  THANK YOU.  LET'S BRING IN OUR

 5      JURY.

 6            AND CAN YOU BRING IN MR. OLMSTEAD?  LET'S GO AHEAD AND

 7      HAVE HIM ON THE STAND, PLEASE.

 8            (JURY IN AT 9:11 A.M.)

 9                  THE COURT:  ALL RIGHT.  WELCOME BACK.  PLEASE TAKE A

10      SEAT.  GOOD MORNING.

11            PLEASE TAKE A SEAT EVERYONE.

12            AND MAYBE WE CAN WORK OUT A SYSTEM THAT WHEN ALL 13 JURORS

13      ARE PRESENT, COULD YOU KNOCK ON THIS DOOR AND THAT WAY WE'LL

14      KNOW THAT EVERYONE IS HERE?  OKAY.  THANK YOU.

15            AND BY "THIS DOOR," I MEAN THE DOOR TO THE COURTROOM.

16            PLEASE TAKE A SEAT EVERYONE.

17            MR. OLMSTEAD, YOU ARE STILL UNDER OATH.

18            PLEASE PROCEED WITH THE DIRECT EXAMINATION.

19            (RANDALL OLMSTEAD, PLAINTIFF'S WITNESS, WAS PREVIOUSLY

20      SWORN.)

21                  MR. KALEBA:  THANK YOU, YOUR HONOR.

22                      DIRECT EXAMINATION (RESUMED)

23      BY MR. KALEBA:

24      Q.   GOOD MORNING.

25      A.   GOOD MORNING.
```

1    Q.   WHEN WE BROKE, WE WERE LOOKING AT SOME E-MAILS THAT YOU'D

2    EXCHANGED WITH MS. LAMBERT AND MS. ALEXANDER.

3         DO YOU SEE EXHIBIT NUMBER 84A IN FRONT OF YOU, AND PAGE

4    1607 ON THE BOTTOM?

5    A.   YES, I'M ON PAGE 1607.

6    Q.   OKAY.  I WANT TO LOOK AT THE E-MAIL THAT'S ON THE VERY

7    TOP.  IT'S FROM YOU TO MS. LAMBERT AND MS. ALEXANDER.

8    A.   OKAY, YES.

9    Q.   OKAY.  AND COULD YOU READ THE FIRST SENTENCE?  IT SAYS

10   "THANK YOU."

11   A.   IT SAYS, "THANK YOU BOTH.  I WILL HAVE A CHECK TO YOU

12   LATER THIS WEEK.  RANDY."

13   Q.   OH, SORRY.  DO YOU SEE THE SENTENCE THAT SAYS -- PAGE --

14   IT'S ON THE SCREEN, "THANK YOU, AND IF POSSIBLE" --

15   A.   "THANK YOU, AND IF POSSIBLE CAN YOU MAIL OUT OR SCAN THE

16   PAGES OF THE AGREEMENT WITH BARBRA'S SIGNATURE ON THEM THAT

17   WOULD BE GREAT."

18   Q.   OKAY.  WHY DID YOU REQUEST A SIGNED COPY OF THE AGREEMENT?

19   A.   BECAUSE HAVING AN EXECUTED CONTRACT REQUIRES BOTH

20   SIGNATURES, SO I WANTED TO MAKE SURE THAT I HAD THAT FOR MY

21   RECORDS.

22   Q.   AND WHY DID YOU ASK FOR BARBRA'S SIGNATURE?

23   A.   BECAUSE SHE WAS THE MANAGING MEMBER, PRESIDENT, CEO OF THE

24   COMPANY.  SO --

25   Q.   AND WAS THAT IMPORTANT TO YOU?

OLMSTEAD DIRECT (RESUMED)

1    A.   YES.

2    Q.   DID YOU RECEIVE A SIGNED COPY BY MS. ALEXANDER?

3    A.   YES, I DID.

4    Q.   OKAY.  COULD YOU TURN TO 84B AND TAKE A LOOK AT THIS

5    DOCUMENT?

6    A.   I'M SORRY.  I'M NOT FINDING THAT.

7         MR. LEEMING:  CAN WE HAVE A PAGE REFERENCE ON THAT,

8    COUNSEL?

9         MR. KALEBA:  AT THE BOTTOM IS 1608.

10        MR. LEEMING:  OKAY.

11        THE WITNESS:  OKAY.  THAT'S A CHECK THERE, YES.

12   BY MR. KALEBA:

13   Q.   OKAY.  COULD YOU IDENTIFY THIS DOCUMENT, PLEASE?

14   A.   YES.  THIS WAS THE CHECK THAT I SENT TO APS FUNDING.

15   Q.   IS THAT YOUR SIGNATURE?

16   A.   NO.  THAT WAS A BANK GENERATED CHECK.

17        MR. KALEBA:  OKAY.  MOVE TO ADMIT 84B, YOUR HONOR.

18        MR. LEEMING:  NO OBJECTION.

19        THE COURT:  IT'S ADMITTED.

20        (PLAINTIFF'S EXHIBIT 84B WAS ADMITTED IN EVIDENCE.)

21        THE COURT:  GO AHEAD, PLEASE.

22        MR. KALEBA:  PLEASE PUBLISH IT.

23   Q.   AT THE TOP THERE IS YOUR NAME; IS THAT RIGHT?

24   A.   CORRECT.

25   Q.   AND BELOW IT THERE'S A NAME CALLED ALPHA VISION.  WHAT'S

1    THAT?

2    A.   THAT'S MY COMPANY, ALPHA VISION COMPUTERS, INC.

3    Q.   OKAY.  AND IT WAS PAID TO THE ORDER OF WHOM?

4    A.   APS FUNDING, INC.

5    Q.   AND WHO, IN YOUR UNDERSTANDING, WAS APS FUNDING, INC.?

6    A.   BARBRA ALEXANDER'S COMPANY.

7    Q.   OKAY.  ON THE BOTTOM THERE'S A NOTE THAT SAYS GREENLIGHT

8    FUND, 40K.

9    A.   YES.

10   Q.   OKAY.  WHAT WAS GREENLIGHT FUND?

11   A.   GREENLIGHT WAS THE INVESTMENT FUND THAT I INVESTED IN,

12   THAT BARBRA WAS OFFERING INVESTING IN.

13   Q.   COULD YOU TURN TO 84C, PLEASE?

14   A.   OKAY.

15   Q.   COULD YOU IDENTIFY THIS DOCUMENT?

16   A.   YES.  THIS WAS A LETTER THAT WAS MAILED TO ME FROM BARBRA.

17   Q.   AND IS THIS A COPY OF THAT LETTER?

18   A.   YES, IT IS.

19   Q.   OKAY.  HOW DID YOU RECEIVE THIS LETTER?

20   A.   THROUGH REGULAR MAIL.

21          MR. KALEBA:  YOUR HONOR, WE MOVE TO ADMIT 84C.

22          THE COURT:  ANY OBJECTION?

23          MR. LEEMING:  NO OBJECTION.

24          THE COURT:  ALL RIGHT.  IT'S ADMITTED.

25          (PLAINTIFF'S EXHIBIT 84C WAS ADMITTED IN EVIDENCE.)

OLMSTEAD DIRECT (RESUMED)

```
1              THE COURT:  GO AHEAD, PLEASE.

2              MR. KALEBA:  PLEASE PUBLISH IT.

3    Q.   AT THE BOTTOM THERE'S HANDWRITTEN WRITING.  DID YOU PUT

4    THAT WRITING THERE?

5    A.   NO, I DID NOT.

6    Q.   WAS IT ON THE COPY OF THE LETTER THAT YOU RECEIVED?

7    A.   YES.

8    Q.   WHAT DOES IT SAY?

9    A.   "FIRST INVESTOR CHECK ENCLOSED WITH THIS LETTER."

10   Q.   WAS THERE A CHECK ENCLOSED WITH THE LETTER?  NOT IN THIS

11   EXHIBIT, BUT DO YOU RECALL RECEIVING A CHECK?

12   A.   THERE MIGHT HAVE BEEN.  I DON'T REMEMBER.

13   Q.   AT THE TIME WERE YOU RECEIVING INTEREST CHECKS FOR YOUR

14   INVESTMENT?

15   A.   YES, I WAS.

16   Q.   AND HOW MUCH PER MONTH DID YOU RECEIVE?

17   A.   AT THIS POINT I WAS RECEIVING $400 PER MONTH.

18   Q.   I'D LIKE TO CHANGE NOW TO EXHIBIT NUMBER 79.

19   A.   OKAY.  I'M THERE.

20   Q.   OKAY.  WOULD YOU TAKE A MOMENT TO REVIEW THESE DOCUMENTS

21   AND PLEASE IDENTIFY WHAT THEY ARE?

22   A.   THE FIRST DOCUMENT IS THE GREENLIGHT FUND SUBSCRIPTION

23   AGREEMENT THAT I SIGNED WITH MY SIGNATURE; THE SECOND DOCUMENT

24   IS THE GREENLIGHT FUND PRIVATE PLACEMENT MEMORANDUM; THE THIRD

25   DOCUMENT IS THE GREENLIGHT FUND CONFIDENTIAL INVESTOR
```

1    SUITABILITY STATEMENT WHICH I COMPLETED; AND THE GREENLIGHT --

2    THE NEXT DOCUMENT IS THE GREENLIGHT FUND OPERATING AGREEMENT.

3    Q.   OKAY.  DID YOU RECEIVE THESE DOCUMENTS FROM APS?

4    A.   YES, I DID.

5    Q.   AND ARE THESE THE DOCUMENTS THAT YOU WERE REFERRING TO IN

6    THE PRIOR E-MAILS WE SAW WHEN YOU REQUESTED COPIES OF THE

7    INVESTMENT DOCUMENTS?

8    A.   YES.

9    Q.   AND DID YOU REVIEW THESE DOCUMENTS PRIOR TO INVESTING?

10   A.   YES, I DID.

11        MR. KALEBA:  WE MOVE TO ADMIT EXHIBIT NUMBER 79, YOUR

12   HONOR.

13        MR. LEEMING:  NO OBJECTION.

14        THE COURT:  IT'S ADMITTED.

15   (PLAINTIFF'S EXHIBIT 79 WAS ADMITTED IN EVIDENCE.)

16        THE COURT:  GO AHEAD, PLEASE.

17   BY MR. KALEBA:

18   Q.   OKAY.  WOULD YOU PLEASE TURN TO PAGE 2 OF EXHIBIT 79?

19        AND IF YOU CAN PUBLISH THAT?

20        AND IF WE LOOK AT PARAGRAPH 2, ACCEPTANCE.

21   A.   YES.

22   Q.   OKAY.  WOULD YOU READ THE FIRST SENTENCE?

23   A.   "ACCEPTANCE:  OBLIGATION TO PURCHASE.  UPON ACCEPTANCE,

24   THIS SUBSCRIPTION WILL OBLIGATE ME TO PURCHASE THE NUMBER OF

25   UNITS SHOWN IN SECTION 6 OF THIS SUBSCRIPTION AGREEMENT FOR THE

```
 1      PURCHASE PRICE OF $40,000 FOR THE MINIMUM PURCHASE OF FOUR

 2      CLASS A UNITS."

 3      Q.   OKAY.  WHAT WAS YOUR UNDERSTANDING OF FOUR CLASS A UNITS?

 4      A.   THEY WERE UNITS THAT, THAT -- TO INVEST IN THIS, TO INVEST

 5      IN THIS INVESTMENT, YES.

 6      Q.   OKAY.  WAS THIS A POOLED INVESTMENT?

 7      A.   UM --

 8      Q.   IS THAT YOUR UNDERSTANDING?

 9      A.   YES, YES.

10      Q.   AND DID A UNIT REFER TO A PORTION OF THE POOL OF THE

11      OVERALL INVESTMENT?

12      A.   YES.

13      Q.   WOULD YOU TURN TO PAGE 3?  DID YOU COMPLETE THIS SECTION

14      WITH THE HANDWRITING?

15      A.   YES, I DID.  THAT'S MY HANDWRITING.

16      Q.   TURN TO PAGE 4.  IS THAT YOUR SIGNATURE?

17      A.   YES, IT IS.

18      Q.   TURN TO PAGE 5.  WHAT IS THIS DOCUMENT?

19      A.   PAGE 5 IS THE -- THAT WAS MY SIGNATURE PAGE; AND THEN I

20      BELIEVE THIS IS THE SIGNATURE PAGE THAT, THAT MS. ALEXANDER AND

21      MS. PINA SIGNED ACCEPTING ME INTO THE, INTO THE GREENLIGHT

22      FUND.

23      Q.   DID YOU RECEIVE THIS SIGNATURE PAGE AFTER OR BEFORE YOU

24      COMPLETED YOUR, YOUR AGREEMENT AND SENT IT?

25      A.   AFTER.
```

1    Q.   WOULD YOU TURN TO THE PRIOR PAGE, PAGE 4.  YOUR SIGNATURE

2    PAGE IS DATED WHICH DATE?

3    A.   10-31-08.

4    Q.   OKAY.  AND IF YOU TURN TO THE ACCEPTANCE PAGE?

5    A.   10-31-2008.

6    Q.   IF YOU WOULD TURN TO PAGE 9, PLEASE.

7    A.   OKAY.

8    Q.   DO YOU SEE THE DESCRIPTION OF THE COMPANY AT THE TOP?

9    A.   YES.

10   Q.   COULD YOU PLEASE READ THE FIRST TWO SENTENCES?

11   A.   SURE.  "THE COMPANY:  THE GREENLIGHT FUND, LLC, A

12   CALIFORNIA LIMITED LIABILITY COMPANY, WAS FORMED ON JUNE 1ST,

13   2008 TO RAISE A POOL OF CAPITAL TO BE USED FOR SHORT-TERM

14   FINANCING.  THE COMPANY WILL MAKE LOANS FOR PURPOSES WHICH MAY

15   INCLUDE BUT NOT BE LIMITED TO THE FOLLOWING:  THE ACQUISITION

16   OF LAND OR RESIDENTIAL OR COMMERCIAL PROPERTY, PROPERTY

17   IMPROVEMENTS AND ENHANCEMENT, AND MISCELLANEOUS FINANCING AND

18   EXPENDITURES.

19        "TYPICALLY, FOR EACH LOAN, THE COMPANY WILL CHARGE 10 TO

20   15 PERCENT ANNUAL INTEREST, WITH AN ADDITIONAL UP-FRONT PAYMENT

21   OF POINTS AND FEES EQUAL TO 1 TO 10 PERCENT.  THE LOANS ARE FOR

22   TERMS FROM 6 TO 12 MONTHS, BUT MAY BE LONGER AT THE DISCRETION

23   OF THE MANAGING MEMBER."

24   Q.   DID YOU REVIEW THIS STATEMENT PRIOR TO COMPLETING THE --

25   PRIOR TO DOING YOUR INVESTMENT?

 1    A.   YES, I DID.

 2    Q.   IS THIS STATEMENT CONSISTENT WITH THE STATEMENTS THAT WERE

 3    MADE TO YOU BY MS. ALEXANDER AND MS. LAMBERT?

 4    A.   YES.   THEY EMPHASIZED THAT THEY ALWAYS INVESTED -- PER

 5    SOME OF THE PREVIOUS E-MAILS WE REVIEWED, THEY REASSURED ME

 6    THAT ALL OF THE INVESTMENTS WOULD BE SECURED BY A DEED OF TRUST

 7    OR A MORTGAGE.   SO THAT WAS IMPORTANT TO ME, YES.

 8    Q.   OKAY.   DO YOU SEE THE PHRASE "MISCELLANEOUS FINANCING AND

 9    EXPENDITURES"?

10    A.   YES.

11    Q.   WHAT WAS YOUR UNDERSTANDING OF THAT TERM?

12    A.   I WOULD THINK OF THAT AS BEING --

13         MR. LEEMING:   OBJECTION.   SPECULATION, NO FOUNDATION.

14         THE COURT:   OVERRULED.

15    GO AHEAD, PLEASE.

16         THE WITNESS:   TO MY UNDERSTANDING, THIS WAS FOR COSTS

17    THAT MIGHT BE ASSOCIATED WITH SECURING A PIECE OF PROPERTY,

18    WHICH MIGHT INCLUDE ESCROW FEES, OTHER FEES OF THAT NATURE WHEN

19    ACQUIRING A PIECE OF PROPERTY.

20    BY MR. KALEBA:

21    Q.   DID THIS INCLUDE FINANCING OR EXPENDITURES UNRELATED TO

22    REAL ESTATE?

23    A.   NO, I DID NOT THINK SO.

24    Q.   ALL RIGHT.   BELOW IT, THE NEXT PARAGRAPH IS THE MANAGING

25    MEMBER.

1    A.   OKAY.

2    Q.   COULD YOU READ THE FIRST SENTENCE, PLEASE?

3    A.   "MANAGING MEMBER:  THE MANAGING MEMBER IS APS FUNDING,

4    INC., A CALIFORNIA CORPORATION, FORMERLY A&P PROPERTIES, INC.

5    THE PRINCIPALS OF APS FUNDING, INC. ARE BARBRA ALEXANDER,

6    MICHAEL SWANSON AND BETH PINA."

7    Q.   OKAY.  DID YOU EVER HAVE ANY DEALINGS WITH MR. SWANSON OR

8    MS. PINA?

9    A.   NO.

10   Q.   TURN TO PAGE 11, PLEASE.  THERE'S A STATEMENT OF RISKS.

11   DO YOU SEE THAT, STARTING AT PARAGRAPH 6?

12   A.   YES.

13   Q.   OKAY.  PULL UP THAT FIRST PARAGRAPH.

14        COULD YOU READ THE FIRST SENTENCE?

15   A.   YES.  "GENERAL RISKS OF REAL ESTATE INVESTMENT.  THE

16   COMPANY WILL BE SUBJECT TO THE RISKS INHERENT IN THE MAKING OF

17   LOANS SECURED BY REAL PROPERTY, INCLUDING CHANGES IN NATIONAL

18   AND LOCAL ECONOMIC CONDITIONS ADVERSELY AFFECTING REAL ESTATE

19   VALUES, DECLINE IN DEMAND FOR RESIDENTIAL AND COMMERCIAL REAL

20   ESTATE, FLUCTUATING COST, INTEREST RATES, AND AVAILABILITY OF

21   REAL ESTATE FINANCING, AND IMPOSITION OF REGULATORY

22   RESTRICTIONS WHICH MAY AFFECT VALUES, AMONG OTHER FACTORS."

23   Q.   OKAY.  IF YOU COULD READ THE NEXT PARAGRAPH, PLEASE,

24   CONCERNING THE JUNIOR LIEN HOLDER AND FORECLOSURE.

25   A.   "JUNIOR LIEN HOLDER AND FORECLOSURE.  MANY OF THE LOANS TO

1    BE MADE BY THE COMPANY MAY NOT BE SECURED BY A FIRST DEED OF

2    TRUST.  SOME WILL BE SECOND AND SOME MAY EVEN BE IN THIRD

3    POSITION."

4    Q.   OKAY.  IF YOU CAN STOP RIGHT THERE.

5         THESE ADVISEMENTS OF THESE RISKS, WAS IT CONSISTENT WITH

6    YOUR UNDERSTANDING THAT THE GREENLIGHT FUND WOULD BE USED FOR

7    INVESTING IN REAL ESTATE?

8    A.   YES.

9    Q.   IS THERE A STATEMENT IN THIS DOCUMENT, IN THIS PARAGRAPH,

10   ABOUT RISKS OF INVESTMENT FOR THINGS OTHER THAN REAL ESTATE?

11   A.   NO.

12   Q.   DID ANYBODY EVER -- FROM THE COMPANY EVER TELL YOU THAT

13   THEY WOULD BE MAKING INVESTMENTS IN THINGS OTHER THAN REAL

14   ESTATE?

15   A.   NO.

16   Q.   OKAY.  WITH RESPECT TO THE LIEN HOLDER'S STATUS, WERE YOU

17   ADVISED -- WAS IT IMPORTANT TO YOU THAT THE LOANS WOULD BE

18   SECURED BY DEEDS OF TRUST?

19   A.   YES.

20   Q.   OKAY.  DID YOU UNDERSTAND THAT THERE COULD BE A FIRST

21   DEED, A SECOND DEED, OR EVEN A THIRD DEED?

22   A.   YES.

23   Q.   BUT THERE WAS GOING TO BE A DEED OF TRUST?

24   A.   CORRECT.

25   Q.   OKAY.  PAGE 16, PLEASE.

```
 1              MR. LEEMING:  EXCUSE ME.  60?

 2              MR. KALEBA:  16.

 3              MR. LEEMING:  SORRY.  THANK YOU.

 4     BY MR. KALEBA:

 5     Q.   AND THE FIRST PARAGRAPH UNDER THE COMPANY.  OKAY.  CAN YOU

 6     READ THE SENTENCE THAT STARTS "THEREFORE, THE COMPANY

 7     SPECIALIZES"?

 8     A.   "THEREFORE, THE COMPANY SPECIALIZES IN MAKING SHORT-TERM,

 9     FIXED RATE LOANS TYPICALLY USED FOR PROPERTY ACQUISITIONS,

10     ENHANCEMENTS, IMPROVEMENTS, AND NEW CONSTRUCTION, AS WELL AS

11     FOR BRIDGE LOANS AND MISCELLANEOUS FINANCING AND EXPENDITURES."

12     Q.   OKAY.  IS THIS -- DID YOU EVER HAVE ANY DISCUSSIONS WITH

13     MS. ALEXANDER OR MS. LAMBERT ABOUT WHAT'S CALLED HARD MONEY

14     LENDING?

15     A.   I MEAN, I UNDERSTOOD THAT THAT'S WHAT THESE BRIDGE LOANS

16     WERE IS THAT THEY WERE --

17              MR. LEEMING:  OBJECTION.  NONRESPONSIVE.

18              THE COURT:  OVERRULED.

19          GO AHEAD.  YOU MAY ANSWER.

20              THE WITNESS:  IT WAS, TO MY UNDERSTANDING, THAT

21     BRIDGE LOANS ARE VERY SIMILAR TO HARD MONEY LOANS, AND SO I DID

22     UNDERSTAND THAT THAT'S HOW THEY WERE ABLE TO ACHIEVE SUCH HIGH

23     INTEREST RATES FOR THESE LOANS.

24     BY MR. KALEBA:

25     Q.   OKAY.  BUT THE LOANS THAT WERE TO BE MADE WERE TO BE
```

OLMSTEAD DIRECT (RESUMED)

```
1     FLEXIBLE, SHORT-TERM REAL ESTATE LOANS?

2              MR. LEEMING:  LEADING.  OBJECTION.

3     BY MR. KALEBA:

4     Q.  IS THAT TRUE?

5     A.  YES.

6              THE COURT:  THAT IS A LEADING QUESTION.

7              MR. KALEBA:  I'M READING FROM THE PARAGRAPH HERE,

8     FLEXIBLE --

9              MR. LEEMING:  OBJECTION.

10    BY MR. KALEBA:

11    Q.  WAS IT YOUR UNDERSTANDING THAT THESE LOANS WERE GOING TO

12    BE FLEXIBLE, SHORT-TERM REAL ESTATE LOANS?

13    A.  YES.

14    Q.  WAS THIS IMPORTANT TO YOU?

15    A.  YES.

16    Q.  PAGE 18, PLEASE.

17             THE COURT:  I OVERRULE THE OBJECTION MADE AT 9:28:52,

18    JUST TO CLEAR UP THE RECORD.

19             MR. KALEBA:  THANK YOU, YOUR HONOR.

20             MR. LEEMING:  THANK YOU, YOUR HONOR.

21             THE COURT:  GO AHEAD, PLEASE.

22    BY MR. KALEBA:

23    Q.  BEFORE WE READ THIS, WERE YOU TOLD ANYTHING BY MS. LAMBERT

24    OR MS. ALEXANDER ABOUT HOW THE MANAGING PARTNERS WOULD BE

25    COMPENSATED?
```

1          MR. LEEMING:  OBJECTION.  VAGUE AS TO WHOM.

2          THE COURT:  SUSTAINED.

3    BY MR. KALEBA:

4    Q.   PRIOR TO INVESTING, WERE YOU EVER TOLD BY MS. ALEXANDER OR

5    MS. LAMBERT ABOUT HOW THE MANAGING PARTNERS WOULD BE

6    COMPENSATED?

7          MR. LEEMING:  SAME OBJECTION.

8          THE COURT:  IT'S JUST "WERE YOU EVER TOLD," SO I'M

9    GOING TO OVERRULE THE OBJECTION.

10         THE WITNESS:  NOTHING WAS SPECIFICALLY MADE IN

11   REFERENCE WITH MY CORRESPONDENCE WITH THEM, BUT I WAS UNDER THE

12   IMPRESSION THAT INVESTORS WOULD BE PAID FIRST.

13         MR. LEEMING:  OBJECTION.  SPECULATION.

14   BY MR. KALEBA:

15   Q.   OKAY.  COULD YOU EXPLAIN WHY --

16         THE COURT:  OVERRULED.

17      GO AHEAD.

18   BY MR. KALEBA:

19   Q.   COULD YOU PLEASE EXPLAIN THE BASIS FOR THAT UNDERSTANDING?

20   A.   BECAUSE HERE IN THIS PARTICULAR DOCUMENT, IT SPECIFICALLY

21   SPELLS OUT THAT CLASS A MEMBERS, WHICH IS WHAT I WAS, WOULD BE

22   BEING PAID 12 PERCENT ON THEIR -- ON THAT.  SO THEY WERE IN

23   FIRST POSITION AS FAR AS PAYMENTS OF ANY INCOME GENERATED BY

24   THE INVESTMENTS THEY MADE.

25   Q.   OKAY.  WERE YOU EVER TOLD THAT THE PARTNERS WOULD TAKE

1    COMPENSATION FROM THE INVESTORS BEFORE INVESTING YOUR MONEY?

2    A.   NO, I WAS NEVER TOLD THAT.

3    Q.   WOULD THAT HAVE BEEN IMPORTANT TO YOU?

4    A.   VERY.

5    Q.   WHY?

6    A.   BECAUSE I CERTAINLY WOULDN'T WANT THEM TO BE PAID BEFORE I

7    WAS PAID MY INTEREST PAYMENTS.

8    Q.   SO WHAT DID YOU THINK -- WHAT WAS YOUR UNDERSTANDING ON

9    HOW THE PARTNERS WOULD MAKE MONEY ON THIS?

10   A.   THEY WOULD MAKE MONEY ON WHATEVER RESIDUALS WERE LEFT

11   AFTER THEY PAID THE INVESTORS.

12   Q.   WHAT DO YOU MEAN BY "RESIDUALS"?

13   A.   LET'S JUST SAY THAT THEY'RE EARNING BETWEEN 10 AND 15

14   PERCENT ON THEIR LOAN, AND THEY'VE ALSO RECEIVED SOME POINTS UP

15   FRONT, THAT ALL OF THOSE -- ALL OF THAT INCOME THERE AFTER

16   PAYING OFF INVESTORS, WHATEVER RESIDUALS WERE LEFT, WOULD BE

17   THEIR PROFIT OF, OF DOING THE -- OF MANAGING THE INVESTMENT FOR

18   US.

19   Q.   OKAY.  CAN WE PLEASE TURN TO PAGE 25?  AND DO YOU SEE THIS

20   DOCUMENT?

21   A.   YES.

22   Q.   OKAY.  WHAT IS THIS?

23   A.   THIS IS THE CONFIDENTIAL INVESTOR SUITABILITY STATEMENT.

24   Q.   TAKE A MOMENT TO LOOK AT THE NEXT PAGES.  DID YOU COMPLETE

25   THIS FORM?

1      A.   YES, I DID.

2      Q.   I'D LIKE TO TURN TO PAGE 28, AND STARTING WITH QUESTION

3      NUMBER 14.

4      A.   I'M SORRY.  WHAT PAGE WAS THAT?

5      Q.   PAGE 28.

6      A.   PAGE 28, OKAY.

7      Q.   STARTING WITH QUESTION 14.

8      A.   UM-HUM.

9      Q.   OKAY.  AT THE TIME, IT SAYS HERE YOU ARE AN INDIVIDUAL

10     WITH A COMBINED NET WORTH OF YOU AND SPOUSE OF 1 MILLION TO

11     4,999,000?

12     A.   CORRECT.

13     Q.   WAS THAT A TRUE STATEMENT AT THE TIME?

14     A.   YES.

15     Q.   AND THE BELOW STATEMENTS, 15, 16, AND 17 CONCERNING YOUR

16     GROSS INCOME, WERE THESE TRUE STATEMENTS AT THE TIME?

17     A.   YES.  YES.

18     Q.   OKAY.  IF YOU COULD TURN TO PAGE 29.  QUESTION NUMBER 20,

19     THERE'S A QUESTION ABOUT HOW MUCH HAVE YOU INVESTED IN LIMITED

20     LIABILITY COMPANY UNITS, LIMITED PARTNERSHIP INTERESTS, TAX

21     SHELTERED INVESTMENTS, OR PRIVATE OFFERINGS OVER THE PAST FIVE

22     YEARS.

23          DO YOU SEE THAT QUESTION?

24     A.   YES.

25     Q.   WHAT WAS YOUR ANSWER?

OLMSTEAD DIRECT (RESUMED)

1    A.    APPROXIMATELY 100,000.

2    Q.    COULD YOU PLEASE DESCRIBE WHAT YOUR BACKGROUND WAS BEHIND

3    THIS 100,000?

4    A.    I HAD OTHER REAL ESTATE INVESTMENTS.  I WAS INVESTED IN A,

5    IN ANOTHER COMPANY SIMILAR TO THE GREENLIGHT FUND THAT DID

6    FIRST TRUST DEEDS.

7    Q.    TURN TO PAGE 32, PLEASE.

8    A.    OKAY.

9    Q.    THIS IS THE OPERATING AGREEMENT.  DID YOU REVIEW THIS

10   PRIOR TO INVESTING?

11   A.    YES, I DID.

12   Q.    COULD YOU PLEASE READ PARAGRAPH 1.4, WHICH STATES THE

13   COMPANY BUSINESS.

14   A.    "THE COMPANY'S BUSINESS IS THE UNDERWRITING AND ISSUING OF

15   SHORT-TERM, FIXED INTEREST RATE LOAN SECURED BY REAL ESTATE,

16   AND TO DO ALL OTHER ACTS NECESSARY OR BENEFICIAL TO THE

17   ACHIEVEMENT OF THE COMPANY'S BUSINESS."

18   Q.    OKAY.  IS THIS STATEMENT CONSISTENT WITH THE

19   REPRESENTATIONS THAT WERE MADE TO YOU BY MS. LAMBERT OR

20   MS. ALEXANDER PRIOR TO YOUR INVESTMENT?

21   A.    YES.

22   Q.    TURN TO PAGE 35, PLEASE, PARAGRAPH 3.2, DISTRIBUTIONS.

23         DO YOU SEE 3.21A1?

24   A.    YES.

25   Q.    THERE IS A LIST OF PRIORITY.  CAN YOU TAKE A MOMENT TO

1    REVIEW THOSE?

2    A.   OKAY, YES.

3    Q.   AND IS THIS SCHEDULE OF WHO GETS PAID IN WHAT ORDER

4    CONSISTENT WITH YOUR UNDERSTANDING OF HOW THE FUND WAS TO

5    OPERATE?

6    A.   YES.

7    Q.   PAGE 38, PLEASE, PARAGRAPH 4.2.  DO YOU SEE THE STATEMENT

8    IN THE MIDDLE, "THE COMPANY WILL USE THE CASH BASIS METHOD FOR

9    ACCOUNTING"?

10   A.   YES.

11   Q.   WERE YOU EVER NOTIFIED BY ANYONE AT THE COMPANY ABOUT

12   CHANGING THE ACCOUNTING METHOD AT ANY TIME?

13   A.   NO, I WAS NOT.

14   Q.   OKAY.  DID YOU MAKE A SECOND INVESTMENT WITH APS?

15   A.   YES, I DID.

16   Q.   I'D LIKE TO DISCUSS THAT INVESTMENT NOW.

17        I'D LIKE TO GO BACK TO THE SECOND BINDER, AND IT'S

18   EXHIBIT -- HAVE YOU LOOK AT EXHIBIT NUMBER 84D.

19   A.   OKAY.

20   Q.   COULD YOU IDENTIFY THESE STATEMENTS?

21   A.   YES.  THESE WERE E-MAILS THAT -- CORRESPONDENCE BETWEEN

22   MYSELF AND MS. ALEXANDER ON MY CONSIDERATION OF INVESTING AN

23   ADDITIONAL $80,000.

24   Q.   OKAY.  DID YOU WRITE THESE E-MAILS?

25   A.   YES.  BARBRA AND I DID.

```
1              MR. KALEBA:  OKAY.  WE MOVE TO ADMIT 84D, YOUR HONOR.

2              MR. LEEMING:  NO OBJECTION.

3              THE COURT:  THEY'RE ADMITTED.

4         (PLAINTIFF'S EXHIBIT 84D WAS ADMITTED IN EVIDENCE.)

5              THE COURT:  GO AHEAD, PLEASE.

6              MR. KALEBA:  I WANT TO START AT THE -- PLEASE PUBLISH

7    THAT.

8    Q.   IF YOU COULD START AT THE E-MAIL AT THE BOTTOM.

9    A.   OKAY.

10   Q.   FIRST IT'S FROM YOU TO, TO MS. ALEXANDER; CORRECT?

11   A.   YES.

12   Q.   OKAY.  WHY DID YOU WRITE DIRECTLY TO MS. ALEXANDER?

13   A.   WELL, AGAIN, SHE'S THE, THE MANAGING MEMBER, PRESIDENT,

14   CEO OF THE GREENLIGHT FUND AND APS.

15   Q.   WHAT DID YOU MEAN IN THE SENTENCE -- I GUESS COULD YOU

16   READ THAT SENTENCE THAT SAYS "HOW IS EVERYTHING GOING"?

17   A.   SURE.  "HOW IS EVERYTHING GOING AT APS?  CAN YOU VERIFY

18   THAT EVERYTHING IS 'BUSINESS AS USUAL' WITH BOTH APS AND THE

19   GREENLIGHT FUND AS I'M CONSIDERING INVESTING ADDITIONAL FUNDS?"

20   Q.   WHAT DID YOU MEAN BY "BUSINESS AS USUAL"?

21   A.   I WANTED TO MAKE SURE THAT THERE WEREN'T ANY CHANGES THAT

22   MIGHT AFFECT THEIR ABILITY TO PERFORM ON INVESTING ADDITIONAL

23   MONEY WITH THEM.  I WANTED TO MAKE SURE THERE WERE NO FINANCIAL

24   ISSUES THAT I SHOULD BE AWARE OF, LIABILITIES OR FORECLOSURES,

25   THINGS OF THAT NATURE THAT I SHOULD BE AWARE OF.
```

OLMSTEAD DIRECT (RESUMED)

```
1    Q.   OKAY.  AT THIS TIME, JUNE OF 2009, WERE YOU STILL

2    RECEIVING MONTHLY CHECKS FROM APS?

3    A.   YES, I WAS.

4    Q.   IN THE SECOND -- OR IN THE LAST PARAGRAPH, IT SAYS, "I'VE

5    ATTACHED SOME CORRESPONDENCE FROM MY INITIAL DUE DILIGENCE."

6         WHAT DOES THAT REFER TO?

7    A.   WE WENT OVER THESE ON TUESDAY.  THESE WERE SOME INITIAL

8    DUE DILIGENCE QUESTIONS THAT I HAD SUBMITTED TO THEM AND I

9    WANTED TO CONFIRM THAT THERE WERE NO CHANGE TO ANY OF THESE

10   QUESTIONS.

11   Q.   WERE THESE THE QUESTIONS THAT YOU HAD ATTACHED FROM YOUR

12   PRIOR CORRESPONDENCE WITH MS. LAMBERT AND MS. ALEXANDER?

13   A.   YES, THEY WERE.

14   Q.   DID YOU RECEIVE A RESPONSE FROM MS. ALEXANDER?

15   A.   I DID.

16   Q.   IS THAT THE E-MAIL THAT'S DIRECTLY ABOVE THIS?

17   A.   YES.

18   Q.   COULD YOU PLEASE PUT THAT ON THE SCREEN?

19        OKAY.  WHAT WAS THE RESPONSE?

20   A.   "HELLO RANDY, THERE WAS NO ATTACHMENT.  BUT CONSIDER THIS

21   A CONFIRMATION THAT ABSOLUTELY NOTHING HAS CHANGED IN THE WAY

22   WE, APS OR THE GREENLIGHT FUND, OPERATES.  I HOPE THIS ANSWERS

23   YOUR REQUEST.  WE ARE HAPPY TO RECEIVE YOUR ADDITIONAL FUNDS

24   AND THEY WILL BE ADDED TO YOUR EXISTING ACCOUNT AS WE DID

25   BEFORE.  IF YOU HAVE ANY ADDITIONAL QUESTIONS PLEASE CONTACT
```

1   ME."

2   Q.   HOW DID YOU INTERPRET THE STATEMENT FROM MS. ALEXANDER

3   THAT "ABSOLUTELY NOTHING HAS CHANGED IN THE WAY" IN HOW THE

4   FUND OPERATES?

5   A.   THAT EVERYTHING WAS GOOD, THERE WERE NO CHANGES, THAT THE

6   FUND WAS OPERATING IN -- WAS LIQUID AND THERE WERE NO ISSUES

7   WITH ANY SECURITIES OR MORTGAGES THAT WERE, THAT WERE SECURING

8   THESE INVESTMENTS.

9   Q.   DID YOU DECIDE TO MAKE A SECOND INVESTMENT THEN WITH APS?

10  A.   I DID.

11  Q.   AND DID YOU RELY UPON THIS STATEMENT THAT NOTHING HAS

12  CHANGED IN DETERMINING WHETHER OR NOT TO MAKE AN INVESTMENT?

13  A.   I DID.

14  Q.   HOW DID YOU WIRE FUNDS THEN TO -- EXCUSE ME.  DID YOU

15  LATER THEN SEND FUNDS TO APS?

16  A.   YES, I DID.

17  Q.   OKAY.  PLEASE EXPLAIN HOW YOU DID THAT.

18  A.   I DID THAT VIA A BANK CHECK, AN ON-LINE BANK CHECK ISSUED

19  THE SAME WAY I DID THE FIRST ONE.

20  Q.   OKAY.  TURN TO EXHIBIT 33, PLEASE.

21       YOUR HONOR, WE WOULD MOVE TO ADMIT 33 BASED ON OUR

22  STIPULATION WITH DEFENSE COUNSEL.

23            MR. LEEMING:  AND THERE'S NO OBJECTION.

24            THE COURT:  THAT'S ADMITTED.

25       (PLAINTIFF'S EXHIBIT 33 WAS ADMITTED IN EVIDENCE.)

```
1              THE COURT:  GO AHEAD, PLEASE.

2              MR. KALEBA:  WOULD YOU PLEASE PUBLISH 33?  IF YOU

3    COULD FIRST HIGHLIGHT THE BOTTOM HALF OF THIS.

4    Q.   OKAY.  THERE'S THE LETTERS "ORG" AND THEN THERE'S SOME

5    LETTERS AND NUMBERS AND A NAME BELOW THAT.

6         WHAT'S THAT NAME?

7    A.   ALPHA VISION COMPUTERS, INC.

8    Q.   OKAY.  WHAT WAS ALPHA VISION COMPUTERS, INC.?

9    A.   THAT'S MY COMPANY.

10   Q.   OKAY.  AND THEN THERE'S A REFERENCE BELOW THAT, IT SAYS

11   "OBI."

12        DO YOU SEE THAT?

13   A.   YES.

14   Q.   OKAY.  AND WHAT DOES IT SAY?

15   A.   "ADDITIONAL FUNDS FOR GREENLIGHT FUND."

16   Q.   OKAY.  CAN YOU GO TO THE TOP HALF OF THE DOCUMENT, PLEASE?

17        DO YOU SEE AN AMOUNT LISTED?

18   A.   YES.  THE AMOUNT IS $80,000.

19   Q.   AND DO YOU SEE A DATE LISTED ABOVE THAT?

20   A.   YES.  THAT WAS JUNE 24TH, 2009.

21   Q.   OKAY.  AND THIS IS TO CREDIT WHOSE ACCOUNT?  DO YOU SEE A

22   RECIPIENT?

23   A.   YES.  APS FUNDING, INC.

24   Q.   DOES THIS DOCUMENT REFER TO YOUR SECOND INVESTMENT WITH

25   APS?
```

1    A.   YES, IT DOES.

2    Q.   COULD YOU TURN TO PAGE 17, PLEASE?  OR, SORRY, EXHIBIT 17.

3         COULD YOU IDENTIFY THIS DOCUMENT?

4    A.   THIS WAS A DOCUMENT MAILED TO ME FROM BETH PINA CONFIRMING

5    THAT THEY HAD RECEIVED MY ADDITIONAL INVESTMENT OF $80,000.

6         MR. KALEBA:  WE MOVE TO ADMIT 17.

7         MR. LEEMING:  NO OBJECTION.

8         THE COURT:  IT'S ADMITTED.

9    (PLAINTIFF'S EXHIBIT 17 WAS ADMITTED IN EVIDENCE.)

10        THE COURT:  GO AHEAD, PLEASE.

11   BY MR. KALEBA:

12   Q.   THE LETTER IS SIGNED BY -- IT SAYS BETH PINA.  DID YOU

13   EVER TALK WITH MS. PINA?

14   A.   I MIGHT HAVE.  I CAN'T RECALL.

15   Q.   DO YOU HAVE ANY UNDERSTANDING OF WHAT HER ROLE WITH THE

16   COMPANY WAS?

17   A.   SHE WAS THE CHIEF FINANCIAL OFFICER.

18   Q.   AFTER YOUR INVESTMENTS OF THE 40,000 AND THE 80,000, DID

19   YOU CONTINUE TO RECEIVE INTEREST PAYMENTS FROM APS?

20   A.   YES, I DID.

21   Q.   HOW MUCH AND WHEN?

22   A.   MONTHLY, AND FOR 1200 AND -- $1200 PER MONTH.

23   Q.   OKAY.  DID THAT REPRESENT A PERCENTAGE OF YOUR PRINCIPAL

24   INVESTMENT?

25   A.   YES, IT DID, 1 PERCENT PER MONTH.

OLMSTEAD DIRECT (RESUMED)

1    Q.   OKAY.  WHAT WAS THE ANNUAL THEN?

2    A.   THE ANNUAL WAS 12 PERCENT PER YEAR.

3    Q.   DID THESE PAYMENTS STOP AT SOME POINT?

4    A.   YES, THEY DID.

5    Q.   WHEN?

6    A.   I RECEIVED MY LAST PAYMENT IN DECEMBER OF 2010.

7    Q.   2000 -- I'M SORRY.  WHICH YEAR?

8    A.   2009, EXCUSE ME.  YEAH, DECEMBER OF 2009.

9    Q.   OKAY.  WHAT HAPPENED THEN?

10   A.   I RECEIVED A CALL FROM -- A VOICEMAIL FROM

11   BARBRA ALEXANDER EXPLAINING TO ME THAT THERE HAD BEEN AN ISSUE

12   WITH A LOAN THAT THEY WERE WORKING ON AND THAT, THAT MY CHECK

13   MIGHT NOT CLEAR FOR DECEMBER.

14        THAT CHECK DID CLEAR, YET THAT WAS THE LAST CHECK I

15   RECEIVED.

16   Q.   DID YOU EVER CONTACT MS. ALEXANDER OR ANYONE AT APS TO ASK

17   FOR THE RETURN OF YOUR PRINCIPAL?

18   A.   YES, I DID.

19   Q.   WHEN DID YOU DO THAT?

20   A.   I DID THAT IN JANUARY OF 2010.

21   Q.   HOW MUCH MONEY DID YOU ASK FOR?

22   A.   I ASKED FOR $100,000.

23   Q.   OKAY.  DID YOU GET YOUR $100,000?

24   A.   NO, I DID NOT.

25   Q.   OKAY.  WHO DID YOU SPEAK WITH?

A.   MS. ALEXANDER.

Q.   WHAT DID YOU SAY?

A.   I TOLD HER THAT I WAS CONCERNED BECAUSE I WASN'T RECEIVING PAYMENTS AND THAT I WANTED TO COMPLETE THE WITHDRAWAL FUND FORM, AND I DID COMPLETE THAT FORM AND SEND THAT TO HER AND SHE SIGNED IT AND SENT IT BACK TO ME.

Q.   OKAY.  WHY DID YOU ASK YOU FOR 100 AND NOT 120,000?

A.   WELL, MS. ALEXANDER WAS LEADING ME TO BELIEVE THAT SHE WAS GOING TO GET THINGS CORRECTED AND EVERYTHING WAS GOING TO BE OKAY, BUT I WAS SOMEWHAT CONCERNED.

BUT I THOUGHT THIS HAD BEEN A GOOD INVESTMENT UP TO THIS POINT, SO I THOUGHT, WELL, I'LL LEAVE 20,000 IN FOR NOW AND SEE HOW IT GOES.

BUT I WANTED TO REDUCE MY RISK BECAUSE I GOT NERVOUS WITH THAT MUCH MONEY ON THE TABLE WITH HER AT THAT POINT.

Q.   AFTER YOU COMPLETED THE PAPERWORK FOR THE $100,000, DID YOU RECEIVE THE $100,000 BACK?

A.   NO, I DID NOT.

Q.   DID YOU CONTINUE TO RECEIVE CORRESPONDENCE FROM APS AFTER DECEMBER OF 2009?

A.   I DID.  I -- IN JANUARY I RECEIVED A -- I RECEIVED A STATEMENT LISTING THE AMOUNTS, THE PRINCIPAL, AS WELL AS INTEREST THAT HAD ACCRUED.

Q.   OKAY.  COULD YOU PLEASE TURN TO EXHIBIT NUMBER 23?  CAN YOU IDENTIFY THIS DOCUMENT?

A. YES. THIS IS THE STATEMENT THAT I RECEIVED IN THE MAIL.

Q. FROM WHOM?

A. APS FUNDING.

Q. DOES THIS RELATE TO YOUR INVESTMENT?

A. YES, IT DOES.

MR. KALEBA: WE MOVE TO ADMIT 23, YOUR HONOR.

MR. LEEMING: NO OBJECTION.

THE COURT: IT'S ADMITTED.

(PLAINTIFF'S EXHIBIT 23 WAS ADMITTED IN EVIDENCE.)

THE COURT: GO AHEAD, PLEASE.

BY MR. KALEBA:

Q. OKAY. FIRST LOOK AT THE BOTTOM LEFT OF THIS DOCUMENT. WHAT'S THE STATEMENT DATE?

A. FEBRUARY 15TH, 2010.

Q. WHAT DOES IT SHOW AS THE VALUE OF YOUR INVESTMENT AS OF FEBRUARY 15, 2010?

A. TOTAL -- TOTAL ACCOUNT VALUE IS $122,412.

Q. HOW FREQUENTLY DID YOU RECEIVE STATEMENTS LIKE THIS FROM APS?

A. THIS WAS THE ONLY STATEMENT I RECEIVED.

Q. HOW WAS IT SENT TO YOU?

A. MAIL, REGULAR MAIL.

Q. OKAY. AT THIS TIME DID YOU BELIEVE THAT APS HAD YOUR MONEY EITHER IN A LOAN OR A BANK ACCOUNT?

A. YES.

1   Q.   BUT DID YOU EVER ACTUALLY HAVE THE $122,000 IN AN ACCOUNT

2   THAT YOU CONTROLLED?

3   A.   NOT IN AN ACCOUNT I CONTROLLED.   THEY CONTROLLED IT.

4   Q.   DID YOU EVER RECEIVE THE RETURN OF YOUR MONEY AT ANY TIME?

5   A.   NO, I DID NOT.

6          MR. KALEBA:   THANK YOU, YOUR HONOR.   NO FURTHER

7   QUESTIONS.

8          THE COURT:   ALL RIGHT.   CROSS-EXAMINATION, PLEASE.

9          MR. LEEMING:   YES.   THANK YOU.

10                       **CROSS-EXAMINATION**

11  BY MR. LEEMING:

12  Q.   GOOD MORNING, MR. OLMSTEAD.

13  A.   GOOD MORNING.

14         MR. LEEMING:   JUST ONE MOMENT, YOUR HONOR.

15         THE COURT:   THAT'S FINE.   TAKE YOUR TIME.

16     (PAUSE IN PROCEEDINGS.)

17  BY MR. LEEMING:

18  Q.   SO MR. OLMSTEAD, MAYBE I MISHEARD YOU, BUT I THOUGHT I

19  HEARD ON DIRECT YOU WORK FOR A COMPANY CALLED S PRO.   IS THAT

20  COMPLETELY WRONG ON MY PART?

21  A.   THAT'S A DIFFERENT COMPANY.

22  Q.   A DIFFERENT COMPANY.   WERE YOU ASSOCIATED WITH A COMPANY

23  CALLED S PRO?

24  A.   YES.

25  Q.   AND WHAT IS S PRO?

```
 1        A.   S PRO IS A MANAGEMENT COMPANY.

 2        Q.   AND WHAT DOES S PRO MANAGE?

 3        A.   IT MANAGES ASSETS.

 4        Q.   WHAT KIND OF ASSETS?

 5        A.   REAL ESTATE ASSETS.

 6        Q.   OKAY.  WHAT'S YOUR ROLE IN S PRO?

 7        A.   I'M -- I'M THE VICE-PRESIDENT.

 8        Q.   OKAY.  AND YOU -- AT THIS TIME YOU WERE WITH ALPHA VISION

 9   COMPUTERS; CORRECT?

10        A.   YES.

11        Q.   ARE YOU STILL WITH ALPHA VISION?

12        A.   YES, I AM.

13        Q.   OKAY.  SO THIS IS A SECOND BUSINESS YOU HAVE?

14        A.   YES, IT IS.

15        Q.   AND THIS STARTED AFTER THE EVENTS THAT WE'VE BEEN TALKING

16   ABOUT TODAY?

17        A.   I BELIEVE IT WAS FORMED PRIOR TO THAT.

18        Q.   PRIOR TO THAT, OKAY.

19             DO YOU -- ARE YOU A MEMBER OF A GROUP CALLED PERFORMANCE

20   CONSULTING GROUP?

21        A.   NO.

22        Q.   OKAY.  HOW ABOUT MASSIVE PASSIVE INCOME?  HAVE YOU EVER

23   HEARD OF THAT?

24        A.   YES.

25        Q.   OKAY.  AND WHAT IS YOUR ROLE WITH MASSIVE PASSIVE INCOME?
```

1      A.   THAT'S A SHELL COMPANY THAT NOTHING HAS BEEN DONE WITH.

2      IT WAS SET UP WITH SOME OTHER BUSINESS PARTNERS OF MINE, BUT

3      IT'S A -- A NON-OPERATING COMPANY.

4      Q.   OKAY.  SO WHAT WAS THE CONCEPT BEHIND MASSIVE PASSIVE

5      INCOME?

6      A.   THERE HASN'T BEEN A CONCEPT YET, OTHER THAN WE LIKED THE

7      NAME SO WE ESTABLISHED THAT COMPANY AND HAVE JUST LEFT IT AS A

8      SHELL COMPANY THAT WE MIGHT IN THE FUTURE USE.

9      Q.   SO IT'S SORT OF OPEN, IN THE FUTURE SOMETHING MIGHT HAPPEN

10     WITH IT?

11     A.   POSSIBLE, YES.  OR WE MAY CLOSE IT.

12     Q.   ARE YOU ASSOCIATED WITH GET BACK ON YOUR FEET, LLC?

13     A.   THAT WAS A COMPANY THAT -- AGAIN, IT WAS SIMILAR TO

14     MASSIVE PASSIVE.  I'M NOT ASSOCIATED WITH THAT COMPANY.

15     Q.   OKAY.  HOW ABOUT MASTERMIND SOLUTIONS?

16     A.   YES, THAT WAS ANOTHER SIMILAR EXACT TYPE COMPANY.

17     Q.   AND HOW DOES MASTERMIND SOLUTIONS WORK, IF IT DOES?

18     A.   IT DOES NOT.

19     Q.   IT DOES NOT, OKAY.

20          SO YOU'RE STILL PRESIDENT OF ALPHA VISION COMPUTERS DURING

21     ALL OF THESE THINGS; RIGHT?

22     A.   ALPHA VISION COMPUTERS, I SPECIALIZE IN BUSINESS AND

23     TECHNOLOGY CONSULTING.

24     Q.   OKAY.  AND YOU'VE BEEN DOING THAT SINCE 2001, SIR?

25     A.   PRIOR TO THAT EVEN, YES.

1    Q.   OKAY.  SO LET'S GO BACK TO HOW YOU LEARNED ABOUT APS.

2         YOU HEARD ABOUT IT AT A REAL ESTATE SEMINAR IN LAS VEGAS?

3    A.   THAT'S CORRECT.

4    Q.   DO YOU REMEMBER THE DATE OF THAT SEMINAR?

5    A.   I DON'T.  BUT I KNOW IT WAS THE SUMMER OF 2008, I BELIEVE.

6    Q.   OKAY.  SO RIGHT AROUND THEN?

7    A.   UM-HUM.

8    Q.   PRETTY HOT IN LAS VEGAS IN THE SUMMER; RIGHT?

9    A.   YES.

10   Q.   YES.  AND YOU WERE TOLD ABOUT IT BY A MR. KASTNER?

11   A.   THAT'S CORRECT.

12   Q.   WHO IS MR. KASTNER?

13   A.   HE WAS AN ACQUAINTANCE THAT I HAD MET AT THAT REAL ESTATE

14   SEMINAR.

15   Q.   DID YOU KNOW HIM BEFORE THE SEMINAR?

16   A.   I DID NOT.

17   Q.   SO YOU MET HIM THERE AND YOU STARTED TALKING BUSINESS?

18   A.   YES.  WE WERE SHARING OUR CURRENT INVESTMENTS THAT WE HAD.

19   Q.   RIGHT.  AND DID HE HAVE AN INTEREST IN REAL ESTATE

20   INVESTMENT AS WELL?

21   A.   HE WAS INVESTED IN ONE OF MS. ALEXANDER'S FUNDS AND HE

22   TOLD ME THAT HE WAS RECEIVING A 12 PERCENT RETURN PER YEAR.

23   Q.   AND YOU SAID TO HIM, "HEY, I'M IN A SIMILAR INVESTMENT,

24   BUT IT ONLY PAYS 10 PERCENT"?

25   A.   THAT'S CORRECT.

```
1    Q.   WHAT WAS THAT INVESTMENT?

2    A.   THAT INVESTMENT WAS A, A FIRST TRUST DEED IN A COMPANY

3    THAT WAS OPERATING SIMILAR TO MS. ALEXANDER'S COMPANY.

4    Q.   IS THAT IN CALIFORNIA?

5    A.   YES, IT IS.

6    Q.   AND MR. KASTNER TOLD YOU A LITTLE BIT ABOUT MS. ALEXANDER;

7    RIGHT?

8    A.   YES.  HE SHARED WITH ME THAT SHE HAD A, A RADIO SHOW

9    CALLED MONEY DOTS.

10   Q.   HE TOLD YOU THAT SHE HAD A FUND THAT HAD BEEN GOING FOR A

11   WHILE?

12   A.   YES.

13   Q.   DO YOU REMEMBER IF KASTNER TOLD YOU WHAT KIND OF AN

14   INVESTMENT THAT WAS?

15   A.   YES.  HE TOLD ME IT WAS REAL ESTATE TRUST DEEDS.

16   Q.   DID HE ENCOURAGE YOU TO INVEST?  DID HE SAY, "HEY, YOU'VE

17   GOT TO GET INTO THIS"?

18   A.   HE WASN'T THAT ENCOURAGING.  HE JUST SAID THAT HE WAS

19   HAPPY WITH THE INVESTMENT AND THAT IT HAD BEEN A GOOD

20   INVESTMENT FOR HIM.

21   Q.   AND HOW ABOUT YOUR INVESTMENT THAT WAS PAYING 10 PERCENT?

22   WAS THAT A GOOD INVESTMENT FOR YOU AT THAT TIME?

23   A.   IT MIGHT HAVE BEEN.  ONE OR TWO OF THOSE DEFAULTED, SO --

24   Q.   I SEE.  AND THOSE DEFAULTS HAD NOTHING TO DO WITH

25   MS. ALEXANDER, I TAKE IT.
```

1    A.    NO.

2    Q.    AND SO LET'S UNPACK THAT A LITTLE BIT.

3          YOU WERE IN AN INVESTMENT, AND IT SOUNDS LIKE MORE THAN

4    ONE.  IS THAT CORRECT?

5    A.    I -- I MIGHT HAVE BEEN IN A COUPLE OF -- THE WAY THAT THIS

6    FUND WORKED WAS THEY HAD OFFERINGS FOR INVESTING IN FIRST TRUST

7    DEEDS AND I MAY HAVE BEEN INVESTED IN SEVERAL OF THOSE.  I'M

8    NOT SURE AT THAT TIME IF I HAD OR NOT.

9    Q.    OKAY.  WAS YOUR UNDERSTANDING OF THAT OTHER COMPANY, WERE

10   THERE SPECIFIC TRUST DEEDS THAT WERE SECURED AGAINST SPECIFIC

11   PROPERTIES IN YOUR NAME?

12   A.    THEY WERE NOT IN MY NAME.  THEY WERE IN THE COMPANY'S

13   NAME.

14   Q.    SO IT WAS SECURITIZED?

15   A.    YES, IT WAS SECURITIZED.

16   Q.    AND WAS THERE A SIMILAR KIND OF SET OF DOCUMENTS THAT YOU

17   SIGNED WHEN YOU INVESTED IN THOSE, THOSE PROPERTIES?

18   A.    YES.

19   Q.    SIMILAR DISCLOSURE OF RISKS, THAT KIND OF THING?

20   A.    YES.

21   Q.    SO WHEN YOU CAME TO CONTACT MS. ALEXANDER'S COMPANY, IT

22   SOUNDS LIKE YOU'D HAD MORE THAN ONE EXPERIENCE INVESTING IN

23   SIMILAR VEHICLES.  IS THAT FAIR TO SAY?

24   A.    AGAIN, I CAN'T REMEMBER THE TIMING ON THIS OTHER

25   INVESTMENT.  I DIDN'T -- I DON'T KNOW THE SPECIFICS, SO I MAY

1    HAVE ONLY INVESTED IN ONE AT THAT POINT.

2    Q.   OKAY.  BUT CERTAINLY WHEN YOU MET MR. KASTNER AT THE

3    INVESTMENT SEMINAR IN VEGAS, YOU HAD ALREADY DONE THIS KIND OF

4    INVESTMENT; RIGHT?

5    A.   YES.

6    Q.   IT WAS A SECURITY; CORRECT?

7    A.   IT WAS A SECURED INVESTMENT, YES.

8    Q.   AND YOU HAD -- BUT IT WAS A SECURITY?  IT WASN'T YOUR NAME

9    ON A SPECIFIC DEED OF PROPERTY; CORRECT?  YOU BOUGHT SHARES IN

10   THAT COMPANY?

11   A.   THAT'S CORRECT, YES.

12   Q.   AND ONE OR TWO OR MORE OF THOSE SUBSEQUENTLY DEFAULTED?

13   A.   YES.

14   Q.   AND THAT WAS ABOUT WHEN?  DO YOU RECALL?

15   A.   I DON'T EXACTLY.  IT'S BEEN WITHIN THE LAST SEVERAL YEARS.

16   Q.   SORT OF THE TIME THAT THE REAL ESTATE MARKET STARTED GOING

17   DOWNHILL?

18   A.   YES.  I DID ALSO, ON SEVERAL OF THEM, RECEIVE MOST OF MY

19   PRINCIPAL BACK.

20   Q.   OH, GOOD.

21   A.   AS WELL AS INTEREST, YES.

22   Q.   SO YOU RESEARCHED APS AND MONEY DOTS AND FOUND THERE WAS

23   NOTHING NEGATIVE THAT YOU COULD FIND OUT ABOUT ANYBODY; RIGHT?

24   A.   THAT'S CORRECT.

25   Q.   AND THAT WAS BEFORE YOU REACHED OUT TO THEM?

```
1    A.   PROBABLY DURING THAT TIME THAT I WAS CORRESPONDING WITH

2    THEM, I MIGHT HAVE BEEN -- I PROBABLY DID SOME DUE DILIGENCE

3    AND VETTING VIA THE INTERNET PRIOR, AND THEN ALSO DURING MY

4    CORRESPONDENCE WITH THEM.

5    Q.   OKAY.  WHEN YOU CALLED INTO APS FOR THE FIRST TIME, WAS

6    IT -- DID YOU INITIALLY SPEAK TO MS. ALEXANDER?

7    A.   I CAN'T REMEMBER --

8    Q.   OKAY.

9    A.   -- IF IT WAS INITIALLY MS. ALEXANDER OR MS. LAMBERT, BUT I

10   CERTAINLY HAD CONVERSATIONS WITH BOTH.

11   Q.   OKAY.  BUT THEY -- AT THE VERY BEGINNING, IT SOUNDS LIKE

12   YOUR INITIAL CONVERSATIONS WERE NOT WITH MS. ALEXANDER, BUT

13   WERE WITH MS. LAMBERT; CORRECT?

14   A.   VIA E-MAIL, YES, THEY WERE WITH MS. LAMBERT, YES.

15   Q.   OKAY.  AND YOU ASKED MS. LAMBERT THOSE DUE DILIGENCE

16   QUESTIONS THAT WE TALKED ABOUT THIS MORNING, AND ALSO BACK ON

17   TUESDAY; RIGHT?

18   A.   CORRECT.

19   Q.   AND SHE ANSWERED THE QUESTIONS AND THOSE ARE EXHIBIT 84

20   THAT WE WERE LOOKING AT EARLIER; CORRECT?

21   A.   YES.  I'M -- I CAN'T QUOTE THE EXHIBIT, BUT I CERTAINLY

22   CAN STATE THAT BOTH MS. LAMBERT AND MS. ALEXANDER REASSURED ME

23   OF THEIR ANSWERS ON THOSE QUESTIONS.

24   Q.   OKAY.  CAN WE BRING UP EXHIBIT 84, PLEASE?

25           MR. KALEBA:  WHICH ONE?
```

```
 1                  MR. LEEMING:  EXHIBIT 84.

 2                  MR. KALEBA:  WHICH ONE?

 3                  MR. LEEMING:  OH, YES.  THIS IS THE ONE I HAVE.

 4            (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

 5       BY MR. LEEMING:

 6       Q.   LET'S TAKE A LOOK AT 84A AND SEE IF IT'S THE RIGHT ONE.

 7       A.   84A?

 8       Q.   YES, 84A.

 9                  MR. LEEMING:  DID I TURN IT OFF?

10                  MS. BURNEY:  YES.

11                  MR. LEEMING:  OH, SORRY.  THESE BUTTONS STICK OUT A

12       LITTLE BIT HERE.

13       Q.   THERE MAY BE SOME DIFFERENCE OF WHAT'S IN MY COMPUTER AND

14       WHAT'S IN THAT BINDER, SO I'M JUST -- I'M JUST TRYING TO GET UP

15       TO SPEED HERE.

16            YES, OKAY, I'M IN THE RIGHT EXHIBIT HERE.

17            SO LET'S GO DOWN TO THE QUESTIONS YOU ASKED, WHICH ARE ON

18       PAGE -- I GUESS IT'S GOING TO BE 1611, THREE PAGES DOWN, AND

19       LET US KNOW WHEN YOU'RE THERE.

20            AND CAN WE BRING UP 1611 AND -- NEXT ONE DOWN.  YES, THANK

21       YOU.  AND CAN WE ZOOM IN ON THE "DEAR RANDY" PORTION.  YES,

22       PERFECT.  THANK YOU VERY MUCH.

23            SO WE WENT THROUGH THESE ON TUESDAY, THE QUESTIONS

24       ABOUT -- THAT YOU ASKED ABOUT THE MINIMUM AND MAXIMUM

25       INVESTMENT ACCOUNTS; CORRECT?
```

1       A.   YES.

2       Q.   POOLING FUNDS; RIGHT?

3       A.   YES.

4       Q.   PARAMETERS FOR INCREASING AND WITHDRAWING THE INVESTOR'S

5       CAPITAL?

6       A.   YES.

7       Q.   AND YOU WERE TOLD BY MS. LAMBERT THAT THE FUNDS WOULD BE

8       FORWARDED WITHIN 30 DAYS OF RECEIPT OF A COMPLETED FORM;

9       CORRECT?

10      A.   YES.

11      Q.   AND YOU ASK ABOUT WHETHER IT'S SECURED; RIGHT?

12      A.   YES.

13      Q.   THERE'S A QUESTION ABOUT FULL RECOURSE; RIGHT?

14      A.   CORRECT.

15      Q.   AND THAT WAS IMPORTANT TO YOU BECAUSE IT MEANT YOU COULD

16      FOLLOW ANY UNPAID ASSETS BACK TO THE PERSON WHO WAS THE

17      BORROWER; RIGHT?

18      A.   I DON'T KNOW ABOUT MYSELF, BUT IT --

19      Q.   THE COMPANY COULD?

20      A.   THE COMPANY COULD, YES.

21      Q.   YES.  AND YOU HAVE QUESTIONS ABOUT FORECLOSURES.

22           SO YOU ASKED THESE QUESTIONS AND THEY WERE ANSWERED TO

23      YOUR SATISFACTION; CORRECT?

24      A.   YES.

25      Q.   AND THIS WAS SORT OF THE BEGINNING OF A DIALOGUE THAT YOU

```
 1      HAD WITH APS?  IS THAT FAIR TO SAY?

 2      A.   YES.

 3      Q.   AND IN RESPONSE TO THE LAST QUESTION, "CAN YOU FORWARD ME

 4      A SUBSCRIPTION AGREEMENT AND CONFIDENTIAL SUITABILITY

 5      STATEMENT," AND THESE DOCUMENTS ARE ATTACHED TO THIS E-MAIL,

 6      WERE THOSE -- WERE THOSE DOCUMENTS ATTACHED?  I'M SORRY.

 7          THAT'S AT THE VERY BOTTOM OF PAGE 1611, YOUR LAST

 8      QUESTION.  DO YOU SEE THAT?

 9      A.   YES.

10      Q.   OKAY.  AND WERE THOSE DOCUMENTS ATTACHED?

11      A.   UM --

12      Q.   TO THE BEST OF YOUR RECOLLECTION?

13      A.   I DON'T SEE AN ATTACHMENT AT THE TOP OF THE E-MAIL, BUT I

14      THINK THAT THEY WERE.  IF NOT, THEY CERTAINLY WERE FORWARDED

15      SHORTLY THEREAFTER.

16      Q.   OKAY.  AND SO YOU HAD A CHANCE TO REVIEW THOSE, TAKE YOUR

17      TIME WITH THEM, AND GO OVER THEM; RIGHT?

18      A.   YES.

19      Q.   AND I THINK YOU SAID EARLIER THEY WERE CONSISTENT WITH THE

20      DOCUMENTS YOU'D SIGNED IN YOUR EARLIER INVESTMENT.

21      A.   I HAVEN'T COMPARED THOSE TWO DIRECTLY, SO I CAN'T STATE

22      THAT.

23      Q.   THE BASIC CONCEPT WAS THE SAME?

24      A.   I BELIEVE SO, YES.

25      Q.   BEST YOU CAN RECALL RIGHT NOW?
```

1    A.   BEST I CAN RECALL, YES.

2    Q.   DO YOU KNOW WHEN YOU DID THAT FIRST INVESTMENT?  WOULD IT

3    HAVE BEEN -- HOW MUCH BEFORE THIS?

4    A.   I DON'T KNOW, BUT IF I HAD TO JUST TAKE A GUESSTIMATE, IT

5    WAS WITHIN PROBABLY ONE TO TWO YEARS BEFORE THIS.

6    Q.   YOUR -- YOU ASK, IN THIS E-MAIL, AGAIN, RIGHT BEFORE

7    THE -- WHERE YOU'RE ASKING TO BE FORWARDED A SUBSCRIPTION

8    AGREEMENT AND CONFIDENTIAL SUITABILITY STATEMENT, YOU ASK FOR

9    FINANCIAL INFORMATION; CORRECT?

10   A.   YES.

11   Q.   AND THE ANSWER IS "CUSTOMARILY WE DO NOT PROVIDE COMPANY

12   FINANCIAL STATEMENTS TO INVESTORS."

13        DO YOU SEE THAT?

14   A.   YES.

15   Q.   AND THEN YOU'RE ASKED, "WHAT SPECIFICALLY WOULD YOU LIKE

16   TO SEE?"  CORRECT?

17   A.   YES.

18   Q.   DID THAT RING ANY BELLS FOR YOU, THAT SPECIFICALLY THEY

19   WOULDN'T -- THEY DIDN'T WANT TO GIVE YOU FINANCIAL INFORMATION

20   ABOUT THE COMPANY?

21   A.   I'M NOT AN EXPERT ENOUGH IN THESE TYPE OF INVESTMENTS TO

22   KNOW WHETHER OR NOT A PRIVATE COMPANY IS REQUIRED TO PROVIDE

23   FINANCIAL STATEMENTS TO POTENTIAL INVESTORS.

24   Q.   DID YOU MAKE ANY INQUIRIES TO FIND OUT IF THAT'S THE CASE?

25   A.   I DID INQUIRE, WHEN SHE ASKED WHAT I WOULD SPECIFICALLY

1    LIKE TO SEE, I KNOW IN THIS PREVIOUS ONE, "MAYBE YOU CAN GIVE

2    ME TOTALS FOR ANNUAL REVENUES AND EXPENSES AND

3    ASSETS/LIABILITIES."

4    Q.   AND, SIR, CAN YOU GIVE ME THE PAGE NUMBER?  IT'S HIGHER

5    UP; CORRECT?

6    A.   YES.  IT'S PAGE 1610.

7    Q.   1610, THANK YOU.

8    A.   YEAH.

9    Q.   SO YOU ASKED, "MAYBE YOU CAN GIVE ME TOTALS FOR ANNUAL

10   REVENUES, EXPENSES AND ASSETS/LIABILITIES."  CORRECT?

11   A.   YES.

12   Q.   AND THE ANSWER IS "WE DO NOT CUSTOMARILY PROVIDE THIS

13   INFORMATION."  RIGHT?

14   A.   YES.

15   Q.   SORRY.  I KNOW YOU'RE NODDING AND YOU'RE AGREEING WITH ME,

16   BUT THE COURT REPORTER HAS TO WRITE THIS DOWN, SO --

17        OKAY.  SO AFTER THIS YOU GOT A PACKAGE OF INVESTMENT

18   DOCUMENTS AND YOU REVIEWED THEM; CORRECT?

19   A.   CORRECT.

20   Q.   YOU SIGNED THEM AND SENT THEM BACK IN; RIGHT?

21   A.   YES.

22   Q.   AND THAT'S WHEN YOU GOT A LETTER, THE WELCOME LETTER FROM

23   MS. ALEXANDER IN RESPONSE TO THE CHECK THAT YOU SENT IN.

24        AND HOW MUCH WAS THE INITIAL INVESTMENT?

25   A.   $40,000.

1     Q.   $40,000.

2          SO WE WENT OVER SOME INVESTMENT DOCUMENTS THAT YOU SIGNED

3     EARLIER TODAY, AND I'D LIKE TO GO BACK TO EXHIBIT 79, IF WE

4     COULD.  IT'S A LOT TO GO THROUGH.  I KNOW.  AND I FOUND

5     PRACTICE DOESN'T HELP, SO --

6     A.   OKAY.

7     Q.   OKAY.  AND SO EXHIBIT 79 YOU DESCRIBED CONSISTS OF FOUR

8     DOCUMENTS:  THE SUBSCRIPTION AGREEMENT; THE PRIVATE PLACEMENT

9     MEMORANDUM; THE SUITABILITY STATEMENT; AND THE GREENLIGHT FUND

10    OPERATING AGREEMENT.  IS THAT CORRECT?

11    A.   YES.

12    Q.   OKAY.  SO LET'S GO TO PAGE -- SORRY -- 6 OF THIS THAT'S

13    DATED 10-31-2008.  WOULD YOU TAKE A LOOK AT THAT, PLEASE?

14         AND THIS IS BY APS FUNDING, MANAGING MEMBER.  THERE'S SOME

15    SIGNATURES THERE.

16         IF WE COULD ZOOM IN ON THE BOTTOM OF PAGE 6, I THINK THAT

17    WOULD BE HELPFUL.

18    A.   I THINK IT'S PAGE 5.

19    Q.   OH, IS IT?  THAT WOULD EXPLAIN THE DIFFICULTY.  PAGE 5,

20    YES.  THANK YOU.

21         SO LOOKING AT THIS, YOU SEE THE DATE; CORRECT?

22    A.   YES.

23    Q.   HALLOWEEN, 2008.  AND IT'S SIGNED BY -- THERE'S AN

24    INITIAL, BARBRA ALEXANDER, PRESIDENT, AND ALSO BETH PINA,

25    SECRETARY.  RIGHT?

1    A.   CORRECT.

2    Q.   NOW, EARLIER YOU SAID THAT YOU THOUGHT BETH PINA'S ROLE

3    WAS CHIEF FINANCIAL OFFICER.

4    A.   YES.

5    Q.   AND DID -- IS THIS INCONSISTENT WITH YOUR UNDERSTANDING OF

6    HER ROLE THERE, OR CONSISTENT WITH IT?

7    A.   IT'S NOT UNCOMMON THAT, THAT SOMEONE CAN BE A CHIEF

8    FINANCIAL OFFICER AND A SECRETARY.  I DON'T KNOW IF SHE HELD

9    MULTIPLE POSITIONS THERE.  AT SOME POINT I, I WAS UNDER THE

10   ASSUMPTION THAT SHE WAS ALSO THE CHIEF FINANCIAL OFFICER.  I

11   MUST HAVE SEEN THAT AT SOME POINT.

12   Q.   OKAY.  ANYWAY, THE -- OKAY.  WE CAN -- WE'RE DONE WITH

13   THIS PORTION OF THIS.  THANK YOU.

14        SO LET'S GO DOWN TO THE SUBSCRIPTION AGREEMENT AT PAGE 3.

15   I DON'T HAVE A --

16        I APOLOGIZE.  I KEEP DOING THIS.  THERE'S DIFFERENT PAGE

17   NUMBERS ON THESE DOCUMENTS AND I'VE WRITTEN DOWN THE WRONG ONES

18   ON OCCASION.

19        IF YOU COULD JUST GIVE ME A MOMENT, YOUR HONOR?

20        OKAY.  UP TO THE TOP -- IT'S NOT PAGE 3, IT IS PAGE 1 --

21   AND IT SAYS "SUBSCRIPTION AGREEMENT," AND THERE'S A PARAGRAPH

22   THAT SAYS "REPRESENTATIONS AND WARRANTIES."

23        DO YOU SEE THAT?

24   A.   YES.

25   Q.   YES, OKAY.

OLMSTEAD CROSS

```
 1              AND THEN BELOW THAT, A, "I HAVE RECEIVED, READ, AND FULLY
 2    UNDERSTAND THE PRIVATE PLACEMENT MEMORANDUM, INCLUDING THE RISK
 3    FACTORS SECTION."
 4    A.   YES.
 5    Q.   AND "I AM PREPARED TO TAKE THOSE RISKS."
 6    A.   YES.
 7    Q.   AND THEN IT GOES ON -- WE DON'T NEED TO ZOOM IN ON IT, BUT
 8    IT TALKS ABOUT UNDERSTANDING THE OPERATING AGREEMENT; CORRECT?
 9    A.   YES.
10    Q.   WERE YOU COMFORTABLE THAT YOU UNDERSTOOD THE OPERATING
11    AGREEMENT AT THE TIME YOU SIGNED IT?
12    A.   YES.
13    Q.   AND YOU DID INDEED COMPLETE AND EXECUTE A CONFIDENTIAL
14    INVESTOR SUITABILITY STATEMENT; CORRECT?
15    A.   YES, I DID.
16    Q.   AND WE LOOKED AT THAT EARLIER TODAY.
17              AND YOU ALSO UNDERSTOOD THAT THE OFFERING WAS BEING MADE
18    WITHOUT REGISTRATION; CORRECT?
19    A.   THAT I DON'T RECALL.  BUT IF IT WAS IN THE DOCUMENT, I MAY
20    HAVE AT THE TIME.
21    Q.   LET'S LOOK AT SUBSECTION D.  IF WE COULD ZOOM IN ON THAT,
22    THAT'S PAGE 1, SUBSECTION D, PLEASE.
23              DO YOU SEE THAT?
24    A.   YES.  OKAY, YES.
25    Q.   IT SAYS, "I UNDERSTAND THE UNITS ARE BEING OFFERED AND
```

1    SOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT."

2        WHAT DID THAT MEAN TO YOU, IF ANYTHING?

3    A.   I'M READING IT NOW.

4        YES.  THEY -- THERE'S OBVIOUSLY A SECURITIES ACT OF 1933

5    AND THEY WERE OFFERING THIS WITHOUT THAT REGISTRATION.

6    Q.   AND DID THAT MEAN ANYTHING TO YOU?

7    A.   I MIGHT NEED YOU TO BE MORE SPECIFIC.  I'M NOT SURE WHAT

8    YOU MEAN BY "MEAN ANYTHING TO ME."

9    Q.   I'M JUST ASKING YOU WHAT THAT PARAGRAPH OR WARNING MEANT,

10   ANYTHING TO YOU AT ALL?

11   A.   THAT THERE WERE SOME SORT OF REGISTRATION THAT, THAT WAS

12   NOT REQUIRED FOR THIS INVESTMENT.

13   Q.   OKAY.  SO THAT'S IT?  YOU DIDN'T LOOK INTO THE SECURITIES

14   REGULATIONS THAT MIGHT HAVE GOVERNED THIS; CORRECT?

15   A.   NO, I DIDN'T.

16   Q.   OKAY.  LET'S GO DOWN TO THE PRIVATE PLACEMENT MEMORANDUM,

17   WHICH BEGINS AT PAGE 6, PLEASE.  AND CAN WE ZOOM IN ON THE

18   BOLD -- SORRY -- THE FIRST PARAGRAPH BELOW THE BOLD FACE TYPE,

19   THE CLASS A LIMITED LIABILITY COMPANY UNITS.  A LITTLE BIT

20   LOWER THAN THAT.  NEXT TWO PARAGRAPHS DOWN, PLEASE.  NEXT ONE

21   DOWN.  THANK YOU.

22       ARE WE THERE?  OKAY.

23       CLASS A -- THIS -- "THE CLASS A LIMITED LIABILITY COMPANY

24   ARE BEING OFFERED ONLY TO A LIMITED NUMBER OF SPECIFIED,

25   SOPHISTICATED AND EXPERIENCED INVESTORS WHO ARE ABLE TO BEAR

1    THE ECONOMIC RISK OF THE INVESTMENT."  CORRECT?

2    A.   CORRECT.

3    Q.   THAT'S WHAT IT SAYS?

4    A.   (NODS HEAD UP AND DOWN.)

5    Q.   DID YOU CONSIDER YOURSELF TO BE SUCH A PERSON AT THAT

6    TIME?

7    A.   YES.

8    Q.   AND ALSO WHEN YOU MADE YOUR SUBSEQUENT INVESTMENT FOR

9    $80,000; SIR?

10   A.   YES.

11   Q.   I'M GOING TO GO TO RISK FACTORS.  IT STARTS AT THE BOTTOM

12   OF PAGE 9, AT LEAST IT'S 9 ON THE BOTTOM OF THIS EXHIBIT THAT

13   ALSO HAS A 4 ON IT.  THERE WE GO.  THANK YOU.  WE DON'T NEED --

14   THAT'S FINE.  YOU CAN KEEP THAT UP.

15        LET'S TALK A LITTLE BIT ABOUT REAL ESTATE.  IT SOUNDS LIKE

16   YOU'VE HAD QUITE A BIT OF EXPERIENCE IN REAL ESTATE AND YOU

17   WERE INVESTING IN REAL ESTATE AND ATTENDING SEMINARS AND TRYING

18   TO EDUCATE YOURSELF ON HOW TO MAKE MONEY IN REAL ESTATE DURING

19   THIS TIME.  IS THAT FAIR TO SAY?

20   A.   YES.

21   Q.   AND YOU INVESTED IN A SIMILAR INVESTMENT MAYBE A YEAR OR

22   TWO BEFORE THIS, WHICH WOULD HAVE BEEN, WHAT, 2006 PERHAPS?

23   2007?  SOMEWHERE IN THERE?

24   A.   YES.

25   Q.   AND DURING THAT TIME IN OUR COUNTRY'S ECONOMIC HISTORY,

OLMSTEAD - CROSS

```
1    REAL ESTATE WAS GOING UP IN VALUE; RIGHT?

2    A.   IT WAS CLOSE TO THE, TO THE TIPPING OVER.

3    Q.   BUT DID YOU THINK IT WAS GOING TO TIP OVER SOON?

4    A.   CERTAINLY IT WAS GOING TO GO THROUGH A CYCLE.

5    Q.   AND AT WHAT POINT DID YOU BELIEVE THE MARKET CYCLE TO BE

6    IN AT THE TIME YOU WERE MAKING THESE INVESTMENTS?

7    A.   WHEN YOU SAY "THESE INVESTMENTS," ARE WE TALKING ABOUT --

8    Q.   LET'S TALK ABOUT THE FIRST INVESTMENT IN THE GREENLIGHT

9    FUND AND THE EARLIER INVESTMENT WITH A DIFFERENT COMPANY.

10   A.   THE FIRST INVESTMENT WITH THE APS FUND, I BELIEVE THAT THE

11   MARKET HAD ALREADY STARTED TO TURN OVER.

12   Q.   OKAY.  AND PRIOR TO THAT, WAS IT FAIR TO SAY YOU WERE

13   FAIRLY ENTHUSIASTIC ABOUT THE CONDITION OF THE MARKET?

14   A.   MAYBE MORE CAUTIOUS KNOWING THAT IT HAD BEEN AN UP MARKET

15   FOR QUITE SOME TIME.

16   Q.   OKAY.  SO IT SOUNDS LIKE YOU'RE PRETTY MUCH AWARE OF SORT

17   OF THE CYCLES OF THE MARKET, AND IN PARTICULAR REAL ESTATE.  IS

18   THAT FAIR TO SAY?

19   A.   I FOLLOW THEM.  THEY'RE DIFFICULT TO PREDICT, OBVIOUSLY.

20   Q.   YES, OBVIOUSLY.

21        ALL RIGHT.  SO LET'S GO BACK TO THE RISK FACTORS.  THEY

22   BEGIN ON -- CAN WE ZOOM OUT, PLEASE?

23        WELL, STOP.  STOP.  SORRY.  SORRY.  I DIDN'T ASK -- I

24   FORGOT TO ASK A QUESTION ABOUT THAT.

25        BUT -- CAN WE GO BACK TO THAT RISK FACTOR AGAIN?  I'M
```

1        SORRY, NINA.

2            OKAY.  IT SAYS THE INVESTMENT -- IT'S WARNING YOU AGAIN,

3    "INVESTMENT IN THE COMPANY INVOLVES CERTAIN RISKS AND IS

4    SUITABLE FOR INVESTORS WHO MEET THE SUITABILITY STANDARDS."

5            WE TALKED ABOUT THAT EARLIER TODAY, BUT YOU REMEMBER

6    READING THIS; CORRECT?

7    A.    YES.

8    Q.    AND THEN FROM THERE, BEGINNING ON PAGE 10, OR AT LEAST THE

9    NEXT PAGE, THERE'S A NUMBER OF THEM THAT THEY TALK ABOUT.

10   CONFLICT OF INTEREST; RIGHT?

11   A.    YES.

12   Q.    NON-LIQUIDITY AND NON-TRANSFERABILITY OF UNITS; RIGHT?

13   A.    YES.

14   Q.    AND, AGAIN, LACK OF REGISTRATION, AND THERE'S A REFERENCE

15   TO REGULATION D; CORRECT?

16   A.    YES.

17   Q.    AND THEN IT TALKS ABOUT MANAGEMENT AND CONTROL OF COMPANY

18   AFFAIRS.  YOU WOULD HAVE NONE; RIGHT?

19   A.    CORRECT.

20   Q.    IT SAYS YOU'RE DEPENDENT ON THE MANAGING MEMBER, WHOEVER

21   THAT IS; CORRECT?

22   A.    CORRECT.

23   Q.    WHATEVER ENTITY THAT IS.

24           AND THEN THERE'S A NUMBER OF RISKS WITH INVESTING IN REAL

25   ESTATE; RIGHT?

1    A.    YES.

2    Q.    AND SO IT'S FAIR TO SAY THAT THERE'S A LOT OF POTENTIAL

3    DOWN SIDE THAT'S IDENTIFIED IN THIS DOCUMENT; RIGHT?

4    A.    I GUESS YOU COULD SAY THAT.  THESE ARE -- THESE SORTS OF

5    DOCUMENTS TEND TO HAVE THESE SORT OF CLAUSES IN THEM TO, TO

6    HELP PROTECT THE MEMBERS.

7    Q.    SURE.  BUT IT'S ALSO WARNING YOU THAT THINGS COULD GO

8    SOUTH; RIGHT?

9    A.    CORRECT.

10   Q.    AND I'M NOT GOING TO GO THROUGH THIS AGAIN, BUT THE

11   INVESTOR SUITABILITY STATEMENTS WERE INCLUDED IN THAT DOCUMENT

12   THAT WE'VE JUST BEEN LOOKING AT; RIGHT?

13   A.    CORRECT.

14   Q.    NOW -- I'M SORRY.  YOUR FIRST INVESTMENT WAS IN WHICH

15   ENTITY, SIR?

16   A.    GREENLIGHT FUND.

17   Q.    AND THE SECOND ONE AS WELL?

18   A.    YES.

19   Q.    OKAY.  BOTH OF THEM IN GREENLIGHT?

20   A.    YES.

21   Q.    AND MICHAEL SWANSON WAS NAMED AS A PARTNER; CORRECT?

22   A.    CORRECT.

23   Q.    DO YOU REMEMBER A DESCRIPTION OF MR. SWANSON BEING

24   CONTAINED IN THIS DOCUMENT?

25   A.    I DO.  I KNOW THAT ALEXANDER, SWANSON, AND PINA WERE

```
1    LISTED AS THE MEMBERS OF THIS COMPANY.

2    Q.   LET'S GO TO PAGE 17, IF WE COULD, OF THIS DOCUMENT, AND

3    THAT'S THE BOTTOM NUMBER.  AND LET'S ZOOM IN ON

4    MR. MICHAEL SWANSON, PLEASE.

5         DO YOU SEE THAT?

6    A.   YES.

7    Q.   OKAY, GOOD.  AND IT TELLS YOU THAT MR. SWANSON IS THE

8    VICE-PRESIDENT SINCE FEBRUARY OF 2008; CORRECT?

9    A.   YES.

10   Q.   AND HE'S A GRADUATE OF U.C. BERKELEY, GOT HIS M.B.A.;

11   RIGHT?

12   A.   YES.

13   Q.   AND HE'S BEEN PRESIDENT OF STRATEGIC FINANCE GROUP FOR 20

14   YEARS?

15   A.   YES.

16   Q.   AND IT TALKS ABOUT VARIOUS OTHER QUALIFICATIONS OF

17   MR. SWANSON.

18        NOW, YOU NEVER MET MR. SWANSON, DID YOU?

19   A.   NOT UNTIL HIS TRIAL.  I DIDN'T MEET HIM THEN, BUT I SAW

20   HIM.

21   Q.   YOU SAW HIM.  AND YOU DIDN'T SPEAK TO HIM?

22   A.   NO.

23   Q.   HE DIDN'T MAKE ANY REPRESENTATIONS TO YOU?

24   A.   NO.

25   Q.   AND DID --
```

1    A.   WELL, I TAKE THAT BACK.  I DID SPEAK TO MICHAEL SWANSON ON

2    A PHONE CONVERSATION AT ONE POINT.

3    Q.   OH.  WHEN WAS THAT?  DO YOU RECALL?

4    A.   IT WOULD HAVE BEEN DURING -- AFTER BARBRA STEPPED DOWN,

5    MICHAEL STEPPED IN AND HIM AND I HAD SEVERAL CONVERSATIONS AT

6    THAT POINT, OR ONE CONVERSATION I BELIEVE.

7    Q.   AND WHAT DID MICHAEL TELL YOU?

8    A.   HE TOLD ME THAT, THAT HE WAS GOING TO COME IN AND DO HIS

9    BEST TO TRY TO RIGHT THE SHIP, BASICALLY, IN GENERAL TERMS.

10   Q.   HE WAS GENERALLY REASSURING TO YOU?

11   A.   HE WASN'T REASSURING IN THE SENSE THAT HE SAID THAT, THAT

12   ASSETS HAD BEEN LOST, THAT THERE WAS MISMANAGEMENT HAPPENING,

13   BUT THAT HE WAS GOING TO COME IN AND DO HIS BEST TO RESOLVE THE

14   SITUATION CONSIDERING WHAT HAD HAPPENED.

15   Q.   AND AT THE TIME YOU SPOKE TO MR. SWANSON, WERE YOU AWARE

16   THAT HE WAS ACTUALLY PART OF THE MANAGEMENT THAT HE WAS

17   DESCRIBING AS BEING RESPONSIBLE FOR MISMANAGEMENT?

18   A.   HE DID DESCRIBE -- I MEAN, I KNEW THAT HE WAS ONE OF THE

19   MANAGING MEMBERS.

20   Q.   SURE.

21   A.   BUT HE WAS -- HE WAS -- FROM MY CONVERSATIONS WITH HIM, IT

22   WAS CLEAR THAT HE HAD NOT BEEN -- OR MADE IT APPEAR AS THOUGH

23   HE HAD NOT BEEN INVOLVED IN A LOT OF THE DAY-TO-DAY

24   TRANSACTIONS AT BEST AND, AND BARBRA HAD BEEN.

25   Q.   AND THAT'S WHAT HE TOLD YOU?

1    A.   THERE WAS CERTAINLY THAT INFERENCE.  I CAN'T REMEMBER IF

2    HE STATED THAT OUT TO ME.

3    Q.   SO THE IMPRESSION YOU GOT, THOUGH, WAS THAT HE HAD BEEN IN

4    THE BACKGROUND, HE DIDN'T REALLY HAVE MUCH TO DO WITH IT, AND

5    NOW HE WAS COMING IN ON THE WHITE HORSE TO SAVE THE DAY?

6    A.   YES.

7    Q.   ALL RIGHT.

8         JUST ONE MOMENT, YOUR HONOR.  I'M ALMOST WHERE I AM,

9    WHERE I NEED TO BE.

10        (PAUSE IN PROCEEDINGS.)

11        MR. LEEMING:  OKAY.  CAN WE GO TO PAGE 32, WHICH IS

12   THE OPERATING AGREEMENT, PLEASE.  AND I'M SORRY, I ACTUALLY

13   WANTED TO GO A LITTLE BIT FURTHER DOWN, WHICH IS GOING TO BE

14   PAGE 34, WHICH IS PROFITS, LOSSES, AND DISTRIBUTIONS.

15   Q.   AND IT LOOKS LIKE YOU'RE THERE, MR. OLMSTEAD.

16   A.   YES.

17   Q.   OKAY.  SO WE TALKED ABOUT THIS EARLIER, YOU DID, WITH THE

18   U.S. ATTORNEY'S OFFICE.

19        IT TALKS ABOUT A SCHEDULE OF PROFITS; CORRECT?

20   A.   YES.

21   Q.   AND IT TALKS ABOUT WHERE THE CASH GOES FROM THE OPERATIONS

22   OF THE COMPANY; RIGHT?

23   A.   CORRECT.

24   Q.   AND IT MENTIONS THE 12 PERCENT; RIGHT?

25   A.   YES.

```
1     Q.   AND THEN IT TALKS ABOUT SOME SPECIAL LOSS RULES IN 3.13,

2     AND I DON'T THINK THE U.S. ATTORNEY ASKED YOU ABOUT THAT.

3          DO YOU SEE THAT?

4     A.   OKAY.

5     Q.   BOTTOM OF PAGE 34.

6     A.   OKAY.

7     Q.   AGAIN, WE'VE GOT SOME LANGUAGE ABOUT POTENTIAL ECONOMIC

8     RISK; RIGHT?

9     A.   YES.

10    Q.   AND SPECIFICALLY, IT HAS THE MEMBER AGREEING TO BEAR

11    ECONOMIC RISK OF LOSS UNDER SOME CIRCUMSTANCES; RIGHT?  THAT'S

12    3.13, SUBPARAGRAPH A2?

13    A.   YES.

14    Q.   VERY BOTTOM.

15    A.   YES.

16    Q.   THANK YOU.  LET'S GO DOWN TO ARTICLE 5, WHICH IS PAGE 39,

17    I BELIEVE, SECTION 5.2.  OKAY?

18    A.   YES.

19    Q.   ALL RIGHT.  SO IT'S -- IT GIVES THE MANAGING MEMBER, WHICH

20    IS APS, SOME AUTHORITY; CORRECT?  IT DEFINES WHAT THE AUTHORITY

21    OF THE COMPANY, THE MANAGING MEMBER IS?

22    A.   YES.

23    Q.   AND IT SAYS "INCLUDING THE AUTHORITY TO DO ALL THE

24    FOLLOWING"?

25    A.   YES.
```

1    Q.   AND SUBPARAGRAPH A SAYS, "INVEST AND EXPEND THE COMPANY

2    FUNDS, INCLUDING, WITHOUT LIMITATION, FOR COMPANY FORMATION AND

3    STRUCTURE."

4        CORRECT?

5    A.   CORRECT.

6    Q.   "MANAGEMENT, AND OPERATIONS."  CORRECT?

7    A.   YES.

8    Q.   "IN SHORT TERM AND LONG TERM INVESTMENTS OF ALL TYPES."

9    CORRECT?

10   A.   CORRECT.

11   Q.   AND ALSO C, "ENTER INTO NECESSARY AGREEMENTS."

12       DO YOU SEE THAT?

13   A.   YES.

14   Q.   "INCLUDING, WITHOUT LIMITATIONS, WITH ANY MEMBER."  RIGHT?

15   A.   YES.

16   Q.   AND LET'S GO DOWN TO F, TO BORROW MONEY; RIGHT?  THAT'S

17   PART OF WHAT WAS GOING ON IN THIS COMPANY; CORRECT?

18   A.   I'M NOT SURE WHAT THAT REFERENCE TO BORROW MONEY IS IN

19   THAT SPECIFIC CASE.

20   Q.   OKAY.  SO AT THE TIME YOU SIGNED THIS, YOU WEREN'T SURE

21   WHAT THE PHRASE IN THIS AUTHORITY SECTION MEANT?

22   A.   I'M NOT SURE ABOUT WHEN I SIGNED IT.  I'M NOT SURE RIGHT

23   NOW TO THE REFERENCE AT THIS MOMENT.

24   Q.   OKAY.  HOW ABOUT G, "LOAN MONEY, INCLUDING, WITHOUT

25   LIMITATION, TO ANY MEMBER, FOR COMPANY PURPOSES, WITH OR

```
 1        WITHOUT SECURITY."

 2            YOU SEE THAT; CORRECT?

 3        A.   I DO, YES.

 4        Q.   AND AGAIN, I'M SORRY, I SEE YOU NODDING.  WE SEE YOU

 5        NODDING.  BUT THE COURT REPORTER HAS TO GET YOUR ANSWER.

 6        A.   YES.

 7        Q.   THAT'S A YES.  THANK YOU.

 8            NOW, SO I WANT TO GO BACK A LITTLE BIT, IF WE COULD NOW,

 9        TO EXHIBIT 84 AND THE QUESTIONS YOU WERE ASKED ABOUT IN THE

10        E-MAIL, AND I'M GOING TO GET THERE MYSELF, IN 84A.

11            AND, AGAIN, THIS IS PAGE -- THIS ONE HAS 1611 AT THE

12        BOTTOM.  WE WERE THERE EARLIER TODAY.  IT'S 84A, AND IT'S THE

13        BOTTOM OF THE PAGE WHERE YOU ASKED SOME QUESTIONS.

14            CORRECT?  ARE YOU THERE?

15        A.   CORRECT.

16        Q.   ALL RIGHT.  SO A COUPLE THINGS.  IS THERE ANYTHING IN THE

17        AGREEMENTS THAT WE JUST REVIEWED ABOUT WHETHER IT'S FULL

18        RECOURSE OR NON-RECOURSE OR ANY KIND OF RECOURSE AT ALL?

19        A.   IT DOES SEEM THAT THERE'S SOME DISCREPANCIES BETWEEN THE

20        ANSWERS I WAS GIVEN HERE AND IN THE AGREEMENT.

21        Q.   YES, SOME FAIRLY SUBSTANTIAL DISCREPANCIES; CORRECT?

22        A.   YES.

23        Q.   SO WE'VE HEARD A LOT ABOUT THIS E-MAIL, BUT THIS WAS AN

24        INTRODUCTORY E-MAIL FROM MS. LAMBERT; CORRECT?

25        A.   WITH MS. ALEXANDER CONFIRMING --
```

1    Q.   SHE WAS COPIED ON IT, I UNDERSTAND.

2    A.   YES.

3    Q.   BUT THIS WAS AN INTRODUCTORY E-MAIL IN RESPONSE TO YOUR

4    GENERAL QUESTIONS AT THE BEGINNING OF THE RELATIONSHIP;

5    CORRECT?

6    A.   YES.  BUT IT WAS ALSO REFERENCED AGAIN WHEN I INVESTED THE

7    SECOND TIME.

8    Q.   I UNDERSTAND.

9         AND THE DOCUMENTS THAT WE'VE JUST LOOKED AT WERE ATTACHED

10   TO THIS E-MAIL, AND I THINK YOU TESTIFIED EARLIER THAT IF THEY

11   WEREN'T, THEY CAME TO YOU VERY SHORTLY THEREAFTER; CORRECT?

12   A.   CORRECT.

13   Q.   YOU'RE A SOPHISTICATED PERSON IN TERMS OF INVESTING;

14   RIGHT?

15   A.   I DON'T KNOW THAT I'D GO THAT FAR, BUT I'VE DONE SOME

16   INVESTING.

17   Q.   YOU'VE HAD SOME TRAINING?

18   A.   SOME.  BUT I -- WITH THIS, NOT NEARLY AS MUCH AS, SAY,

19   REAL ESTATE AS SECURITIES.

20   Q.   OKAY.  BUT YOU HAD BEEN INVOLVED IN AN INVESTMENT SIMILAR

21   TO THIS BEFORE YOU SIGNED THESE DOCUMENTS; RIGHT?

22   A.   YES.

23   Q.   YOU KNOW THAT THE SIGNED DOCUMENTS CONTROL, NOT AN E-MAIL

24   WHEN YOU'RE APPROACHING A COMPANY, DON'T YOU?

25   A.   I THINK THAT BOTH SHOULD BE IMPORTANT, ESPECIALLY IF I'VE

1       SPECIFIED THIS OUT FOR THE REPRESENTATION IN AN E-MAIL OF

2       SOMETHING FORMAL OF THIS NATURE, TO SPECIFICALLY UNDERSTAND

3       EXACTLY WHAT SORT OF INVESTMENT THEY ARE DOING WITHIN THE

4       PARAMETERS OF THE AGREEMENTS THAT THEY'RE OFFERING.

5       Q.   AGAIN, THERE'S SOME DISCREPANCIES BETWEEN THIS E-MAIL AND

6       THE DOCUMENTS YOU REVIEWED AT HOME, WITHOUT ANY PRESSURE, AND

7       WHAT YOU ACTUALLY SIGNED; CORRECT?

8       A.   THERE ARE SOME DIFFERENCES.

9            YET AHEAD OF TIME, THEY SPECIFIED THAT THIS WAS THE WAY

10      THE FUNDS WERE GOING TO BE INVESTED.

11      Q.   SO IS IT YOUR UNDERSTANDING THAT THE E-MAIL IS CONTROLLING

12      AND NOT THE DOCUMENTS YOU SIGNED?

13      A.   THE E-MAIL CERTAINLY SPECIFIES THE SPECIFIC WAY THEY'RE

14      GOING TO INVEST WITH THESE DOCUMENTS.  THAT WAS MY

15      UNDERSTANDING.

16      Q.   MY QUESTION IS, WAS IT YOUR UNDERSTANDING THAT THE E-MAIL

17      IS CONTROLLING AND NOT THE DOCUMENTS YOU SIGNED?

18      A.   I THINK THAT BOTH SHOULD BE -- ARE CONTROLLING BECAUSE

19      CERTAINLY THAT'S WRITTEN COMMUNICATION BETWEEN MYSELF AND

20      SOMEONE THAT'S OFFERING ME AN INVESTMENT.

21      Q.   YOU'VE SIGNED SOME CONTRACTS BEFORE, HAVEN'T YOU?

22      A.   YES.

23      Q.   IS THIS A CONTRACT?

24      A.   NO, BUT IT IS AN E-MAIL.

25      Q.   IT'S AN E-MAIL?

1    A.   AND IN TODAY'S WORLD, A LOT OF DOCUMENTS ARE PASSED VIA

2    E-MAIL.

3              THE COURT:  THE TIME IS NOW 10:31.  I'D LIKE TO TAKE

4    A BREAK.

5              MR. LEEMING:  THANK YOU.

6              THE COURT:  OKAY.  WE'LL TAKE A 15 MINUTE BREAK.

7    THANK YOU.

8         YOU MAY STEP DOWN.

9              THE WITNESS:  THANK YOU.

10        (JURY OUT AT 10:32 A.M.)

11        (RECESS FROM 10:32 A.M. UNTIL 10:51 A.M.)

12        (JURY IN AT 10:51 A.M.)

13             THE COURT:  ALL RIGHT.  LET'S CONTINUE, MR. LEEMING,

14   PLEASE.

15   BY MR. LEEMING:

16   Q.   GOOD MORNING AGAIN, MR. OLMSTEAD.

17   A.   GOOD MORNING AGAIN.

18   Q.   I JUST HAVE A FEW QUESTIONS LEFT.

19             CAN WE BRING UP EXHIBIT 79, PAGE 5, PLEASE, WITH THE

20   SIGNATURES ON IT, AND ZOOM IN ON THE SIGNATURES AGAIN.

21             AND YOU SEE ON THE SCREEN THERE THERE'S, AGAIN, THE DATE.

22   WE LOOKED AT THIS EARLIER.  THERE'S SOME INITIALS, AND THERE'S

23   A SIGNATURE BY BETH PINA; RIGHT?

24   A.   THAT LOOKS LIKE A FULL SIGNATURE BY BARBRA AND BETH PINA.

25   Q.   OKAY.  AND SO THAT'S IT FOR THAT.

```
 1              CAN WE BRING UP EXHIBIT 84C, AND ZOOM IN ON THE SIGNATURES
 2      THERE.
 3              SO THIS IS A LETTER, I THINK YOU TESTIFIED IT WAS
 4      DECEMBER 1ST, 2008, WELCOMING YOU TO APS.
 5              WOULD YOU LOOK AT THE SIGNATURE THERE?
 6      A.   YES.
 7      Q.   IT'S WRITTEN QUITE DIFFERENTLY, ISN'T IT?
 8      A.   IT SEEMS LIKE IN THIS CASE SHE'S JUST SIGNED HER FIRST
 9      NAME, AND MAYBE HER LAST INITIAL, BUT I CAN'T TELL FOR SURE.
10      I'M NOT THAT FAMILIAR WITH HER SIGNATURE.
11      Q.   ALL RIGHT.  YOU ACTUALLY DON'T KNOW IF IT WAS
12      BARBRA ALEXANDER WHO SIGNED THIS LETTER, DO YOU?
13      A.   CERTAINLY I WAS UNDER THE IMPRESSION THAT IT WAS SINCE IT
14      APPEARED TO LOOK AS THOUGH HER SIGNATURE TO ME, YES.
15      Q.   OKAY.  BUT YOU CAN'T TELL.  YOU ASSUMED IT WAS; CORRECT?
16      A.   OF COURSE, YES.
17      Q.   BUT, IN FACT, YOU DON'T KNOW WHO SIGNED THIS DECEMBER 1ST
18      LETTER?
19      A.   AGAIN, I WAS CERTAINLY UNDER THE IMPRESSION IT WAS BARBRA.
20      Q.   I UNDERSTAND THAT.
21              THANK YOU.  I JUST HAD A COUPLE MORE QUESTIONS.
22              YOU TESTIFIED YOU HAD HAD SOME TRAINING IN REAL ESTATE.
23      IS THAT RIGHT?
24      A.   YES.
25      Q.   YOU'RE ACTUALLY A LICENSED REAL ESTATE AGENT, AREN'T YOU?
```

1    A.    YES.

2    Q.    AND YOU'VE BEEN LICENSED TO PRACTICE AND SELL -- BUY AND

3    SELL -- EXCUSE ME -- TO SELL REAL ESTATE SINCE 2003?

4    A.    YES.

5    Q.    AND YOU STILL HAVE THAT LICENSE TODAY?

6    A.    YES, I DO.

7              MR. LEEMING:  OKAY.  THANK YOU.

8         THAT'S ALL I HAVE, YOUR HONOR.

9              THE COURT:  ALL RIGHT.  ANY REDIRECT?

10             MR. KALEBA:  NO, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

12   AND IS IT SUBJECT TO RECALL OR NOT?

13             MR. LEEMING:  EXCUSED, NO RECALL.

14             MR. KALEBA:  YES, YOUR HONOR, EXCUSED, NOT SUBJECT TO

15   RECALL.

16             THE COURT:  NO RECALL.  ALL RIGHT.

17        YOU MAY STEP DOWN AND YOU ARE EXCUSED.  YOU WILL NOT HAVE

18   TO COME BACK.

19        ALL RIGHT.  PLEASE BRING YOUR NEXT WITNESS IN.

20             MR. KALEBA:  YOUR HONOR, THE UNITED STATES CALLS

21   BARBARA WORKMAN.  WE'VE SPOKEN WITH THE DEFENSE AND WE'RE READY

22   TO PROCEED.

23             THE COURT:  OH, OKAY.  SO YOU DON'T NEED A RULING

24   FROM ME.  THAT'S FINE.

25             MR. KALEBA:  THANK YOU.

```
1              (PAUSE IN PROCEEDINGS.)

2                   THE CLERK:  IF YOU WOULD STEP UP HERE, PLEASE, AND

3         RAISE YOUR RIGHT HAND.

4              (BARBARA WORKMAN, PLAINTIFF'S WITNESS, WAS SWORN.)

5                   THE WITNESS:  YES.

6                   THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE.

7              AND WOULD YOU PULL THE MICROPHONE TOWARDS YOU AND GIVE US

8         YOUR NAME AND SPELL IT, PLEASE.

9                   THE WITNESS:  OKAY.

10                        DIRECT EXAMINATION

11        BY MR. KALEBA:

12        Q.   WOULD YOU PLEASE STATE AND SPELL YOUR NAME?

13        A.   CAN YOU SPEAK UP JUST A LITTLE BIT?

14        Q.   WOULD YOU PLEASE STATE AND SPELL YOUR NAME?

15        A.   BARBARA WORKMAN, B-A-R-B-A-R-A, WORKMAN, W-O-R-K-M-A-N.

16        Q.   GOOD MORNING.

17        A.   GOOD MORNING.

18        Q.   WHERE DO YOU CURRENTLY LIVE, MS. WORKMAN?

19        A.   YOU KNOW, I'M JUST A LITTLE BIT HARD OF HEARING, SO CAN

20        YOU SPEAK UP JUST A LITTLE BIT?

21        Q.   YES.  WHERE DO YOU CURRENTLY LIVE?

22        A.   I CURRENTLY LIVE IN DALLAS, TEXAS.

23        Q.   HAVE YOU EVER LIVED IN THE MONTEREY, CALIFORNIA AREA?

24        A.   YES, I HAVE.

25        Q.   WHERE WAS THAT?
```

1    A.   I LIVED IN PACIFIC GROVE, CALIFORNIA, WHICH IS PART OF

2    MONTEREY.

3    Q.   WHEN WAS THAT?

4    A.   WHEN?  FOR THE LAST SEVEN OR EIGHT YEARS.

5    Q.   WHEN DID YOU LEAVE PACIFIC GROVE?

6    A.   OCTOBER 3RD.

7    Q.   ARE YOU FAMILIAR WITH THE FIRM APS FUNDING?

8    A.   YES.

9    Q.   WHAT IS IT?

10   A.   WELL, IT WAS SUPPOSED TO BE A HARD MONEY LENDING REAL

11   ESTATE INVESTMENT --

12   Q.   ARE YOU FAMILIAR --

13   A.   -- COMPANY.

14   Q.   ARE YOU FAMILIAR WITH A PERSON NAMED BARBRA ALEXANDER?

15   A.   YES, I AM.

16   Q.   IS THAT PERSON IN THE COURTROOM THIS MORNING?

17   A.   I DON'T KNOW.  I -- I WOULD ASSUME.  SHE'S OVER THERE

18   MAYBE, BEHIND THAT MONITOR.

19   Q.   CAN YOU STAND UP AND SEE?  CAN YOU IDENTIFY HER, PLEASE?

20        THE COURT:  AND IF YOU NEED TO GET DOWN FROM THE

21   STAND TO DO THAT, YOU'RE FREE TO DO SO.

22        THE WITNESS:  I SEE HER.  THERE SHE IS IN THE GREEN.

23   BY MR. KALEBA:

24   Q.   THANK YOU.

25        HOW DID YOU FIRST COME TO MEET MS. ALEXANDER?

1    A.   I MOVED OUT HERE CLOSE TO NINE YEARS OR SO AGO, AND WAS --

2    I DIDN'T KNOW ANYBODY, AND SO EVERY PERSON I MET WAS A NEW

3    PERSON, AND I WAS GETTING ACQUAINTED WITH A LADY NAMED

4    ADRIANA GRANAT THAT OWNED EUROPEAN JEWELERS IN THE CROSSROADS,

5    AND SHE SORT OF HAS THIS GREET EVERYBODY AND MEET EVERYBODY

6    SMALL BUSINESS.

7         SO I WAS IN THERE GETTING SOME JEWELRY REPAIRED AND

8    EVERYBODY WAS TALKING TO EVERYBODY AND SOMETHING CAME UP ABOUT

9    LOW INTEREST RATES AND BANKS AND THE STOCK MARKET AND WISH WE

10   COULD FIND A BETTER PLACE TO PUT OUR MONEY.

11        SO I MET A LADY NAMED HELGA PATE IN THERE WHO WAS ALSO

12   SHOPPING.

13   Q.   OKAY.  AND DID THE SUBJECT OF INVESTING COME UP BETWEEN

14   YOU AND MS. HELGA PATE?

15   A.   IF IT ACTUALLY CAME UP THAT VERY DAY, I'M NOT SURE.  IT

16   MAY HAVE COME UP AS SORT OF A CASUAL JUST CHIT CHAT

17   CONVERSATION.

18        HELGA, I BELIEVE, HAD MOVED RECENTLY AND WAS ALSO SOMEWHAT

19   LIKE ME, NOT KNOWING --

20   Q.   OKAY.  DID THE SUBJECT OF MS. ALEXANDER COME UP WHILE YOU

21   WERE IN THE JEWELRY STORE?

22   A.   EITHER THAT TIME OR POSSIBLY THE NEXT TIME, YES, IT DID.

23   Q.   OKAY.  AT THAT PERIOD OF TIME, WERE YOU LOOKING TO MAKE

24   ANY INVESTMENTS?

25   A.   I WAS LOOKING TO MAKE A BETTER INVESTMENT.  I FELT THAT

```
 1        THE STOCK MARKET WAS GETTING WEAK AND I WANTED OUT OF THAT.  I

 2     HAD PUT MY MONEY IN AN INSTITUTION AND WAS GETTING LESS THAN

 3     2 PERCENT, SO I WAS LOOKING FOR A PLACE TO PUT IT TO GET MORE

 4     INTEREST.

 5     Q.   WERE YOU INTERESTED IN INVESTING IN REAL ESTATE AT THIS

 6     TIME?

 7     A.   OH, I WAS PROBABLY WOULD HAVE BEEN OPEN TO LOTS OF

 8     SUGGESTIONS, BUT MY FAMILY -- MY FATHER WAS A CAREER REAL

 9     ESTATE, AND SO WAS MY HUSBAND, SO THAT'S A FAMILIAR AREA FOR

10     ME.

11     Q.   OKAY.  HOW MUCH MONEY WERE YOU INTERESTED IN INVESTING?

12     A.   EVERYTHING I HAD.

13     Q.   AND HOW MUCH WAS THAT?

14     A.   IT WAS ABOUT 650,000.

15     Q.   DID YOU EVER COME TO MEET MS. ALEXANDER?

16     A.   YES, I DID.

17     Q.   WHEN WAS THAT?

18     A.   SHORTLY THEREAFTER HELGA PATE TOOK ME OVER TO MEET HER.

19     Q.   WHERE DID YOU MEET?

20     A.   AT BARBRA ALEXANDER'S HOME WHERE SHE HANDLED HER BUSINESS.

21     IT WAS HER OFFICE, I BELIEVE.

22     Q.   WHERE WAS THE HOME?  WHAT CITY?

23     A.   IN MONTEREY.

24     Q.   WAS ANYBODY ELSE THERE AT THE TIME?

25     A.   THERE WERE ALWAYS A LOT OF PEOPLE AROUND.  I BELIEVE SHE
```

```
1        HAD AN OFFICE DOWN BELOW AND POSSIBLY A RECORDING STUDIO IN

2        THERE.

3              SO THERE WAS ALWAYS TWO OR THREE OR MORE PEOPLE KIND OF

4        MOVING AROUND THE HOUSE.

5        Q.   DID YOU SPEAK WITH MS. ALEXANDER AT THIS TIME ABOUT

6        INVESTING?

7        A.   I DID.

8        Q.   OKAY.  WHAT DID YOU DISCUSS?

9        A.   WELL, IT WAS MOSTLY GET ACQUAINTED, MEET AND GREET.  SHE

10       ASKED A LOT OF QUESTIONS ABOUT, YOU KNOW, ME MOVING TO

11       CALIFORNIA AND WHAT I WAS DOING AND, YOU KNOW, AT THAT POINT I

12       DIDN'T KNOW WHAT -- I WAS A LITTLE CONFUSED ABOUT EVERYTHING

13       AND WHAT I WANTED TO DO WITH MYSELF AND THE HOME AND A FUTURE.

14             AND SHE BROUGHT UP THE -- AND I'M NOT SURE SHE USED THE

15       WORD APS FUNDING AT THE TIME, BUT THAT SHE HAD AN INVESTMENT

16       GROUP.

17       Q.   OKAY.  HOW DID SHE DESCRIBE THE INVESTMENT GROUP?

18       A.   WELL, THE THING THAT JUMPED OUT, OF COURSE, WAS THE

19       HIGH -- YOU KNOW, SHE WAS PAYING MONTHLY HIGH INTEREST RATE.

20       WHERE I WAS GETTING UNDER 2 PERCENT WITH MORGAN STANLEY, WHICH

21       IS WHERE I PARKED MY MONEY, SHE WAS AT 10 PERCENT.

22       Q.   OKAY.  DID SHE DESCRIBE WHAT THE INVESTMENTS WOULD BE IN?

23       A.   SHE -- REAL ESTATE.  NOT SPECIFICALLY AT THAT POINT, MORE

24       OF A VAGUE DESCRIPTION.  THIS WAS AN AREA OF EXPERTISE OF HERS.

25       Q.   OKAY.  HOW MANY TIMES DO YOU THINK YOU MET WITH
```

WORKMAN DIRECT

1    MS. ALEXANDER AT HER HOME TO DISCUSS INVESTING?

2    A.   DOZENS.

3    Q.   AND WAS THIS BEFORE YOU ACTUALLY PUT YOUR MONEY INTO THE

4    FUND?

5    A.   NO.  IT WAS PROBABLY -- YOU KNOW, IT WAS REALLY A LONG

6    TIME AGO, FOUR OR FIVE YEARS AGO.  BUT MAYBE, MAYBE FIVE TO TEN

7    TIMES BEFORE I ACTUALLY MOVED THE MONEY, BECAUSE FROM WHEN I

8    FIRST GOT ACQUAINTED WITH HER AND A LITTLE BIT MORE ABOUT WHAT

9    SHE DID, I TRIED TO DO SOME HOMEWORK TO EDUCATE MYSELF A LITTLE

10   BETTER.

11   Q.   WHAT DID YOU DO TO EDUCATE YOURSELF BETTER ABOUT THIS

12   INVESTMENT?

13   A.   I WASN'T FAMILIAR WITH THE TERM "HARD MONEY LENDING."  I'D

14   NEVER EVEN HEARD IT, WHICH IS STRANGE BECAUSE MY HUSBAND HAD

15   BEEN A BANKER.  I SHOULD HAVE HEARD THAT TERM.

16        BUT I ACTUALLY CALLED HIM AND MY SON AND SON-IN-LAW AND I

17   GOOGLED -- WE ALL GOOGLE -- AND I TRIED TO LEARN MORE ABOUT IT.

18   Q.   DID YOU DISCUSS THE INVESTMENT WITH ANYONE ELSE, BESIDES

19   MS. ALEXANDER, WHO WORKED FOR MS. ALEXANDER OR WAS PART OF THE

20   COMPANY?

21   A.   WELL, ALL MY CONVERSATIONS WERE BETWEEN BARBRA -- SHE'S

22   BARBRA AND I'M BARBARA -- BARBRA AND I, AND THEN OFTEN HER

23   ASSISTANT, JACKIE LAMBERT WAS THERE FREQUENTLY, ALMOST ALL THE

24   TIME.

25   Q.   DURING THESE PRE-INVESTMENT MEETINGS, DID YOU EVER MEET

```
 1        WITH A PERSON BY THE NAME OF MICHAEL SWANSON?

 2        A.   NO.

 3        Q.   DID YOU -- DURING THESE PRE-INVESTMENT MEETINGS, DID YOU

 4        EVER MEET WITH A PERSON NAMED BETH PINA?

 5        A.   NO.

 6        Q.   DID YOU FEEL CONFIDENT IN -- BY THE WORDS THAT

 7        MS. ALEXANDER WAS TELLING YOU ABOUT THE INVESTMENT?

 8        A.   DID I FEEL CONFIDENT?

 9        Q.   YEAH, IN HER.

10        A.   WELL, OBVIOUSLY I DID TO THE EXTENT THAT I WENT AHEAD AND

11        MADE THE INVESTMENT.

12        Q.   WHY?

13        A.   WELL, IN MY -- WELL, ONE THING WAS GREED.  I WAS HOPING TO

14        MAKE A LITTLE BIT MORE MONEY.

15             THE OTHER WAS REAL ESTATE IS A FAMILIAR AREA FOR ME.

16             HOWEVER, WHEN I HAD CHECKED WITH MY FAMILY AND A COUPLE OF

17        OTHER FRIENDS, THE COMMENT I MOSTLY GOT WAS HARD MONEY LENDING

18        IS VERY RISKY AND I TOLD BARBRA THAT.

19             AND SHE WAS EXPLAINING IT IN MORE DEPTH TO ME AND THAT SHE

20        HAD EXPERIENCE IN REAL ESTATE AND THE MORTGAGE AND BANKING

21        INDUSTRY, AND SOMEHOW OR ANOTHER I MADE THE WRONG DECISION.

22        Q.   DID YOU EVER DISCUSS WITH HER WHETHER THESE REAL ESTATE

23        INVESTMENTS WOULD BE SECURED BY DEEDS OF TRUST?

24        A.   I'M SORRY.  BY WHAT?

25        Q.   DID YOU EVER DISCUSS WITH MS. ALEXANDER WHETHER THE REAL
```

1    ESTATE INVESTMENTS WOULD BE SECURED BY A DEED OF TRUST?

2    A.   WELL, THEY -- MY UNDERSTANDING WAS THEY WERE SECURED BY

3    THE REAL ESTATE PROPERTIES, HOLDINGS, PEOPLE SHE'D MADE LOANS

4    TO, THAT SORT OF THING.  IS THAT WHAT YOU'RE ASKING ME?

5    Q.   YES.

6    A.   YEAH.

7    Q.   DID YOU DISCUSS WHETHER THESE INVESTMENTS WOULD BE MADE

8    INTO THINGS OTHER THAN REAL ESTATE?

9    A.   I'M SO SORRY.  I -- JUST A LITTLE BIT LOUDER IF YOU DON'T

10   MIND.

11           THE COURT:  CAN YOU MOVE THAT MICROPHONE AND SLIDE IT

12   CLOSER TO YOU?

13           THE WITNESS:  I THINK -- WELL, AND I DON'T HEAR

14   GREAT.  I'M LEANING IN THIS MICROPHONE, WHICH ISN'T HELPING YOU

15   AT ALL.

16   BY MR. KALEBA:

17   Q.   DID YOU DISCUSS, PRIOR TO INVESTING, WHETHER SHE WOULD BE

18   MAKING INVESTMENTS INTO THINGS OTHER THAN REAL ESTATE?

19   A.   NO.

20   Q.   DID YOU EVER MEET A PERSON BY THE NAME OF JACKIE LAMBERT?

21   A.   YES.

22   Q.   WHO WAS MS. LAMBERT?

23   A.   WELL, I -- I THINK SHE WAS BARBRA'S ASSISTANT.  SHE WAS

24   DEFINITELY HER RIGHT HAND PERSON.  SHE WAS ALMOST ALWAYS THERE

25   LISTENING IN, TAKING NOTES, OBSERVING, COMMENTING JUST BRIEFLY.

```
 1        SHE WAS A VERY POSITIVE TYPE INFLUENCE.  SHE THREW OUT A VERY

 2        POSITIVE VIBE.

 3        Q.   WAS MS. LAMBERT PRESENT WITH MS. ALEXANDER DURING YOUR

 4        CONVERSATIONS ABOUT THE INVESTMENT?

 5        A.   MOST OF THEM, YES, I'M SURE.

 6        Q.   OKAY.  WHAT TYPE OF STATEMENTS DID MS. LAMBERT MAKE ABOUT

 7        THE INVESTMENT?

 8        A.   OH, VERY ENCOURAGING AND THAT SHE HAD INVESTMENTS IN IT

 9        AND JUST FELT GREAT ABOUT IT AND IT WAS A WONDERFUL

10        OPPORTUNITY.  I MEAN, SHE WAS A REALLY GOOD CHEERLEADER FOR

11        HER.

12        Q.   DID YOU -- WHEN DID YOU DECIDE TO MAKE AN INVESTMENT WITH

13        MS. ALEXANDER?

14        A.   IT -- NOW, I'M WINGING IT HERE, BUT MAYBE A MONTH FROM

15        WHEN I MET HER.

16        Q.   OKAY.  AND IN THAT PERIOD, IN THAT MONTH, HOW MANY

17        TIMES -- I BELIEVE YOU SAID IT WAS FIVE TO TEN TIMES YOU MET

18        WITH MS. ALEXANDER.

19        A.   I -- WHAT I WAS DOING WAS MAKING INQUIRIES AND FINDING OUT

20        MORE ABOUT HARD MONEY LENDING, AND IT WAS RAISING SOME RED

21        FLAGS BECAUSE OF THE RISK, THE RISKINESS OF IT.

22             AND I WOULD GO BACK AND PROPOSE, OR POSE THESE QUESTIONS

23        TO HER AND TRY TO CHALLENGE SOME OF THE THINGS I'D HEARD TO

24        CLARIFY IN MY OWN MIND.

25        Q.   OKAY.  HAVE YOU EVER HEARD OF THE TERM GREENLIGHT FUND?
```

1      A.   I'M IN GREENLIGHT FUND.

2           BUT I HADN'T HEARD IT AHEAD OF TIME.

3      Q.   WHAT IS THE GREENLIGHT FUND, TO YOUR UNDERSTANDING?

4      A.   WELL, APS FUNDING, WHICH THIS I'M REALLY EMBARRASSED TO

5      TELL YOU, I DID NOT KNOW THAT APS STOOD FOR ALEXANDER, PINA,

6      AND SWANSON UNTIL ABOUT A YEAR OR TWO AGO.  I DON'T KNOW HOW

7      THAT ONE GOT AWAY FROM ME, THAT THE THREE PEOPLE THAT OWNED THE

8      COMPANY, OR RAN THE COMPANY, IT WAS THEIR INITIALS.

9           BUT APPARENTLY THEY HAD TWO FUNDS, ONE WAS GCS FUNDING, I

10     BELIEVE.

11          BUT APS ALSO HAD -- I DIDN'T -- I DID NOT KNOW THAT THERE

12     WERE TWO FUNDS, OKAY?  I JUST KNEW THERE WAS ONE.  I DIDN'T

13     KNOW HOW MANY INVESTORS THERE WERE.  I NEVER SAW A LIST OF

14     INVESTORS.

15          SO THE DAY THAT I WENT IN AND SAID I WAS -- THAT I'M GOING

16     TO PUT MY MONEY THERE WAS THE FIRST TIME I HEARD THE WORD

17     GREENLIGHT.

18     Q.   OKAY.  AND WHERE WAS THAT CONVERSATION?

19     A.   AT BARBRA'S HOUSE.

20     Q.   OKAY.  WHO DID YOU SAY "I'M GOING TO PUT MY MONEY INTO

21     GREENLIGHT" TO?

22     A.   WELL, I TOLD BARBRA THAT I HAD DECIDED TO TRANSFER MY

23     MONEY OVER FROM MORGAN STANLEY, AND JACKIE LAMBERT WAS EITHER

24     IN THE ROOM OR WALKED IN THE ROOM RIGHT THEN.  SO THE TWO OF

25     THEM WERE IN THERE.

1    Q.   OKAY.  AND PLEASE DESCRIBE THAT CONVERSATION.

2    A.   I THINK I DIRECTLY TOLD BARBRA THAT I HAD MADE UP MY MIND

3    TO GO AHEAD AND DO THAT, AND SHE LOOKED UP AT -- BARBRA WORKED

4    OVER HER DINING ROOM TABLE, KIND OF LIKE A BOARD TABLE, AND SHE

5    LOOKED UP AT JACKIE AND SHE SAID, "BARBARA'S GOING TO WIRE HER

6    MONEY OVER, OR INVEST HER MONEY WITH US AND WE'RE GOING TO PUT

7    IT IN GREENLIGHT, IN THE GREENLIGHT FUND."

8         AND I HAD THE WORST GUT FEELING RIGHT THEN.  GREENLIGHT

9    WAS A NEW WORD AND LET'S -- HERE WE'VE GOT A GREEN LIGHT, WE'VE

10   GOT A LOT OF MONEY AND WE'RE STARTING GREENLIGHT FUND.

11        I DON'T KNOW WHETHER IT EXISTED AHEAD OF TIME OR NOT, BUT

12   MY STOMACH SANK TO THE GROUND WHEN I THOUGHT "I'M THE

13   GREENLIGHT.  UH-OH.  I SHOULD BE THE RED LIGHT."

14   Q.   PRIOR TO YOUR DECISION TO INVEST, DID YOU RECEIVE ANY

15   DOCUMENTS FROM APS OR MS. ALEXANDER?

16   A.   NOT -- NOT PRIOR.

17   Q.   DID YOU RECEIVE ANY DOCUMENTS DURING THAT MEETING IN THE

18   DINING ROOM?

19   A.   I DON'T THINK -- I'M NOT SURE IF I DID THEN OR WITHIN THE

20   NEXT FEW DAYS.

21   Q.   DID YOU SIGN ANY DOCUMENTS WITH MS. ALEXANDER AT SOME

22   POINT?

23   A.   I DID.  JACKIE HANDED ME A DOCUMENT TO SIGN AND -- WHICH I

24   DID.

25   Q.   HOW MANY PAGES WAS THE DOCUMENT?

```
1        A.   ONE.

2        Q.   HOW MANY PAGES DO YOU THINK YOU SIGNED IN TOTAL THAT DAY?

3        A.   WE WERE DISCUSSING HOW TO MOVE THAT MONEY AND THEY WERE

4        SETTING ME UP AN ACCOUNT AT FIRST NATIONAL BANK, WHICH WAS

5        WHERE BARBRA DID HER BUSINESS.

6             I MAY HAVE SIGNED SOMETHING ABOUT MOVING THE MORGAN

7        STANLEY MONEY TO FIRST NATIONAL BANK.

8        Q.   DID YOU --

9        A.   I'M NOT SURE WHETHER IT WAS THAT DAY OR THE NEXT.

10       Q.   DID YOU DECIDE TO MAKE YOUR INVESTMENT BEFORE READING THE

11       INVESTMENT DOCUMENTS?

12       A.   YES.

13       Q.   WHY?

14       A.   BECAUSE I'M STUPID.  I'M NOT A BUSINESS WOMAN.  I HAD BEEN

15       MARRIED FOR 40 YEARS TO A BANKER.  AND I TRUSTED HER.  SHE HAD

16       WON MY TRUST.

17       Q.   DID YOU RECEIVE DOCUMENTS FROM APS AFTER YOUR INVESTMENT?

18       A.   QUITE A WHILE AFTERWARDS.

19       Q.   I'D LIKE TO SHOW YOU SOME DOCUMENTS IN THE BINDER ON YOUR

20       TABLE.  IT'S EXHIBIT NUMBER 70.

21            YOUR HONOR, MAY I APPROACH TO HELP HER WITH THE BINDER?

22                 THE COURT:  THAT'S FINE.  GO AHEAD, PLEASE.

23                 THE WITNESS:  THERE'S A LOT OF BINDERS HERE.

24                 THE COURT:  I UNDERSTAND.

25                 THE WITNESS:  THANK YOU.
```

```
 1        BY MR. KALEBA:

 2        Q.   WOULD YOU TAKE A MOMENT TO LOOK AT THE PAGES THAT ARE

 3        BEHIND NUMBER 70?

 4        A.   WELL, MY FIRST COMMENT, OF COURSE, IS THAT HER NAME IS

 5        SPELLED B-A-R-B-R-A, AND I'M B-A-R-B-A-R-A, AND I WAS HER NEW

 6        INVESTOR AND POSSIBLY BIGGEST, AND THERE WAS A QUESTION ABOUT

 7        WHETHER I'M THE MOST.  AND SHE SPELLED MY NAME THE WAY SHE

 8        SPELLED HER NAME.  I THOUGHT, THAT ISN'T VERY EFFICIENT.

 9             SO IT'S ADDRESSED TO B-A-R-B-R-A, HER NAME.

10        Q.   WE'LL GET TO THE SUBSTANCE OF THE DOCUMENTS --

11        A.   WELL, THAT WAS THE FIRST THING I SAW AND I WENT, "WHOA."

12        Q.   WOULD YOU JUST TAKE A LOOK AT THE DOCUMENTS AND TELL ME

13        WHETHER OR NOT THESE ARE THE DOCUMENTS YOU RECEIVED FROM APS.

14        A.   I WOULD SAY APPROXIMATELY.

15        Q.   YES.  THESE ARE THE DOCUMENTS?

16        A.   THESE LOOK LIKE THE DOCUMENTS.  THEY'RE ALL DATED THE SAME

17        DAY.  I'M WITH YOU.

18        Q.   OKAY.

19        A.   IS THERE SOME PARTICULAR --

20             MR. KALEBA:  NO.  YOUR HONOR, WE WOULD MOVE TO ADMIT

21        70.

22             MR. LEEMING:  NO OBJECTION.

23             THE COURT:  IT'S ADMITTED.

24        (PLAINTIFF'S EXHIBIT 70 WAS ADMITTED IN EVIDENCE.)

25             THE COURT:  GO AHEAD, PLEASE.
```

```
 1        BY MR. KALEBA:

 2        Q.   MS. WORKMAN, I'D LIKE YOU TO TURN TO PAGE 22 OF THE

 3        AGREEMENT, 22.

 4        A.   YES.

 5        Q.   AND THIS IS A SUBSCRIPTION AGREEMENT?

 6        A.   YES.

 7        Q.   DID YOU READ THIS BEFORE THE INVESTMENT?

 8        A.   BEFORE THE INVESTMENT?  NO.

 9        Q.   OKAY.  WOULD YOU TURN TO PAGE 24, PLEASE?

10        A.   I NEVER SAW THAT BEFORE.

11             OKAY.  I'M ON 24.

12        Q.   DO YOU SEE PARAGRAPH 6 WITH SOME HANDWRITING?

13        A.   THAT'S NOT MY HANDWRITING.

14        Q.   DO YOU KNOW WHO COMPLETED THIS?

15        A.   ACTUALLY, I'M NOT SURE I EVER EVEN ACTUALLY SAW

16        BARBRA ALEXANDER'S HANDWRITING, SO I WOULD THINK THIS IS

17        JACKIE LAMBERT'S.

18        Q.   OKAY.  BUT YOU DON'T KNOW?

19        A.   I DON'T KNOW.

20        Q.   DID YOU AUTHORIZE ANYBODY TO FILL THIS OUT ON YOUR BEHALF?

21        A.   NO.

22        Q.   WOULD YOU TURN TO THE NEXT PAGE, 25.

23             WHOSE SIGNATURE IS THIS?

24        A.   THAT'S MINE.

25        Q.   DID YOU SIGN THIS?
```

```
1     A.   I THINK SO.

2     Q.   DID YOU DATE THAT?

3     A.   NO.

4     Q.   IS THAT YOUR HANDWRITING?

5     A.   NO.

6     Q.   DO YOU KNOW WHO DATED THAT?

7     A.   IT LOOKS LIKE THE OTHER HANDWRITING.

8     Q.   WAS IT DATED IN YOUR PRESENCE?

9     A.   NO.  I THINK IF IT WAS DATED IN MY PRESENCE, IT WOULD BE

10    IN MY HANDWRITING.

11    Q.   WOULD YOU PLEASE TURN TO PAGE 47?

12    A.   CAN I SAY SOMETHING?

13    Q.   YES.

14    A.   ON PAGE 26, WHICH IS JUST THE NEXT PAGE I TURNED TO, HERE

15    IS BARBRA ALEXANDER'S HANDWRITING AND IT LOOKS A LOT LIKE MINE.

16    I WRITE -- BECAUSE I'VE HAD SOME HAND INJURIES, SO I DO A

17    SCRIBBLE.  THAT'S A REALLY SIMILAR SCRIBBLE.

18    Q.   WELL, LET ME ASK THE QUESTION THIS WAY.

19    A.   I'M SORRY.  THAT I JUST -- I HAVE NEVER SEEN THAT PAGE

20    BEFORE.

21    Q.   OKAY.  LET'S PULL UP PAGE 26, PLEASE.

22    A.   PAGE 20?

23    Q.   PAGE 26, THE ONE YOU WERE JUST ON.

24    A.   OKAY.

25    Q.   THERE ARE TWO SIGNATURES THERE; RIGHT?
```

```
1     A.   YES.

2     Q.   DID YOU WITNESS THOSE SIGNATURES?

3     A.   NO.

4     Q.   SO DO YOU KNOW WHO SIGNED THOSE?

5     A.   IT SAYS BARBRA ALEXANDER AND BETH PINA.

6     Q.   BUT YOU DIDN'T SEE ANYBODY SIGN THAT; RIGHT?

7     A.   NO.

8     Q.   OKAY.  PAGE 47, PLEASE.  THIS IS THE INVESTOR SUITABILITY

9     STATEMENT.

10         IS THAT YOUR HANDWRITING AT THE BOTTOM?

11    A.   NO.

12    Q.   OKAY.  LET'S TURN THE PAGE.

13         IS THAT YOUR HANDWRITING?

14    A.   NO.

15    Q.   DID YOU GIVE THIS INFORMATION TO ANYBODY TO FILL OUT?

16    A.   I MUST HAVE BECAUSE THEY WOULDN'T HAVE IT OTHERWISE.  I

17    MEAN, IT'S ABOUT MY COLLEGE -- WHAT COLLEGE I WENT TO.

18    Q.   AND THAT WAS YOUR AGE, AND THIS IS YOUR SOCIAL SECURITY

19    NUMBER?

20    A.   YES.

21    Q.   DO YOU REMEMBER SITTING DOWN WITH SOMEBODY AND GIVING THEM

22    THE INFORMATION?

23    A.   I'M SURE -- I DON'T.  I DON'T REMEMBER IT, BUT I HAD TO

24    HAVE GIVEN SOMEONE THIS INFORMATION.

25    Q.   WELL, DO YOU RECALL EVER BEING ASKED FOR YOUR SOCIAL
```

```
 1      SECURITY NUMBER?

 2      A.   YES.

 3      Q.   BY WHOM?

 4      A.   IT ALWAYS SEEMED TO ME LIKE JACKIE WAS HANDLING THE

 5      BUSINESS END OF THINGS, SO I WOULD THINK PROBABLY JACKIE.

 6      Q.   OKAY.  COULD YOU TURN TO PAGE 50, AND STARTING AT QUESTION

 7      14.

 8      A.   YES.

 9      Q.   DID YOU COMPLETE THIS PAGE?

10      A.   NO.

11      Q.   COULD YOU HIGHLIGHT 14, PLEASE?

12      A.   I'M SORRY?  OH.

13      Q.   OKAY.  THERE'S A CHECK MARK NEXT TO THE NET WORTH OF YOU

14      AT THE TIME OF BEING MORE THAN A MILLION DOLLARS.  WAS THAT A

15      TRUE STATEMENT?

16      A.   YES.

17      Q.   DID YOU PROVIDE THIS INFORMATION TO SOMEBODY?

18      A.   WELL, AS YOU SEE, IT'S A BETWEEN 1 AND 5 MILLION.

19      Q.   RIGHT.

20      A.   YES.

21      Q.   DID YOU GIVE THIS INFORMATION TO MS. ALEXANDER OR

22      MS. LAMBERT?

23      A.   PROBABLY TO BARBRA.  IT'S TRUE, SO --

24      Q.   OKAY.

25      A.   -- I SAID IT TO SOMEONE.
```

```
1    Q.   OKAY.  LET'S LOOK AT THE NEXT THREE QUESTIONS, 15, 16, AND

2    17.

3    A.   YOU KNOW, I JUST REALIZED THIS IS PRINTED OVER HERE.

4    EXCUSE ME.  IT'S BETTER AND EASIER TO SEE.

5    Q.   OKAY.  DID YOU COMPLETE THESE QUESTIONS?

6    A.   NO, THAT'S NOT MY HANDWRITING.

7    Q.   OKAY.  WAS YOUR GROSS INCOME IN 2008 MORE THAN $250,000?

8    A.   YES.

9    Q.   OKAY.  TURN TO PAGE 53, QUESTION 29.

10        DID YOU INITIAL THESE PAGES?

11   A.   IT APPEARS I DID.

12   Q.   DO YOU REMEMBER INITIALING THEM?

13   A.   I DON'T REMEMBER SPECIFICALLY.

14   Q.   AND IF WE GO TO THE SIGNATURE AT THE BOTTOM.

15   A.   THE SIGNATURE AT THE BOTTOM, IT SAYS "SIGNATURE PROPOSED

16   INVESTOR," AND IT APPEARS TO BE MY HANDWRITING.

17        BUT THEN WHERE IT SAYS PRINT NAME AND PLACE, THAT IS NOT

18   MY HANDWRITING.

19   Q.   OKAY.  AND LET'S GO BACK TO PAGE 1 OF THIS DOCUMENT.  YOU

20   MENTIONED SOMETHING ABOUT HOW YOUR NAME IS SPELLED.

21        YOU CAN LOOK AT THE SCREEN.  THAT'LL BE EASIER.

22   A.   OKAY.

23   Q.   OKAY.  COULD YOU SAY THAT AGAIN?

24   A.   SAY AGAIN?

25   Q.   YES, THE PART ABOUT BARBARA.
```

1    A.   OH.  DID I SPEAK OUT OF TURN?  I'M SORRY.

2         BARBRA ALEXANDER'S NAME IS SPELLED -- I ALWAYS REMEMBER IT

3    THE WAY BARBRA STREISAND SPELLS HER NAME, B-A-R-B-R-A, WHICH IS

4    WHEN YOU SAY "BARBARA," IT COMES OUT SOUNDING LIKE "BARBRA."

5    SO I WAS SORT OF ENVIOUS THAT SHE HAD A GOOD SPELLING.  BUT I

6    AM B-A-R-B-A-R-A.

7    Q.   AT ANY TIME DID ANYONE EXPLAIN THESE DOCUMENTS TO YOU?

8    A.   NO.

9    Q.   DID ANYBODY SIT DOWN AND WALK THROUGH THEM WITH YOU?

10   A.   NO.

11   Q.   DID MS. ALEXANDER MAKE ANY PROMISES TO YOU, BEFORE

12   INVESTING, ABOUT THE RATE OF RETURN THAT YOU WOULD GET?

13   A.   YES.  IT WOULD GET BETWEEN 10 AND 12 PERCENT MONTHLY, PAID

14   THROUGH FIRST NATIONAL BANK.

15   Q.   OKAY.  DID YOU RECEIVE MONTHLY CHECKS?

16   A.   I RECEIVED A VERY FEW.

17   Q.   AND WAS THAT RATE OF RETURN AND THE MONTHLY CHECKS

18   IMPORTANT TO YOU?

19   A.   YES.

20   Q.   TO YOUR DECISION TO INVEST?

21   A.   YES.  WELL, I MEAN, YES.

22   Q.   SO I WANT TO TALK ABOUT HOW YOU ARRANGED TO GET THE MONEY

23   FROM MORGAN STANLEY TO APS.

24   A.   THERE WAS A GENTLEMAN AT MORGAN STANLEY THAT I -- WHEN I

25   GOT OUT HERE, I NEEDED TO ESTABLISH NEW FINANCIAL CONTACTS, SO

1      I -- A FRIEND REFERRED ME TO THIS GENTLEMAN AT MORGAN STANLEY,

2      AND I LET HIM KNOW THAT I WANTED TO MOVE THIS MONEY.

3           AND HE REALLY GOT UPSET WITH ME.  I HAD TO FIGHT IT OUT OF

4      HIM.  HE SAID, "WHAT ARE YOU DOING?"

5           AND I SAID, "I'M TRYING TO, TRYING TO GET A BETTER

6      INTEREST RATE."

7      Q.   DID YOU -- PRIOR TO INVESTING, DID YOU DISCUSS WITH

8      MS. ALEXANDER YOUR ABILITY TO GET YOUR MONEY OUT OF THE FUND?

9      A.   ABSOLUTELY.

10     Q.   HOW MANY TIMES?

11     A.   MANY.  I WOULD NEVER HAVE PUT IT IN IF I HADN'T THOUGHT I

12     COULD GET IT OUT.

13     Q.   AND WHAT WERE YOU PROMISED?

14     A.   THAT I COULD GET MY MONEY OUT ANY TIME I WANTED.

15     Q.   OKAY.  COULD YOU LOOK AT EXHIBIT NUMBER 24?

16     A.   IS THAT PAGE 24?

17     Q.   EXHIBIT.

18          AND ACTUALLY WE WOULD MOVE TO ADMIT IT AT THIS TIME.  IT'S

19     A BANK RECORD, PURSUANT TO STIPULATION.

20               MR. LEEMING:  SO STIPULATED.

21     BY MR. KALEBA:

22     Q.   AND IF YOU COULD LOOK ON YOUR SCREEN?

23               THE COURT:  EXHIBIT 24, THAT'S ADMITTED.

24          (PLAINTIFF'S EXHIBIT 24 WAS ADMITTED IN EVIDENCE.)

25               MR. KALEBA:  THANK YOU, YOUR HONOR.

```
 1              THE COURT:  GO AHEAD, PLEASE.

 2              MR. KALEBA:  CAN YOU PULL UP 24, PLEASE?

 3    Q.   AND THE FIRST HALF OF THE DOCUMENT, DO YOU SEE THE WORDS,

 4    "VIE SUR SON ARGENT"?

 5    A.   WHO'S IN CHARGE OF THIS?  THANK YOU FOR MAKING IT LARGER.

 6         OKAY.  WHAT?

 7    Q.   DO YOU SEE THE TWO NAMES AT THE TOP, BENEFICIARY AND

 8    ORIGINATOR?

 9    A.   BARBARA WORKMAN.

10    Q.   OKAY.  WHAT IS THE ORIGINATOR?

11    A.   IT'S A COMPANY -- I HAD JUST GONE THROUGH A DIVORCE, AND

12    IT ACTUALLY KIND OF STARTED AS A JOKE FOR AN LLC NAME TO PUT

13    THINGS IN MY OWN NAME, AND IT CAME UP WITH THIS STRANGE FRENCH

14    WORD, VIE SUR SON ARGENT, WHICH WAS SUPPOSED TO BE LIVING ON

15    HIS MONEY.

16         BUT I DIDN'T GET THE MONEY, SO THE NAME'S NOT VERY

17    APPROPRIATE.

18    Q.   OKAY.  IF WE CAN GO TO THE SECOND HALF OF THIS DOCUMENT.

19    A.   OKAY.

20    Q.   DO YOU SEE THIS IS A WIRE FROM CITIBANK AND IT'S TO

21    MORGAN STANLEY?  DO YOU SEE SENDER AT THE TOP?

22    A.   YES.

23    Q.   OKAY.  WAS THE MONEY ORIGINALLY IN A CITIBANK ACCOUNT?

24    A.   IT WAS MOVING AROUND QUITE A BIT BECAUSE I WAS MOVING

25    AROUND, AND I -- SINCE MY HUSBAND WAS A BANKER, I WAS TRYING TO
```

```
1     GET INTO OTHER BANKING INSTITUTIONS.  AND I -- I'M EMBARRASSED

2     TO TELL YOU, I'M NOT REAL SURE HOW IT GOT TO CITIBANK.

3     Q.   OKAY.  LET ME ASK YOU THE AMOUNT.  DO YOU SEE THE LINE

4     THAT SAYS "AMOUNT"?

5     A.   AND THIS AMOUNT IS CORRECT.

6     Q.   CAN YOU READ THE AMOUNT?

7     A.   649 -- 649 -- THANK YOU.  $649,225.92.

8     Q.   DID YOU LATER PROVIDE THIS $649,000 TO MS. ALEXANDER TO

9     INVEST?

10    A.   DID I?

11    Q.   DID YOU LATER PROVIDE THIS MONEY --

12    A.   YES.

13    Q.   -- TO MS. ALEXANDER TO INVEST?

14    A.   YES.

15    Q.   FOR HOW LONG DID YOU RECEIVE MONTHLY INTEREST PAYMENTS?

16    A.   I BELIEVE IT WAS THREE OR FOUR MONTHS.

17    Q.   DID THE CHECKS STOP COMING?

18    A.   THE CHECKS STARTED COMING -- THEY HAD BEEN VERY, VERY ON

19    TIME, AND THEN THEY CAME LIKE A DAY LATE THE NEXT MONTH AND

20    ANOTHER DAY LATE THE NEXT MONTH, AND I HAD A FEELING THAT -- I

21    JUST DIDN'T FEEL RIGHT.

22        SO I WENT OVER TO TALK TO HER AND I GOT THAT INTEREST,

23    BUT, LIKE, A DAY LETTER A LETTER WAS SENT OUT TO ALL THE

24    INVESTORS SAYING THE PAYMENTS WERE GOING TO BE LATE, AND THEN I

25    KNEW I WAS IN TROUBLE.
```

1    Q.   OKAY.  YOU SAID YOU WENT OVER AND SAW HER.  WHO DID YOU

2    SEE?

3    A.   I WENT OVER AND I -- IT WASN'T UNUSUAL FOR ME TO GO OVER.

4    SHE DIDN'T LIVE FAR FROM ME AT ALL, AND I WENT OVER AND RANG

5    THE FRONT DOORBELL AND NOBODY WAS THERE, AND I KNEW THAT SHE

6    HAD HER OFFICES ON THE LOWER LEVEL OF HER HOUSE.

7         AND SO THE GATE WAS OPEN AND I JUST WALKED ROUND THERE AND

8    BARBRA WAS AT A HUGE DESK AT THE RIGHT AND JACKIE LAMBERT WAS

9    AT A HUGE DESK ON THE LEFT.  THEY WERE SORT OF SURPRISED TO SEE

10   ME IN THEIR BACKYARD.

11        AND I SAID THAT I CAME TO SEE WHAT WAS GOING ON.

12   Q.   BECAUSE THE CHECK WAS LATE?

13   A.   UM-HUM.

14   Q.   DID YOU GET A CHECK THAT DAY?

15   A.   I DID GET A CHECK THAT DAY.

16   Q.   WHO WROTE THE CHECK?

17   A.   IT WAS PUT INTO THE, INTO THE FIRST NATIONAL BANK.

18   Q.   OKAY.  DO YOU KNOW WHO SIGNED THE CHECK?

19   A.   I'M SORRY.  I DON'T.

20   Q.   OKAY.  YOU SAID THE NEXT DAY YOU RECEIVED A LETTER.

21   A.   WELL, I'M -- I IMAGINE ALL OF US DID.  IT WAS A GROUP

22   LETTER SAYING THAT PAYMENTS WOULD NO LONGER COME -- AND I'M

23   SURE YOU'VE GOT THE DOCUMENT HERE -- I BELIEVE ON THE 1ST, THAT

24   THEY WOULD NOW COME ON THE 5TH OR SOMETHING LIKE THAT.

25        BUT THERE WAS ALREADY SIGNS OF TROUBLE.

```
1    Q.   DID YOU EVENTUALLY ASK FOR THE RETURN OF YOUR MONEY?

2    A.   YES.

3    Q.   WHY?

4    A.   MY GUT WAS TALKING.  I HAD A REALLY BAD FEELING.

5    Q.   WHEN WAS THIS?

6    A.   IT WAS THEN.  I -- I HAD A FRIEND WHO WAS TRAINING HER

7    GERMAN SHEPARD FOR A -- ACTUALLY, I THINK THEY CALLED IT A

8    CADAVER DOG, A SEARCH AND RESCUE DOG.

9         I'M LOSING MY EYESIGHT AND I HAD A LABRADOODLE AND I

10   WANTED HIM TRAINED FOR A SIGHT DOG, A SERVICE DOG, NOT FOR THE

11   BLIND, BUT AS A SERVICE DOG.

12        AND SO BARBRA INTRODUCED ME TO THE TRAINER, OR I MET THE

13   TRAINER AT BARBRA'S HOUSE.

14        AND AT THAT POINT, HE WAS STILL TRAINING BOTH BARBRA'S

15   POODLE, DIVA, AND MY LABRADOODLE, AND HE SAID HE HADN'T GOTTEN

16   PAID.

17        AND I WOULDN'T HAVE EVEN THOUGHT ABOUT IT.  I WOULDN'T

18   HAVE EVEN KNOWN HIM, BUT WHEN HE MENTIONED THIS TO ME --

19             MR. LEEMING:  OBJECTION.  HEARSAY.

20             THE WITNESS:  -- IT JUST SEEMED LIKE THERE WAS A RED

21   FLAG GOING ON.

22             THE COURT:  THE HEARSAY OBJECTION IS SUSTAINED.

23   BY MR. KALEBA:

24   Q.   MS. WORKMAN, WHEN THERE'S AN OBJECTION, IF YOU WOULD JUST

25   WAIT FOR THE JUDGE TO MAKE A RULING.
```

```
 1     A.   OKAY.  AND I'M SORRY, BUT I COULDN'T HEAR WHAT THAT SOUND

 2     WAS.  I'M SORRY.

 3               THE COURT:  OKAY.  NOT A PROBLEM.  I'LL USE THE

 4     MICROPHONE, TOO.

 5               THE WITNESS:  OKAY.

 6     BY MR. KALEBA:

 7     Q.   I WANT TO GO BACK TO YOU ASKING FOR YOUR MONEY BACK.  WHO

 8     DID YOU ASK TO GET YOUR MONEY BACK?

 9     A.   I WENT DIRECTLY TO BARBRA'S HOUSE AND ASKED FOR MY MONEY

10     BACK.

11     Q.   TO WHOM?  TO BARBRA?

12     A.   BARBRA AND JACKIE.  I BELIEVE JACKIE WAS STANDING THERE AT

13     THE SAME TIME.

14     Q.   OKAY.  WHAT DID YOU SAY?

15     A.   NO.

16     Q.   NO.  WHAT DID YOU SAY TO HER?

17     A.   WHAT DID I SAY?  I DID NOT WANT TO SOUND LIKE I LOST MY

18     CONFIDENCE, NOR DID I WANT TO INSULT HER IN ANY WAY, AND I SAID

19     THAT I HAD SOME THINGS HAD COME UP AND I NEEDED TO USE MY MONEY

20     FOR SOMETHING ELSE.

21     Q.   AND WHAT WERE YOU TOLD BY MS. ALEXANDER?

22     A.   NO.

23     Q.   DID SHE SAY WHY?

24     A.   NO.

25     Q.   OKAY.  WHAT DID SHE SAY?
```

1    A.   AND NOT AT THAT TIME.  AND THAT WAS, LIKE, MY FIRST

2    REQUEST.  THERE WERE MANY, MANY REQUESTS OVER AND OVER AND

3    OVER.

4    Q.   SHE JUST SAID NO?

5    A.   BASICALLY NO.

6    Q.   OKAY.  DID YOU REFER TO YOUR PRIOR CONVERSATIONS WHEN YOU

7    WERE PROMISED YOU COULD HAVE --

8    A.   YES, I DID.

9    Q.   -- YOUR MONEY BACK AT ANY TIME?

10   A.   I WAS NOT ARGUMENTATIVE.  AT THIS POINT, I FELT THAT MY

11   BEST TACT WAS TO BE AS TACTFUL AS POSSIBLE.

12   Q.   SO WHAT DID YOU DO AFTER YOU WERE TOLD NO?

13   A.   I WAS PRETTY UPSET AND -- BUT I ALSO TOOK -- I HAD AN

14   ASSISTANT HELPING ME BECAUSE I HAVE TROUBLE WITH MY EYES, AND

15   SO SHE WAS WITH ME AND WE LEFT AND I SAID, "WELL, THAT SURE

16   DIDN'T WORK."  AND I SAID, "I THINK WHAT I'LL DO IS ASK FOR A

17   LESSER AMOUNT THAN MY WHOLE INVESTMENT."

18        SO THEN I BEGAN TO BACK OFF, AND IF I REMEMBER CORRECTLY,

19   I -- THE NEXT THING I MAY HAVE ASKED FOR A FEW DAYS LATER WAS

20   HALF OF IT, AND THEN IT WAS JUST NO, NO, NO.

21        SO I KEPT REDUCING IT DOWN HOPING I'D GET ANYTHING.

22   Q.   DID MS. ALEXANDER EVER GIVE YOU AN EXPLANATION OF WHY YOU

23   COULD NOT HAVE YOUR MONEY BACK?

24   A.   NO.  WELL, I MEAN, SHE -- YOU KNOW, SHE COMMENTED THAT THE

25   MARKET WAS GETTING A LITTLE WEAK AND, YOU KNOW, PEOPLE WEREN'T

1    PAYING HER ON TIME, JUST -- NO REAL -- NO DETAILS AND NO

2    EXPLANATION.

3    Q.   WERE YOU EVER TOLD STATEMENTS ABOUT THE NEED TO FORECLOSE

4    ON HOUSES OR SOMEHOW MANAGE THE REAL ESTATE PORTFOLIO BEFORE

5    YOU COULD GET YOUR MONEY BACK?

6    A.   I DID NOT HEAR THAT.  I HEARD THAT I -- I COULD GET THE

7    MONEY BACK IF I CAN BRING IN NEW INVESTORS.

8    Q.   SHE SAID YOU COULD HAVE YOUR MONEY BACK IF YOU COULD BRING

9    IN NEW MONEY?

10    A.   NEW INVESTORS.

11    Q.   AND THEN WHAT DID YOU SAY TO THAT?

12    A.   I WAS DUMBFOUNDED BECAUSE I WOULD NEVER HAVE BROUGHT

13    ANYBODY INTO SOMETHING LIKE THAT.

14    Q.   DID YOU RECEIVE ANY CORRESPONDENCE FROM MS. ALEXANDER OR

15    APS DURING THIS PERIOD OF TIME WHEN YOU'RE ASKING FOR YOUR

16    MONEY BACK?

17    A.   IF I DID, IT'S NOT -- IT WASN'T, LIKE, MEANINGFUL.  I

18    DON'T RECALL IT.

19    Q.   DID YOU EVER HAVE ANY DEALINGS WITH MR. SWANSON DURING

20    THIS PERIOD OF TIME?

21    A.   I NEVER GOT TO MEET HIM, BUT APPROXIMATELY AT THE TIME

22    THAT PROBABLY I ASKED FOR THE FIRST MONEY BACK, OR THE

23    SECOND -- I HAD HEARD HE WAS A REALLY NICE GENTLEMAN AND SO I

24    CALLED HIM.  I JUST MADE A COLD CALL TO HIM ONE EVENING.

25        AND I GENERALLY TRY TO KEEP MY BUSINESS DURING THE DAY AND

```
 1    NOT BOTHER PEOPLE, BUT I REACHED HIM ONE EVENING AT DINNER WITH

 2    HIS WIFE AND HE JUST COULD NOT HAVE BEEN MORE REASSURING.

 3         I SAID I HAD BECOME VERY CONCERNED ABOUT MY MONEY AND I

 4    NEEDED IT REALLY BADLY, AND I WONDER IF YOU COULD HELP ME OUT

 5    OR WHATEVER.

 6         AND HE, HE JUST COULD NOT HAVE BEEN MORE OF A GENTLEMAN

 7    AND HE SAID, "OH, THERE'S NO PROBLEM.  THERE'S NO, NO PROBLEMS

 8    WITH APS.  I HAVE MY OWN FAMILY INVESTED IN IT.  DON'T WORRY

 9    ABOUT IT.  I'M OUT TO DINNER WITH MY WIFE AND WE'RE HAVING A

10    ROMANTIC DINNER AND CAN I TALK TO YOU LATER?"

11         SO I -- YOU KNOW, I FELT GOOD.

12    Q.   WAS THAT THE ONLY DEALING YOU HAD WITH MR. SWANSON?

13    A.   I THINK I MIGHT HAVE SPOKEN TO HIM ONE OTHER TIME AFTER

14    THAT WHERE HE MADE A FOLLOW-UP CALL, BUT IT WAS ALONG THE SAME

15    LINES OF EVERYTHING WAS VERY POSITIVE AND VERY MUCH OKAY.

16    Q.   WHAT ABOUT WITH MS. PINA?  DID YOU EVER HAVE ANY CONTACTS

17    WITH HER?

18    A.   YOU KNOW, SHE WAS SORT OF THE MYSTERY LADY IN THAT SHE

19    DIDN'T LIVE IN THE AREA, AND I BELIEVE HER TITLE WAS CFO, OR AT

20    LEAST THAT WAS THE WAY I INTERPRETED IT.  SHE HANDLED THE BOOKS

21    AND FINANCES AND WROTE CHECKS AND THAT SORT OF THING.

22         AND SHE LIVED IN IOWA OR IDAHO, AN "I" WORD.

23         AND BARBRA ATE LUNCH ALMOST EVERY SINGLE DAY AT ONE

24    PARTICULAR RESTAURANT IN CARMEL, I MEAN, PARDON ME, IN

25    MONTEREY.
```

1        AND SO ONE DAY I WAS, I JOINED BARBRA FOR LUNCH AND THIS

2    LADY CAME UP IN KIND OF A RUSH AND SHE WAS DRESSED IN JEANS AND

3    A T-SHIRT AND TENNIS SHOES AND SHE SAT DOWN FOR, LIKE, FIVE

4    MINUTES AND THEY INTRODUCED HER TO ME AS BETH PINA.

5        AND I WAS A LITTLE SURPRISED BECAUSE, TO ME, A CFO MEETING

6    A MAJOR INVESTOR PROBABLY SHOULD HAVE PRESENTED HERSELF A

7    LITTLE MORE PROFESSIONALLY.

8        THERE -- THAT DIDN'T HAPPEN.

9        AND SHE WASN'T -- THERE WAS NO DISCUSSION ABOUT MONEY AT

10   ALL.

11   Q.   OKAY.

12   A.   IT WAS JUST A "HI, HOW ARE YOU?"

13   Q.   DID YOU EVER RECEIVE THE RETURN OF YOUR INVESTMENT?

14   A.   I BEG YOUR PARDON?  DID I RECEIVE?

15   Q.   YEAH, ANY RETURN OF YOUR INVESTMENT?

16   A.   JUST THE THREE OR FOUR INTEREST PAYMENTS.

17   Q.   AND HOW MUCH MONEY ARE YOU STILL OWED?  DO YOU KNOW?

18   A.   YOU KNOW, THIS IS CALLED DENIAL.  I PROBABLY HAVEN'T DONE

19   THE MATH, BUT ALMOST ALL OF IT.

20        MR. KALEBA:  OKAY.  THANK YOU, YOUR HONOR.

21        NO FURTHER QUESTIONS.

22        THE COURT:  ALL RIGHT.

23        CROSS-EXAMINATION?

24        MR. LEEMING:  YES.  THANK YOU, YOUR HONOR.

25        THE COURT:  GO AHEAD, PLEASE.

```
1                    CROSS-EXAMINATION

2   BY MR. LEEMING:

3   Q.   GOOD MORNING, MS. WORKMAN.

4   A.   HOW ARE YOU?

5   Q.   SO AS I UNDERSTAND IT, YOU MOVED TO THIS AREA AFTER YOU

6   GOT DIVORCED; CORRECT?

7   A.   I --

8   Q.   OKAY.  I GOT IT.

9        CAN YOU HEAR ME NOW?

10  A.   I CAN.

11  Q.   VERY GOOD.

12       SO YOU WERE IN A DIVORCE, CORRECT, AND THEN AFTER THAT WAS

13  DONE, YOU MOVED TO THE MONTEREY AREA?

14  A.   RIGHT.  I WAS IN OKLAHOMA -- I LIVED IN OKLAHOMA CITY.

15  Q.   YEAH.  WHAT PROMPTED YOU TO MOVE TO MONTEREY?

16  A.   WELL, I WANTED TO GET AS FAR FROM MY EX-HUSBAND AS

17  POSSIBLE, AND AS SOMEONE SAID, I WENT AS FAR AS I COULD WEST

18  WITHOUT FALLING IN THE SEA.

19  Q.   SO IT SOUNDS LIKE IT WAS A ROUGH DIVORCE.

20  A.   VERY ROUGH.

21  Q.   AND YOU HAD AN ATTORNEY IN THAT DIVORCE, DID YOU NOT?

22  A.   YES.

23  Q.   SEVERAL?

24  A.   SEVERAL.

25  Q.   AND IS IT TRUE THAT THE DIVORCE WENT ALL THE WAY UP TO THE
```

1    SUPREME COURT IN OKLAHOMA?

2    A.   GOSH, I NEVER HEARD THAT.

3    Q.   ALL RIGHT.

4    A.   NO.  IT WAS SETTLED IN A -- WHAT DO YOU CALL IT? -- A

5    MEDIATION.

6    Q.   OKAY.  IT WAS SETTLED THROUGH MEDIATION?

7    A.   UM-HUM.

8    Q.   YOU GOT CERTAIN -- YOU TESTIFIED EARLIER TODAY THAT ALL

9    YOUR MONEY WAS THE $640,000, OR --

10   A.   ALL THE MONEY I HAD LEFT AFTER I HAD MOVED OUT HERE AND

11   HAD GOTTEN MYSELF SETTLED.  THAT WAS MY SLIM HOLDINGS.

12   Q.   OKAY.  AND THAT INCLUDED BUYING A HOME; CORRECT?

13   A.   NO.

14   Q.   IT DID NOT?

15   A.   NO.  MY BRILLIANT HUSBAND, IN THE DIVORCE, I -- I -- I WAS

16   BLIND SIDED BY THE DIVORCE.  AND HE WAS BRILLIANT, AND HE STILL

17   IS.  HE PROVIDED A HOME FOR ME, SO HE OWNED THE HOME.

18   Q.   OKAY.  DID HE PURCHASE THE HOME OR HIS TRUST PURCHASED THE

19   HOME?

20   A.   HIS TRUST DID, UM-HUM.

21   Q.   ALL RIGHT.

22   A.   BUT THEN I -- I PUT A GOODLY AMOUNT OF MONEY INTO MAKING

23   IT MY HOME.  IT DIDN'T HAVE A BATHTUB, IT DIDN'T HAVE A MASTER

24   BATHROOM OR ANYTHING.

25   Q.   SURE.  IN ONE OF THESE DOCUMENTS YOU LISTED YOUR

1    OCCUPATION AS INTERIOR DESIGN.  IS IT FAIR TO SAY YOU TOOK OVER

2    THAT HOUSE AND MADE IT YOURS?

3    A.    YES.  I HAD BEEN IN A -- MY PARTNER AND I HAD A COMPANY

4    CALLED CABOCHON LIMITED FOR OVER 40 YEARS.

5    Q.    AND THAT WAS AN INTERIOR DESIGN COMPANY?

6    A.    YES, IT WAS.

7    Q.    SO YOU MOVED TO THE MONTEREY AREA.  AND THEN YOU WERE

8    DESCRIBING HOW YOU MET SOME PEOPLE AT A JEWELRY STORE WHERE YOU

9    WENT IN TO GET A PIECE OF JEWELRY REPAIRED; CORRECT?

10   A.    CORRECT.

11   Q.    AND, AGAIN, I KNOW YOU'RE NODDING AND WITNESSES FORGET,

12   BUT THIS PERSON HAS TO TAKE DOWN AN ANSWER.

13   A.    RIGHT.  I'M SORRY.

14   Q.    THANK YOU.

15         AND DESCRIBE -- DESCRIBE THAT.  YOU'RE IN THE JEWELRY

16   STORE AND PEOPLE ARE TALKING.  WHAT HAPPENED THERE?

17   A.    IT'S A VERY SMALL STORE, MAYBE TWICE THE SIZE OF THIS BOX.

18   Q.    TWICE THE SIZE OF THE JURY BOX HERE?

19   A.    UH-HUH, VERY FRIENDLY, RUN BY A LADY, AND HER HUSBAND'S

20   HER PARTNER.  AND IT'S REALLY VERY CASUALLY RUN.  EVERYBODY IS

21   INTRODUCED TO EVERYBODY.  MOST PEOPLE KNOW EACH OTHER.

22         I WAS THE OUT OF TOWNER, AND THEY WERE JUST TRYING TO GET

23   ME -- YOU KNOW, HELPING ME MEET SOME NEW PEOPLE AND WE WERE

24   JUST ALL CHIT CHATTING.

25   Q.    IS THIS A STORE YOU WENT INTO MORE THAN ONCE?  DID YOU

```
1    DROP BY OCCASIONALLY?  TELL US ABOUT THAT.

2    A.   WELL, IT WAS IN THE CROSSROADS IN CARMEL, WHICH IS NOT

3    DOWNTOWN, IT'S A LITTLE --

4    Q.   IT'S UP THE VALLEY A LITTLE BIT; RIGHT?

5    A.   UH-HUH.

6    Q.   YES.

7    A.   AND IT JUST -- I FELT REAL COMFORTABLE THERE.  THAT WAS,

8    LIKE -- I LOVE JEWELRY, AND IT WAS A -- IT WAS A COMFORT ZONE

9    FOR ME.  I REALLY RELATED TO THE OWNER AND SHE HAD THINGS I

10   LOVED, AND SO I WAS IN THERE OFTEN.

11   Q.   OKAY.

12   A.   YOU KNOW, ANY TIME I WAS IN THE AREA.

13        BUT WHEN I MOVED TO PACIFIC GROVE, I WAS PRETTY FAR AWAY

14   FROM THAT.  I -- AS THE CROW FLIES, I WOULDN'T -- IF I WAS IN

15   THE AREA BUYING DOG FOOD OR GOING TO THE GROCERY STORE OR

16   SOMETHING, I WOULD GO IN THAT STORE ALWAYS.

17   Q.   SO YOU'D DROP BY OCCASIONALLY?

18   A.   UH-HUH.

19   Q.   REGULARLY IT SOUNDS LIKE.

20   A.   UH-HUH.

21   Q.   SO IN THE COURSE OF THOSE MEETINGS, YOU MET A FEW PEOPLE

22   IT SOUNDS LIKE.  RIGHT?

23   A.   I DID.

24   Q.   AND ONE OF THOSE PEOPLE WAS HELGA PATE?  IS THAT WHERE YOU

25   MET HER?
```

1    A.   YES.

2    Q.   AND AT SOME POINT PEOPLE WERE DISCUSSING POTENTIAL

3    INVESTMENTS; RIGHT?

4    A.   YES.

5    Q.   TELL US ABOUT THAT.

6    A.   I DON'T REALLY KNOW IF IT WAS MY FIRST TIME IN THE STORE,

7    BUT THAT'S THE TYPE OF THING THAT WAS -- THAT WOULD BE

8    ADDRESSED -- THAT AND A BABYSITTER AND THE FLU AND -- IT WAS A

9    VERY -- IT WAS LIKE A WOMAN'S SEWING GROUP, SORT OF.  EVERYBODY

10   WAS CHATTING AND SHARING INFORMATION.

11         AND, AND AS THE NEW PERSON, I WAS ALSO ASKING SOMETIMES,

12   WHERE IS THE BEST PLACE TO HAVE YOUR CAR WORKED ON?

13   Q.   SURE.  AND WAS IT HELGA PATE WHO MENTIONED THAT SHE HAD

14   SOME MONEY INVESTED?  OR THE OWNER OF THE STORE?  WHO TOLD YOU

15   ABOUT BARBRA ALEXANDER?

16   A.   HELGA DID.

17   Q.   HELGA DID?

18   A.   BUT THEN EVERYONE IN THE STORE KNEW WHO SHE WAS, TOO.

19   Q.   SURE.

20   A.   IT'S A PRETTY SMALL AREA.

21   Q.   YES.  AND SO WHAT DID HELGA TELL YOU?

22   A.   SHE TOLD ME -- I'M TRYING TO THINK EXACTLY.  I -- IT WAS A

23   LONG --

24   Q.   BEST OF YOUR RECOLLECTION.

25   A.   "HAVE YOU HEARD OF A LADY NAMED BARBRA ALEXANDER?"

1          AND I SAID, "NO, WHY?"

2          AND SHE SAID BECAUSE SHE DID INVESTMENT BANKING.

3     Q.   OKAY.  AND THAT WAS THE PHRASE SHE USED, "INVESTMENT

4     BANKING"?

5     A.   PROBABLY NOT.  THAT'S A PHRASE I USE.

6     Q.   THAT'S A PHRASE FROM LIVING WITH A BANKER FOR A LONG TIME;

7     RIGHT?

8     A.   MORE THAN 40 YEARS, UH-HUH.

9     Q.   SURE.  OKAY.  AND AT SOME POINT YOU WENT UP TO BARBRA'S

10    HOUSE?

11    A.   RIGHT.

12    Q.   HOW DID THAT COME TO BE?

13    A.   HELGA TOOK ME.

14    Q.   AND WAS THERE A MEETING ARRANGED IN ADVANCE?  OR DID

15    YOU --

16    A.   I BELIEVE -- I BELIEVE THAT HELGA HAD ARRANGED A TIME AND

17    WE WENT OVER THERE TO MEET BARBRA.

18    Q.   ALL RIGHT.  AND YOU -- YOU -- I THINK YOU SAID THAT THERE

19    WERE A NUMBER OF TIMES WHEN YOU WENT OVER TO BARBRA'S HOUSE AND

20    DISCUSSED --

21    A.   YES.

22    Q.   AND THAT WOULDN'T BE FOCUSSED SOLELY ON THE POTENTIAL FOR

23    INVESTMENT.  YOU WOULD TALK ABOUT SOCIAL THINGS AND OTHER

24    THINGS; CORRECT?

25    A.   MOSTLY AT BARBRA'S IT WAS BUSINESS.  SHE RAN HER BUSINESS

1    OUT OF HER HOME.

2    Q.   SO IT WAS BUSINESS ALL THE TIME?

3    A.   IT WAS THAT, AND SHE HAD JUST FINISHED -- OR SHE WAS IN

4    THE MIDST OF REMODELING HER KITCHEN AND THERE WAS ALWAYS

5    CONVERSATIONS ABOUT THAT SORT OF THING.

6    Q.   NOW, I THINK YOU SAID THAT NO PAPER WAS PROVIDED TO YOU,

7    NO PAPERWORK ABOUT THIS WAS PROVIDED TO YOU BEFORE YOU DECIDED

8    TO INVEST YOUR FUNDS.  IS THAT YOUR TESTIMONY?

9    A.   I BELIEVE SO.

10   Q.   OKAY.  BUT YOU DID MAKE AN EFFORT TO DETERMINE WHAT IT WAS

11   YOU WERE GETTING INTO; RIGHT?

12   A.   DID I?  IS THAT WHAT YOU'RE SAYING?

13   Q.   YES.

14   A.   TO THE BEST OF MY ABILITY.  I MADE PHONE CALLS, I GOOGLED,

15   I LOOKED UP HARD MONEY LENDING AND ANYTHING I COULD FIND ABOUT

16   IT, AND THEN I LOOKED UP BARBRA --

17   Q.   SURE.

18   A.   -- AT GREAT LENGTH, AND THE FUNNY THING WAS THERE ARE A

19   LOT OF BARBRA ALEXANDER'S AROUND.

20        AND I FOUND THAT SHE AND I, I BELIEVE, SHARED THE SAME

21   MIDDLE NAME.

22   Q.   ALL RIGHT.  BUT MY QUESTION IS, YOU MADE SOME CALLS ABOUT

23   THE NATURE OF THE INVESTMENT YOU WERE GETTING INTO; RIGHT?

24   A.   RIGHT, UH-HUH.

25   Q.   AND YOU EVEN CALLED YOUR EX-HUSBAND?

1    A.   I DID.  I HAVE A HUGE RESPECT FOR HIS BRILLIANCE.

2    Q.   AND PRETTY MUCH THE FEEDBACK YOU GOT -- SORRY.  PRETTY

3    MUCH THE FEEDBACK YOU GOT WAS THAT THIS WAS A RISKY THING;

4    RIGHT?

5    A.   YES.

6    Q.   DID YOUR HUSBAND TELL YOU NOT TO DO IT?

7    A.   NO.

8    Q.   OKAY.  WHEN YOU PULLED YOUR MONEY OUT OF THE ACCOUNT WHERE

9    IT WAS EARNING 1 PERCENT, YOU MENTIONED THAT THE PERSON WHO

10   MANAGED THAT ACCOUNT WAS SORT OF UPSET ABOUT IT?

11   A.   VERY.

12   Q.   DID HE TELL YOU NOT TO DO IT?

13   A.   YES.

14   Q.   DID HE TELL YOU THAT THAT WAS A RISKY PLACE TO PUT YOUR

15   FUNDS, THAT YOU COULD LOSE IT?

16   A.   HE DIDN'T SAY IT QUITE LIKE THAT NICE.  HE TOLD ME I WAS A

17   REAL FOOL.

18   Q.   OH.  SO HE WAS HARSHER.  I'M NOT GOING TO SAY THAT HERE.

19   A.   NO.

20   Q.   HE TOLD YOU THAT WAS A FOOLISH THING TO DO?

21   A.   VERY FOOLISH THING TO DO AND WHY DID I NOT JUST DO HALF OF

22   IT?  AND I'M JUST BULLHEADED ENOUGH THAT I DIDN'T LISTEN.

23   Q.   OKAY.  WELL, WITH ALL THESE WARNINGS -- YOU'RE A PERSON

24   WHO HAS HIRED ATTORNEYS; RIGHT?  YOU'VE BEEN REPRESENTED IN

25   YOUR DIVORCE FOR A NUMBER OF YEARS.  DID YOU THINK THAT PERHAPS

```
1    YOU SHOULD GET SOMEBODY PROFESSIONAL TO REVIEW THESE DOCUMENTS

2    AND TALK TO YOU ABOUT THEM?

3    A.   YOU KNOW, IF I STILL HAD BEEN IN MY HOME STATE OF

4    OKLAHOMA, OKLAHOMA CITY WHERE I KNEW EVERYBODY AND ALL I WOULD

5    HAVE HAD TO HAVE DONE WAS PICKED UP THE PHONE AND CALLED A

6    FRIEND -- I DIDN'T HAVE ANY CONTACTS OUT HERE.  I MOVED OUT

7    HERE COMPLETELY NOT KNOWING A LIVING SOUL AND COLD.  SO, NO, I

8    DID NOT.

9    Q.   BUT YOU COULD HAVE STILL PICKED UP THE PHONE AND CALLED

10   THE FRIENDS; RIGHT?

11   A.   KIND OF.  AFTER THE DIVORCE, I WASN'T EVEN SURE WHO MY

12   FRIENDS WERE.

13   Q.   OH.  PERSONA NON GRATA, HUH?  OKAY.

14        EXCUSE ME JUST ONE SECOND.

15        (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

16   BY MR. LEEMING:

17   Q.   YOU MENTIONED THAT MS. LAMBERT WAS PRESENT WHEN YOU HAD

18   THE MEETINGS AT BARBRA ALEXANDER'S HOUSE.

19   A.   MOST OF THE TIME, YES.

20   Q.   MOST OF THE TIME.  AND YOU DESCRIBED HER AS VERY POSITIVE,

21   VERY UP?

22   A.   YES.

23   Q.   VERY GOOD CHEERLEADER?

24   A.   SHE INSTALLED CONFIDENCE IN YOU.

25   Q.   AND I THINK YOU MENTIONED THAT MS. LAMBERT ALSO TOLD YOU
```

1    THAT SHE HAD INVESTED IN THESE FUNDS HERSELF.

2    A.   YES.

3    Q.   AND YOU DIDN'T HAVE ANY WAY OF VERIFYING THIS, DID YOU?

4    A.   NO, I DID NOT.  I DIDN'T EVEN KNOW HOW MANY INVESTORS

5    THERE WERE UNTIL AFTER EVERYTHING WAS SAID AND DONE, AFTER

6    EVERYTHING HAD GONE WRONG.

7    Q.   SO IN ANY EVENT, AT ONE POINT YOU DID DECIDE TO SORT OF

8    PULL THE TRIGGER ON THIS AND YOU WENT OVER TO BARBRA'S HOUSE,

9    AND I THINK YOUR TESTIMONY IS THAT YOU SIGNED ONE PIECE OF

10   PAPER.  IS THAT RIGHT?

11   A.   YES.

12   Q.   AND THAT SOMEONE ELSE FILLED OUT THAT SHEET OF PAPER;

13   CORRECT?

14   A.   CORRECT.

15   Q.   SO WHAT I'M NOT CLEAR ON IS WHAT INFORMATION YOU PROVIDED

16   TO HAVE THAT PAPERWORK FILLED OUT.

17   A.   THE ONLY THING THAT I REALLY KNOW FOR SURE IS MY SOCIAL

18   SECURITY AND WHERE MY MONEY WAS.

19   Q.   DO YOU REMEMBER SITTING DOWN AT A TABLE AND BEING

20   QUESTIONED, ASKED QUESTIONS ABOUT CERTAIN THINGS?

21   A.   WAS I ASKED QUESTIONS OR DID I ASK QUESTIONS?

22   Q.   I'M SORRY.  THAT WAS A TERRIBLE QUESTION.  LET ME TRY IT

23   AGAIN.

24        DO YOU REMEMBER SITTING DOWN AT THE TABLE AND BEING ASKED

25   A SERIES OF QUESTIONS ABOUT THE INFORMATION THAT WAS ULTIMATELY

```
1     PUT ON THOSE FORMS?

2     A.   NO.

3     Q.   BUT WHILE YOU DON'T RECALL IT, THE INFORMATION ON THOSE

4     FORMS IS ACCURATE; CORRECT?

5     A.   WELL, THE SOCIAL SECURITY NUMBER AND WHERE THE MONEY WAS,

6     YES.

7     Q.   WHERE YOU WENT TO SCHOOL; CORRECT?

8     A.   YES.

9     Q.   YOUR EDUCATION?

10    A.   YES.

11    Q.   THE INCOME THAT YOU WERE RECEIVING FROM YOUR DIVORCE

12    SETTLEMENT; CORRECT?

13    A.   RIGHT, AND SOME FAMILY INVESTMENTS.

14    Q.   AND SOME FAMILY INVESTMENTS.  AND ACTUALLY WHAT YOU PUT ON

15    THE FORM WAS 80 PERCENT OF YOUR INCOME WAS FROM YOUR DIVORCE

16    SETTLEMENT AND 20 PERCENT WAS FROM INVESTMENTS; IS THAT

17    CORRECT?

18    A.   DID I PUT THAT THERE?

19    Q.   SORRY.  WHAT YOU -- STRIKE THAT.

20    A.   I DIDN'T.

21    Q.   YOU DIDN'T PUT --

22    A.   I DIDN'T DO THAT.

23    Q.   YOU DIDN'T DO THAT.

24         DID YOU TELL SOMEONE THAT 80 PERCENT OF YOUR INCOME CAME

25    FROM YOUR DIVORCE SETTLEMENT?
```

```
 1        A.   I DON'T KNOW.

 2        Q.   IS THAT ACCURATE?  WOULD THAT HAVE BEEN ACCURATE AT THE

 3   TIME?

 4        A.   PROBABLY.

 5        Q.   PROBABLY.  SO WHOEVER WAS FILLING OUT THOSE FORMS HAD NO

 6   WAY OF KNOWING THAT UNLESS YOU TOLD THEM; RIGHT?

 7        A.   BUT I WAS NEVER ASKED THAT QUESTION AND I DON'T REMEMBER

 8   ACTUALLY ANSWERING THAT QUESTION.

 9        Q.   SO IS IT YOUR TESTIMONY THAT SOMEHOW THIS ACCURATE

10   INFORMATION WAS COMMUNICATED TO THIS SHEET OF PAPER WITHOUT YOU

11   DISCLOSING IT?

12        A.   WELL, IF YOU'RE TALKING ABOUT THE BETWEEN 1 MILLION AND 5

13   MILLION, THAT'S A PRETTY BIG NUMBER.

14        Q.   SURE.  I'M TALKING ABOUT THE PERCENTAGE OF YOUR INCOME

15   FROM YOUR DIVORCE SETTLEMENT VERSUS THE PERCENTAGE OF YOUR

16   INCOME FROM YOUR OTHER INVESTMENTS.

17        A.   I'M SORRY.  I DON'T REMEMBER IT.  I DON'T REMEMBER

18   BREAKING IT INTO, INTO SEGMENTS.

19        Q.   I UNDERSTAND THAT.  YOU DON'T REMEMBER BEING ASKED THOSE

20   QUESTIONS; RIGHT?

21        A.   NO.

22        Q.   BUT AS YOU SIT HERE NOW, THE INFORMATION ON THAT FORM, AT

23   THE TIME THAT IT WAS FILLED OUT, IS ACCURATE?

24        A.   I FEEL LIKE YOU'RE ASKING ME SOMETHING AND I'M NOT SURE

25   WHAT I'M SUPPOSED TO -- WHAT THE RIGHT -- WHAT -- HOW TO ANSWER
```

```
 1         YOU PROPERLY.

 2         Q.   OKAY.  LET ME BREAK IT DOWN A BIT.

 3         A.   I MEAN, IT SOUNDS LIKE A SUPPOSITION SOMEWHERE.

 4         Q.   OKAY.

 5              CAN WE PULL UP EXHIBIT 70 AND GO TO PAGE 49, PLEASE.  I

 6    THINK WE NEED TO GO A COUPLE PAGES FURTHER.  LET'S TRY 50.

 7    WELL, LET'S STOP RIGHT HERE.

 8              ON PAGE 49, IS IT TRUE, MA'AM, THAT YOU HAD BEEN -- YOU

 9    WERE THE OWNER OF AN INTERIOR DESIGN COMPANY AND HAD BEEN FOR

10    30 YEARS?

11         A.   I WAS A CO-OWNER.

12         Q.   YOU WERE A CO-OWNER.  SO THIS INFORMATION IS ACCURATE;

13    RIGHT?

14         A.   CORRECT.

15         Q.   OKAY.  THANK YOU.

16              CAN WE GO TO THE NEXT PAGE, PLEASE, AND LET'S GO TO ITEM

17    15.  IF WE CAN ZOOM IN ON THAT PART OF THE DOCUMENT.

18              AND ITEM 15 SAYS IF YOU ARE AN INDIVIDUAL, PLEASE STATE

19    YOUR GROSS INCOME FOR 2006, AND THERE'S A -- SOMEBODY HAS

20    WRITTEN IN -- NOT YOU, CORRECT -- BUT SOMEONE HAS WRITTEN IN

21    THAT IT'S $250,000 AND THERE'S A CHECKMARK THERE.  RIGHT?

22         A.   CORRECT.

23         Q.   IS THAT ROUGHLY ACCURATE FOR YOUR INCOME AT THAT TIME?

24         A.   IS THAT FOR ONE MONTH?  I'M SORRY.  I'M HAVING A LITTLE

25    TROUBLE --
```

1    Q.    SURE.

2    A.    -- PUTTING THIS IN CONTEXT.

3    Q.    SURE.

4    A.    PLEASE INDICATE YOUR GROSS INCOME FOR 2006.

5    Q.    2006.

6    A.    SO THAT DOESN'T INCLUDE THE MONTHLY ALIMONY?

7    Q.    I'M ASKING YOU IF IT'S -- SO YOUR INCOME, INDEPENDENT OF

8    YOUR MONTHLY ALIMONY, WOULD HAVE BEEN $250,000, OR THEREABOUTS?

9    A.    MY ALIMONY WAS 240,000 A MONTH.

10   Q.    OKAY.  240,000 A MONTH?

11   A.    YES.

12   Q.    OKAY.  SO YOU WERE CERTAINLY MAKING MORE THAN 250,000 PER

13   YEAR?

14   A.    YES.  THAT'S WHY I'M STRUGGLING WITH THIS NUMBER.

15   Q.    OH, NO.  THAT'S WHY I'M ASKING.  I JUST WANT TO KNOW

16   THE --

17   A.    AND THEN I HAD, FROM MY PARENTS AND OTHER REAL ESTATE

18   INVESTMENTS --

19   Q.    ADDITIONAL MONEY?

20   A.    -- ADDITIONAL INCOME.

21   Q.    OKAY.  SO LET'S GO -- LET'S ZOOM OUT AND GO DOWN A LITTLE

22   BIT FURTHER.  LET'S GO TO ITEM 18 AT THE BOTTOM.

23         MA'AM, THIS IS THE NUMBER I WAS ASKING YOU ABOUT EARLIER.

24   AGAIN, I UNDERSTAND YOU DIDN'T FILL THIS OUT PERSONALLY.

25   RIGHT?

```
 1      A.   NO.

 2      Q.   IT SAYS APPROXIMATE PERCENTAGE OF LAST YEAR'S GROSS INCOME

 3      DERIVED FROM, AND THE WORD SALARY IS CROSSED OUT, AND IT SAYS

 4      80 PERCENT, AND THEN UNDERNEATH THAT IS WRITTEN SPOUSAL

 5      SUPPORT.

 6           AND SO MY QUESTION EARLIER WAS, IS THAT ACCURATE?  YOU

 7      DON'T KNOW?

 8      A.   I'M SORRY.  I DIDN'T WRITE IT IN, AND I REALLY -- I'M NOT

 9      A NUMBERS PERSON.

10      Q.   SURE.

11      A.   SO I DIDN'T -- I CAN JUST SAY I'M LOOKING AT THE SAME

12      THING YOU ARE.

13      Q.   FAIR ENOUGH.

14      A.   NOT WRITTEN IN MY HANDWRITING.

15      Q.   IS IT FAIR TO SAY THAT YOU HAD INCOME FROM SPOUSAL SUPPORT

16      AND ALSO SOME INCOME FROM OTHER INVESTMENTS?

17      A.   YES.

18      Q.   OKAY.  BUT YOU CAN'T TELL US RIGHT NOW, BACK WHEN YOU,

19      WHEN YOU ULTIMATELY DID SIGN THIS DOCUMENT AND MADE THIS

20      INVESTMENT, IF THESE PERCENTAGES ARE RIGHT, CAN YOU?

21      A.   NO.

22      Q.   OKAY.  NOW, EVENTUALLY YOU WERE GIVEN A COPY OF THESE

23      DOCUMENTS; CORRECT?

24      A.   I BELIEVE I WAS MAILED A COPY.

25      Q.   ABOUT HOW MUCH LATER AFTER YOU MADE THE INVESTMENT?
```

```
1      A.   IT WAS QUITE A WHILE.  THEY DIDN'T COME RIGHT AWAY, LIKE

2      IN THE NEXT WEEK OR TWO.

3      Q.   SO WAS IT A MONTH LATER?  MAYBE?

4      A.   SUPPOSITION.

5      Q.   BEST OF YOUR RECOLLECTION.  A FEW WEEKS?

6      A.   I WAS KIND OF SURPRISED, YOU KNOW, WHEN I GOT THIS PACKET

7      AND I HAD A COUPLE OF SIGNATURE PAGES IN IT.  IT -- THAT THEY

8      HAD BEEN INSERTED INTO IT.  THAT WAS A SURPRISE FOR ME.

9      Q.   SURE.  AND SO WHEN YOU WERE SURPRISED LIKE THAT, DID YOU

10     CALL UP BARBRA AND SAY, "HEY, WHAT'S THIS?  THERE'S A COUPLE OF

11     SIGNATURE PAGES INSERTED INTO THESE DOCUMENTS YOU'VE NEVER

12     GIVEN ME."

13     A.   THE FIRST THING I DID WAS BERATE MYSELF TO SEE THAT I HAD

14     ALLOWED THAT TO HAPPEN.

15     Q.   OKAY.  BUT MY QUESTION WAS --

16     A.   WELL, I DON'T HAVE AN ANSWER TO YOUR QUESTION.

17     Q.   DID -- WELL, IT'S A YES OR NO.  DID YOU CALL UP BARBRA AND

18     SAY, "HEY, I'VE BEEN GIVEN THIS PACK OF DOCUMENTS THAT HAS SOME

19     SIGNATURES PAGES AND I DIDN'T -- WHAT ARE THESE?"

20     A.   I CANNOT SWEAR TO YOU THAT I DID.  I JUST DON'T REMEMBER.

21     I WAS SO SURPRISED THAT I DON'T REMEMBER --

22     Q.   OKAY.

23     A.   -- WHAT I DID.

24     Q.   BUT AT THIS TIME YOU WERE STILL GOING OVER TO BARBRA'S

25     HOUSE; RIGHT?
```

1    A.   YES.

2    Q.   YOU WERE STILL TALKING TO HER?

3    A.   OH, YEAH.

4    Q.   YOU WERE TALKING TO HER ABOUT THE INVESTMENT?

5    A.   UM-HUM.

6    Q.   AND YOU DID THAT AFTER YOU RECEIVED THIS PACKAGE OF

7    DOCUMENTS; IS THAT RIGHT?

8    A.   YES.

9    Q.   AND SO DID YOU EVER GO OVER TO HER HOUSE AND SAY, "HEY,

10   WHAT IS THIS?"

11   A.   I DON'T REMEMBER.

12   Q.   DID YOU EVER EXPRESS SURPRISE, LIKE YOU JUST DID, THAT --

13   OR SHOCK THAT SOMEONE HAD INSERTED PAGES INTO THESE DOCUMENTS

14   THAT WERE RELATING TO YOUR INVESTMENT?

15   A.   I DON'T REMEMBER.  I MAY HAVE BEEN SO ANGRY WITH MYSELF I

16   DIDN'T SAY A WORD.

17            THE COURT:  THE TIME IS NOW NOON.  IS THIS A GOOD

18   BREAKING POINT?

19            MR. LEEMING:  THAT'S FINE.

20            THE COURT:  LET'S GO AHEAD AND TAKE OUR LUNCH BREAK

21   NOW.

22       YOU MAY STEP DOWN.

23            THE WITNESS:  THANK YOU.

24            THE COURT:  WE'LL BE BACK AT 1:00 O'CLOCK.

25       ALL RIGHT.  PLEASE DON'T RESEARCH OR DISCUSS THE CASE.

```
 1        WE'LL SEE YOU BACK IN AN HOUR.  THANK YOU FOR YOUR PATIENCE AND

 2        YOUR SERVICE.  WE REALLY APPRECIATE IT.

 3             AND YOU MAY STEP DOWN.

 4             (JURY OUT AT 12:01 P.M.)

 5                  THE COURT:  THE RECORD SHOULD REFLECT THE JURORS HAVE

 6        LEFT THE COURTROOM.

 7             WE'LL WAIT JUST A MINUTE.

 8             (PAUSE IN PROCEEDINGS.)

 9             (MS. WORKMAN NOT PRESENT.)

10                  THE COURT:  THE RECORD SHOULD REFLECT THAT

11        MS. WORKMAN, OUR WITNESS, HAS NOW LEFT THE COURTROOM.

12             WHAT WAS THE AGREEMENT THAT THE PARTIES HAVE REACHED, JUST

13        SO I HAVE SOME NOTICE FOR THIS AFTERNOON?

14                  MR. KALEBA:  WITH RESPECT TO MS. WORKMAN, IT WAS HE'S

15        SHOWN US WHAT HE -- AREAS THAT HE'D LIKE TO GET INTO, AND HE

16        SHOWED US THE DOCUMENTS THAT HE THINKS ARE A FOUNDATION FOR THE

17        AREAS AND IT RELATES TO JEWELRY THAT WAS INSURED IN THE DIVORCE

18        VERSUS A POLICE CLAIM THAT WAS LATER MADE.

19             AND THERE WAS ANOTHER MATTER ABOUT HER FINANCIAL SAVVY,

20        BUT I THINK YOU'VE MAYBE MOVED PAST THAT.

21                  MR. LEEMING:  I MAY HAVE MOVED PAST THAT ALREADY.

22                  THE COURT:  ALL RIGHT.  SO IT'S NOT GOING TO BE AN

23        ISSUE?

24                  MR. LEEMING:  I DON'T THINK WE HAVE AN ISSUE AT THIS

25        MOMENT UNLESS THE UNITED STATES WANTS TO BRING IT UP.
```

1          MR. KALEBA:  NO.  WITH RESPECT TO MS. WORKMAN, I

2     THINK THERE'S NO OTHER ISSUES.  I MEAN -- AND IF SOMETHING

3     COMES UP IN CROSS, WE'LL OBJECT IF WE THINK SOMETHING HAS

4     CROSSED THE LINE.

5          THE COURT:  BUT THERE'S NOTHING RIPE RIGHT NOW FOR

6     DECISION?

7          MR. LEEMING:  NO.

8          THE COURT:  OKAY.  THANK YOU ALL.

9          MR. LEEMING:  THERE IS ANOTHER ISSUE, THOUGH --

10         THE COURT:  OH, WHAT'S THAT?

11         MR. LEEMING:  -- THAT I THINK THE PROSECUTION WANTS

12    TO BRING UP.

13         THE COURT:  WHAT'S THAT?

14         MR. SCHENK:  WE UNDERSTAND THAT THE DEFENSE INTENDS

15    TO CROSS-EXAMINE MS. CAGLE USING THE VOICEMAIL MESSAGES.  IF

16    THE COURT REMEMBERS --

17         THE COURT:  FROM MR. SWANSON'S TRIAL?

18         MR. SCHENK:  YES.  AND WE DON'T UNDERSTAND THE BASIS

19    THAT THEY'RE ADMISSIBLE UNDER.

20         MR. LEEMING:  I -- FIRST OF ALL, THE OFFER -- I

21    INTEND TO USE ONLY THE FIRST VOICEMAIL MESSAGE, WHICH IS

22    MR. SWANSON CALLING HER UP AND ESSENTIALLY THREATENING HER.

23         MY OFFER OF PROOF IS THAT IT IS RELEVANT TO HER STATE OF

24    MIND, THAT IT SHOWS THAT SHE'S AFRAID OF HIM, IT EXPLAINS

25    CERTAIN ACTIONS SHE TOOK THEREAFTER, INCLUDING HAVING HER

```
 1     HUSBAND PRESENT WHEN -- AND PUTTING MR. SWANSON ON A SPEAKER

 2     PHONE.

 3          SHE TESTIFIED AT THE PRECEDING TRIAL THAT WHEN SHE GOT

 4     THIS VOICEMAIL MESSAGE, SHE FELT LIKE IT WAS EXACTLY WHAT

 5     AGGIE FLORY HAD WARNED HER WAS GOING TO HAPPEN, AND THAT IS

 6     THAT SHE WAS GOING TO BE MADE A SCAPEGOAT.

 7          AND IF THE COURT RECALLS, THAT IS THE REASON THAT SHE WENT

 8     AHEAD AND KEPT COPIES OF CERTAIN DOCUMENTS, WHICH ARE SITTING

 9     IN THAT CART OVER THERE READY TO BE INTRODUCED.

10          SO I THINK IT CERTAINLY HAS BEARING ON WHAT SHE DID.  IT

11     HAS BEARING ON HER STATE OF MIND.  IT HAS BEARING ON HER

12     SUBSEQUENT CONDUCT.

13          AND ALL I'M GOING TO DO IS PLAY THE FIRST VOICEMAIL AND

14     THE FIRST -- IT'S TWO PAGES OF TRANSCRIPT, WHICH I'VE

15     SEGREGATED OUT AND RENUMBERED.

16          THE COURT:  AND WHAT'S YOUR POSITION?

17          MR. SCHENK:  IT'S HEARSAY AND THERE'S NO BASIS THAT'S

18     BEEN STATED TO ADMIT IT UNDER.  IT'S -- THERE'S JUST NO

19     EXCEPTION THAT APPLIES TO ADMIT A STATEMENT THAT SWANSON MADE

20     TO HER.  IT WAS ADMISSIBLE IN SWANSON'S TRIAL BECAUSE IT WAS AN

21     ADMISSION.

22          THE COURT:  WHAT'S THE HEARSAY EXCEPTION?

23          MR. LEEMING:  STATE OF MIND.

24          AND ALSO IT'S NOT OFFERED FOR THE TRUTH.  OBVIOUSLY IT'S

25     NOT TRUE.  IT'S SOMETHING THAT'S, FRANKLY, A LIE.
```

```
 1            BUT IT DEMONSTRATES WHY SHE DID WHAT SHE DID, WHY SHE KEPT

 2      THE RECORDS SHE KEPT, AND WHY, IN FACT, SHE SUBSEQUENTLY QUIT,

 3      BECAUSE SHE DID QUIT.

 4            AND IT ALSO EXPLAINS THAT SHE'S AFRAID OF HIM, AND BECAUSE

 5      OF THAT --

 6              THE COURT:  BUT WHY CAN'T YOU ASK QUESTIONS THAT

 7      ESSENTIALLY GET THAT INFORMATION WITHOUT ELICITING HEARSAY?

 8      CAN'T YOU JUST ASK QUESTIONS?  "DID YOU GET A PHONE CALL FROM

 9      MR. SWANSON?"

10              MR. LEEMING:  "WHAT DID HE SAY?"

11              THE COURT:  "DID THAT PHONE CALL" -- NO, THAT'S

12      ELICITING HEARSAY.  BUT "DID THE PHONE CALL GIVE YOU ANY

13      CONCERN ABOUT YOUR SAFETY?"

14         "YES, IT DID."

15         I MEAN, I THINK YOU CAN ASK QUESTIONS TO CONVEY THIS

16      INFORMATION WITHOUT ELICITING THE HEARSAY STATEMENT ITSELF.

17         I'M UNCLEAR ON WHAT YOU WANT TO OFFER IT FOR, THAT SHE WAS

18      AFRAID AND THAT IT CONFIRMED WHAT AGGIE FLORY PREDICTED?

19              MR. LEEMING:  YES.  YES.  SO THIS ALL SORT OF COMES

20      BACK TO TESTIMONY THAT I EXPECT TO HEAR TODAY, AND THAT IS THAT

21      MS. FLORY MADE -- HAD ASKED FOR CERTAIN RECORDS, MS. FLORY

22      REVIEWED THOSE RECORDS, MS. FLORY WENT AND SPOKE TO MS. CAGLE

23      AND SAID, "HEY, DON'T YOU KNOW THIS IS A PONZI SCHEME?"

24         I KNOW THE COURT KNOWS THE BASIC BACKGROUND, SO I WON'T GO

25      INTO THE DETAILS.
```

1          THE COURT:  UM-HUM.

2          MR. LEEMING:  "YOU BETTER KEEP A COPY OF THESE

3     RECORDS YOURSELF.  THEY'RE GOING TO TRY TO MAKE A SCAPEGOAT OUT

4     OF YOU."

5          THEN LATER MR. SWANSON CALLS HER AND SAYS, "DON'T LISTEN

6     TO AGGIE FLORY.  DON'T BELIEVE ANYTHING SHE SAYS.  THERE'S --

7     IT'S NOT COMING -- THERE'S INFORMATION COMING FROM SOMEBODY.

8     IT'S NOT COMING FROM ME.  IT'S NOT COMING FROM ANYBODY ELSE.

9     IT'S GOT TO BE COMING FROM YOU.  THEY'RE SETTING YOU UP TO

10    MAKE -- AGGIE IS SETTING YOU UP TO BE A SCAPEGOAT IN ALL OF

11    THIS.  SHE'S GOING TO BLAME IT ON YOU."

12         AND THAT'S THE VOICEMAIL MESSAGE IN QUESTION.

13         THE COURT:  UM-HUM.

14         MR. LEEMING:  SO IT'S -- IT TIES INTO THE WHOLE CASE

15    AS TO HER BEHAVIOR IN PRODUCING THE RECORDS.  AND AS I SAID,

16    THEY'RE HERE AND THEY'RE VOLUMINOUS.

17         THE COURT:  ALL RIGHT.  WELL, I THINK THE HEARSAY

18    OBJECTION IS SUSTAINED.

19         BUT YOU CAN CERTAINLY ELICIT THIS KIND OF INFORMATION

20    WITHOUT ASKING THE QUESTION THAT ELICITS THE HEARSAY.

21         MR. LEEMING:  VERY GOOD.

22         THE COURT:  OKAY.  THANK YOU ALL.

23         MR. SCHENK:  THANK YOU, YOUR HONOR.

24         THE COURT:  WE'LL SEE YOU AT 1:00.

25         (THE LUNCH RECESS WAS TAKEN FROM 12:07 P.M. TO 1:03 P.M.)

```
 1                        AFTERNOON SESSION

 2         (JURY OUT AT 1:03 P.M.)

 3              THE COURT:  OKAY.  MR. LEEMING, GO AHEAD AND MAKE

 4    YOUR RECORD, PLEASE.

 5              MR. LEEMING:  OH, YOUR HONOR, JUST -- I'VE SHOWN THE

 6    GOVERNMENT WHAT'S BEEN MARKED AS DEFENSE 1003A AND WE'D LIKE TO

 7    SUBMIT THIS TRANSCRIPT AS AN OFFER OF PROOF ON THE HEARSAY

 8    ISSUE THAT WE MADE EARLIER, AND I'M NOT -- I'M NOT

 9    CHALLENGING --

10              THE COURT:  WHAT IS THE DOCUMENT?  IS A TRANSCRIPT OF

11    THE PHONE CALL MESSAGE?

12              MR. LEEMING:  THAT'S A TRANSCRIPT OF THE PHONE CALL

13    THAT WAS PLAYED AT THE EARLIER TRANSCRIPT -- EARLIER TRIAL.

14              THE COURT:  ALL RIGHT.  THAT'S FINE.

15         THE COURT IS FAMILIAR WITH THIS RECORDING BECAUSE I HEARD

16    IT MULTIPLE TIMES IN MR. SWANSON'S TRIAL.  HE'S NOT A DEFENDANT

17    IN THIS TRIAL.  HE'S NOT GOING TO TESTIFY IN THIS TRIAL.  I

18    DON'T THINK IT'S APPROPRIATE TO GET HIS FULL STATEMENT IN.  I

19    THINK IT IS HEARSAY AND STATE OF MIND AND NOT OFFERED FOR THE

20    TRUTH EXCEPTIONS DO NOT APPLY HERE.

21         MOREOVER, THE DEFENSE IS NOT PREJUDICED BECAUSE YOU CAN

22    GET IN WHAT YOU WANT FOR STATE OF MIND THROUGH OTHER QUESTIONS

23    THAT DO NOT ELICIT HEARSAY.

24         ALL RIGHT.  LET'S BRING OUR JURY IN, AND PLEASE BRING

25    MS. WORKMAN IN NOW.
```

```
1              MR. LEEMING:  THANK YOU, YOUR HONOR.

2              THE COURT:  THANK YOU.

3         (JURY IN AT 1:04 P.M.)

4              THE COURT:  GO AHEAD, PLEASE, AND HAVE A SEAT.

5         (PAUSE IN PROCEEDINGS.)

6         (MS. WORKMAN NOT PRESENT.)

7              MR. LEEMING:  YOUR HONOR, I'VE JUST INFORMED THE

8    GOVERNMENT, THE DEFENSE HAS NO FURTHER QUESTIONING OF

9    MS. WORKMAN.

10             THE COURT:  OH, OKAY.

11             MR. LEEMING:  I DON'T KNOW IF THERE'S REDIRECT, BUT I

12   DON'T BELIEVE THERE IS.

13             THE COURT:  IS THERE ANY REDIRECT?

14             MR. KALEBA:  NO, YOUR HONOR.

15             THE COURT:  OH, OKAY.  THEN MAY THIS WITNESS BE

16   EXCUSED, AND IS IT SUBJECT TO RECALL OR NO RECALL?

17             MR. LEEMING:  YES.

18             MR. KALEBA:  NO RECALL, YOUR HONOR.

19             MR. LEEMING:  EXCUSED, NO RECALL.

20             THE COURT:  ALL RIGHT.  THEN SHE IS EXCUSED, NOT

21   SUBJECT TO RECALL.

22         YOU CAN JUST INFORM HER -- I DON'T SEE ANY NEED, THEN, FOR

23   HER TO COME BACK IN.

24             MR. KALEBA:  THANK YOU, YOUR HONOR.  WE WILL LET HER

25   KNOW.
```

```
 1                THE COURT:  ALL RIGHT.  THANK YOU.

 2           IF YOU WILL PLEASE CALL YOUR NEXT WITNESS.

 3                MR. KALEBA:  THE UNITED STATES CALLS LINDA CAGLE.

 4           (PAUSE IN PROCEEDINGS.)

 5           (LINDA CAGLE, PLAINTIFF'S WITNESS, WAS SWORN.)

 6                THE WITNESS:  YES, I DO.

 7                THE CLERK:  WOULD YOU HAVE A SEAT, PLEASE?

 8                THE WITNESS:  THANK YOU.

 9                THE CLERK:  AND WOULD YOU STATE YOUR NAME, PLEASE,

10      AND SPELL IT.

11                THE WITNESS:  LINDA CAGLE, L-I-N-D-A, C-A-G-L-E.

12                THE CLERK:  THANK YOU.

13                THE COURT:  WOULD YOU PLEASE ADJUST THE MICROPHONE TO

14      MATCH YOUR HEIGHT?  THANK YOU.

15                         DIRECT EXAMINATION

16      BY MR. KALEBA:

17      Q.   WHERE DO YOU CURRENTLY LIVE?

18      A.   PRUNEDALE, CALIFORNIA.

19      Q.   ARE YOU CURRENTLY EMPLOYED?

20      A.   YES, I AM.

21      Q.   WHAT IS YOUR JOB?

22      A.   I'M IN ACCOUNTS PAYABLE FOR A LOCAL AGRICULTURAL COMPANY.

23      Q.   WHAT IS THE HIGHEST GRADE OF EDUCATION THAT YOU'VE

24      RECEIVED?

25      A.   ONE YEAR OF COLLEGE.
```

```
1     Q.   DID YOU RECEIVE ANY FORMAL TRAINING IN ACCOUNTING OR

2     FINANCE?

3     A.   NO.  JUST THAT ONE YEAR, I TOOK SOME ACCOUNTING CLASSES.

4     Q.   DID YOU HAVE ANOTHER JOB PRIOR TO THIS CURRENT EMPLOYMENT?

5     A.   YES, I DID.

6     Q.   WHERE DID YOU WORK?

7     A.   I WORKED FOR GOLD COAST FINANCIAL, APS FUNDING.

8     Q.   DO YOU KNOW A PERSON BY THE NAME OF BARBRA ALEXANDER?

9     A.   YES.  SHE WAS MY EMPLOYER.

10    Q.   IS SHE IN THE COURTROOM TODAY?

11    A.   YES, SHE IS.

12    Q.   COULD YOU IDENTIFY HER?

13    A.   SHE'S SEATED AT THE DEFENSE TABLE.

14    Q.   ARE YOU FAMILIAR WITH THE COMPANY APS FUNDING?

15    A.   YES.

16    Q.   WHAT IS THAT?

17    A.   IT WAS A COMPANY MADE UP OF BARBRA ALEXANDER, BETH PINA,

18    AND MICHAEL SWANSON.  IT WAS FOR HARD MONEY LENDING.

19    Q.   ARE YOU FAMILIAR WITH THE COMPANY A&P --

20    A.   YES.

21    Q.   -- PROPERTIES.  WHAT IS THAT?

22    A.   THAT IS FOR ALEXANDER AND PINA.  THEY HAD A COMPANY THAT

23    THEY PURCHASED HOMES AND DID REHABS ON THEM.

24    Q.   OKAY.  ARE YOU FAMILIAR WITH THE COMPANY GOLD COAST

25    FINANCIAL?
```

CAGLE DIRECT

1    A.   YES.

2    Q.   WHAT'S THAT?

3    A.   THAT WAS A LENDING COMPANY AS WELL OWNED BY

4    BARBRA ALEXANDER.

5    Q.   AND ARE YOU FAMILIAR WITH THE COMPANY CALLED GCF, GOLD

6    COAST FINANCIAL SERVICES?

7    A.   YES.

8    Q.   OKAY.  WHAT'S THAT?

9    A.   GOLD COAST FINANCIAL SERVICES LTD?  IS THAT WHAT YOU'RE

10   REFERRING TO?

11   Q.   YES.

12   A.   YES.  THAT WAS A COMPANY THAT WAS BROUGHT BACK TO LIFE, AS

13   YOU WILL, FOR LENDING PURPOSES, A MORTGAGE COMPANY.

14   Q.   OKAY.  WHAT ABOUT GCF INVESTMENTS, SOLE?  WHAT IS THAT?

15   A.   THAT WAS ALSO AN INVESTMENT COMPANY FOR LENDERS TO COME IN

16   AND THEN THAT MONEY WAS GIVEN TO BORROWERS.

17   Q.   OKAY.  WHAT ABOUT GCF INVESTMENTS, LLC?

18   A.   THE SAME.  IT WAS THE SECOND INVESTMENT COMPANY THAT

19   HAPPENED.

20   Q.   AND WHAT ABOUT GREENLIGHT FUND?

21   A.   THAT WAS THE THIRD INVESTMENT COMPANY.

22   Q.   WAS THERE A COMMON BOSS FOR ALL OF THESE ENTITIES?

23   A.   YES.

24   Q.   WHO?

25   A.   BARBRA ALEXANDER WAS THE -- CEO I GUESS WAS HER TITLE.

CAGLE DIRECT

1    Q.   DID THESE ENTITIES HAVE DISTINCT OR DIFFERENT BUSINESS

2    ADDRESSES?

3    A.   NO.  THEY WERE ALL THE SAME.

4    Q.   OKAY.  AND WHERE WAS THE BUSINESS ADDRESS?

5    A.   21 ALTA MESA CIRCLE IN MONTEREY, CALIFORNIA.

6    Q.   IS THAT IN AN OFFICE BUILDING?

7    A.   NO.  IT WAS A PRIVATE HOME.

8    Q.   WHOSE HOME WAS THIS?

9    A.   BARBRA ALEXANDER.

10   Q.   DID THESE BUSINESSES EVER HAVE A BUSINESS ADDRESS OUTSIDE

11   OF THE HOUSE?

12   A.   LATER IN 2009, THE OFFICES WERE MOVED TO -- GOLD COAST

13   FINANCIAL LIMITED AND MY OFFICE WHERE I WAS PLACED AT EL DORADO

14   IN MONTEREY, CALIFORNIA, EL DORADO STREET -- I'M NOT

15   REMEMBERING THE ADDRESS.  I THINK IT WAS 87 EL DORADO.

16   Q.   OKAY.  PLEASE SPEAK UP, IF YOU WOULD.

17   A.   UM-HUM.

18   Q.   WHEN WERE YOU FIRST HIRED?  AND LET ME JUST SAY WITH

19   MS. ALEXANDER.

20   A.   I WAS HIRED PART-TIME IN MAY OF 2006.

21   Q.   OKAY.  WHAT WAS YOUR JOB?

22   A.   I WAS DOING A VARIETY OF OFFICE DUTIES FOR

23   BARBRA ALEXANDER AND FOR HER PARTNER AT THAT TIME, BETH PINA.

24   I DID A LOT OF THE OFFICE FILING, ANSWERING THE PHONES,

25   REORGANIZING FILES, AND I WAS ALSO LEARNING TO DO QUICK BOOKS

1    WITH BETH PINA.

2    Q.    OKAY.  WHAT IS THE QUICK BOOKS?

3    A.    IT WAS A SOFTWARE PROGRAM THAT THEY USED FOR THEIR

4    ACCOUNTING.

5    Q.    AT SOME POINT DID YOU MANAGE THE ACCOUNTS PAYABLE FOR

6    MS. ALEXANDER?

7    A.    YES, I DID.

8    Q.    AND DID YOU MANAGE THE ACCOUNTS PAYABLE FOR HER BUSINESS

9    ENTITIES, AS WELL AS FOR HER PERSONAL?

10   A.    YES, I DID.

11   Q.    DID YOU WORK, AS PART OF THE ACCOUNTS PAYABLE, WITH THE

12   COMPANIES AND THE ENTITIES' BANKS?  DID YOU HAVE ACCESS TO

13   EITHER PREPARING CHECKS OR DOING ANYTHING WITH RESPECT TO

14   BANKING?

15   A.    YES.

16   Q.    OKAY.  WHAT DID YOU DO?

17   A.    USUALLY I PUT TOGETHER THE DEPOSITS FOR MS. ALEXANDER AND

18   BETH PINA, CHECKS THAT WOULD COME IN FROM BORROWERS OR FROM

19   INVESTORS.  I WOULD STAMP THEM AND GET THEM READY FOR DEPOSIT,

20   AND I WAS USUALLY THE PERSON WHO DROVE THEM TO THE BANK FOR

21   DEPOSIT.

22   Q.    OKAY.  WOULD YOU PREPARE CHECKS FOR ACCOUNTS PAYABLE?

23   A.    YES.

24   Q.    AND HOW WOULD YOU DO THAT?

25   A.    IN THE BEGINNING IT WAS USUALLY BY DIRECTION OF BETH PINA

1    TO PAY THOSE BILLS THAT SHE HAD ENTERED INTO QUICK BOOKS.

2         LATER ON IN MY EMPLOYMENT, I WAS ACTUALLY THE ONE THAT WAS

3    TAKING THOSE BILLS AND ENTERING THEM INTO QUICK BOOKS FOR

4    PAYMENT.

5    Q.   OKAY.  DID YOU MANAGE BUSINESS EXPENSES, THE ACCOUNTS

6    PAYABLE FOR THE BUSINESS EXPENSES FOR THE ENTITIES THAT WE

7    DISCUSSED?

8    A.   YES.

9    Q.   OKAY.  DID YOU HAVE SIGNATURE AUTHORITY ON ANY OF THE

10   BUSINESS ENTITIES' BANK ACCOUNTS?

11   A.   NO, I DID NOT.

12   Q.   SO WERE YOU ABLE TO TAKE ANY MONEY OUT OF THE ACCOUNT FOR

13   YOURSELF PERSONALLY?

14   A.   NO.

15   Q.   COULD YOU EVER WRITE A CHECK TO YOURSELF PERSONALLY AND

16   SIGN IT?

17   A.   NO.

18   Q.   OKAY.  WHO COULD SIGN CHECKS ON BEHALF OF THE COMPANIES?

19   A.   BARBRA ALEXANDER AND BETH PINA.

20   Q.   OKAY.  DID -- ARE YOU FAMILIAR WITH A PERSON NAMED

21   MICHAEL SWANSON?

22   A.   YES.

23   Q.   WHO IS HE?

24   A.   HE WAS ALSO A MANAGING MEMBER OF THE FUND WHEN IT BECAME

25   APS FUNDING.  HE ALSO HAD A SIGNATURE -- HE COULD SIGN CHECKS

1        AS WELL.

2        Q.   AS PART OF YOUR JOB, DID YOU PREPARE CHECKS TO BE SENT OUT

3        TO INVESTORS AS FAR AS THEIR MONTHLY CHECKS WENT?

4        A.   YES.

5        Q.   OKAY.  AND AS PART OF YOUR JOB, DID YOU ALSO HANDLE

6        BORROWER REPAYMENTS AND THE DEPOSITS OF THOSE PAYMENTS?

7        A.   I'M SORRY.  ONE MORE TIME.

8        Q.   DID YOU, AS PART OF YOUR JOB, ALSO PREPARE THE PAYMENTS

9        FROM BORROWERS FOR DEPOSIT INTO THE --

10       A.   YES.

11       Q.   -- BUSINESS ACCOUNTS?

12       A.   WHEN THOSE CHECKS WOULD COME FOR WHATEVER LOAN THEY HAD

13       WITH THE COMPANY, YES.

14       Q.   DID YOU MANAGE THE LOANS, THOUGH?

15       A.   NO.

16       Q.   DID YOU IDENTIFY WHO THE BORROWERS WOULD BE?  FOR EXAMPLE,

17       DID YOU -- WOULD YOU EVER IDENTIFY WHO A PROSPECTIVE BORROWER

18       WOULD BE?

19       A.   WELL, I KNEW WHO SOME OF THEM WERE FROM THE DEPOSITS THAT

20       I WAS DOING FOR THEM.

21       Q.   OKAY.  BUT DID YOU -- DID YOU FIND THEM?  DID YOU DISCUSS

22       LOAN TERMS WITH THEM?

23       A.   NO.

24       Q.   OKAY.

25       A.   NO.

CAGLE DIRECT

1    Q.   WHO MANAGING THE LOAN PORTFOLIO?

2    A.   THAT WOULD HAVE BEEN BARBRA ALEXANDER AND BETH PINA.

3    Q.   OKAY.  WHAT WAS YOUR UNDERSTANDING OF THE TYPE OF BUSINESS

4    THAT APS FUNDING WAS INVOLVED IN?

5    A.   APS FUNDING WAS A COMPANY THAT HAD INVESTORS COME INTO IT

6    THAT THEIR MONEY WOULD BE SECURED WITH A DEED OF TRUST FROM A

7    BORROWER WHO NEEDED TO COME INTO THE FUND BECAUSE THEY COULDN'T

8    GET A LOAN, A CONVENTIONAL LOAN FROM A BANK, AND THEY WOULD

9    COME IN AND BORROW MONEY THAT THEY NEEDED FOR WHATEVER FROM THE

10   INVESTMENT COMPANY.

11   Q.   OKAY.  WHAT WAS -- WHAT -- SPECIFICALLY WHAT TYPE OF

12   LENDING WAS APS FUNDING INVOLVED IN?

13   A.   IT WAS CALLED A HARD MONEY LOAN --

14   Q.   OKAY.

15   A.   -- THAT THEY WOULD --

16   Q.   AND WHAT DOES THAT MEAN TO YOU?

17   A.   THAT IT WAS FOR THOSE INDIVIDUALS WHO COULD NOT GET A

18   CONVENTIONAL LOAN, SO THEY PAID A HIGHER INTEREST RATE FOR THIS

19   HARD MONEY LENDING.

20   Q.   AND WAS THIS LENDING FOR REAL ESTATE?

21   A.   FOR -- FOR PROPERTY OWNERS, YES.

22   Q.   OKAY.  WAS THE LENDING FOR ANY OTHER PURPOSE?

23   A.   AS FAR AS I KNOW, THE -- THEY WOULD MAYBE PURCHASE A HOME

24   THAT WOULD BE FOR REHAB.

25   Q.   OKAY.

CAGLE DIRECT

```
 1        A.   YES.

 2        Q.   I'D LIKE TO GO THROUGH SOME OF THE BANK DOCUMENTS WITH

 3     YOU.

 4        A.   OKAY.

 5             MR. KALEBA:  AND I'D LIKE TO MOVE THE FOLLOWING

 6     EXHIBITS INTO EVIDENCE AT THIS TIME:  EXHIBIT NUMBER 200, 203,

 7     205, 206, 207, 208, AND 214 AT THIS TIME.

 8             THE COURT:  ANY OBJECTION?

 9             MR. LEEMING:  THAT'S PURSUANT TO STIPULATION, YOUR

10     HONOR.

11             THE COURT:  THERE'S NO OBJECTION?

12             MR. LEEMING:  NONE.

13             THE COURT:  OKAY.  THEY'RE ADMITTED.

14        (PLAINTIFF'S EXHIBITS 200, 203, 205, 206, 207, 208, AND

15     214 WERE ADMITTED IN EVIDENCE.)

16             THE COURT:  GO AHEAD, PLEASE.

17             MR. KALEBA:  OKAY.  WOULD YOU PLEASE PUBLISH EXHIBIT

18     NUMBER 200?  AND IF YOU COULD FIRST HIGHLIGHT THE TOP HALF OF

19     THIS DOCUMENT.

20        Q.   IT'S GOING TO BE ON YOUR SCREEN, MS. CAGLE.

21        A.   OKAY, GREAT.

22        Q.   OKAY.  DO YOU SEE THE ACCOUNT NAME THAT'S LISTED HERE?

23        A.   YES.  APS FUNDING COST ACCOUNT.

24        Q.   OKAY.  AND IT'S -- THERE'S A SERIES OF BANKS THAT ARE

25     LISTED AT THE TOP; CORRECT?
```

1    A.   YES.

2    Q.   OKAY.  SANTA BARBARA BANK AND TRUST?

3    A.   FIRST NATIONAL, SOUTH VALLEY NATIONAL, SAN BENITO, AND

4    FIRST BANK OF SAN LUIS OBISPO.

5    Q.   THERE IS A BUSINESS ADDRESS THAT'S LISTED.  DO YOU SEE

6    THAT?

7    A.   YES.  484B WASHINGTON STREET, NUMBER 350.

8    Q.   DID APS FUNDING HAVE A PHYSICAL BUSINESS AT THAT ADDRESS?

9    A.   NO.

10   Q.   WHAT IS THAT ADDRESS?

11   A.   THAT WAS THEIR P.O. BOX WHERE THE MAIL WAS DELIVERED.

12   Q.   OKAY.  IF WE COULD GO TO THE MIDDLE SECTION OF THIS

13   ACCOUNT, PLEASE.

14   A.   UM-HUM.

15   Q.   THERE ARE THREE ACCOUNT OWNERS LISTED.

16   A.   YES.

17   Q.   COULD YOU IDENTIFY THEM?

18   A.   BARBRA ALEXANDER, BETH PINA, AND MICHAEL SWANSON.

19   Q.   AND IF YOU COULD TURN TO THE NEXT PAGE, PLEASE.  THERE ARE

20   THREE SIGNATURES AT THE TOP.

21        DO YOU SEE THAT?

22   A.   YES, I DO.

23   Q.   OKAY.  DO YOU RECOGNIZE THOSE INDIVIDUALS' --

24   A.   YES.

25   Q.   -- SIGNATURES?  WHO ARE THEY?

```
1    A.   BARBRA ALEXANDER, MICHAEL SWANSON, AND BETH PINA.

2    Q.   AND IF WE COULD GO TO THE BOTTOM HALF OF THIS DOCUMENT

3    WHERE IT LISTS CORPORATIONS AND ASSOCIATIONS?

4    A.   THAT WOULD BE BETH PINA'S SIGNATURE.

5    Q.   OKAY.  LET'S TURN TO EXHIBIT NUMBER 203, PLEASE.  IF WE

6    COULD PULL UP THE TOP HALF OF THE DOCUMENT.

7         COULD YOU IDENTIFY THE ACCOUNT NAME AND ADDRESS HERE?

8    A.   IT IS MONEY DOTS, INCORPORATED AT 528 ABREGO STREET,

9    NUMBER 202.

10   Q.   IS THIS ONE OF THE ACCOUNTS THAT YOU HAD ACCESS TO DURING

11   THE COURSE OF YOUR EMPLOYMENT?

12   A.   YES.

13   Q.   WHAT IS MONEY DOTS, INC.?

14   A.   MONEY DOTS, INC. IS A RADIO PROGRAM THAT BARBRA ALEXANDER

15   WAS THE HOST OF.

16   Q.   THERE'S A PHYSICAL STREET ADDRESS THAT'S LISTED.

17   A.   THAT'S 528 ABREGO STREET, SUITE NUMBER 202.

18   Q.   WHAT IS THAT ADDRESS?

19   A.   THAT WAS AN ADDRESS WHERE SHE PICKED UP MAIL.

20   Q.   IS IT A BUSINESS OR HOME OR --

21   A.   YES, IT WAS A BUSINESS.  I BELIEVE IT WAS A COPYING, A

22   COPY BUSINESS.

23   Q.   WITH, LIKE, A MAIL DROP, A P.O. BOX?

24   A.   YES.

25   Q.   OKAY.  GO TO THE NEXT -- TO THE AUTHORIZED OWNERS OF THE
```

CAGLE DIRECT

1    ACCOUNT.

2         WHO ARE THE TWO ACCOUNT OWNERS IDENTIFIED?

3    A.   BARBRA ALEXANDER AND BETH PINA.

4    Q.   IF WE COULD GO TO PAGE 21 OF THIS DOCUMENT.  ACTUALLY,

5    SORRY.  PAGE 70 OF THE DOCUMENT.

6         MR. LEEMING:  70?

7         MR. KALEBA:  7-0.  IF YOU COULD HIGHLIGHT THE TOP

8    HALF OF THE DOCUMENT.

9    Q.   IS THIS A BANK STATEMENT FOR THE MONEY DOTS ACCOUNT?

10   A.   YES, FOR MAY OF 2006 FOR MONEY DOTS.

11   Q.   OKAY.  AND GO TO THE SECOND HALF OF THE DOCUMENT AT THE

12   BOTTOM.

13        WHAT IS THE ENDING BALANCE OF MONEY DOTS AT THE END OF

14   MAY 2006?

15   A.   $5,854.83.

16   Q.   OKAY.  CAN WE GO TO PAGE 100, PLEASE.

17        IS THIS ANOTHER STATEMENT?

18   A.   YES, FOR AUGUST OF 2007.

19   Q.   OKAY.  AND THIS IS ALSO FOR MONEY DOTS?

20   A.   YES, IT IS.

21   Q.   COULD YOU READ THE ACCOUNT BALANCE ENDING FOR AUGUST OF

22   2007?

23   A.   $2,206.35.

24   Q.   PAGE 124, PLEASE.  COULD YOU IDENTIFY THIS DOCUMENT?

25   A.   IT WOULD HAVE BEEN AUGUST OF 2008 FOR MONEY DOTS, INC.

608

1    Q.   OKAY.  AND WHAT WAS THE STATEMENT BALANCE FOR AUGUST OF

2    2008?

3    A.   $2,350.68.

4    Q.   PAGE 148, PLEASE.  WHAT'S THIS?

5    A.   ANOTHER STATEMENT FOR MONEY DOTS FOR AUGUST OF 2009.

6    Q.   AND WHAT WAS THE STATEMENT BALANCE FOR MONEY DOTS FOR THIS

7    MONTH?

8    A.   $40.33.

9    Q.   NOW, ARE YOU FAMILIAR WITH ANY OTHER BANK ACCOUNT THAT

10   MONEY DOTS, THE ENTITY, HAD?

11   A.   NO.

12   Q.   WAS THIS -- THE DOLLAR AMOUNTS THAT YOU HAVE SEEN OVER THE

13   THREE YEAR PERIOD, WAS THAT ROUGHLY CONSISTENT OF THE AVERAGE

14   BALANCE IN MONEY DOTS?

15   A.   NOT THIS LAST ONE FOR 2009.  THAT'S A LITTLE LOW.

16   Q.   WHAT ABOUT FOR 2007/2008?

17   A.   IT KEPT A BALANCE OF ABOUT $2,000 IN THE ACCOUNT.

18   Q.   CAN WE GO TO PAGE 187, PLEASE, AND IF YOU WOULD PULL UP

19   CHECK NUMBER 3430.

20        OKAY.  WHAT IS THIS?

21   A.   IT'S A CHECK FROM GCF INVESTMENT IN MAY OF 2006 TO

22   MONEY DOTS FOR $5,000, AND IT'S SIGNED BY BETH PINA.

23   Q.   OKAY.  WHAT IS THE GCF INVESTMENT TRUST ACCOUNT?

24   A.   THAT IS THE FIRST INVESTMENT COMPANY THAT WAS OPENED BY

25   BARBRA ALEXANDER AS A HARD MONEY LENDING INSTITUTE.

```
 1        Q.   GO TO PAGE 190, PLEASE, CHECK NUMBER 3471.  IF YOU COULD

 2     PULL UP THE FRONT AND BACK OF THE CHECK.

 3          OKAY.  WHAT IS THIS?

 4        A.   THIS IS ALSO A CHECK WRITTEN TO MONEY DOTS FROM GCF

 5     INVESTMENT IN JUNE OF 2006 SIGNED BY BARBRA ALEXANDER FOR

 6     $10,000.

 7        Q.   DID YOU PREPARE THIS CHECK FOR EITHER SIGNATURE OR

 8     DEPOSIT?

 9        A.   IN JUNE OF 2006, IT POSSIBLY WAS BETH PINA THAT WOULD HAVE

10     PREPARED THIS CHECK FOR SIGNATURE.

11        Q.   DO YOU SEE ANY HANDWRITING ON THE --

12        A.   ON THE BACK SIDE?

13        Q.   YEAH.

14        A.   THE ACCOUNT NUMBER?  I MAY -- I MAY HAVE BEEN THE ONE WHO

15     MADE THE DEPOSIT.  I CAN BARELY MAKE OUT THAT SIGNATURE ON THE

16     BACK HERE.

17        Q.   OKAY.

18        A.   OR ACCOUNT NUMBER.

19        Q.   WHAT ABOUT PAGE NUMBER 202, CHECK NUMBER 3699?

20        A.   THAT WAS A CHECK IN DECEMBER OF 2006.  IT WAS WRITTEN OFF

21     OF GCF INVESTMENT FOR $10,000 TO MONEY DOTS.

22        Q.   OKAY.  DID YOU PREPARE THIS CHECK FOR SIGNATURE?

23        A.   I'M GOING TO SAY THAT, YES, I PROBABLY DID.

24        Q.   WHY DO YOU SAY THAT?

25        A.   BETH PINA WAS NO LONGER IN THE MONTEREY OFFICE, SO I WAS
```

```
1    THE PERSON AT THAT TIME WHO WAS PREPARING CHECKS FOR DEPOSIT.
2    Q.   THERE'S SOME SCRIBBLE ON THE TOP.  IS THAT -- DO YOU
3    KNOW -- ABOVE THE WORD MONEY DOTS?
4    A.   NO.  I THINK THAT MAY HAVE BEEN SOMETHING FROM THE BANK
5    ITSELF.
6    Q.   OKAY.  PAGE 203.
7        AND WOULD YOU TAKE A MOMENT TO LOOK AT THESE DEPOSITS, AND
8    COULD YOU PLEASE DESCRIBE THE ENTITIES THAT ARE MAKING
9    DEPOSITS.
10   A.   THIS WAS IN JANUARY OF 2007, GOLD COAST FINANCIAL WROTE A
11   CHECK TO MONEY DOTS FOR $1,000, AND IT WAS SIGNED BY
12   BARBRA ALEXANDER.
13       AND THAT IS MY HANDWRITING ON THE DEPOSIT SLIP, SO I MADE
14   THAT DEPOSIT.
15   Q.   OKAY.  AND PAGE 205.
16   A.   SO ON JANUARY 10TH, THE SAME YEAR, 2007, A&P PROPERTIES,
17   IT WAS HANDWRITTEN CHECK TO MONEY DOTS -- THAT IS MY
18   HANDWRITING -- FOR $650, AND IT HAS BEEN SIGNED BY
19   BARBRA ALEXANDER FOR DEPOSIT.
20   Q.   AND PAGE 207, PLEASE.  DO YOU SEE THE CHECK, 3733?
21   A.   YES, I DO.
22   Q.   OKAY.
23   A.   IT'S WRITTEN ON GCF INVESTMENT, IT IS IN JANUARY OF 2007
24   FOR THE AMOUNT OF $5,000 TO MONEY DOTS, AND IT'S SIGNED BY
25   BETH PINA.
```

1    Q.   OKAY.  SO THESE ARE THE DEPOSITS FROM JANUARY OF 2007.

2         I'D LIKE TO GO TO JANUARY OF 2008, STARTING AT PAGE 249.

3    A.   IN JANUARY, THE 2ND, IN 2008, A CHECK FROM GCF INVESTMENT,

4    LLC, TO MONEY DOTS FOR $1,000, AND IT'S SIGNED BY

5    BARBRA ALEXANDER.

6    Q.   OKAY.  AND THE NEXT PAGE?

7    A.   ON THE 9TH OF JANUARY, 2008, A CHECK FROM GCF INVESTMENT,

8    LLC, $2,000 TO MONEY DOTS, AND IT'S SIGNED BY BARBRA ALEXANDER.

9    Q.   DID YOU PREPARE --

10   A.   YES, THAT IS MY HANDWRITING ON THE DEPOSIT SLIP.

11   Q.   OKAY.  WHOSE SIGNATURE IS IT?

12   A.   IT IS BARBRA ALEXANDER'S SIGNATURE.

13   Q.   251, PLEASE.

14   A.   ON JANUARY THE 16TH OF 2008, A CHECK FROM APS PROPERTIES

15   FOR $2,000 TO MONEY DOTS, AND IT IS SIGNED BY BETH PINA.

16   Q.   AND 253, PLEASE.

17   A.   ON THE 29TH OF JANUARY, 2008, A CHECK FROM A&P PROPERTIES

18   IN THE AMOUNT OF $6,000.  THE CHECK IS SIGNED BY

19   BARBRA ALEXANDER AND IT'S MADE OUT TO MONEY DOTS.

20   Q.   AND DID YOU PREPARE THIS CHECK FOR DEPOSIT OR SIGNATURE?

21   A.   YES, I DID.

22   Q.   OKAY.  LET'S MOVE FORWARD A YEAR TO JANUARY OF 2009,

23   STARTING AT PAGE 294, AND MAYBE JUST THE BOTTOM TWO, PLEASE.

24   A.   I CANNOT READ THE DAY ON THAT CHECK, 2175.

25        IT IS JANUARY THE 8TH OF 2009, IT'S WRITTEN OFF OF

CAGLE DIRECT

1      APS FUNDING, THE AMOUNT OF $1700 IS WRITTEN TO MONEY DOTS, AND

2      IT'S BEEN SIGNED BY BARBRA ALEXANDER.

3      Q.    OKAY.  NEXT PAGE, PLEASE, 295.

4      A.    JANUARY THE 16TH OF 2009, A CHECK FROM APS FUNDING, INC.

5      FOR THE AMOUNT OF $3,700, AND IT'S SIGNED BY BETH PINA.

6      Q.    AND THE SOURCE OF FUNDS IS?

7      A.    APS FUNDING.

8      Q.    THE PATTERN OF DEPOSITS THAT WE'VE GONE THROUGH, WAS THAT

9      CONSISTENT WITH WHAT YOU OBSERVED DURING THE COURSE OF YOUR

10     EMPLOYMENT?

11     A.    YES.

12     Q.    WERE THERE EVER SOURCES OF DEPOSITS INTO MONEY DOTS THAT

13     DID NOT COME FROM AN ALEXANDER ENTITY?

14     A.    NO.

15     Q.    AT LEAST THAT YOU DON'T RECALL?

16     A.    NOT THAT I RECALL.

17     Q.    OKAY.  FROM YOUR OBSERVATIONS, WAS MONEY DOTS MAKING ANY

18     MONEY?

19     A.    NO.

20     Q.    WAS MONEY DOTS SELF-SUFFICIENT?

21     A.    NO, IT WAS NOT.

22     Q.    WHAT MONEY WAS BEING USED TO SUPPORT MONEY DOTS?

23     A.    INVESTOR MONEY.

24     Q.    OKAY.  LET'S GO TO CHECK -- I WANT TO GO THROUGH SOME

25     CHECKS WITH YOU.

CAGLE DIRECT

```
 1            PAGE 323, STARTING WITH CHECK NUMBER 1085, WHAT'S THIS?
 2       A.   IT'S A CHECK DATED DECEMBER 17TH OF 2003 FOR $3400, AND
 3       BARBRA ALEXANDER SIGNED THAT CHECK.
 4            MR. LEEMING:  OBJECTION.  RELEVANCE, 2003.
 5            THE WITNESS:  I WAS NOT EMPLOYED AT THAT TIME WITH
 6       MONEY DOTS.
 7            MR. LEEMING:  NO FOUNDATION.
 8            THE COURT:  SUSTAINED.
 9       BY MR. KALEBA:
10       Q.   LET'S GO TO PAGE 338.  CAN YOU PULL UP CHECK NUMBER 3044.
11            WHAT IS THIS?
12       A.   IT IS A CHECK FOR $4,740 TO INDEPENDENT RADIO SERVICES,
13       IT'S WRITTEN ON A MONEY DOTS CHECK, NUMBER 3044, IT'S SIGNED BY
14       BETH PINA.
15       Q.   DID YOU PREPARE THIS CHECK FOR SIGNATURE?
16       A.   NO, I DON'T BELIEVE I DID.
17       Q.   OKAY.  DO YOU KNOW WHAT INDEPENDENT RADIO SERVICES IS?
18       A.   THAT WAS WHERE THE RADIO PROGRAM -- I BELIEVE IT WAS
19       STREAMED THROUGH THAT INDEPENDENT RADIO SERVICES.
20       Q.   OKAY.  PAGE 341, PLEASE, CHECK NUMBER 3068.
21       A.   THIS WAS A CHECK WRITTEN FOR $4,740 IN JUNE, THE 23RD,
22       2008, TO INDEPENDENT RADIO SERVICES, AND IT WAS SIGNED BY
23       BARBRA ALEXANDER.
24       Q.   PAGE 343, CHECK NUMBER 3089.
25       A.   THIS WOULD HAVE BEEN AUGUST 15, 2006, INDEPENDENT RADIO
```

1    SERVICE WAS WHO IT WAS WRITTEN TO, FOR $4,740, AND IT WAS

2    SIGNED BY BARBRA ALEXANDER.

3    Q.   DO YOU KNOW IF YOU PREPARED THIS CHECK FOR SIGNATURE?

4    A.   I WOULD SAY YES.

5    Q.   PAGE 344, PLEASE, CHECK NUMBER 3097.

6         WHAT IS THIS?

7    A.   IT'S A CHECK WRITTEN TO SIXTY FIVE DEGREES FOR $12,000.

8    Q.   AND IT'S SIGNED BY?

9    A.   BARBRA ALEXANDER.

10   Q.   AND DO YOU RECALL PREPARING THIS CHECK?

11   A.   I WOULD HAVE BEEN THE PERSON WHO WOULD HAVE PRINTED THIS

12   CHECK, YES.

13   Q.   OKAY.  WHEN YOU SAY "PRINTED THIS CHECK," WHAT DO YOU MEAN

14   BY THAT?

15   A.   I WOULD HAVE BEEN THE PERSON SITTING THERE IN THE QUICK

16   BOOKS SOFTWARE PROGRAM -- IT WOULD HAVE BEEN BETH PINA OR

17   MYSELF.  AT THIS TIME, THOUGH, I WAS WORKING PART-TIME FOR

18   BARBRA ALEXANDER, SO I'M GOING TO SAY THAT BETH PREPARED THE

19   CHECK AND THEN I WAS ASKED TO PRINT IT FOR BARBRA'S SIGNATURE.

20   Q.   THE QUICK BOOKS PROGRAM, DOES IT LET A BUSINESS PRINT ITS

21   OWN CHECKS?

22   A.   YES.

23   Q.   OKAY.  DID THE BUSINESS HAVE, LIKE, A CHECKBOOK, LIKE A

24   PERSONAL CHECKBOOK THAT YOU WOULD WRITE CHECKS OUT OF AND TEAR

25   THEM OUT?

CAGLE DIRECT

```
1    A.   YES, THEY WROTE THOSE AS WELL.

2         BUT THIS IS A CHECK THAT WAS PRINTED FROM THE COMPUTER.

3    Q.   OUT OF QUICK BOOKS?

4    A.   OUT OF QUICK BOOKS, YES, SIR.

5    Q.   PAGE -- WELL, DO YOU KNOW WHAT SIXTY FIVE DEGREES IS?

6    A.   NO, I DON'T RECALL WHAT SIXTY FIVE DEGREES IS.

7    Q.   OKAY.  PAGE 366, CHECK NUMBER 3292.

8    A.   THIS WAS A CHECK WRITTEN IN DECEMBER OF 2007 TO AIR TIME

9    MEDIA FOR $5,340, AND IT WAS SIGNED BY BARBRA ALEXANDER.

10   Q.   WERE YOU STILL EMPLOYED WITH BARBRA AT THIS TIME?

11   A.   YES, I WAS.

12   Q.   DID YOU PREPARE THIS CHECK?

13   A.   I'M CERTAIN THAT I DID.

14   Q.   PAGE 360 -- WELL, DO YOU KNOW WHAT AIR TIME MEDIA WAS?

15   A.   IT WAS ANOTHER RADIO WHERE SHE DID HER -- HOW MONEY DOTS

16   WAS BROADCAST.  SO IT WAS A -- SOME -- WHERE THE PROGRAM WAS

17   STREAMED FROM THERE.

18   Q.   PAGE 369, PLEASE, CHECK NUMBER 3312.

19   A.   THIS WAS ON JANUARY 29TH OF 2008, AGAIN, A CHECK TO AIR

20   TIME MEDIA FOR $5,340, AND IT WAS SIGNED BY BARBRA ALEXANDER.

21   Q.   DID YOU PREPARE THIS CHECK FOR SIGNATURE?

22   A.   I'M SURE I DID.

23   Q.   PAGE 379, CHECK NUMBER 3408.

24   A.   THIS WAS ON AUGUST THE 20TH OF 2008 FOR BUSINESS TALK

25   RADIO FOR $3400, AND IT WAS SIGNED BY BARBRA ALEXANDER.
```

CAGLE DIRECT

```
1    Q.   DID YOU PREPARE THIS CHECK?

2    A.   I'M SURE I DID.

3    Q.   WHAT IS BUSINESS TALK RADIO?

4    A.   IT'S ANOTHER ENTITY FOR MONEY DOTS, HOW THE PROGRAM WAS

5    STREAMED ON THE RADIO WAVES.

6    Q.   OKAY.  IF WE COULD GO UP TO CHECK NUMBER 3411.

7         WHAT'S THIS?

8    A.   CLEAR CHANNEL BROADCASTING, A CHECK ON AUGUST THE 20TH OF

9    2008 FOR $1,250, AND IT WAS SIGNED BY BARBRA ALEXANDER.

10   Q.   DID YOU PREPARE THIS CHECK?

11   A.   I'M SURE I DID.

12   Q.   WHAT IS CLEAR CHANNEL BROADCASTING?

13   A.   I BELIEVE CLEAR CHANNEL BROADCASTING IS A LOCAL

14   BROADCASTING COMPANY THAT THE RADIO PROGRAM WAS AIRED ON.

15             THE COURT:  LET'S JUST TAKE ONE MINUTE FOR EVERYONE

16   JUST TO STAND, IF YOU WANT TO SHAKE AND STRETCH, I'LL JUST GIVE

17   EVERYONE A MINUTE TO DO THAT.

18        I KNOW AFTER LUNCH IT CAN BE A LITTLE BIT DIFFICULT TO SIT

19   STILL, SO IF YOU WANT TO JUST --

20        YOU'RE WELCOME TO AS WELL.

21             THE WITNESS:  CAN I GET SOME WATER?

22             THE COURT:  YES.  IF ANYONE WANTS TO GET SOME WATER,

23   YOU'RE WELCOME TO DO THAT.  AND AS I SAID TO THE JURORS, IF YOU

24   WANT TO BRING A COKE OUT HERE WHILE YOU'RE OBSERVING THE TRIAL,

25   YOU'RE WELCOME TO DO THAT.
```

```
 1              (PAUSE IN PROCEEDINGS.)

 2                   THE COURT:  PLEASE PROCEED.

 3                   MR. KALEBA:  THANK YOU, YOUR HONOR.

 4      Q.   STAYING ON THIS PAGE, CHECK NUMBER 3583 -- SORRY.  PAGE

 5      393.

 6           WHAT IS THIS?

 7      A.   THIS IS A CHECK WRITTEN ON THE 31ST OF JULY, 2009.  IT'S

 8      FROM THE MONEY DOTS ACCOUNT TO BUSINESS TALK RADIO FOR $4,250,

 9      AND IT IS SIGNED BY BARBRA ALEXANDER.

10      Q.   OKAY.  I'D LIKE TO MOVE FROM THE MONEY DOTS ACCOUNT TO A

11      NEW ACCOUNT.

12           IF WE CAN PULL UP EXHIBIT NUMBER 204.

13           CAN YOU IDENTIFY THE ACCOUNT NAME HERE?

14      A.   A&P PROPERTIES, INC. AT 528 ABREGO, SUITE 202 IN MONTEREY,

15      CALIFORNIA.

16      Q.   AND WAS THE 528 ABREGO STREET A PHYSICAL BUSINESS LOCATION

17      OR --

18      A.   NOT FOR A&P PROPERTIES.  IT JUST WAS A LOCATION WHERE THE

19      MAIL WAS PICKED UP.

20      Q.   OKAY.  WHAT WAS THE PRIMARY BUSINESS PURPOSE OF THIS

21      ACCOUNT?

22      A.   THIS WAS, AGAIN, BARBRA ALEXANDER AND BETH PINA.  THEY

23      PURCHASED HOMES FOR REHAB.

24      Q.   OKAY.  IF WE COULD PULL UP THE SECOND HALF OF THE

25      DOCUMENT, PLEASE.
```

```
 1              THE COURT:  THIS ONE WASN'T PREVIOUSLY ADMITTED.

 2      WERE YOU MEANING TO ADMIT IT?

 3              MR. KALEBA:  204 WAS NOT?

 4              THE COURT:  NO.  I HAVE 200, 203, 5, 6, 7, 8, AND 14.

 5              MR. KALEBA:  YES, YOUR HONOR.  I MADE A MISTAKE AND

 6      MEANT 204, NOT 203.

 7              THE COURT:  OH, OKAY.

 8          SO IS THERE ANY OBJECTION, MR. LEEMING?

 9              MR. LEEMING:  NO, YOUR HONOR.

10              THE COURT:  ALL RIGHT.  SO 204 IS ADMITTED.

11          (PLAINTIFF'S EXHIBIT 204 WAS ADMITTED IN EVIDENCE.)

12              THE COURT:  DO YOU WANT TO -- OH, WE WERE AT 203.

13      WASN'T THAT THE FIRST NATIONAL BANK RECORDS?

14              MR. LEEMING:  I THINK THE COURT IS CORRECT.

15              THE COURT:  I'M SORRY.  I COULDN'T HEAR THAT.

16              MR. LEEMING:  I'M SORRY.  I BELIEVE THE COURT IS

17      CORRECT.

18              MR. KALEBA:  YOU'RE CORRECT.  WE DID 203.  I OMITTED

19      204.  IT SHOULD HAVE BEEN INCLUDED.

20              THE COURT:  OKAY.  SO THERE'S NOT ANY THAT WE'VE

21      ADMITTED THAT SHOULD NOT BE ADMITTED?

22              MR. KALEBA:  THAT'S CORRECT.

23              THE COURT:  ALL RIGHT.  GO AHEAD WITH 204, PLEASE.

24      BY MR. KALEBA:

25      Q.   COULD YOU IDENTIFY THE ACCOUNT HOLDERS TO THIS ACCOUNT?
```

```
 1        A.   YES.  THEY ARE BETH PINA AND BARBRA ALEXANDER.

 2        Q.   GO TO PAGE 77.  ARE THESE COPIES OF DEPOSITS INTO THE

 3   A&P PROPERTIES ACCOUNT?

 4        A.   YES.  IT'S WRITTEN OFF OF GCF INVESTMENT, LLC ACCOUNT.

 5        Q.   OKAY.  DID YOU PREPARE THIS CHECK FOR SIGNATURE?

 6        A.   YES.

 7        Q.   DID YOU PREPARE IT FOR DEPOSIT?

 8        A.   YES.

 9        Q.   AND WHO SIGNED THIS CHECK?

10        A.   BARBRA ALEXANDER SIGNED THIS CHECK.

11        Q.   NEXT PAGE.  AND WHAT IS THIS?

12        A.   THIS IS A DEPOSIT INTO A&P PROPERTIES FOR THE AMOUNT OF

13   $600 FROM THE GCF INVESTMENT, LLC, AND IT'S SIGNED BY

14   BARBRA ALEXANDER.

15        Q.   OKAY.  PAGE 125, PLEASE.  WHAT IS THIS?

16        A.   THIS IS A CHECK FOR $15,000 TO A&P PROPERTIES FROM GCF

17   INVESTMENT, LLC, AND IT'S SIGNED BY BARBRA ALEXANDER.

18        Q.   DID YOU PREPARE THESE CHECKS FOR SIGNATURE?

19        A.   YES.

20        Q.   DID YOU PREPARE IT FOR DEPOSIT?

21        A.   YES.

22        Q.   AND THIS IS -- THE DATE OF THIS DEPOSIT IS?

23        A.   APRIL THE 8TH OF 2008.

24        Q.   OKAY.  NEXT PAGE, PLEASE.  IS THIS ANOTHER DEPOSIT?

25        A.   YES, ON APRIL THE 9TH OF 2008 FOR $33,500 FROM GCF
```

CAGLE DIRECT

1      INVESTMENT, LLC, TO A&P PROPERTIES.  IT'S BEEN SIGNED BY

2      BARBRA ALEXANDER.

3      Q.   DID YOU PREPARE THIS CHECK FOR SIGNATURE?

4      A.   YES.

5      Q.   DID YOU PREPARE THIS CHECK FOR DEPOSIT?

6      A.   YES.

7      Q.   THE NEXT PAGE, PLEASE.  WHAT IS THIS?

8      A.   THIS IS A DEPOSIT ON THE 11TH OF APRIL OF 2008 FOR $5,500

9      WRITTEN OFF THE GCF INVESTMENT ACCOUNT TO A&P PROPERTIES, AND

10     IT'S SIGNED BY BARBRA ALEXANDER.

11     Q.   NEXT PAGE.  WHAT IS THIS?

12     A.   THIS IS A DEPOSIT FOR A&P PROPERTIES WRITTEN ON APRIL THE

13     16TH OF 2008 FROM GCF INVESTMENT, LLC, TO A&P PROPERTIES, AND

14     IT IS SIGNED BY BARBRA ALEXANDER.

15     Q.   DID YOU PREPARE THIS CHECK FOR SIGNATURE AND DEPOSIT?

16     A.   YES.

17     Q.   NEXT PAGE, PLEASE.  WHAT IS THIS?

18     A.   APRIL 17TH OF 2008, A CHECK FROM GCF INVESTMENT, LLC, TO

19     A&P PROPERTIES FOR $1,000, AND IT'S BEEN SIGNED BY

20     BARBRA ALEXANDER.

21     Q.   NEXT PAGE.  WHAT IS THIS?

22     A.   THIS IS A DEPOSIT TO A&P PROPERTIES FROM GCF INVESTMENT,

23     LLC, FOR $15,000 ON APRIL THE 23RD OF 2008, AND IT'S SIGNED BY

24     BARBRA ALEXANDER.

25     Q.   DID YOU PREPARE THIS FOR SIGNATURE AND DEPOSIT?

CAGLE - DIRECT

```
 1     A.   YES.

 2     Q.   NEXT PAGE, PLEASE.

 3             MR. LEEMING:  COUNSEL, COULD YOU JUST GIVE ME THE

 4     PAGE NUMBER?  I THINK I MAY HAVE GOTTEN OFF.

 5             MR. KALEBA:  PAGE 131.

 6             MR. LEEMING:  THANK YOU.

 7     BY MR. KALEBA:

 8     Q.   WHAT IS THIS?

 9     A.   THIS IS A CHECK DATED APRIL 25TH OF 2008 FOR $1,000 TO

10     A&P PROPERTIES, INC. FROM GCF INVESTMENT, LLC, AND IT'S SIGNED

11     BY BARBRA ALEXANDER.

12     Q.   AND THE LAST ONE, THE NEXT PAGE, IS 132.  WHAT IS THIS?

13     A.   IT IS ANOTHER DEPOSIT FOR A&P PROPERTIES WRITTEN ON

14     APRIL 28TH OF 2008 FOR $45,000 FOR GCF INVESTMENT, LLC, AND

15     IT'S SIGNED BY BETH PINA.

16     Q.   OKAY.  WE'VE JUST GONE THROUGH ALL THE DEPOSITS IN APRIL

17     OF 2008 INTO THE A&P PROPERTIES ACCOUNT?

18     A.   YES.

19     Q.   THE ONLY DEPOSITOR WAS GCF INVESTMENTS?

20     A.   YES.

21     Q.   WAS THAT TYPICAL?

22     A.   YES.

23     Q.   OKAY.  PAGE 176.  LET'S START WITH CHECK NUMBER 2021 AT

24     THE VERY TOP.

25             AND IF YOU COULD GET THE WHOLE -- I'M SORRY.  JUST THAT.
```

1           WHAT IS THIS?

2      A.   THIS IS A CHECK TO BARBRA ALEXANDER FOR $2,231.50, AND

3      IT'S WRITTEN OFF THE A&P PROPERTIES, INC. ACCOUNT, AND BARBRA

4      SIGNED IT.

5      Q.   DID YOU PREPARE THIS CHECK?

6      A.   YES.

7      Q.   WHAT ABOUT THE ONE BELOW IT, 2012?  WHAT IS THIS?

8      A.   THIS IS A CHECK PAID TO BETH PINA ON THE A&P PROPERTIES,

9      INC. ACCOUNT FOR $3,382.50, AND IT'S BEEN SIGNED BY

10     BARBRA ALEXANDER.

11     Q.   DID YOU PREPARE THIS CHECK?

12     A.   YES.

13     Q.   PAGE 178, PLEASE, CHECK NUMBER 2029.  WHAT IS THIS?

14     A.   THIS IS A CHECK TO BARBRA ALEXANDER FOR $3,000 FROM

15     A&P PROPERTIES, INC. IN JULY OF 2007.

16     Q.   DID YOU PREPARE THIS CHECK?

17     A.   YES.

18     Q.   LET'S GO TO THE ONE BELOW IT, 2028.  WHAT IS THIS?

19     A.   THIS IS A CHECK FROM A&P PROPERTIES, INC. ON JULY 12TH OF

20     2007 FOR $6,000 TO BETH PINA, AND BARBRA ALEXANDER SIGNED IT.

21     Q.   DID YOU PREPARE THIS CHECK?

22     A.   YES.

23     Q.   PAGE 2020 -- THE CHECK NUMBER 2027, PLEASE.  WHAT IS THIS?

24     A.   THIS IS A CHECK WRITTEN ON A&P PROPERTIES, INC. FOR THE

25     AMOUNT OF $8,557.61, AND IT'S TO PAY AMERICAN EXPRESS, AND IT

1      IS SIGNED BY BARBRA ALEXANDER.

2      Q.   DID THE COMPANY HAVE A CREDIT CARD OR AN ACCOUNT WITH

3      AMERICAN EXPRESS?

4      A.   YES.

5      Q.   OKAY.  DO YOU KNOW WHO THE SIGNATURES ON THE ACCOUNT WERE?

6      A.   BARBRA ALEXANDER AND BETH PINA.

7      Q.   DID ANYBODY ELSE HAVE AUTHORIZATION OR A CARD TO USE THAT

8      CARD?

9      A.   NOT THAT I'M AWARE OF.

10     Q.   DID YOU?

11     A.   NO.

12     Q.   DID MR. SWANSON?

13     A.   I DON'T RECALL MR. SWANSON BEING ON THAT ACCOUNT.

14     Q.   AND DID YOU PREPARE CHECKS PAYABLE TO AMERICAN EXPRESS?

15     A.   YES.  THAT WAS PART OF MY JOB WAS AS A PAYABLE.

16     Q.   IF AN AMERICAN EXPRESS BILL CAME IN --

17     A.   YES, I WOULD GO THROUGH IT WITH BARBRA ALEXANDER.

18     Q.   AND PREPARE THE CHECK?

19     A.   YES.

20     Q.   PAGE 2036.  WHAT'S THIS?

21     A.   THIS IS A CHECK FOR $3,000 DATED AUGUST THE 2ND OF 2007

22     WRITTEN ON A&P PROPERTIES, INC. ACCOUNT TO BARBRA ALEXANDER,

23     AND IT'S BEEN SIGNED BY BARBRA.

24     Q.   PAGE 183, CHECK NUMBER 2072.

25     A.   THIS IS A CHECK FROM A&P PROPERTIES, INC. TO AMERICAN

1    EXPRESS ON JANUARY THE 2ND OF 2008 FOR THE AMOUNT OF $3,239.65,

2    AND IT'S SIGNED BY BARBRA ALEXANDER.

3    Q.    OKAY.  CHECK NUMBER 2074, PLEASE.

4    A.    THIS IS A CHECK DATED JANUARY 16TH OF 2008 FROM A&P

5    PROPERTIES, INC. TO MONEY DOTS FOR $2,000, AND IT'S SIGNED BY

6    BETH PINA.

7    Q.    PAGE 186, PLEASE, CHECK NUMBER 2095.  CAN YOU READ THAT?

8    A.    UM-HUM.

9    Q.    WHAT IS IT?

10   A.    IT IS A CHECK FROM A&P PROPERTIES, INC. TO LINDA M. CAGLE

11   DATED MARCH -- OR THAT COULD BE FEBRUARY, FEBRUARY 28TH OF 2008

12   FOR THE AMOUNT OF $1,5244.

13   Q.    IS THIS A CHECK TO YOU?

14   A.    YES, IT IS.

15   Q.    WHAT IS THIS?

16   A.    THIS IS MY PAYROLL CHECK.

17   Q.    CHECK NUMBER 2098.  WHAT IS THIS?

18   A.    THIS IS A CHECK FROM A&P PROPERTIES, INC. ON THE 28TH OF

19   FEBRUARY OF 2008 TO MONEY DOTS FOR $8,000, AND IT'S SIGNED BY

20   BETH PINA.

21   Q.    DID YOU PREPARE THIS CHECK?

22   A.    I'M GOING TO SAY YES.

23   Q.    CHECK NUMBER 2096.  WHAT IS THIS?

24   A.    THIS IS A CHECK DATED FEBRUARY 28TH, 2008, FOR $10,000

25   FROM A&P PROPERTIES TO MICHAEL SWANSON, AND IT'S BEEN SIGNED BY

1    BETH PINA.

2    Q.    OKAY.  PAGE 187, CHECK NUMBER 2109.  WHAT IS THIS?

3    A.    A CHECK DRAWN ON A&P PROPERTIES, INC. ON MARCH 6TH OF 2008

4    FOR $2,625, AND IT'S WRITTEN TO JACQUELINE LAMBERT.

5    Q.    WHO SIGNED THIS CHECK?

6    A.    BARBRA ALEXANDER SIGNED THIS CHECK.

7    Q.    WHAT IS JACQUELINE LAMBERT?

8    A.    THAT WAS AN EMPLOYEE WHO CAME ON BOARD IN MARCH OF 2008 TO

9    WORK WITH BARBRA.

10   Q.    PAGE 190, PLEASE, CHECK NUMBER 2138.  WHAT IS THIS?

11   A.    THIS IS A CHECK FROM A&P PROPERTIES, INC. ON APRIL THE 9TH

12   OF 2008 FOR $10,500 WRITTEN TO MONEY DOTS, AND IT'S BEEN SIGNED

13   BY BARBRA ALEXANDER.

14   Q.    PAGE 191, PLEASE, CHECK NUMBER 2134.  WHAT IS THIS?

15   A.    THIS IS A CHECK FROM A&P PROPERTIES, INC. ON APRIL THE 9TH

16   OF 2008.  IT IS WRITTEN TO FINN & COHEN FOR $2,740, AND IT IS

17   SIGNED BY BARBRA.

18   Q.    AND WHAT IS FINN & COHEN?

19   A.    THAT IS THEIR ACCOUNTANTS.

20   Q.    AND THE CHECK BELOW IT, 2142, WHAT IS THIS?

21   A.    THIS IS A CHECK FOR $3,000 MADE OUT TO BARBRA ALEXANDER,

22   SIGNED BY BARBRA ALEXANDER, FROM A&P PROPERTIES, INC. ACCOUNT

23   ON THE 14TH OF APRIL OF 2008.

24   Q.    AND THE CHECK BELOW THAT, 2141?

25   A.    ON APRIL THE 11TH OF 2008, IT'S A CHECK FOR $10,000

CAGLE DIRECT

1    WRITTEN TO BETH PINA FROM A&P PROPERTIES, INC., AND IT'S SIGNED

2    BY BARBRA ALEXANDER.

3    Q.   AND THE CHECK BELOW THAT, 2139, PLEASE.

4    A.   A CHECK WRITTEN ON APRIL THE 9TH OF 2008 TO AMERICAN

5    EXPRESS FOR $11,351.29 FROM A&P PROPERTIES, INC. ACCOUNT, AND

6    IT'S SIGNED BY BARBRA ALEXANDER.

7    Q.   AND DID YOU PREPARE THIS CHECK?

8    A.   YES.

9    Q.   PAGE 215, PLEASE, CHECK NUMBER 2328.

10   A.   THIS IS A CHECK WRITTEN ON SEPTEMBER 15TH OF 2008 FOR

11   $10,000 TO BARBRA ALEXANDER FROM A&P PROPERTIES, INC., AND

12   BARBRA ALEXANDER HAS SIGNED THIS CHECK.

13   Q.   CHECK NUMBER 2327.

14   A.   A CHECK WRITTEN ON SEPTEMBER THE 15TH OF 2008 FOR $10,000

15   TO MICHAEL SWANSON FROM A&P PROPERTIES, INC. ACCOUNT, AND IT'S

16   BEEN SIGNED BY BARBRA ALEXANDER.

17   Q.   CHECK NUMBER 2329.

18   A.   SEPTEMBER 15TH OF 2008, A CHECK FROM A&P PROPERTIES, INC.

19   TO BETH PINA FOR $5,000, AND IT'S BEEN SIGNED BY

20   BARBRA ALEXANDER.

21   Q.   AND THE LAST PAGE, PLEASE, OF 2016, CHECK NUMBER 2331.

22   A.   SEPTEMBER 17TH OF 2008 FROM A&P PROPERTIES, INC., CHECK

23   WRITTEN TO MONEY DOTS FOR $10,000, AND IT WAS SIGNED BY

24   BARBRA ALEXANDER.

25   Q.   DID YOU PREPARE THIS CHECK?

```
1        A.    YES.

2        Q.    IF YOU COULD PULL UP THE FULL SCREEN.

3              ACCORDING TO THE BANK RECORDS, THE LAST CHECK WAS WRITTEN

4     ON OCTOBER 7TH OF 2008, IF YOU CAN SEE THAT.  IT'S THE TOP

5     CORNER.

6              DO YOU KNOW WHY THERE WERE NO FURTHER CHECKS DRAWN FROM

7     THIS ACCOUNT AFTER OCTOBER OF 2008?

8        A.    I BELIEVE AT THAT POINT MICHAEL SWANSON CAME ON BOARD AND

9     IT WAS NOW A& -- APS FUNDING AND NOT A&P PROPERTIES.

10       Q.    OKAY.  LET'S GO TO EXHIBIT NUMBER 205, WHICH I BELIEVE IS

11    ADMITTED.

12             WHAT IS THIS ACCOUNT?

13       A.    THIS IS GCF INVESTMENT, LLC.

14       Q.    OKAY.  AND WHO ARE THE ACCOUNT HOLDERS ON THIS ACCOUNT?

15       A.    BARBRA ALEXANDER AND BETH PINA.

16       Q.    SO WHO HAD SIGNATURE AUTHORITY TO ACCESS THE MONEY IN THIS

17    ACCOUNT?

18       A.    BARBRA AND BETH.

19       Q.    WHAT WAS THE PRIMARY BUSINESS PURPOSE OF THIS ACCOUNT?

20       A.    THIS WAS A -- GCF INVESTMENT, LLC, WAS THE INVESTMENT FOR

21    HARD MONEY LENDING.

22             THE COURT:  I'LL GO AHEAD AND STOP YOU ONE MOMENT.

23             DOES ANYONE NEED COFFEE OR ANYTHING?  I'M CONCERNED THAT

24    FOLKS -- AT LEAST SOMEBODY IS LOOKING VERY SLEEPY AND I NEED

25    YOU TO PAY ATTENTION.  SO DO YOU WANT TO GET ANYTHING TO DRINK?
```

CAGLE DIRECT

```
 1        I'LL TAKE A BREAK RIGHT NOW IF YOU WANT TO GET A DRINK FROM THE

 2        REFRIGERATOR IN THE JURY ROOM OR COLD WATER.

 3             OKAY.  I DO NEED PEOPLE TO STAY ALERT.

 4             SO GO AHEAD, PLEASE.  WE'LL TAKE A BREAK AT 2:15.

 5             MR. KALEBA:  THANK YOU, YOUR HONOR.

 6   Q.   LET'S GO TO PAGE 96.  DO YOU SEE A CHECK THAT'S IN THE

 7   MIDDLE FROM RAUL DE LA FLOR PAINTING?

 8   A.   YES.

 9   Q.   OKAY.  WHAT IS THIS?

10   A.   THIS IS A CHECK FROM RAUL DE LA FLOR PAINTING TO GCF

11   INVESTMENTS FOR $3800 ON FEBRUARY THE 5TH OF 2007, AND IN THE

12   NOTE IT'S REFERENCING NOTE 1 AND 2.  SO HE IS MAKING A PAYMENT

13   ON WHAT HE BORROWED FROM GCF INVESTMENT.

14   Q.   OKAY.  SO WHO IS RAUL DE LA FLOR?  ARE YOU FAMILIAR WITH

15   THAT?

16   A.   HE IS A BORROWER.

17   Q.   OF WHO?

18   A.   OF GCF INVESTMENTS.

19   Q.   OKAY.  WERE BORROWER PAYMENTS OF GCF INVESTMENTS MADE INTO

20   THIS ACCOUNT, THE DEPOSITS?

21   A.   AT THAT TIME, YES.

22   Q.   AND OTHER DEPOSITS WERE MADE FROM OTHER BORROWERS?

23   A.   YES, I BELIEVE SO.

24   Q.   OKAY.  AND WERE OTHER BORROWER PAYMENTS MADE INTO ANY

25   OTHER OF THE BANK ACCOUNTS, TO YOUR KNOWLEDGE?
```

```
 1      A.   MAYBE LATER ON THEY MIGHT -- MAY HAVE HAD A BORROWER IN

 2   GCF INVESTMENT, LLC, OR IN THE GREENLIGHT FUND, AND THOSE

 3   BORROWERS, THEIR PAYMENTS WOULD BE DEPOSITED TO THAT FUND.

 4      Q.   OKAY.  PAGE 98.  DO YOU SEE THE RYAN JORGENSEN CHECK?

 5      A.   YES.

 6      Q.   IS THIS ANOTHER BORROWER DEPOSIT?

 7      A.   YES, IT IS.

 8      Q.   ARE YOU FAMILIAR WITH RYAN JORGENSEN?

 9      A.   YES, I AM.

10      Q.   OKAY.  WOULD YOU MAKE -- WOULD YOU DEPOSIT CHECKS FROM

11   RYAN JORGENSEN INTO THE GCF INVESTMENT ACCOUNT?

12      A.   YES.

13      Q.   OKAY.  PAGE 151.  THERE'S A CHECK FROM CRAIG AND

14   MICHELLE BARTH.  DO YOU SEE THAT?

15      A.   YES, I DO.

16      Q.   OKAY.  WHAT IS THIS?

17      A.   THAT WOULD BE AN INVESTOR THAT INVESTED MONEY WITH GCF

18   INVESTMENT, LLC.

19      Q.   AND WOULD YOU HAVE PREPARED THIS CHECK FOR DEPOSIT?

20      A.   YES, IT APPEARS THAT IS MY HANDWRITING ON THAT DEPOSIT

21   SLIP.

22      Q.   WHAT PART OF THIS IS YOUR HANDWRITING?

23      A.   I RECOGNIZE THE DATE AT THE TOP OF THE DEPOSIT SLIP.

24      Q.   PAGE 283.  DO YOU SEE THE --

25      A.   THIS IS A CHECK FROM APS FUNDING COST ACCOUNT ON
```

CAGLE DIRECT

```
 1      MAY THE 5TH OF 2009 FOR $27,000 GOING INTO GCF INVESTMENT, LLC,

 2      AND IT HAS BEEN SIGNED BY BARBRA ALEXANDER.

 3      Q.   DID YOU PREPARE THIS CHECK FOR SIGNATURE OR DEPOSIT?

 4      A.   YES.

 5      Q.   AND IS THIS A RELATED COMPANY, APS FUNDING, TO

 6      GCF INVESTMENT, LLC?

 7      A.   I'M SORRY.  CAN YOU REPEAT THAT?

 8      Q.   ARE THESE TWO COMPANIES RELATED IN ANY WAY, APS --

 9      A.   YES.

10      Q.   WHAT'S THE RELATIONSHIP?

11      A.   APS FUNDING WAS THE MANAGING ENTITY OF GCF INVESTMENT,

12      LLC.

13      Q.   PAGE 2096, PLEASE.

14           MR. LEEMING:  1896?

15           MR. KALEBA:  2096.

16           MR. LEEMING:  2096.

17           MR. KALEBA:   SORRY.

18      Q.   AND LOOKING AT ALL THE CHECKS RIGHT NOW, CAN YOU MAKE OUT

19      THE SIGNATURES?

20      A.   YES.

21      Q.   OKAY.  WHOSE SIGNATURES DO YOU SEE?

22      A.   BETH PINA AND BARBRA ALEXANDER.

23      Q.   OKAY.  AND IF YOU COULD JUST PULL UP THE FIRST TWO CHECKS

24      AND DESCRIBE WHAT WE ARE -- WHAT WE'RE LOOKING AT.

25      A.   THESE CHECKS ARE WRITTEN FROM GCF INVESTMENT, LLC.  ONE IS
```

1    MADE OUT TO LONNIE CORY, AND THE OTHER ONE IS MADE OUT TO

2    JOANNA WUEFLING.

3    Q.   OKAY.  AND ARE THOSE NAMES FAMILIAR TO YOU AT ALL?

4    A.   YES.

5    Q.   OKAY.  WHO ARE THESE PEOPLE?

6    A.   THEY ARE INVESTORS.

7    Q.   OKAY.  AND THE NEXT TWO CHECKS, PLEASE.  WHAT ARE THESE?

8    A.   THESE ALSO ARE CHECKS FROM GCF INVESTMENT, LLC.  ONE IS

9    MADE OUT TO JIM AND ANITA CLAGHORN, AND THE OTHER TO

10   ANTHONY COSTANZA, AND THEY ARE ALSO INVESTORS.

11   Q.   OKAY.  PAGE 309, PLEASE, AND CHECK NUMBER 3090.  WHAT IS

12   THIS?

13   A.   THIS IS A CHECK FROM GCF INVESTMENT, LLC, AND IT'S MADE

14   OUT TO GCF INVESTMENT FOR $10,000, AND IT'S SIGNED BY

15   BARBRA ALEXANDER.

16   Q.   WHAT'S THE DIFFERENCE BETWEEN THOSE TWO GCF'S?

17   A.   THE FIRST ONE, GCF INVESTMENT, WAS THE FIRST INVESTMENT

18   COMPANY THAT I TALKED ABOUT EARLIER.

19        AND THEN THE LLC, AS I REFER TO IT, GCF INVESTMENT, LLC,

20   WAS THE SECOND, AND THEY ARE FUNDING ONE INVESTMENT COMPANY TO

21   THE OTHER INVESTMENT COMPANY.

22   Q.   OKAY.  THE NEXT CHECK, PLEASE, 3091.  3091.

23   A.   THIS IS A CHECK FROM GCF INVESTMENT, LLC, TO MONEY DOTS IN

24   JULY OF 2007 FOR $10,000, AND IT'S BEEN SIGNED BY

25   BARBRA ALEXANDER.

CAGLE DIRECT

1    Q.   OKAY.  I'D LIKE TO TURN NOW TO EXHIBIT 206.  WHAT IS THIS?

2    A.   THIS IS AN ACCOUNT FOR APS FUNDING, A TRUST ACCOUNT.

3    Q.   WHO ARE THE ACCOUNT HOLDERS FOR THIS ACCOUNT?

4    A.   IT WOULD HAVE BEEN BARBRA ALEXANDER, MIKE SWANSON, AND

5    BETH PINA.

6    Q.   AND WHO HAD SIGNATURE AUTHORITY FOR THIS ACCOUNT?

7    A.   BARBRA ALEXANDER AND BETH PINA.

8    Q.   WHAT WAS THE PRIMARY BUSINESS PURPOSE OF THIS ACCOUNT?

9    A.   ON THE APS TRUST ACCOUNT?

10   Q.   YES.

11   A.   THAT WOULD HAVE BEEN USED FOR CHECKS WRITTEN BACK TO THE

12   INVESTORS.  I'M -- I REALLY DON'T RECALL ALL THE -- SORRY.

13   Q.   OKAY.  CAN WE GO BACK TO THE TOP, PLEASE, FOR THE ADDRESS.

14        WHAT IS THE BUSINESS PHYSICAL ADDRESS LISTED AS?

15   A.   484B WASHINGTON STREET, NUMBER 350.

16   Q.   WAS THAT THE PHYSICAL ADDRESS OF APS FUNDING TRUST

17   ACCOUNT?

18   A.   NO.  THAT WAS WHERE THE P.O. BOX WAS LOCATED.

19   Q.   OKAY.  WHERE WAS THE PHYSICAL ADDRESS OF THE BUSINESS AT

20   THIS TIME?

21   A.   I DON'T SEE A DATE ON HERE.

22   Q.   NO.  I'M JUST ASKING YOU --

23   A.   IT WOULD HAVE BEEN 21 ALTA MESA CIRCLE.

24   Q.   IF WE CAN GO TO THE NEXT PAGE, THERE'S A SIGNATURE AND A

25   DATE.  SO AS OF AUGUST 2008?

CAGLE DIRECT

```
 1        A.   IT WOULD HAVE BEEN 21 ALTA MESA CIRCLE.

 2        Q.   AND WAS THAT MS. ALEXANDER'S --

 3        A.   IT'S HER HOME, YES.

 4        Q.   TURN TO PAGE 9.  INCLUDED IN THE BANK RECORDS IS THE

 5        SECRETARY OF STATE REGISTRATION, AND IF YOU COULD HIGHLIGHT THE

 6        BOX THAT HAS THE NAMES AND COMPLETE ADDRESSES OF THE OFFICERS.

 7             WHO WAS IDENTIFIED AS THE CHIEF EXECUTIVE OFFICER?

 8        A.   BARBRA ALEXANDER.

 9        Q.   AND THE SECRETARY?

10        A.   BETH PINA.

11        Q.   AND THE CHIEF FINANCIAL OFFICER?

12        A.   IS MICHAEL SWANSON.

13        Q.   AND IS THIS CONSISTENT WITH YOUR EXPERIENCE OR

14        UNDERSTANDING OF THE MANAGEMENT STRUCTURE?

15        A.   YES.

16        Q.   BARBRA WAS THE BOSS?

17        A.   YES, SHE WAS.

18        Q.   OKAY.  PAGE 11.  THIS IS A STATEMENT.  DO YOU SEE THAT?

19        A.   YES.

20        Q.   OKAY.  WHAT'S THE STATEMENT PERIOD?

21        A.   SEPTEMBER OF 2008.

22        Q.   OKAY.  AND WHAT IS THE ACCOUNT?

23        A.   APS FUNDING, INC., THE TRUST ACCOUNT.

24        Q.   AND AT THE BOTTOM HALF, DO YOU SEE THE DEPOSITS?

25        A.   YES.
```

CAGLE DIRECT                                                    634

```
 1        Q.   DO YOU SEE A DEPOSIT IN THE AMOUNT OF 649,000?

 2        A.   YES, I DO.

 3        Q.   ARE YOU FAMILIAR WITH THAT DEPOSIT?

 4        A.   NO.

 5        Q.   OKAY.

 6        A.   IT COULD ONLY HAVE BEEN ONE OF A COUPLE PEOPLE THAT MADE A

 7   DEPOSIT.

 8             MR. LEEMING:  OBJECTION.  MOVE TO STRIKE,

 9   SPECULATION.

10             THE COURT:  SUSTAINED.

11   BY MR. KALEBA:

12        Q.   OKAY.  PAGE 49, PLEASE.  DO YOU SEE A CHECK AT THE BOTTOM?

13        A.   YES.

14        Q.   OKAY.  WHAT IS THIS?

15        A.   THIS IS A CHECK FOR $40,000 TO APS FUNDING, INC.

16        Q.   OKAY.  THERE'S A REFERENCE TO --

17        A.   GREENLIGHT FUND.

18        Q.   OKAY.  WHAT IS THE GREENLIGHT FUND?

19        A.   THE GREENLIGHT FUND IS ALSO A, A HARD MONEY LENDING FUND.

20        Q.   IS IT RELATED TO GCF INVESTMENT, LLC?

21        A.   YES, IT IS.  IT CAME AFTER THE LLC.

22        Q.   AND AT THE TOP THERE'S A NAME, RANDELL OLMSTEAD.

23        A.   YES.

24        Q.   ARE YOU FAMILIAR WITH THAT NAME?

25        A.   YES.
```

CAGLE DIRECT

```
 1        Q.   WHO IS RANDALL OLMSTEAD?

 2        A.   HE WAS AN INVESTOR IN THAT FUND.

 3        Q.   WERE YOU FAMILIAR WITH OTHER INVESTOR DEPOSITS INTO THIS

 4   ACCOUNT, THE TRUST ACCOUNT?

 5        A.   YES.

 6        Q.   OKAY.  PAGE 56, PLEASE.  DO YOU SEE THE CHECK THAT'S

 7   NUMBERED 5390?  WHAT IS THIS?

 8        A.   THIS IS A CHECK TO APS FUNDING FOR $100,000.

 9        Q.   DO YOU RECOGNIZE THE SIGNATURE?

10        A.   NO, I DO NOT.

11        Q.   OKAY.  PAGE 58, PLEASE, AND CHECK NUMBER 3004.  WHAT IS

12   THIS?

13        A.   THIS IS A CHECK FOR $150,000 GOING FROM THE TRUST ACCOUNT,

14   APS FUNDING, TO THE APS FUNDING COST ACCOUNT, AND IT HAS BEEN

15   SIGNED BY BARBRA ALEXANDER.

16        Q.   DID YOU PREPARE THIS CHECK FOR SIGNATURE?

17        A.   NO, I DO NOT THINK I DID.

18        Q.   OKAY.  CHECK NUMBER 3009.

19             THE COURT:  AFTER THIS WE'RE GOING TO TAKE OUR BREAK.

20   OR DO YOU WANT TO TAKE IT RIGHT NOW?  GO AHEAD, YOU CAN ASK A

21   COUPLE MORE QUESTIONS.

22             MR. KALEBA:  THANK YOU.

23        Q.   WHAT IS CHECK NUMBER 3009?

24        A.   THIS IS A CHECK FROM APS FUNDING TRUST ACCOUNT TO

25   GREENLIGHT FUND, LLC, FOR $498,054.92, AND IT'S SIGNED BY
```

1    BARBRA ALEXANDER.

2    Q.   DID YOU PREPARE THESE CHECKS FOR SIGNATURE?

3    A.   NOT THAT I REMEMBER, NO, SIR.

4         MR. KALEBA:   OKAY.   THANK YOU, YOUR HONOR.   WE CAN

5    TAKE A BREAK.

6         THE COURT:   ALL RIGHT.   IT'S 2:18.   LET'S TAKE A

7    BREAK UNTIL 2:30.   WE'LL TAKE ANOTHER BREAK IN ABOUT AN HOUR.

8         AGAIN, PLEASE DON'T DISCUSS OR RESEARCH THE CASE.   THANK

9    YOU.

10        YOU MAY STEP DOWN.

11        THE WITNESS:   THANK YOU.

12        (JURY OUT AT 2:19 P.M.)

13        (RECESS FROM 2:19 P.M. UNTIL 2:34 P.M.)

14        (JURY IN AT 2:34 P.M.)

15        THE COURT:   WELCOME BACK.   PLEASE TAKE A SEAT.

16        PLEASE PROCEED.

17        MR. KALEBA:   THANK YOU, YOUR HONOR.   I KNOW AFTER

18   LUNCH, NOTHING IS BETTER THAN GOING THROUGH BANK CHECKS AND

19   STATEMENTS, BUT LET'S CONTINUE.

20        (LAUGHTER.)

21   BY MR. KALEBA:

22   Q.   EXHIBIT NUMBER 207, PLEASE.   WOULD YOU PLEASE IDENTIFY THE

23   ACCOUNT NAME AND ADDRESS?

24   A.   THIS IS GREENLIGHT FUND, LLC, AND THE ADDRESS IS

25   484 WASHINGTON STREET, SUITE 350, MONTEREY, CALIFORNIA.

CAGLE DIRECT

```
1    Q.   AND WHAT WAS THE GREENLIGHT FUND?

2    A.   IT WAS AN INVESTMENT FUND FOR HARD MONEY LENDING.

3    Q.   OKAY.  AND WHAT IS THIS BUSINESS ADDRESS OF 484 WASHINGTON

4    STREET, SUITE 350?

5    A.   IT WAS THE P.O. BOX WHERE THE MAIL WAS PICKED UP.

6    Q.   WHO WERE THE ACCOUNT OWNERS AND AUTHORIZED SIGNERS OF THIS

7    ACCOUNT?

8    A.   BARBRA ALEXANDER AND BETH PINA.

9    Q.   AND TURN TO THE NEXT PAGE, PLEASE.

10        AND THE DATE THAT THE ACCOUNT WAS SIGNED FOR?

11   A.   WAS OCTOBER THE 2ND OF 2008.

12   Q.   WHAT WAS THE PRIMARY BUSINESS PURPOSE OF THIS ACCOUNT?

13   A.   THE GREENLIGHT FUND WAS SET UP AS A NEW INVESTMENT

14   COMPANY.

15   Q.   OKAY.  AND WHAT WAS GREENLIGHT FUND GOING TO INVEST IN?

16   A.   GREENLIGHT FUND WAS GOING TO HAVE BORROWERS COME INTO THAT

17   FUND.

18   Q.   OKAY.  BORROWERS FOR WHAT?

19   A.   WHO NEEDED HARD MONEY LOANS.

20   Q.   OKAY.  TO YOUR KNOWLEDGE, DID THE GREENLIGHT FUND EVER

21   ORIGINATE OR MAKE ANY HARD MONEY LOANS?

22   A.   NOT THAT I'M AWARE OF, NO.

23   Q.   PAGE 27, PLEASE.  WHAT IS THIS?

24   A.   THIS IS A BANK STATEMENT ENDING IN OCTOBER OF 2008 FOR

25   GREENLIGHT FUND.
```

```
1    Q.   OKAY.  AND GO TO THE BOTTOM, PLEASE.  WHAT IS THIS?

2    A.   THIS IS A SUMMARY OF THE BANK DEPOSITS SHOWING DEPOSITS

3    AND A CHECK AND A BALANCE.

4    Q.   OKAY.  THE PRIOR SIGNATURE PAGE SAID THE ACCOUNT WAS

5    OPENED ON OCTOBER 2ND, 2008?

6    A.   YES.

7    Q.   SO IS THIS A STATEMENT, THEN, FOR THE FIRST MONTH OF THE

8    ACCOUNT?

9    A.   YES, DATED OCTOBER 31ST.

10   Q.   AND THEN IT'S OPENED WITH A -- HAS A DEPOSIT AT THE END OF

11   THE MONTH OF HOW MUCH?

12   A.   THE ENDING BALANCE WAS $491,558.77.

13   Q.   OKAY.  PAGE 76, PLEASE, AND GO TO CHECK NUMBER 4008.  WHAT

14   IS THIS?

15   A.   THIS IS A CHECK WRITTEN OFF THE GREENLIGHT FUND TO --

16   PAYABLE TO APS FUNDING, BARBARA WORKMAN, FOR $6,496.15.  IT'S

17   BEEN SIGNED BY BARBRA ALEXANDER.

18   Q.   DID YOU PREPARE THIS CHECK?

19   A.   I BELIEVE I DID.

20   Q.   WHO IS BARBARA WORKMAN?

21   A.   SHE WAS AN INVESTOR IN THAT GREENLIGHT FUND.

22   Q.   LET'S TURN TO EXHIBIT NUMBER 208.  WHAT IS THIS?

23   A.   THIS IS A BANK STATEMENT FOR APS FUNDING DATED -- I DON'T

24   SEE A DATE.  IT'S A DRAW ACCOUNT.  THE ADDRESS IS 484B

25   WASHINGTON STREET, NUMBER 350.
```

1    Q.   WHAT WAS THE PRIMARY BUSINESS PURPOSE OF THIS ACCOUNT?

2    A.   FOR APS FUNDING, INC.?  I BELIEVE THE DRAW ACCOUNT, THEY

3    PAID BILLS OUT OF THIS ACCOUNT.

4    Q.   OKAY.  WHO WERE THE ACCOUNT OWNERS AND AUTHORIZED SIGNERS?

5    A.   IT WOULD HAVE BEEN BARBRA ALEXANDER, BETH PINA, AND

6    MICHAEL SWANSON.

7    Q.   OKAY.  WOULD YOU TAKE A LOOK AT THE DOCUMENTS?  ACCORDING

8    TO THE RECORDS?

9    A.   BARBRA ALEXANDER IS PRESIDENT, BETH PINA IS CFO.

10   Q.   OKAY.  DID MICHAEL SWANSON, ACCORDING TO THE BUSINESS

11   RECORDS, HAVE SIGNATURE AUTHORITY ON THIS ACCOUNT?

12   A.   NOT AT THIS TIME, NO.

13   Q.   OKAY.  PAGE 68, PLEASE, CHECK NUMBER 3022.  WHAT IS THIS?

14   A.   THIS IS A CHECK DATED MARCH 23RD OF 2007.  IT'S WRITTEN TO

15   A&P PROPERTIES, INC. FOR $22,332.60.  IT'S WRITTEN OFF OF

16   GCF INVESTMENT, LLC, AND IT'S SIGNED BY BETH PINA.

17   Q.   AND WHAT'S THE RELATIONSHIP BETWEEN GCF INVESTMENT, LLC,

18   AND APS PROPERTIES?

19   A.   THEY WERE OWNED BY THE SAME INDIVIDUALS, BARBRA ALEXANDER

20   AND BETH PINA.

21   Q.   AND PAGE 86, PLEASE.  THE CHECK AT THE VERY TOP, WHAT IS

22   THIS?

23   A.   THIS IS A CHECK TO BETH PINA FOR $3,000 FROM A&P

24   PROPERTIES SIGNED BY BARBRA ALEXANDER.

25   Q.   DID YOU PREPARE THIS CHECK?

```
 1     A.   YES, THIS LOOKS LIKE MY HANDWRITING.

 2     Q.   AND THE ONE BELOW IT?

 3     A.   THIS IS A CHECK FROM A&P PROPERTIES TO MONEY DOTS FOR

 4     $650, AND IT'S BEEN SIGNED BY BARBRA ALEXANDER.

 5     Q.   OKAY.  COULD YOU PULL UP CHECK NUMBER 5002, PLEASE.  WHAT

 6     IS THIS?

 7     A.   THIS IS A CHECK FROM A&P PROPERTIES, INC. FOR $6,128.70 TO

 8     NEIL TICKER, AND IT'S BEEN SIGNED BY BARBRA ALEXANDER.

 9     Q.   DID YOU PREPARE THIS CHECK?

10     A.   I'M GOING TO SAY YES.

11     Q.   WHO IS NEIL TICKER?

12     A.   NEIL TICKER WAS A LAWYER FOR BARBRA ALEXANDER, FOR

13     A&P PROPERTIES.

14     Q.   OKAY.  LET'S TURN NOW TO EXHIBIT NUMBER 210.

15          THE COURT:  THAT WASN'T ADMITTED.  ARE YOU MOVING TO

16     ADMIT IT NOW?

17          MR. KALEBA:  WE DO MOVE SO, YOUR HONOR.

18          THE COURT:  ANY OBJECTION?

19          MR. LEEMING:  NO OBJECTION.

20          THE COURT:  IT'S ADMITTED.

21     (PLAINTIFF'S EXHIBIT 210 WAS ADMITTED IN EVIDENCE.)

22          THE COURT:  GO AHEAD, PLEASE.

23     BY MR. KALEBA:

24     Q.   WHAT IS THE ACCOUNT NAME HERE?

25     A.   APS FUNDING, INC., BARBARA WORKMAN ACCOUNT, PHYSICAL
```

641

```
 1        ADDRESS 484 WASHINGTON STREET, UNIT 350B, MONTEREY, CALIFORNIA.
 2        Q.   OKAY.  WHO HAD SIGNATURE AUTHORITY ON THIS ACCOUNT?
 3        A.   BARBRA ALEXANDER, BETH PINA, AND BARBARA WORKMAN.
 4        Q.   OKAY.  DO YOU KNOW THE PRIMARY BUSINESS PURPOSE OF THIS
 5        ACCOUNT?
 6        A.   NO, I DO NOT RECALL THAT.
 7             MR. KALEBA:  I'D LIKE TO TURN TO 211, WHICH I DON'T
 8        THINK HAS BEEN ADMITTED YET, BUT WE WOULD MOVE SO AT THIS TIME
 9        UNDER OUR STIPULATION.
10             THE COURT:  ANY OBJECTION?
11             MR. LEEMING:  NO OBJECTION.
12             THE COURT:  IT'S ADMITTED.
13        (PLAINTIFF'S EXHIBIT 211 WAS ADMITTED IN EVIDENCE.)
14             THE COURT:  GO AHEAD, PLEASE.
15             MR. KALEBA:  THANK YOU.
16        Q.   WHAT IS THIS ACCOUNT?
17        A.   THIS IS APS FUNDING COST ACCOUNT.
18        Q.   AND WHO HAD SIGNATURE AUTHORITY ON THIS ACCOUNT?
19        A.   BARBRA ALEXANDER AND BETH PINA.
20        Q.   IF YOU WOULD TURN THE PAGE.  THE DATE THAT THIS ACCOUNT
21        WAS OPENED?
22        A.   AUGUST 18TH OF 2008.
23        Q.   PAGE 45, PLEASE.  AND PULL UP THE CHECK AT THE BOTTOM.
24        WHAT IS THIS?
25        A.   THIS IS A CHECK FROM GCF INVESTMENT, LLC, FOR $6,000 MADE
```

CAGLE DIRECT

1    OUT TO APS FUNDING, INC. ON AUGUST THE 26TH OF 2008.

2    Q.   AND THE SOURCE OF FUNDS FOR THIS CHECK WAS?

3    A.   GCF INVESTMENT, LLC.

4    Q.   THANKS.  PAGE 47.  WHAT IS THIS?

5    A.   A CHECK DRAWN ON GCF INVESTMENT, LLC, FOR $10,000 MADE OUT

6    TO APS FUNDING, INC. COST ACCOUNT.

7    Q.   WHO SIGNED THIS CHECK?

8    A.   BARBRA ALEXANDER.

9    Q.   DID YOU PREPARE THIS CHECK?

10   A.   I BELIEVE I DID.

11   Q.   IS THIS THE TYPE OF CHECK THAT WOULD BE PRINTED FROM QUICK

12   BOOKS?

13   A.   YES.

14   Q.   PAGE 53.  WHAT IS THIS?

15   A.   THIS IS A CHECK FROM APS FUNDING, INC. TRUST ACCOUNT TO

16   APS FUNDING COST ACCOUNT FOR $150,000 DATED OCTOBER 29TH OF

17   2008.

18   Q.   DID YOU PREPARE THIS CHECK?

19   A.   I BELIEVE I MUST HAVE.

20   Q.   OKAY.  IF WE LOOK AT THE SLIP ABOVE IT.

21   A.   YES, THAT APPEARS TO BE MY HANDWRITING.

22   Q.   IS THAT THE DEPOSIT SLIP?

23   A.   YES, IT IS.

24   Q.   AND COULD YOU EXPLAIN HOW THIS WOULD WORK, MAKING --

25   WRITING A CHECK FROM APS FUNDING TRUST ACCOUNT INTO APS FUNDING

1    COST ACCOUNT?

2    A.   AS I RECALL, THE MONIES WOULD COME INTO THE TRUST ACCOUNT,

3    IT WOULD BE HELD THERE FOR A PERIOD OF TIME, AND THEN IT WOULD

4    BE DIRECTED THEN TO THE COST ACCOUNT TO PAY FOR PAYABLES FOR

5    DIFFERENT ACCOUNTS.

6    Q.   WHO WOULD DIRECT YOU AS FAR AS WHERE THE MONEY NEEDED TO

7    GO?

8    A.   BETH OR BARBRA WOULD.

9    Q.   WOULD MICHAEL EVER TELL YOU WHICH FUNDS TO -- OR WHICH

10   ACCOUNTS TO MOVE THE MONEY?

11   A.   NO.

12   Q.   PAGE 55.  WHAT IS THIS?

13   A.   THIS IS A CHECK FOR $30,000 DATED NOVEMBER THE 5TH OF

14   2008.  IT'S COMING FROM THE GREENLIGHT FUND, LLC, AND IT'S

15   BEING PAID TO APS FUNDING COST ACCOUNT.

16   Q.   IN GENERAL, WHAT WAS THE SOURCE OF FUNDS THAT WERE

17   DEPOSITED INTO THE COST ACCOUNT?

18   A.   INTO APS FUNDING COST ACCOUNT?  IT WOULD HAVE BEEN

19   INVESTOR CHECKS THAT WERE COMING FROM THE TRUST AND THEN INTO

20   THE COST ACCOUNT.

21   Q.   DID YOU EVER DO BORROWER DEPOSITS OR REPAYMENTS INTO THAT

22   COST ACCOUNT?

23   A.   NOT THAT I REMEMBER, NO.

24   Q.   WHAT TYPE OF EXPENSES WERE PAID FROM THIS COST ACCOUNT?

25   A.   ALL THE EXPENSES WERE PAID FROM THIS ACCOUNT.

1    Q.   OKAY.  LET'S GO TO PAGE 121.  AT THE TOP, CHECK NUMBER

2    2013, WHAT'S THIS?

3    A.   THIS IS A CHECK FOR $10,000 MADE OUT TO BARBRA ALEXANDER,

4    SIGNED BY BARBRA ALEXANDER, FROM THE APS FUNDING COST ACCOUNT.

5    Q.   OKAY.  CHECK NUMBER 2012.

6    A.   THIS IS A CHECK DATED OCTOBER THE 1ST OF 2008 FOR $10,000

7    MADE OUT TO MICHAEL SWANSON FROM APS FUNDING COST ACCOUNT, AND

8    BARBRA ALEXANDER SIGNED THIS CHECK.

9    Q.   CHECK NUMBER 2017, PLEASE.

10   A.   THIS IS A CHECK DATED OCTOBER THE 2ND, 2008.  IT'S MADE

11   OUT TO LINDA M. CAGLE FOR $1,750, AND IT'S COMING FROM

12   APS FUNDING COST ACCOUNT.

13   Q.   DID YOU PREPARE THIS CHECK?

14   A.   YES.

15   Q.   DID YOU SIGN IT?

16   A.   NO.  BARBRA ALEXANDER SIGNED THE CHECK.

17   Q.   DID YOU HAVE THE ABILITY TO MAKE CHECKS PAYABLE TO YOU AND

18   SIGN THEM TO YOU?

19   A.   YES.

20   Q.   YOU COULD DO BOTH, PREPARE, AS WELL AS SIGNATURE?

21   A.   I COULD PREPARE THE CHECK FOR MYSELF, AND THEN BARBRA

22   WOULD SIGN IT.

23   Q.   OKAY.  COULD YOU SIGN IT THOUGH?

24   A.   NO.

25   Q.   CHECK NUMBER 2001.

645

```
 1        A.    THIS IS A CHECK DATED OCTOBER THE 1ST, 2008.  IT'S MADE

 2        OUT TO JACKIE LAMBERT FOR $3500.  IT'S BEEN SIGNED BY

 3        BARBRA ALEXANDER, AND IT'S COMING FROM APS FUNDING COST

 4        ACCOUNT.

 5        Q.    AND WHAT IS THIS PAYMENT TO MS. LAMBERT?

 6        A.    THIS WAS HER PAYCHECK.

 7        Q.    OKAY.  AND THE CHECK NEXT TO IT, 2034, WHAT IS THIS?

 8        A.    THIS IS A CHECK DATED OCTOBER THE 9TH OF 2008 FOR $5400,

 9        IT'S MADE OUT TO MONEY DOTS, AND IT'S ON APS FUNDING COST

10        ACCOUNT, AND IT'S BEEN SIGNED BY BARBRA.

11        Q.    OKAY.  PAGE 122, PLEASE, CHECK NUMBER 2035.

12        A.    THIS CHECK IS DATED OCTOBER THE 10TH, 2008.  IT'S COMING

13        FROM APS FUNDING COST ACCOUNT, PAYABLE TO BARBRA ALEXANDER FOR

14        $20,000, AND BARBRA HAS SIGNED THIS CHECK.

15        Q.    OKAY.  CHECK NUMBER 2022 ON THE SAME PAGE AT THE BOTTOM.

16        A.    THIS IS A CHECK FROM APS FUNDING COST ACCOUNT, IT'S IN THE

17        AMOUNT OF $3,368.46, IT'S MADE OUT TO AMERICAN EXPRESS, AND

18        IT'S BEEN SIGNED BY BARBRA ALEXANDER.

19        Q.    OKAY.  PAGE 123, CHECK NUMBER 2049.

20        A.    THIS CHECK IS DATED THE 21ST OF OCTOBER OF 2008.  IT'S

21        COMING FROM THE APS FUNDING COST ACCOUNT PAYABLE TO

22        BARBRA ALEXANDER FOR $20,000, AND IT'S BEEN SIGNED BY

23        BARBRA ALEXANDER.

24        Q.    DID YOU PREPARE THIS CHECK?

25        A.    YES.
```

CAGLE DIRECT

```
1     Q.   PAGE 126, CHECK NUMBER 2071.

2     A.   THIS IS A CHECK FROM APS FUNDING, IT IS WRITTEN TO

3     AMERICAN EXPRESS FOR $24,012.68, AND IT'S BEEN SIGNED BY

4     BARBRA ALEXANDER.

5     Q.   DID YOU PREPARE THIS CHECK?

6     A.   I BELIEVE I DID.

7     Q.   PAGE 137, CHECK NUMBER 2217.

8     A.   THIS IS A CHECK DATED JANUARY 30, 2009, FROM APS FUNDING

9     COST ACCOUNT TO BARBRA ALEXANDER FOR $10,000, SIGNED BY BARBRA.

10    Q.   OKAY.  I'D LIKE TO TURN NOW FOR A MOMENT AWAY FROM THE

11    BANK RECORDS AND ASK YOU SOME QUESTIONS ABOUT THE QUICK BOOKS

12    THAT YOU DESCRIBED EARLIER.

13         SO WHEN DID YOU FIRST HAVE ACCESS TO THE QUICK BOOKS

14    SOFTWARE AT APS?

15    A.   WHEN I STARTED MY EMPLOYMENT THERE IN MAY OF 2006, I WAS

16    INTRODUCED TO IT BY BETH.

17    Q.   BETH PINA?

18    A.   BETH PINA.  THAT'S THE ACCOUNTING SOFTWARE THAT THEY WERE

19    USING AT THE TIME.

20    Q.   OKAY.  AND DID THEY USE THAT SOFTWARE THE WHOLE TIME YOU

21    WERE THERE?

22    A.   YES, THEY DID.

23    Q.   AND WHAT WAS YOUR TRAINING WITH RESPECT TO THE QUICK

24    BOOKS?

25    A.   I HAD NEVER HAD TRAINING ON IT BEFORE MY EMPLOYMENT THERE.
```

```
 1     Q.   OKAY.  SO WHAT DID MS. PINA INSTRUCT YOU TO DO?

 2     A.   AT FIRST I WAS JUST WATCHING HER WITH THE ENTRIES INTO THE

 3     SOFTWARE PROGRAM, DOING HER FILING FOR HER, JUST DAILY LITTLE

 4     TASKS IN THE OFFICE.

 5          IT DIDN'T COME UNTIL AFTER -- OR JUST BEFORE SHE LEFT TO

 6     GO TO IDAHO IN JUNE OF 2006 THAT I WAS ACTUALLY MAKING ENTRIES

 7     INTO THE QUICK BOOKS SOFTWARE.

 8     Q.   OKAY.  DID YOU HAVE A COMPUTER?

 9     A.   YES, I DID.

10     Q.   OKAY.  WHERE WAS YOUR COMPUTER?

11     A.   IT WAS DOWNSTAIRS IN THE BASEMENT OFFICE.

12     Q.   WAS THIS IN MS. ALEXANDER'S HOUSE?

13     A.   YES, IT WAS.

14     Q.   HOW MANY COMPUTERS IN THE HOUSE HAD THE QUICK BOOKS ON IT?

15     A.   JUST THE ONE.

16     Q.   DID ANYONE ELSE HAVE ACCESS TO THAT COMPUTER?

17     A.   YES.  BETH PINA AND BARBRA ALEXANDER HAD ACCESS TO THAT

18     COMPUTER.

19     Q.   DO YOU KNOW WHETHER MS. ALEXANDER EVER ACCESSED YOUR

20     COMPUTER?

21     A.   YES.  AFTER I LEFT IN THE AFTERNOONS IS USUALLY WHEN SHE

22     WOULD GO DOWN, OR IN THE EVENING.

23     Q.   OKAY.  HOW DO YOU KNOW SHE ACCESSED YOUR COMPUTER IF YOU

24     WEREN'T THERE?

25     A.   I WOULD ARRIVE THE NEXT MORNING AND GO DOWN AND I WOULD
```

1    SEE ALL OF THE EVIDENCE THAT SHE HAD BEEN THERE THE NIGHT

2    BEFORE, WHICH WOULD HAVE BEEN PAPERWORK ACROSS THE DESK AREA,

3    AND BARBRA WAS A SMOKER AND I WOULD HAVE TO CLEAN ALL THE ASHES

4    OFF OF THE KEYBOARD.

5    Q.   DID MS. LAMBERT HAVE ACCESS TO THE COMPUTER?

6    A.   NOT UNTIL 2008 DID SHE HAVE ACCESS TO THE COMPUTER.  THERE

7    WAS A SECOND COMPUTER AT THAT TIME.

8    Q.   OKAY.  I'M SORRY.  CAN YOU PLEASE DESCRIBE, THEN, HOW YOU

9    USED QUICK BOOKS ON A DAILY BASIS.

10   A.   AFTER PICKING UP THE MAIL AT THE POST OFFICE, I WOULD

11   USUALLY GO DOWNSTAIRS AND OPEN UP THAT MAIL AND GET IT READY

12   FOR BARBRA TO REVIEW.

13       I WOULD THEN TAKE IT BACK UPSTAIRS TO HER AND SHE WOULD

14   INDICATE TO ME HOW SHE WANTED ME TO TAKE CARE OF THOSE BILLS

15   AND WHAT THEY WERE FOR, ITEMIZE THEM, IF YOU WILL.  LIKE THE

16   CREDIT CARD STATEMENT WOULD COME AND I WOULD ENTER IT INTO

17   QUICK BOOKS AND WHETHER IT WAS FOR ENTERTAINMENT OR IF IT WAS

18   SOMETHING THAT WAS PURCHASED FOR THE OFFICE OR WHATEVER THE

19   CHARGES WERE.

20   Q.   OKAY.  AND THEN WOULD YOU BE DIRECTED TO PREPARE CHECKS

21   FROM QUICK BOOKS FOR PAYMENT?

22   A.   YES, I WOULD.

23   Q.   OKAY.  AND THEN WHAT WOULD YOU DO AFTER YOU PREPARED THE

24   CHECKS?

25   A.   I WOULD TAKE THE CHECKS BACK UP TO BARBRA FOR SIGNING.

```
 1     Q.   OKAY.  NOW, DID YOU ALSO KEEP A TRACK -- KEEP TRACK OF

 2     WHETHER THOSE CHECKS HAD CLEARED AFTER SHE HAD SIGNED THEM?

 3     A.   WHEN THE BANK STATEMENTS WOULD ARRIVE AFTER A PERIOD OF

 4     TIME, YES, BETH PINA HAD ME -- BECAUSE OF MY LOCATION THERE IN

 5     MONTEREY, I HAD ACCESS TO THOSE BANK STATEMENTS, SO THEN I

 6     WOULD, YES, CLEAR THE CHECKS ON THE QUICK BOOKS PROGRAM.

 7     Q.   AND IS IT POSSIBLE TO PRINT REPORTS FROM THE QUICK BOOKS

 8     SOFTWARE?

 9     A.   YES.

10     Q.   OKAY.  WOULD YOU TAKE A MOMENT AND LOOK AT EXHIBIT

11     NUMBER 53.  THERE'S A BINDER ON YOUR DESK.  IT'S A SEPARATE

12     BINDER.  THE FIRST IS THE APS FUNDING GENERAL LEDGER.

13          ARE YOU FAMILIAR WITH APS FUNDING, INC.?

14     A.   YES, I AM.

15     Q.   AND DID IT MAINTAIN A GENERAL LEDGER THROUGH QUICK BOOKS?

16     A.   YES.

17     Q.   OKAY.  HAVE YOU SEEN THIS BEFORE?

18     A.   I'VE SEEN IT, YES.

19     Q.   THE GENERAL LEDGER FOR APS?

20     A.   UM-HUM.

21     Q.   OKAY.  WOULD YOU TURN TO 53B, PLEASE.  WHAT I'D LIKE TO DO

22     IS FIRST HAVE YOU JUST IDENTIFY THESE AND THEN WE'LL TALK ABOUT

23     THEM INDIVIDUALLY.

24     A.   OKAY.

25     Q.   THIS IS APS FUNDING, INC. TRANSACTION DETAIL BY ACCOUNT.
```

```
 1        HAVE YOU SEEN THIS BEFORE?

 2        A.   YES, UM-HUM.

 3        Q.   AND DID THE COMPANY USE QUICK BOOKS TO MAINTAIN A

 4        TRANSACTION DETAIL RECORD?

 5        A.   YES.

 6        Q.   OKAY.  53C, PLEASE.  THIS IS A&P PROPERTIES, INC.

 7        A.   YES.

 8        Q.   AND IT'S THE GENERAL LEDGER?

 9        A.   YES, IT IS.

10        Q.   AND DID YOU HAVE ACCESS TO THE GENERAL LEDGER AT

11        A&P PROPERTIES?

12        A.   I HAD ACCESS TO IT, YES.

13        Q.   AND IS THIS A COPY OF THE GENERAL LEDGER?

14        A.   YES, IT IS.

15        Q.   OKAY.  53D, IS THIS A COPY OF THE A&P PROPERTIES

16        TRANSACTION DETAIL?

17        A.   YES, IT IS.

18        Q.   DID THE COMPANY MAINTAIN ITS -- DID A&P PROPERTIES

19        MAINTAIN ITS TRANSACTION DETAIL THROUGH QUICK BOOKS?

20        A.   YES, IT DID.

21        Q.   OKAY.  TURN THE PAGE, 53E.  THIS IS GOLDEN EGG RESOURCES,

22        LIMITED?

23        A.   YES.

24        Q.   WHAT IS GOLDEN EGG RESOURCES, LIMITED?

25        A.   GOLDEN EGG RESOURCES, LIMITED WAS A COMPANY THAT WAS
```

CAGLE DIRECT

```
 1        FORMED BY BARBRA ALEXANDER TO HOLD SEMINARS TO EACH TEACH OTHER
 2        PEOPLE HOW TO DO WHAT THEY DID.
 3        Q.   OKAY.  AND DID YOU HAVE ACCESS TO THE GOLDEN EGG RESOURCES
 4        ACCOUNTS ON THE QUICK BOOKS --
 5        A.   YES, I DID.
 6        Q.   -- DURING YOUR EMPLOYMENT?
 7             OKAY.  IS THIS A COPY OF THE GENERAL LEDGER?
 8        A.   YES, IT IS.
 9        Q.   IF YOU WOULD TURN TO 53F.  THIS IS A LIST OF THE
10        TRANSACTION DETAILS FOR GOLDEN EGG RESOURCES?
11        A.   YES, IT IS.
12        Q.   OKAY.  DID YOU HAVE ACCESS TO THIS DURING YOUR EMPLOYMENT?
13        A.   YES.
14        Q.   53G, THIS IS THE GREENLIGHT FUND.
15        A.   YES.
16        Q.   ARE YOU FAMILIAR WITH GREENLIGHT FUND?
17        A.   YES, I AM.
18        Q.   DID YOU ACCESS THE GREENLIGHT FUND THROUGH QUICK BOOKS
19        DURING YOUR EMPLOYMENT?
20        A.   YES, I DID.
21        Q.   53H.  DID THE GREENLIGHT FUND MAINTAIN A GENERAL LEDGER
22        THROUGH QUICK BOOKS?
23        A.   YES, THEY DID.
24        Q.   IS THIS A COPY OF THE GENERAL LEDGER?
25        A.   YES, IT IS.
```

CAGLE - DIRECT

1    Q.   OKAY.  53I.  THIS IS A GCF INVESTMENT, LLC, TRANSACTION

2    DETAIL?

3    A.   YES, IT IS.

4    Q.   DID THE GCF INVESTMENT, LLC, MAINTAIN A TRANSACTION DETAIL

5    RECORD THROUGH QUICK BOOKS?

6    A.   YES, IT DID.

7    Q.   AND DID YOU HAVE ACCESS TO THAT?

8    A.   YES, I DID.

9    Q.   LIKEWISE ON 53J?

10   A.   YES.

11   Q.   THIS IS THE GENERAL LEDGER?

12   A.   YES, IT IS, FOR GCF INVESTMENT, LLC.

13   Q.   IF YOU COULD TURN TO 53K.  TAKE A MOMENT TO LOOK THROUGH

14   THESE.  IT'S BALANCE SHEETS, STATEMENT OF CASH FLOW FOR THE

15   VARIOUS ENTITIES WE DISCUSSED?

16   A.   YES, IT IS.

17   Q.   OKAY.  AND YOU'RE FAMILIAR WITH THESE REPORTS FROM QUICK

18   BOOKS?

19   A.   YES.

20   Q.   OKAY.  AND THEN THERE'S ALSO, AT THE BACK, A LIST OF

21   VENDOR RECORDS FOR APS FUNDING.  ARE YOU FAMILIAR WITH THAT?

22   A.   YES.

23   Q.   AND DID APS FUNDING MAINTAIN A LIST OF ITS EXPENSES

24   THROUGH THIS VENDOR BALANCE SHEET AS PART OF QUICK BOOKS?

25   A.   YES.

1    Q.   AND WERE THESE QUICK BOOK RECORDS MAINTAINED DURING THE

2    REGULAR COURSE OF BUSINESS?

3    A.   YES.

4    Q.   AND WERE THE ENTRIES THAT ARE RECORDED IN QUICK BOOKS MADE

5    BY SOMEONE WHO HAD KNOWLEDGE OF THE ENTRIES AT THE TIME THEY

6    WERE BEING -- THE ENTRIES WERE BEING MADE?

7    A.   YES.

8    Q.   AND WAS IT PART OF THE COMPANY'S REGULAR PRACTICE TO KEEP

9    TRACK OF ITS EXPENSES THROUGH THE QUICK BOOKS?

10   A.   YES.

11          MR. KALEBA:  YOUR HONOR, WE WOULD MOVE TO ADMIT 53A

12   THROUGH K.

13          MR. LEEMING:  AND THERE'S NO OBJECTION.

14          THE COURT:  IS THE FIRST 53, IS THAT A?  BECAUSE I

15   DIDN'T HEAR A.  I JUST HEARD 53 AND THEN I HEARD B THROUGH K.

16          MR. KALEBA:  YES, YOUR HONOR.

17          THE COURT:  ALL RIGHT.

18          MR. KALEBA:  IT'S A THROUGH K.

19          THE COURT:  ALL RIGHT.  I'LL ADMIT THEM.

20      (PLAINTIFF'S EXHIBITS 53A - 53K WERE ADMITTED IN

21   EVIDENCE.)

22          THE COURT:  GO AHEAD, PLEASE.

23   BY MR. KALEBA:

24   Q.   WOULD YOU TURN TO 53B, PLEASE.

25          AND IF YOU COULD JUST HIGHLIGHT THE FIRST HALF OF THIS

1    DOCUMENT?

2         COULD YOU DESCRIBE THE PROCESS OF HOW YOU WENT THROUGH

3    CLEARING A CHECK OF APS FUNDING?

4    A.   YES.  THERE'S A, A LITTLE X, AS YOU WILL, NEXT TO THE

5    CHECK OR THE DEPOSIT FOR THAT TRANSACTION.

6    Q.   IS THAT WHAT WE SEE UNDER THE HEADER "CLR"?

7    A.   YES.

8    Q.   OKAY.  SO CAN YOU EXPLAIN THE PROCESS AGAIN?  YOU WOULD --

9    A CHECK WOULD BE WRITTEN AND YOU WOULD WAIT FOR A BANK

10   STATEMENT?

11   A.   YES.

12   Q.   OKAY.  AND THEN WHAT DID YOU DO?

13   A.   AND THEN I WOULD GO INTO THAT QUICK BOOKS ACCOUNT, THIS

14   ONE HAPPENS TO BE APS FUNDING, AND I WOULD GO IN AND I WOULD

15   CHECK IN THE BANK STATEMENT OF THAT PROGRAM AND CHECK THE

16   DEPOSITS AND CHECKS THAT HAD CLEARED FOR THAT MONTH FOR THAT

17   STATEMENT.

18   Q.   NOW, THERE'S A HEADER THAT'S NEXT TO IT THAT SAYS "SPLIT."

19   DO YOU KNOW WHAT THAT MEANS?

20   A.   IF THE CHECK WAS WRITTEN AND IT HANDLED MORE THAN ONE

21   COST, IT WOULD BE SPLIT BETWEEN THE TWO ACCOUNTS.

22   Q.   CAN WE TURN TO PAGE 7 OF THIS DOCUMENT.  IN BOLD IT

23   SAYS -- DO YOU SEE THE WORDS "APS FUNDING TRUST"?

24   A.   YES.

25   Q.   OKAY.  AND IF WE GO BACK TO PAGE 1 FOR A MINUTE --

CAGLE DIRECT

1     A.   YES.

2     Q.   -- THERE'S A BOLD HEADING THAT SAYS "APS FUNDING COST"?

3     A.   RIGHT.

4     Q.   WHAT'S THE DIFFERENCE BETWEEN THOSE TWO?

5     A.   THE COST ACCOUNT WAS WHERE THE BILLS WERE PAID.  THE TRUST

6     ACCOUNT WAS MORE FOR THE INVESTOR MOVEMENTS, WHETHER IT BE A

7     DEPOSIT WHERE THEIR CHECKS WOULD GO INTO.

8     Q.   AND IS IT JUST BROKEN OUT THROUGH QUICK BOOKS SO YOU

9     CAN -- WHY IS IT BROKEN OUT IN QUICK BOOKS THIS WAY?

10    A.   SO THEY WOULD KNOW THE INVESTOR MOVEMENT IN THE TRUST

11    ACCOUNT.

12    Q.   OKAY.  ALL RIGHT.  PAGE 23.  DO YOU SEE THE HEADER FOR

13    GCF?

14    A.   YES, I DO.

15    Q.   OKAY.  WHY IS IT -- WHAT IS GOING ON WITH GCF HERE?

16    A.   THIS IS GCF INVESTMENT, THE LLC.

17    Q.   OKAY.

18    A.   AND THIS IS ALSO FOR INVESTORS, FOR THEIR PRINCIPALS OR

19    WITHDRAWALS AT THAT TIME.

20    Q.   AND IS THIS A RECORD OF THE TRANSACTION DETAILS RELATING

21    TO THE GCF, LLC, INVESTMENT FOR THIS PERIOD OF TIME?

22    A.   YES, SIR.  YES.

23    Q.   PAGE 26.  THERE'S AN ENTRY FOR GREENLIGHT FUND, LLC.

24    A.   YES.

25    Q.   OKAY.  AND WHAT IS THIS?

1     A.   IT APPEARS TO BE A JOURNAL ENTRY TO GREENLIGHT FUND.

2     Q.   OKAY.  NEXT PAGE.  AT THE TOP WHERE IT SAYS NOTES

3     RECEIVABLE --

4     A.   YES.

5     Q.   -- WHAT ARE THESE?

6     A.   THESE ARE CHECKS BEING WRITTEN FROM GCF INVESTMENT TO

7     MONEY DOTS.

8     Q.   OKAY.  AND GO TO THE BOTTOM HALF, PLEASE.

9     A.   UM-HUM.

10    Q.   WHAT IS THIS?

11    A.   THESE WERE CHECKS THAT WERE WRITTEN FROM MONEY DOTS

12    ACCOUNT AND BARBRA ALEXANDER -- WELL, THIS IS

13    BARBRA ALEXANDER'S PERSONAL ACCOUNT.

14    Q.   OKAY.  THEY'RE UNDER -- BOTH OF THESE BARBRA ALEXANDER

15    MONEY DOTS AND BARBRA ALEXANDER OTHER ARE UNDER WHAT IS CALLED

16    NOTES RECEIVABLE.

17         CAN YOU PULL IT BACK, PLEASE, FULL SCREEN.

18         WHAT IS BEING RECORDED HERE?

19    A.   ON THE BOTTOM OF PAGE 27?  IS THAT WHAT WE'RE LOOKING AT?

20    Q.   YES.

21    A.   THIS IS BARBRA ALEXANDER OTHER, CHECKS WRITTEN TO

22    BARBRA ALEXANDER.  THERE WAS A DRAW ACCOUNT TO MONEY DOTS.

23    THERE ARE CREDIT CARD CHARGES THAT WERE EXPENSED TO THIS

24    ACCOUNT.

25    Q.   OKAY.  DO YOU KNOW ANYTHING ABOUT THE ENTRIES THAT ARE

CAGLE DIRECT

```
1    NEXT TO IT?

2         IF YOU COULD PULL UP THE BARBRA ALEXANDER OTHER.

3    A.   AS FAR AS THE HITAKI, TAJMAHALS ENTRY?  IS THAT WHAT

4    YOU'RE REFERRING TO?

5    Q.   RIGHT.  DID YOU MAKE THESE ENTRIES AS YOU WERE KEEPING

6    YOUR RECORDS?

7    A.   YES, IT WOULD HAVE COME -- I'M NOTICING HERE, THEY WOULD

8    HAVE COME FROM THE CREDIT CARD CHARGES.  THE EXPENSES WOULD

9    HAVE GONE TO THAT OTHER BARBRA ALEXANDER.

10   Q.   DO YOU KNOW WHAT THE TAJMAHALS DUTY FREE ENTRY WAS?

11   A.   I BELIEVE THAT WAS WHEN SHE WAS RETURNING FROM JAMAICA.

12   IT WOULD COME FROM THERE.

13   Q.   OKAY.  AND YOU SAID THAT'S A CREDIT CARD CHARGE?

14   A.   IT'S A CREDIT CARD CHARGE, CORRECT.

15   Q.   LIKEWISE EUROPEAN JEWELERS IS A CREDIT CARD CHARGES?

16   A.   YES.

17   Q.   DO YOU KNOW WHAT THOSE ARE?

18   A.   PURCHASES FROM EUROPEAN JEWELERS IN -- I BELIEVE CARMEL IS

19   WHERE THEY'RE LOCATED.

20   Q.   TURN TO PAGE 29 OF THIS DOCUMENT, AND THE BOTTOM HALF.

21   A.   FOR BETH PINA?

22   Q.   YES.  WHAT'S GOING ON HERE?

23   A.   IT LOOKS LIKE TRANSACTIONS THAT WERE FROM BETH PINA AND

24   CHECKS FROM THE OPERATING ACCOUNT, E-MANAGEMENT FUNDS BEING

25   DIRECTED TOWARDS BETH.
```

1           ANGIE'S BOUTIQUE, THAT WOULD HAVE BEEN A CREDIT CARD FROM

2      BETH.

3      Q.    OKAY.  THESE ARE JUST A RECORD OF --

4      A.    EXPENSES FROM BETH.

5      Q.    FROM APS TO BETH?

6      A.    CORRECT.

7      Q.    THEY ARE BEING SUBMITTED?

8      A.    YES.

9      Q.    OKAY.  IF WE CAN GO BACK TO PAGE 27.  AT THE BOTTOM

10     THERE'S TOTALS THAT ARE BEING MAINTAINED HERE.

11     A.    OKAY.

12     Q.    AND DO YOU SEE, AT LEAST ON PAGE 27, IT'S $44,431 AT THE

13     BOTTOM RIGHT?

14     A.    $43,431.63.

15     Q.    OKAY.

16     A.    THAT IS THE RUNNING BALANCE FOR THAT BARBRA ALEXANDER

17     OTHER.

18     Q.    OKAY.  AND IF WE COULD TURN THE PAGE.

19     A.    YES.

20     Q.    AND IF YOU LOOK AT THE FAR RIGHT COLUMN, IS THIS JUST A

21     RUNNING BALANCE?

22     A.    YES, IT IS.

23     Q.    OKAY.  AND AT -- THE SAME FOR BARBRA ALEXANDER OTHER?

24     A.    YES, IT IS.

25     Q.    OKAY.  AND WHAT'S THE BALANCE AT THE BOTTOM OF PAGE 28?

CAGLE DIRECT

```
 1    A.   $296,536.85.

 2    Q.   OKAY.  AND TURN THE PAGE AGAIN.

 3    A.   YES.

 4    Q.   IF YOU COULD DO THE BALANCE AS OF FEBRUARY 13TH, 2009.

 5    A.   IT WAS, LET'S SEE, TOTAL BARBRA ALEXANDER, $531,797.26.

 6    Q.   AND THEN IF YOU TURN THE PAGE TO PINA.  SO THAT'S PAGE 30.

 7    A.   $263,525.71.

 8    Q.   SO AS OF FEBRUARY --

 9    A.   OF 2009.

10    Q.   OKAY.  A BALANCE OF FUNDS TO PINA IN THE AMOUNT OF

11    263,000?

12    A.   $525.71.

13    Q.   OKAY.  LET'S TURN TO PAGE 31.  DO YOU SEE AN ENTRY FOR

14    MR. SWANSON?

15    A.   YES, I DO.

16    Q.   WHAT'S THE DATE RANGE FOR THESE ENTRIES?

17    A.   FROM OCTOBER OF 2007 TO FEBRUARY OF 2009, THE BALANCE

18    BEING AT $316,000 EVEN.

19    Q.   OKAY.  GO TO PAGE 40, PLEASE.  STARTING WITH THE ENTRY

20    THAT'S B, CAPITAL ONE, 4123.

21         DO YOU SEE THAT?

22    A.   CAPITAL ONE, YES, 4123.

23    Q.   WHAT IS THIS?

24    A.   THAT WOULD HAVE BEEN A CAPITAL ONE CREDIT CARD.

25    Q.   OKAY.  TURN TO THE NEXT PAGE.
```

```
 1      A.    UM-HUM.

 2      Q.    DO YOU SEE THE ENTRY CBT VISA?

 3      A.    YES.

 4      Q.    OKAY.  WHAT IS THIS?

 5      A.    THAT'S ANOTHER CREDIT CARD.

 6      Q.    AND DO YOU SEE THE ONE BELOW IT FOR AMEX?

 7      A.    AMERICAN EXPRESS CREDIT CARD.

 8      Q.    FOR ANY OF THESE CARDS DID YOU HAVE ANY PURCHASING

 9      AUTHORITY?

10      A.    NO.

11      Q.    FOR THE AMERICAN EXPRESS IN PARTICULAR, WHO HAD A COPY OF

12      THAT?

13      A.    BARBRA ALEXANDER AND BETH PINA.

14      Q.    OKAY.  PAGE 52.  THERE'S AN ENTRY FOR A MANAGEMENT FEE

15      ADVANCE.

16      A.    YES.

17      Q.    WHAT IS THIS?

18      A.    MANAGEMENT FEE ADVANCE -- THESE ARE ALL JOURNAL ENTRIES.

19      I DID NOT DO JOURNAL ENTRIES.  THIS WOULD HAVE BEEN BETH.

20      Q.    OKAY.  LET'S TURN TO EXHIBIT 53D.  THIS IS A TRANSACTION

21      DETAIL FOR WHICH, WHICH ACCOUNT?

22      A.    THIS IS A&P PROPERTIES DRAW ACCOUNT.

23      Q.    TURN TO PAGE 8.  THERE ARE ENTRIES FOR LOANS MADE AND

24      NOTES RECEIVABLE.  DO YOU SEE THAT?

25      A.    YES.
```

```
1    Q.   DO YOU KNOW WHAT THESE ARE?

2    A.   THESE ARE ALSO JOURNAL -- GENERAL JOURNAL ENTRIES.

3    Q.   DID YOU RECORD THESE JOURNAL ENTRIES AS PART OF YOUR

4    EMPLOYMENT?

5    A.   NO.

6    Q.   OKAY.  WHO DID THAT?

7    A.   IT WOULD HAVE BEEN BETH.

8    Q.   PAGE 10.  WHAT ARE THESE?

9    A.   AMERICAN EXPRESS CREDIT CARD CHARGES.

10   Q.   THAT ARE SUBMITTED TO THE COMPANY?

11   A.   YES.

12   Q.   DID YOU -- THERE ARE ENTRIES THAT ARE LISTED HERE FOR

13   VARIOUS DETAILS UNDER THE "NAME" COLUMN.  DO YOU SEE THAT?

14   A.   YES.

15   Q.   DID YOU DO THAT?

16   A.   YES, I WOULD HAVE ENTERED THESE.

17   Q.   DO YOU SEE AN ENTRY FOR -- ON THE NEXT PAGE, THE

18   TAJMAHALS, DUTY FREE?

19   A.   YES.

20   Q.   WHAT IS THAT?

21   A.   AGAIN, THAT WAS BARBRA COMING FROM JAMAICA.

22   Q.   WAS THAT A BUSINESS TRIP?

23   A.   SHE VACATIONED THERE EVERY THANKSGIVING.

24   Q.   HARD ROCK CAFE, JAMAICA?

25   A.   THAT WOULD HAVE BEEN BARBRA IN JAMAICA.
```

1    Q.   OKAY.  PAGE 14, PLEASE.

2    A.   PAGE 14?

3    Q.   DO YOU SEE -- PAGE 14, PLEASE.  DO YOU SEE AT THE BOTTOM

4    THERE'S A HEADER THAT SAYS "LOAN, NOTES PAYABLE"?

5    A.   YES.

6    Q.   DID YOU MAKE THESE ENTRIES?

7    A.   I DON'T REMEMBER MAKING THESE ENTRIES.

8    Q.   OKAY.  PAGE 17, PLEASE.  DO YOU SEE AN ENTRY ENTITLED

9    "SHAREHOLDER DISTRIBUTIONS"?

10   A.   YES, I DO.

11   Q.   OKAY.  DO YOU KNOW WHAT THOSE ARE?

12   A.   DISTRIBUTIONS FOR THE SHAREHOLDERS, BARBRA ALEXANDER AND

13   MICHAEL SWANSON.  I SEE THEIR INITIALS.

14   Q.   DO YOU SEE ANY OTHER SHAREHOLDERS LISTED?

15   A.   BETH PINA ON PAGE 18.

16   Q.   OKAY.  LET'S GO TO EXHIBIT NUMBER 53K, PLEASE.  AND IF YOU

17   COULD HIGHLIGHT THE FIRST HALF OF THIS DOCUMENT?

18        SO THIS IS FOR STATEMENT OF CASH FLOWS FOR GCF INVESTMENT?

19   A.   YES.

20   Q.   AND THERE'S A LIST HERE OF WHAT ARE TERMED SHORT-TERM

21   LOANS.  DO YOU RECOGNIZE THOSE NAMES?

22   A.   YES, I DO.

23   Q.   WHAT ARE THOSE?

24   A.   THESE -- THE MAJORITY OF THEM ARE BORROWERS.

25   Q.   CAN YOU IDENTIFY SOME OF THE INDIVIDUALS WHO ARE

1    BORROWERS?

2    A.   ALEXANDER AND PINA, APS MANAGEMENT FEE, ARTNER, DE LA FLOR

3    PAINTING, JORGENSEN, LASANE, SPARHAWK, VRT SOLUTIONS, YES.

4    Q.   DID THE COMPANY KEEP TRACK OF ITS LOANS THAT IT MADE

5    THROUGH QUICK BOOKS?

6    A.   YES, I BELIEVE THEY DID.

7    Q.   ARE THESE THE ENTRIES HERE?

8    A.   UM-HUM.

9    Q.   THERE'S AN ENTRY OF SHORT-TERM LOAN APS MANAGEMENT FEE

10   ADVANCE.  DO YOU SEE THAT?

11   A.   YES, I DO.

12   Q.   WHAT'S THE AMOUNT?

13   A.   $1,308,086.50.

14   Q.   DO YOU KNOW ANYTHING ABOUT WHAT THE APS MANAGEMENT FEE

15   ADVANCE IS?

16   A.   NO, I DO NOT.

17   Q.   OKAY.  IF WE CAN GO TO THE BOTTOM HALF OF THIS DOCUMENT,

18   THERE'S -- DO YOU SEE THE HEADER OF "FINANCING ACTIVITIES"?

19   A.   YES.

20   Q.   AND A LIST OF LIMITED MEMBERS?

21   A.   YES.

22   Q.   OKAY.  WHAT ARE THOSE?

23   A.   THESE WOULD BE THE INVESTORS.

24   Q.   DID THE COMPANY KEEP TRACK OF ITS INVESTORS THROUGH QUICK

25   BOOKS?

CAGLE DIRECT

```
1    A.   YES, IT DID.

2    Q.   IF YOU WOULD TURN TO THE GREENLIGHT FUND, WHICH IS SEVEN

3    PAGES IN, I THINK.  SORRY, SIX PAGES.

4         MR. LEEMING:  AND CAN YOU INDICATE WHAT PAGE YOU'RE

5    IN, COUNSEL?

6         MR. KALEBA:  IT'S THE SIXTH ONE IN THIS DOCUMENT,

7    GREENLIGHT FUND LLC.

8         THE WITNESS:  STATEMENT OF CASH FLOWS.

9         MR. LEEMING:  GOT IT.

10   BY MR. KALEBA:

11   Q.   SAME QUESTION.  DO YOU SEE A LIST OF SHORT-TERM LOANS AT

12   THE TOP?

13   A.   YES, I DO.

14   Q.   OKAY.  AND DO YOU SEE A LIST OF LIMITED MEMBERS AT THE

15   BOTTOM?

16   A.   YES.

17   Q.   IS THIS A SCHEDULE OF BORROWERS AND INVESTORS FOR --

18   A.   YES, IT IS.

19   Q.   -- THE GREENLIGHT FUND?

20   A.   FOR GREENLIGHT FUND.

21   Q.   OKAY.  NINE PAGES IN, PLEASE.  DO YOU SEE THE APS FUNDING

22   STATEMENT OF CASH FLOW?

23   A.   YES.

24   Q.   OKAY.  I WANT TO GO THROUGH THE FIRST HALF OF THE

25   OPERATING ACTIVITIES.  WHAT DO WE SEE HERE?
```

```
 1    A.   I SEE BALANCES FOR NOTE RECEIVABLES FOR BARBRA ALEXANDER,

 2    BETH PINA, MICHAEL SWANSON, ORGANIZATIONAL EXPENSES, GOLD COAST

 3    FINANCIAL, MANAGEMENT FEE ADVANCE, CREDIT CARD, AMERICAN

 4    EXPRESS.

 5    Q.   OKAY.  WHEN YOU SEE A MINUS SIGN NEXT TO IT, DOES THAT

 6    MEAN MONIES GOING IN OR COMING OUT?

 7    A.   I BELIEVE THAT WAS MONEY GOING OUT.

 8    Q.   OKAY.  WE WENT THROUGH CHECKS EARLIER -- WE WENT THROUGH A

 9    LOT OF CHECKS EARLIER, CHECKS TO SOME OF THE PRINCIPALS.

10         DID THE COMPANY KEEP TRACK OF THOSE CHECKS THROUGH QUICK

11    BOOKS?

12    A.   YES.

13    Q.   OKAY.  IS THAT WHAT WE'RE SEEING HERE?

14    A.   YES.

15    Q.   OKAY.  I'D LIKE TO GO TO THE LAST THREE PAGES OF THE

16    DOCUMENT, WHICH IS THE APS FUNDING EXPENSES BY VENDOR SUMMARY.

17    ARE YOU ABLE TO -- I THINK IT'S THE 21ST PAGE IN.  GREAT.

18    THAT'S IT.

19         WHAT ARE WE LOOKING AT HERE?

20    A.   THE EXPENSES BY VENDOR FROM JANUARY OF 2001 TO JANUARY OF

21    2014.

22    Q.   OKAY.  ARE WE GOING TO SEE YOUR NAME LISTED IN HERE

23    ANYWHERE?

24    A.   I DON'T BELIEVE SO.  OH, YEAH, YOU WILL, FOR MY PAYCHECK,

25    MY PAY.
```

1    Q.   OKAY.

2    A.   THIS WOULD HAVE BEEN MY PAY THAT I MADE DURING THAT TIME.

3    Q.   WILL WE SEE JACKIE LAMBERT'S NAME IN HERE?

4    A.   YES.

5    Q.   OKAY.  HOW MUCH WERE YOU PAID DURING THIS PERIOD OF TIME?

6    A.   $41,235.23.

7    Q.   ARE WE GOING TO SEE MONEY DOTS IN THIS LIST?

8    A.   YES, YOU ARE.

9    Q.   HOW MUCH DID MONEY DOTS GET?

10   A.   $174,700.

11   Q.   OKAY.  ARE WE GOING TO SEE CELEBRITY CRUISES?

12   A.   YES, YOU ARE.

13   Q.   WHAT WAS THAT ALL ABOUT?

14   A.   BETH PINA, THAT WAS HER VACATION.  SHE LIKED TO TAKE

15   CRUISES.

16   Q.   ARE WE GOING TO SEE AIR JAMAICA?

17   A.   YES.

18   Q.   WHAT WAS THAT?

19   A.   THAT WOULD BE BARBRA GOING TO JAMAICA ON HER VACATION.

20   Q.   WHAT ABOUT ALASKAN AIRLINES?

21   A.   ALSO THAT WOULD HAVE BEEN FOR A VACATION OF SOME SORT.

22   Q.   WILL WE SEE THE VENETIAN LAS VEGAS?

23   A.   YES.

24   Q.   IS THAT ON THE LAST PAGE OF THIS DOCUMENT?

25   A.   YES.

CAGLE DIRECT

1    Q.    WHAT IS THAT?

2    A.    THAT WOULD HAVE BEEN TRAVEL TO VEGAS, I BELIEVE IT WAS FOR

3    A CONVENTION THAT THEY WENT TO.

4    Q.    OKAY.  WHY DON'T WE MOVE INTO A NEW AREA NOW AND PUT THESE

5    ASIDE.

6         BESIDES THE ACCOUNTS PAYABLE, THE MAINTAINING OF THESE

7    RECORDS, DID -- WHAT WAS YOUR INVOLVEMENT WITH THE BORROWERS OF

8    GREENLIGHT OR GCF OR ANY OF THE OTHERS?

9    A.    I DIDN'T HAVE MUCH INVOLVEMENT WITH THE BORROWERS.

10   Q.    WHAT INVOLVEMENT THEN DID YOU HAVE?

11   A.    USUALLY I WOULD HAVE THEIR PAYMENT COME TO ME VIA THE POST

12   OFFICE BOX, OR MAYBE IT HAD BEEN DELIVERED TO THE HOME AT

13   21 ALTA BATES DRIVE, AND THEN I WOULD MAKE THAT DEPOSIT FOR THE

14   BORROWER.

15   Q.    DO YOU RECALL, DURING THE COURSE OF YOUR EMPLOYMENT, ANY

16   ISSUES OR PROBLEMS WITH THE REPAYMENT BY BORROWERS?

17   A.    YES.  THERE WAS -- WE WEREN'T RECEIVING PAYMENTS FROM

18   BORROWERS.

19   Q.    OKAY.  WHEN WAS THIS?

20   A.    THAT WOULD HAVE BEEN IN 2008, 2009.  I WAS SEEING THAT

21   THERE WASN'T AS MUCH ACTIVITY COMING FROM THE BORROWERS.

22   Q.    CAN YOU GIVE AN ESTIMATE OF HOW MUCH LESS MONEY PER MONTH

23   YOU WERE RECEIVING?

24   A.    NO, I DON'T RECALL THAT.

25   Q.    OKAY.  WHO WAS RESPONSIBLE FOR MANAGING THE LOANS?

668

CAGLE DIRECT

1     A.    THAT WOULD HAVE BEEN BARBRA OR BETH.

2     Q.    OKAY.  WHO WAS RESPONSIBLE FOR GETTING PAYMENT BACK FROM

3     THE BORROWERS?

4     A.    BARBRA AND BETH.

5     Q.    WHO WAS RESPONSIBLE FOR COLLECTING ON LOANS THAT ARE IN

6     DEFAULT?

7     A.    THAT WOULD HAVE BEEN BARBRA OR BETH.

8     Q.    WHAT ABOUT WHO WAS RESPONSIBLE FOR THE FORECLOSURE OF ANY

9     LOANS THAT WERE IN DEFAULT?

10    A.    AGAIN, BARBRA OR BETH.

11    Q.    DO YOU RECALL, DURING YOUR EMPLOYMENT, WHETHER THEY MADE

12    ANY FORECLOSURE ACTIONS AGAINST ANY OF THEIR BORROWERS?

13    A.    NO, I DON'T RECALL ANY OF THAT.

14    Q.    DO YOU RECALL WHETHER THEY SUED ANY OF THEIR BORROWERS TO

15    TRY TO COLLECT ANY OF THAT MONEY?

16    A.    NO, I DON'T RECALL THAT.

17    Q.    WHAT DO YOU RECALL ABOUT THEIR EFFORTS TO GET REPAYMENT OF

18    THEIR LOANS?

19    A.    WHAT I DO RECALL IS SPEAKING WITH BETH PINA AT ONE POINT

20    ABOUT THE FACT THAT THERE -- I NOTICED THAT THERE WAS -- THAT

21    YOU COULD IMPLEMENT A PAST DUE STATEMENT TO SEND TO THE

22    BORROWER AND SHE INDICATED THAT SHE WOULD TAKE CARE OF THOSE

23    THINGS.

24         I DID NOT HAVE A LOT TO DO WITH THE SENDING OF STATEMENTS

25    TO THE BORROWERS OR LATE NOTICES.  THAT WAS USUALLY BARBRA OR

1    BETH ON A SYSTEM CALLED TRAKKER, AND I WAS NOT FAMILIAR WITH

2    THAT SYSTEM.

3    Q.   SO I WANT TO CHANGE FROM THE COLLECTION OF LOANS THAT WERE

4    EXISTING TO THE ISSUANCE OF NEW LOANS TO NEW BORROWERS.

5         DID THE VOLUME OF LOAN ACTIVITY EVER CHANGE DURING THE

6    COURSE OF YOUR EMPLOYMENT?

7    A.   YES.

8    Q.   OKAY.  WHEN?

9    A.   I WOULD SAY AT THE -- IN 2008 IT DECLINED AS FAR AS

10   BORROWERS COMING IN.

11        IN 2009, I DON'T RECALL ANY LOANS BEING GIVEN AT THAT

12   TIME.

13   Q.   OKAY.  DO YOU RECALL WHETHER ANY GREENLIGHT FUNDS WERE

14   USED TO PAY -- TO MAKE NEW LOANS, REAL ESTATE LOANS?

15   A.   NO.

16   Q.   OKAY.  WHO WAS RESPONSIBLE FOR MANAGING THE GREENLIGHT

17   LENDING ON BEHALF OF THE COMPANY?

18   A.   THAT WOULD HAVE BEEN BARBRA ALEXANDER OR BETH PINA.

19   Q.   DO YOU KNOW WHETHER DEEDS OF TRUST WERE EVER SECURED ON

20   PROPERTIES?

21   A.   THAT WAS WHAT THEY WERE SUPPOSED TO DO WAS THE DEEDS OF

22   TRUST.  I NEVER SAW THOSE AFTER A PERIOD OF TIME.

23   JACKIE LAMBERT WAS PUT IN PLACE TO TAKE CARE OF THAT DETAIL.

24   Q.   OKAY.  BUT YOU JUST DON'T KNOW ONE WAY OR THE OTHER?  IS

25   THAT FAIR?

CAGLE DIRECT

1        A.   THAT'S FAIR.

2             MR. KALEBA:   OKAY.  I'M READY TO GO INTO A NEW AREA.

3        DO YOU WANT TO --

4             THE COURT:   YES, IT'S 3:29 -- OH, IT JUST TURNED

5        3:30.

6             ALL RIGHT.  LET'S TAKE OUR LAST BREAK OF THE DAY, TEN

7        MINUTES, AND THEN WE'LL GO TO 4:30.

8             THANK YOU ALL.  PLEASE DON'T DISCUSS OR RESEARCH THE CASE.

9             YOU MAY STEP DOWN.

10            THE WITNESS:   THANK YOU.

11            (JURY OUT AT 3:30 P.M.)

12            (RECESS FROM 3:30 P.M. UNTIL 3:41 P.M.)

13            (JURY IN AT 3:41 P.M.)

14            THE COURT:   ALL RIGHT.  WELCOME BACK.  WE'RE IN THE

15       HOME STRETCH FOR THE WEEK.  WE'LL END AT 4:30.

16            PLEASE TAKE A SEAT.

17            GO AHEAD, PLEASE.

18            MR. KALEBA:   THANK YOU, YOUR HONOR.

19       Q.   MS. CAGLE, I'D LIKE TO ASK YOU NOW ABOUT YOUR EXPERIENCE

20       WITH THE LIMITED MEMBERS, OR THE INVESTORS OF THE GREENLIGHT

21       AND GCF INVESTMENT, LLC.

22            DURING THE COURSE OF YOUR EMPLOYMENT, DID YOU PREPARE

23       INTEREST CHECKS PAYABLE TO THE INVESTORS?

24       A.   YES.

25       Q.   OKAY.  WHO SIGNED THOSE CHECKS?

```
 1        A.    BARBRA ALEXANDER.

 2        Q.    HOW DID YOU KNOW HOW MUCH MONEY TO SEND TO THE INDIVIDUAL

 3   INVESTORS?

 4        A.    BETH USUALLY HAD THOSE READY FOR ME TO PRINT WHEN I WOULD

 5   COME INTO THE OFFICE.

 6        Q.    WAS SHE IN IDAHO AT THIS TIME?

 7        A.    YES.

 8        Q.    SO EXPLAIN HOW THAT WOULD WORK.

 9        A.    SHE HAD ACCESS TO OUR COMPUTER THROUGH ANOTHER SOFTWARE

10   PROGRAM THAT SHE COULD COME IN REMOTELY FROM IDAHO AND MAKE THE

11   INVESTOR CHECKS, GET THEM QUEUED TO THE SYSTEM FOR ME TO PRINT

12   WHEN I CAME IN.

13        Q.    OKAY.  AND ON AVERAGE, WHAT WAS THE AVERAGE MONTHLY AMOUNT

14   OF MONEY PER MONTH THAT WAS BEING SENT OUT TO INVESTORS AS

15   INTEREST PAYMENTS?

16        A.    I DON'T REMEMBER AN EXACT AMOUNT.

17        Q.    OKAY.  DO YOU KNOW THE SOURCE OF MONEY THAT WAS BEING USED

18   TO PAY THE INVESTORS THE INTEREST PAYMENTS?

19        A.    THEY WERE COMING FROM THE FUND THAT THEY WERE SIGNED UP

20   WITH.

21        Q.    OKAY.  DID YOU OBSERVE SUFFICIENT FUNDS FROM THE REPAYMENT

22   OF LOANS TO MAKE THE INTEREST PAYMENTS?

23        A.    NO.

24        Q.    SO WHERE WAS THE MONEY COMING FROM?

25        A.    IT WAS COMING FROM NEW INVESTMENT MONEY.
```

672

1    Q.    WERE YOU, YOURSELF, AN INVESTOR?

2    A.    YES, I WAS.

3    Q.    WHEN DID YOU DECIDE -- WHEN DID YOU INVEST WITH APS?

4    A.    IN NOVEMBER OF 2006, THE -- I HAD TWO POSITIONS THAT I WAS

5    WORKING AT THE TIME, AND IN THE POSITION THAT I HELD IN SALINAS

6    FOR A COMPANY CALLED PACIFIC ARCHITECTURAL HARDWOODS, IT WENT

7    IN A DIFFERENT DIRECTION, AND I HAD MONEY THROUGH A 401 IRA

8    ACCOUNT, AND I HAD MENTIONED THAT TO BARBRA ALEXANDER, THAT I

9    HAD MONIES COMING, AND SHE SAID, "WELL, WHY DON'T YOU GO AHEAD

10   AND BRING IT OVER TO THE INVESTMENT COMPANY?"

11         SO I DID THAT AT THAT TIME.  I BELIEVE IT WAS IN JANUARY

12   OF 2007.  $20,000 IS WHAT I INVESTED.

13   Q.    OKAY.  WAS THAT YOUR ONLY INVESTMENT WITH THE FUND?

14   A.    NO, IT WAS NOT.

15   Q.    OKAY.  HOW MANY OTHER INVESTMENTS DID YOU MAKE?

16   A.    BETWEEN MY HUSBAND AND I, THERE WAS A TOTAL OF THREE

17   INVESTMENTS.

18   Q.    OKAY.  BETWEEN WHAT DATE RANGE?

19   A.    THE SECOND AND THIRD DID NOT HAPPEN UNTIL THE END -- I

20   BELIEVE IT WAS THE END OF 2009, OR -- 2008, DECEMBER, AND

21   JANUARY I BELIEVE OF 2009.  IT WAS FROM AN ACCOUNT FROM OUR

22   DEAN ROCHE MORGAN STANLEY.  WITH THE MARKET AND EVERYTHING KIND

23   OF CRASHING, WE WERE LOSING MONEY IN THERE, SO WE DECIDED TO

24   REMOVE IT AND PUT IT INTO THE GREENLIGHT FUND AT THAT TIME.

25   Q.    OKAY.  COULD YOU TURN TO EXHIBIT NUMBER 26, PLEASE.

```
 1           DO YOU SEE THIS DOCUMENT?

 2     A.   YES.

 3     Q.   AND DO YOU SEE ANYTHING ABOUT THIS DOCUMENT THAT RELATES

 4     TO ONE OF YOUR INVESTMENTS?

 5     A.   YES.

 6     Q.   WHAT IS THAT?

 7     A.   THIS IS COMING THROUGH IRA SERVICES IN DECEMBER OF 2008

 8     FOR $15,225.49.

 9     Q.   OKAY.  AND WAS THIS --

10     A.   IT WAS A WIRE.

11     Q.   THIS WAS ONE OF YOUR --

12           WE WOULD MOVE TO ADMIT EXHIBIT 26, YOUR HONOR.

13              MR. LEEMING:  NO OBJECTION.

14              THE COURT:  IT'S ADMITTED.

15         (PLAINTIFF'S EXHIBIT 26 WAS ADMITTED IN EVIDENCE.)

16              THE COURT:  GO AHEAD, PLEASE.

17              MR. KALEBA:  MAY IT BE PUBLISHED?

18              THE COURT:  PLEASE, GO AHEAD.

19     BY MR. KALEBA:

20     Q.   OKAY.  IN THE MIDDLE, YOU SAID THERE WAS A DOLLAR AMOUNT.

21     COULD YOU PLEASE -- SORRY, IN THE MIDDLE.

22     A.   $15,225.49.

23     Q.   OKAY.  WAS THIS YOUR MONEY?

24     A.   YES.

25     Q.   OKAY.  WHERE WAS THE MONEY BEING HELD?
```

CAGLE DIRECT

```
1    A.   IT WAS BEING HELD IN IRA SERVICES, A TRUST COMPANY.

2    Q.   IS THAT A RETIREMENT ACCOUNT?

3    A.   IT WAS AN ACCOUNT TO, WHICH WAS COMING FROM MY 401(K), AND

4    THEN IT WOULD GO TO IRA SERVICES, WHICH WAS A, KIND OF A HOLDER

5    OF THAT FUND, AND THEN IT WOULD BE RELEASED TO APS FUNDING

6    TRUST ACCOUNT.

7    Q.   OKAY.  DID YOU WIRE ADDITIONAL MONIES AFTER THIS?

8    A.   YES.

9    Q.   OKAY.  COULD YOU TURN TO EXHIBIT NUMBER 27?  WHAT IS THIS?

10   A.   THESE ARE FUNDS THAT WERE TRANSFERRED ALSO INTO IRA

11   SERVICES FOR APS FUND TRUST ACCOUNT FOR $38,797.15.

12   Q.   AND IS THIS THE MONEY THAT RELATES TO YOUR INVESTMENT WITH

13   APS?

14   A.   YES, MINE AND MY HUSBAND'S.

15        MR. KALEBA:  MOVE TO ADMIT EXHIBIT 27, PLEASE.

16        MR. LEEMING:  NO OBJECTION.

17        THE COURT:  IT'S ADMITTED.

18   (PLAINTIFF'S EXHIBIT 27 WAS ADMITTED IN EVIDENCE.)

19        THE COURT:  GO AHEAD, PLEASE.

20        MR. KALEBA:  CAN YOU PUBLISH IT?  COULD YOU PULL THE

21   MIDDLE SECTION?

22   Q.   AND SHOW US WHERE THE AMOUNT IS.  DO YOU SEE THAT ON THE

23   SCREEN?

24   A.   YES.

25   Q.   COULD YOU PLEASE READ THE AMOUNT AGAIN?
```

CAGLE DIRECT

```
 1        A.   $38,797.15.

 2        Q.   OKAY.  WHAT WAS THE TOTAL AMOUNT OF YOUR INVESTMENT WITH

 3   MS. ALEXANDER?

 4        A.   IT WAS PROBABLY CLOSE TO $80,000 TOTAL.

 5        Q.   WHY DID YOU INVEST WITH MS. ALEXANDER?

 6        A.   SHE CONVINCED MY HUSBAND AND I THAT IT WAS A SAFE

 7   INVESTMENT, THAT OUR MONEY WOULD BE HELD WITH A DEED OF TRUST

 8   FROM THE BORROWER THAT OUR MONEY WOULD BE HELPING.  SO -- AND

 9   THE RETURN WAS ATTRACTIVE AT THE TIME BECAUSE OF WHAT WAS

10   HAPPENING WITH OUR ACCOUNT, WHERE IT WAS BEFORE.  WE WERE

11   LOSING MONEY.

12        Q.   WERE YOU PROMISED A CERTAIN RATE OF RETURN?

13        A.   YES, I WAS.

14        Q.   WHAT WAS THAT?

15        A.   IT WAS 1 PERCENT PER ANNUM I BELIEVE IS WHAT WE WERE

16   PROMISED.

17        Q.   OKAY.  AND DID YOU EXPECT A YEARLY RETURN?

18        A.   WE DID NOT TAKE A DIVIDEND CHECK EVERY MONTH.  WE ROLLED

19   IT OVER SO WE JUST KEPT SEEING OUR FUND GROW.  WE JUST RECEIVED

20   A STATEMENT EACH MONTH.

21        Q.   OKAY.  WHEN YOU SAY "1 PERCENT PER ANNUM," WHAT DOES THAT

22   MEAN TO YOU?

23        A.   THAT THE MONEY THAT WAS LOANED TO THE BORROWERS, THAT

24   THEIR -- THE RATE OF INTEREST WAS, SAY, 14 PERCENT AND IT WAS

25   ONLY -- I GET CONFUSED WITH ALL THIS.  IT'S NOT MY THING.
```

1           ANYWAY, IT WAS A 1 PERCENT PER ANNUM IS WHAT WE WERE GOING

2      TO GET.  SO IF THERE WAS $1,000, IT WAS $100 INTEREST THAT WE

3      WOULD ACCRUE.

4      Q.   AND WOULD YOU GET THAT 1 PERCENT FOR THE WHOLE YEAR OR FOR

5      A PERIOD OF TIME?

6      A.   A PERIOD OF TIME, EACH MONTH.

7      Q.   SO 1 PERCENT PER MONTH?

8      A.   YES, SO 12 PERCENT PER YEAR.

9      Q.   WERE YOU TOLD THAT YOUR MONEY WOULD BE INVESTED IN REAL

10     ESTATE?

11     A.   YES.

12     Q.   WERE YOU TOLD THAT YOUR MONEY WOULD BE INVESTED IN THINGS

13     NOT REAL ESTATE?

14     A.   NO.

15     Q.   DID YOU RELY ON THESE PROMISES BEFORE INVESTING WITH

16     MS. ALEXANDER?

17     A.   YES, WE DID.

18     Q.   DID YOU RECEIVE ANY DOCUMENTS BEFORE INVESTING WITH

19     MS. ALEXANDER?

20     A.   YES.

21     Q.   OKAY.

22     A.   WE SIGNED DOCUMENTS.

23     Q.   WOULD YOU TURN TO EXHIBIT NUMBER 71.  ARE YOU THERE?

24     A.   YEP.

25     Q.   OKAY.  WOULD YOU TAKE A MOMENT TO LOOK THROUGH THESE

```
 1        DOCUMENTS?  HAVE YOU SEEN THESE MATERIALS BEFORE?

 2        A.   YES, I HAVE.

 3        Q.   DID YOU RECEIVE THESE MATERIALS FROM APS?

 4        A.   YES, WE DID.

 5        Q.   DID THEY RELATE TO YOUR INVESTMENT?

 6        A.   YES.

 7               MR. KALEBA:  OKAY.  WE MOVE TO ADMIT 71.

 8               MR. LEEMING:  NO OBJECTION.

 9               THE COURT:  IT'S ADMITTED.

10        (PLAINTIFF'S EXHIBIT 71 WAS ADMITTED IN EVIDENCE.)

11               THE COURT:  GO AHEAD, PLEASE.

12   BY MR. KALEBA:

13        Q.   MS. CAGLE, DID YOU READ THESE MATERIALS BEFORE INVESTING?

14        A.   I BELIEVE WE DID SCAN THROUGH THEM, YES.

15        Q.   DID YOU CAREFULLY READ THEM?

16        A.   NO, I DON'T THINK I CAREFULLY READ THEM.

17        Q.   COULD YOU TURN TO PAGE 20?

18             IF THAT COULD BE PUBLISHED, PLEASE.

19             ARE YOU THERE?

20        A.   YES.

21        Q.   THIS IS THE SUITABILITY STATEMENT?

22        A.   YES.

23        Q.   HAVE YOU SEEN THIS BEFORE?

24        A.   YES.

25        Q.   DID YOU FILL OUT THIS FORM?
```

CAGLE DIRECT

```
1     A.   YES, I DID.

2     Q.   OKAY.  DID YOU WRITE YOUR NAME RIGHT THERE ON THE BOTTOM?

3     IS THAT YOUR HANDWRITING?

4     A.   YES, IT IS.

5     Q.   OKAY.  COULD YOU TURN TO THE NEXT PAGE?  DID YOU -- IS

6     THIS YOUR HANDWRITING HERE?

7     A.   YES, IT IS.

8     Q.   COULD YOU TURN TO PAGE 23, QUESTION NUMBER 14.

9     A.   UM-HUM.

10    Q.   DID YOU FILL OUT THIS PAGE AS WELL?

11    A.   YES.

12    Q.   AND AT THE TIME, IN 2008, DID YOU HAVE A COMBINED NET

13    WORTH OF BETWEEN A MILLION DOLLARS AND $4.9 MILLION?

14    A.   YES.

15    Q.   OKAY.  AND THE INCOME STATEMENT, IS THIS ACCURATE BELOW

16    IT, QUESTIONS 15 THROUGH 17?

17    A.   YES.

18    Q.   OKAY.  PAGE 24, QUESTION NUMBER 22, THIS IS A

19    QUESTIONNAIRE ABOUT YOUR INVESTMENT EXPERIENCE.

20    A.   YES.

21    Q.   OKAY.  DID YOU FILL THOSE OUT?

22    A.   YES.

23    Q.   AND ARE THESE STATEMENTS TRUE THAT YOU'VE MARKED?

24    A.   YES.

25    Q.   YOU'D NEVER HAD ANY INVESTMENT EXPERIENCE IN MARKET
```

CAGLE - DIRECT

```
1     SECURITIES AT THE TIME?

2     A.   NOT THAT I RECALL, NO.

3     Q.   DID YOU EVER -- YOU NEVER HAD INVESTMENT SECURITY IN

4     COMMODITIES FEATURES?

5     A.   NO.

6     Q.   NEVER IN OPTIONS?

7     A.   NO.

8     Q.   NEVER IN SECURITIES PURCHASED ON MARGIN?

9     A.   NO.

10    Q.   NEVER ON ILLIQUID SECURITIES?

11    A.   NO.

12    Q.   DO YOU EVEN KNOW WHAT THOSE THINGS ARE?

13    A.   NO.

14    Q.   OKAY.  TURN THE PAGE PREVIOUSLY.

15    A.   PAGE 23?

16    Q.   YES, BACK TO PAGE 23 AT THE BOTTOM.  THERE'S A QUESTION

17    ABOUT PREEXISTING RELATIONSHIPS.  DO YOU SEE THAT?

18    A.   YES.

19    Q.   AND YOU HAVE TO TURN THE PAGE TO 22 TO SEE WHETHER OR NOT

20    YOU HAVE A PREEXISTING RELATIONSHIP WITH THREE PEOPLE.  AND WHO

21    DID YOU MARK?

22    A.   BARBRA ALEXANDER AND BETH PINA.

23    Q.   OKAY.  WHAT WAS YOUR PREEXISTING RELATIONSHIP WITH THOSE

24    TWO PERSONS?

25    A.   BEFORE GOING INTO THE GREENLIGHT FUND, I HAD WORKED FOR
```

CAGLE DIRECT

1     BOTH OF THESE PEOPLE.

2     Q.   OKAY.  BEFORE GOING INTO THE FUND, DID YOU HAVE ANY

3     RELATIONSHIP WITH MR. SWANSON?

4     A.   NO.

5     Q.   DID YOU EVER RECEIVE MONTHLY INTEREST PAYMENTS FROM YOUR

6     INVESTMENT?

7     A.   NO.

8     Q.   DID YOU WANT YOUR PAYMENTS OR DID YOU WANT THE MONEY TO BE

9     ROLLED INTO THE FUND?

10    A.   NO, I DID NOT WANT THE PAYMENTS.  I JUST WANTED IT ROLLED

11    INTO IT.

12    Q.   OKAY.  IS THAT WHAT YOU WANTED TO HAVE HAPPEN?

13    A.   YES.

14    Q.   DID YOU EVER CHANGE THAT AT SOME POINT?

15    A.   AT THE -- IN MAY OF 2009, I REQUESTED TO HAVE OUR FUNDS

16    RETURNED.

17    Q.   OKAY.  WHY DID YOU DO THAT?

18    A.   IN MAY OF 2009, I SAW THAT THERE WAS A CASH FLOW PROBLEM

19    WITH THE COMPANY AND BECAME CONCERNED, SO THAT'S WHEN I ASKED

20    FOR, IN WRITING, FOR MY INVESTMENTS TO BE RETURNED TO ME.

21    Q.   WHO DID YOU ASK FOR YOUR MONEY BACK?

22    A.   I TURNED IT IN TO BETH PINA.

23    Q.   OKAY.  DID YOU EVER SPEAK WITH MS. PINA ABOUT GETTING YOUR

24    MONEY BACK?

25    A.   YES.

```
1    Q.   OKAY.  WHAT WERE YOU TOLD BY MS. PINA?

2    A.   THAT THERE WERE OTHER INVESTORS THAT WERE IN FRONT OF ME,

3    AND THAT AS FUNDS WERE AVAILABLE, THAT THE FUNDS WOULD BE

4    RETURNED.

5    Q.   OKAY.  AND WHAT DID YOU UNDERSTAND THAT TO MEAN, AS FUNDS

6    WERE AVAILABLE, YOUR FUNDS COULD BE RETURNED?

7    A.   THAT AS I -- I UNDERSTOOD THAT TO BE AS OTHER INVESTORS

8    CAME INTO THE FUND, THAT I WOULD HAVE MY FUNDS RETURNED.

9    Q.   DID YOU EVER ASK MS. ALEXANDER FOR YOUR MONEY BACK?

10   A.   NO, I DON'T BELIEVE I EVER DID TALK WITH BARBRA ALEXANDER

11   ABOUT THAT.

12   Q.   IN MAY OF 2009, WAS THE COMPANY STILL RECRUITING NEW

13   INVESTORS?

14   A.   YES, THEY WERE.

15   Q.   OKAY.  WHAT WAS BEING DONE WITH THE NEW INVESTOR MONEY?

16   A.   IT WAS PAYING OTHER INVESTORS' INTEREST PAYMENTS.

17   Q.   WAS YOUR PRINCIPAL EVER RETURNED TO YOU?

18   A.   NO, IT WAS NOT.

19   Q.   DID YOU EVER SPEAK WITH MS. ALEXANDER ABOUT THE USE OF

20   INVESTOR MONEY TO FUND MONEY DOTS?

21   A.   I SPOKE WITH BARBRA ALEXANDER ABOUT THAT, BUT MOSTLY I

22   SPOKE WITH BETH PINA AND MICHAEL SWANSON AS WELL.

23   Q.   WHAT DID YOU DISCUSS WITH THEM?

24   A.   THAT I -- AT FIRST IT WAS WITH BETH, THAT I NO LONGER

25   WANTED TO BE RESPONSIBLE FOR WRITING THE PAYROLL CHECKS FOR
```

1       MONEY DOTS.  I DIDN'T BELIEVE THAT IT WAS SOMETHING THAT THE

2       COMPANY WAS -- NEEDED TO BE PUTTING MONEY INTO.

3           I DIDN'T -- I ALSO DID NOT WANT TO DO THE BOOKKEEPING FOR

4       BARBRA ALEXANDER PERSONALLY.  I DIDN'T -- I FELT LIKE IT WAS A

5       CONFLICT.  I DID SEE -- I DID NOT LIKE WHAT I WAS SEEING THERE,

6       AND SO I ASKED TO BE REMOVED FROM THOSE DUTIES.

7           I DID TALK TO BARBRA ABOUT THAT AT ONE POINT, THAT I

8       WANTED TO HAVE THAT DISCUSSION WITH HER.  I ASKED HER TO COME

9       INTO THE OFFICE THERE AT EL DORADO AFTER A LUNCH THAT I HAD

10      WITH HER, AND SHE WOULD NOT EVEN COME INTO THE OFFICE AND TALK

11      WITH ME ABOUT IT.  SHE SAID THAT I NEEDED TO TALK TO BETH PINA

12      ABOUT THAT.

13          I TOLD HER THAT I HAD ALREADY SPOKEN TO BETH PINA ABOUT NO

14      LONGER DOING THE WORK FOR MONEY DOTS AND I WAS NOT HAPPY WITH

15      THE MONEY THAT WAS GOING INTO THERE.

16          SHE WAS NOT HAPPY WITH THAT AND DROVE OFF, AND I NEVER GOT

17      ANOTHER RESPONSE FROM HER REGARDING THOSE DUTIES.

18  Q.  DID YOU EVER HAVE CONVERSATIONS WITH HER ABOUT THE PARTNER

19      COMPENSATION, HOW THE PARTNERS WERE GETTING PAID?

20  A.  I DO NOT RECALL THOSE CONVERSATIONS.

21  Q.  DID YOU EVER RAISE IT WITH ANYBODY, WITH MS. PINA OR

22      MR. SWANSON?

23  A.  ONLY WITH REGARDS TO MONEY DOTS DID I TALK WITH

24      MR. SWANSON, THAT I WAS NOT HAPPY WITH WHAT I WAS SEEING GOING

25      OUT FOR MONEY DOTS.

CAGLE DIRECT

```
 1    Q.   OKAY.  WHAT ABOUT -- AND WHAT ABOUT FOR COMPANY EXPENSES?
 2    WERE YOU EVER CONCERNED ABOUT ANY COMPANY EXPENSES THAT YOU
 3    WERE ASKED TO PAY?
 4    A.   YES, I WAS.  I DID NOT LIKE SEEING BILLS BEING PAID FOR A
 5    MEETING TO BE HELD ON AN AIRPLANE.  I WAS NOT PLEASED WHEN I
 6    SAW MONEY BEING PAID FOR FUEL FOR A PRIVATE JET FOR
 7    MS. ALEXANDER TO GO AND HAVE A MEETING IN THE AIR.
 8    Q.   OKAY.  WHAT OTHER -- WHAT OTHER TYPES OF EXPENSES DID YOU
 9    SEE THAT YOU WERE CONCERNED ABOUT?
10    A.   JEEZ, IT'S BEEN SO LONG.  EXPENSES FOR TRAINING THE DOG.
11    I MEAN, WE WERE PAYING HER SALARY SO THAT SHE COULD TURN AROUND
12    AND PAY FOR HER DOG TRAINING.
13         OR THERE WERE JUST MULTIPLE LITTLE THINGS.  I CAN'T
14    REMEMBER ALL OF THEM STRAIGHT OFF.
15         BUT THE EXPENSES WERE -- I DIDN'T THINK THEY WERE
16    NECESSARY AND I QUESTIONED THEM.
17    Q.   WAS THERE ANY WORK BEING DONE ON MS. ALEXANDER'S HOME
18    WHILE YOU WERE THERE, DURING YOUR EMPLOYMENT?
19    A.   THOSE EXPENSES WERE A CONCERN ALSO.  SHE WAS GOING THROUGH
20    A COMPLETE KITCHEN REMODEL WHICH THEN TURNED INTO A LAND --
21    COMPLETE WITH LANDSCAPING OVER HER BACKYARD, NEW DECKING.  IT
22    WENT, YOU KNOW, OUT OF THE KITCHEN INTO THE DINING.  A LOT OF
23    MONEY WENT INTO THE HOME THAT SHE WAS LIVING IN AT THE TIME.
24    Q.   AND WERE THOSE EXPENSES RELATED TO THE REMODEL GIVEN TO
25    YOU BY MS. ALEXANDER?
```

1    A.   YES, THEY WERE.

2    Q.   WHAT WERE YOU SUPPOSED TO DO WITH THEM?

3    A.   I WAS SUPPOSED TO PAY THEM.

4    Q.   OUT OF WHAT ACCOUNTS?

5    A.   I WOULD PAY THEM OUT OF THE LLC ACCOUNT OR

6    BARBRA ALEXANDER'S PERSONAL ACCOUNT, AND THEN WE WOULD FUND HER

7    PERSONAL ACCOUNT FOR THOSE EXPENSES.

8    Q.   I WANT TO ASK YOU TO TURN TO EXHIBIT NUMBER 63, AND IF YOU

9    WOULD TURN TO PAGE 10 OF EXHIBIT NUMBER 63.  COULD YOU IDENTIFY

10   THE DOCUMENTS ON PAGES 10 AND 11, PLEASE?

11   A.   THIS IS A CHECK MADE OUT TO BARBRA ALEXANDER FROM

12   APS FUNDING COST ACCOUNT FOR $20,000 WITH AN INDICATION THAT IT

13   WAS FOR REMODEL EXPENSES.

14   Q.   AND THERE'S HANDWRITING ON IT.  WHOSE HANDWRITING IS THAT?

15   A.   THAT IS MINE.

16   Q.   AND THE NEXT PAGE, PLEASE.

17   A.   IT IS A CHECK FOR $8,000 TO BARBRA ALEXANDER, NOTES

18   RECEIVABLE, BARBRA ALEXANDER FOR REMODEL, REIMBURSEMENT FOR

19   REMODEL.

20   Q.   AND THERE'S HANDWRITING ON THIS CHECK.

21   A.   YES.

22   Q.   WHOSE IS THAT?

23   A.   THAT IS MINE.

24        MR. KALEBA:  YOUR HONOR, WE OFFER 63, PAGES 10 AND

25   11, INTO EVIDENCE.

CAGLE DIRECT

```
 1              MR. LEEMING:  NO OBJECTION.

 2              THE COURT:  THEY'RE ADMITTED.

 3         (PLAINTIFF'S EXHIBIT 63, PAGES 10 AND 11, WERE ADMITTED IN

 4    EVIDENCE.)

 5              THE COURT:  GO AHEAD, PLEASE.

 6              MR. KALEBA:  COULD YOU PLEASE PUBLISH PAGE 10?

 7    Q.   OKAY.  DO YOU REMEMBER THE DETAILS BEHIND THIS CHECK?

 8    A.   NO.

 9    Q.   WAS IT COMMON TO RECEIVE INVOICES RELATED TO THE REMODEL

10    THAT YOU WERE TOLD TO PAY?

11    A.   YES.

12    Q.   OKAY.  AND WHY DID YOU WRITE "REMODEL" ON THIS NOTE HERE?

13    A.   BECAUSE I KNEW THAT'S WHAT WE WERE REIMBURSING AND PAYING

14    HER FOR WAS FOR REMODEL EXPENSES.

15    Q.   AND DID SHE ASK YOU TO KEEP TRACK OF THE REMODELING

16    EXPENSES?

17    A.   NO.  BETH DID.

18    Q.   OKAY.  LET'S TURN THE PAGE, PLEASE, TO 11.  DO YOU

19    REMEMBER THE DETAILS BEHIND THIS?

20    A.   NO.  JUST REIMBURSEMENT FOR REMODEL.

21    Q.   AND WHY DID YOU WRITE "REIMBURSEMENT FOR REMODEL" ON IT?

22    A.   TO KEEP TRACK OF THE MONIES GOING TOWARDS THAT REMODEL OF

23    THE HOME.

24    Q.   OKAY.  AND FOR BOTH OF THESE, IT HAS, AT THE HEADER, THE

25    APS FUNDING, INC. COST ACCOUNT?
```

1    A.   YES.

2    Q.   THAT WAS ONE OF THE BUSINESS ACCOUNTS?

3    A.   THAT WAS THE BUSINESS ACCOUNT.

4    Q.   OKAY.  I WANT TO ASK YOU ABOUT SOME OF THE CREDIT CARD

5    PAYMENTS.  IF YOU WOULD TURN TO PAGE 18 OF EXHIBIT 63, AND

6    COULD YOU TAKE A MOMENT TO LOOK AT PAGES 18, 19, AND 20?

7    A.   YOU DO KNOW THESE AREN'T NUMBERED, RIGHT?

8         THE COURT:  THESE AREN'T NUMBERED.

9         MR. KALEBA:  THESE AREN'T.  I'M JUST --

10        THE COURT:  WHY DON'T YOU GIVE A BATES NUMBER?  THEN

11   WE ALL HAVE SOME COMMON REFERENCE POINT.

12        MR. KALEBA:  SURE.  IT BEGINS AT PAGE 696.

13        THE WITNESS:  OKAY.  THANK YOU.

14        THE COURT:  JUST FOR THE RECORD, WHAT IS THE BATES

15   FOR PAGE 10 AND PAGE 11?

16        MR. KALEBA:  THOSE WERE --

17        THE COURT:  THOSE ARE NOT BATES NUMBERED.  OH, NO,

18   THEY ARE.

19        MR. KALEBA:  IT'S APS B51000457 AND 459.

20        THE COURT:  THANK YOU.

21   BY MR. KALEBA:

22   Q.   COULD YOU TAKE A MOMENT TO LOOK AT BATES NUMBERS 696, 697,

23   AND 699?

24   A.   YES.

25   Q.   OKAY.  HAVE YOU SEEN THESE BEFORE?

```
 1      A.   YES.

 2      Q.   THERE'S HANDWRITING ON THAT.  WHOSE HANDWRITING IS THAT?

 3      A.   THAT IS MY HANDWRITING.

 4      Q.   AND WHEN DID YOU SEE THESE DOCUMENTS?

 5      A.   WHEN THE BILL WOULD COME IN.

 6      Q.   AND DID YOU MEET WITH ANYBODY ABOUT THESE DOCUMENTS?

 7      A.   I WOULD MEET WITH BARBRA ALEXANDER ABOUT THEM.

 8           MR. KALEBA:  WE OFFER EXHIBIT 63, BATES 696, 697, AND

 9      699 INTO EVIDENCE.

10           MR. LEEMING:  NO OBJECTION.

11           THE COURT:  THEY'RE ADMITTED.

12      (PLAINTIFF'S EXHIBIT 63, BATES PAGES 696, 697, AND 699,

13      WAS ADMITTED IN EVIDENCE.)

14           THE COURT:  GO AHEAD, PLEASE.

15      BY MR. KALEBA:

16      Q.   OKAY.  COULD YOU START AT PAGE 18 OF THE DOCUMENT, BATES

17      696?

18      A.   YES.

19      Q.   OKAY.  SO THERE'S AN ENTRY THAT HAS HANDWRITING NEXT TO IT

20      IN THE MIDDLE OF THE PAGE.

21      A.   FOR SAPPORO IN MONTEREY.  IT HAS THE NAME WALLACE GROVES

22      FOR $170.58.

23      Q.   OKAY.  WHAT IS SAPPORO?

24      A.   IT'S A RESTAURANT THERE ON MONTEREY ROAD.

25      Q.   OKAY.  IF YOU COULD GO HIGHLIGHT TO THE TOP OF THE
```

1    DOCUMENT, PLEASE.  OKAY.

2        DO YOU SEE AMERICAN EXPRESS?  BETH PINA, A&P PROPERTIES?

3    A.   YES.

4    Q.   OKAY.  IS THIS THE COMPANY AMERICAN EXPRESS CARD WE TALKED

5    ABOUT EARLIER?

6    A.   YES.

7    Q.   WHO HAD AUTHORITY TO MAKE CHARGES ON THIS ACCOUNT?

8    A.   BARBRA ALEXANDER AND BETH PINA.

9    Q.   OKAY.  ANYONE ELSE?

10   A.   NOT TO MY KNOWLEDGE, NO.

11   Q.   OKAY.  WOULD YOU TURN TO THE NEXT PAGE, 697.  THIS IS

12   ANOTHER PAGE FROM THE AMERICAN EXPRESS BILL?

13   A.   YES.

14   Q.   OKAY.  THERE'S HANDWRITING IN THE MIDDLE.  COULD YOU

15   EXPLAIN WHAT THIS IS?

16   A.   THESE EXPENSES ON THIS CREDIT CARD WERE ALL FOR REMODEL

17   EXPENSES, EXCEPT FOR THE ONE, AND IT WAS TRAVEL AND

18   ENTERTAINMENT.  IT WAS PROBABLY FOR A LUNCH OR DINNER AT A

19   LOCAL RESTAURANT.

20   Q.   IS THAT YOUR HANDWRITING?

21   A.   YES, IT IS.

22   Q.   HOW DID YOU KNOW THESE EXPENSES WERE RELATED TO THE

23   REMODEL?

24   A.   I WOULD SIT ACROSS FROM BARBRA ALEXANDER AND WE WOULD

25   DISCUSS WHAT THE CHARGES WERE FOR.

1    Q.   OKAY.  IF YOU COULD GO DOWN TO THE BOTTOM.  WHAT WAS THE

2    TOTAL DUE FOR THIS?

3    A.   TOTAL DUE FOR BARBRA ALEXANDER WAS $22,816.87.

4    Q.   AND THEN BELOW THAT THERE'S A TOTAL DUE IN FULL ACTIVITY?

5    A.   $24,012.68.

6    Q.   COULD YOU PULL EXHIBIT NUMBER 208 NEXT TO IT?  I'D LIKE IT

7    SIDE BY SIDE, PAGE 126.

8         I GAVE YOU THE WRONG EXHIBIT.  SORRY.  IT'S 211.

9              MS. BURNEY:  WITH PAGE 126?

10             MR. KALEBA:  YES.

11   Q.   DO YOU SEE CHECK NUMBER 2071?

12   A.   YES.

13   Q.   IS THAT THE AMERICAN EXPRESS --

14   A.   YES.

15   Q.   -- CHECK THAT PAID OFF THE BILL FOR REMODEL?

16   A.   CORRECT.

17             MR. KALEBA:  OKAY.  THANK YOU, YOUR HONOR.  NO

18   FURTHER QUESTIONS AT THIS TIME.

19             THE COURT:  ALL RIGHT.  PLEASE PROCEED WITH

20   CROSS-EXAMINATION.

21             MR. LEEMING:  THANK YOU, YOUR HONOR.

22                         **CROSS-EXAMINATION**

23   BY MR. LEEMING:

24   Q.   GOOD AFTERNOON.

25   A.   GOOD AFTERNOON.

1        Q.   SO I THINK I WANTED TO START OFF WHERE WE FINISHED.

2             IT SOUNDS LIKE YOU HAD SOME CONCERNS ABOUT THE WAY MONEY

3        WAS BEING SPENT; RIGHT?

4        A.   YES, I DID.

5        Q.   YOU WERE CONCERNED ABOUT SOME OF THESE CREDIT CARD

6        PAYMENTS; RIGHT?

7        A.   YES, I WAS.

8        Q.   YOU WERE CONCERNED ABOUT THIS REMODEL?

9        A.   YES, I WAS.

10       Q.   YOU WERE CONCERNED ABOUT SOME ENTERTAINMENT EXPENSES YOU

11       DIDN'T FEEL WERE APPROPRIATE?

12       A.   YES.

13       Q.   AND, YET, AFTER ALL OF THAT, YOU STILL INVESTED MONEY?

14       A.   YES.

15       Q.   AND THE REASON YOU DID THAT WAS BECAUSE THE RATE OF RETURN

16       REPORTED TO YOU WAS HIGHER THAN IN OTHER PLACES; CORRECT?

17       A.   YES.

18       Q.   BUT YOU HAD ACCESS TO THE BOOKS BEFORE YOU EVER INVESTED,

19       AT LEAST THE SECOND PART OF YOUR INVESTMENT; CORRECT?  OR THE

20       THIRD ONE?

21       A.   A PORTION OF THEM, YES.

22       Q.   OKAY.

23       A.   I'M SORRY.  WHAT'S YOUR NAME?

24       Q.   OH, I'M SORRY.  MY NAME IS PETER LEEMING.

25       A.   THANK YOU.

CAGLE CROSS

1    Q.   L-E-E-M-I-N-G.

2    A.   THANK YOU.

3    Q.   YES, THANK YOU.  I APOLOGIZE.

4         SO LET'S BACK UP A LITTLE BIT HERE.  YOU -- HOW DID YOU

5    COME TO WORK FOR BARBRA?

6    A.   I WAS WORKING PART-TIME FOR ANOTHER COMPANY IN SALINAS.

7    SHE HAD A MUTUAL FRIEND, AND THERE WAS SOME DISCUSSION ABOUT

8    ANOTHER COMPANY IN MONTEREY THAT WAS NEEDING PART-TIME HELP,

9    AND SO I WAS GIVEN DIRECTION BY THAT FRIEND TO GO AND APPLY FOR

10   THAT POSITION.  IT WASN'T A GOOD FIT FOR ME.

11        AND AT THAT TIME I BELIEVE BETH PINA WAS GOING TO BE

12   MOVING TO IDAHO AND THEY NEEDED SOMEONE TO COME INTO THE OFFICE

13   AND DO THE DAY-TO-DAY OFFICE WORK, AND SO I WAS APPROACHED BY

14   BARBRA AT THAT TIME FOR ME TO COME AND WORK PART-TIME FOR THEM.

15   Q.   AND ABOUT WHEN WAS THAT, THE BEST YOU CAN RECALL?

16   A.   IN MAY OF 2006.

17   Q.   AND AT THAT POINT I THINK YOU WERE SAYING THAT YOU DIDN'T

18   REALLY HAVE BOOK, BOOKKEEPING EXPERIENCE.  IS THAT RIGHT?

19   A.   I HAD SOME.

20   Q.   YOU HAD SOME?

21   A.   YES.

22   Q.   BUT YOU DIDN'T KNOW HOW TO USE QUICK BOOKS?

23   A.   I DIDN'T KNOW HOW TO USE QUICK BOOKS.

24   Q.   AND WAS THIS A PERIOD OF TIME WHEN BETH PINA WAS BEGINNING

25   TO MOVE OUT OF CALIFORNIA AND BACK --

CAGLE CROSS

1     A.   TO IDAHO, YES.

2     Q.   -- TO IDAHO?

3     A.   UM-HUM.

4     Q.   OKAY.  ABOUT HOW LONG WERE YOU AND BETH IN THE OFFICE AT

5     THE SAME TIME?

6     A.   I WOULD SAY MAYBE EIGHT WEEKS.  I THINK SHE WAS WAITING

7     FOR HER DAUGHTER, WHO WAS GRADUATING FROM HIGH SCHOOL IN JUNE,

8     BEFORE DEPARTING TO IDAHO.

9          SO I STARTED IN MAY OF 2006, AND I BELIEVE SHE LEFT THAT

10    SUMMER, IN JUNE OR JULY.

11    Q.   AND I TAKE IT BETH'S DAUGHTER WAS IN HIGH SCHOOL IN

12    CALIFORNIA; RIGHT?

13    A.   YES, YES.

14    Q.   OKAY.  SO -- AND DURING THAT PERIOD OF TIME, I GUESS YOU

15    WERE TRAINED ON THE JOB, SO TO SPEAK.  IS THAT FAIR TO SAY?

16    A.   YES.

17    Q.   AND DID YOU DO ANY FORMAL SEMINARS, ANYTHING LIKE THAT, ON

18    HOW TO USE QUICK BOOKS?

19    A.   NO.

20    Q.   YOU DIDN'T GO TO ONE OF THOSE QUICK BOOKS WEEKEND COURSES?

21    A.   NO, NO.

22    Q.   OKAY.  SO AFTER -- AFTER BETH WENT TO IDAHO, SHE WAS STILL

23    VERY MUCH WORKING IN THE COMPANY; RIGHT?

24    A.   YES, SHE WAS.

25    Q.   AND I THINK YOU TESTIFIED ON DIRECT THAT SHE HAD A SYSTEM

```
1    CALLED LOG ME IN.  IS THAT RIGHT?

2    A.   YES.  I BELIEVE THAT'S WHAT IT WAS CALLED, LOG ME IN.

3    Q.   AND SHE COULD LITERALLY DIAL IN AND IT WOULD BE AS THOUGH

4    SHE WAS IN THE ROOM --

5    A.   SITTING IN THE ROOM WITH ME, YES, SIR.

6    Q.   ON THE SAME COMPUTER; RIGHT?

7    A.   YES.  I COULD SEE HER MOVEMENT OF --

8    Q.   COULD YOU SEE THE MOUSE --

9    A.   YES.

10   Q.   YOU COULD SEE THE MOUSE MOVING AROUND ON THE SCREEN?

11   A.   YES, THE LITTLE CURSOR, AND I COULD SEE WHAT SHE WAS

12   DOING, YES.

13   Q.   AND SO SHE WOULD BE IN QUICK BOOKS WHEN SHE DID THIS?

14   A.   YES.

15   Q.   AND DID SHE HAVE ACCESS TO OTHER PORTIONS OF THE COMPUTER

16   BESIDES THE QUICK BOOKS, OR DID SHE JUST WORK WITH THE QUICK

17   BOOKS?

18   A.   NO.  SHE HAD ACCESS TO EVERYTHING THAT WAS ON THAT

19   COMPUTER.

20   Q.   EVERYTHING THAT WAS ON THAT COMPUTER?

21   A.   YES.

22   Q.   OKAY.  AND -- BUT AS FAR AS YOU WERE CONCERNED, WHAT SHE

23   WOULD DO IS SHE WOULD DIAL IN AND SHE WOULD GO THROUGH THE

24   BOOKS; RIGHT?

25   A.   YES, SIR.
```

1    Q.   FROM IDAHO?

2    A.   UM-HUM.

3    Q.   AND THEN SHE WOULD FIGURE OUT WHAT CHECKS SHE WANTED TO

4    HAVE YOU PRINT OUT; RIGHT?

5    A.   CORRECT.

6    Q.   HOW WOULD SHE DO THAT?  DO YOU KNOW?

7    A.   YES.  SHE WOULD PUT THEM IN WHAT SHE CALLED A QUEUE, "I'VE

8    QUEUED CHECKS TO BE PRINTED, LINDA," AND THEN I WOULD PRINT

9    THEM FROM, FROM THAT PRINT QUEUE WHERE SHE HAD THEM READY FOR

10   ME.

11   Q.   I GUESS THAT WASN'T A VERY GOOD QUESTION.

12        DO YOU KNOW ANYTHING ABOUT HER DECISION MAKING PROCESS IN

13   DECIDING WHICH CHECKS WOULD GET PRINTED?

14   A.   NO.

15   Q.   OKAY.  IN OTHER WORDS, SHE DIDN'T TELL YOU WHY A SPECIFIC

16   CHECK WAS GOING TO BE PRINTED AND NOT ANOTHER ONE?

17   A.   NO.

18   Q.   DID YOU EVER ASK HER WHY WAS THIS CHECK BEING PRINTED AND

19   NOT SOME OTHER CHECK THAT PERHAPS YOU MIGHT HAVE NOTICED?

20   A.   NO.

21   Q.   OKAY.  AND YOU BASICALLY DID WHAT SHE TOLD YOU TO?

22   A.   MOST DAYS, YES.

23   Q.   OKAY.

24   A.   ESPECIALLY IN THE BEGINNING, YES.

25   Q.   ESPECIALLY IN THE BEGINNING?

```
1    A.    YES.

2    Q.    OKAY.  SO YOU BEGAN TO GO WORK FOR BARBRA, AND BARBRA AT

3    THAT TIME HAD A COMPANY CALLED GCF; IS THAT RIGHT?

4    A.    GCF INVESTMENT.

5    Q.    AND THAT WAS HER PERSONAL MORTGAGE COMPANY THAT SHE'D HAD

6    FOR A LOT OF YEARS; RIGHT?

7    A.    I BELIEVE SO, YES.

8    Q.    OKAY.  AND THAT DID REGULAR MORTGAGES, NO HARD MONEY

9    LOANS?

10   A.    THE GCF INVESTMENT WAS FOR HARD MONEY LOANS, AND THEN GOLD

11   COAST FINANCIAL WAS -- SHE WAS THE BROKER FOR THE CONVENTIONAL

12   LOANS.

13   Q.    CONVENTIONAL LOANS?

14   A.    YES.

15   Q.    SO DO YOU KNOW WHICH ONE WAS FIRST?

16   A.    NO.  I WANT TO SAY IT WAS GOLD COAST FINANCIAL, BUT I'M

17   NOT --

18   Q.    BUT YOU --

19   A.    -- POSITIVE WHICH ONE WAS FIRST.

20   Q.    I'M SORRY.  I'LL TRY TO STOP TALKING WHEN YOU'RE ANSWERING

21   A QUESTION.  I APOLOGIZE.

22        AND THEN -- SO THERE'S THE MORTGAGE COMPANY AND THEN THERE

23   WAS GOLD COAST INVESTMENTS; RIGHT?

24   A.    GOLD COAST FINANCIAL WAS THE MORTGAGE COMPANY.

25   Q.    OKAY.
```

1    A.   GCF INVESTMENT WAS FOR HARD MONEY LENDING.

2    Q.   HARD MONEY LENDING.  AND WAS BETH PINA ASSOCIATED WITH GCF

3    INVESTMENT?

4    A.   I DON'T KNOW.

5    Q.   OKAY.  AT SOME POINT A&P PROPERTIES WAS RUNNING.  WAS THAT

6    RUNNING AT THE TIME YOU STARTED IN MAY OF 2006?

7    A.   I BELIEVE IT WAS, YES.

8    Q.   AND DID YOU HAVE INTERACTION WITH THAT, THAT ENTITY AS

9    WELL AS WITH THE --

10   A.   AS TIME WENT ON, YES, I DID.

11   Q.   OKAY.  SO IS IT FAIR TO SAY THAT INITIALLY YOU DIDN'T HAVE

12   A LOT OF ACCESS AND YOU GAINED MORE AND MORE AS TIME WENT ON?

13   A.   AS TIME WENT ON, YES.

14   Q.   DID BARBRA AND BETH HAVE A COMPANY CALLED REAL PROPERTIES

15   AS WELL?

16   A.   YES.

17   Q.   WHAT WAS REAL PROPERTIES?  WHAT DID THAT DO?

18   A.   THAT WAS PROPERTIES THAT WERE -- WELL, REAL PROPERTIES, I

19   BELIEVE THAT SHE HAD OTHER PARTNERS FOR, FOR THAT, FOR REAL

20   PROPERTIES.

21   Q.   ISN'T IT A FACT THAT REAL PROPERTIES WAS PROPERTIES THAT

22   BARBRA AND BETH OWNED TOGETHER IN OTHER STATES?

23   A.   THAT WAS A&P PROPERTIES.

24   Q.   THAT WAS A&P PROPERTIES?

25   A.   I THINK SO, YES.

CAGLE CROSS

1    Q.   OKAY.  WAS THERE A COMPANY THAT, THAT BARBRA HAD WITH SOME

2    GENTLEMEN THAT OWNED PROPERTIES IN MARYSVILLE, IN CALIFORNIA?

3    A.   YES.  I BELIEVE THAT WAS REAL PROPERTIES.

4    Q.   OKAY.  DO YOU KNOW WHAT PROPERTIES THOSE WERE?

5    A.   IN MARYSVILLE, CALIFORNIA?

6    Q.   YES.

7    A.   WE REFERRED TO THEM AS HOUSTON STREET AND DEATON STREET.

8    Q.   AND WHAT WERE THOSE?

9    A.   THEY WERE RENTAL PROPERTIES IN THE MARYSVILLE AREA, I

10   BELIEVE.

11   Q.   SINGLE FAMILY HOUSES, APARTMENTS?

12   A.   I BELIEVE SO, SINGLE FAMILY HOMES, YES.

13   Q.   ALL RIGHT.  DID YOU EVER DEAL WITH THE FINANCES FOR THOSE

14   PROPERTIES?

15   A.   JUST IN PAYING FOR WATER, ELECTRICITY WHEN THE HOMES WERE

16   EMPTY, MAKING CHECKS TO THE INDIVIDUAL WHO WOULD GO IN AND

17   OVERSEE THE PROPERTIES WHEN THEY WERE VACANT OR BRINGING

18   RENTERS INTO THE PROPERTIES.

19   Q.   AND YOU SAID IT WAS A COUPLE OF OTHER PEOPLE.  DO YOU KNOW

20   THE NAMES OF THOSE OTHER PEOPLE?

21   A.   DUSTIN COOK AND ANTHONY COSTANZA.

22   Q.   SO WAS IT YOUR UNDERSTANDING THAT DUSTIN COOK AND

23   ANTHONY COSTANZA OWNED THE MARYSVILLE PROPERTIES WITH BARBRA,

24   OR HAD SOME OWNERSHIP CAPACITY WITH HER?

25   A.   YES.

1   Q.   DO YOU KNOW WHEN THOSE HOUSES WERE PURCHASED?

2   A.   NO.

3   Q.   BUT THEY HAD BEEN PURCHASED BY THE TIME YOU BEGAN WORKING;

4   IS THAT RIGHT?

5   A.   YES.

6   Q.   AT SOME POINT -- YOU STARTED AS A PART-TIME EMPLOYEE, BUT

7   AT SOME TIME YOU BECAME A FULL-TIME EMPLOYEE; IS THAT CORRECT?

8   A.   IN NOVEMBER OF 2006 I BECAME FULL TIME.

9   Q.   AND AT THAT POINT A&P PROPERTIES WAS RUNNING; RIGHT?

10  A.   YES.

11  Q.   GCF INVESTMENT WAS RUNNING?

12  A.   YES.

13  Q.   GOLD COAST FINANCIAL, THE MORTGAGE COMPANY WAS STILL

14  THERE; RIGHT?

15  A.   YES.

16  Q.   WAS THERE ANY OTHER PROPERTIES BESIDES -- THAT WERE PART

17  OF THIS BUSINESS ENTITY AT THAT MOMENT?

18  A.   MONEY DOTS.

19  Q.   MONEY DOTS?

20  A.   THAT WAS ALSO PART OF THAT.

21  Q.   AND WE TALKED ABOUT THIS A LITTLE BIT EARLIER, BUT LET'S

22  GO BACK TO IT.

23       YOUR FIRST INVESTMENT WAS WHEN?

24  A.   IT WOULD HAVE BEEN IN, I BELIEVE, JANUARY OF 2007.

25  Q.   OKAY.  SO ABOUT SIX MONTHS AFTER YOU STARTED WORKING?

CAGLE CROSS

1    A.   YES.

2    Q.   AND AT THAT TIME HAD YOU BEEN WRITING THE MONEY DOTS

3    CHECKS, OR AT LEAST PRINTING THEM OUT, NOT WRITING THEM?

4    A.   PRINTING THEM OUT, YES.

5    Q.   ALL RIGHT.  NOW, YOUR UNDERSTANDING -- WELL, AT SOME POINT

6    THIS MORPHED INTO APS; RIGHT?

7    A.   YES.

8    Q.   DO YOU KNOW WHEN THAT WAS?

9    A.   I BELIEVE THAT WOULD HAVE BEEN IN 2008, SOMEWHERE AROUND

10   THERE.

11   Q.   SOMEWHERE AROUND 2008 IS YOUR BEST RECOLLECTION?

12   A.   I THINK SO, YES.

13   Q.   OKAY.  AND MR. SWANSON WAS A PARTNER AT THAT POINT IN

14   TIME; RIGHT?

15   A.   YES.

16   Q.   DID YOU MEET MR. SWANSON?

17   A.   YES.

18   Q.   HOW OFTEN?

19   A.   I THINK I FIRST MET MR. SWANSON AT A BIRTHDAY FOR

20   BARBRA ALEXANDER.  LATER IN 2009, I WOULD SEE HIM PERIODICALLY

21   COME INTO THE OFFICE, BUT NOT THAT OFTEN.

22   Q.   DO YOU REMEMBER WHEN YOU FIRST MET HIM?

23   A.   NO.

24   Q.   WAS IT WHEN YOU WERE WORKING FULL TIME?

25   A.   YES, AFTER FULL TIME EMPLOYMENT.

700

CAGLE CROSS

```
1    Q.   SO AS -- SOMETIME AFTER MAY OF 2006?

2    A.   I WOULD SAY PROBABLY IN 2007, AROUND JUNE OR JULY.  I

3    FORGET WHEN BARBRA -- I THINK HER BIRTHDAY WAS IN JULY.

4    Q.   WHAT WAS YOUR UNDERSTANDING OF WHAT MR. SWANSON DID AT THE

5    COMPANY?

6    A.   HE WOULD BRING INVESTORS INTO THE COMPANIES.

7    Q.   PEOPLE WOULD -- HE WOULD BRING IN MONEY BASICALLY?

8    A.   YES.

9    Q.   SIGN PEOPLE UP?

10   A.   YES.

11   Q.   SO I THINK THAT YOU TESTIFIED INITIALLY YOU INVESTED

12   $20,000 IN THE COMPANY.  CORRECT?

13   A.   YES.

14   Q.   AND THEN AT SOME POINT YOU ASKED FOR SOME OF YOUR MONEY

15   BACK; IS THAT RIGHT?

16   A.   YES, I DID.  I -- WE ASKED FOR THE WHOLE 20,000 BACK.  I

17   HAD A FAMILY MEMBER THAT WAS NEEDING TO HAVE FINANCIAL SUPPORT

18   AND SO I WAS HELPING THAT INDIVIDUAL.

19   Q.   SURE.  AND WHEN WAS THAT?

20   A.   I DON'T REMEMBER THE EXACT DATE.

21   Q.   APPROXIMATELY.

22   A.   TOWARDS THE END OF 2007.

23   Q.   ALL RIGHT.  AND THAT MONEY WAS RETURNED TO YOU; CORRECT?

24   A.   15,000 OF IT WAS RETURNED TO ME.

25   Q.   JUST 15,000?
```

CAGLE CROSS

```
1    A.   AT THAT TIME, YES.

2    Q.   AND THEN AT SOME POINT YOU WERE PAID BACK BY YOUR FAMILY

3    MEMBER AND YOU REINVESTED THAT MONEY; RIGHT?

4    A.   YES, I DID.

5    Q.   AND DO YOU KNOW ABOUT WHEN YOU REINVESTED THAT MONEY?

6    A.   NO, I DON'T REMEMBER THAT.

7    Q.   ABOUT HOW MANY MONTHS LATER DO YOU THINK?  AND, AGAIN,

8    JUST BEST RECOLLECTION.

9    A.   SIX MONTHS.

10   Q.   ALL RIGHT.

11   A.   I THINK.

12   Q.   I'M SORRY.  THERE'S A LOT OF PAPER IN THIS CASE.

13   A.   UM-HUM.

14   Q.   I THINK YOU SAID THIS ON DIRECT, BUT IF NOT, I'LL ASK.

15   DID YOU -- HOW WOULD YOU DESCRIBE -- DID YOU GET ALONG WELL

16   WITH BARBRA ALEXANDER?

17   A.    IN THE BEGINNING I THINK WE DID.

18   Q.   AND LATER THAT BEGAN TO CHANGE?

19   A.   AS I STARTED ASKING QUESTIONS ABOUT THINGS, IT CHANGED,

20   YES.

21   Q.   THE EXPENSES AND THOSE SORTS OF THINGS?

22   A.   YES.

23   Q.   AND EVENTUALLY SOMEBODY NAMED JACKIE LAMBERT WAS BROUGHT

24   IN; IS THAT RIGHT?

25   A.   YES.  I BELIEVE THAT WAS IN MARCH OF 2008 WHEN JACKIE WAS
```

1    ADDED TO THE OFFICE.

2    Q.    AND WHO WAS JACKIE?

3    A.    THAT WAS SOMEONE THAT BARBRA KNEW PREVIOUSLY.

4    Q.    SO BARBRA HAD A PREVIOUS RELATIONSHIP WITH JACKIE?

5    A.    YES.

6    Q.    AND SHE WORKED WITH JACKIE BEFORE?  DO YOU KNOW?

7    A.    I THINK SHE DID.

8    Q.    DO YOU KNOW IN WHAT CAPACITY?

9    A.    NO.

10   Q.    IN ANY EVENT, DID YOUR JOB DUTIES CHANGE AFTER JACKIE WAS

11   BROUGHT IN IN 2008?

12   A.    YES, THEY DID.

13   Q.    AND, AGAIN, IT WAS YOUR PERCEPTION THAT MS. LAMBERT WAS

14   HIRED BECAUSE YOU WERE ASKING SOME DIFFICULT QUESTIONS?  FAIR

15   TO SAY?

16   A.    OH, I DON'T KNOW IF IT WAS JUST BECAUSE OF THAT.  I THINK

17   THEY WERE -- SHE WAS NEEDING SOMEONE TO ASSIST HER WITH OTHER

18   AREAS OF THE COMPANY, AND THEN I STARTED ASKING QUESTIONS AND

19   THEN THOSE DUTIES WOULD BE MOVED OVER TO JACKIE LAMBERT.

20   Q.    WHAT WERE YOUR DUTIES AFTER JACKIE LAMBERT BEGAN TO WORK

21   FOR THE COMPANY?

22   A.    IT WAS MOSTLY JUST THE PAYABLES, PAYING THE BILLS.  I WAS

23   NO LONGER INVOLVED WITH INVESTOR MONIES.  I DIDN'T MAKE -- SEE

24   THOSE CHECKS, MAKE THOSE DEPOSITS.

25         I THINK JACKIE ALSO WORKED WITH THE PROPERTIES THAT WERE

1          BEING REHABBED IN OHIO.  I BELIEVE THAT SHE WAS A PART OF THAT.

2             I THINK SHE ASSISTED BARBRA WITH THE MONEY DOTS PROGRAM AS

3     WELL.

4     Q.   ALL RIGHT.  WELL, LET'S UNPACK THAT JUST A LITTLE BIT.

5             YOU MENTIONED THERE WERE SOME PROPERTIES THAT WERE BEING

6     REHABBED IN OHIO.  THOSE WERE PROPERTIES THAT WERE PURCHASED BY

7     THE COMPANY TO BE SORT OF FIXED UP AND RESOLD ON THE MARKET?

8     A.   YES, SIR.

9     Q.   AND HOW MANY OF THOSE PROPERTIES WERE THERE?

10    A.   THREE OR FOUR I BELIEVE.

11    Q.   DO YOU KNOW WHEN THOSE WERE PURCHASED?

12    A.   2008?  I'M GUESSING HERE.  I DON'T RECALL THE EXACT --

13    Q.   WE DON'T WANT YOU TO GUESS, BUT APPROXIMATELY IN 2008?

14    A.   I WOULD SAY IN 2008.

15    Q.   DID YOU SEE BOOKS, PAYMENTS RELATING TO THOSE PROPERTIES

16    COME THROUGH YOUR SYSTEM?

17    A.   YES, THROUGH A&P PROPERTIES I BELIEVE IN THE BEGINNING.

18    Q.   WERE THE PROPERTIES PURCHASED BY A&P PROPERTIES?

19    A.   I THINK SO.

20    Q.   SO YOUR UNDERSTANDING WAS THAT -- FIRST OF ALL, WHO ELSE

21    WAS INVOLVED IN THOSE TRANSACTIONS WITH THE A&P PROPERTIES IN

22    OHIO?

23    A.   WELL, I THINK IT WAS BARBRA AND BETH.

24    Q.   ANYBODY ELSE?

25    A.   AT -- I THINK MICHAEL WAS INVOLVED AT A CERTAIN POINT, BUT

```
 1            I DON'T KNOW TO WHAT DEGREE.

 2      Q.    WAS THERE SOMEBODY BACK IN OHIO WHO WAS INVOLVED IN THAT

 3      PROJECT?

 4      A.    I THINK THAT TIM CHOKA WAS DOING THE CONSTRUCTION WORK ON

 5      THOSE PROPERTIES AT THAT TIME.

 6      Q.    WAS THERE A REALTOR INVOLVED IN THOSE PROPERTIES?

 7      A.    THAT WOULD HAVE BEEN AGGIE FLORY, I BELIEVE.

 8      Q.    AGGIE --

 9      A.    AGNES FLORY.

10      Q.    AGGIE WAS A REALTOR IN OHIO AS FAR AS YOU KNEW?

11      A.    NO.  I THINK SHE WAS IN THE CONVENTIONAL LOANS.

12      Q.    OKAY.

13      A.    I DON'T THINK SHE WAS A REALTOR.

14      Q.    ALL RIGHT.  SO MY QUESTION WAS, WAS THERE A REALTOR

15      INVOLVED IN THOSE PROPERTIES AND TRANSACTIONS?

16      A.    I DON'T REMEMBER --

17      Q.    YOU DON'T KNOW?

18      A.    -- HIS NAME, NO.

19      Q.    BUT THERE WAS SOMEBODY AS FAR AS YOU CAN TELL, YOU JUST

20      DON'T REMEMBER HIS NAME?

21      A.    YES, SIR.

22      Q.    OKAY.  SO AS YOU UNDERSTOOD IT, THESE HOMES WERE PURCHASED

23      AND THEY WERE GOING TO BE FIXED UP AND SOLD; RIGHT?

24      A.    THAT WAS MY UNDERSTANDING.

25      Q.    AND THEY WERE PURCHASED BY A&P PROPERTIES; RIGHT?
```

CAGLE CROSS

```
1     A.   YES.

2     Q.   AND THEY WERE PURCHASED USING WHAT FUNDS?

3     A.   FUNDS FROM INVESTORS.

4     Q.   FUNDS FROM INVESTORS.  WERE -- AND DID YOU KNOW IF THESE

5     WERE RECORDED DEEDS OF TRUST ON THE PROPERTIES OUT IN OHIO?

6     A.   I DO NOT KNOW THAT.

7     Q.   YOU DON'T KNOW THE CONDITION OF THOSE PROPERTIES?

8     A.   NO.

9     Q.   DO YOU KNOW -- WELL, LET ME ASK YOU THIS:  WAS TIM CHOKA

10    A -- IN THE CONSTRUCTION BUSINESS?

11    A.   I BELIEVE HE WAS, YES.

12    Q.   SO HE WAS THE PERSON WHO WAS GOING TO BE FIXING UP THOSE

13    HOUSES FOR RESALE?

14    A.   I BELIEVE SO, YES.

15    Q.   AND THEN THERE WAS A REALTOR WHO WAS HELPING TO PICK OUT

16    THE HOUSES TO PURCHASE AND TURN OVER?

17    A.   THE NAME THAT I RECALL, I THINK, WAS A TONY PRATER.

18    Q.   TONY PRATER?

19    A.   UM-HUM.  I THINK IT WAS REMAX.

20    Q.   AND MS. FLORY'S JOB WAS TO SECURE THE FINANCING WHEN THEY

21    WERE FIXED; IS THAT RIGHT?  DO YOU KNOW?

22    A.   I -- NO, NO.  I DON'T KNOW.

23    Q.   YOU DID KNOW THAT AGGIE FLORY WAS A PERSON WHO WAS

24    INVOLVED IN THE FINANCIAL WORLD?

25    A.   YES.
```

1   Q.   SHE LATER CAME OUT TO WORK FOR A&P; RIGHT?

2   A.   YES.

3   Q.   SHE WAS BROUGHT IN TO MANAGE WHAT HAD BEEN THE

4   CONVENTIONAL MORTGAGE BUSINESS THAT YOU INITIALLY BEGAN WORKING

5   FOR; RIGHT?

6   A.   IT WAS DIFFERENT.  GOLD COAST FINANCIAL LTD THEY PUT ON

7   THE END OF IT.

8   Q.   BUT ESSENTIALLY IT WAS GOING TO BE A CONVENTIONAL

9   LENDING --

10   A.   YES, SIR.

11   Q.   -- BUSINESS?  ALL RIGHT.

12       SO DO YOU KNOW WHAT HAPPENED WITH THOSE HOUSES OUT IN

13   OHIO?

14   A.   NO.

15   Q.   YOU DON'T KNOW IF THEY GOT FORECLOSED ON OR --

16   A.   NO.

17   Q.   YOU DON'T KNOW IF THEY WERE SOLD?

18   A.   NO.

19   Q.   NOTHING IN YOUR BOOKKEEPING WOULD REFLECT WHAT -- THE FATE

20   OF THOSE PROPERTIES?

21   A.   NO.

22   Q.   OKAY.  YOU MENTIONED THAT MS. FLORY CAME OUT TO CALIFORNIA

23   TO WORK AT APS.  CORRECT?

24   A.   FOR GOLD COAST FINANCIAL.

25   Q.   FOR GOLD COAST FINANCIAL?

1    A.   YES.

2    Q.   WHAT WAS THE RELATIONSHIP BETWEEN APS AND GOLD COAST

3    FINANCIAL, LTD?

4    A.   THEY WERE OWNED BY THE SAME PEOPLE.

5    Q.   OKAY.  WASN'T IT THE CASE THAT MS. FLORY WAS GOING TO TAKE

6    OVER AND PURCHASE GOLD COAST FINANCIAL, LTD AS HER BUSINESS?

7    A.   SHE WAS GOING TO BE PRESIDENT OF THAT COMPANY.  THAT WAS

8    MY UNDERSTANDING.

9    Q.   DID YOU UNDERSTAND THAT MS. FLORY WAS LICENSED TO DO LOANS

10   IN ALL 50 STATES?

11   A.   THAT THE COMPANY THAT SHE WORKED FOR WAS LICENSED TO DO

12   LOANS IN 50 STATES.

13   Q.   IS THAT CORRECT?

14   A.   I BELIEVE SO.  I BELIEVED IT.

15   Q.   THAT'S WHAT YOU UNDERSTOOD?

16   A.   YES.

17        MR. LEEMING:  OKAY.  YOUR HONOR, IT'S CLOSE --

18        THE COURT:  IT'S 4:29.  LET'S GO AHEAD AND TAKE OUR

19   BREAK FOR THE WEEKEND.

20        THANK YOU VERY MUCH FOR YOUR PATIENCE AND YOUR SERVICE.

21   PLEASE DON'T DISCUSS OR RESEARCH THE CASE.

22        WE WILL SEE YOU MONDAY AT 9:00 O'CLOCK.  AND NEXT WEEK

23   IT'S THE SAME SCHEDULE, MONDAY AT 9:00, TUESDAY AT 9:00, NO

24   TRIAL WEDNESDAY AND THURSDAY, BUT THEN TRIAL AGAIN FRIDAY AT

25   9:00.

1          THANK YOU VERY MUCH FOR YOUR PATIENCE AND YOUR SERVICE.

2     IF YOU WOULD PLEASE LEAVE YOUR NOTEBOOKS AND YOUR INSTRUCTIONS

3     IN THE JURY ROOM.

4          THANK YOU.

5          AND YOU MAY STEP DOWN.

6          THE WITNESS:  THANK YOU.

7          (JURY OUT AT 4:30 P.M.)

8          THE COURT:  THE RECORD SHOULD REFLECT THE JURORS HAVE

9     LEFT THE COURTROOM.

10         IS THERE ANYTHING WE NEED TO DISCUSS OR SHOULD WE JUST GO

11    AHEAD AND ADJOURN FOR THE DAY?

12         MR. SCHENK:  WE WERE JUST GOING TO SHARE OUR

13    WITNESSES WITH THE COURT NEXT WEEK IF THE COURT WOULD LIKE.

14         THE COURT:  OH, OKAY.  LET'S JUST WAIT ONE SECOND.

15         (PAUSE IN PROCEEDINGS.)

16         THE COURT:  THE CAGLES HAVE LEFT THE COURTROOM AND

17    NOW NO WITNESSES ARE PRESENT.

18         ALL RIGHT.  WHO ARE THE NEXT WITNESSES?

19         MR. SCHENK:  THE NEXT WITNESS WILL BE BETH PINA.

20         THE COURT:  OKAY.

21         MR. SCHENK:  WE EXPECT SHE WILL TAKE MONDAY.

22         THE COURT:  AT LEAST?

23         MR. SCHENK:  YES.

24         THE COURT:  OKAY.

25         MR. SCHENK:  TUESDAY IS WALLACE GROVES.  WE

```
 1    ANTICIPATE THAT HE WILL TESTIFY, BUT HE'S FLYING INTO TOWN, SO

 2    SOME OF THAT MAY ACTUALLY DEPEND ON OUR PROGRESS WITH MS. PINA,

 3    BECAUSE IF HE DOESN'T FINISH TUESDAY, HE WOULD HAVE TO STAY

 4    HERE UNTIL FRIDAY.

 5        IF WE WERE ABLE TO MAKE THE JUDGMENT ON MONDAY THAT HE

 6    WOULDN'T FINISH HIS TESTIMONY TUESDAY, BECAUSE THERE WAS A LOT

 7    LEFT FOR MS. PINA, WE MIGHT DELAY HIM UNTIL FRIDAY.

 8            THE COURT:  OKAY.

 9            MR. SCHENK:  AND WE ALSO HAVE SEVERAL VICTIM

10    INVESTORS LEFT, MICHELLE BARTH, BARBARA DIEDWARDO,

11    KEVIN MACQUARRIE, AND WE'RE WORKING WITH THEM ON THEIR

12    SCHEDULES AND THEIR AVAILABILITIES AND WE FIGURE WE'LL PLUG

13    THEM IN AS -- AROUND MS. PINA AND MR. GROVES.

14        WE STILL, OBVIOUSLY, HAVE SEVERAL OTHER WITNESSES LEFT,

15    BUT THAT SHOULD REALLY TAKE MUCH OF MONDAY AND TUESDAY OF NEXT

16    WEEK.

17            THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  WHAT ABOUT

18    MR. HAWKINS?  HE WAS ON THE LIST FOR TUESDAY.

19            MR. KALEBA:  WE THINK FRIDAY, YOUR HONOR.

20            THE COURT:  OKAY.  ALL RIGHT.  ANYTHING ELSE?

21            MR. SCHENK:  NO.

22            MR. LEEMING:  NO.

23            THE COURT:  ALL RIGHT.  THANK YOU ALL.  HAVE A GOOD

24    WEEKEND.  WE'LL SEE YOU MONDAY AT 9:00.

25        (THE EVENING RECESS WAS TAKEN AT 4:32 P.M.)
```

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
17    CERTIFICATE NUMBER 9595

18         DATED:  SEPTEMBER 28, 2014

19

20

21

22

23

24

25